IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS

Armando Amaya )
       Prisoner )
# K-75877 )
TAMMS C-MAX C.C. )
      Vs. )
)
KEN BARTLY, Warden )
    and )
The Attorney General of The )
STATE OF ILLINOIS )
      Respondents. )

07-730-MJR

DOCKET NO.

FILED
OCT 18 2007
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

## MEMORADUM AT LAW

Now comes Armando Amaya, in support of the attached pettion under 28 U.S.C. Section 2254 for a writ of habeas corpus by a person I the state custody. and hereby state the following:

## POINT OF AUTHORITIES

THE APPEllATE COURT ERRED IN RULLING THAT MR. KlIMENT MADE A GOOD FAITH DETERMINATION THAT DEFENDANT'S ALIBI WITNESSES WOULD OFFERED PERJURY TESTIMONY, WHERE THE RECORD SHOWS, THAT MR. KlIMENT DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNRESONABIE AND PREJUDICIAl.

                                                Pgs.

People v. Amaya; 321 Ill. App. 3d 923, 748 N.E. 2d
         1251. (2ND Dist. 2001)............... 3-14-16

Strickland v. Washington; 466. U.S. 668, 104 S.Ct. 2052
                   80, LEd 2d 674 (7th Cir. 1984)... 5-7-18

CRIP v. Duckworth; 743 F.2d 580, 583 (7th Cir 1984).... 7-13

1

Pgs.

People v. Albanese; 104 Ill. 2d. 504, 473 N.E. 2d 1246 (1984) .... 8

People v. Truly; 230, Ill. App. 3d 1948, 595, N.E. 2d 1230 (1st Dist. 1992) ........ 8

People v. West; 187 Ill 2d. 418, 719 N.E. 2d 644 (1999) ....... 8

People v. Ramey; 152 Ill 2d 41, 604 N.E. 2d 275 (1992) ........ 8

People v. York; 312 Ill. App. 3d, 434, 727 N.E. 2d 674 (2nd Dist. 2000) ........ 8

Cave v. Singletary; 971 F. 2d 1513 (11th Cir. 1992) ........ 8

Horton v. Zant; 941 F. 2d 1449 (11th Cir. 1991) ........ 8

People v. Simac; 161 Ill 2d. 297, 641 N.E. 2d 416 (1994) ........ 13

Smotherman v. Beto; 276 F. Supp 579, 588. (N.D. Tex 1967) ..... 13

People v. King; 316 Ill. 3d. 901, 738 N.E 556 (1st Dist. 2000) ... 13-14

People v. Tripet; 108 Ill 2d. 463, 485 N.E. 2d. 9 (1985) ...... 15

People v. Williams 173 Ill. 2d. 48, 670, N.E. 2d 638 (1996) ...... 15

## STATEMENT OF FACTS

I, Defendent, Armando Amaya, was found guilty of First degree murder, attempted Murder, aggravated battery with a firearm and aggravated Discharge of a firearm. The aggravated battery conviction merged with the attempted murder convictions. The trial court sentenced me to 40 years imprisonment for the first-degree murder conviction, 10 and 12 years' imprisonment for the two convictions of attempted murder, and 9 years' imprisonment for the aggravated discharge of a firearm conviction. The trial court order that the sentences be be served consecutively for a total of 62 years. The Appellate affirmed the defendant's convictions and sentences on direct reviewd in People v. Amaya 321 Ill. App. 3d 923 (2001). However, the Appellate Court vacated the imposition of Consecutive sentences. Amaya; 321 Ill. App. 3d at 933.

At trial, Public defender, David P. Kliment, represented defendant. Kliment did not call any of the alibi witness to testify at trial although Kliment had asserted an alibi defense in his discovery answer.

However, in another trial, (97-CF-2326), regarding another shooting that occurred late the same night as the instan shooting, defendant presented four alibi witnesses, Sonia Delatorre and her sister, Elizabeth Delatorre, George Gamboa, and Ramiro Sandoval. This trial ended in a hung jury.

Kathleen Colton file a post-conviction petition for defendant in this case. The petition alleged that Kliment was ineffective because the four alibi witnesses had given alibi testimony in case No. 97 CF 2326 and that Kliment should have had them testify in the instant case as well. The petition was supported by the affidavit of Ramiro Sandoval and a private investigator who stated that Gamboa and Sandoval, both would testify on defendant's behalf. Colton then file a 651 (c) Certificate. 134 Ill 2d R 651 (c). The trial court denied the State's motion to dismiss the Petition.

At the hearing on defendant's Post-conviction petition, defendant testified that his alibi cover the time for both shootings; that he had been at the Delatorre house when both shootings occurred. Defendant repetedly told Kliment about the alibi and Kliment kept saying he was looking into it. Kliment never told defendant that he spoke with the alibi defense witnesses. Defendant spoke with the alibi witnesses except for Emma Delatorre, and they said they would testify for him at trial, but they were not contacted by Kliment. Elizabeth Delatorre was living in Arizona at the time of the hearing. Defendant denied telling Kliment that he had been at the shooting in the instant case.

3

The following documents were admitted into evidence during the defendant's testimony; transcripts of the tape statement given by the defendant and Sonia Delatorre to the Police on October 30, 1997; and a transcript of the December 11, 1997 bound reduction hearing in the other shooting where in the Delatorre Sisters stated that the defendant was at their house on the time of the shooting.

Private investigator, Arnoldo Castillo testified consistently with his affidavit filed in support of the post-conviction; additionally Castillo that he work for the Public Defenders Offices for the year of 1998 into 1999 and that he was a privy for all the murder investigation being conducted during 1998 into 1999. Castillo also testified that to his knowledge there was no investigation done in the witnesses of, Armando Amaya, case prosecuted by the State under 98-CF-535 done specifically by him. Sandoval testified, through Kara an interpreter, that nobody from the Kane County Defender's Office had contacted him prior to trial but he was at the Court house during the trial. Sandoval testified that he was with the defendant at the time the shooting occurred, that he and the defendant were at the Delatorres house at the time of both shootings.

Defense Counsel, David P. Kliment, testified that he reviewed the Police report and witness statement including tape statements given by Sonia Delatorre, he also reviewed the transcripts from the testimony given in the other case by, Gamboa, Sandoval and the Delatorre Sisters. He did not know if he was aware of the bond reduction held in 97CF2326 he stated "I don't recall being aware". (R1209). When asked whether he knew that the prior case ended in a hung jury Kliment stated, "well, see, now, I would be confuse with my answer. I know now, I don't know if I knew then. I'm sure I did. I know now it was a hung jury. I don't know if I knew that back then. I don't know why I would not have know it." (R1208-09) Kliment also testified that he had investigators interview potential witnesses although he had no written report, Kliment stated that the investigator who participated, did the investigation where listed in the discovery file. (R1214-16) Kliment testified that he never try to subpoena any of the alibi defense or tried to personally talk to them. (R1227) He spoke with defendant about potential alibi witnesses on at leas "a couple of occasions". Kliment filed a supplemental discovery answer asserting an alibi defense and listed potential alibi witnesses. But when he spoke to the defendant later he told defendant that he did not like the alibi defense because "putting on a bad alibi defense is worse then putting no defense at all,

4

# ARGUMENT

THE APPELLATE COURT ERRED IN RULLING THAT MR. KLIMENT MADE A GOOD FAITH DETERMINATION THAT THE DEFENDANT ALIBI WITNESSES WOULD OFFER PERJURY TESTIMONY, WHERE THE RECORD SHOWS THAT MR. KLIMENTS DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNRESONABLE AND PREJUDICIAL.

The Appellate court rule in a unpublished order, "We do not believe the trial court decision to deny defendants post-conviction relief was manifestly erroneus" (Apendix A)

This court should review the judgment of the Appellate court because their opinion faile to consider that Kliment never did an interview or, an investigation of the alibi defense from the start. Kliment testified that investigators have been participating in the investigation in the case, and that they investigators who work for his office, but that he does not know who his investigators interview because there is nothing in his file that indicates who they talk to, That the investigators who did the investigation where listed in the discovery file, That he had no recollection of specifically asking any one of investigators to talk to any one involved in the alibi defense. (R1198, 1216-17).

The irony of it is, That Arnoldo Castillo, was one of the two investigators listed in Mr. Kliments discovery file as a defense witness for 98CF535 (R99) Ironocally, Arnoldo Castillo was the investigator retain for the purpose of locating the alibi witnesses in the post-conviction.

The appellate court faile to consider Castillos' testimony- Castillo testified for the defendant that he was employed as an investigator for the Kane County Public Defenders Office in 1998 for the intire year and also through January '99, That he was one of the Public Defender Office Criminal investigator, That upon an investigation to be initiated from an attorney a written request has to be made out and given to the designated investigator in the office. That he was a privy to all the murder investigations been conducted during 1998 into '99. Castillo ironically testified that to his knowledge there was no investigation into the witnesses of, the defendant, Armando Amaya case prosecuted by the State under 98CF535, done specifically by him (R1243-44)

The Appellate Court faile to consider, that Mr. Kliment was not being honest when he said, "There was investigator participating in the case, and they where listed in the discovery files"... Castillo was listed as one of the witness investigator at that time and he stated to the court,

because it makes you look like you trying to lie if the alibi is going poorly". Kliment told the defendant that "Putting on any defense was a matter of trial Strategy", and that defendant would be "better of" with out the alibi defense. Kliment explained that the alibi witnesses could not account for the entire 90 minute period between the Shooting underlying the Charges in the First Shooting (the Shooting in the instant case) and the Second Shooting. Kliment Stated, "I think they tried to, but when you piece it together, there was gaps and so forth, and I'm trying to remember back a long time, remember, but there was problems with it".

Kliment, also testified that defendant made remarks which made it "Impossible" for him to raise the alibi defense. According to Kliment, defendant said "that the witnesses where there to testified for him, they know what to say, but that he was there at the shooting, he just wasn't involved", upon hearing that Kliment became concerned "That the alibi witnesses would perhaps not testified truthfully". Kliment Stated, that the instant Shooting and the time of the Shooting was the topic of the conversation when defendant made the Statement and that he did not tried to explore the Statement any further. Kliment believed that he was "bare from using" the alibi defense in light of the remark.

After hearing arguments from counsel, the trial court denied defendants post-conviction petition, the trial court rule, inter alia that the decision to forgo the alibi defense was reasonable because of the time gaps, and it would be unethical to pursue the alibi after the defendant allegedly admitted being at the scene. A timely appeal followed.

On appeal, defendant argue that the trial court erred by dismissing his petition because his counsel was ineffective by failing to present alibi witnesses at trial. Defendants claims where that his witnesses help him gain a hung Jury in another trial involving a shooting on the same night as the shooting in this case and failing to call them fell below the Standar establish in Strickland v. Washinton; 466 U.S. 668 104 S.Ct. 2052, 80 L.Ed 2d 674 (1984)

The appellate Court affirmed defendants appeal in finding that, "The finding of the trial court implies that it believe Kliment made a good faith determination that the defendant's alibi witnesses would lie if call to testify, 'Base on the record before us, we cannot say that the trial Court's findings are manisfestly erroneous.

3

That no investigation was done by him. Kliment was not honest, he stated in sum that there was an investigation done by the investigators listed in the discovery file. "Though there may be unusual cases when an attorney can make a rational decision that an investigation is unacessary, as a general rule an attorney must investigate a case in order to provide minimally copeten professional representation", Crip v. Duckworth, 743, F.2d 580, 587 (7th Cirt. 1984)

The appellate court error in not taking into consideration the history record of the case, where Mr. Kliment told the Court, "I have not filed an answer in this case, but there is no affirmative I entend to raise." (R1296-97 also see trial transcripts Nov. 9 1998)

The appellat court fail in not considering the fact that Mr. Kliment in '98 had made up his mind not to put an alibi defense.... Mr. Kliment testified that he never tried to subpoena any of the alibi defense; That he never personally talk to the alibi, never spoke to any of the Delatorres' sisters' or, to Gamboa or, Ramiro Sandoval. (R1227)

The Appellate Court error in quoting Ramiro Sandoval testimony. In there opinion the quoted, "Sandoval acknowledge that he previously testified that he had been with the defendant 'during' the shooting that led to the charges in the other shooting", when in fact Sandoval testimony was, with the defendant at the "time" the shooting occurred, not "during", the shooting like the appellate Court quote it.

Defendant ask this Court to take into consideration, that Mr. Sandoval testified through an interpreter name, Kara. (R1248) That whom at one point didn't understand Mr. Sandoval, Kara said "I'm sorry I don't understand the very last sentence he said", Sandoval at this time was stating that he was not in any shooting, that he and the defendant were just with the girls. (R1253)

Ineffective assistance claims are mesure against the standar set forth in Strickland, which requires the defendant to establish that counsel's performance was both objectively unresonable and prejudicial. 466. U.S 668, 687-94. 104 S.Ct. 2052, 68 L.Ed.2d 674, 693-98 (1984). The resonableness of counsel's performance is determined by "Prevaling prufessinal norms".

Strickland 466, U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed. 2d at 694. Counsel's incompetence is prejudicial where it raise a resonable probability that the result of the proceeding would have been different, i.e., where the deficient performance undermines confidence in the out come. Strickland, 466. U.S. at 694, 104 S.Ct. at 2068, 80. L.Ed 2d at 698. Illinois has adopted the Strickland test.

7

People v. Albanese, 104 Ill. 2d. 504, 473, N.E 2d 1246 (1984) The test set forth in Strickland, requires a review court to undertake a "Fact sensitive analysis", that focus on the specific circumstances of the case being review. People v. Truly, 230, Ill. App. 3d. 948, 952, 595. N.E 2d 1230, 1233 (1st Dist. 1992)

Originaly, Counsels decision regarding which defense to raise and which witness to call are deemed to be matters of trial strategy that are entitled to great deferenece on review. People v. West, 187 Ill. 2d 418, 432-33, 719 N.E. 2d 664, 673 (1999), People v. Ramsey, 152 Ill. 2d. 41, 54, 604 N.E. 2d 275, 281 (1992) People v. York, 312 Ill. App. 3d 434, 437, 727 N.E. 2d 674, 677-78 (2nd Dist. 2000) Nevertheless, the "mere indication of word 'strategy' does not insulate attorney behavior from review", Cave v. Singletary, 971, F 2d 1513, 1518 (11th Cirt. 1992). "Strategy or not" an unsound or, unresonableness of Counsel's decission is a question of Law. West, 187 Ill. 2d at 432-33, 719 N.E. 2d at 673; Cave, 971 F.2d. at 1518; Horton v. Zant, 941 F 2d. 1449, 1462. (11th Cirt. 1991).

* In this case, the post-conviction petition alleged that Kliment knew that the defendant had raised an alibi in 97-CF-2326. That the alibi resulted in a hung jury in 97 CF 2326 (C 320-24) During the evidentiary hearing on the petition, Kliment acknowledge that he was aware of potential alibi testimony in 98 CF 535, that the defendant vigorously urged him to raise it and that he had filed a supplemental discovery answer asserting the alibi defense and listed the alibi witness. Neverthless Kliment ultimetly rejected the alibi defense, despite the defendant's wishes. (e 98; R 1196-98, 1203-16) Kliment offered two reasons for his decision to forgo the alibi, First Kliment explained that he "did 'not' like the [alibi] defense" in this case because in his opinion it would not have been creedible or "effective". (R 1203-05) second, Kliment claimed that the defendant made an admission that made the alibi defense "impossible" (R 1204) According to Kliment the defendant admitted being at the scene of the shooting that related to the charge in 98 CF 535 (R 1204-05)

In denying the petition the trial court found that each of those reasons supported Kliment's decision not to pursue the alibi claim. (R 1311-18) Additionally, the trial court found that the defendant was not prejudiced by the obsence of the alibi evidence, given the finding of the Appellate Court on direct appeal, that there was ample evidence to find the defendant guilty as the principal. (R 1319)

8

for the reasons that follow, the trial court ruling should be reversed.

Contrary to the trial court's conclusion, Kliment did not have any reasonable basis for ignoring his client's desire to assert the alibi defense in 98 CF 535. Although Kliment referred to "gaps" in the alibi testimony, he did not give any specific example. (R1208) He also could not identify the "others" in his office whom he claimed share his low opinion of the alibi. (R1224) In fact, the record shows that the alibi testimony was remarkably consistent on the crucial question of whether the defendant could have been present when the shooting occurred.

According to the record, the shooting that led to the charges in 98 CF 535, had occurred at approximately 8:45 or 9:00 p.m. On October 29, 1997 (R379-414-19, 425-26) In discovery Kliment had received a transcript of a tape statement that Sonia Delatorre had given to the Aurora Police on October 30, 1997 (DEF EX. 2; R1196-97) In that statement Sonia advised the police that the defendant had been at her house during the day on October 29, but that he had left the house at some point and then returned with Gamboa and Sandoval around 6:30 or 7:00 O'clock that evening. Sonia also told the police that the defendant, Gamboa and Sandoval, had left the house shortly after 10:30 p.m. and that her sister Elizabeth and Emma were in the house when the defendant was there (Def EX 2 at 2-3, 8-9, 13-15, 22-23) Sonia related the same information when she testified at the bond reduction hearing in 97 CF 2326 on December 11, 1997. (DEF EX. 3 at 18-25) Elizabeth Delatorre also testified at the bond reduction hearing, and she corroborated Sonia's testimony (DEF EX. 3 at 19-34) At the hearing Sonia and Elizabeth testified that they were not sure if Gamboa and Sandoval had left the house for part of the time between 6:30 and 10:30 p.m., but they knew defendant was there the entire time. (Def EX 3 at 23-24, 28-30)

Kliment did not recall seeing the transcripts of the bond reduction hearing. (R1211) He did However, review the transcripts of the testimony given by the alibi witnesses at the trial in 97 CF 2326. (R1196-98, 1207-09) At the trial Gamboa, testified that although he was not sure exactly how long he, Sandoval and the defendant had been at the Delatorre residence on the night of the shooting, he was sure they had been there since sometime between 8:30 and 9:15 p.m. (SR 44, 51-52) Gamboa was impeached with testimony indicating that he had not mentioned anything about being at the Delatorre residence when he was interviewed by the police less than 12 hours after the shooting. (SR162) In his testimony at the trial in 97 CF 2326, Sandoval said that he, Gamboa and the defendant had been at the Delatorre residence for about

9

three hours prior to leaving at approximately 10:15 p.m. (SR 30-38, 36)

Elizabeth Delatorre testified at the trial in 97CF2326 that the defendant had arrived at her house with Gamboa and Sandoval between 6:30 and 7:00 p.m. on the night of the shooting (SR 70-72) Elizabeth said that Gamboa and Sandoval had "stepped out" at some point, but they later returned and then left with the defendant shortly at about 10:30 p.m. (SR 73-74, 80)

Sonia Delatorre testified at the trial in 97CF2326 that she and Elizabeth had gone to the store with the defendant during the day on October 29, 1997. That he went home later that afternoon but that he came to the Delatorre house with Gamboa and Sandoval around 6:30 or 7:00 p.m. Sonia further testified that Gamboa, Sandoval and the defendant left the house together just before 10:30 p.m. She was sure that the defendant had been at the house during the entire time but, she acknowledge that Gamboa and Sandoval may have been gone for part of the time (SR 91-94)

Emma Delatorre, who was called as a rebuttal witness by the State in 97CF2326 testified that the defendant had been at her house with Gamboa and Sandoval until some time between 10:00 and 10:30 p.m. (SR 142-47) A police officer testified that Emma had made a statement on the day after the shooting which she stated that Gamboa, Sandoval and the defendant had been at her house from about 6:00 p.m. until about 10:30 p.m. (SR 154-56) Emma admitted telling the officer "They" had left the house for about 10-15 minutes at some point before returning, but she testified that "they" referred only to Gamboa and Sandoval not the defendant. (SR 144, 146) According to the police officer Emma was "pretty confused" about how long the individuals had been gone from the residence. (SR 157-58) The officer acknowledged that he did not ask Emma to whom she was referring when she use the term "they" (SR 157).

The defendant testified at the trial 97CF2326 In his testimony, he stated that he had gone shopping with Sonia and Elizabeth on the afternoon of October 29, 1997, that he later went back to his house, and then went over to the Delatorre residence with Gamboa and Sandoval that evening. According to the defendant, I was "getting dark" when Gamboa and Sandoval pick him up to go to the Delatorre house, although he could not say exactly what time they arrived at the house (SR 116-18) the defendant testified that he stay at the house for more then two hours before he left with Gamboa and Sandoval around 10:30 p.m. (SR 120-23) He did not see Gamboa and Sandoval during the entire time (SR 120-134) the

10

defendant acknowledge that he had given a statement to the Police in the early morning hours of October 30, 1997. In which he first said he had arived at the Delatorre residence around 8:00 p.m., but he said he was unsure of the exact arrival time (SR125) the defendant admitted that he had told the police, that Sonia picked him up and brought him to the house around 8:00 p.m., but he testified he "must have gotten it confused because there was a lot of yelling between me and the Officer" (SR136) According to the defendant the police was trying to trick him during the interview. (SR140) In his statement to the police the defendant also mistakely referred to Sandoval as "Rudy" insted of "Ramiro", because Ramiro had a brother name Rudy. (SR137) The defendant did not recall telling the police that Gamboa and Sandoval had picked him up at the Delatorre residence (SR138)

In sum, Kliment knew that the defendant and all the Delatorre Sisters had repeatedly stated, Starting on the day after the shooting that the defendant was at there residence when the shooting occurred. (Def ex. 1-3; SR 70-122, 142-47) Although the defendant's intitial Statement to the Police Conflicted with the testimony at trial in 97CF2326 on one detail whether he was brought to the Delatorre residence by Sonia or by Gamboa and Sandoval his statement is subsuquent testimony were consistent on the key point of when he arrived at the residence, and his anitial misstatement about who had brought him there was understandable, given the antaganistic circumstances of the Police interview, and the fact Sonia had actually picked him up and taken him to the store earlier in the day (Def ex. 1, Def ex. 3; SR91-94, 116-18) Kliment also knew that Sandoval and Gamboa had each given sworn testimony corroborating the Delatorre Sisters (SR-30-52) According to a police officer, Gamboa had not mention the alibi when he was interviwed on the day after the shooting. (SR 162) But even if that provided Kliment with a valid reason for not calling Gamboa to testified in 98CF535, it would hardly justified Kliments' decision not to call the witnesses. Moreover, Kliment knew that the trial in 97CF2326 had resulted in a hung jury despite the "gaps" in the alibi testimony. (R1208-11) Given these facts, Kliment conclusion that the alibi would not been viable was objectively unreasonable.

In Finding that Kliment had acted resonably in the decision to forgo the alibi defense, the trial court relied not only on Klimet's opinion[9] that it "would not have been an effective defense", in 98CF535, but also on his allegation that the defendant had admitted being at the scene of the shooting in that case. which occurred around 8:45 or 9:00 p.m. (R1204-05, 1312-18) Kliment claim however, was wholly uncorroborated and the defendant flatly denied making such, and such admission. (SR 1217, 1270-71) additionally, Kliment acknowledge that he did not

11

ask any followed up questions to explore exactly what the defendant meant when he supposely said that "he had been at the scene. Kliment merely assumed that the defendant meant he had been at the scene of the shooting in 98CF535 "because of the context of the conversation" (R1215-16, R225-26, 1231).

According to Kliment, the context was "The Shooting, the time of the Shooting", not the time of the arrest latter in that evening. (R1226) But the record showed that the defendant had been arrested shortly after and in close proximity to the scene of the Shooting that occurred at about 10:15 p.m., which lead to the charges in 97CF2326 (R97-98; SR97, 32-35) Indeed, Kliment admitted that it was "pretty apparent" that the defendant had been at the "scene or near the scene" of the second Shooting. (R1225-26) Because Kliment himself already alleged he knew that the defendant was at the second Shooting he jump to conclusion that the defendant was admitting that he had also been at the Scene of the first Shooting (R1226) Kliment apperantly never considered the possibility that the defendant was simply reapeating information that Kliment already knew - i.e., that he was arested near the scene of the second Shooting - to emphasize that he was nevertheless not involve in either Shooting, and to explain why Gamboa and Sandoval, and the Delatorre sisters were in a position to provide him with with an alibi for the entire evening. The defendant's alibi related to both Shootings; he was at the Delatorre residence with Gamboa, Sandoval, and the Delatorre Sisters, from ealy part of the evening untill approximately 10:30 p.m. then was stopped by the police moments latter. (Def EX.1-3; SR 30-147) There for when the defendant allegedly told Kliment that the alibi witnesses, "Know what to say", (since defendant also whent to trial with them, he heard them testified in 97CF2326 bond hearing and trial), and that "he was there at the shooting he just wasn't involved". (R1204) The defendant was remaning Kliment of the whole story of what happened that evening and trying to tell Kliment that he had a valid alibi for the entire evening even though he was stopped near the scene of the second Shooting almost immediatly after it happened. Without asking the following question, Kliment could not resonably determine that the alibi was false. Although Kliment certaintly had an ethical duty not to present false evidence he also has a obligation to present his client zealously People v. Simac, 161 Ill. 2d 297, 309, 641, N.E. 2d 416, 422 (1994), and thus to make sufficient inquiries of his client to determain wether the evidence was in fact false. Kliment acknowledge that the defendant was admant

12

about raising the alibi, (R12:13-15) and he never explain "Why the defendant would essentically pull the rug out from under the defense, by telling Kliment it was a lie.

An attorney who fails even to interview a readilly available witness whom noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the Shiel "Trial Strategy and tatics". Crip v. Duckworth; 743 F.2d. 580, 583 (7th cirt 1984) "The lawyer who does not probe, does not inquire and does not seek out all the facts' relevant to his clients case is prepare to do little more then stand still at the time of trial. Smotherman v. Betu; 276 F. supp 579, 586 (N.D. TEX 1967)

Kliments failure to clarify what the defendant meant when he allegedlly said that he was at the scene was objectively unresonable. Kliment knew that the defendant had secure a hung Jury in 97CF2326, where the alibi had been presented, and contrary to Kliment's assertion, the alibi testimony did not contain any temporal "gaps". R1204-11; JR 309-147; Def Ex. 1-3) under the circumstances, a resonable competent attorney would not have rejected a potential meritorious alibi defense without resolving the ambiguity as to what the defendant ment when alleged to have said he was at the scene.

This instant case resembles, People v. King; 316 ILL. App. 3d 901, 738 N.E. 2d 556 (1st Dist. 2000) In King, the reviewing court held that the trial court had manifestly erred by denying a post-conviction petition which alleged that the trial counsel had been ineffective for falling to call alibi witness testimony that would have been "unequivocally exculpatory" and would have "complemented" counsel's trial Strategy of raising doubts about the veracity of the defendant's accuser. 316 ILL. App 3d. at 914-15, 738 N.E.2d at 567. The State argue that the trial counsel might have reasonably concluded that the alibi witness would have not been credible witness, but the reviewing court noted that when counsel testified at the evidentiary hearing on the petition, he said nothing about witness lacking credibility. King, 316, ILL. App. 3d at 916, 738 N.E. 2d at 569. Here, Kliment, likewise opted not to present alibi testimony that would have indisputably exculpated the the defendant and lent weight to Kliment's chosen trial Strategy, which focused on the lack of physical evidence linking the defendant to the shooting and the unreliability of the eye witness testimony. (R 374-77, 796-813) Although Kliment opined that the alibi testimony was weak and possibly false, his opinion was base on the erroneous belief that there were "gaps", in the alibi testimony and on mere

assuption from ambiguous comment by the defendant (R1204-06, 1245-16, 1225-26, 1231) Failing to present a viable alibi defense with out having accuratly understood the statement and prior testimony of the alibi witnesses- and without thorouhly examining the defendant to clarify whether he was at the scene of the shooting- is just as objectively uresonable as not calling an alibi witness without making any determination as to her credibility, as accure in King.

The trial court in this case also manifestly erred by holding that Kliment's Failure to present alibi was not prejudicial. In reaching that conclusion, the trial court cited appellate court's decesion on the direct appeal, (R1319), which found that there was "ample evidence" to find the defendant guilty as the principal. People v. Amaya, 321. Ill. App. 3d. 923, 930. N.E. 2d .1251,1256 (2ND Dist. 2001) the trial court's reliance on the appellate Court's decesion in direct appeal is misplaced because the appellate Court's finding occurred in the context of determing whethere given the jury unworrated accountubility instruction was reversible error. Amaya, 321 ILL. App. 3d. at 929-30, 748 N.E. 2d at 1256. The question here, by contrast, is whether the defendant was prejudice by the absence of evidence indicating that he was not even at the scene of the shooting. Although the evidence presented to the jury may be sufficient to convic the defendant as principal, and thus to dismiss the improper accountability instruction as harmles error, The Appellate court has no occasion in the direct appeal to consider the potential impact of the alibi evidence, which the jury did not hear. A review of the record shows that the evidence against the defendant was far from overwhelming. There was no physical evidence linking the defendant to the shooting. Three of the five witnesses who were present when the shooting occurred never identify the defendant as the shoter. (R413-45, 558-76) One of the surviving victoms, Alonzo Matthews testified that he did not even see the defendant in the court room, even though he had told the police immediatly after the shooting that he would be able to identify the shooter if he saw the shooter again (R437-719-20)

Two witnesses- Shayla Johnson and Nicole "Coco" Pearson did identify the defendant as the shooter. (R453-54, 468, 485-90) But their testimony was undermined by several factors. Both women had pending criminal cases in Kane County, (R447, 479), giving them motive to testify for the State. People v. Triplett, 108, ILL. 2d. 463, 485, N.E. 2d 9 (1985) Pearson also had prior theft convictions (R478-79) further

14

defendant and some other Hispanic male riding in a white car as the women were walking together near the scene just prior to the shooting, but there testimony was inconsistent. Pearson testified that she did not hear any one in the car say anything, while Johnson testified, testified that the men in the car were shouting insults directed towards a rival gang which "controlled" the area. (R448-49, 457-59, 470 467-68, 495-96, 4677-80) Johnson claim that the two men were hanging out of the car, but she does not recall mentioning that fact when she talk to the police about the case prior to the trial (R459-468)

Another witness - TRACY JOHNSON, (no relation to Shayla) - testified that he saw three Hispanic men in a white car near the scene shortly before the shooting, and that two men were making insulting comments and gestures about a rival gang (R580-84, 594) Mr. Johnson did not describe the hight, weight, or age of those men, however, Mr. Johnson claimed that he saw the same three men running from the scene back to the car, right after the shooting (R584-87) According to Mr. Johnson, he later saw the defendant, Sandoval, and Gamboa being stopped by the police, and he told the police at that time he had seen those men running from the scene (R589, 592, 662-64) At trial Mr. Johnson testified that all three men were lying on the ground when he saw them in police custody, but he had given an prior statement indicating that only one of them was on the ground, with the other two being on the squad car. (R589-92, 603-04) Mr. Johnson acknowledge that he did not see the shooting, and he never identified the defendant, either in any subsequent line-up or in open court (R602-636-37) Moreover, Mr. Johnson had been drinking heavily at that time of the incident, By his own admission, Mr. Johnson was a drug addict with several prior felony conviction (R578-79, 595, 601, 605) Finally, Mr. Johnson was a close fried of the deceased victim and referre to the victim as his "cousin" (R580)

The reliability of the eye witnesses testimony is further eroded by the fact that the witnesses gave conflicting description of the shooter. Four of the five witnesses who were present when the shooting occurred describe the shooter as a Hispanic male who had approche from Lincoln Street. (R381-94, 416-18, 428-29, 451-52, 482) Two of those witnesses said that the shooter was in his teens or early twenties, while the other two witnesses did not mention the shooters age. (R416, 425-28, 483) All four witnesses describe the shooter's height, but they variously describe him as anywhere from 5'4" to 5'9" tall. (R418, 428-29, 472, 501) Only two of the witnesses describe the shooter's weight, one saying he weighed between 130-140 pounds, and the other he weighed between 140-145

16

detracting from her credibility. People v. Williams; 173, Ill. 2d. 48, 670 N.E. 2d. 638 (1996)

Neither Johnson or Pearson went to the police to report what they saw, even though they were friends with one of the victims. (R468-503) Almost two months later, after Pearson learned that her friend had die in the shooting, she and Johnson went to the police station, but merely to complain about another matter, not to talk about the case. Johnson and Pearson gave information about this case only because the police relized that they were the "Shayla" and "Coco", who have been named as possible witnesses (R461-63, 488-90, 503-04, 515-16, 521)

When the women finally viewed a line-up, more then three months had passed since the shooting. (R519-2). At the line-up Pearson first said that the defendant was not the shooter because the shooter had been "more slimer" and "skinnier". (R493) Pearson identified the defendant as the shooter only after the police talk to her and ask her leading questions about whether she wanted to identified him as the shooter.(R490-93, 508-10, 522-31, 543-50) Johnson also identified the defendant at the line-up, but she lived with Pearson and admitted she talk to Pearson about the incedent prior to the line-up (R463-64, 471, 506-08, 532-35)

Pearson denied talking to Johnson about the incident before they went to the police or viewed the line-up (R504-06) At the same time, however, Pearson acknowledge that when she first spoke to the police, she indicated that she had learned the defendant's nickname from Johnson, who also told Pearson that she [Johnson] thought the defendant was the shooter. (R486, 516-17) Amaya; 321 Ill App. 3d at 926, 748 N.E. 2d at 1254. Pearson had only seen the defendant once prior to the shooting, but she was not when she saw him, except that it was night. (R486-87) Consequently Pearson identification of the defendant might have been influenced by what Johnson told her. Pearsons opportunity to observe the shooter was also questionable, given that she was involved in the argument and was surrounded by the crowd which had gathered to watch (R497-98)

Johnson claimed to have seen the defendant around the neighborhood five or six times prior to the shooting, but she last saw him about two months before the shooting (R454-56) even if Johnson was familiar with the defendant, that familiarty may have simply predisposed her to identified the defendant when she saw him in the line-up. Johnson admitted she was looking at the gun after the shooting started, that the scene was "not really brightly lit" and that she was "shocked" by the shooting (R460-61, 464-65)

Johnson and Pearson also testified that they saw the

15.

pounds. (R428-29, 472) The arrest warrant issued for the defendant on March 11, 1998, indicate that he was 18 years of age, 5'8" tall and 160 pounds (C22)

The same four witnesses gave remarkedly different description of the shooter's clothing. One witness, Tara Harris, said that the shooter was wearing a black jacket and white "Hoodie", which cover his head (R44-17, S88) A second witness, Alonzo Matthews, testified that the shooter was wearing a black hoodie. (R429) Nicole Pearson testified that the shooter was wearing a black hoodie, but Pearson did not mention the hoodie when she talked to the police. According to Pearson, the shooter was also wearing a black hat or skullcap. (R483-510-11, 548-50) Pearson added that the shooter was wearing jacket and pants, or sweatsuit (R483) Shayla Johnson, said only that the shooter was dressed in clothing that "look black", but might have been "dark blue". (R477).

A fifth witness, William McCalister, was also present when the shooting occurred. He was standing near the southeast corner of the building where the shooting took place, putting him on the other side of the building from Lincoln Street. As noted earlier the other eye-witnesses said the shooter had approched from Lincoln Street. R 381-94, 416-18, 428-29, 451-52, 482, 560-61) As he watched the argument that was going on behind the building, McCalister notice a Hispanic male approched from New York Street, which was north of the scene. According to McCalister, the man was about 5'10" or 5'11" tall, about 160-175 pounds, and wearing "dark hooded clothing" specifically a dark jacket over a dark hooded jacket. (R562-65, 574) McCalister heard the gunshot, which sounded as though they had come to the area of his right, near where the Hispanic [19] man had been standing. McCalister, did not see who actually fire the shots, however. (R568-73)

Given the lack of physical evidence and the weak identification testimony, the alibi evidence might have swayed the jury in the defendant's favor, or at least left the jury with reasonable doubt as to his guilt. Kliment failure not to raise the alibi at trial was "sufficient" to undermine confidence in the outcome", and thus to establish Prejudice. Strickland 466 U.S. at 694, 104 S.Ct. at 2068-80. L.Ed. 2d at 698.

For these reasons, this Court should reverse the Order, reverse the order denying the defendants Post-conviction conviction, reverse his conviction in 98CFS35 an order a new trial in this case.

## CONCLUSION

WHEREFORE, the defendant-Appellant, Armando Amaya, pray this Honorable Court, grant his petition for Leave to appeal and reverse defendant's post-conviction conviction, reverse his conviction in 98 CF 535 and Order a new trial.

Respectfully Submitted.

Armando Amaya.
Armando Amaya, Pro Se'
Inmate K-75877
P.O. Box 2000
Tamms, ILL. 62988.