IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
5 - 29 - 2008
MAY 2 9 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. ARMANDO AMAYA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 07 C 6793 |
| | ) | |
| KEN BARTLEY, | ) | |
| Warden, Tamms Correctional Center, | ) | The Honorable |
| | ) | John W. Darrah, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the following exhibits A through X to respondent's Answer To Petition For Writ of Habeas Corpus (Doc. 23) are hereby filed with this Court:

Exhibit A:   *People v. Amaya*, 748 N.E.2d 1251 (Ill.App. 2001);

Exhibit B:   Pet. Br., *People v. Amaya*, No. 2-00-0099 (Ill.App.);

Exhibit C:   State's Br., *People v. Amaya*, No. 2-00-0099 (Ill.App.);

Exhibit D:   Pet. Reply Br., *People v. Amaya*, No. 2-00-0099 (Ill.App.);

Exhibit E:   PLA, *People v. Amaya*, No. 91749;

Exhibit F:   Order Denying PLA, *People v. Amaya*, No. 91749;

Exhibit G:   Postconviction Petition, *People v. Amaya*, No. 98 CF 535;

Exhibit H:   Order Dismissing Postconviction Petition, *People v. Amaya*, No. 98 CF 535;

Exhibit I:    Pet. Br., *People v. Amaya*, No. 2-05-0706 (Ill.App.);

Exhibit J:    State's Br., *People v. Amaya*, No. 2-05-0706 (Ill.App.);

Exhibit K:    Pet. Reply Br., *People v. Amaya*, No. 2-05-0706 (Ill.App.);

Exhibit L:    Rule 23 Order, *People v. Amaya*, No. 2-05-0706 (Ill.App. 2007)

Exhibit M:    PLA, *People v. Amaya*, No. 105041;

Exhibit N:    Order Denying PLA, *People v. Amaya*, No. 105041;

Exhibit O:    Motion for Leave to File Successive Postconviction Petition, *People v. Amaya*, No. 98 CF 535;

Exhibit P:    Successive Postconviction Petition, *People v. Amaya*, No. 98 CF 535;

Exhibit Q:    Order of May 9, 2007, *People v. Amaya*, No. 98 CF 535;

Exhibit R:    Certified Statement of Disposition, *People v. Amaya*, No. 98 CF 535;

Exhibit S:    Trial Transcripts, *People v. Amaya*, No. 98 CF 535;

Exhibit T:    Transcript of Postconviction Evidentiary Hearing, *People v. Amaya*, No. 98 CF 535 (Apr. 20, 2005);

Exhibit U:    Transcript of Postconviction Evidentiary Hearing, *People v. Amaya*, No. 98 CF 535 (May 12, 2005);

Exhibit V:    Transcript of Postconviction Evidentiary Hearing, *People v. Amaya*, No. 98 CF 535 (Jul. 15, 2005);

Exhibit W:    Affidavits of Arnoldo Castillo (executed Jul. 25, 2003); and

Exhibit X:    Transcript of December 12, 1997 Bond Reduction Hearing, *People v. Amaya*, No. 97 CF 2326.

May 29, 2008                    Respectfully submitted,

                                LISA MADIGAN
                                Attorney General of Illinois

                    By:

                                MICHAEL R. BLANKENHEIM, Bar # 6289072
                                Assistant Attorney General
                                100 West Randolph Street, 12th Floor
                                Chicago, Illinois 60601-3218
                                TELEPHONE: (312) 814-8826
                                FAX: (312) 814-2253
                                EMAIL: mblankenheim@atg.state.il.us

-3-

Westlaw.

748 N.E.2d 1251

Page 1

321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181
**(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)**

**H**

People v. Amaya
Ill.App. 2 Dist.,2001.

Appellate Court of Illinois,Second District.
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Armando AMAYA, Defendant-Appellant.
**No. 2-00-0099.**

May 10, 2001.

Defendant was convicted in the Circuit Court, Kane County, Donald C. Hudson, J., of attempted murder, first-degree murder, and aggravated discharge of a firearm. Defendant appealed. The Appellate Court, McLaren, J., held that: (1) trial court's error, if any, in instructing jury on principles of accountability, was harmless; (2) conviction for aggravated discharge of a firearm could not stand under one-act, one-crime doctrine; and (3) consecutive sentences based on sentencing court's finding that defendant inflicted severe bodily injury did not violate due process.

Affirmed in part and vacated in part.

West Headnotes

**[1] Criminal Law 110 ☞1172.1(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1172 Instructions
        110k1172.1 In General
          110k1172.1(1) k. Instructions in General. Most Cited Cases
A defendant's claim of improper jury instructions is reviewed under a harmless-error analysis; that is, improper jury instructions will not warrant a new trial unless the result of the trial would have been different had the jury been instructed properly.

**[2] Criminal Law 110 ☞922(3)**

110 Criminal Law
  110XXI Motions for New Trial
    110k922 Instructions and Failure or Refusal to Instruct
      110k922(3) k. Giving Erroneous Instructions. Most Cited Cases
When a jury is improperly instructed regarding the principles of accountability, a new trial is not warranted if the evidence is sufficient to find the defendant guilty beyond a reasonable doubt as a principal.

**[3] Criminal Law 110 ☞1172.1(2)**

110 Criminal Law
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1172 Instructions
        110k1172.1 In General
          110k1172.1(2) k. Particular Instructions. Most Cited Cases
Trial court's error, if any, in instructing jury on principles of accountability, was harmless, where sufficient evidence supported finding that defendant was guilty beyond a reasonable doubt as a principal of attempted murder and first-degree murder. S.H.A. 720 ILCS 5/8-4(a), 9-1(a)(1), 9-1(a)(2).

**[4] Criminal Law 110 ☞29(14)**

110 Criminal Law
  110I Nature and Elements of Crime
    110k29 Different Offenses in Same Transaction
      110k29(5) Particular Offenses
        110k29(14) k. Homicide. Most Cited Cases
Conviction of aggravated discharge of a firearm could not stand under one-act, one-crime doctrine, where firearm conviction arose out of the same physical acts as convictions for first-degree murder and attempted murder, and charging instrument

EXHIBIT A

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

748 N.E.2d 1251                                                                    Page 2
321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181
**(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)**

charged defendant with same conduct as the other counts but under a different theory of culpability without distinguishing between shots that struck victims and any other shots defendant may have fired. S.H.A. 720 ILCS 5/8-4(a), 9-1(a)(1), 9-1(a)(2), 24-1.2(a)(2).

**[5] Constitutional Law 92 ⚖═4711**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)6 Judgment and Sentence
            92k4711 k. Multiple Sentences; Concurrent or Consecutive Terms. Most Cited Cases
   (Formerly 92k270(1))

**Sentencing and Punishment 350H ⚖═600**

350H Sentencing and Punishment
   350HIII Sentence on Conviction of Different Charges
      350HIII(B) Consecutive or Cumulative Sentences
         350HIII(B)3 Factors and Purposes
            350Hk600 k. Nature and Degree of Harm or Injury. Most Cited Cases
Consecutive sentences based on sentencing court's finding that defendant inflicted severe bodily injury did not violate due process for defendant convicted of first-degree murder and attempted murder; bodily injury finding did not increase sentence but only determined how it was to be served. U.S.C.A. Const.Amend. 14; S.H.A. 720 ILCS 5/8-4(a), 9-1(a)(1), 9-1(a)(2), 24-1.2(a)(2); 730 ILCS 5/5-8-4(a).

**[6] Sentencing and Punishment 350H ⚖═545**

350H Sentencing and Punishment
   350HIII Sentence on Conviction of Different Charges
      350HIII(B) Consecutive or Cumulative Sentences
         350HIII(B)1 In General
            350Hk545 k. In General. Most Cited Cases

The imposition of consecutive sentences does not increase the penalty for a crime beyond the prescribed statutory maximum; rather, it only determines the manner in which the sentence for each individual offense is to be served. S.H.A. 730 ILCS 5/5-8-4(a).

**[7] Sentencing and Punishment 350H ⚖═600**

350H Sentencing and Punishment
   350HIII Sentence on Conviction of Different Charges
      350HIII(B) Consecutive or Cumulative Sentences
         350HIII(B)3 Factors and Purposes
            350Hk600 k. Nature and Degree of Harm or Injury. Most Cited Cases
The penalty for a crime is not increased when sentences are ordered to be served consecutively based on severe bodily injury. S.H.A. 730 ILCS 5/5-8-4(a).

**[8] Criminal Law 110 ⚖═1177**

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1177 k. Sentence and Judgment and Proceedings After Judgment. Most Cited Cases
Sentencing court's error, if any, in ordering defendant to serve consecutive sentences based on court's finding that defendant inflicted severe bodily injury, was harmless; no reasonable juror, already having found defendant guilty of attempted murder and first-degree murder, could have found that defendant did not inflict severe bodily injury. S.H.A. 720 ILCS 5/8-4(a), 9-1(a)(1), 9-1(a)(2), 24-1.2(a)(2); 730 ILCS 5/5-8-4(a).

**\*\*1252\*923\*\*\*182** G. Joseph Weller, Deputy Defender, Office of the State Appellate Defender, Elgin, Lawrence D. Wechter, Batavia, for Armando Amaya.
**\*924** Meg Gorecki, Kane County State's Attorney, St. Charles, Martin P. Moltz, Deputy Director,

748 N.E.2d 1251                                                    Page 3
321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181
(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)

Lawrence M. Bauer, State's Attorneys Appellate Prosecutor, Elgin, Gunta Z. Hadac, Grayslake, for the People.

Justice McLAREN delivered the opinion of the court:

The defendant, Armando Amaya, appeals his convictions and sentences for attempted murder, first-degree murder, and aggravated discharge of a firearm after three people were shot, one fatally, at an apartment building in Elgin. We affirm in part and vacate in part.

On April 28, 1998, the defendant was charged in a six-count indictment with two counts of first-degree murder in that the defendant shot Jermaine Lambert with the intention of killing him (720 ILCS 5/9-1(a)(1) (West 1996)) and that the defendant shot Lambert knowing such act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1996)); two counts of attempted murder (720 ILCS 5/8-4(a) (West 1996)) in that the defendant shot and intended to kill Alonzo Matthews and Tara Harris; two counts of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 1996)) in that the defendant committed a battery by means of discharging a firearm and shooting Matthews and Harris; and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1996)) in that the defendant knowingly discharged a firearm in the direction of a person.

The evidence at trial revealed the following. One of the victims, Alonzo Matthews, testified that he was visiting a friend at an apartment at 309 New York Street in Aurora, Illinois, on October 29, 1997, and, as he listened to some girls argue outside the apartment building, he felt someone creep up behind him. A "Mexican" man, 5 feet 8 inches to 5 feet 9 inches, 140 to 145 pounds, was dressed in black with a hood on his head and came from the direction of Lincoln Street. Matthews saw the man for only two seconds before the man shot Matthews in the stomach. The shooter's gun was chrome or black, a revolver or an "automatic," and had a wheel-like chamber. Matthews underwent surgery and remained in the hospital for nine days. Matthews admitted that he was on probation in Wisconsin for a drug crime, but he denied being a gang member and did not know why anyone would want to shoot him. The parties stipulated that at the hospital Matthews told a police officer that he could recognize the shooter. During cross-examination Matthews stated that he did not see the shooter in the courtroom.

The other surviving victim, Tara Harris, testified that on October 29, 1997, she was taking her daughter's diaper to the Dumpster**1253 ***183 on the side of her apartment at 309 New York Street in Aurora, Illinois, *925 when she stopped to watch some girls arguing. A " Mexican" or "Spanish" man, 5 feet 5 inches or 5 feet 6 inches tall, in his late teens or early 20s, approached the area from the Lincoln Street end of the building. His hands were in his pockets and he wore a jacket with a hood. The hood covered the man's head but not his face. When Harris turned away, she heard two gun shots but did not see a gun. Harris had been shot in the back but did not realize it until she was back in her apartment. She blacked out and later underwent surgery and stayed in the hospital for nine days. The bullet was still in Harris's back at the time she testified. Harris admitted that at the time of trial she was on probation for a drug crime, but she denied being a gang member and did not know why anyone would want to shoot her.

Shayla Johnson testified that she also was watching the girls argue outside the New York Street apartment building on the night in question when she saw the defendant come from the direction of Lincoln Street. The defendant wore black or navy blue, was 5 feet 4 inches tall, and weighed 130 to 140 pounds. The defendant approached the group of girls, bumped into a woman, pushed her out of the way, walked three or four more steps, and started to shoot. Handling the weapon "wildly," the defendant shot five or six times with what Shayla thought was a revolver. Shayla stated that she got a good look at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

748 N.E.2d 1251

321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181

(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)

Page 4

the shooter and recognized him as a man known as "Scarecrow," whom she had seen five or six times before the shooting. Shayla ran from the shooting and did not speak to the police officers at the scene because she did not want to get involved and did not think anyone had been shot. Earlier that evening, as Shayla walked toward the apartment building to meet some friends, she saw the defendant and two other Hispanic men in a white, four-door Celebrity or Century with a red stripe. Two of the car's occupants hung out of the car windows yelling "King love," "GDK," and "Kings rule."

Shayla stated that, less then two months later, on December 19, 1997, she spoke to the Aurora police about the shooting while she was at the police station regarding an unrelated incident. On February 4, 1998, Shayla identified the defendant as the shooter in a lineup and admitted speaking with her friend, Nicole Pearson, another witness, about the incident. Shayla admitted that she had charges for theft and other offenses pending against her and was presently in custody after being arrested for failing to appear in court.

Nicole Pearson testified that on the evening of October 29, 1997, she argued with some girls on the side of the apartment building in question. When the argument ended, a short, teenage "Mexican" man, dressed in black and wearing a black hat, approached from Lincoln Street, carrying a "big gun." Pearson identified that man as *926 the defendant. The defendant fired the gun, and the crowd scattered. The defendant had difficulty handling the gun. Pearson stated that the defendant pointed the gun at her but did not fire because she was on the ground. The defendant moved away and continued to shoot, and Pearson stood up and ran away. Pearson stated that she had seen the defendant before near a taco restaurant and knew his name as "Scarecrow." Earlier that evening, she saw the defendant in a white car with two other men but did not hear them say anything.

Pearson explained that at the February 1998 lineup she did not think the defendant was the shooter be-

cause he had gained weight since the shooting. Pearson also told the officers that she was hesitant **1254 ***184 to testify because she was afraid that the defendant would kill her. Later Pearson identified the defendant to the police as being present during the shooting and in the white car that evening, but not as the shooter. Still later, after discussing the matter with the police after the lineup, Pearson identified the defendant as the shooter. Pearson admitted that her friend, Shayla Johnson, told Pearson that she (Shayla) believed that the defendant was the shooter and that Shayla told Pearson that the defendant's nickname was " Scarecrow." But Pearson, who lived with Shayla Johnson at the time of the shooting, denied speaking with Shayla about the incident before speaking with the police. Pearson admitted that she had prior convictions of retail theft, resisting a peace officer, disorderly conduct, and criminal trespass and had cases pending for mob action and battery. Pearson denied being a gang member but admitted that she associated with members of the Gangster Disciple gang, wore Gangster Disciple colors, and knew that she was in Gangster Disciple territory the night of the shooting. Pearson also stated that one of the victims, Lambert, was her friend.

William McCalister testified that he saw a man outside the apartment building just before the shooting who wore dark clothing with a hood. McCalister did not see a gun but heard gunshots a few minutes later. McCalister admitted that he had a theft charge pending at the time of trial.

Tracy Johnson testified that just before the shooting he was drinking alcohol with his friends when he saw three Hispanic men in a white Chevrolet Celebrity drive by the New York Street apartment building two or three times. The men in the Chevy made gang signs that were insulting to Gangster Disciples. Later, Tracy heard three gunshots and then saw the three men that were in the Celebrity run from the area of the shots, cross the street, and get into the same white Celebrity that was parked at the Lincoln Laundry on Lincoln Street. At approx-

imately 10:30 p.m., Tracy saw the men being stopped by the police. Tracy then told the police what he knew and gave a *927 taped statement at 11:50 p.m. Tracy admitted that, both before and after the incident, he drank a pint of gin and some beer with his friends that evening and that he previously received substance abuse treatment. In addition, Tracy admitted that he had a prior conviction of a felony drug charge and convictions of several residential burglaries, burglary, attempted burglary, and retail theft.

Aurora police officer Scott Wolters testified that he stopped the white Celebrity that evening at approximately 10:30 p.m. The defendant sat in the front passenger seat wearing faded blue jeans and a hooded overcoat with a black hooded sweatshirt. Romero Sandoval was also in the car wearing a dark Nike hooded pullover and a black leather jacket. The third man in the car was George Gamboa. Wolters found no weapons or ammunition either in the vehicle or on any of the men in the car.

Officer Mike Doerzaph testified that Tracy reported that he had seen the three men who had been stopped running from the scene of the shooting.

Aurora police sergeant Mike Langston, an expert in gang activity, testified that the defendant and the two others who were arrested were members of the Latin Kings gang and that the defendant's nickname was "Scarecrow." The Latin Kings were rivals of the Gangster Disciples; however, none of the victims, nor Shayla Johnson or Nicole Pearson, was a member of any gang. The shooting occurred in Gangster Disciple gang territory. The Lincoln Laundry, the place where the white Celebrity was parked during the **1255 ***185 shooting, was located on the edge of Gangster Disciple territory. The phrase "King love" showed respect for the Latin Kings, and "GDK" stood for "Gangster Disciple Killer." Langston added that gang members commonly used getaway drivers and lookouts when entering rival gang territory, since it was risky to enter that territory on foot.

Aurora police officer James Fancsali testified that, when Tracy Johnson gave his statement to the police the evening of the shooting, he did not appear to be intoxicated and had no odor of alcoholic beverages. In February 1998, Shayla Johnson identified the defendant in a lineup as the shooter, after first stating that the defendant was not the shooter and then stating that he was present at the shooting but was not the shooter.

Aurora police officer Jeffrey Sauer corroborated Fancsali's testimony regarding Pearson's lineup statements. Pearson told the officers that the shooter was "skinnier" and lighter than the defendant.

Aurora police officer Andrew Hilgenberg testified that, while on patrol on October 29, 1997, he was dispatched to the apartment building at 309 East New York Street to secure the inside of a crime scene *928 at 309 East New York Street. When Officer Hilgenberg arrived at approximately 8:45 p.m., Matthews, who appeared to have been shot, was in front of the apartment building. The parking lot area was illuminated. Hilgenberg then entered Tara Harris's apartment and spoke with her. Harris also had been shot. Jermaine Lambert was lying on his back in Harris's kitchen in a pool of blood. Lambert appeared to be breathing but was pronounced dead at 9:03 p.m. by a paramedic.

Evidence technician Stan Kahle testified that he found clothing in the white Chevy Celebrity but did not collect the clothing for evidence and did not find any weapons or ammunition.

The parties stipulated that a forensic pathologist would testify that Lambert's autopsy would reveal that Lambert received a single, penetrating gunshot wound to the chest that was consistent with the barrel of the weapon being placed directly on the body. The gunshot wound caused Lambert's death, the bullet having penetrated through the heart and right lung.

Over defense counsel's objection, the trial court included instructions on the principles of accountabil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ity. After deliberations, the jury found the defendant guilty of first-degree murder (bodily harm) of Lambert, attempted murder of Harris and Matthews, aggravated battery with a firearm as to both Harris and Matthews, and aggravated discharge of a firearm. The trial court denied the defendant's posttrial motion. Regarding sentencing, the State conceded and the trial court agreed that the aggravated battery convictions merged with the attempted murder convictions. The State urged the trial court to impose consecutive sentences based on section 5-8-4(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(a) (West 1996)), seeking a finding that the defendant committed a Class X felony and inflicted severe bodily injury. Defense counsel objected to the imposition of consecutive sentences, arguing that the State failed to present evidence at sentencing regarding the issue of severe bodily injury.

The trial court sentenced the defendant to 40 years imprisonment for the first-degree murder conviction, 10 and 12 years imprisonment for the convictions of the attempted murder of Harris and Lambert, respectively, and 9 years imprisonment for the aggravated discharge of a firearm conviction. The court ordered the sentences for the murder and attempted murder convictions to run consecutively for a total of **1256 ***186 62 years imprisonment and the sentence for aggravated discharge of a firearm to run concurrently with the other sentences. The court based its decision to impose consecutive sentences on its findings that the defendant had committed a Class X felony, that the offenses were part of a single course of conduct with no substantial change in the *929 nature of the criminal objective, and that defendant inflicted severe bodily injury in the murder and attempted murder offenses. The trial court subsequently denied the defendant's motion to reconsider the sentences, and the defendant filed this timely appeal.

On appeal, the defendant first argues that he is entitled to a new trial because the trial court erroneously instructed the jury regarding the accountability theory. In the alternative, defendant asserts that there was insufficient evidence to support a guilty verdict on a theory of accountability because the evidence supported a guilty verdict based only on the defendant's acting as a principal. The State responds that there was sufficient evidence to warrant the accountability instructions, there was sufficient evidence to support a guilty verdict on the theory of accountability, and that, even if the instruction was erroneous, it was harmless error because there was overwhelming evidence that the defendant was guilty as a principal.

[1][2] It is well settled that a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis. *People v. Dennis,* 181 Ill.2d 87, 95, 229 Ill.Dec. 552, 692 N.E.2d 325 (1998). That is, improper jury instructions will not warrant a new trial unless the result of the trial would have been different had the jury been instructed properly. *People v. Pena,* 317 Ill.App.3d 312, 319, 250 Ill.Dec. 821, 739 N.E.2d 584 (2000). For example, when a jury is improperly instructed regarding the principles of accountability, a new trial is not warranted if the evidence is sufficient to find the defendant guilty beyond a reasonable doubt as a principal. *Pena,* 317 Ill.App.3d at 319, 250 Ill.Dec. 821, 739 N.E.2d 584.

[3] In this case, there was ample evidence to support a guilty verdict based on the defendant's acting as a principal. There was uncontroverted evidence that, just prior to the shooting, the defendant was riding in a car with two other men, yelling insults and making insulting gestures at a rival gang, and that the defendant and his cohorts were members of the Latin Kings, rivals of the Gangster Disciples. Four witnesses, including both surviving victims, testified that a Hispanic or Mexican male who wore dark clothes approached the crowd outside the apartment building from Lincoln Street and shot at the crowd. Two women, Shayla Johnson and Nicole Pearson, who were present at the scene of the shooting, identified the defendant as the man who approached and fired a gun into the crowd. It was

748 N.E.2d 1251                                                          Page 7
321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181
**(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)**

uncontroverted that three people were shot, one fatally, and that the shooting occurred in territory "belonging" to the defendant's rivals, the Gangster Disciples. Another witness, Tracy Johnson, testified that after he heard shots he saw three Hispanic men run from the scene of the shooting back to a white Chevy Celebrity that was parked just outside Gangster Disciple territory. Considering this evidence, we *930 determine that there was ample evidence to find the defendant guilty beyond a reasonable doubt as a principal. Therefore, even if there was not enough evidence to warrant instructing the jury on the principles of accountability, the error was harmless and a new trial is not required. See *People v. Rhodes,* 243 Ill.App.3d 701, 706, 183 Ill.Dec. 884, 612 N.E.2d 536 (1993).

[4] Next, the defendant contends that his conviction of aggravated discharge of a **1257 ***187 firearm was carved out of the same physical acts as the convictions of first degree murder and attempted murder. Thus, the defendant argues that his conviction of aggravated discharge of a firearm must be vacated under the one-act, one-crime doctrine. See *People v. King,* 66 Ill.2d 551, 559-66, 6 Ill.Dec. 891, 363 N.E.2d 838 (1977).

After considering a similar argument in *People v. Crespo,* No. 86556, 203 Ill.2d ----, 273 Ill.Dec. 241, 788 N.E.2d 1117, 2001 WL 135311 (February 16, 2001), our supreme court recently held that the defendant's conduct of stabbing a victim three times constituted only one single act and did not support multiple convictions. The court stated that, although the conduct could have supported two separate convictions, one of aggravated battery and another of armed violence, the State did not differentiate between the stab wounds and did not apportion them to separate offenses either in the charging instrument or to the jury at trial. *Crespo,* slip op. at 6-7, ---Ill.2d at ---- - ----, --- Ill.Dec. ----, --- N.E.2d ----. Therefore, the State was precluded from treating the defendant's conduct as multiple acts supporting multiple convictions. *Crespo,* slip op. at 8,--- Ill.2d at ----, ---Ill.Dec. ----, --- N.E.2d ----.

*Crespo* controls the issue presented to us here. In this case, the charging instrument indicates that the State intended to treat the conduct of the defendant as a conglomerate of three gunshots. The indictment did not differentiate between the three gunshots that actually struck the victims and other shots that were fired by the defendant without striking anyone. Rather, the aggravated discharge of a firearm count charged the defendant with the same conduct as the other counts but under a different theory of culpability without distinguishing between the three shots that struck the victims and any other shots the defendant may have fired.

Further, at trial the prosecutor presented the case as involving a conglomerate of three shots. Although at least one witness testified that he heard four or five shots, the prosecutor, during closing arguments, spoke only of the three shots that struck the victims. He did not discuss the other shots that could have supported a separate conviction of aggravated discharge of a firearm. The prosecutor never argued that some of the gunshots would be sufficient to sustain a conviction of aggravated discharge of a firearm and that other, separate shots would be sufficient to sustain a conviction of first-degree murder and attempted murder. Since the State failed to apportion the gunshots among the two charges, it cannot do so now on appeal. *Crespo,*931 slip op. at 8, --- Ill.2d at ----, --- Ill.Dec. ----, ---N.E.2d ----. Further, because aggravated discharge of a firearm is a less serious offense than first-degree murder and attempted murder, the defendant's conviction of aggravated discharge of a firearm must be vacated. See *People v. Milton,* 309 Ill.App.3d 863, 868, 243 Ill.Dec. 495, 723 N.E.2d 798 (1999).

[5] Lastly, the defendant argues that the imposition of consecutive sentences violated his rights under the due process clause of the United States Constitution (U.S. Const., amend. XIV) as interpreted in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This issue was not raised in the trial court below; however, we will re-

748 N.E.2d 1251
321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181
(Cite as: 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181)

Page 8

view it as plain error because it affects a fundamental right. See *People v. Keene,* 296 Ill.App.3d 183, 186, 230 Ill.Dec. 522, 693 N.E.2d 1273 (1998).

In *Apprendi,* the United States Supreme Court found unconstitutional a New Jersey "hate crime" statute allowing the imposition of an extended-term sentence if **1258 ***188 the trial court found by a preponderance of the evidence that, when committing the offense at issue, the defendant acted with a racially biased purpose. The Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455.

In sentencing the defendant in this case, the trial judge found that the defendant had been convicted of a Class X felony, no substantial change occurred in the nature of the criminal objective, and the defendant had inflicted severe bodily injury. The trial court ordered the defendant's sentences to be served consecutively under section 5-8-4(a) of the Code (730 ILCS 5/5-8-4(a) (West 1996)). Relying on *Apprendi,* the defendant argues that section 5-8-4(a) is unconstitutional because it allows a trial court to make factual findings-in this case, a finding that the defendant inflicted severe bodily injury-that increase the permissible range of penalties by requiring the defendant's sentences to run consecutively. The State argues that *Apprendi* does not apply to section 5-8-4(a) of the Code because that section does not authorize the imposition of a sentence that is beyond the prescribed statutory maximum for any particular offense. Rather, the State asserts, an order that multiple sentences run consecutively pursuant to section 5-8-4(a) affects only the manner in which the sentences will be served, not the length of those sentences.

Section 5-8-4(a) provides, in relevant part, as follows:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal*932 objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, * * * in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5-8-4(a) (West 1996).

[6][7] We agree with the State that *Apprendi* was not violated here. The imposition of consecutive sentences does not increase the penalty for a crime beyond the prescribed statutory maximum. Rather, it only determines the manner in which the sentence for each individual offense is to be served. *People v. Primm,* 319 Ill.App.3d 411, 253 Ill.Dec. 239, 745 N.E.2d 13 (2000). Our supreme court has characterized consecutive sentences as " 'sentences following in a train, succeeding one another in a regular order, with an uninterrupted course or succession, and having no interval or break.' [Citation.]" (Emphasis omitted.) *Thomas v. Greer,* 143 Ill.2d 271, 278, 158 Ill.Dec. 1, 573 N.E.2d 814 (1991). In other words, connecting the several individual freight cars of a train together does not increase the size of each individual freight car. Thus, for purposes of an *Apprendi* analysis, the penalty for a crime is not increased when sentences are ordered to be served consecutively under section 5-8-4(a) of the Code based on severe bodily injury. *People v. Sutherland,* 317 Ill.App.3d 1117, 1131, 252 Ill.Dec. 851, 743 N.E.2d 1007 (2000).

We understand that the Appellate Court, First District, has held otherwise in *People v. Clifton,* 321 Ill.App.3d 707, 726, 255 Ill.Dec. 769, 750 N.E.2d 686, (2000), and *People v. Carney,* 317 Ill.App.3d 806, 251 Ill.Dec. 354, 740 N.E.2d 435 (2000). However, we respectfully disagree with these decisions. These courts based their decisions**1259 ***189 on the statement made in *Apprendi* that "the relevant inquiry is not one of form" (*Apprendi,* 530 U.S. at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

but of the effect of the required finding and that, since a finding of severe bodily injury increased the sentence for a single course of conduct, that finding had to be made by a fact finder and not the court. *Carney,* 317 Ill.App.3d at 812-13, 251 Ill.Dec. 354, 740 N.E.2d 435; *Clifton,* 321 Ill.App.3d at 726, 255 Ill.Dec. 769, 750 N.E.2d 686.

This reasoning expands the holding of *Apprendi* beyond its scope. The statutory scheme invalidated in *Apprendi* permitted a sentence to be *extended past the maximum permitted by statute* upon a finding by the trial court that the defendant acted with a racially biased purpose. In this case, the defendant's sentence was not extended but was ordered to be served consecutively, and the defendant's *mens rea* was not at issue. Rather, the imposition of consecutive sentences was imposed after a finding that the defendant inflicted severe bodily injury. Thus, we decline to follow *Carney* and *Clifton* by expanding the holding of *Apprendi* here.

[8] Further, even if an *Apprendi* violation occurred here, the error is harmless beyond a reasonable doubt. The facts were uncontroverted that in the two attempted murder offenses the defendant shot one *933 victim in the stomach and another in the back. Both victims required surgery and a lengthy hospital stay and the bullet remained in one victim at the time of trial. Therefore, no reasonable juror, having already found the defendant guilty of the offenses charged, could have found that the defendant did not inflict severe bodily injury and, thus, the outcome would not have been different if a jury had decided this issue. See *People v. Johnson,* 149 Ill.2d 118, 159, 171 Ill.Dec. 401, 594 N.E.2d 253 (1992) (supreme court determined that a gunshot wound to the shoulder constituted severe bodily injury); *Primm,* 319 Ill.App.3d at 427, 253 Ill.Dec. 239, 745 N.E.2d 13 (appellate court held that gunshot to the thigh constituted severe bodily injury). Thus, we will not vacate the imposition of consecutive sentences.

The judgment of the circuit court of Kane County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

GEIGER and GROMETER, JJ., concur.
Ill.App. 2 Dist.,2001.
People v. Amaya
321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NO. 2-00-0099

IN THE APPELLATE COURT OF ILLINOIS

SECOND JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of the |
| Plaintiff-Appellee, | ) | 16th Judicial Circuit, |
| | ) | Kane County, |
| | ) | Illinois |
| | ) | |
| vs. | ) | NO.: 98 CF 535 |
| | ) | |
| ARMANDO AMAYA, | ) | Honorable |
| | ) | Donald C. Hudson, |
| Defendant-Appellant. | ) | Judge Presiding |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

arry Wechter
ontract Attorney for the
ffice of the State Appellate Defender
28 S. Batavia Avenue, Suite 2N
atavia, IL 60510
30/761-8446

OUNSEL FOR DEFENDANT-APPELLANT

UMENT REQUESTED

EXHIBIT B

## POINTS AND AUTHORITIES

### ARGUMENT I

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS AND NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED THE COMMISSION OF THE CRIMES. THE DEFENDANT'S PRESENCE AT THE SCENE OF THE CRIME AND HIS FLIGHT WITH THE GUNMAN WOULD NOT BE SUFFICIENT TO CONVICT HIM AS AN ACCOUNTABLE PARTY. DUE TO THE WEAKNESS OF THE IDENTIFICATION EVIDENCE, THE INSTRUCTIONAL ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT. (Page 17)

| | Page |
|---|---|
| People v. Dennis, 181 Ill.2d 87, 95 (1998) | 17, 19, 22 |
| People v. Jefferson, 227 Ill.App.3d 491, 496 (1st Dist., 1992) | 17 |
| People v. Perez, 189 Ill.2d 254, 265 (2000) | 17, 19, 24 |
| 720 ILCS 5/5-2(c) (West 1998) | 18 |
| People v. Stark, 33 Ill.2d 616, 622 (1966) | 18 |
| People v. Testa, 261 Ill.App.3d 1025, 1030 (2nd Dist., 1994) | 18 |
| People v. Crowder, 239 Ill.App.3d 1027, 1030 (3rd Dist., 1993) | 18 |
| People v. Batchelor, 202 Ill.App.3d 316, 330 (1st Dist., 1990) | 18 |
| People v. Lusietto, 41 Ill.App.3d 205, 207 (3rd Dist., 1976) | 18 |

                                                                    Page

People v. Umphers, 133 Ill.App.2d 853, 857 (5th Dist., 1971)      18, 24

People v. Taylor, 186 Ill.2d 439, 447 (1999)                      19, 23

People v. Shaw, 186 Ill.2d 301, 323 (1998)                        19, 23

People v. Estrada, 243 Ill.App.3d 177, 184 (1st Dist., 1993)      19

People v. Taylor, 219 Ill.App.3d 47, 49 (3rd Dist., 1991)         19

720 ILCS 5/9-1(a)(1), (a)(2) (West 1998)                          22

720 ILCS 5/8-4(a) (West 1998)                                     22

People v. Parker, 311 Ill.App.3d 80, 89 (1st Dist., 1999)         22

## ARGUMENT II

THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON THE JURY
VERDICT CONVICTING THE DEFENDANT OF THE OFFENSE OF
AGGRAVATED DISCHARGE OF A FIREARM, SINCE THE CONVICTION WAS
BASED ON THE SAME PHYSICAL ACTS AS THE MURDER AND
ATTEMPTED MURDER CONVICTIONS.  (Page 27)

                                                                    Page


People v. Boyd, 307 Ill.App.3d 991, 998 (3rd Dist., 1999)         27

People v. Smith, 183 Ill.2d 425, 426 (1998)                       27

People v. Hicks, 181 Ill.2d 541, 545 (1998)                       27

People v. King, 66 Ill.2d 551, 566 (1977)                         27-28

ARGUMENT III

THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM. THESE FACTUAL DETERMINATIONS SHOULD HAVE BEEN MADE BY THE JURY BY THE STANDARD OF PROOF APPLICABLE TO CRIMINAL TRIALS. (Page 29)

|  | Page |
|---|---|
| Apprendi v. New Jersey, 147 L.Ed.2d 435, 442 (2000) | 29-30 |
| 730 ILCS 5/5-8-4(a)(i) (West 1998) | 29 |
| U.S. v. Murphy, ___ F.Supp.3d ___, | 30 |
| (D. Minn., case # 4-95-103(8), August 7, 2000) | |
| 730 ILCS 5/5-8-1(a)(1)(a) (West 1998) | 31 |
| 720 ILCS 5/8-4(c)(1) (West 1998) | 31 |
| 730 ILCS 5/5-8-1(c)(3) (West 1998) | 31 |
| People v. Abraham, 257 Ill.App.3d 587, 596 (1st Dist., 1994) | 31 |
| People v. Morris, 237 Ill.App.3d 140, 145 (2nd Dist., 1992) | 31 |
| People v. Abrams, 205 Ill.App.3d 295, 299 (1st Dist., 1990) | 31 |
| People v. Laskowski, 287 Ill.App.3d 539, 543 (4th Dist., 1997) | 31 |
| People v. Edwards, 259 Ill.App.3d 151, 156 (1st Dist., 1994) | 31 |
| 720 ILCS 5/9-3(e) (West 1998) | 32 |

## NATURE OF THE CASE

This action concerns an appeal from the Defendant's convictions for the offenses of first-degree murder, attempted murder and aggravated discharge of a firearm. The Defendant was convicted following a jury trial and was sentenced to a consecutive terms of 62 years of imprisonment in the Illinois Department of Corrections. No issue has been raised regarding the pleadings.

## ISSUES PRESENTED FOR REVIEW

I.     WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS AND NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED THE COMMISSION OF THE CRIMES.

II.     WHETHER THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON THE JURY VERDICT CONVICTING THE DEFENDANT OF THE OFFENSE OF AGGRAVATED DISCHARGE OF A FIREARM, SINCE THE CONVICTION WAS BASED ON THE SAME PHYSICAL ACTS AS THE MURDER AND ATTEMPTED MURDER CONVICTIONS.

III.     WHETHER THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM.

## JURISDICTION

The Defendant appeals from the final judgment of the circuit court finding him guilty of the offenses of first-degree murder, attempted murder and aggravated discharge of a firearm, pursuant to Supreme Court Rules 603 and 606(a) (S.Ct.Rule 603, 606(a)). The Defendant was found guilty of the offenses on January 29, 1999 (R. C185-192) and was sentenced on August 12-13, 2000. (R. C229-236, 238-239)  The Defendant filed his Motion to Reconsider Sentence on September 13, 1999 (R. C240-241), which the trial court denied on January 18, 2000. (R. C248)  The Defendant's Notice of Appeal was filed on January 18, 2000. (R. C249)


## STATUTE INVOLVED

"A person is legally accountable for the conduct of another when:

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

720 ILCS 5/5-2  (West 1998)

6

## STATEMENT OF FACTS

On April 28, 1998, the Defendant-Appellant, ARMANDO AMAYA, was indicted for the first-degree murder of Jermaine Lambert and the attempted murders of Alonzo Matthews and Tara Harris. (R. C23-C31) The indictment alleged that the Defendant shot all three of the victims with a gun on October 29, 1997. Three other counts alleged the commission of the offenses of aggravated battery with a firearm and aggravated discharge of a firearm based on the same acts.

Aurora police officer Andrew Hilgenberg was the State's first witness at the jury trial. On October 29, 1997, he went to an apartment complex at 309 E. New York Street to investigate a shooting incident. After darkness had fallen at approximately 8:45 p.m., he located a man on the parkway near the street who had been wounded by gunfire. He then entered the front door of one of the apartments at that address and observed a woman sitting on a couch, who was also suffering from a gunshot wound. In the kitchen, he saw a man lying on his back with a gunshot wound to the chest and a pool of blood beneath him. This last victim was pronounced dead by a paramedic shortly after 9:00 p.m. (R. 378-411)

Tara Harris was the State's first occurrence witness . At the time of trial, she was on probation for a drug crime. On the night of the shooting, she heard arguing behind her apartment at 309 E. New York Street . She saw a person approach from the west end of the building on Lincoln Street wearing a hood and keeping his hands in his jacket pockets. She heard two shots and was struck by one of the bullets. She described the shooter as a Mexican or Spanish male in his late teens or early twenties between 5'5" and 5'6" tall. She never saw the gun and did not get a good look at his face. She was hospitalized for her injuries

7

and the bullet remained in her back at the time of trial. She denied being a street gang member and did not know why anyone would want to shoot her. (R. 413-421)

Alonzo Matthews was on probation in Wisconsin for a drug crime. On the night of the shooting, he was located behind the same apartment building on New York Street. As he was watching an argument among a group of women, he heard someone creeping up behind him. He turned around and saw a Mexican man wearing a hood who shot him in the stomach. He described the shooter as being between 5'8" and 5'9" tall, weighing 140 to 145 pounds, and dressed in black. The witness made statements variously describing the weapon as chrome or black in color and the type of weapon being either a revolver or an automatic. He underwent surgery for his wounds. Mr. Matthews denied being a gang member and did not know why anyone would want to shoot him. On cross-examination, he denied that anyone located in the courtroom was the shooter. (R. 425-437)

The State's next occurrence witness was 17 year-old Shayla Johnson. She had charges for theft and other offenses pending against her and was presently in custody after being arrested for failing to appear in court. On the night of the shooting, she walked to the area of the apartment building and met some friends. She saw a person approach the area and begin shooting. As the shooting began, she was looking at the gun. She identified the defendant as the gunman. She had seen him on several prior occasions and knew that he used the nickname of Scarecrow. While walking to the area of the apartment building, she observed the defendant and other Hispanic men in a car. She heard shouts coming from the car, including statements such as "King Love", "GDK" and "Kings Rule". After the shooting, she ran from the area and did not speak to the police. Almost two months later, on December 19, 1997, she went to the police

8

department with Nicole Pearson to file a complaint about an unrelated incident. This was the first time that she spoke to police about the shooting incident. Subsequently, on February 4, 1998, she attended a line-up at the county jail where she identified the Defendant. (R. 446-458)

On cross-examination, the witness admitted speaking to other persons about the shooting incident prior to discussing the matter with the police. Her friend, Nicole Pearson, spoke to her about the incident and they both went to the Aurora Police Department together in December. She described the shooter to the police as being 5'4" tall and weighing 130-140 pounds. A garbage can was located between the witness and the person who fired the shots. (R. 465-475)

The second identification witness was 18-year-old Nicole Pearson. She had been convicted of retail theft, resisting a peace officer, disorderly conduct and criminal trespass to land and had pending cases for mob action and battery. On the night of the shooting, she was participating in an argument on the side of the apartment building. She saw a Mexican man approach from one block away and start shooting. He was wearing black clothing and had a hood down. He appeared to be in his teens. She was not sure of the type of weapon which was used. She identified the defendant as the shooter and noted that she had seen him on one prior occasion. She also knew that he used the nickname of Scarecrow. Earlier on the evening of the shooting, she saw the defendant located in a car with other Hispanic men, but did not hear them say anything. Following the shooting, she did not stay in the area and did not talk to the police. However, she did speak to the police when she went to the police department a couple of months later with her friend, Shayla Johnson. In February 1998, she viewed a line-up at the county jail and identified the Defendant. At that time, she told the police that the defendant was not the shooter. She denied being a gang

9

member, but admitted associating with friends who were Gangster Disciples. (R. 478-494)

On cross-examination, Ms. Pearson admitted wearing Gangster Disciples gang colors and that she was located in Gangster Disciple territory that night. Since it was dark in the area of the shooting, she could not see the face of the person approaching from the street while he was located under a walkway. She noted that the shooter was acting alone. Jermaine Lambert was a friend of hers. She denied speaking to Shayla Johnson prior to talking to the police, even though they were living together at that time. When first discussing the incident with the police at the lineup, she stated that Scarecrow was not the gunman. However, she changed her mind about her identification after talking to the police following the line-up. Her second story to the police indicated that the defendant was present at the shooting, but did not fire the weapon. After further examination, she admitted that Ms. Johnson provided her with the defendant's nickname of Scarecrow. Also, Johnson told the witness that she (Johnson) thought Scarecrow committed the shooting. (R. 495-501, 516-517)

Officers James Fancsali and Jeffrey Sauer testified to the line-ups conducted with witnesses Pearson and Johnson at the county jail. Officer Sauer admitted that Pearson alternately denied that the Defendant was the shooter, accused him of being involved in the incident and eventually identifying him as firing the weapon. (R. 518-550)

At the conclusion of the officers' testimony, the prosecutor indicated that subsequent evidence would provide sufficient evidence for him to submit an accountability instruction. He admitted that the evidence to that point in the trial was not sufficient to give such an instruction. (R. 555-556)

William McCalister had a theft charge pending against him at the time of trial. On the night of the shooting, he was standing on the southeast corner of

10

the apartment building and observed some women arguing there. He heard gunshots as the arguments continued, but did not see anyone approaching the scene beforehand. Prior to the shooting, he saw a man located across New York Street who appeared to be Hispanic, stood 5'10" to 5'11" tall, weighed 150-155 pounds and wore dark clothing. This man merely stood at that location and never spoke to him. The shots did not come from the area where the man was standing. The witness ran to his car after the shooting. He did not identify anyone in court or by means of photographs during his testimony. (R. 558-576)

Witness Tracy Johnson had served a prison term for a felony drug conviction. In the past, he had been convicted of several charges of residential burglary, burglary, attempted burglary and retail theft. On the night of the shooting, he was drinking alcohol with his friends when he saw a car driving by the area of 4th and Galena, with the Hispanic male occupants throwing out gang signs which were insulting to the Gangster Disciples. After hearing three gunshots, he saw three people running from the area of the apartment building. The people running from the scene were the same individuals he had seen traveling in the car. They re-entered the same car and drove from the area. At approximately 10:30 p.m., he observed the same vehicle stopped by the police with the same men lying on the ground. Mr. Johnson admitted drinking beer and sharing a pint of gin with his friends that evening. He admitted drinking alcohol both before and after the shooting and having received substance abuse treatment for his drug addiction. (R. 577-605)

Officer Scott Wolters testified to the traffic stop of the vehicle containing the Defendant and two companions at approximately 10:30 p.m. on the night of the shooting. No weapons or ammunition were found on the persons of any of the three men or in the vehicle. The Defendant was wearing faded blue jeans which were not black in color. Officer Mike Doerzaph testified to statements

11

made to him by Tracy Johnson during the course of the traffic stop. Mr. Johnson stated that he had seen two of the three men detained by the police earlier that evening running from the scene of the shooting. As to the third subject, Johnson had only observed him earlier in the day driving the car. Mr. Johnson did not identify anyone in court or by means of photographs during his testimony. (R. 606-630, 633-636, 662-664)

Officer Mike Langston testified to his experience investigating gang activity in Aurora. On the date of the shooting, the defendant was a member of the Latin Kings street gang. His gang nickname was Scarecrow. The two men who were detained by the police following the shooting were also members of the same gang. On the date in question, the Gangster Disciples were a rival of the Latin Kings. The apartment building on New York Street was located in Gangster Disciple territory. None of the victims of these offenses were gang members. Also, neither Shayla Johnson nor Nicole Pearson were known to be gang members. The slogan "King Love" showed respect for the Latin Kings and the initials "GDK" stood for "Gangster Disciple Killer". He concluded that gang members commonly used getaway drivers and lookouts when entering rival gang territory, since it was risky to enter that territory on foot. (R. 665-693)

The parties stipulated that a forensic pathologist would testify to the results of his autopsy performed on Jermaine Lambert on October 30, 1997. The victim had received a single penetrating gunshot wound to the chest which was consistent with the barrel of the weapon being placed directly on the body. The bullet penetrated through both chest cavities, the heart and the right lung, resulting in collapse of the lungs. The gunshot wound to the chest was the cause of death. (R. 697-699)

12

Officer Stan Kahle examined the automobile stopped by the police containing the Defendant. His search of the vehicle did not disclose any firearms, bullets, cartridges or any other firearm evidence. (R. 702-707)

After the state rested its case, the parties stipulated that witness Alonzo Matthews had been interviewed at the hospital on the night of the shooting. At that time, he told the police that he could recognize the person who shot him. (R. 719-721)

At the jury instruction conference, the prosecutor tendered instructions pertaining to the principles of accountability. He focused on the common design rule as the basis for giving the instructions. In the event that the jurors disbelieved that Defendant actually fired the shots at the victims, they could still find him accountable for the conduct of the gunman. The same three people were observed together before, during and after the shooting. All of the men must have known one of them was armed and that they had no other purpose to enter rival gang territory than to commit the shootings. The person observed by witness McCalister could have been a lookout or present to assist in flight from the scene. Thus, the jury could believe that either of the Defendant's two companions was the shooter if they did not trust the identification testimony. The defense objected to the accountability instructions by noting that the only evidence of Mr. Amaya's involvement in the crime was his identification as the gunman. (R. 727-739) The court decided to give the accountability instructions based on the testimony that the Defendant was observed in the vehicle from which gang slogans were shouted, as well as being observed fleeing the scene of the shooting. (R. 739-748)

During closing argument, the State first affirmed the reliability of the identification testimony. Alternatively, the person observed by witness

13

McCalister may have been the Defendant, since the witness' description fit Mr. Amaya.  The prosecutor continued as follows:

> "What if the defendant wasn't the actual guy that walked up that walkway into the crowd and pulled that trigger?  What if it was Romero Sandoval that walked up that walkway and pulled the trigger?  What if it was George Gamboa that walked up that way?  What if he didn't pull the trigger of the gun that killed Jermaine Lambert and wounded Tara Harris and Alonzo Matthews.  Could he still be guilty of first degree murder and attempt murder?  Yes.  Yes, he could under the law of the State of Illinois and the facts of this case.... Clearly Armando Amaya, Romero Sandoval and George Gamboa were acting together in a common design back on October 29th, 1997, and thus, each is accountable for the acts of the others, each one of them is the shooter, not physically, but legally.... Would they bring a gun into rival gang territory if all three didn't know that at least one was armed with a gun?"

In addition, he stated that the act of running to the getaway car after the shooting confirmed the common plan of the three men.  Also, planning for the offense was demonstrated by the fact that the shooting was an aggressive act of violence committed in rival gang territory.  The two people who did not fire the weapon were acting as lookouts or were present to help facilitate an escape.  Since any of those scenarios constituted aiding and abetting the crime, all three men would be guilty of the offenses charged.  (R. 784-796, 824-826)

The court's instructions to the jury included a definition of accountability and issues instructions for the crimes charged which included accountability language.  (R. C170, 172, 174-176, 179; 832-837)  The jury returned verdicts of

14

guilty of the offenses of the first-degree murder of Jermaine Lambert, the attempted murders of Harris and Matthews, aggravated battery with a firearm as to both Harris and Matthews, and aggravated discharge of a firearm. (R. C185-C192; 865-871)

Following hearings, the trial court denied the defense post-trial motion. (R. C194-C196, C205; Supp.R. 5-34) At the sentencing hearing, the State conceded that the aggravated battery convictions merged into the attempted murder convictions. The judge agreed that the "one act/one crime" rule required this result. (R. 928-931) The State requested consecutive sentences based on section 5-8-4 of the Unified Code of Corrections following a finding that the Defendant committed a class X felony and inflicted severe bodily injury. The prosecutor urged that the testimony of Harris and Matthews supported a finding of severe bodily injury. The defense objected to consecutive sentences since the State failed to present any evidence at sentencing regarding the issue of great bodily harm. (R. 992-1015)

The court made factual findings that one of the offenses was a class X felony and that the Defendant inflicted severe bodily injury. He also found that the crimes were committed as part of a single course of conduct with no substantial change in the nature of the criminal objective. On this basis, the trial judge felt compelled to impose consecutive sentences. His findings were based on the testimony of Matthews and Harris that they sustained gunshot wounds which required hospitalization. He imposed prison terms of 40 years for the murder of Lambert, 12 years for the attempted murder of Matthews, 10 years for the attempted murder of Harris, and 9 years for aggravated discharge of a firearm. The murder and attempted murder sentences were ordered to run

consecutively to one another, for a total sentence of 62 years' imprisonment.  (R. C229-C236, C238-C239; 1017-1028, 1031-1033)

The Defendant's Motion to Reconsider Sentence was denied and a Notice of Appeal was filed on Mr. Amaya's behalf.  (R. C240-C241, C248-C249; 1039-1047)

<u>ARGUMENT I</u>

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS AND NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED THE COMMISSION OF THE CRIMES. THE DEFENDANT'S PRESENCE AT THE SCENE OF THE CRIME AND HIS FLIGHT WITH THE GUNMAN WOULD NOT BE SUFFICIENT TO CONVICT HIM AS AN ACCOUNTABLE PARTY. DUE TO THE WEAKNESS OF THE IDENTIFICATION EVIDENCE, THE INSTRUCTIONAL ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT.

The Defendant contends that the trial court erred in giving accountability instructions to the jury. Since the evidence only tended to indicate that Mr. Amaya actually shot the victims, his presence at the scene and his flight with the supposed gunman could not support a verdict based on accountability as a matter of law. Due to the weakness in the identification testimony, this error could not have been harmless.

The standard of review concerning the propriety of the court's instructions regarding the elements of the crime requires a determination of whether erroneous instructions were harmless beyond a reasonable doubt. <u>People v. Dennis</u>, 181 Ill.2d 87, 95 (1998); <u>People v. Jefferson</u>, 227 Ill.App.3d 491, 496 (1st Dist., 1992) In the present appeal, this Court must also determine as a matter of law whether the evidence would have sufficed to prove Mr. Amaya's guilt on a theory of accountability. <u>People v. Perez</u>, 189 Ill.2d 254, 265 (2000)

17

Illinois law provides that a person is legally accountable for the conduct of another when he solicits, aids, abets, agrees or attempts to aid another individual in the planning or commission of a crime. The aid must occur either before or during commission of the offense accompanied by the intent to promote or facilitate the criminal act. 720 ILCS 5/5-2(c) (West 1998) A trial judge may give instructions on both the theory of accountability and the theory of guilt as a principal offender, as long as some evidence of the accountability theory has been introduced. The submission of accountability instructions is only proper if evidence of the accused's direct participation in the crime is inconclusive. The State may not utilize an accountability theory to alter the elements of proof of the substantive crime by substituting accountability elements. In other words, if the evidence demonstrates that the defendant was either the principal offender or that he did not participate in the crime, then submission of accountability instructions will result in vacation of the conviction and award of a new trial. People v. Stark, 33 Ill.2d 616, 622 (1966); People v. Testa, 261 Ill.App.3d 1025, 1030 (2nd Dist., 1994); People v. Crowder, 239 Ill.App.3d 1027, 1030 (3rd Dist., 1993); People v. Batchelor, 202 Ill.App.3d 316, 330 (1st Dist., 1990); People v. Lusietto, 41 Ill.App.3d 205, 207 (3rd Dist., 1976); People v. Umphers, 133 Ill.App.2d 853, 857 (5th Dist., 1971)

With regard to the substantive law of accountability, the defendant must either share a criminal intent of the principal offender to violate the law or he must participate in a common criminal design with other persons. If the accused does not possess knowledge of a design to harm the victims, then the State cannot prove his shared criminal intent with the principal. The alternative common design rule for imposing criminal responsibility only applies if the accused is proven to possess prior knowledge of the common plan and participates in some fashion in effectuating that plan. Factors such as the

18

defendant's presence at the scene, flight from the scene and subsequent affiliation with co-defendants may be considered to determine the existence of a common design. However, accountability cannot be imposed for the conduct of other individuals by proof of the defendant's mere presence at the scene, even if combined with proof of his flight from that location, his knowledge that a crime has been committed, his driving of a getaway car, or his failure to report the crime to police. People v. Perez, 189 Ill.2d 254, 265 (2000); People v. Taylor, 186 Ill.2d 439, 447 (1999); People v. Shaw, 186 Ill.2d 301, 323 (1998); People v. Dennis, 181 Ill.2d 87, 95 (1998); People v. Estrada, 243 Ill.App.3d 177, 184 (1st Dist., 1993); People v. Taylor, 219 Ill.App.3d 47, 49 (3rd Dist., 1991)

In Mr. Amaya's trial, the State sought to apply principles of accountability based on improper factors such as his flight from the scene of the shootings. However, the evidence of his guilt rested solely upon the accusation that he actually murdered Jermaine Lambert and personally shot both Tara Harris and Alonzo Matthews. Midway through the trial, the State conceded that the evidence could not support an accountability instruction. Instead, the prosecutor predicted that the evidence to be elicited from witnesses William McCalister, Tracy Johnson and Officer Mike Langston would supply the necessary facts to instruct the jury concerning principles of accountability. (R. 555-556) However, none of the testimony of these individuals or any of the other evidence in the case demonstrated that Mr. Amaya shared the intention of other persons to harm the victims. Also, the evidence did not prove that the Defendant knew of a plan to shoot the victims or that he participated in a common scheme with other individuals to commit these crimes.

Both Tara Harris and Alonzo Matthews testified that they were shot by a single individual whom they could not identify. Neither shooting victim observed anyone other than the single perpetrator aiding or abetting in commission of any

19

of the shootings. (R. 413-421, 425-437) Although both Shayla Johnson and Nicole Pearson testified that the Defendant fired the weapon at all of the victims, neither of those two witnesses related any information that other individuals participated in the murder or the attempted murders. In fact, Pearson testified that the gunman acted alone. (R. 446-475, 478-513, 516-517) Therefore, the prosecutor accurately represented to the court that none of the testimony of the State's first four occurrence witnesses would substantiate an accountability instruction. (R. 555-556)

While the State attempted to rely upon the testimony of William McCalister to support its accountability theory, this witness only observed an individual standing across the street on the opposite side of the building from where the shootings occurred. This person never made any statements to the witness or anyone else in the area and never did anything other than stand some distance away from the scene with his hands in his pockets. His description of the man differed by at least six (6) inches in height compared to the description of the gunman provided by Shayla Johnson. Moreover, Mr. McCalister did not observe this individual flee the scene and he never identified either the Defendant or anyone else as the silent man standing across the street. (R. 558-576) Even if the jury believed the State's argument that the person observed by the witness was Mr. Amaya (R. 778-783), mere presence at the scene of a crime does not suffice to attach criminal responsibility for the actions of other persons. (See the authorities cited at page 19 above.) Therefore, this testimony could not form a proper basis for an accountability instruction.

Witness Tracy Johnson indicated that he observed three Hispanic males driving in a vehicle shouting gang slogans at some time prior to the shootings. He did not identify the Defendant or anyone else as an occupant of the car or as the person(s) making the remarks. Mr. Johnson did not observe the shooting

and thus could not identify anyone who might have fired the weapon. He stated that he saw three persons running from the general area of the crimes entering the same vehicle from which the gang slogans were shouted and that these same persons were eventually arrested by the police. However, Mr. Johnson never identified either the Defendant or anyone else as being the person(s) fleeing the scene and occupying the vehicle upon being detained by the police. (R. 577-605) As noted above, this testimony also cannot form the basis for an accountability instruction, since presence at the crime scene and flight from the area will not suffice to so instruct the jury. (See the authorities cited at page 19 above.)

In closing argument, the prosecutor first stated that the jury should find Mr. Amaya guilty because of the strength of the identification evidence. However, he then suggested a number of reasons for holding the Defendant accountable for the murder and attempted murders if the jury chose not to give credence to the identification testimony. First, he argued that the person observed by witness McCalister may have been the Defendant (R. 778-783), even though McCalister never identified anyone as the silent male standing across the street. Also, the silent male was never connected to any of the three individuals observed running from the scene on a different street on the opposite side of the building. (R. 558-568, 577-587) Thus, this suggested basis for an accountability instruction invited speculation as to the identity of the silent male, as well as misstating the law to permit the unknown person's passive presence at the scene to suffice to prove aiding and abetting.

In addition, the State wanted the jury to assume that a common plan existed among the three persons who ran from the scene because they committed an aggressive act of violence in rival gang territory. (R. 793) The prosecutor also asserted that the other persons present were acting as lookouts.

21

(R. 793-794)  But, once again, these insinuations are not borne out by the record, since no evidence was introduced that any common plan existed, much less that Mr. Amaya was aware of any such plan.  Moreover, the presence of supposed companions of the shooter at the scene did not demonstrate that they were acting as lookouts.  Even if two persons accompanied the gunman into the general area of the apartment building, this circumstance does not prove that the non-participants were aware of the shooter's possession of a weapon or of any plan to use the gun against persons located in the area.    Indeed, the spontaneous, random nature of the shootings which constituted the underpinning for the State's theory of the case more likely indicates a lack of awareness of any plan by companions of the gunman.

Finally, the State wanted the jury to support an accountability verdict on the basis that the persons observed running from the scene were assisting in effecting an escape from the area of the shooting.  (R. 791-794)  However, the recent cases of People v. Dennis, supra, and the other authorities cited at page 19 above, have squarely rejected the idea that flight or assisting escape can form the basis for an accountability instruction, absent such factors being defined as elements of the offense.  The elements of first-degree murder include killing a person without lawful justification either (1) intending to kill or inflict great bodily harm, or (2) knowing that the acts committed will cause death to the victim, or (3) knowing that the acts create a strong probability of death or great bodily harm to that person.  720 ILCS 5/9-1(a)(1), (a)(2) (West 1998) The crime of attempted murder requires proof that the defendant took a substantial step toward committing the crime of murder with the intent to kill the victim.  720 ILCS 5/8-4(a) (West 1998); People v. Parker, 311 Ill.App.3d 80, 89 (1st Dist., 1999) The additional crime for which Mr. Amaya was sentenced, namely aggravated discharge of a firearm, also does not include escape as one of its elements.

22

People v. Taylor, 186 Ill.2d 439, 447 (1999) Therefore, since the acts proving the murder of Jermaine Lambert and the attempted murders of Tara Harris and Alonzo Matthews had already occurred when Tracy Johnson observed three men running from the scene, assisting in escape from the area of the apartment building could not legally support a finding of accountability. Therefore, the prosecutor's suggestion that this evidence supported a guilty verdict, even if Mr. Amaya did not shoot the victims, may have tipped the balance in favor of conviction in violation of controlling case law. See People v. Shaw, 186 Ill.2d 301, 323 (1998)

In addition, even the trial court was led astray by the prosecutor's argument when determining how to instruct the jury. He determined that the jury should be informed of the principles of accountability partially on the basis that the evidence included proof of flight from the scene. (R. 739-748). If the trial judge improperly considered this factor in determining the application of accountability to the facts, surely a lay jury could not be immune from such an argument.

Since none of the factual circumstances could individually support an accountability instruction, the State postulated a theory of the case which relied upon Mr. Amaya's gang membership as a substitute for proof of his intent or participation in a common design. This theory was based on the argument that random shootings occurred on October 29, 1997 by three Latin Kings entering rival gang territory and attacking their victims without any other rhyme or reason. Other than a generalized opinion by Officer Langston that the Latin Kings were rivals of another gang whose "territory" was entered (R. 665-693), no other connection was demonstrated between gang membership and the shootings. In fact, Langston confirmed that none of the victims or occurrence witnesses were members of any gang. While the Defendant's affiliation with other persons

23

before and after the shootings was a relevant circumstance, mere membership in a gang does not suffice to prove that Mr. Amaya shared the motive of the theorized gunman to harm the victims. Absent proof of the accountable party's knowledge of the gunman's intentions or his design to harm the victims, a guilty finding based on accountability cannot stand. People v. Perez, 189 Ill.2d 254, 265 (2000) Instead, the most that can be said for the State's theory is that Mr. Amaya was observed in the company of other gang members before and after the shootings without any proof that he personally shouted gang slogans, that any plan existed among the men to harm the victims, that the Defendant possessed knowledge of such a plan, or that he acted in concert with the supposed gunman.

Although some case law holds that the improper submission of an accountability instruction can be harmless error (for example, People v. Umphers, 133 Ill.App.2d 853, 857 (5th Dist., 1971)), in the present case the identification evidence was extremely weak. Neither of the surviving shooting victims was able to make an identification of the Defendant. Significantly, Matthews testified that Mr. Amaya was not the person who shot him. (R. 413-421, 425-437) Also, witnesses McCalister and Tracy Johnson did not observe the shooting and could not identify the persons they observed in the area of the apartment building during and after the shootings. Even the descriptions of the gunman by Harris, Matthews and McCalister differed substantially in describing his height, with estimates ranging from 5'4" tall to 5'11" tall. Tracy Johnson's "identification" of the Defendant as the same person he saw fleeing the scene was called into question by Officer Doerzaph, who recalled that Johnson only mentioned seeing two of the men detained by police run from the apartment building. In fact, all of Tracy Johnson's testimony was subject to suspicion because of his prior drug conviction and sentence of imprisonment, the

24

fact that he drank heavily on the night of the shootings, and his admitted drug addiction. The failure of the police to locate any weapons or ammunition in the vehicle further called into question the identity of the actual gunman. (R. 558-576, 577-605, 606-627, 662-664, 702-707)

Only the testimony of Shayla Johnson and Nicole Pearson provided an identification of Mr. Amaya as the actual gunman. (R. 446-477, 478-517) However, the testimony of both of these individuals was severely undermined by the fact that neither one of them provided any information to the police for nearly two months after the shootings occurred. Only by happenstance did the authorities become aware of their supposed knowledge of the crimes when they entered the Aurora Police Department to report an unrelated incident nearly two months later. During the intervening weeks, the women never reported their observations to anyone else. However, they did live together and discussed the matter between themselves, with Ms. Johnson suggesting to Ms. Pearson the identity of the Defendant as the shooter. When they were taken to the county jail for line-up identifications over three months following the shootings, Ms. Pearson initially informed the police that Mr. Amaya was not the person who shot the victims. Only after further conversation did the police persuade her to change her mind to identify the Defendant as a participant in the crimes. Even then, she initially stated that he was not the actual gunman, only later giving a third version of her story that identified Mr. Amaya as the principal offender.

Moreover, every one of the occurrence witnesses had a criminal record. Both Harris and Matthews were serving sentences of probation at the time of the trial. (R. 413-421, 432-437) Shayla Johnson had pending charges for theft and other crimes, despite her youth of 17 years of age. She was also being held in custody for her failure to appear in court voluntarily. (R. 446-458) Nicole Pearson, who was only 18 years old, had already been convicted of theft and

25

other misdemeanors, along with mob action and battery charges pending against her. She admitted being an associate of the Gangster Disciples street gang. (R. 478-494)

These inconsistencies in the various "identification" statements of the witnesses presented serious credibility issues for the jury's resolution. In fact, the entire motivation for submitting an accountability instruction to the jury was the State's uneasiness with resting the prosecution solely on the argument that they proved the Defendant actually shot the victims. In closing argument, the prosecutor frankly acknowledged to the jury that they might not accept the identification testimony of Johnson and Pearson, but encouraged a guilty verdict based on the Defendant's alleged actions as a lookout. (R. 727-737, 738-739, 778-796, 824-826) While the jury was certainly free to accept or reject the validity of these identifications of Mr. Amaya, the State's fallback theory of accountability prevented the defense from obtaining a verdict based solely on the evidence that the Defendant was the actual gunman. Instead, the jury could have thoroughly disbelieved the identification testimony of both Shayla Johnson and Nicole Pearson, but found Mr. Amaya guilty of the crimes based solely on the invalid theory of accountability. Thus, the erroneous use of accountability instructions was not harmless to the defense beyond a reasonable doubt.

Therefore, this Court should vacate all of the Defendant's convictions in this case and remand for a new trial in which the jury is only instructed on a finding of guilt or innocence based on his alleged actions as the killer of Jermaine Lambert and the person who attempted to kill Tara Harris and Alonzo Matthews.

ARGUMENT II

THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON THE JURY VERDICT CONVICTING THE DEFENDANT OF THE OFFENSE OF AGGRAVATED DISCHARGE OF A FIREARM, SINCE THE CONVICTION WAS BASED ON THE SAME PHYSICAL ACTS AS THE MURDER AND ATTEMPTED MURDER CONVICTIONS.

The Defendant contends that his conviction for the offense of aggravated discharge of a firearm should be vacated under the "one act/one crime" rule, because the acts of firing the handgun were the same acts which formed the basis for the murder and attempted murder convictions.  The court imposed a concurrent sentence of 9 years' imprisonment for this crime.  (R. C238-C239; 1031-1033)

On appellate review, whether multiple convictions have been entered improperly is a question of law subject to *de novo* scrutiny.  People v. Boyd, 307 Ill.App.3d 991, 998 (3rd Dist., 1999)

Although trial counsel for the Defendant failed to object at the sentencing hearing to any "one act/one crime" violation, the defense did file a motion for reconsideration of the sentence.  (R. C240-C241)  Even in situations where the defendant fails to raise this issue at sentencing or in any post-trial motion , these types of claims are routinely reviewed as plain error, since an unauthorized sentence affects substantial rights.  This is particularly true in the context of a case where consecutive sentences have been imposed .  People v. Smith, 183 Ill.2d 425, 426 (1998); People v. Hicks, 181 Ill.2d 541, 545 (1998).

The appearance of more than one guilty finding on the Defendant's record for a single over act is prohibited by the decision in People v. King, 66 Ill.2d 551,

27

566 (1977). <u>King</u> holds that a defendant suffers prejudice where more than one offense is carved from the same physical act. A physical act is defined as any overt or outward manifestation which will support a guilty finding for a different offense.

In the instant appeal, the prosecution proved that Jermaine Lambert was killed by the use of a firearm which resulted from a gunshot wound to the chest. (R. 697-699) Also, both Alonzo Matthews and Tara Harris were shot with a gun, resulting in physical injuries to them. (R. 413-421, 425-437) Other than these acts of firing a handgun, no other testimonial or physical evidence was introduced to substantiate that a separate physical act of firing a weapon occurred. In fact, both the indictment and the jury verdict failed to specifically identify which shot constituted this offense, since the victim of the shooting was not named for this crime. By contrast, the jury verdicts for all other counts identified the particular victim who was the subject of each criminal offense. (R. C29, C185-C190)

Therefore, since the evidence did not support a separate conviction for the offense of aggravated discharge of a firearm, this Court should vacate the conviction and sentence imposed thereon.

ARGUMENT III

THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM. THESE FACTUAL DETERMINATIONS SHOULD HAVE BEEN MADE BY THE JURY BY THE STANDARD OF PROOF APPLICABLE TO CRIMINAL TRIALS.

The Defendant contends that the trial court erred in imposing consecutive sentences for his first-degree murder and attempted murder convictions, since the case of Apprendi v. New Jersey, 147 L.Ed.2d 435, 442 (2000), now requires such determinations to be made by a jury based upon a finding of proof beyond a reasonable doubt. The findings that the nature of the Defendant's criminal objective did not change during the course of the crimes and that the victims suffered great bodily harm cannot be determined at sentencing by the trial court.

At the Defendant's sentencing hearing, the State sought consecutive sentences for Mr. Amaya based upon section 5-8-4 of the Unified Code of Corrections. (730 ILCS 5/5-8-4(a)(i) (West 1998)) The defense objected to consecutive sentencing because the State failed to prove the "elements" supporting the factual basis for the required findings "at the sentencing hearing". Defense counsel also urged that the sentences should run concurrently. However, the trial judge overruled the defense objection and entered findings that no substantial change occurred in the nature of the criminal objective and that the victims suffered great bodily harm. The court then imposed sentences

of 40 years' imprisonment for the murder conviction, 12 years' imprisonment for the attempted murder of Alonzo Matthews, and 10 years' imprisonment for the attempted murder of Tara Harris. The court further ordered that all of the sentences should run consecutively to one another for a total of 62 years' imprisonment. (R. C229-C236, C238-C239; 992-1015, 1017-1028, 1031-1033)

In the case of Apprendi v. New Jersey, 147 L.Ed.2d 435, 442 (2000), the Supreme Court of the United States determined that the Sixth Amendment right to trial by jury and the Due Process Clause of the 14th Amendment require that factual determinations authorizing an increase in the maximum prison term for a crime must be made by a jury based on proof beyond a reasonable doubt. The only exception to this ruling is that prior convictions need not be proven by these standards. In Apprendi, the prosecution sought an extended term sentence based on a sentencing statute which authorized a more lengthy prison term if the accused acted with a purpose to intimidate the crime victims due to their race. Since this finding was made by the trial court by a standard of the preponderance of the evidence, the Supreme Court vacated the extended sentence. The high court also noted in its decision that the jury trial and criminal standard of proof protections apply regardless of whether the additional fact supporting the extended sentence is labeled an element of the offense or a sentencing factor. Instead, the issue is whether the accused was exposed to a greater punishment than authorized by the jury's verdict. The Apprendi decision is considered a new rule of criminal procedure which applies retroactively to cases pending on direct state appeal, as well as on collateral habeas corpus review. U.S. v. Murphy, ___ F.Supp.3d ___, (D. Minn., case # 4-95-103(8), August 7, 2000)

Under Illinois law, a defendant convicted of the crime of first-degree murder is normally subject to a sentence of between 20 and 60 years'

## CONCLUSION

WHEREFORE, the Defendant-Appellant, ARMANDO AMAYA, prays the Court to vacate his convictions for the offenses of first-degree murder, attempted murder and aggravated discharge of a firearm and to remand this cause to the circuit court for a new trial, due to the improper accountability instructions given to the jury. In the alternative, the Defendant seeks the vacation of his conviction for aggravated discharge of a firearm under the "one act/one crime" rule. If the Court does not reverse or vacate his convictions, the Defendant further prays the Court to vacate his sentences and to remand this cause to the trial court for re-sentencing, due to the failure to prove the factual predicate for his consecutive sentencing to a jury beyond a reasonable doubt.

Respectfully submitted,

Larry Wechter
Contract Attorney for the
Office of the State Appellate Defender
528 S. Batavia Avenue, Suite 2N
Batavia, IL 60510
630/761-8446

COUNSEL FOR DEFENDANT-APPELLANT

APPENDIX

# TABLE OF CONTENTS TO THE APPENDIX

| DATE OF FILING | DOCUMENT | PAGE |
|---|---|---|
| April 28, 1998 | Indictment | A2-A10 |
| January 29, 1999 | Judgment Order | A11 |
| August 12, 1999 | Sentencing Order | A12 |
| August 13, 1999 | Sentencing Order | A13-A14 |
| September 13, 1999 | Motion to Reconsider Sentence | A15-A16 |
| January 18, 2000 | Order denying Motion to Reconsider Sentence | A17 |
| January 18, 2000 | Notice of Appeal | A18 |
| | Table of Contents to the Common Law Record | A19-A20 |
| | Table of Contents to the Report of Proceedings | A20 |

Multiple ... Indictment

IN THE CIRCUIT COURT FOR SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS    VS    ARMANDO AMAYA

Defendant,

General Number  98 CF 535

INDICTMENT

THE GRAND JURY CHARGES THAT:          APR 2 ... 1998

Count One

On or about _____ October 29, 1997

_____ Armando Amaya

committed the offense of First Degree Murder,

_____ Special

in violation of Chapter  720 , Section  5/9-1(a)(1)  of the

Illinois Compiled Statutes, as amended, in that

said defendant, without lawful justification and with the intent to kill

Jermaine Lambert aka: Victor Lambert, shot Jermaine Lambert aka: Victor

Lambert with a gun, thereby causing the death of Jermaine Lambert aka:

Victor Lambert.

A 2

All of the foregoing occurred in Kane County, Illinois.

Page One.

C00023

Indictment: PEOPLE V. __ARMANDO AMAYA__ Pg. __2__

General Number __98 CF 535__

THE GRAND JURY CHARGES THAT:

APR 2 8 1998

### Count Two

On or about _____ __October 29, 1997__

_____ __Armando Amaya__ _____

committed the offense of __First Degree Murder,__ _____

_____ __Special__ _____

in violation of Chapter __720__, Section __5/9-1(a)(2)__ of the

Illinois Compiled Statutes, as amended, in that

said defendant, without lawful justification, shot Jermaine Lambert,

aka: Victor Lambert with a gun, knowing such act created a strong

probability of death or great bodily harm to Jermaine Lambert aka Victor

Lambert, thereby causing the death of Jermaine Lambert, aka: Victor

Lambert.

A 3

All of the foregoing occurred in Kane County, Illinois.

C00024

Multiple no Indictment

Indictment:    PEOPLE V. __ARMANDO AMAYA_____,  Pg. __3__

General Number __98 CF 535__

THE GRAND JURY CHARGES THAT:

Count Three                      APR 28 1998

On or about _____ __October 29, 1997_____            039

_____ __Armando Amaya_____    ENTERED

committed the offense of __Attempted (First Degree Murder),_____

_____ __Class X Felony_____

in violation of Chapter __720__, Section __5/8-4(a)_____ of the

Illinois Compiled Statutes, as amended, in that

said defendant, with the intent to commit the offense of First Degree

Murder, in violation of Illinois Compiled Statutes, Chapter 720, Act 5,

Section 5/9-1, performed, a substantial step towards the commission of

that offense, in that he without lawful justification and with the

intent to kill Alonzo Mathews, shot Alonzo Mathews with a gun.

A 4

All of the foregoing occurred in Kane County, Illinois.

C00025

Indictment:    PEOPLE V. ARMANDO AMAYA                    Pg.  4

General Number  98 CF 535

THE GRAND JURY CHARGES THAT:

Count Four

APR 28 1998

On or about _____ October 29, 1997 _____

_____ Armando Amaya _____

committed the offense of Attempted (First Degree Murder),

Class X Felony

in violation of Chapter  720 , Section    5/8-4(a)       of the

Illinois Compiled Statutes, as amended, in that

said defendant, with the intent to commit the offense of First Degree

Murder, in violation of Illinois Compiled Statutes, Chapter 720, Act 5,

Section 9-1, performed a substantial step towards the commission of that

offense, in that he without lawful justification and with the intent to

kill Tara Harris, shot Tara Harris with a gun.

A 5

All of the foregoing occurred in Kane County, Illinois.

C00026

Indictment:   PEOPLE V.  ARMANDO AMAYA                ,  Pg.  5

General Number  98 CF 535

THE GRAND JURY CHARGES THAT:

Count Five

APR 27 1998

On or about _____ October 29, 1997 _____

_____ Armando Amaya _____

committed the offense of Aggravated Battery with a Firearm,

_____ Class X Felony _____

in violation of Chapter  720 , Section 5/12-4.2(a)(1)  of the

Illinois Compiled Statutes, as amended, in that

said defendant, in committing a battery, in violation of Illinois

Compiled Statutes, Chapter 720, Act 5, Section 12-3, knowingly, without

legal justification and by means of discharging a firearm caused an

injury to Alonzo Mathews, in that said defendant shot Alonzo Mathews

with a gun.

A 6

All of the foregoing occurred in Kane County, Illinois.

C00027

Indictment: PEOPLE V. ARMANDO AMAYA Pg. 6

General Number 98 CF 535

THE GRAND JURY CHARGES THAT:

Count Six

APR 29 1998

030

On or about _____ October 29, 1997

_____ Armando Amaya _____

committed the offense of Aggravated Battery with a Firearm,

_____ Class X Felony _____

in violation of Chapter __720__, Section 5/12-4.2(a)(1) __ of the

Illinois Compiled Statutes, as amended, in that

said defendant, in committing a battery, in violation of Illinois

Compiled Statutes, Chapter 720, Act 5, Section 12-3, knowingly, without

legal justification and by means of discharging a firearm caused an

injury to Tara Harris, in that said defendant shot Tara Harris with a

gun.

Ã 7

All of the foregoing occurred in Kane County, Illinois.

C00028

Indictment:   PEOPLE V. __ARMANDO AMAYA_____ , Pg. _7_

General Number _98 CF 535_

THE GRAND JURY CHARGES THAT:

APR 29 1998

### Count Seven

On or about _____ October 29, 1997 _____

_____ Armando Amaya _____

committed the offense of_Aggravated Discharge of a Firearm,_____

_____ Class 1 Felony _____

in violation of Chapter __720__, Section_5/24-1.2(a)(2)___ of the

Illinois Compiled Statutes, as amended, in that

said defendant, knowingly discharged a firearm in the direction of

another person.

A 8

All of the foregoing occurred in Kane County, Illinois.

A TRUE BILL

_Barbara J. Wolf_____
Foreperson of the Grand Jury

C00029

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,   vs   ARMANDO AMAYA
_____ Plaintiff, _____ Defendant,

General Number __98 CF 535__

N O T I C E

TO: __Armando Amaya_____          __Public Defender_____

_____          APR 28 1998

_____          _____

Defendant _____          Attorney of Record _____

    You are hereby notified that the above-named defendant for whom you have appeared as attorney of record, was indicted by the Kane County Grand Jury on __ _____April 28, 1998_____.

    You are further notified that the Court has issued a,

    _____ Warrant ordered to continue for the arrest of the defendant _____ _____ requiring his/her appearance before the Court for arraignment in Room _____, Kane County Judicial Center,  St. Charles, Illinois.

    __XXXX__ Notice this matter is set for arraignment on the pre-existing court date, requiring the defendant _____Armando Amaya_____ to appear before the Court in Room __217__, Kane County Judicial Center, St. Charles, Illinois.

    You are further notified that with reference to the above-numbered cause(s) the defendant has been charged with the offense(s) of: _First Degree Murder, Special (2cts), Att. (First Degree Murder, Cl. X Fel._ _(2 cts), Agg. Battery w/Firearm, Cl. X Fel. (2 cts) and Agg. Discharge of_ _A Firearm, Cl. 1 Fel.____ and that bail has been set on said charge(s) in the total amount of $_No Bail_.     If the defendant fails to appear for arraignment the State will move that any bond previously furnished by the defendant on the above charge(s) be forfeited and that a warrant immediately issue for his/her arrest.

    All inquiries concerning arraignment procedures should be directed to DAVID R. AKEMANN, State's Attorney of Kane County, phone (630) 232-3500.

    A 10          DAVID R. AKEMANN
          State's Attorney of Kane County
          37W777 Rt. 38, Kane County Jud.   Center

C00031

**Clerk of the Circuit Court**
Kane County, IL

JAN 29 1999

FILED 107
ENTERED

GEN. NO. ___98 CF 535___

☐ JURY ☐ NON-JURY

People

VS.

Armando Amaya

PLAINTIFF (S) | DEFENDANT (S)

| JUDGE Hudson | COURT REPORTER LAN | PLTF. ATTY. Guagliardo | CHECK IF PRESENT |
| DEPUTY CLERK | A copy of this order ☐ should be sent to: ☐ has been sent to: | DEFT. ATTY. Kliment | |

**ORDER**

Jury returns findings of guilty on Counts 2, 3, 4, 5, 6 and 7 of the indictment and no verdict on Count 1. State dismisses Count 1. Defendant's bond revoked. Adult Court Services to do pre-sentence report. Sentencing set for 4-8-99 at 1:00 p.m. Room 313 Defendant to be transported

DATE 1-29-99

JUDGE C00191

Yes ☐  No ☐ ——————Disposal

P7-MISC-001

A 11

# IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

GEN. NO. 98 CF 535

☐ JURY   ☐ NON-JURY

People of the State of Illinois

VS.

~~ARMANDO AMAYA~~

Clerk of the Circuit Court
Kane County, IL

AUG 12 1999

FILED 063

ENTERED

PLAINTIFF (S)                    DEFENDANT (S)

| JUDGE Hudson | COURT REPORTER Peggy | PLTF. ATTY. Quagliano / Walsh |
|---|---|---|
| DEPUTY CLERK John | A copy of this order ☐ should be sent to: ☐ has been sent to: | CHECK IF PRESENT DEFT. ATTY. Klinnt |

## ORDER

The Court having heard and considered all the evidence and Arguments of counsel As well As the STATUTORY Factors in MITIGATION AND AGGRAVATION sentences the Defendant As follows:

For the murder of Jermaine Lambert: Forty (40) years Illinois Department of Corrections.

For the Attempted First Degree murder of Alonzo Matthews: Twelve (12) years Illinois Department of Corrections.

For the Attempted First Degree murder of Tara Harris: Ten (10) years Illinois Department of Corrections.

Said sentences to run consecutively to each other.

DATE  8-12-99

JUDGE  006229

Yes ☐    No ☐ ——— Disposal

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT

KANE COUNTY, ILLINOIS

Clerk of the Circuit Court
Kane County, IL

AUG 13 1999

FILED    104

ENTERED

GEN. NO. **98CF535**

THE PEOPLE OF ILLINOIS                    vs        *Armando Amaya*

PLAINTIFF                                                          DEFENDANT

| JUDGE *Hudson* | COURT REPORTER *Steinberg* | PLTF. ATTY. *Guagliardo* | ☑ |
|---|---|---|---|
| DEPUTY CLERK | A copy of this order ☐ should be sent to: ☐ has been sent to: | DEFT. ATTY. *Kliment* — CHECK IF PRESENT — | ☑ |

### JUDGMENT ORDER
Illinois Department of Corrections

Crime For Which Defendant Convicted:
*Aggravated Discharge of a Firearm*
Chapter and Section:
*720 ILCS 5/24-1.2 (a)(2)* ct.7

Credit for Time Served:
☑ Kane County Jail:

_____ Day(s) _____ Month(s) ☐ NONE
☑ To be determined by Sheriff

☐ Other Credit:_____
(Type/Place/Agency)

_____ Day(s) _____ Month(s) ☐ NONE

Costs of These Proceedings:

Fine                                            $ _____
Circuit Clerk's Costs                        _____
State's Attorney's Costs                     _____
Sheriff's Costs                              _____
Surcharge                                    _____
Sub-total _____ (A)
Bond on Deposit          $ _____
Less 10% (if applicable) ( _____ )
Credit Amount ( _____ ) (B)
BALANCE DUE (A–B)        $ _____
Balance Due:
☐ Instanter   ☐ _____, 19 ___

Sentence of the Court:
_____ Days(s) _____ Month(s) _9_ Year(s)
(if applicable):
☑ Concurrent   ☐ Consecutive with Case Number(s):
*Count 1  98 CF 535*

☐ Finding of guilty but mentally ill

Municipality of Arrest (if over 25,000 pop.):
*Aurora*

THE COURT being advised in the premises:

IT IS HEREBY ORDERED that the defendant named herein is guilty of the crime set forth in this case; and,

IT IS FURTHER ORDERED that the defendant be given credit for such time served as determined by the Court; and, that the defendant pay all costs of these proceedings.

NOW, THEREFORE, is is Ordered, Adjudged and Decreed that the defendant be sentenced to the Illinois Department of Corrections for the crime he/she stands convicted, for a term of days, months or years as set forth herein; and,

FURTHER, that the defendant be taken from the bar of this Court to the Kane County Jail, and from there, by the Sheriff of Kane County, to the nearest reception and classification center of the Illinois Department of Corrections, and the Illinois Department of Corrections is hereby required and commanded to take the body of the defendant and confine him/her in a Penitentiary or State Penal Farm, according to law, from and after delivery thereof until discharged according to law, provided such term of imprisonment shall be not less than nor more than the term of days, months or years for which the defendant stands convicted.

Date   *August 13, 1999*

Enter: _____
(Judge)

A 13                              C00258

By virtue of the within Judgment Order — Illinois Department of Corrections, I have taken the body of the within named defendant and will deliver him/her to the Reception and Classification Center of the Illinois Department of Corrections.

Date _____ Aug 13, 1999 _____    Signed: _____

                                                                    (Sheriff)

                      By: _____ #270

                                             (Deputy Sheriff)

A 14

000239

## IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS
## CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,    )
    Plaintiffs,    )
        )
    vs.    )    Gen. No. 98 CF 535
        )
ARMANDO AMAYA,    )
    Defendant.    )

### MOTION TO RECONSIDER SENTENCE

NOW COMES the defendant, Armando Amaya, by and through his attorney, David P. Kliment, Kane County Public Defender, and for his Motion to Reconsider Sentence in this cause states as follows:

1. That the defendant was sentenced to serve a term of 40 years for first degree murder; 12 for first degree murder (attempt); and 8 years for first degree murder (attempt), with all sentences to run consecutively.

2. That the sentences imposed by the Court failed to comply with Article I, Section 11 of the Constitution of the State of Illinois. The sentence imposed by the Court does not comply with the constitutional mandate that the sentence be imposed with the objective of restoring the offender ot useful citizenship.

3. That the sentences imposed by the Court fail to take into account the defendant's youth and the potential that he can be rehabilitated.

4. That the sentences imposed by the Court constitute cruel and unusual punishment in violation of the Eight Amendment to the Constitution of the United States.

WHEREFORE, the defendant, Armando Amaya, prays that this Honorable Court vacate the sentences imposed in this case, and that he be sentenced to a total term in the Department of

C00240

Corrections of thirty two (32) years, and for such other and further relief as this Court deems fair and just under the circumstances.

David P. Kliment
Kane County Public Defender

A 16

C00241

# IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

GEN. NO. _98 CF 535_

☐ JURY  ☐ NON-JURY

People

VS.

Armando Amaya

PLAINTIFF (S)                    DEFENDANT (S)

| JUDGE Hudson | COURT REPORTER Vikti | PLTF. ATTY. Gngelinado |  |
| DEPUTY CLERK | A copy of this order ☐ should be sent to: ☐ has been sent to: | DEFT. ATTY. Kliment | CHECK IF PRESENT |

## ORDER

Motion to Reconsider Sentence is hereby denied following hearing (for the reasons stated on the record).

DATE _1-18-00_                    A 17

C00248

Yes ☐    No ☐ ——Disposal

P7-MISC-001

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS, )
                      Plaintiff. )
  vs.                            )     General Number 98 CF 635
*Armondo Amoya*,                 )
                      Defendant. )

                      ## NOTICE OF APPEAL

*JAN 18 2000*

An appeal is taken from the order or judgment described below.

(1) Court to which appeal is taken: *Second District Appellate Court, Elgin, Illinois*

(2) Name of appellant and address to which notices shall be sent.

  Name: *Armondo Amoya c/o State Appellate Defender*

  Address: *2010 Larkin Ave*
  *Elgin IL 60123*

(3) Name and address of appellant's attorney on appeal.

  Name: *State Appellate Defender*

  Address: *2010 Larkin Ave*
  *Elgin IL 60123*

If appellant is indigent and has no attorney, does he want one
appointed? *Yes*

(4) Date of judgment or order: *1/18/00*

(5) Offense of which convicted: *1st degree murder*
*Attempt 1st degree murder (2 cts)*

(6) Sentence: *40 + 12 + 10 consecutive (62 total)*

(7) If appeal is not from a conviction, nature of order appealed from:
*pretrial, trial, post trial proceedings*

A 18

000249

## TABLE OF CONTENTS TO THE
## COMMON LAW RECORD

| DATE OF FILING | DOCUMENT | PAGE |
|---|---|---|
| March 12, 1998 | Complaint for Preliminary Hearing | C5-C12 |
| April 28, 1998 | Indictment | C23-C31 |
| April 30, 1998 | Arraignment Order | C33-C34 |
| April 30, 1998 | Demand for Speedy Trial | C39 |
| January 21, 1999 | State's Motion in Limine | C86-C87 |
| January 22, 1999 | Defense Motion in Limine | C94-C96 |
| January 22, 1999 | Order ruling on motions in limine | C105 |
| January 25, 1999 | State's 2nd Motion in Limine | C109 |
| January 29, 1999 | Guilty Verdicts & Order | C185-C191 |
| January 29, 1999 | Judgment Order | C192 |
| February 25, 1999 | Post-Trial Motion | C194-C196 |
| April 8, 1999 | Order denying portions of of post-trial motion | C205 |
| March 24, 1999 | Pre-Sentence Report | C215-C222 |
| August 12, 1999 | Sentencing Order | C229 |
| August 12, 1999 | Judgment Orders | C230-C236 |
| August 13, 1999 | Judgment Order | C238-C239 |
| September 13, 1999 | Motion to Reconsider Sentence | C240-C241 |
| January 18, 2000 | Order denying motion to reconsider sentence | C248 |

A19

January 18, 2000              Notice of Appeal                    C249

## TABLE OF CONTENTS TO THE
## REPORT OF PROCEEDINGS

| Witness | Direct Exam | Cross-Exam | Redirect |
|---|---|---|---|
| Andrew Hilgenberg | 378 | 408 | 411 |
| Tara Harris | 413 | 421 | |
| Alonzo Matthews | 425 | 432, 439 | 437 |
| Shayla Johnson | 446 | 465 | 476 |
| Nicole Pearson | 478 | 495, 516 | 513 |
| James Fancsali | 518 | 537 | 540 |
| Jeffrey Sauer | 541 | 546 | |
| William McCalister | 558 | 569, 576 | 575 |
| Tracy Johnson | 577 | 596 | |
| Scott Wolters | 606 | 627 | 630 |
| Mike Doerzaph | 633 | | |
| Mike Langston | 665 | 693 | 695 |
| Stipulation | 697 | | |
| Stan Kahle | 702 | 706 | |
| James Fancsali | 708 | 710 | |
| Stipulation | 719 | | |

A20

ORIG

NO. 2-00-0099



FILED

JAN 2 4 2001

IN THE

LOREN J. STROTZ, CLERK
APPELLATE COURT 2nd DISTRICT

APPELLATE COURT OF THE STATE OF ILLINOIS

SECOND JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 16th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kane County, Illinois. |
| | ) | |
| -vs- | ) | No. 98 CF 535 |
| | ) | |
| ARMANDO AMAYA, | ) | Honorable |
| | ) | Donald C. Hudson, |
| Defendant-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE

Meg Gorecki
State's Attorney
Kane County
St. Charles, Illinois 60175
(630) 232-3500

Norbert J. Goetten, Director
State's Attorneys Appellate
  Prosecutor

Martin P. Moltz
Deputy Director
Lawrence M. Bauer
Staff Attorney
State's Attorneys
  Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123
(847) 697-0020

Gunta Z. Hadac

OF COUNSEL

COUNSEL FOR PLAINTIFF-APPELLEE

## ORAL ARGUMENT REQUESTED

EXHIBIT C

## POINTS AND AUTHORITIES

PAGE

I.

THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON
THE PRINCIPLES OF ACCOUNTABILITY. . . . . . . . . . . . .  13

People v. Gwartney, 289 Ill. App. 3d 350, 683 N.E.2d 497,
     255 Ill. Dec. 329 (4th Dist. 1997) . . . . . . . 13, 14

People v. Gilliam, 172 Ill. 2d 484, 670 N.E.2d 606,
     218 Ill. Dec. 884 (1996)  . . . . . . . . . . . .  13

People v. Jones, 175 Ill. 2d 126, 676 N.E.2d 646,
     221 Ill. Dec. 843 (1997)  . . . . . . . . . . . 13-14

People v. Crane, 145 Ill. 2d 520, 585 N.E.2d 99,
     165 Ill. Dec. 703 (1992)  . . . . . . . . . . . .  14

720 ILCS 5/5-2(c)(West 1998)  . . . . . . . . . . . .  14

720 ILCS 5/9-1(a)(2)  . . . . . . . . . . . . . . . .  14

720 ILCS 5/8-4(a) . . . . . . . . . . . . . . . . . .  14

720 ILCS 5/24-1.2(a)(2) . . . . . . . . . . . . . . .  14

People v. Pena, ____ Ill. App. 3d ___, 739 N.E.2d 584,
     250 Ill. Dec. 821 (2nd Dist. 2000) . . . . . . . .  16

People v. Jefferson, 227 Ill. App. 3d 491, 592 N.E.2d 134,
     169 Ill. Dec. 647 (1st Dist. 1992) . . . . . . . .  16

People v. Collins, 106 Ill. 2d 237, 478 N.E.2d 267,
     87 Ill. Dec. 910 (1985) . . . . . . . . . . . . .  16

People v. Testa, 261 Ill. App. 3d 1025, 633 N.E.2d 1361,
     199 Ill. Dec. 370 (2nd Dist. 1994) . . . . . . 17, 18

People v. Wanke, 303 Ill. App. 3d 772, 708 N.E.2d 833,
     237 Ill. Dec. 30 (2nd Dist. 1999)  . . . . . . . .  18

People v. McCleary, 208 Ill. App. 3d 466, 567 N.E.2d 434,
     153 Ill. Dec. 476 (1st Dist. 1990) . . . . . . . .  18

II.

DEFENDANT WAS PROPERLY CONVICTED OF AGGRAVATED
DISCHARGE OF A FIREARM. . . . . . . . . . . . . . . . .  19

1

People v. King, 66 Ill. 2d 551, 363 N.E.2d 838,
     6 Ill. Dec. 891 (1977)  . . . . . . . . . . . .  19, 20

People v. Lee, 311 Ill. App. 3d 363, 724 N.E.2d 557,
     243 Ill. Dec. 958 (4th Dist. 2000)  . . . . .  19, 20, 22

People v. Pena, ___ Ill. App. 3d ___, 739 N.E.2d 584,
     250 Ill. Dec. 821 (2nd Dist. 2000)  . . . . . .  19, 20

People v. Rodriguez, 169 Ill. 2d 183, 661 N.E.2d 305,
     214 Ill. Dec. 451 (1996)  . . . . . . . . . . . . .  20

People v. McLaurin, 184 Ill. 2d 58, 703 N.E.2d 11,
     234 Ill. Dec. 399 (1998)  . . . . . . . . . . . . .  20

## III.

THE TRIAL COURT CORRECTLY SENTENCED DEFENDANT TO
40 YEARS' IMPRISONMENT FOR FIRST DEGREE MURDER, TO 12
YEARS' IMPRISONMENT AND TO 10 YEARS' IMPRISONMENT FOR
THE OFFENSES OF ATTEMPTED FIRST DEGREE MURDER, THE
SENTENCES FOR ATTEMPTED FIRST DEGREE MURDER TO RUN
CONCURRENTLY AND TO BE SERVED CONSECUTIVELY TO HIS
FIRST DEGREE MURDER SENTENCE. . . . . . . . . . . . . . .  23

730 ILCS 5/5-8-4(a)(i)  . . . . . . . . . . . . . . . . .  23

Thomas v. Greer, 143 Ill. 2d 271, 573 N.E.2d 814,
     158 Ill. Dec. 1 (1991)  . . . . . . . . . . . .  23, 24

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348,
     147 L.Ed.2d 435 (2000)  . . . . . . . . . .  23, 25, 26

People v. Goffman, 65 Ill. 2d 296, 357 N.E.2d 483,
     2 Ill. Dec. 316 (1976)  . . . . . . . . . . . . . .  24

People v. Kilpatrick, 167 Ill. 2d 439, 657 N.E.2d 1005,
     212 Ill. Dec. 660 (1995)  . . . . . . . . . . .  24, 25

People v. Jones, 168 Ill. 2d 367, 659 N.E.2d 1306,
     213 Ill. Dec. 659 (1995)  . . . . . . . . . . . . .  25

People v. Clifton, Nos. 1-98-2126 & 1-98-2384 (cons.)
     (1st Dist., Sept. 29, 2000)  . . . . . . . . . . . .  26

People v. Perruquet, 68 Ill. 2d 149, 368 N.E.2d 882,
     11 Ill. Dec. 274 (1977)  . . . . . . . . . . . . . .  27

134 Ill. 2d R. 615(b)(4)  . . . . . . . . . . . . . . . .  27

People v. Joyner, ___ Ill. App. 3d ___, 739 N.E.2d 594,
     250 Ill. Dec. 831 (2nd Dist. 2000)  . . . . . . . . .

## NATURE OF THE CASE

After a jury trial, defendant was found guilty of first degree murder, two counts of attempted first degree murder, two counts of aggravated battery with a firearm and aggravated discharge of a firearm. Two counts of aggravated battery with a firearm merged into the two counts of attempted first degree murder. Defendant was sentenced to forty years imprisonment for first degree murder, to be served consecutively with twelve years imprisonment on one count of attempted first degree murder, and a concurrent term of imprisonment of ten years imprisonment on a second count of attempted first degree murder. (R. 1028) From his convictions and sentences, defendant now appeals. Defendant does not challenge the sufficiency of the pleadings nor the voir dire.

## ISSUES PRESENTED FOR REVIEW

1. Whether the trial court properly instructed the jury on the principles of accountability.

2. Whether defendant was properly convicted of aggravated discharge of a firearm.

3. Whether the trial court correctly sentenced defendant to 40 years' imprisonment for first degree murder, to 12 years' imprisonment and to 10 years' imprisonment for the offenses of attempted first degree murder, the sentences for attempted first degree murder to run concurrently and to be served consecutively to his first degree murder sentence.

3

## STANDARDS OF REVIEW

1.  On review, the court must determine whether it appears beyond a reasonable doubt that the instructional error, if any, did not contribute to the verdict obtained. People v. Jefferson, 227 Ill. App. 3d 491, 496-97, 592 N.E.2d 134, 166 Ill. Dec. 647 (1st Dist. 1992).

2.  Whether multiple convictions may properly stand is a question of law subject to de novo review. People v. Boyd, 307 Ill. App. 3d 991, 998, 719 N.E.2d 306, 241 Ill. Dec. 445 (3rd Dist. 1999).

3.  Because the construction of a statute is a question of law, the standard of review is de novo. People v. Whitney, 188 Ill. 2d 91, 98, 720 N.E.2d 255, 241 Ill. Dec. 770 (1999).

STATEMENT OF FACTS

In the brief filed on behalf of defendant, Armando Amaya, the following facts were omitted or insufficiently emphasized.

On October 29, 1997, Officer Andrew Hilgenberg was alone and on patrol when he was dispatched in his marked police vehicle to New York and Lincoln streets.  (R. 378-80)  The officer's responsibility was to secure the inside of the crime scene located in apartment one at 309 East New York Street. (R. 396, 410)  Other police officers were required to secure the exterior of the building.  (R. 410-11)  When he arrived, Officer Hilgenberg saw a man in front of the apartment building on the parkway between the sidewalk and the street who appeared to have been shot.  (R. 395)  The man was breathing and conscious and was sitting upright, talking to a police officer. (R. 395-96, 409)  Officer Hilgenberg also noticed that the parking lot area was illuminated, as was the access to the stairs of the building.  (R. 384)  He climbed the stairs onto the porch and entered the front door of the apartment.  (R. 396)

Inside the apartment, Officer Hilgenberg spoke to a woman seated on the living room couch who also appeared to have been shot.  (R. 397)  She was conscious and breathing.  (R. 397) The officer then went to the kitchen area, where he saw on the kitchen floor a man lying with his arms to his side on his back in a pool of blood.  (R. 397-98)  He thought he heard labored breathing and immediately removed the sweatshirt which had been

5

pulled up over his head. (R. 397, 402) Paramedics arrived on the scene and Officer Hilgenberg assisted. (R. 402) The man, identified as Jermaine Lambert, was pronounced dead at 9:03 p.m. that evening. (R. 402, 410)

Tara Harris was a resident of 309 East New York Street and testified that she was taking her daughter's diaper to the dumpster when she stopped to watch some girls arguing. (R. 414-15) She noticed someone come up from the other end of the building, his hands in his pockets wearing a jacket and a hood over his head. (R. 416, 422) The hood did not cover the front part of the man's face; Harris noticed that the man was a Mexican or Spanish male, standing 5'5" or 5'6", in his late teens or early 20's. (R. 417-18) When Harris turned away, she heard two gunshots, but she never saw a gun. (R. 416, 417, 418) She was not aware that she had been shot in the back until she was back in her apartment. (R. 417) Harris had blacked out after she was shot. (R. 424) She underwent surgery and her injury caused her to be hospitalized for nine days. (R. 419) At the time she testified, the bullet was still in Harris's lower back. (R. 417)

Alonzo Matthews was visiting a friend when he heard some girls arguing. (R. 427) The girls were getting ready to fight when he heard "someone creeping up behind me, and I turned around and I just seen a Mexican with a hoodie on, and then he shot me...." (R. 428-28) The man came from the direction of Lincoln Street. (R. 428) Matthews observed that the man was

6

Mexican and stood 5'8" to 5'9" tall, 140 to 145 pounds and was dressed in black with a black hoodie.  (R. 429, 433)  He saw the man for two seconds before he was shot: "...it happened so fast, as soon as he seen me, I seen him, it was over with." (R. 434-35)  The man was standing three feet away when he shot Matthews.  (R. 434)  Matthews averred that the gun was long and had a wheel-like chamber.  (R. 430, 433)  Matthews denied being a gang member and he did not know why anyone would want to shoot him.  (R. 431)  Matthews had been shot in the stomach; he went to the hospital where he underwent surgery and stayed for nine days.  (R. 428, 431, 434)

Both Shayla Johnson and Nicole Pearson identified defendant as the man who started shooting.  (R. 454, 485, 545, 546)  Johnson was watching the argument when she saw defendant walk up from the Lincoln side and walk toward the group of people watching the argument.  (R. 450-51)  Johnson stood facing Lincoln Street and got a "good look" at his face when defendant walked up.  (R. 451, 453)  Defendant was dressed in black or navy.  (R. 477)  She had seen defendant five or six times before and knew his knickname was "Scarecrow."  (R. 454, 457)  Johnson watched as defendant bumped a woman, pushed her out of the way, walked three or four more steps and then started shooting.  (R. 452)  It appeared to Johnson that defendant was unable to control the gun and handled it wildly. (R. 452)  Johnson heard five or six shots and, therefore, she thought the gun was a revolver.  (R. 452)

7

Johnson had seen defendant in a white, four-door Celebrity or Century, with a "red line" on the side prior to the shooting. (R. 458, 460) Two of the automobile's occupants were hanging out of the car and were saying "King love" and "GDK" and "Kings Rule." (R. 459) Johnson did not see the car again. (R. 460)

Johnson ran from the shooting, but later returned. (R. 461) She did not speak to police officers at the scene, and she did not want to get involved. (R. 461) She did not think anyone had been shot. (R. 465) Less than two months later, on December 19, 1997, Johnson and Pearson went to the Aurora Police Department on an unrelated matter and were questioned about the shooting. (R. 462-63) The police initiated the conversation; they had witnesses names of Shayla and Coco but they did not know who the girls were until Pearson admitted that her street name was "Coco." (R. 521-22) During the interview, the girls agreed to view a lineup and Johnson told police what she knew. (R. 463, 522) In February 1998, Pearson was the first to view the lineup at the Kane County Jail, where she identified defendant as the shooter in the October 29th incident. (R. 463-64, 525) Then Johnson viewed the lineup and identified defendant as the shooter. (R. 532-33)

Nicole Pearson testified that she had been arguing with some girls behind a building and near dumpsters located at West Park and New York. (R. 480-81) After the argument ended, a

8

Mexican male approached from Lincoln Street.  (R. 482)  The man was dressed in black and had on a black hat.  (R. 483)  As the man walked from underneath the third level of the apartment building, she saw his face and she recognized that the man was defendant.  (R. 484-85, 501)  He was also holding a big gun. (R. 483)  Defendant started shooting, but he "couldn't hold it right, like the gun was too big for him to hold, so like cocking (sic) his hand up afterward...."  (R. 483-84)  When defendant started shooting, the group of people scattered.  (R. 501)  Pearson fell to the ground and, although defendant pointed the gun at her, he did not fire because Pearson was already on the ground.  (R. 502)  Defendant left and, while he was still shooting, Pearson stood up and ran.  (R. 488, 502)

She had seen defendant once before near Poncho's Tacos and knew his nickname was "Scarecrow."  (R. 487)  She also saw defendant and two other people in a white car just before the shooting.  (R. 486, 496)

When Pearson viewed the lineup in February 1998, she initially told police that defendant was in the white car but he was not the shooter.  (R. 544)  She said that defendant was not the shooter because, although his face looked the same, he had gained weight.  (R. 515)  She observed that "whoever did the shooting was skinny and light, lighter than [defendant]." (R. 544)  Detective Robert Sauer continued to question Pearson about defendant's role in the shooting because it "seemed strange to identify someone in a lineup and yet also say no,

9

that person didn't do the shooting.  (R. 545-46)  Pearson explained that she was hesitant to pick out defendant as the shooter because she thought defendant was going to kill her friends.  (R. 514-15)  Pearson also told the police that she "didn't want to go in front of these Mexican guys because they might try to kill me...."  (R. 516)  Pearson had not even spoken to Shayla Johnson about the shooting.  (R. 504, 506) She ultimately identified defendant as the shooter.  (R. 509-10, 545)

William McCalister had observed, before the shooting, a man just standing and watching.  (R. 566)  He noticed the man because "he was behind me, and... I took a look, because I didn't want anybody to be just walking up behind me."  (R; 567) The man stood there five to eight minutes.  (R. 567)  The gunshots McCalister heard did not come from the location in which the man was standing, and McCalister did not see the man with a gun.  (R. 568)  However, the man's hands were in his pockets.  (R. 574-75)  The man was wearing dark clothing and a jacket over a hooded jacket.  (R. 565, 574)

Tracy Johnson noticed a white Chevrolet Celebrity which was occupied by three hispanic men "throwing out forks" on the night of the shooting.  (R. 581-82, 584)  The automobile drove by two or three more times.  (R. 583)  Tracy Johnson heard three gunshots and then saw three men running from the area of the shots.  (R. 584-85)  These men were the same men who were riding in the white Celebrity.  (R. 585)  He watched as they

10

ran across Galena Street to the Lincoln Laundry on Lincoln Street and get into the same white automobile. (R. 587, 682) The laundry was on the outer edge of Gangster Disciples territory. (R. 682) When Johnson saw the men stopped by police later that evening at the intersection of Downer and Jackson, he talked to police and told them what he knew. (R. 593, 622, 662-63) He also gave a taped statement to police at 11:50 p.m. on October 29, 1997; during that statement, he gave no sign outwardly either by odor or appearance or actions that he had been drinking at all. (R. 708-10)

When police officers stopped the white Celebrity, defendant was sitting in the front passenger seat and was wearing a hooded overcoat with a black hoodie sweatshirt. (R. 607-8, 620) Romero Sandoval, another occupant of the white automobile, was wearing a dark Nike hooded pullover and a black leather jacket over the pullover. (R. 614, 617) George Gamboa was also an occupant of the automobile. (R. 614)

Mike Langston was a Sergeant in the Aurora Police Department and served for three years as the supervisor of the gavel unit, an investigative unit within the special operations group which works on gang violence and serious violent crimes such as homicide. (R. 665-66) Sergeant Langston explained that the special operations group was an investigative unit within the Aurora Police Department which primarily worked on gang and drug-related cases. (R. 666) The officer then testified to his experience investigating gang activity in

11

Aurora and to the specialized training and instruction he received. (R. 666-72) Sergeant Langston testified that he had been qualified as a gang expert in criminal courts in Kane county 114 times. (R. 672) He was then qualified as an expert in the field of street gangs in Aurora, Illinois and gave his testimony in that capacity. (R. 672)

Sergeant Langston testified that defendant was a member of the Latin Kings gang and that his nickname was "Scarecrow." (R. 675-76) Both men arrested with defendant were also Latin King gang members. (R. 676-77) The apartment complex located at Lincoln and New York Streets was in the Gangster Disciple's territory. (R. 680) The officer also testified that "throwing down forks" represented a disrespectful gesture using the pitchfork hand sign in a downward direction. (R. 692)

Evidence technician Stan Kahle testified that clothing was found in the four-door, white 1987 Chevrolet Celebrity he was instructed to search. (R. 703, 705) He did not collect the clothing for evidence because he was not told to search the vehicle for clothing. (R. 705)

12

ARGUMENT

I.

THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON THE
PRINCIPLES OF ACCOUNTABILITY.

Defendant contends that the trial court erred when it
instructed the jury on the principles of accountability where
there was no evidence to merit the instruction to the jury.
Defendant further contends that the error was not harmless
because the evidence which identified him as the shooter was
weak and the use of the accountability instruction improperly
guaranteed a conviction.  The People maintain that the trial
court acted appropriately when it instructed the jury on the
principles of accountability where some evidence was presented
that defendant may not have been the shooter but he partici-
pated in the illegal action.  The People further maintain that,
assuming that the trial court erroneously instructed the jury,
the error was harmless where the evidence of defendant's guilt
as a principal was overwhelming.

Both the State and the defendant are entitled to the
submission of appropriate jury instructions on the law that
applies to their theory of the case if there was evidence to
support the theory.  People v. Gwartney, 289 Ill. App. 3d 350,
354, 683 N.E.2d 497, 255 Ill. Dec. 329 (4th Dist. 1997); People
v. Gilliam, 172 Ill. 2d 484, 519, 670 N.E.2d 606, 218 Ill. Dec.
884 (1996).  Moreover, very slight evidence upon a given theory
of a case will justify the giving of an instruction.  People v.
Jones, 175 Ill. 2d 126, 132, 676 N.E.2d 646, 221 Ill. Dec. 843

13

(1997); People v. Gwartney, 289 Ill. App. 3d at 354. If there is some evidence to support a party's theory, it would be an abuse of discretion for the trial court to so instruct the jury. People v. Crane, 145 Ill. 2d 520, 526, 585 N.E.2d 99, 165 Ill. Dec. 703 (1992).

Under Illinois law, a person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. 720 ILCS 5/5-2(c)(West 1998).

In this case, defendant was charged with and convicted of the offense of first degree murder in that he, without lawful justification, shot Jermaine Lambert with a gun knowing such act created a strong probability of death, thereby causing the death of Jermaine Lambert. 720 ILCS 5/9-1(a)(2). Defendant was also charged with and convicted of two counts of attempted first degree murder in that he, with the intent to commit the offense of first degree murder, performed a substantial step towards the commission of that offense, without lawful justification and with the intent to kill both Alonzo Mathews and Tara Harris, shot Alonzo Mathews and Tara Harris with a gun. 720 ILCS 5/8-4(a). Lastly, defendant was charged with and convicted of the offense of aggravated discharge of a firearm in that he knowingly discharged a firearm in the direction of another person. 720 ILCS 5/24-1.2(a)(2).

14

The evidence showed that defendant and two other men were riding in a white Chevrolet Celebrity in the area of Lincoln and New York Streets. The occupants in the automobile were Latin King gang members and were "throwing down forks," or making gestures disrespectful to the Gangster Disciples, a rival gang. The area in which the men were traveling was in Gangster Disciple territory. One of the occupants of the automobile was seen shooting into a group of people. Jermaine Lambert was shot and died shortly after he was shot. Tara Harris was shot in the back and was hospitalized. Alonzo Mathews was shot in the stomach when the shooter was three feet away, and he was hospitalized. Witnesses heard between two and six shots fired. Another occupant from the automobile was seen standing and watching during the shooting. All three occupants were seen running in a group from the scene of the shooting to the Lincoln Laundry, where the white Celebrity was parked, and then getting into that automobile. The witness who observed the three men running from the scene later saw the automobile after it had been stopped by police in a traffic stop. The witness noticed that the men were the same three men who fled from the scene of the shooting, and the witness talked to police. Based on this evidence, it was clearly appropriate for the People to request that the jury also be instructed on the theory of accountability.

Even if it was error for the court to have instructed the jury as to the principles of accountability, the error was

15

harmless. The law is clear that an accountability instruction that is inappropriately given does not constitute reversible error where sufficient evidence was adduced from which the jury could find a defendant guilty as a principal. People v. Pena, ___ Ill. App. 3d ___, 739 N.E.2d 584, 250 Ill. Dec. 821 (2nd Dist. 2000); People v. Jefferson, 227 Ill. App. 3d 491, 496, 592 N.E.2d 134, 169 Ill. Dec. 647 (1st Dist. 1992).

When evaluating the sufficiency of the evidence, a reviewing court is to determine, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. People v. Pena, citing People v. Collins, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 87 Ill. Dec. 910 (1985). The reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt regarding the defendant's guilt. People v. Pena; People v. Collins, 106 Ill. 2d at 261-62.

The evidence adduced was sufficient upon which the jury could have found defendant guilty of first degree murder, attempted first degree murder and aggravated discharge of a firearm. Two witnesses identified defendant as the shooter. Shayla Johnson stood facing Lincoln Street and got a "good

16

look" at his face when defendant walked up.   She had seen
defendant five or six times before.   Johnson watched as
defendant bumped a woman, pushed her out of the way, walked
three or four more steps and then started shooting.   Nicole
Pearson saw a Mexican male, dressed in black and wearing a
black hat, approach from Lincoln Street.   As the man walked
from underneath the third level of the apartment building,
Pearson saw his face and she recognized that the man was
defendant.   She also noticed that he was holding a big gun.
She had seen defendant once before near Poncho's Tacos and knew
his nickname was "Scarecrow."   She also saw defendant and two
other people in a white car just before the shooting.   These
witnesses also identified defendant in a lineup several months
later.   This was clearly sufficient for the jury to have found
defendant guilty as a principal of all offenses.

Defendant argues that use of an accountability theory was
impermissible because the evidence demonstrated that he was
either the principal offender or did not participate in the
crime at all and, in support, relies on a number of cases.
(Deft. Br. 18)   None of the cases cited by defendant support
his contention on appeal that the trial court erred because,
here, there was some evidence that defendant could be ac-
countable for the offenses. Moreover, People v. Testa supports
the People's position because, in Testa, the court held that
even the slightest evidence in support of a theory of account-
ability warrants giving the jury the instruction and the court

17

may give instructions on both the principal action and accountability. People v. Testa, 261 Ill. App. 3d 1025, 1030, 633 N.E.2d 1361, 199 Ill. Dec. 370 (2nd Dist. 1994)

A constitutional error in jury instructions requires reversal only if "'there is a reasonable possibility that the error contributed to the defendant's conviction.'" People v. Wanke, 303 Ill. App. 3d 772, 785, 708 N.E.2d 833, 237 Ill. Dec. 30 (2nd Dist. 1999), quoting People v. McCleary, 208 Ill. App. 3d 466, 475, 567 N.E.2d 434, 153 Ill. Dec. 476 (1st Dist. 1990). Here, there was overwhelming evidence that defendant committed the offenses either as a principal or under an accountability theory. Therefore, defendant's convictions and the sentences imposed thereon should be affirmed.

II.

DEFENDANT WAS PROPERLY CONVICTED OF AGGRAVATED DISCHARGE OF A FIREARM.

Defendant contends that his aggravated discharge of a firearm conviction should be vacated because the same acts that supported the conviction were the same acts which formed the bases for his first degree murder and attempted first degree murder convictions.   The People maintain that defendant's conviction for aggravated discharge of a firearm conviction and sentence was proper because the conviction was supported by evidence of separate acts.

Defendant's conviction is proper and should not be vacated.  The King doctrine provides that multiple convictions are not proper where (1) only one physical act was manifested, or (2) where multiple acts were manifested, but some of the convictions are for included offenses. People v. King, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 6 Ill. Dec. 891 (1977); People v. Lee, 311 Ill. App. 3d 363, 369, 724 N.E.2d 557, 243 Ill. Dec. 958 (4th Dist. 2000).  Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. People v. King, 66 Ill. 2d at 566; People v. Pena, ___ Ill. App. 3d ___, 739 N.E.2d 584, 250 Ill. Dec. 821 (2nd Dist. 2000).  Analysis under the King doctrine requires two steps.  First, a court must determine whether a defendant's conduct consisted of separate acts or a single physical act.  An "act" is "'any overt or outward manifestation

19

which will support a different offense.'" People v. Rodriguez,
169 Ill. 2d 183, 188, 661 N.E.2d 305, 214 Ill. Dec. 451 (1996),
quoting People v. King, 66 Ill. 2d at 366.  If separate acts
were undertaken, a court must next ask whether any of the
offenses are included offenses.  If so, multiple convictions
are improper.  People v. Rodriguez, 169 Ill. 2d at 186.  Under
the "charging instrument" approach, an offense can qualify as
an included offense only if the instrument charging the greater
offenses set out, at a minimum, the main outline of the
included offense.  People v. Pena, ___ Ill. App. 3d ___, 739
N.E.2d 584, 250 Ill. Dec. 821 (2nd Dist. 2000);  People v.
McLaurin, 184 Ill. 2d 58, 104-05, 703 N.E.2d 11, 234 Ill. Dec.
399 (1998); People v. Lee, 311 Ill. App. 3d at 370.

     The evidence shows that defendant began shooting into a
crowd. Jermaine Lambert was shot and died shortly after he was
shot.  Alonzo Mathews was shot in the stomach when defendant
was standing three feet away.  Tara Harris was shot in the back
when she was running away from the crowd.  Shayla Johnson saw
defendant shooting, as did Nicole Pearson, and Johnson also
testified that she heard five or six shots.  The gunshots that
did not strike victims Lambert, Mathews or Harris were separate
acts sufficient upon which to support a conviction for aggra-
vated discharge of a firearm.

     Defendant's multiple convictions are appropriate where his
conviction for aggravated discharge of a firearm was not a
lesser-included offense to first degree murder or attempted

                             20

first degree murder.    Defendant was charged with the offense of aggravated discharge of a firearm as follows: "defendant... knowingly discharged a firearm in the direction of another person."    (C. 29)    This offense can be considered a lesser-included offense only if the charges of first degree murder or attempted first degree murder set out, at a minimum, the main outline of aggravated discharge of a firearm.    The indictment for first degree murder states: "defendant, without lawful justification, shot Jermaine Lambert... with a gun, knowing such act created a strong probability of death or great bodily harm to Jermaine Lambert..., thereby causing the death of Jermaine Lambert...."    (C. 24)    The counts in the indictment for attempted first degree murder state: "defendant, with the intent to commit the offense of First Degree Murder..., performed, a substantial step towards the commission of that offense, in that he without lawful justification and with the intent to kill (Alonzo Mathews (C. 25) or Tara Harris (C. 26)), shot (Alonzo Mathews (C. 25) or Tara Harris (C. 26)) with a gun."    The outline of the offense of aggravated discharge of a firearm is not included in the offenses of first degree murder and attempted first degree murder because defendant was shooting at others in the group which had gathered to watch the argument.    Defendant shot at the group five or six times, and the shots struck three people.    Defendant's conviction for aggravated discharge of a firearm need not fall simply because it was fortuitous that defendant had not shot more people.

21

In <u>People v. Lee</u>, <u>supra</u>, the court similarly found that separate gunshots supported multiple convictions. Defendant Lee shot the victim three times and each gunshot, although to the same victim, was a separate overt manifestation that supported multiple convictions. <u>People v. Lee</u>, 311 Ill. App. 3d at 369.

Because defendant's conviction for aggravated discharge of a firearm was appropriate and supported by separate evidence, defendant's conviction and the sentence imposed thereon should be affirmed.

III.

THE TRIAL COURT CORRECTLY SENTENCED DEFENDANT TO 40 YEARS' IMPRISONMENT FOR FIRST DEGREE MURDER, TO 12 YEARS' IMPRISONMENT AND TO 10 YEARS' IMPRISONMENT FOR THE OFFENSES OF ATTEMPTED FIRST DEGREE MURDER, THE SENTENCES FOR ATTEMPTED FIRST DEGREE MURDER TO RUN CONCURRENTLY AND TO BE SERVED CONSECUTIVELY TO HIS FIRST DEGREE MURDER SENTENCE.

Defendant received consecutive sentences pursuant to section 5-8-4(a)(i) of the Unified Code of Corrections (the "Code"). That statute requires that a consecutive sentence be imposed where a defendant commits as part of a single course of conduct during which there is no substantial change in the nature of the criminal objective a Class X or Class 1 felony and the defendant inflicts severe bodily injury. 730 ILCS 5/5-8-4(a)(i). Consecutive sentences are sentences that follow one another with an uninterrupted course or succession. Thomas v. Greer, 143 Ill. 2d 271, 278, 573 N.E.2d 814, 158 Ill. Dec. 1 (1991).

In his brief, defendant relies on the recent United States Supreme Court decision of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In that case, the Court held that the United States Constitution requires that any fact which increases the penalty for an offense beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be charged in an indictment, submitted to a jury and proved beyond a reasonable doubt. Defendant asserts that Apprendi applies here where the fact of the infliction of severe bodily injury mandating consecutive sentences was neither pled nor proven beyond a reasonable doubt. Defendant

23

concludes that, based on Apprendi, consecutive sentences would be improper.

Apprendi is inapplicable to not only the present cause but also to section 5-8-4(a)(i). The Illinois Supreme Court has long held that consecutive sentences determine only the manner in which the sentences for individual offenses are to be served, and have nothing to do with the length of each discrete sentence. People v. Goffman, 65 Ill. 2d 296, 303-04, 357 N.E.2d 483, 2 Ill. Dec. 316 (1976).

In Thomas v. Greer, supra, the supreme court explained that when sentences are "made consecutive to one another, a new single sentence [is] not formed...." Thomas, 143 Ill. 2d at 278. In reaching this determination, the court noted that section 5-8-4(e) did mandate that the Department of Corrections was to treat a defendant subject to consecutive sentences "as though he had been committed for a single term ***." Thomas, 143 Ill. 2d at 278. However, reiterating its holding in Goffman regarding this provision, the Thomas court stated that section 5-8-4(e) was "directed to the Department of Correc-tions, not the judiciary, and indicates the manner in which consecutive sentences shall be served for the purpose of determining an offender's eligibility for parole." Thomas, 143 Ill. 2d at 278-79, quoting Goffman, 65 Ill. 2d at 302.

Any doubt as to the supreme court's position on the nature of consecutive sentences was dispelled in two 1995 decisions. In People v. Kilpatrick, 167 Ill. 2d 439, 657 N.E.2d 1005, 212

24

Ill. Dec. 660 (1995), the court held that a trial court could not sentence a defendant to consecutive prison terms of six and nine years, only to vacate those sentences and impose a single sentence of 15 years' imprisonment.  The court ruled that the increased sentence violated section 5-8-1(c) of the Code (730 ILCS 5/5-8-1(c)), which prohibits a court from increasing a sentence once it is imposed.  <u>Kilpatrick</u>, 167 Ill. 2d at 446-47.  In <u>People v. Jones</u>, 168 Ill. 2d 367, 372, 659 N.E.2d 1306, 213 Ill. Dec. 659 (1995), relying on <u>Kilpatrick</u>, the supreme court held that the trial court violated section 5-8-1(c) when it ordered consecutive sentences of 25 years' imprisonment for attempted first degree murder and armed robbery convictions, but later vacated those sentences and imposed a 30-year sentence for the attempted first degree murder conviction and no new sentence for the armed robbery conviction.  In reaching these decisions, both the <u>Kilpatrick</u> and <u>Jones</u> courts reaffirmed that consecutive sentences are not to be treated as a single sentence under section 5-8-1(c).  <u>Kilpatrick</u>, 167 Ill. 2d at 446; <u>Jones</u>, 168 Ill. 2d at 372.

The import of the above cases is clear.  Consecutive sentences are comprised of discrete, singular sentences; those sentences cannot be "lumped" together as though they were one total sentence for one total offense.  The imposition of consecutive sentences does not affect the length of sentences imposed for the individual convictions.  Unlike <u>Apprendi</u>, the penalty of each separate crime under section 5-8-4(a)(i) is not

increased by a fact not proven at trial.  The imposition of consecutive sentences only goes to the manner in which the sentences are to be served and not to the length of the sentences.  Therefore, Apprendi is inapplicable and defendant's consecutive sentences must stand.

For these same reasons, the holding in People v. Clifton, Nos. 1-98-2126 & 1-98-2384 (cons.) (1st Dist., Sept. 29, 2000), must be considered to be contrary to the well established holdings of our supreme court.  In order to support its rationale, the Clifton court improperly "lumped" together consecutive sentences, conceptually, in order to compare a single course of conduct where such sentences were statutorily authorized with a single course of conduct where only concurrent sentences would be imposed.  Moreover, when the Clifton court found it "unduly narrow and arbitrary" not to apply Apprendi to section 5-8-4(a), it also effectively stripped the trial court of the broad discretion that it has traditionally been allowed and the great deference that reviewing courts are obligated to accord the trial court's sentencing determinations.  See, People v. Perruquet, 68 Ill. 2d 149, 154, 368 N.E.2d 882, 11 Ill. Dec. 274 (1977).  Thus, Clifton's holding cannot be allowed to control the issue at bar and the defendant's sentences should be affirmed.

Even if this Court were to follow the rationale and holding of Clifton, defendant's sentences need not be vacated. Defendant admits that his sentence of 40 years' imprisonment

for first degree murder and 12 years' and 10 years' imprison-
ment for his two convictions for attempted first degree murder
are within the "normal" statutorily prescribed range.   (Deft.
Br. 30-1)   Under Supreme Court Rule 615 (b) (4) (134 Ill. 2d R.
615(b)(4)), this Court can exercise its authority and modify
the mittimus to order that defendant's sentences be served
concurrently rather than consecutively.   (See, People v.
Joyner, ___ Ill. App. 3d ___, 739 N.E.2d 594, 250 Ill. Dec. 831
(2nd Dist. 2000).

27

<u>CONCLUSION</u>

WHEREFORE, based on the foregoing, the People of the State of Illinois respectfully request that this Honorable Court affirm the convictions and sentences of Armando Amaya and assess statutory State's Attorney's fees pursuant to 55 ILCS 5/4-2002(a) and <u>People v. Nicholls</u>, 71 Ill. 2d 166 (1978).

Respectfully Submitted,

Meg Gorecki
State's Attorney
Kane County
St. Charles, Illinois 60175
(708) 232-3500

By _____

Martin P. Moltz
Deputy Director
Lawrence M. Bauer
Staff Attorney
State's Attorneys
  Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123
(847) 697-0020

Gunta Z. Hadac

OF COUNSEL

COUNSEL FOR PLAINTIFF-APPELLEE

28