File Date: _5 - 29 - 2008_____

Case No: _07 cv 6793_____

ATTACHMENT # _____

EXHIBIT _D to J_____

TAB (DESCRIPTION)

_____



NO. 2-00-0099

IN THE APPELLATE COURT OF ILLINOIS

SECOND JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | | Appeal from the |
| | ) | Circuit Court of the |
| Plaintiff-Appellee, | ) | 16th Judicial Circuit, |
| | ) | Kane County, |
| | ) | Illinois |
| | ) | |
| vs. | ) | NO.: 98 CF 535 |
| | ) | |
| ARMANDO AMAYA, | ) | Honorable |
| | ) | Donald C. Hudson, |
| Defendant-Appellant. | ) | Judge Presiding |

REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

Larry Wechter
Contract Attorney for the
Office of the State Appellate Defender
528 S. Batavia Avenue, Suite 2N
Batavia, IL 60510
630/761-8446

COUNSEL FOR DEFENDANT-APPELLANT

ORAL ARGUMENT REQUESTED

EXHIBIT D

## ARGUMENT I

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS AND NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED THE COMMISSION OF THE CRIMES. THE DEFENDANT'S PRESENCE AT THE SCENE OF THE CRIME AND HIS FLIGHT WITH THE GUNMAN WOULD NOT BE SUFFICIENT TO CONVICT HIM AS AN ACCOUNTABLE PARTY. DUE TO THE WEAKNESS OF THE IDENTIFICATION EVIDENCE, THE INSTRUCTIONAL ERROR WAS NOT HARMLESS BEYOND A REASONABLE DOUBT.

In response to portions of the argument contained in the State's brief, the Defendant seeks to clarify the proof concerning the identification of various individuals located at or near the scene of the crime. On page 15 of the State's brief, the prosecution summary of the evidence has overstated the proof presented at trial. In particular, none of the prosecution witnesses ever identified any of the occupants of the vehicle observed traveling in the area before the shooting as the individual who stood watching the events leading up to the shooting on the side of the New York Street apartment building. In fact, the identification of the unknown person standing near the building by witness McCallister was totally unconnected to the identification of any of the occupants of the vehicle before or after the shooting. (R. 558-576) None of the State's evidence ever established any connection between that person and the person who fired the weapon or the persons who occupied the car.

In addition, although witness Tracy Johnson thought that the three persons who fled the scene were the same individuals later stopped by the police, he never identified any of those persons either in court or any other type of identification procedure.  (R. 577-605)

The State's effort to portray the testimony as a seamless web of identification of the participants in the murder and attempted murder is not an accurate characterization of the evidence.  In fact, the testimony failed to connect the persons observed in the vehicle prior to the shooting with those individuals who were stopped by the police.  The evidence also failed to identify in any fashion the person who stood near the building at the time of the shooting or to connect him with the occupants of the vehicle.  See Defendant's initial brief, pp. 20-22)

As noted in the Defendant's initial brief, none of the evidence demonstrated that any plan existed to commit these offenses.  The proof also failed to affirm that Mr. Amaya had any knowledge of any such plan to shoot the victims or that he acted pursuant to a common scheme to commit the crimes at issue.  Therefore, his conviction could not be supported on an accountability theory and a new trial should only permit the State to present the theory of his direct participation in the shootings to a jury.

## ARGUMENT II

THE TRIAL COURT ERRED IN ENTERING JUDGMENT ON THE JURY VERDICT CONVICTING THE DEFENDANT OF THE OFFENSE OF AGGRAVATED DISCHARGE OF A FIREARM, SINCE THE CONVICTION WAS BASED ON THE SAME PHYSICAL ACTS AS THE MURDER AND ATTEMPTED MURDER CONVICTIONS.

The Defendant relies on the arguments presented in his initial brief concerning this issue.

## ARGUMENT III

THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM. THESE FACTUAL DETERMINATIONS SHOULD HAVE BEEN MADE BY THE JURY BY THE STANDARD OF PROOF APPLICABLE TO CRIMINAL TRIALS.

The State's brief attempts to counter the defense arguments based on the authority of Apprendi v. New Jersey, 147 L.Ed.2d 435, 442 (2000), by citing Illinois case law pertaining to the interpretation of state sentencing statutes. (See State's brief, pp. 24-27)  This approach fails to recognize the fact that Apprendi was decided on federal constitutional grounds interpreting the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. Obviously, state law interpretation of its sentencing statutes cannot negate the constitutional principles that require the submission of issues of fact to a jury when the determination of those facts may impact on the severity of the Defendant's sentence.

In addition, this Court has recently ruled that "the imposition of consecutive sentences is the same as a sentence enhancement, and, therefore, other than the fact of a prior conviction, any fact that is utilized to increase the amount of time a defendant must serve must be submitted to the trier of fact and proved beyond a reasonable doubt.  Thus, the requirement of section 5-8-4(a) that the defendant be sentenced to consecutive sentences for the offenses listed therein if the defendant committed the offenses "as part of a single course of

conduct during which there was no substantial change in the nature of the ,criminal objective" is unconstitutional." <u>People v. Waldrup</u>, ___ Ill.App.3d ___, 740 N.E.2d 71, 81 (2nd Dist., 2000)

The State's argument strains logic by asserting that the length of Mr. Amaya's incarceration does not consume a longer period of his life when the years of his sentences are served consecutively to one another. Regardless of whether the period of his incarceration is considered a single sentence under Illinois law, such arguments have now been swept away by the holding in <u>Apprendi</u>.

## CONCLUSION

WHEREFORE, the Defendant-Appellant, ARMANDO AMAYA, prays the Court to vacate his convictions for the offenses of first-degree murder, attempted murder and aggravated discharge of a firearm and to remand this cause to the circuit court for a new trial, due to the improper accountability instructions given to the jury. In the alternative, the Defendant seeks the vacation of his conviction for aggravated discharge of a firearm under the "one act/one crime" rule. If the Court does not reverse or vacate his convictions, the Defendant further prays the Court to vacate his sentences and to remand this cause to the trial court for re-sentencing, due to the failure to prove the factual predicate for his consecutive sentencing to a jury beyond a reasonable doubt.

Respectfully submitted,

Larry Wechter
Contract Attorney for the
Office of the State Appellate Defender
528 S. Batavia Avenue, Suite 2N
Batavia, IL 60510
630/761-8446

COUNSEL FOR DEFENDANT-APPELLANT

NO.

IN THE

## SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Appellate ) Court for the Second ) Judicial District ) No. 2-00-0099 |
| Plaintiff-Respondent, | ) |
| vs. | ) Original Appeal from the ) 16th Judicial Circuit, |
| ARMANDO AMAYA, | ) Kane County ) No. 98 CF 535 |
| Defendant-Petitioner. | ) ) Hon. Donald C. Hudson, ) Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

Larry Wechter
Contract Attorney for the Office
of the State Appellate Defender
528 S. Batavia Avenue, Suite 2N
Batavia, Illinois 60510
630/761-8446

COUNSEL FOR DEFENDANT-PETITIONER

EXHIBIT E

## PRAYER

Now comes Petitioner, ARMANDO AMAYA, and prays for leave to appeal from a decision of the Appellate Court for the Second Judicial District in the above-captioned cause, which affirmed his convictions for the offenses of first-degree murder and attempted murder and his consecutive sentences totaling 62 years' imprisonment. The Petitioner seeks an order of this Court vacating his convictions and remanding the case to the Circuit Court for a new trial. In the alternative, the Petitioner seeks an order of this Court vacating his consecutive sentences and remanding the case to the Circuit Court for a new sentencing hearing.

## STATUS OF THE CASE

The judgment of the Appellate Court was entered on May 10, 2001. (A copy of the opinion of the Appellate Court is attached as Appendix A.) No Petition for Rehearing was filed in the Appellate Court. An affidavit of intent to seek review in this Court was filed with the Appellate Court on May 15, 2001. (A copy of the affidavit of intent to seek review in this Court is attached as Appendix B.)

POINTS RELIED UPON FOR REVERSAL

OF THE JUDGMENT OF THE APPELLATE COURT

ARGUMENT I

THE APPELLATE COURT ERRED IN RULING THAT INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY WAS HARMLESS ERROR, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS, NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED IN THE COMMISSION OF THE CRIMES, AND THE IDENTIFICATION EVIDENCE WAS WEAK AND CONTRADICTORY.  (Page 13)

|  | Page |
|---|---|
| People v. Stark, 33 Ill.2d 616, 622 (1966) | 13 |
| People v. Testa, 261 Ill.App.3d 1025, 1030 (2nd Dist., 1994) | 13 |
| People v. Crowder, 239 Ill.App.3d 1027, 1030 (3rd Dist., 1993) | 13 |
| People v. Batchelor, 202 Ill.App.3d 316, 330 (1st Dist., 1990) | 13 |
| People v. Lusietto, 41 Ill.App.3d 205, 207 (3rd Dist., 1976) | 13 |
| People v. Umphers, 133 Ill.App.2d 853, 857 (5th Dist., 1971) | 13 |

ARGUMENT II

THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM. THESE FACTUAL DETERMINATIONS SHOULD HAVE BEEN MADE BY THE JURY BY THE STANDARD OF PROOF APPLICABLE TO CRIMINAL TRIALS. (Page 17)

|  | Page |
|---|---|
| Apprendi v. New Jersey, 530 U.S. 466 (2000) | 17-18 |
| 730 ILCS 5/5-8-4(a)(i) (West 1998) | 17 |
| People v. Wagener, ___ Ill.2d ___, docket #88843 (June 1, 2001) | 18 |
| 730 ILCS 5/5-8-1(a)(1)(a) (West 1998) | 18 |

## STATEMENT OF FACTS

On April 28, 1998, the Petitioner, ARMANDO AMAYA, was indicted for the first-degree murder of Jermaine Lambert and the attempted murders of Alonzo Matthews and Tara Harris. (R. C23-C31) The indictment alleged that the Defendant shot all three of the victims with a gun on October 29, 1997. Three other counts alleged the commission of the offenses of aggravated battery with a firearm and aggravated discharge of a firearm based on the same acts.

Aurora police officer Andrew Hilgenberg testified for the State at the jury trial that he went to an apartment complex at 309 E. New York Street on October 29, 1997 to investigate a shooting incident. After darkness had fallen at approximately 8:45 p.m., he located a man on the parkway near the street who had been wounded by gunfire. He then entered the front door of one of the apartments at that address and observed a woman sitting on a couch, who was also suffering from a gunshot wound. In the kitchen, he saw a man lying on his back with a gunshot wound to the chest and a pool of blood beneath him, who was pronounced dead by a paramedic shortly after 9:00 p.m. (R. 378-411)

Tara Harris was the State's first occurrence witness. At the time of trial, she was on probation for a drug crime. On the night of the shooting, she heard arguing behind her apartment at 309 E. New York Street. She saw a person approach from the west end of the building on Lincoln Street wearing a hood and keeping his hands in his jacket pockets. She heard two shots and was struck by one of the bullets. She described the shooter as a Mexican or Spanish male in his late teens or early twenties between 5'5" and 5'6" tall. She never saw the gun and did not get a good look at his face. She was hospitalized for her injuries and the bullet remained in her back at the time of trial. She denied being a street gang member. (R. 413-421)

4

Alonzo Matthews was on probation in Wisconsin for a drug crime. On the night of the shooting, he was located behind the same apartment building on New York Street. As he was watching an argument among a group of women, he heard someone creeping up behind him. He turned around and saw a Mexican man wearing a hood who shot him in the stomach. He described the shooter as being between 5'8" and 5'9" tall, weighing 140 to 145 pounds, and dressed in black. The witness made statements variously describing the weapon as chrome or black in color and the type of weapon being either a revolver or an automatic. He underwent surgery for his wounds. Mr. Matthews denied being a gang member. On cross-examination, he denied that anyone located in the courtroom was the shooter. (R. 425-437)

The State's next occurrence witness was 17 year-old Shayla Johnson. She had charges for theft and other offenses pending against her and was presently in custody after being arrested for failing to appear in court. On the night of the shooting, she walked to the area of the apartment building and met some friends. She saw a person approach the area and begin shooting. As the shooting began, she was looking at the gun. She identified the defendant as the gunman. She had seen him on several prior occasions and knew that he used the nickname of Scarecrow. While walking to the area of the apartment building, she observed the defendant and other Hispanic men in a car. She heard shouts coming from the car, including statements such as "King Love", "GDK" and "Kings Rule". After the shooting, she ran from the area and did not speak to the police. Almost two months later, on December 19, 1997, she went to the police department with Nicole Pearson to file a complaint about an unrelated incident. This was the first time that she spoke to police about the shooting incident. Subsequently, on February 4, 1998, she attended a line-up at the county jail where she identified the Defendant. (R. 446-458)

5

On cross-examination, the witness admitted speaking to other persons about the shooting incident prior to discussing the matter with the police. Her friend, Nicole Pearson, spoke to her about the incident and they both went to the Aurora Police Department together in December. She described the shooter to the police as being 5'4" tall and weighing 130-140 pounds. A garbage can was located between the witness and the person who fired the shots. (R. 465-475)

The second identification witness was 18-year-old Nicole Pearson. She had been convicted of retail theft, resisting a peace officer, disorderly conduct and criminal trespass to land and had pending cases for mob action and battery. On the night of the shooting, she was participating in an argument on the side of the apartment building. She saw a Mexican man approach from one block away and start shooting. He was wearing black clothing and had a hood down. He appeared to be in his teens. She was not sure of the type of weapon which was used. She identified the defendant as the shooter and noted that she had seen him on one prior occasion. She also knew that he used the nickname of Scarecrow. Earlier on the evening of the shooting, she saw the defendant located in a car with other Hispanic men, but did not hear them say anything. Following the shooting, she did not stay in the area and did not talk to the police. However, she did speak to the police when she went to the police department a couple of months later with her friend, Shayla Johnson. In February 1998, she viewed a line-up at the county jail and identified the Defendant. At that time, she told the police that the defendant was not the shooter. She denied being a gang member, but admitted associating with friends who were Gangster Disciples. (R. 478-494)

On cross-examination, Ms. Pearson admitted wearing Gangster Disciples gang colors and that she was located in Gangster Disciple territory that night. Since it was dark in the area of the shooting, she could not see the face of the

6

person approaching from the street while he was located under a walkway. She noted that the shooter was acting alone. Jermaine Lambert was a friend of hers. She denied speaking to Shayla Johnson prior to talking to the police, even though they were living together at that time. When first discussing the incident with the police at the lineup, she stated that Scarecrow was not the gunman. However, she changed her mind about her identification after talking to the police following the line-up. Her second story to the police indicated that the defendant was present at the shooting, but did not fire the weapon. After further examination, she admitted that Ms. Johnson provided her with the defendant's nickname of Scarecrow. Also, Johnson told the witness that she (Johnson) thought Scarecrow committed the shooting. (R. 495-501, 516-517)

Officers James Fancsali and Jeffrey Sauer testified to the line-ups conducted with witnesses Pearson and Johnson at the county jail. Officer Sauer admitted that Pearson alternately denied that the Defendant was the shooter, accused him of being involved in the incident and eventually identifying him as firing the weapon. (R. 518-550)

William McCalister had a theft charge pending against him at the time of trial. On the night of the shooting, he was standing on the southeast corner of the apartment building and observed some women arguing there. He heard gunshots as the arguments continued, but did not see anyone approaching the scene beforehand. Prior to the shooting, he saw a man located across New York Street who appeared to be Hispanic, stood 5'10" to 5'11" tall, weighed 150-155 pounds and wore dark clothing. This man merely stood at that location and never spoke to him. The shots did not come from the area where the man was standing. The witness ran to his car after the shooting. He did not identify anyone in court or by means of photographs during his testimony. (R. 558-576)

7

Witness Tracy Johnson had served a prison term for a felony drug conviction. In the past, he had been convicted of several charges of residential burglary, burglary, attempted burglary and retail theft. On the night of the shooting, he was drinking alcohol with his friends when he saw a car driving by the area of 4th and Galena, with the Hispanic male occupants throwing out gang signs which were insulting to the Gangster Disciples. After hearing three gunshots, he saw three people running from the area of the apartment building. The people running from the scene were the same individuals he had seen traveling in the car. They re-entered the same car and drove from the area. At approximately 10:30 p.m., he observed the same vehicle stopped by the police with the same men lying on the ground. Mr. Johnson admitted drinking beer and sharing a pint of gin with his friends that evening. He admitted drinking alcohol both before and after the shooting and having received substance abuse treatment for his drug addiction. (R. 577-605)

Officer Scott Wolters testified to the traffic stop of the vehicle containing the Defendant and two companions at approximately 10:30 p.m. on the night of the shooting. No weapons or ammunition were found on the persons of any of the three men or in the vehicle. The Defendant was wearing faded blue jeans which were not black in color. Officer Mike Doerzaph testified to statements made to him by Tracy Johnson during the course of the traffic stop. Mr. Johnson stated that he had seen two of the three men detained by the police earlier that evening running from the scene of the shooting. As to the third subject, Johnson had only observed him earlier in the day driving the car. Mr. Johnson did not identify anyone in court or by means of photographs during his testimony. (R. 606-630, 633-636, 662-664)

Officer Mike Langston testified to his experience investigating gang activity in Aurora. On the date of the shooting, the defendant was a member of

8

the Latin Kings street gang. His gang nickname was Scarecrow. The two men who were detained by the police following the shooting were also members of the same gang. On the date in question, the Gangster Disciples were a rival of the Latin Kings. The apartment building on New York Street was located in Gangster Disciple territory. None of the victims of these offenses were gang members. Also, neither Shayla Johnson nor Nicole Pearson were known to be gang members. The slogan "King Love" showed respect for the Latin Kings and the initials "GDK" stood for "Gangster Disciple Killer". He concluded that gang members commonly used getaway drivers and lookouts when entering rival gang territory, since it was risky to enter that territory on foot. (R. 665-693)

The parties stipulated that a forensic pathologist would testify to the results of his autopsy performed on Jermaine Lambert on October 30, 1997. The victim had received a single penetrating gunshot wound to the chest which was consistent with the barrel of the weapon being placed directly on the body. The gunshot wound to the chest was the cause of death. (R. 697-699)

Officer Stan Kahle examined the automobile stopped by the police containing the Defendant. His search of the vehicle did not disclose any firearms, bullets, cartridges or any other firearm evidence. (R. 702-707)

After the state rested its case, the parties stipulated that witness Alonzo Matthews had been interviewed at the hospital on the night of the shooting. At that time, he told the police that he could recognize the person who shot him. (R. 719-721)

At the jury instruction conference, the prosecutor tendered instructions pertaining to the principles of accountability. He focused on the common design rule as the basis for giving the instructions. In the event that the jurors disbelieved that Defendant actually fired the shots at the victims, they could still find him accountable for the conduct of the gunman. The same three people

9

were observed together before, during and after the shooting. All of the men must have known one of them was armed and that they had no other purpose to enter rival gang territory than to commit the shootings. The person observed by witness McCalister could have been a lookout or present to assist in flight from the scene. Thus, the jury could believe that either of the Defendant's two companions was the shooter if they did not trust the identification testimony. The defense objected to the accountability instructions by noting that the only evidence of Mr. Amaya's involvement in the crime was his identification as the gunman. (R. 727-739) The court decided to give the accountability instructions based on the testimony that the Defendant was observed in the vehicle from which gang slogans were shouted, as well as being observed fleeing the scene of the shooting. (R. 739-748)

During closing argument, the State first affirmed the reliability of the identification testimony. Alternatively, the person observed by witness McCalister may have been the Defendant, since the witness' description fit Mr. Amaya. The prosecutor continued as follows:

"What if the defendant wasn't the actual guy that walked up that walkway into the crowd and pulled that trigger? What if it was Romero Sandoval that walked up that walkway and pulled the trigger? What if it was George Gamboa that walked up that way? What if he didn't pull the trigger of the gun that killed Jermaine Lambert and wounded Tara Harris and Alonzo Matthews. Could he still be guilty of first degree murder and attempt murder? Yes. Yes, he could under the law of the State of Illinois and the facts of this case.... Clearly Armando Amaya, Romero Sandoval and George Gamboa were acting together in a common design back on October 29th, 1997, and thus, each is accountable for the acts of the

10

others, each one of them is the shooter, not physically, but legally....

Would they bring a gun into rival gang territory if all three didn't know that

at least one was armed with a gun?"

In addition, he stated that the act of running to the getaway car after the shooting confirmed the common plan of the three men. Also, planning for the offense was demonstrated by the fact that the shooting was an aggressive act of violence committed in rival gang territory. The two people who did not fire the weapon were acting as lookouts or were present to help facilitate an escape. Since any of those scenarios constituted aiding and abetting the crime, all three men would be guilty of the offenses charged. (R. 784-796, 824-826)

The court's instructions to the jury included a definition of accountability and issues instructions for the crimes charged which included accountability language. (R. C170, 172, 174-176, 179; 832-837) The jury returned verdicts of guilty of the offenses of the first-degree murder of Jermaine Lambert, the attempted murders of Harris and Matthews, aggravated battery with a firearm as to both Harris and Matthews, and aggravated discharge of a firearm. (R. C185-C192; 865-871)

Following hearings, the trial court denied the defense post-trial motion. (R. C194-C196, C205; Supp.R. 5-34) At the sentencing hearing, the State conceded that the aggravated battery convictions merged into the attempted murder convictions. The judge agreed that the "one act/one crime" rule required this result. (R. 928-931) The State requested consecutive sentences based on section 5-8-4 of the Unified Code of Corrections following a finding that the Defendant committed a class X felony and inflicted severe bodily injury. The prosecutor urged that the testimony of Harris and Matthews supported a finding

11

of severe bodily injury. The defense objected to consecutive sentences since the State failed to present any evidence at sentencing regarding the issue of great bodily harm. (R. 992-1015)

The court made factual findings that one of the offenses was a class X felony and that the Defendant inflicted severe bodily injury. He also found that the crimes were committed as part of a single course of conduct with no substantial change in the nature of the criminal objective. On this basis, the trial judge felt compelled to impose consecutive sentences. His findings were based on the testimony of Matthews and Harris that they sustained gunshot wounds which required hospitalization. He imposed prison terms of 40 years for the murder of Lambert, 12 years for the attempted murder of Matthews, 10 years for the attempted murder of Harris, and 9 years for aggravated discharge of a firearm. The murder and attempted murder sentences were ordered to run consecutively to one another, for a total sentence of 62 years' imprisonment. (R. C229-C236, C238-C239; 1017-1028, 1031-1033)

The Defendant's Motion to Reconsider Sentence was denied and a Notice of Appeal was filed on Mr. Amaya's behalf. (R. C240-C241, C248-C249; 1039-1047)

The Appellate Court ruled in a published opinion that sufficient evidence was introduced at trial to prove Mr. Amaya guilty as a principal of the crimes. The Appellate Court also ruled that the imposition of consecutive sentences did not violate the authority of Apprendi v. New Jersey, 530 U.S. 466 (2000). (See Appendix A) No petition for rehearing was filed in the Appellate Court.

ARGUMENT I

THE APPELLATE COURT ERRED IN RULING THAT INSTRUCTING THE JURY ON THE PRINCIPLES OF ACCOUNTABILITY WAS HARMLESS ERROR, WHERE THE EVIDENCE ONLY SUPPORTED A FINDING THAT THE DEFENDANT PERSONALLY SHOT THE VICTIMS, NONE OF THE TESTIMONY OR EXHIBITS INDICATED THAT MR. AMAYA OTHERWISE AIDED OR ABETTED THE COMMISSION OF THE CRIMES, AND THE IDENTIFICATION EVIDENCE WAS WEAK AND CONTRADICTORY.

The Appellate Court ruled in a published opinion that harmless error occurred by instructing the jury concerning the principles of accountability. The reviewing court determined that the evidence sufficed to prove Mr. Amaya's guilt as a principal, rendering any instructional error harmless. (See Appendix A)

This Court should review the judgment of the Appellate Court because the opinion below failed to consider that the Defendant was entitled to a jury determination concerning the strength of the identification evidence. Illinois case law prohibits the State from utilizing an accountability theory to alter the elements of proof of the substantive crime by substituting accountability elements. These authorities hold that submission of accountability instructions will result in vacation of the conviction and award of a new trial if the evidence demonstrates only that the defendant was either the principal offender or that he did not participate in the crime at all. People v. Stark, 33 Ill.2d 616, 622 (1966); People v. Testa, 261 Ill.App.3d 1025, 1030 (2nd Dist., 1994); People v. Crowder, 239 Ill.App.3d 1027, 1030 (3rd Dist., 1993); People v. Batchelor, 202 Ill.App.3d 316, 330 (1st Dist., 1990); People v. Lusietto, 41 Ill.App.3d 205, 207 (3rd Dist., 1976); People v. Umphers, 133 Ill.App.2d 853, 857 (5th Dist., 1971)

The Appellate Court failed to address any of these authorities in its opinion and failed to consider the weakness of the identification evidence.

At Mr. Amaya's trial, Tara Harris and Alonzo Matthews testified that they were shot by a single individual whom they could not identify. Neither shooting victim observed anyone other than the single perpetrator aiding or abetting in commission of any of the shootings. (R. 413-421, 425-437) Significantly, Matthews testified that Mr. Amaya was not the person who shot him. (R. 413-421, 425-437) Also, witnesses McCalister and Tracy Johnson did not observe the shooting and could not identify the persons they observed in the area of the apartment building during and after the shootings. Even the descriptions of the gunman by Harris, Matthews and McCalister differed substantially in describing his height, with estimates ranging from 5'4" tall to 5'11" tall. Tracy Johnson's "identification" of the Defendant as the same person he saw fleeing the scene was called into question by Officer Doerzaph, who recalled that Johnson only mentioned seeing two of the men detained by police run from the apartment building. In fact, all of Tracy Johnson's testimony was subject to suspicion because of his prior drug conviction and sentence of imprisonment, the fact that he drank heavily on the night of the shootings, and his admitted drug addiction. The failure of the police to locate any weapons or ammunition in the vehicle further called into question the identity of the actual gunman. (R. 558-576, 577-605, 606-627, 662-664, 702-707)

Only the testimony of Shayla Johnson and Nicole Pearson provided an identification of Mr. Amaya as the actual gunman. (R. 446-477, 478-517) However, the testimony of both of these individuals was severely undermined by the fact that neither one of them provided any information to the police for nearly two months after the shootings occurred. Only by happenstance did the authorities become aware of their supposed knowledge of the crimes when they

entered the Aurora Police Department to report an unrelated incident nearly two months later. During the intervening weeks, the women never reported their observations to anyone else. However, they did live together and discussed the matter between themselves, with Ms. Johnson suggesting to Ms. Pearson the identity of the Defendant as the shooter. When they were taken to the county jail for line-up identifications over three months following the shootings, Ms. Pearson initially informed the police that Mr. Amaya was not the person who shot the victims. Only after further conversation did the police persuade her to change her mind to identify the Defendant as a participant in the crimes. Even then, she initially stated that he was not the actual gunman, only later giving a third version of her story that identified Mr. Amaya as the principal offender.

Moreover, every one of the occurrence witnesses had a criminal record. Both Harris and Matthews were serving sentences of probation at the time of the trial. (R. 413-421, 432-437) Shayla Johnson had pending charges for theft and other crimes, despite her youth of 17 years of age. She was also being held in custody for her failure to appear in court voluntarily. (R. 446-458) Nicole Pearson, who was only 18 years old, had already been convicted of theft and other misdemeanors, along with mob action and battery charges pending against her. She admitted being an associate of the Gangster Disciples street gang. (R. 478-494)

These inconsistencies in the various "identification" statements of the witnesses presented serious credibility issues for the jury's resolution. In fact, the entire motivation for submitting an accountability instruction to the jury was the State's uneasiness with resting the prosecution solely on the argument that they proved the Defendant actually shot the victims. In closing argument, the prosecutor frankly acknowledged to the jury that they might not accept the identification testimony of Johnson and Pearson, but encouraged a guilty verdict

15

based on the Defendant's alleged actions as a lookout.  (R. 727-737, 738-739, 778-796, 824-826)  While the jury was certainly free to accept or reject the validity of these identifications of Mr. Amaya, the State's fallback theory of accountability prevented the defense from obtaining a verdict based solely on the evidence that the Defendant was the actual gunman.  Instead, the jury could have thoroughly disbelieved the identification testimony of both Shayla Johnson and Nicole Pearson, but found Mr. Amaya guilty of the crimes based solely on the invalid theory of accountability.  Thus, the erroneous use of accountability instructions was not harmless to the defense of the case.

The Appellate Court opinion presented its analysis of the evidence in the case as if the testimony of these witnesses was uncontradicted and not seriously impeached. (See Appendix A, pp. 10-11)  The opinion also omits any mention of the prosecutor's encouragement to the jury to find Mr. Amaya guilty on the alternative accountability theory if the jurors could not abide the credibility of the State's witnesses.  On the basis of these errors, this Court should vacate all of the Defendant's convictions in this case and remand for a new trial.  At a re-trial, the jury should only receive instructions on a finding of guilt or innocence based on Mr. Amaya's alleged actions as the killer of Jermaine Lambert and the person who attempted to kill Tara Harris and Alonzo Matthews.

ARGUMENT II

THE DEFENDANT'S RIGHTS TO TRIAL BY JURY AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE LOWER COURT IMPOSED CONSECUTIVE SENTENCES BASED UPON FACTUAL FINDINGS THAT MR. AMAYA DID NOT CHANGE THE NATURE OF HIS CRIMINAL OBJECTIVE AND THAT THE SHOOTING VICTIMS SUFFERED GREAT BODILY HARM. THESE FACTUAL DETERMINATIONS SHOULD HAVE BEEN MADE BY THE JURY BY THE STANDARD OF PROOF APPLICABLE TO CRIMINAL TRIALS.

The Appellate Court ruled in a published opinion that the trial judge did not violate the case authority of Apprendi v. New Jersey, 530 U.S. 466 (2000) by imposing consecutive sentences upon Mr. Amaya without a jury determination of the factual basis for those sentences beyond a reasonable doubt.

At the Defendant's sentencing hearing, the trial court imposed consecutive sentences upon Mr. Amaya based upon section 5-8-4 of the Unified Code of Corrections. (730 ILCS 5/5-8-4(a)(i) (West 1998)) This statute permits imposition of consecutive sentences based on findings that no substantial change occurred in the nature of the criminal objective and that the victims suffered great bodily harm. The court imposed sentences of 40 years' imprisonment for the murder conviction, 12 years' imprisonment for the attempted murder of Alonzo Matthews, and 10 years' imprisonment for the attempted murder of Tara Harris. The court further ordered that all of the sentences should run consecutively to one another for a total of 62 years' imprisonment. (R. C229-C236, C238-C239; 992-1015, 1017-1028, 1031-1033)

17

Although the Defendant acknowledges the recent opinion of this Court in People v. Wagener, ___ Ill.2d ___, docket #88843 (June 1, 2001), Mr. Amaya seeks reconsideration of that decision due to the importance of the federal constitutional question involved. As acknowledged in the Wagener opinion, the Appellate Court was sharply divided on the application of Apprendi to the Illinois consecutive sentencing scheme. (See opinion, pp. 12-13) The Defendant respectfully submits that this Court applied an unduly narrow interpretation of the language in Apprendi. (See opinion, pp. 13-14) Although the Supreme Court stated that Apprendi's other convictions were not relevant to disposition of the constitutional issue, this does not mean that the principle announced in Apprendi cannot be applied to consecutive sentences. In Mr. Amaya's case, he received three sentences that were ordered to run consecutive to one another for a total of 62 years of incarceration. As a result, the total length of the sentence exceeds the maximum 60-year term allowed for the conviction on the most serious offense involved in this prosecution, namely first-degree murder. 730 ILCS 5/5-8-1(a)(1)(a) (West 1998)

Since this Court's opinion in Wagener explicitly noted that portions of the Apprendi opinion could support an attack on a consecutive sentencing scheme, this legal argument should be reconsidered. This Court should vacate Mr. Amaya's sentences for the offenses of first-degree murder and attempted murder and order remandment for re-sentencing, pursuant to the decision in Apprendi v. New Jersey.

## CONCLUSION

WHEREFORE, the Defendant-Petitioner, ARMANDO AMAYA, prays this Court to grant his Petition for Leave to Appeal.

Respectfully submitted,

Larry Wechter
Contract Attorney for the Office
of the State Appellate Defender
528 S. Batavia Avenue, Suite 2N
Batavia, IL 60510
630/761-8446

COUNSEL FOR DEFENDANT-PETITIONER

APPENDIX A

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

91749

October 3, 2001

Hon. Jim Ryan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No.  91749 - People State of Illinois, respondent, v. Armando
          Amaya, petitioner.  Leave to appeal, Appellate
          Court, Second District.

The Supreme Court today DENIED the petition for leave to
appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court
on October 25, 2001.

EXHIBIT F

STATE OF ILLINOIS     )
                          ) SS

COUNTY OF KANE     )

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS  ) | |
|                               ) | |
|             Plaintiff,   ) | Gen. No. 98 CF 535 |
| vs.                           ) | |
|                              ) | |
| ARMANDO AMAYA,       ) | |
|                              ) | |
|       Defendant/Petitioner.   ) | |

## PETITION FOR POST-CONVICTION HEARING AND RELIEF PURSUANT TO 725 ILCS 5/122-1 ET SEQ. AND PETITION TO INCORPORATE DEFENDANT'S PRO SE "MOTION FOR A NEW TRIAL" FILED SEPTEMBER 27, 2000 AND FEBRUARY 15, 1999

Now comes the Defendant/Petitioner, ARMANDO AMAYA, by and through his attorney, THE LAW OFFICES OF KATHLEEN COLTON, LTD., and moves this Honorable Court for a Post-Conviction Hearing and relief pursuant to 725 ILCS 5/122-1, et seq.(Article 122), and further, pursuant to 725 ILCS 5/122-2, to incorporate into the instant Petition his pro se "Motion for a New Trial" filed on September 27, 2000 and February 15, 1999, and in support, states as follows:

1. That the Defendant was charged with First Degree Murder, Special Class, and other felony offenses, alleged to have occurred on October 29, 1997, under the above case number.

2. That the Office of the Public Defender was appointed to represent the Defendant on April 16, 1998, and that the case proceeded to trial on January 25, 1999, assigned to David P. Kliment.

3. That on January 22, 1999, three days prior to the commencement of trial, Attorney David P. Kliment, Kane County Public Defender, filed Defendant's Supplemental Answer to Discovery, listing certain witnesses, and asserting that "the defendant may or may not raise the affirmative defense of alibi, as set forth in the discovery materials tendered to the defense by the State."

4. That on January 22, 1999, Attorney David P. Kliment, in his Defendant's Supplemental Answer to Discovery, listed seven potential witnesses, only one of whom had an address known to defense counsel three days prior to the commencement of trial, but six of whom had given "statements in possession of the State."

5. That the Defendant had been previously charged under case number 97 CF 2326, a charge of Attempted First Degree Murder, alleged to have been committed on the same date of offense as 98 CF 535, October 29, 1997.

6. That 97 CF 2326 proceeded to jury trial on March 17, 1998, and that witnesses Ramiro Sandoval, George Gamboa, and Elizabeth Delatorre had testified for the Defendant in support of his alibi defense in his case in chief, and that Emma Delatorre had testified in rebuttal.

7. That additionally, Sonia Delatorre and Elizabeth Delatorre had previously testified at a bond reduction hearing in case number 97 CF 2326, and that testimony as to the Defendant's alibi on October 29, 1997 had been elicited.

8. That on January 29, 1999, the jury in case number 98 CF 535 returned verdicts of guilty to First Degree Murder, Attempted First Degree Murder, 2 counts, Aggravated Discharge of a Firearm, and Aggravated Battery with a Firearm, 2 counts.

9. That counsel for the Defendant in case number 98 CF 535 was ineffective as stated in the Defendant's pro se Motion filed on February 15, 1999, and September 27, 2000, attached and incorporated in the instant motion as **Group Exhibit A**, in that he failed to call any witnesses in support of the Defendant's alibi defense; in that he failed to find and interview alibi witnesses; in that he failed to obtain any transcripts of the testimony of the alibi witnesses from 97 CF 2326; and in that he failed to file a Motion to Quash Arrest and Suppress Evidence.

10. That attached and incorporated into this instant Petition is an Affidavit of Ramiro Sandoval, dated June 1, 2001, **Defendant's Exhibit B**, and that other affidavits will be obtained and submitted purusant to statute.

11. That the Defendant filed a timely Notice of Appeal of his convictions, and that the judgment of Kane County was affirmed in part and vacated in part. P. v. Amaya, 748 N.E. 2d 1252, 321 Ill. App. 3d 923(Ill. App. 2 Dist. 2001)

WHEREFORE, the Defendant, Armando Amaya, respectfully requests that this Honorable Court grant his Petiton for Hearing and Relief, for the reasons stated.

Respectfully submitted,

Kathleen Colton

*The Law Offices of Kathleen Colton, Ltd.*
*Kathleen Colton, Attorney at Law*
*226 S. Batavia Avenue*
*Batavia, IL 60510*
*(630)232-7002*
*Attorney # 06200023*

CIRCUIT COURT OF KANE COUNTY

People of Illinois,                         )) Motion for a New Trial
            Respondent                      )
                                            )
                                            )
                                            )
            Vs.                             )      Case No. 98 CF 535
                                            )
                                            )
                                            )
Armando Amaya,                             ) The Honorable
            Movant                          ) D.C. Hudson, presiding

MOTION FOR LEAVE TO FILE
THE ATTACHED MOTION FOR A NEW TRIAL

Now Comes movant Armando Amaya, in his own proper

person, and moves this Honorable Court for leave to file the

attached MOTION FOR A NEW TRIAL, in the interests of substansive

justice and fundamental fairness, where the said motion was not

acknowledged and or addressed by this court upon initial filing

on the date of 2/15/99.

Respectfully Submitted,


Armando Amaya, Pro se

Clerk of the Circuit Court
Kane County, IL

SEP 27 2000

C000323

**DEFENDANT'S
EXHIBIT #** A
Group    AA1-13          AA1

People of Illinois,       )    Motion for New Trial

      Respondent       )

                          )

                          )

                          )

      Vs.              )    Case No. 98 CF 535

                          )

                          )

Armando Amaya,         )    The Honorable

      Movant          )    D.C. Hudson, presiding

### MOTION FOR A NEW TRIAL

               Now Comes movant Armando Amaya, in his own proper person, and moves this Honorable Court pursuant to Illinois Rev. Statutes, Chapter 725, section 5/116-1 (725 ILCS 5/116-1), and moves this Honorable Court for entry of an order setting aside the verdict of the jury returned on 1/30/99, and grant him a new trial.

      In support this movant states:

      1). That I am the movant in the above entitled cause.

      2). That defense counsel was ineffective where he did not put on this movants alibi defense, and call alibi witnesses.

      3). That defense counsel was ineffective for failing to file a "MOTION TO QUASH THE ARREST AND SUPPRESS ANY EVIDENCE" obtained as a result.

      4). That defense counsel was ineffective where did not call any witnesses in support of the "defense" he actually advanced to the court, where there were witnesses avalible.

      5). Any other grounds that may appear in the record of the proceeding had in this case.

Chief Judge, Circuit Court Clerk of the Circuit Court

SEP 27 2000

AA2

C000324

Wherefore, this movant prays that this Honorable Court will grant this motion, and grant him a new trial.

Respectfully Submitted,

Armando Amaya, Pro se

) ss

County of Will    )


## AFFIDAVIT

I Armando Amaya, first being duly sworn upon oath, deposes and states that the facts avered in this affidavit are true and correct in substance, to the best of my knowlege, understanding, information, and belief.

1). That I am the movant in the attached Motion For A New Trial.

2). That on the approx. date of 1/30/99 I was convicted of First Degree Murder, and two (2) counts of Att. First Degree Murder in the Circuit Court of Kane County.

3). That on the approx. date of 2/13/99 this affiant drafted what would be a pro se Motion for a New Trial. (See Exhibit A).

4). That on the approx. date of 2/15/99 this affiant placed the said motion in the United States Mail, addressed to the Kane County Clerks office in an envelope baring sufficient postage by placing it in the hands of an officer Parker, and or Kelly while housed in the work cell block of the Kane County Jail.

5). That proceeding his conviction, this affiants counsel filed Post-trial motions which did not include any of the issues which were raised in his Pro se Motion For A New Trial. (See Exhibit B)

6). That my motion for a New Trial was sent to the clerk approx. two weeks after my conviction.

Deborah _____
Clerk of the Circuit Court
Kane County, IL
SEP 27 2000
FILED

C000326

AA4

That in light of the above, where my motion was handed to county officials to be mailed to the County Clerks office within the 30 day (statutory) limit allowed for such motions. It was "Filed" for purposes of satisfying the statutory requirment. (See attahced Memorandum at Law).

8). That I have never received any disposition on the said Motion, nor has the County Clerk, or this Court ever acknowledged or addressed the merits of the motion.

9). That the attached Motion is made in good faith.

10). That because of the merits of the said motion, defense counsel could not raise the issues himself in a Post-trial motion.

11). That in light of the said motion not being acknowledged or addressed by the court, this movant brings the attached motion in good faith.

12). That this movant does not wish to delay any of the proceedings in his filing of the attached motion. But affirmatively states that he believed at one point that the motion was filed and heard, and was confused by the Post-trial proceedings in this case (the motion was not filed or heard by the court).

13). That this affiant only recently learned that by the trial court not addressing the said motion, and the County Clerk acknowledging the motion in writing effectively ment that it was not filed.

C000327

AA5

14). That this affiant is a layman to the law and does not undersand "all this legal stuff."

15). That I have attached a Motion for Leave and a Motion for a New Trial.

16). That in light of the circuimstances, and all the above, this affiant brings the attached motion in good faith for proper disposal.

17). That the above is true and correct to the best of my knowlege, understanding, information, and belief.

Respectfully Submitted,

Armando Amaya, Affiant

In accord with 28 U.S.C. 1746, I declare under penalty of perjury that the above is true and correct to the best Knowlege, and belief.

Armando Amaya, affiant

C000328

AAb

I.. E CIRCUIT COURT OF KANE C..,TY

People of Illinois,                         ) Motion for a New Trial
     Respondent                        )
                                       )
                                       )
            Vs.                         )                    Case No.. 98 CF 535
                                       )
                                       )
Armando Amaya,                             ) The Honorable
     Movant                            ) D.C. Hudson, Presiding

## MEMORANDUM AT LAW

        Now Comes Armando Amaya, in support of the attached MOTION FOR A NEW TRIAL, and hereby states the following:


### I

### ARGUMENT

        1). WHERE THIS MOVANT PLACED HIS MOTION FOR A NEW TRIAL IN THE HANDS OF COUNTY OFFICIALS TO. BE MAILED TO THE CIRCUIT CLERK WITHIN THE 30 DAY STATUTORY LIMIT, SUCH PAPERS ARE DEEMED "FILED."


        In the present case, we have a situation that is not very unusual. This movant, on the date of 2/15/99, gave his legal papers addressed to the County Clerk, to an officer so that they can be mailed. However, as evident by the fact that those papers were not acknowledged, and or addressed by the trial court, one of three things must have happened. Either the officer lost the paperwork, the clerk lost the paperwork, or the papers mistakenly thrown away. Here, it is apparent that the said papers were in a postage paid envelope, and properly addressed to the County Clerk. Therefore, this movant did all that he could do to ensure their proper filing. In this, when this movant placed the papers in the hands of county officials, they were deemed

C000329

Clerk of the Circuit Court
Kane County, IL
27 2000

"FILED." (See Houston . Lack, 487 U.S. 266, 108 Ct. 2379, 2383, (1988)).

      In this case, once this movant gave the papers to county officials, he relinquished control over any ability he had to ensure that the said papers were sent to the county clerk. In this regard, this movant must be absolved of any responsibility, if infact the papers were not mailed, or was lost in the shuffle. (Houston, 108 S.Ct. at 2382). And specifically because of this movants status as a prisoner, he was forced to depend exclusively on county officials to mail his legal papers. Likewise, in this regard he cannot be held responsible for such. (Houston, i.d.). Furthermore, in this case the circumstances are even more compelling because this movant only had 30 days to file the motion (absent extention by the court). And as shown in the attached filing (see exhibit A), and evinced in the attached affidavit, this movant gave the motion to county officials to be sent to the clerk well within the 30 days limit. However, in context of the fact that there was no acknowledgment by the clerk and or the trial court in context of the said motion. And where its is clear that the clerk does not have a record of receiving the said motion. It is impossible to believe that the motion was ever sent to the clerk in the first place! Therefore, this movant should now be allowed to file the said motion, and be heard on it. In light of the fact that the motion was "FILED" on time, i.e. 2/15/99, and in light of the fact that this movant made every effort to have the motion filed, he should be allowed to proceed on it. (Houston, 108 S.Ct. at 2381-83). This motion was timely filed where it was placed in the hands of county officials within the 30 day limit as required by statute. (Houston, i.d.).

C000330

AA8

Memorandum at Law/ Armando Amaya

Respectully Submitted,


Armando Amaya, Pro se

AR9

[EXHIBIT A]

DATE/ 02-15-99

DEAR JUDGE.

I WAS TOLD THAT I HAD TO WRITE YOU
AFTER MY TRIAL TO LET YOU KNOW THAT
MY ATTORNEY DID NOT DO HIS JOB. AND
EXPLAIN TO YOU WHY HE DID NOT SO THAT
I CAN GET A NEW TRIAL. SO THAT I CAN
PROVE MY INNOCENCE

1) MY ATTORNEY DID NOT DO HIS
JOB. BECAUSE HE DID NOT PUT MY ALIBI
DEFENSE, UP AND CALL MY WITNESSES.

I HAD WITNESS WHO COULD HOK
BEEN CALL TO TESTIFY AS TO WERE I WAS
AT 830 OR WHATEVER WHEN THE SHOTE
WAS DONE. I ALSO HAD WITNESS WHO
COULD HAVE TOLD THE COURT AND THE JURY
THAT BECAUSE I WAS WITH THEM. MY
ATTORNEY DID NOT DO HIS JOB. OK THE
HE DID NOT CALL NONE OF THE WITNESS
AND HE DID NOT TELL THE JURY THAT
I WAS NOT AND COULD NOT HAVE BEEN
THERE BECAUSE OF THOSE WITNESSES SO
BECAUSE HE DID NOT DO THIS I DID NOT
GET A FAIR TRIAL.

C000332

AA10

SEP 27 2000

2) MY ATTORNEY DID NOT DO HIS JOB BECAUSE HE DID NOT FILE A MOTION TO QUASH MY ARREST AND SUPPRES ANY EVIDENCE.

THE POLICE STOPED ME FOR NOTHING. BEFORE THEY STOPED ME THEY DID NOT HAVE A DESCRIPTION OF THE CAR. NOR DID THEY HAVE ANY OTHER REASON. WE WERE NOT ACTING FUNNY. WE HAD JUST CAME FROM MY GRRLFRIENDS HOUSE AND HAD RECENTLY PULLED OUT OF THE DRIVE WAY. THEY DID NOT EVEN KNOW WHAT WAS GOING ON. THEY PULLED US OVER JUST BECAUSE WE MEXICAN. THIS DOES NOT GIVE THEM A PROBABLE CAUSE TO PULL USE OVER. THE SEARCH A SEIZURE WAS BOGUS, THEY SAID IT WAS A TRAFFIC STOP BUT THEY HAD THEIR GUNS OUT POINTING AT US SO IT WAS BOGUS.

3) MY ATTORNEY DID NOT DO HE'S JOB BECAUSE HE DID NOT CALL WITNESS TO SOPPORT HIS OFFENSE.

MY ATTORNEY DID NOTHING ELSE AA11

STATE EVIDENCE. HE DID NOT PUT ANY EVIDENCE ON, HIM SELF EVEN THOUGH THERE WAS SOME THAT HE COULD HAVE PUT ON. HE DID NOT CALL ANY WITNESS OR STRONGLY CHALLENGE THE STATE WITNESSES. THERE WERE OTHER WITNESS THAT WERE AVAILIBLE WHO COULD HAVE SUPPORTED THE DEFENSE HE PRESENTED. BECAUSE HE DID NOT. HE WAS INEFFECTIVE AND I DID NOT GET A FARE TRIAL.

JUDGE I DID NOT DO THIS. IF ONLY HAD MY ATTORNEY DONE HIS JOB. I PROBABLY WOULD NOT HAVE BEEN CONVICTED.

SINCEARLY

Armando Amaya

PROOF OF SERVICE

This certifies that I have served upon the below named parties, the attached "MOTION FOR LEAVE TO FILE THE ATTACHED MOTION FOR A NEW TRIAL", "MOTION FOR A NEW TRIAL", "AFFIDAVIT", and "MEMORANDUM AT LAW", by enclosing the same in a legal envelope, properly addressed, and baring sufficient postage, by placing it in the United States Mail at the Stateville Correctional Center, P.O. Box 112, Joliet Illinois, 60434, on the date of 9/6/00. The following has been caused to be served in lieu of the above on:

Circuit Ckerk of Kane County
C/O Deborah Seyller
P.O. Box 112
Geneva, Il. 60134

Respectfully Submitted, é

Armando Amaya, Pro se

In accord with 28 U.S.C. 1746, I declare under penalty of prejury that the above is true and correct to the best of my knowlege, and belief.

Respectfully Submitted

Clerk of the Circuit Court
Kane County, IL.
SEP 27 2000

C000335

AA 13

State of Illinois    )
                     )         ) SS
County of Kane       )

### AFFADAVIT

I Ramiro Sandoval, first being duly sworn upon oath, do so hear by state the following.

1). That I am the affaint in the above entitled cause.

2). That I knew , Armando Amaya , George Gamboa on the year of , 1997 .

3). That in the night of 10/29/1997 . I was with, Armando Amaya & George Gamboa .

4). October, 29 of 1997 . I pick Armando & George , from there homes to go to a house of Three sisters on North ave. in Aurora . That we spend a couple of hours there before me & George left there home for about a hour to go get some food & beer at Lincoln and New York st. at approx. 7:00 or 8:00 pm.

5). That on return to , Emma. Sonia , & Elyse's home. We spend time there . cause Armando was there waiting for us to come back with the beer .

6) That on the night of October, 29 1997 . I gave a Statement to the Aurora police as I do know .

7). That there was no gun in my car or with us At any time that night.

8). That I knew Armando was going to trial on the case he is on now , and I had told him if I was call to testify I would have said the same as I did at the police station and as I do now.

DEFENDANT'S
EXHIBIT # B

C000336

9). That I was never call or contacted by any of Armando's lawyers or any body else

10). That I was never ask to testify , however if I had been , I would have.

11). That this statement is giving of my own free will. I have not been threatned, course, and or promise anything to give it .

12). That if called, I will testify subtantially consisted with this affidavit .

FURTHER THIS AFFAINT SAYETH NOT

Respectfully submitted,

*Ramiro Sandoval*
Ramiro Sandocal, affaint

Subscribed and sworn to before me
this ___9___ day of ___June 2001___
at Aurora, County of Kane, State of Illinois.

Notary Public _____

"OFFICIAL SEAL"
JORGE CERDA
Notary Public, State of Illinois
My Commission Expires Jan. 8, 2003

C000337  D's Exhibit B, p. 2

STATE OF ILLINOIS     )
                             ) SS

COUNTY OF KANE      )

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS   )
                                   )
                Plaintiff,   )
                                   )
vs.                               )   Gen. No. 98 CF 535
                                   )
ARMANDO AMAYA,        )
                                   )
                Defendant.  )

## NOTICE OF FILING

TO:

| Kane County Circuit Clerk | Office of the State's Attorney | Armando Amaya |
|---|---|---|
| P.O. Box 112 | 37W777 Route 38 | C/o Stateville Corr. Center |
| Geneva, IL 60134 | St. Charles, IL 60175 | P.O. Box 112 |
| | **Attn: Greg Sams** | Joliet, IL 60434 |

    **PLEASE TAKE NOTICE** that on the **14th** day of **March, 2002**, there were filed, or mailed to be filed, with the Clerk of the Court on behalf of the Defendant, the attached: **PETITION FOR POST-CONVICTION HEARING AND RELIEF PURSUANT TO 725 ILCS 5/122-1 ET SEQ. AND PETITION TO INCORPORATE DEFENDANT'S PRO SE "MOTION FOR NEW TRIAL" FILED SEPETEMBER 27, 2000 AND FEBRUARY 15, 1999.**

                                 *Kathleen Colton*
                                  Kathleen Colton, Attorney at Law
                                  Attorney for the Defendant

*The Law Offices of Kathleen Colton, Ltd.*
*Kathleen Colton, Attorney at Law*
*226 S. Batavia Avenue*
*Batavia, IL 60510*
*(630) 232-7002*
*Attorney #06200023*

C000318

STATE OF ILLINOIS )
)
COUNTY OF KANE )

The undersigned, being first duly sworn on oath, deposes and states that (s)he served the foregoing Notice and the above documents:

A. By depositing them in the U.S. Post Office mail box in Batavia, Illinois, on the _____, day of _____, 2002, a true and correct copy thereof in a sealed envelope, CERTIFIED MAIL with return receipt requested, to each person to whom it is directed;

**OR**

B. By depositing them in the U.S. Post Office mail box in Batavia, Illinois, on the _____, day of _____, 2002, a true and correct copy thereof in a sealed envelope, first class postage prepaid, to each person to whom it is directed;

**OR**

C. By personally delivering a copy of the documents to the above named persons on the _14th_ day of, _____, 2002.

**OR**

D. By personally delivering by FACSIMILE TRANSMISSION a copy of the documents to the above named persons on the _____ day of, _____, 2002.

_Kathleen Colton_

Subscribed and sworn to before me this

_14th_ day of _____, 2002.

_____
NOTARY PUBLIC

OFFICIAL SEAL
PATRICK COLTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/10/02

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

Case No. *98 CF 535*

| | | |
|---|---|---|
| Plaintiff(s) *People* | Defendant(s) *Armando Amaya* | |
| Plaintiff(s) Atty. *Stajdoher* | Defendant(s) Atty. *Colton* | Deborah Seyller<br>Clerk of the Circuit Court<br>Kane County, IL<br>JUL 1 5 2005<br>FILED    090<br>ENTERED<br>File Stamp |
| Judge *Wegner*  Court Reporter *Kathi L*  ☐ None (NCRP)  Deputy Clerk | | |

A copy of this order  ☐ should be sent to:  ☐ has been sent to:

☐ Plaintiff Atty. ☐ Defense Atty. ☐ Other _____

## ORDER

*cust IDOC*

☒ Defendant is present in Open Court (DPOC)
☐ Defendant is present via Closed Circuit TV (CCTV)
☐ Defendant did not appear (DNAOC)
☐ Interpreter present (INTPR)
☐ Other _____

☐ Defendant has been advised of his rights and penalties (DFRPE)
☐ Inabsentia explained (IAE)
☐ Defendant remanded for transport by sheriff (OROT)
☐ Defendant remanded for CCTV appearance (ORCTV)
☐ Defendant to appear in street clothes and bring lunch (DFASC)

☐ CASE CONTINUED TO _____ at _____ m. room _____

☐ By agreement (MAGRE)
☐ On Motion of State (MPROS)
☐ On Motion of Defendant (MDEFN)
☐ On Motion of Court (MCORT)

☐ Pre-trial/status _____
☐ Bench trial
☐ Jury trial
☐ Attorney
☐ VOP Hearing
☐ Hearing on Motion for _____
☐

## THE CLERK IS ORDERED TO:

☐ Send bail forfeiture notice returnable _____ at _____ m. room _____ (BN)
☐ Issue summons returnable _____ at _____ m. room _____ (OISUM)
☐ Take Judgment on forfeiture
☐ Send failure to pay notice returnable _____ at _____ m. room _____
☐ Send failure to pay notice and close upon non-payment
☐ Send final notice returnable _____ at _____ m. room _____
☐ Issue warrant forthwith (OIWAR)(504)

Bail set at _____   ☐ 10% to apply   ☐ Full Cash   ☐ Hold Without Bond   ☐ No Recog.

☐ Strike court date of _____ (OCDST)   ☐ Vacate all other court dates
☐ Recall outstanding warrants on this file only (WRNTC)
☒ Other *D's Petition for Post Conviction Relief is denied for*
*the reasons stated on the record. No future dates*
*Notice of Appeal filed.*

Entered *7/15/05*

EXHIBIT H

A20
C000508

P1-CF-001 (07/03)    White - Clerk    Yellow - Sheriff or P.D    Pink - Defendant    Gold - SAO

ECEIVED

OCT 2 5 2006

SAAP SECOND DISTRICT

No. 2-05-0706

## IN THE

## APPELLATE COURT OF ILLINOIS

## SECOND JUDICIAL DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | for the 16th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Kane County, Illinois, |
| | ) | |
| -vs- | ) | No. 98 CF 535 |
| | ) | |
| **ARMANDO AMAYA,** | ) | Honorable |
| | ) | Grant S. Wegner, |
| Defendant-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

THOMAS A. LILIEN
Deputy Defender

PAUL ALEXANDER ROGERS
Assistant Defender
Office of the State Appellate Defender
2010 Larkin Avenue
Elgin, Illinois 60123
(847) 695-8822

COUNSEL FOR DEFENDANT-APPELLANT

## ORAL ARGUMENT REQUESTED

EXHIBIT I

# POINT AND AUTHORITIES

Page

**THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S POST-CONVICTION PETITION, WHERE THE RECORD SHOWS THAT MR. KLIMENT'S DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNREASONABLE AND PREJUDICIAL**................................................................**17**

*People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998)...............................17

*Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052,
    80 L.Ed. 2d 674 (1984)...........................................................17-18,26-27,34

*People v. Crane*, 195 Ill.2d 42, 743 N.E.2d 555 (2001)..........................................17

*People v. Daniels*, 187 Ill.2d 301, 718 N.E.2d 149 (1999)....................................17

*People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984)..............................18

*People v. Truly*, 230 Ill. App. 3d 948, 595 N.E.2d 1230 (1st Dist. 1992)...............18

*People v. West*, 187 Ill. 2d 418, 719 N.E.2d 664 (1999)........................................18

*People v. Ramey*, 152 Ill. 2d. 41, 604 N.E.2d 275 (1992)......................................18

*People v. York*, 312 Ill. App. 3d 434, 727 N.E.2d 674 (2nd Dist. 2000).................18

*Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992)...............................................18

*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991).....................................................18

*People v. Simac*, 161 Ill. 2d 297, 641 N.E.2d 416 (1994)......................................26

*People v. King*, 316 Ill. App. 3d 901, 738 N.E.2d 556 (1st Dist. 2000)..............27-28

*People v. Amaya*, 321 Ill. App. 3d 923, 748 N.E.2d 1251 (2nd Dist. 2001)........28,30

*People v. Triplett*, 108 Ill. 2d 463, 485 N.E.2d 9 (1985)........................................29

*People v. Williams*, 173 Ill. 2d 48, 670 N.E.2d 638 (1996)....................................29

## NATURE OF THE CASE

The defendant-appellant, Armando Amaya, appeals from a judgment denying his petition for post-conviction relief following an evidentiary hearing.

No issue is raised concerning the charging instrument.

## ISSUE PRESENTED FOR REVIEW

Whether the trial court manifestly erred by denying the post-conviction petition, where the record shows that the defendant's trial attorney unreasonably refused to raise a viable alibi defense.

## JURISDICTION

This is an appeal from a final order denying a post-conviction petition following an evidentiary hearing. The final order was entered on July 15, 2005. (C508) A notice of appeal was filed that same day. (C510) This Court therefore has jurisdiction pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651(a).

# STATEMENT OF FACTS

*Introduction and Background*

At approximately 8:45 or 9:00 p.m. on October 29, 1997, a man fired some gunshots in an area behind an apartment building at 309 East New York Street in Aurora, where a crowd had gathered to watch an argument between Nicole Pearson and another woman. Three individuals were hit by the gunshots, and one of those individuals was killed. (R379, 395-404, 414-19, 425-29, 497-98) At approximately 10:17 p.m. that same night, another shooting incident occurred in Aurora, and at 10:31 p.m. the defendant, Armando Amaya, was arrested by Aurora police as he was riding in a car with two other individuals, George Gamboa and Ramiro Sandoval. (R97-98; Def. Ex. 3 at 35-38 ) Following his arrest, the defendant was charged in case 97 CF 2326 with attempt murder and other offenses, based on the second shooting. (C216; R60, 1119-21, 1183, 1196, 1210-11; Def. Ex. 3 at 35-41)

A bond reduction hearing was held in 97 CF 2326 on December 11, 1997. At that hearing, Sonia Delatorre and her sister, Elizabeth Delatorre, each testified that the defendant had arrived at their residence in Aurora at 6:30 p.m. on the night of the shootings, and that he remained there until 10:30 p.m., when he left the residence with Gamboa and Sandoval. (Def. Ex. 3 at 18-34)

On March 12, 1998, the defendant was charged in case 98 CF 535 with various offenses in connection with the first shooting. Specifically, he was charged with one count of aggravated discharge of a firearm and two counts each of first degree murder, attempt murder, and aggravated battery with a firearm. (C2, 14-22)

3

About a week after the defendant was charged in 98 CF 535, a jury trial was held in 97 CF 2326. (R2)   The defendant raised an alibi defense in 97 CF 2326 and at trial he presented testimony from himself, the Delatorre sisters, Gamboa, and Sandoval in support of his alibi. (R1130-32, 1197)   The trial in 97 CF 2326 ended with a hung jury. (R49, 1133, 1210-11)

On April 16, 1998, the Kane County Public Defender was appointed to represent the defendant regarding 98 CF 535, after the defendant had failed in his efforts to hire attorney Kathleen Colton, who had represented him in 97 CF 2326. (C29; R1-10)   Both cases were continued from time to time until November 9, 1998, when the State elected to proceed to trial on 98 CF 535 instead of retrying the defendant on 97 CF 2326. (R59-64)

On January 22, 1999, Public Defender David Kliment filed a discovery answer for the defendant in 98 CF 535. (C94)   Kliment indicated that the defendant might present testimony from the witnesses who had been listed in the State's discovery answer, which had been filed in May, 1998. (C44-45, 94)   The State's witnesses list had included Gamboa, Sandoval, Sonia and Elizabeth Delatorre, and a third Delatorre sister, Emma. The State also gave addresses for each of those witnesses. (C45)   Kliment also filed two supplemental discovery answers on January 22. One of those supplemental answers indicated that the defense was providing the State with transcripts of tape-recorded statements that the State had previously tendered from various witnesses, including the defendant, Gamboa, and the three Delatorre sisters. (C93)   The second supplemental answer specifically listed Gamboa, Sandoval, and

4

the Delatorre sisters as possible defense witnesses. (C98) The second supplemental discovery answer further indicated that the defendant "may or may not assert the affirmative defense of alibi, as set forth in the discovery materials tendered to the defense by the State." (C98)  At a pretrial hearing on January 22, 1999, Kliment advised the trial court that he had asserted an alibi defense in his discovery answer, although he was not sure if he would actually use that defense at trial. (R102)

A jury trial in 98 CF 535 began on January 25, 1999. (C118)  The evidence presented at trial was summarized in the opinion disposing of the direct appeal, a copy of which is included in the appendix, below. Accordingly, the defendant will not describe that evidence in detail here.  The defendant does wish to point out that Kliment did not pursue the alibi defense at trial and that neither Gamboa, Sandoval, nor any of the Delatorre sisters testified at the trial. (R374-77, 711-21, 796-813) The defendant also did not testify at the trial; the record shows that the trial court admonished the defendant of his right to testify and that the defendant indicated that it was his personal and voluntary decision not to take the stand. (R714-17)

At the conclusion of the trial, the jury found the defendant guilty on all counts. (C179) In August, 1999, the defendant was sentenced to consecutive prison terms of 40 years, 12 years, and 10 years on the murder and two attempt murder counts, plus a concurrent term of 9 years on the aggravated discharge count.  The guilty verdicts on the aggravated battery counts were merged into the attempt murder counts. (C235-44) The defendant then filed a direct appeal. (C255)  On May 10, 2001, this Court issued a decision vacating the aggravated discharge conviction but otherwise

5

affirming the defendant's convictions and sentences. *People v. Amaya*, 321 Ill. App. 3d 923, 748 N.E.2d 1251 (2nd Dist. 2001). Leave to appeal was denied by the Illinois Supreme Court on October 3, 2001. *People v. Amaya*, 196 Ill. 2d 547, 763 N.E.2d 320 (2001).

On March 15, 2002, attorney Colton filed a post-conviction petition for the defendant in 98 CF 535. (C320-22) The petition incorporated a pro se post-trial motion that the defendant had attempted to file prior to being sentenced and that he actually did file while the direct appeal was pending. (C282-94, 323-35) In that motion, the defendant alleged that Kliment had been ineffective in failing to raise the alibi defense and call witnesses to support that defense. (C324) In her petition, Colton noted that Gamboa, Sandoval, and the Delatorre sisters had given alibi testimony in 97 CF 2326. The petition further alleged that Kliment had been ineffective in that he failed to call the alibi witnesses in 98 CF 535, to interview those witnesses, or to obtain transcripts of their prior testimony in 97 CF 2326. (C321)

The petition was supported by an affidavit from Ramiro Sandoval dated June 9, 2001. (C336) In the affidavit, Sandoval stated that: (a) he was with Gamboa and the defendant at "a house of three sisters" during the evening of October 29, 1997; (b) he and Gamboa left the house around 7:00 or 8:00 p.m.; (c) they returned to the house about an hour later, at which time the defendant was still there; (d) he would have testified to the same facts if he had been called as a witness in this case; and (e) he was never contacted by the defendant's attorney. (C336-37)

On October 3, 2003, Colton filed two additional affidavits in support of the

6

post-conviction petition. (C 342-47) Both affidavits were from a private investigator, Arnoldo Castillo. In one affidavit, Castillo stated that he had interviewed Gamboa in Aurora on May 22, 2003, at which time Gamboa said that he had not been contacted by anyone from the Kane County Public Defender's Officer regarding 98 CF 535, that he had not been subpoenaed to testify in that matter, and that he would testify for the defendant if called to do so. (C344-45) In the second affidavit, Castillo indicated that he had spoken to Sandoval on July 20, 2003, at which time Sandoval made statements similar to those that Gamboa had made to Castillo on May 22. (C346-47)

On March 4, 2004, Colton filed a certificate pursuant to Supreme Court Rule 651(c), stating that she had: (a) personally conferred with the defendant regarding his contentions of error in the trial and sentence; (b) made any amendments to the defendant's pro se pleadings that were necessary for an adequate presentation of his claims of constitutional error; and (c) examined the trial court file and the reports of proceedings for the trial and sentencing in 98 CF 535. (C355-57)

Also on March 4, the State filed a motion to dismiss the petition. The State alleged that the petition was untimely, that it raised issues that could have been raised on direct appeal, and that it "avers matters outside the court record without sufficient supporting documentation." (C353-54)

A hearing on the motion to dismiss was held on May 19, 2004. At the outset of the hearing, the trial court noted that the statutory 90-day summary dismissal period had elapsed, so that the matter had necessarily advanced to the second stage of the post-conviction proceedings. (R1084-85)    During the hearing, the State

7

withdrew its allegation that the petition was untimely. (R1087-88, 1096) Instead, the State argued that the ineffective assistance claim against Kliment was waived because it could have been raised on direct appeal and that there was no supporting affidavit from Gamboa, who was now deceased. (R1088-91) Colton replied that the petition could be amended to allege ineffective assistance of counsel on direct appeal, if the court determined that the ineffective assistance claim against Kliment could have been raised on direct appeal. (R1094-95) Additionally, Colton advised the trial court that her investigator had been "in the process" of going back to get an affidavit from Gamboa when Gamboa was killed. (R1097)

On July 29, 2004, the trial court denied the State's motion to dismiss the petition. (C366; R1102-05) The court found that Kliment may have had "legitimate, strategic reasons" for not calling the alibi witnesses, but that "the court at this stage doesn't know that." (R1104)

The State filed an answer to the petition on September 1, 2004. (C367) The State admitted all of the allegations in the petition, with two exceptions. The State denied the allegation that Kliment had been ineffective for failing to investigate or call the alibi witnesses, and the State said it lacked sufficient information to "form a belief as to the truth or falsity" of Sandoval's affidavit. (C367)

An evidentiary hearing on the petition was held on April 20 and May 12, 2005, with the Hon. Grant Wegner presiding. (R1116, 1235) The Hon. Donald Hudson had presided over the trial and the earlier proceedings on the post-conviction petition. (R247, 1073-1110)

8

The defendant was the first witness at the evidentiary hearing. The defendant testified that his alibi for the night of October 29, 1997, covered the times for both the shooting that had occurred around 10:15 p.m., which provided the basis for the charges in 97 CF 2326, and the shooting that had occurred earlier that night, which provided the basis for the charges in 98 CF 535. According to the defendant, he had been at the Delatorre house when both shootings occurred. (R1134-38, 1186) He said that he mentioned the alibi to Assistant Public Defender Sandra Parga when Parga first spoke to him at the jail regarding the charges in 98 CF 535 and that he advised Parga to contact Colton about the alibi. (R1137) The defendant further testified that he had repeatedly mentioned the alibi to Kliment prior to the trial in 98 CF 535 and that whenever he did so, Kliment would indicate that he was "looking into it." (R1140-42) The defendant said that he asked Kliment, in Parga's presence, to pursue the alibi in 98 CF 535, but that neither Kliment nor Parga ever told him that they had talked to Colton or any of the alibi witnesses. (R1142-44)

The defendant testified that he had been in contact with Gamboa, Sandoval, and the Delatorre sisters prior to the trial in 98 CF 535. (R1168-70) He said that he also talked to all of those witnesses, except for Emma Delatorre, after he was found guilty. According to the defendant, all of those witnesses indicated that they would have testified for him at the trial but that they were never contacted by his attorneys. (R1159-68) The defendant testified that Elizabeth Delatorre was living in Arizona at the time of the evidentiary hearing. (R1166)

The defendant denied that he had agreed not to raise an alibi defense at trial in

9

98 CF 535. (R1168)  He also denied telling Kliment that he had been at the scene of the shooting that led to the charges in 98 CF 535. (R1185) He never told Kliment that he was guilty of those charges. (R1189-90)

The defendant acknowledged that he and Kliment had reviewed the police reports in 98 CF 535 and discussed the testimony of the potential witnesses. (R1170, 1173-75)  He further acknowledged that Kliment had indicated that he intended to argue that the State's evidence was insufficient to prove the defendant guilty beyond a reasonable doubt because of the lack of physical evidence tying him to the shooting. (R1175) The defendant denied that Kliment had indicated prior to trial that he would not raise the alibi defense. (R1174)

During the defendant's testimony, three documents were admitted into evidence without objection.  Transcripts of the taped statements given by the defendant and Sonia Delatorre to the police on October 30, 1997, were admitted as Defense Exhibits 1 and 2. A transcript of the December 11, 1997, bond reduction hearing in 97 CF 2326 was admitted as Defense Exhibit 3. (R1123-30)

Two other witnesses testified for the defendant at the evidentiary hearing. Arnold Castillo, the private investigator hired by Colton, gave testimony consistent with the affidavits that Colton had previously obtained from Castillo and filed in support of the petition, in which Castillo described his interviews with George Gamboa and Ramiro Sandoval. (R1238-50)

Sandoval also testified, through an interpreter. (R1251)  He said that he had been living in Aurora in 1998-99 and that nobody from the Kane County Public

10

Defender's Office had contacted him prior to the trial in 98 CF 535. (R1251-52) Sandoval further testified that he had not been subpoenaed as a witness in 98 CF 535, but that he was in the courthouse while the trial in 98 CF 535 was in progress. He had come to the courthouse at the request of the defendant's family. (R1252-53) Nobody from the Public Defender's Office spoke to Sandoval at the courthouse. (R1253) Sandoval acknowledged that he had previously testified that he had been with the defendant at the time of the shooting that led to the charges in 97 CF 2326. (R1254) He knew that the shooting that led to the charges in 98 CF 535 had occurred about two hours earlier than the other shooting. (R1254) Sandoval denied that he had been present for either shooting. "We were just with the girls," he stated. (R1254-55) Sandoval further stated that "we" left the girls' residence at about 9:00 p.m. to buy some beer. (R1256) He admitted signing the affidavit that was filed as Defense Exhibit B in support of the petition. (R1257) The affidavit was in English, but it was read to Sandoval by an investigator who spoke Spanish. (R1259, 1263, 1266) Sandoval did not remember the name of the investigator. (R1263) Sandoval did not recognize Castillo as the investigator, but Sandoval said that he only saw the investigator once and did not recall his face very well. (R1263, 1265-68)

David Kliment testified for the State at the evidentiary hearing. (R1194) Kliment told the court that, prior to the trial in 98 CF 535, he had reviewed the police reports and witness statements in that case, including the taped statements given by the defendant and Sonia Delatorre on October 30, 1997. (R1196-97, 1208-09) He had also reviewed the transcripts for the testimony given in 97 CF 2326 by Gamboa,

11

Sandoval, and the Delatorre sisters.[1] (R1196-98, 1207) He did not recall reviewing the transcript of the December 11, 1997, bond reduction hearing in 97 CF 2326. (R1211) Kliment also could not recall whether he knew, prior to the trial in 98 CF 535, that the trial in 97 CF 2326 had ended with a hung jury, but he added, "I don't know why I wouldn't have known it," and told the court, "I'm sure I did." (R1210-11) Kliment had a letter in his file from Colton indicating that the "same alibi defense" had resulted in a hung jury in 97 CF 2326. (R1224-25)

Kliment further testified that he had investigators interview potential witnesses in 98 CF 535, although none of the investigators prepared any written reports. (R1200) Kliment did not know which witnesses the investigators had interviewed, and he had no recollection or record indicating that he had asked the investigators to interview the alibi witnesses. (R1218-19) Kliment had no record or recollection of speaking to any of the alibi witnesses himself. (R1229-30) The addresses for the alibi witnesses were mentioned in the transcript of the testimony in 97 CF 2326, and Kliment believed that the defendant was in contact with those witnesses. (R1220, 1227-28) Kliment's file contained a note indicating that the defendant had arranged for some of the alibi witnesses to be flown in from Phoenix. (R1220)

Kliment stated that he had discussed all of the potential defense strategies with the defendant prior to the trial in 98 CF 535 and that he had talked to the defendant

---

[1] None of the transcripts from the trial in 97 CF 2326 were included in the record on appeal, but Mr. Kliment has provided appellate counsel with a copy of the trial transcript for March 18, 1998, which includes the testimony of the defendant and the alibi witnesses in 97 CF 2326. A motion to supplement the record with that transcript is being filed with this brief. The transcript will be cited as "SR___."

12

about the potential alibi witnesses on at least "a couple of occasions." (R1197-1200) Kliment said that he "probably" discussed the alibi with the defendant for the last time on January 21, 1999. (R1199) He recalled filing a supplemental discovery answer on January 22, 1999, asserting the alibi defense and listing the alibi witnesses, even though by then he had no intention of actually pursuing the alibi defense at trial. (R1202, 1217-18) Kliment included the alibi defense in the supplemental answer because he "didn't want to foreclose it completely" and he already had "the paperwork" done. (R1217-18)

According to Kliment, when he spoke to the defendant on January 21, he told the defendant that he "didn't like" the alibi defense in this case. (R1203-04) Based on his experience – which included trying 40-50 murder cases, about half of which were capital cases – Kliment believed that "putting on a bad alibi defense is worse than putting on no defense at all, because it makes you look like you're trying to lie if the alibi is going poorly." (R1195, 1204) Kliment told the defendant that "putting on any kind of defense was a matter of trial strategy" and that the defendant would be "better off" without the alibi defense. (R1204)

Kliment testified that he did not think that the defendant's alibi witnesses could account for the entire 90-minute period between the shooting underlying the charges in 98 CF 535 and the later shooting underlying the charges in 97 CF 2326. (R1207-08) "I think that they tried to," Kliment stated, "but when you piece it together, there were gaps and so forth, and I'm trying to remember back a long time, remember, but there were problems with it." (R1208)

13

Kliment said that his opinion regarding the viability of the alibi defense in this case was shared by "others" in his office, although he could not remember the names of those "others." (R1224)

Kliment acknowledged that the defendant wanted him to raise the alibi defense "because it was his life on the line." (R1204) Kliment then testified that the defendant proceeded to make "other statements" during the January 21 conference that made it "impossible" for Kliment to pursue the alibi defense. (R1204) According to Kliment, the defendant said "that the witnesses were there to testify for him, they know what to say, but that he was there at the shooting, he just wasn't involved." (R1204) Upon hearing that, Kliment became concerned "that the alibi witnesses would perhaps not testify truthfully." (R1204-05)

When asked whether the defendant was referring to the shooting underlying the charges in 98 CF 535 when he admitted being at the scene, Kliment replied, "That was the topic of conversation." (R1205) Kliment said that he did not "explore it any further." (R1205) Kliment testified that the alibi "would not have been an effective defense" as a matter of "trial strategy" and that he was "barred from using it" in light of the defendant's remark. (R1205) During the January 21 meeting, Kliment concluded the discussion of the alibi by telling the defendant "we're not going to do that, I can't now, and I went no further with it." (R1206) He may have said "won't" instead of "can't." (R1217) Kliment admitted that he had sometimes opted to raise a defense in a particular case even though he did not personally "like" that defense. (R1223)

Kliment acknowledged that no one else was present when he spoke to the defendant on January 21. (R1217) He further acknowledged that he and the defendant "were arguing" about the alibi defense on January 21 because the defendant was "insisting" on asserting that defense, whereas Kliment "didn't want to put it on." (R1213, 1215) Prior to hearing what the defendant had to say on January 21, Kliment had already determined that the alibi "was going to come on very poorly and look like a made-up lie." (R1214) When the defendant made the comment about being at the scene of the shooting, Kliment did not ask him "specific questions" about it because of "the context of the conversation." (R1215-16) The context "was the shooting, the time of the shooting," not the time of the arrest later that evening. (R1226) Based on what he already knew, it was "pretty apparent" to Kliment that the defendant "was at the scene or near the scene of the shooting at 10:30 later on that night," so Kliment inferred or assumed that the defendant was saying that he had also been at the scene of the first shooting. (R1225-26, 1231)

Kliment did not recall what advice he gave to the defendant about testifying in his own behalf, but he was sure that he told the defendant that he had the right to testify. (R1222)

The defendant testified in rebuttal. He denied telling Kliment that he had been at the scene of the shooting that led to the charges in 98 CF 535. (R1270-71) He also denied telling Kliment that the alibi testimony was untruthful. (R1271)

After hearing arguments of counsel, Judge Wegner took the post-conviction petition under advisement. (C504; R1272-99)

15

Judge Wegner issued an order denying the petition on July 15, 2005. (C508; R1309-19) Judge Wegner found that the ineffective assistance of counsel claim based on Kliment's alleged failure to investigate and present the alibi defense had not been waived because it depended on facts outside the record that existed at the time of the direct appeal. (R1311-12)    According to Judge Wegner, the decision to forego the alibi defense was reasonable because of the "gaps" that Kliment found in the alibi evidence and because it would have been unethical to pursue the alibi after the defendant admitted being at the scene. (R1312-18) Judge Wegner further found that the defendant was not prejudiced by Kliment's failure to raise the alibi defense. (R1318-19) In Judge Wegner's view, Sandoval's testimony "lacked any credibility." (R1318) Additionally, Judge Wegner noted that the opinion affirming the convictions on direct appeal had determined that there was "ample evidence" to convict the defendant as a principal in 98 CF 535. (R1319)

The defendant filed a notice of appeal on July 15, 2005, seeking review of the order denying his petition. (C510)

16

## ARGUMENT

### THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S POST-CONVICTION PETITION, WHERE THE RECORD SHOWS THAT MR. KLIMENT'S DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNREASONABLE AND PREJUDICIAL.

**Standard of review:** In reviewing an order denying a post-conviction petition following an evidentiary hearing, this Court must determine whether the trial court manifestly erred. *People v. Coleman*, 183 Ill. 2d 366, 385, 701 N.E.2d 1063, 1074 (1998). At the same time, however, a reviewing court should consider the nature of the post-conviction claims. In this case, the post-conviction petition alleged that the defendant's trial attorney, David Kliment, was ineffective in 98 CF 535 because he failed to investigate and present an alibi defense. (C320-24) An ineffective assistance claim presents a mixed question of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed. 2d 674, 700 (1984). Although the reviewing court must defer to the trial court's findings of historical fact, the reviewing court is free to make its own independent determination of the ultimate legal issue. *People v. Crane*, 195 Ill.2d 42, 51, 743 N.E.2d 555, 562 (2001). In other words, what counsel did or did not do is a question of fact, but whether counsel's acts or omissions support an ineffective assistance claim is a question of law that is subject to *de novo* review. *People v. Daniels*, 187 Ill.2d 301, 307, 718 N.E.2d 149, 155 (1999).

Ineffective assistance claims are measured against the standard set forth in *Strickland,* which requires the defendant to establish that counsel's performance was both objectively unreasonable and prejudicial. 466 U.S. 668, 687-94, 104 S. Ct. 2052-

68, 80 L. Ed. 2d 674, 693-98 (1984). The reasonableness of counsel's performance is determined by "prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. Counsel's incompetence is prejudicial where it raises a reasonable probability that the result of the proceeding would have been different, *i.e.*, where the deficient performance undermines confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. Illinois has adopted the *Strickland* test. *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). The test set forth in *Strickland* requires a reviewing court to undertake a "fact sensitive analysis" that focuses on the specific circumstances of the case being reviewed. *People v. Truly*, 230 Ill. App. 3d 948, 952, 595 N.E.2d 1230, 1233 (1st Dist. 1992).

Ordinarily, counsel's decisions regarding which defenses to raise and which witnesses to call are deemed to be matters of trial strategy that are entitled to great deference on review. *People v. West*, 187 Ill. 2d 418, 432-33, 719 N.E.2d 664, 673 (1999); *People v. Ramey*, 152 Ill. 2d. 41, 54, 604 N.E.2d 275, 281 (1992); *People v. York*, 312 Ill. App. 3d 434, 437, 727 N.E.2d 674, 677-78 (2nd Dist. 2000). Nevertheless, the "mere incantation of the word 'strategy' does not insulate attorney behavior from review." *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir. 1992). "Strategic" or not, an unsound or unreasonable decision can support an ineffective assistance claim, and the reasonableness of counsel's decision is a question of law. *West* 187 Ill. 2d at 432-33, 719 N.E.2d at 673; *Cave*, 971 F.2d at 1518; *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991).

In this case, the post-conviction petition alleged that Kliment knew that the defendant had raised an alibi in 97 CF 2326, that the alibi resulted in a hung jury in 97 CF 2326, and that the alibi also covered the time of the shooting that had led to the charges in 98 CF 535. (C320-24)  During the evidentiary hearing on the petition, Kliment acknowledged that he was aware of the potential alibi testimony in 98 CF 535, that the defendant vigorously urged him to raise it, and that he had filed a supplemental discovery answer asserting the alibi defense and listing the alibi witnesses.  Nevertheless, Kliment ultimately rejected the alibi defense, despite the defendant's wishes. (C98; R1196-98, 1203-16)  Kliment offered two reasons for his decision to forego the alibi.  First, Kliment explained that he "didn't like the [alibi] defense" in this case because, in his opinion, it would not have been credible or "effective." (R1203-05)  Second, Kliment claimed that the defendant made an admission that made the alibi defense "impossible." (R1204)  According to Kliment, the defendant admitted being at the scene of the shooting that related to the charges in 98 CF 535. (R1204-05)

In denying the petition, the trial court found that each of those reasons supported Kliment's decision not to pursue the alibi claim. (R1311-18)  Additionally, the trial court found that the defendant was not prejudiced by the absence of the alibi evidence, given this Court's finding on direct appeal that there was ample evidence to find the defendant guilty as a principal. (R1319)  For the reasons that follow, the trial court's ruling should be reversed.

Contrary to the trial court's conclusion, Kliment did not have any reasonable

19

basis for ignoring his client's desire to assert the alibi defense in 98 CF 535. Although Kliment referred to "gaps" in the alibi testimony, he did not give any specific examples. (R1208)  He also could not identify the "others" in his office whom he claimed shared his low opinion of the alibi. (R1224)  In fact, the record shows that the alibi testimony was remarkably consistent on the crucial question of whether the defendant could have been present when the shooting occurred.

According to the record, the shooting that led to the charges in 98 CF 535 had occurred at approximately 8:45 or 9:00 p.m. on October 29, 1997. (R379, 414-19, 425-29)  In discovery, Kliment had received a transcript of a taped statement that Sonia Delatorre had given to the Aurora police on October 30, 1997. (Def. Ex. 2; R1196-97) In that statement, Sonia advised the police that the defendant had been at her house during the day on October 29, but that he had left the house at some point and then returned with Gamboa and Sandoval around 6:30 or 7:00 o'clock that evening. Sonia also told the police that the defendant, Gamboa, and Sandoval had left the house shortly after 10:30 p.m. and that her sisters Elizabeth and Emma were in the house when the defendant was there. (Def. Ex. 2 at 2-3, 8-9, 13-15, 22-23)  Sonia related the same information when she testified at a bond reduction hearing in 97 CF 2326 on December 11, 1997. (Def. Ex. 3 at 18-25)  Elizabeth Delatorre also testified at the bond hearing, and she  corroborated Sonia's testimony. (Def. Ex. 3 at 19-34)  At the hearing, both Sonia and Elizabeth testified that they were not sure if Gamboa and Sandoval had left the house for part of the time between 6:30 and 10:30 p.m., but they knew the defendant was there the entire time. (Def. Ex. 3 at 23-24, 28-30)

Kliment did not recall seeing the transcript of the bond reduction hearing. (R1211) He did, however, review the transcript of the testimony given by the alibi witnesses at the trial in 97 CF 2326. (R1196-98, 1207-09)   At that trial, Gamboa testified that although he was not sure exactly how long he, Sandoval, and the defendant had been at the Delatorre residence on the night of the shooting, he was sure that they had been there since sometime between 8:30 and 9:15 p.m. (SR44, 51-52)  Gamboa was impeached with testimony indicating that he had not mentioned anything about being at the Delatorre residence when he was interviewed by the police less than 12 hours after the shooting. (SR162) In his testimony at the trial in 97 CF 2326, Sandoval said that he, Gamboa, and the defendant had been at the Delatorre residence for about three hours prior to leaving at approximately 10:15 p.m. (SR30-33, 36)

Elizabeth Delatorre testified at the trial in 97 CF 2326 that the defendant had arrived at her house with Gamboa and Sandoval between 6:30 and 7:00 p.m. on the night of the shooting. (SR70-72)  Elizabeth said that Gamboa and Sandoval had "stepped out" at some point, but they later returned and then left with the defendant shortly at about 10:30 p.m. (SR73-74, 80)

Sonia Delatorre testified at the trial in 97 CF 2326 that she and Elizabeth had gone to a store with the defendant during the day on October 29, 1997, that he went home later that afternoon, but that he came to the Delatorre house with Gamboa and Sandoval around 6:30 or 7:00 p.m. Sonia further testified that Gamboa, Sandoval, and the defendant left the house together just before 10:30 p.m. She was sure that the

21

defendant had been at the house during that entire time, but she acknowledged that Gamboa and Sandoval may have been gone for part of the time. (SR91-94)

Emma Delatorre, who was called as rebuttal witness by the State in 97 CF 2326, testified that the defendant had been at her house with Gamboa and Sandoval until sometime between 10:00 and 10:30 p.m. (SR142-47)  A police officer testified that Emma had made a statement on the day after the shooting in which she stated that Gamboa, Sandoval, and the defendant had been at the house from about 6:00 p.m. until about 10:30 p.m. (SR154-56)  Emma admitted telling the officer that "they" had left the house for about 10-15 minutes at some point before returning, but she testified that "they" referred only to Gamboa and Sandoval, not to the defendant. (SR144, 146) According to the police officer, Emma was "pretty confused" about how long the individuals had been gone from the residence. (SR157-58)  The officer acknowledged that he did not ask Emma to whom she was referring when she used the term "they." (SR157)

The defendant also testified at the trial in 97 CF 2326.  In his testimony, he stated that he had gone shopping with Sonia and Elizabeth on the afternoon of October 29, 1997, that he later went back to his house, and that he went over to the Delatorre residence with Gamboa and Sandoval that evening.  According to the defendant, it was "getting dark" when Gamboa and Sandoval picked him up to go to the Delatorre house, although he could not say exactly what time they arrived at the house. (SR116-18)  The defendant testified that he stayed at the house for more than two hours before he left with Gamboa and Sandoval around 10:30 p.m. (SR120-22)

22

He did not see Gamboa and Sandoval during the entire time. (SR120, 134)  The defendant acknowledged that he had given a statement to the police in the early morning hours of October 30, 1997, in which he first said that he had arrived at the Delatorre residence around 8:00 p.m., but then said he was unsure of the exact arrival time. (SR125)  The defendant admitted that he had told the police that Sonia picked him up and brought him to the house around 8:00 p.m., but he testified that he "must have gotten it confused because there was a lot of yelling between me and the officer." (SR136)  According to the defendant, the police were trying to trick him during the interview. (SR140)  In his statement to the police, the defendant also mistakenly referred to Sandoval as "Rudy" instead of "Ramiro," because Ramiro had a brother named Rudy. (SR137)  The defendant did not recall telling the police that Gamboa and Sandoval had picked him up at the Delatorre residence and that they were stopped by the police immediately after they left that residence. (SR138)

The transcript of the defendant's statement – which Kliment reviewed in preparing for trial in 98 CF 535 – shows that he told the police that Sonia brought him to the Delatorre residence between 7:15 and 8:30 p.m. and that Gamboa and Sandoval later picked him up at that location right before they were pulled over by the police in connection with the shooting that had occurred at about 10:15 p.m., which led to the charges in 97 CF 2326. (Def. Ex. 1 at 3-4; R97-98, 1196, 1208-09)  At the trial in 97 CF 2326, the defendant acknowledged that he "got confused" during the police interrogation on October 30 and that he "did get a lot of things mistaken that day." (SR138)

23

In sum, Kliment knew that the defendant and all three Delatorre sisters had repeatedly stated, starting on the day after the shooting, that the defendant was at their residence when the shooting occurred. (Def. Ex. 1-3; SR70-122, 142-47)  Although the defendant's initial statement to the police conflicted with his testimony at the trial in 97 CF 2326 on one detail – whether he was brought to the Delatorre residence by Sonia or by Gamboa and Sandoval – his statement and his subsequent testimony were consistent on the key point of when he arrived at the residence, and his initial misstatement about who had brought him there was understandable, given the antagonistic circumstances of the police interview and the fact that Sonia had actually picked him up and taken him to a store earlier in the day. (Def. Ex. 1; Def. Ex. 3; SR91-94, 116-18)   Kliment also knew that Sandoval and Gamboa had each given sworn testimony corroborating the Delatorre sisters. (SR30-52)   According to a police officer, Gamboa had not mentioned the alibi when he was interviewed on the day after the shooting, (SR162), but even if that provided Kliment with a valid reason for not calling Gamboa to testify in 98 CF 535, it would hardly justify Kliment's decision not to call any of the other alibi witnesses. Moreover, Kliment knew that the trial in 97 CF 2326 had resulted in a hung jury, despite any "gaps" in the alibi testimony. (R1208-11) Given these facts, Kliment's conclusion that the alibi would not have been viable was objectively unreasonable.

In finding that Kliment had acted reasonably in deciding to forego the alibi defense, the trial court relied not only on Kliment's opinion that it "would not have been an effective defense" in 98 CF 535, but also on his allegation that the defendant

24

had admitted being at the scene of the shooting in that case, which occurred around 8:45 or 9:00 p.m. (R1204-05, 1312-18)  Kliment's claim, however, was wholly uncorroborated, and the defendant flatly denied making any such admission. (SR1217, 1270-71)  Additionally, Kliment acknowledged that he did not ask any follow up questions to explore exactly what the defendant meant when he supposedly said that he had been at the scene. Kliment merely assumed that the defendant meant he had been at the scene of the shooting in 98 CF 535 "because of the context of the conversation." (SR1215-16, 1225-26, 1231)

According to Kliment, the context was "the shooting, the time of the shooting," not the time of the arrest later in the evening, (R1226), but the record showed that the defendant had been arrested shortly after and in close proximity to the scene of the shooting that had occurred at about 10:15 p.m., which led to the charges in 97 CF 2326. (R97-98; SR97, 132-35) Indeed, Kliment admitted that it was "pretty apparent" that the defendant had been "at the scene or near the scene" of the second shooting. (R1225-26)  Because Kliment himself already knew that the defendant was at the scene of the second shooting, he jumped to the conclusion that the defendant was admitting that he had also been at the scene of the first shooting. (R1226) Kliment apparently never considered the possibility that the defendant may simply have been repeating information that Kliment already knew – *i.e.*, that he was near the scene of the second shooting – to emphasize that he was nevertheless not involved in either shooting, and to explain why Gamboa, Sandoval, and the Delatorre sisters were in a position to provide him with an alibi for the entire evening.  The defendant's alibi

related to both shootings: he was at the Delatorre residence with Gamboa, Sandoval, and the Delatorre sisters from the early part of the evening until approximately 10:30 p.m., when he left the residence with Gamboa and Sandoval and then was stopped by the police moments later. (Def. Ex.1-3; SR30-147)  Therefore, when the defendant allegedly told Kliment that the alibi witnesses "know what to say" and that "he was there at the shooting, he just wasn't involved," (R1204), the defendant may have been reminding Kliment of the whole story of what happened that evening and trying to tell Kliment that he had a valid alibi for the entire evening even though he was stopped near the scene of the second shooting almost immediately after it happened.  Without asking any follow-up questions, Kliment could not reasonably determine that the alibi was false.  Although Kliment certainly had an ethical duty not to present false evidence, he also had an obligation to represent his client zealously, *People v. Simac*, 161 Ill. 2d 297, 309, 641 N.E.2d 416, 422 (1994), and thus to make sufficient inquiries of his client to determine whether the evidence was in fact false.  Kliment acknowledged that the defendant was adamant about raising the alibi, (R1213-15), and he never explained why the defendant would essentially pull the rug out from under that defense by telling Kliment it was a lie.

Strategic choices made by counsel after a thorough investigation are "virtually unchallengeable," but no such deference is due where counsel fails to make a complete investigation into the "law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695.  Decisions made without a thorough investigation are reasonable "precisely to the extent that

26

reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Here, Kliment cannot be faulted for failing to contact or interview the alibi witnesses prior to trial, as he already knew what the witnesses would say based on the police reports and the transcripts from 97 CF 2326. However, Kliment's failure to clarify what the defendant meant when he allegedly said that he was at the scene was objectively unreasonable. Kliment knew that the defendant had secured a hung jury in 97 CF 2326, where the alibi had been presented, and, contrary to Kliment's assertion, the alibi testimony did not contain any temporal "gaps." (R1204-11; SR309-147; Def. Ex. 1-3) Under the circumstances, a reasonably competent attorney would not have rejected a potentially meritorious alibi defense without resolving the ambiguity as to what the defendant meant when he said he was at the scene.

The instant case resembles *People v. King*, 316 Ill. App. 3d 901, 738 N.E.2d 556 (1st Dist. 2000). In *King*, the reviewing court held that the trial court had manifestly erred by denying a post-conviction petition which alleged that trial counsel had been ineffective for failing to call an alibi witness whose testimony would have been "unequivocally exculpatory" and would have "complemented" counsel's trial strategy of raising doubts about the veracity of the defendant's accuser. 316 Ill. App. 3d at 914-15, 738 N.E.2d at 567. The State argued that trial counsel might have reasonably concluded that the alibi witness would not have been a credible witness, but the reviewing court noted that when counsel testified at the evidentiary hearing on the petition, he said nothing about the witness lacking credibility. *King*, 316 Ill.

27

App. 3d at 916, 738 N.E.2d at 569.  Here, Kliment likewise opted not to present alibi testimony that would have indisputably exculpated the defendant and lent weight to Kliment's chosen trial strategy, which focused on the lack of physical evidence linking the defendant to the shooting and the unreliability of the eyewitness testimony. (R374-77, 796-813)  Although Kliment opined that the alibi testimony was weak, and possibly false, his opinion was based on the erroneous belief that there were "gaps" in the alibi testimony and on a mere assumption arising from an ambiguous comment by the defendant. (R1204-06, 1215-16, 1225-26, 1231)   Failing to present a viable alibi defense without having accurately understood the statements and prior testimony of the alibi witnesses – and without thoroughly examining the defendant to clarify whether he was at the scene of the shooting – is just as objectively unreasonable as not calling an alibi witness without making any determination as to her credibility, as occurred in *King*.

The trial court in this case also manifestly erred by holding that Kliment's failure to present the alibi was not prejudicial.  In reaching that conclusion, the trial court cited this Court's decision in the direct appeal, (R1319), which found that there was "ample evidence" to find the defendant guilty as a principal. *People v. Amaya*, 321 Ill. App. 3d 923, 930, 748 N.E.2d 1251, 1256 (2nd Dist. 2001).  The trial court's reliance on this Court's finding in the direct appeal is misplaced because this Court's finding occurred in the context of determining whether giving the jury an unwarranted accountability instruction was reversible error. *Amaya*, 321 Ill. App. 3d at 929-30, 748 N.E.2d at 1256.  The question here, by contrast, is whether the defendant was

28

prejudiced by the absence of evidence indicating that he was not even at the scene of the shooting. Although the evidence presented to the jury may have been sufficient to convict the defendant as a principal, and thus to dismiss the improper accountability instruction as harmless error, this Court had no occasion in the direct appeal to consider the potential impact of the alibi evidence, which the jury did not hear.

A review of the record shows that the evidence against the defendant was far from overwhelming. There was no physical evidence linking the defendant to the shooting. Three of the five witnesses who were present when the shooting occurred never identified the defendant as the shooter. (R413-45, 558-76) One of the surviving victims, Alonzo Matthews, testified that he did not even see the defendant in the courtroom, even though he had told the police immediately after the shooting that he would be able to identify the shooter if he saw the shooter again. (R437, 719-20)

Two witnesses – Shayla Johnson and Nicole "Coco" Pearson – did identify the defendant as the shooter. (R453-54, 462, 485-90) But their testimony was undermined by several factors. Both women had pending criminal cases in Kane County, (R447, 479), giving them a motive to testify for the State. *People v. Triplett,* 108 Ill. 2d 463, 485 N.E.2d 9 (1985). Pearson also had a prior theft conviction, (R478-79), further detracting from her credibility. *People v. Williams,* 173 Ill. 2d 48, 670 N.E.2d 638 (1996).

Neither Johnson nor Pearson went to the police to report what they saw, even though they were friends with one of the victims. (R468-69, 503) Almost two months

29

later, after Pearson learned that her friend had died in the shooting, she and Johnson went to the police station, but merely to complain about another matter, not to talk about this case. Johnson and Pearson gave information about this case only because the police realized that they were the "Shayla" and "Coco" who had been named as possible witnesses. (R461-63, 488-90, 503-04, 515-16, 521)

When the women finally viewed a line-up, more than three months had passed since the shooting. (R519-2) At the line-up, Pearson first said that the defendant was not the shooter because the shooter had been "more slimmer" and "skinnier." (R493) Pearson identified the defendant as the shooter only after the police talked to her and asked her leading questions about whether she wanted to identify him as the shooter. (R490-93, 508-10, 522-31, 543-50) Johnson also identified the defendant at the line-up, but she lived with Pearson and admitted that she had talked to Pearson about the incident prior to the line-up. (R463-64, 471, 506-08, 532-35)

Pearson denied talking to Johnson about the incident before they went to the police or viewed the line-up. (R504-06) At the same time, however, Pearson acknowledged that, when she first spoke to the police, she indicated that she had learned the defendant's nickname from Johnson, who also told Pearson that she [Johnson] thought the defendant was the shooter. (R486, 516-17) *Amaya*, 321 Ill. App. 3d at 926, 748 N.E.2d at 1254. Pearson had only seen the defendant once prior to the shooting, but she was not sure when she saw him, except that it was at night. (R486-87) Consequently, Pearson's identification of the defendant might have been influenced by what Johnson had told her. Pearson's opportunity to observe the

30

shooter was also questionable, given that she was involved in the argument and was surrounded by the crowd which had gathered to watch. (R497-98)

Johnson claimed to have seen the defendant around the neighborhood five or six times prior to the shooting, but she last saw him about two months before the shooting.   (R454-56)   Even if Johnson was familiar with the defendant, that familiarity may have simply predisposed her to identify the defendant when she saw him in the line-up.  Johnson admitted that she was looking at the gun after the shooting started, that the scene was "not really brightly lit," and that she was "shocked" by the shooting. (R460-61, 464-65)

Johnson and Pearson also testified that they saw the defendant and some other Hispanic males riding in a white car  as the women were walking together near the scene just prior to the shooting, but their testimony was inconsistent. Pearson testified that she did not hear anyone in the car say anything, while Johnson testified that the men in the car were shouting insults directed towards a rival gang, which "controlled" the area. (R448-49, 457-59, 470, 487-88, 495-96, 677-80) Johnson claimed that two of the men were hanging out of the car, but she did not recall mentioning that fact when she talked to the police about the case prior to the trial. (R459, 468)

Another witness – Tracy Johnson (no relation to Shayla) – testified that he saw three Hispanic men in a white car near the scene shortly before the shooting, and that those men were making insulting comments and gestures about a rival gang. (R580-84, 594)   Mr. Johnson did not describe the height, weight, or age of those men, however.  Mr. Johnson claimed that he saw the same three men running from the

31

scene back to the car right after the shooting. (R584-87) According to Mr. Johnson, he later saw the defendant, Sandoval, and Gamboa being stopped by the police, and he told the police at that time that he had seen those men running from the scene. (R589, 592, 662-64) At trial, Mr. Johnson testified that all three men were lying on the ground when he saw them in police custody, but he had given a prior statement indicating that only one of the men was on the ground, with the other two being in a squad car. (R589-92, 603-04)   Mr. Johnson acknowledged that he did not see the shooting, and he never identified the defendant, either in any subsequent line-up or in open court. (R602, 636-37) Moreover, Mr. Johnson had been drinking heavily at the time of the incident. By his own admission, Mr. Johnson was a drug addict with several prior felony convictions. (R578-79, 595, 601, 605) Finally, Mr. Johnson was a close friend of the deceased victim and referred to the victim as his "cousin." (R580)

The reliability of the eyewitnesses testimony is further eroded by the fact that the witnesses gave conflicting descriptions of the shooter.  Four of the five witnesses who were present when the shooting occurred described the shooter as a Hispanic male who had approached from Lincoln Street. (R381-94, 416-18, 428-29, 451-52, 482) Two of those witnesses said that the shooter was in his teens or early twenties, while the other two witnesses did not mention the shooter's age. (R418, 425-78, 483) All four witnesses described the shooter's height, but they variously described him as being anywhere from 5'4" to 5"9" tall. (R418, 428-29, 472, 501) Only two of the witnesses described the shooter's weight, one saying he weighed between130-40 pounds, and the other saying he weighed between 140-45 pounds. (R 428-29, 472)

32

The arrest warrant issued for the defendant on March 11, 1998, indicated that he was 18 years of age, 5'8" tall, and 180 pounds. (C22)

The same four witnesses gave markedly different descriptions of the shooter's clothing. One witness, Tara Harris, said that the shooter was wearing a black jacket and a white "hoodie," which covered his head. (R416-17, 538) A second witness, Alonzo Matthews, testified that the shooter was wearing a black hoodie. (R429) Nicole Pearson testified that the shooter was wearing a black hoodie, but Pearson did not mention the hoodie when she talked to the police. According to Pearson, the shooter was also wearing a black hat or skullcap. (R483, 510-11, 548-50) Pearson added that the shooter was wearing a black jacket and pants, or a sweatsuit. (R483) Shayla Johnson said only that the shooter was dressed in clothing that "looked black," but that might have been "dark, dark blue." (R477)

A fifth witness, William McCalister, was also present when the shooting occurred. He was standing near the southeast corner of the building where the shooting took place, putting him on the other side of the building from Lincoln Street. As noted earlier, the other eyewitnesses said that the shooter had approached from Lincoln Street. (R381-94, 416-18, 428-29, 451-52, 482, 560-61) As he watched the argument that was going on behind the building, McCalister noticed a Hispanic male approach from New York Street, which was to the north of the scene. According to McCalister, the man was about 5'10" or 5'11" tall, about 160-75 pounds, and wearing "dark hooded clothing," specifically a dark jacket over a dark hooded jacket. (R562-65, 574) McCalister heard the gunshots, which sounded as though they had come

33

from the area to his right, near where the Hispanic man had been standing. McCalister did not see who actually fired the shots, however. (R568-73)

Given the lack of physical evidence and the weak identification testimony, the alibi evidence might have swayed the jury in the defendant's favor, or at least left the jury with a reasonable doubt as to his guilt. Kliment's failure to raise the alibi at trial was "sufficient to undermine confidence in the outcome," and thus to establish prejudice. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

For these reasons, this Court should reverse the order denying the defendant's post-conviction conviction, reverse his convictions in 98 CF 535, and order a new trial in that case.

## CONCLUSION

For the foregoing reasons, the defendant-appellant, Armando Amaya, respectfully requests that this Court reverse the order denying the post-conviction conviction, reverse the convictions in 98 CF 535, and order a new trial in that case.

Respectfully submitted,

Thomas A. Lilien, Deputy Defender

Paul Alexander Rogers, Assistant Defender
OFFICE OF THE STATE APPELLATE DEFENDER
2010 Larkin Avenue
Elgin, Illinois 60123
(847) 695-8822

COUNSEL FOR PETITIONER-APPELLANT

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the appendix, is 35 pages.

Paul Alexander Rogers, Assistant Defender

No. 2-05-0706

IN THE

APPELLATE COURT OF THE STATE OF ILLINOIS

SECOND JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>  Plaintiff-Appellee,<br><br>v.<br><br>ARMANDO AMAYA,<br><br>  Defendant-Appellant. | ) Appeal from the Circuit Court of the<br>) 16th Judicial Circuit,<br>) Kane County, Illinois.<br>)<br>) No. 98 CF 535<br>)<br>) Honorable<br>) Grant S. Wegner,<br>) Judge Presiding. |

BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE

John A. Barsanti
State's Attorney
Kane County
St. Charles, Illinois 60175
(630) 232-3500

Norbert J. Goetten, Director
State's Attorneys Appellate
  Prosecutor

Martin P. Moltz
Deputy Director
Marshall M. Stevens
Staff Attorney
State's Attorneys
  Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123
(847) 697-0020

COUNSEL FOR PLAINTIFF-APPELLEE

ORAL ARGUMENT REQUESTED

EXHIBIT J

POINT AND AUTHORITIES

PAGE

STANDARD OF REVIEW

People v. Coleman, 183 Ill.2d 366, 385, 701 N.E.2d 1063, 233 Ill.Dec. 789 (1998) .... 3

ARGUMENT

THE TRIAL COURT DID NOT ERR IN DENYING THE DEFENDANT'S POST-CONVICTION PETITION ALLEGING THE INEFFECTIVENESS OF COUNSEL FOR FAILURE TO CALL ALIBI WITNESSES WHERE THE RECORD DEMONSTRATES THAT COUNSEL CHOSE NOT TO, BASED ON REASONED STRATEGY AND HIS ETHICAL DUTY NOT TO KNOWINGLY PRESENT FALSE TESTIMONY FROM WITNESSES HE KNEW WOULD COMMIT PERJURY ..... 4

ILCS S.Ct.Rules of Prof.Conduct, RPC Rule 3.3(a)(4) ........................... 4

Nix v. Whiteside, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ............. 4

People v. Flores, 128 Ill.2d 66, 538 N.E.2d 481, 131 Ill.Dec. 106 (1989) ........... 5

People v. Bartee, 208 Ill.App.3d 105, 566 N.E.2d 855, 153 Ill.Dec. 5

    (2nd Dist. 1991) ...................................................... 5

People v. Taggart, 233 Ill.App.3d 530, 599 N.E.2d 501, 174 Ill.Dec. 717

    (2nd Dist. 1992) ...................................................... 5

People v. Calhoun, 351 Ill.App.3d 1072, 815 N.E.2d 492, 287 Ill.Dec. 89

    (4th Dist. 2004) ...................................................... 5

People v. Peterson, 108 Ill.App.3d 856, 439 N.E.2d 1103, 64 Ill.Dec. 438

    (4th Dist. 1982) ...................................................... 7

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ...... 8

1

People v. Bates, 324 Ill.App.3d 812, 755 N.E.2d 139, 258 Ill.Dec. 58

    (1st Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

People v. Flores, 128 Ill.2d 66, 538 N.E.2d 481, 131 Ill.Dec. 106 (1989) . . . . . . . . . . . 8

People v. Lester, 145 Ill.App.3d 720, 495 N.E.2d 1278, 99 Ill.Dec. 543

    (2nd Dist. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. King, 316 Ill.App.3d 901, 738 N.E.2d 556, 250 Ill.Dec. 340

    (1st Dist. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Arroyo, 339 Ill.App.3d 137, 790 N.E.2d 943, 274 Ill.Dec.170

    (2nd Dist. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Austin, 328 Ill.App.3d 798, 767 N.E.2d 433, 262 Ill.Dec. 973

    (1st Dist. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

People v. Foster, 76 Ill.2d 365, 392 N.E.2d 6, 29 Ill.Dec. 449 (1979) . . . . . . . . . . . . . 15

People v. Amaya, 321 Ill.App.3d 923, 748 N.E.2d 1251, 255 Ill.Dec. 181

    (2nd Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2

## ISSUE PRESENTED FOR REVIEW

Whether the trial court erred in denying the defendant's post-conviction petition based on defense counsel's failure to introduce alibi evidence at trial after an evidentiary hearing which disclosed that the proposed testimony was perjured and easily impeachable.

## STANDARD OF REVIEW

The manifestly erroneous standard is appropriate when reviewing the propriety of an order of the circuit court granting or denying post-conviction relief at the conclusion of the evidentiary stage of the proceeding.  People v. Coleman, 183 Ill.2d 366, 385, 701 N.E.2d 1063, 233 Ill.Dec. 789 (1998).

3

## ARGUMENT

THE TRIAL COURT DID NOT ERR IN DENYING THE DEFENDANT'S POST-CONVICTION PETITION ALLEGING THE INEFFECTIVENESS OF COUNSEL FOR FAILURE TO CALL ALIBI WITNESSES WHERE THE RECORD DEMONSTRATES THAT COUNSEL CHOSE NOT TO, BASED ON REASONED STRATEGY AND HIS ETHICAL DUTY NOT TO KNOWINGLY PRESENT FALSE TESTIMONY FROM WITNESSES HE KNEW WOULD COMMIT PERJURY.

The defendant contends that the trial court erred in denying his post-conviction petition based on the failure of his trial attorney, Mr. Kliment, to present witnesses who would have supplied him with an alibi defense establishing his whereabouts to have been other than the scene of the crime. The People disagree, since the defendant admitted to Mr. Kliment in substance that the alibi was false and because, aside from that ethical question, Mr. Kliment's strategic decision not to present a flawed alibi defense was correct.

The most decisive issue in this case is whether Mr. Kliment could even call the proposed alibi witnesses when he had been informed that they would be testifying falsely. As noted by Judge Wegner (R. 1317-1318), Illinois' rules of professional conduct state that a lawyer appearing professionally before a tribunal shall not "offer evidence that the lawyer knows to be false." ILCS S. Ct. Rules of Prof.Conduct, RPC Rule 3.3(a)(4). Defendants do not have any constitutional right to testify falsely or have counsel who will cooperate with planned perjury. For counsel to take steps to make the defendant testify truthfully, even under the threat of withdrawing from representation, does not deny the defendant any constitutional right. Nix v. Whiteside, 475 U.S. 157, 173-4, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). The Illinois Supreme Court rejected the argument that defense counsel must have actual knowledge that a defendant's testimony will be perjurious in order to justify refusing

4

to call an alibi witness. The court held that defense counsel should have discretion to make a good-faith determination whether particular proposed witnesses for the defendant will testify untruthfully and, absent some showing that counsel's decision was unreasonable under the circumstances, a reviewing court will not find that a defendant has been denied a fair trial. People v. Flores, 128 Ill.2d 66, 107, 538 N.E.2d 481, 131 Ill.Dec. 106 (1989). This Court adhered to Flores in People v. Bartee, 208 Ill.App.3d 105, 108, 566 N.E.2d 855, 153 Ill.Dec. 5 (2nd Dist. 1991) and People v. Taggart, 233 Ill.App.3d 530, 558-9, 599 N.E.2d 501, 174 Ill.Dec. 717 (2nd Dist. 1992), which rejected the claim that the "firm factual basis" test should be used, and embraced the "good faith determination" test, which gives defense counsel "great discretion" in determining whether testimony will be truthful. (Cf., People v. Calhoun, 351 Ill.App.3d 1072, 1082, 815 N.E.2d 492, 287 Ill.Dec. 89 (4th Dist. 2004) (Defense counsel's "mere belief" defendant would lie, where the defendant never indicated to his defense counsel that he would testify falsely and never changed his story, was insufficient to meet "good faith determination" test)).

In the instant case, the "good faith determination" test is easily met. Mr. Kliment testified that the defendant told him that the alibi witnesses were there to testify for him, that they knew what to say, and that defendant told him that he had been at the scene of the shooting, but he had not been involved. (R. 1204). When the defendant told that to Mr. Kliment, it made him believe that the alibi witnesses would not testify truthfully. Moreover, when defendant said he was at the scene of the shooting, the murder charged in the instant case was the topic of the conversation. When asked if that was the reason why Mr. Kliment did not put on an alibi defense, he replied:

5

"That is what made it easy for me to decide, as it really was a matter of trial

strategy, that would not have been an effective defense, but then I think I

became barred from using it." (R. 1205, emphasis added).

Mr. Kliment stated that this opinion was based on legal ethics. (R. 1206). He reiterated

during cross-examination that he felt barred from using the proposed alibi testimony. (R.

1217).

Despite the fact that Mr. Kliment was very definite that the context of the

conversation in which defendant admitted he was present was the time of the shooting that

resulted in the murder charged in this case (R. 1226), the defendant posits that Mr. Kliment

"jumped to the conclusion" that the defendant admitted his presence at the scene of the crime

and perhaps the defendant really only meant that he was near the scene of the second

shooting. (Defendant's brief at 25). The defendant maintains that Mr. Kliment should have

asked follow-up questions to determine if the defendant really meant what he said and asks

why the defendant would have sabotaged his own case by admitting that the alibi was a lie.

(Defendant's brief at 26).

Regarding the first point, Mr. Kliment was the one who had the conversation with the

defendant and knew that the context of that conversation demonstrated that the defendant

meant he was at the scene of the murder charged herein. He gave no indication that he had

any doubt regarding what the defendant meant. Judge Wegner implicitly found Mr. Kliment

to be a credible witness when he held that defense counsel would have violated his

professional duties by offering the alibi. (R. 1318).

As to why the defendant would "pull the rug out" from the alibi defense by admitting

6

to Kliment that he was there at the scene of the shooting, the simple explanation is that it did not occur to him that lawyers have ethical limits which they will not cross. Indeed, when Mr. Kliment said that he did not want to explore the defendant's statement further, it is reasonable to assume that he meant he was not going to evade his ethical duty by tipping the defendant that his admission made it unacceptable to present the alibi unless he withdrew the admission. In any event, a fair and complete reading of Mr. Kliment's testimony at the post-conviction hearing makes it clear that he knew exactly what the defendant meant and did not need to clarify anything, that he did not jump to any conclusions, and that he most certainly was ethically bound not to present perjury which the defendant and his friends intended to perpetrate upon the trial. Mr. Kliment's level of certainty went beyond the "good faith determination" test, since he did have actual knowledge that defendant intended for himself and his witnesses to commit perjury.

Regarding the defendant's contention that Mr. Kliment erred strategically in not presenting the alibi witnesses, the defendant stresses that this testimony was presented at the defendant's other trial and that trial ended in a hung jury. (Defendant's brief at 19). However, a hung jury represents neither a conviction nor an acquittal. People v. Peterson, 108 Ill.App.3d 856, 859, 439 N.E.2d 1103, 64 Ill.Dec. 438 (4th Dist. 1982). The fact that it occurred in a completely different case with a different jury makes it irrelevant to the instant case. Had the other case been tried again, defendant cannot say that he would have been acquitted instead of convicted.

Once again, the People must stress that, if this Court accepts that Mr. Kliment was reasonable in his belief that the defendant and his friends intended to perjure themselves by

7

giving a false alibi, the inquiry stops there. There is no need to consider whether the alibi was consistent enough to be convincing or whether the evidence was closely balanced, since the evidence could not be introduced.

The benchmark for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 685-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a claim of ineffective assistance of counsel a defendant must show that counsel's representation fell below an objective standard of reasonableness and that the substandard representation so prejudiced the defendant as to deny him a fair trial. There is a strong presumption that the defendant's representation fell within a wide range of reasonable professional assistance, and that the challenged conduct might be considered sound trial strategy under the circumstances. In order to overcome these presumptions, the defendant must show that the outcome would have been different had it not been for counsel's ineffective representation. People v. Bates, 324 Ill.App.3d 812, 815, 755 N.E.2d 139, 258 Ill.Dec. 58 (1st Dist. 2001). In general, the decision whether to call a particular witness is a matter of trial strategy, and an ineffective assistance of counsel claim which arises from a matter of defense strategy will not support a claim of ineffective representation. People v. Flores, 128 Ill.2d 66, 85, 538 N.E.2d 481, 131 Ill.Dec. 106 (1989).

In the instant case, the defendant disputes Mr. Kliment's testimony that he did not want to put on the alibi testimony because there were "gaps and so forth." (R. 1208). The defendant asserts that the various alibi witnesses would have supplied a consistent alibi, but

8

at the very same time acknowledges that the stories were impeached as to where the defendant was when the shooting at issue occurred at 8:45 to 9:00 pm on October 29, 1997. (R. 379, 414-419, 425-429).

The general template for the story the alibi witnesses settled on was represented by Sonia Delatorre, who was the defendant's on and off girlfriend. (R. 1126). She told the police that she had been with the defendant earlier in the day and that the defendant, George Gamboa and Ramiro Sandoval came to her house between 6:30 and 7:00 pm. They stayed until after 10:30 pm. (Def. Ex. 2). The defendant was in her sight the whole time, but she did not see Gamboa and Sandoval for the entire time. (Def. Ex. 3, p. 24).

However, in the defendant's statement, he told the interviewing officer that he was picked up by his girlfriend, Sonia Delatorre, they went to the mall, and then went to her home. He did not know how long he stayed there, but he left when George and "Rudy" [Ramiro] picked him up. They were arrested shortly after they left. (Def. Ex. 1). In 98 CF 2326, the defendant told a different story. He said that he had been with the Delatorre sisters at the mall earlier in the day, they dropped him off and then Gamboa and Sandoval picked him up to go to the Delatorre house. He was there until he left with Gamboa and Sandoval at 10:30 pm. (S.R. 116-121). When confronted with the inconsistent statement he gave the police, he stated that he must have been confused because there was a lot of yelling between him and the officer. (S.R. 136). However, the transcript shows that his statement regarding Sonia picking him up, going to the mall and then going to her house, from where Gamboa and Sandoval picked him up, was given at the very beginning of the interview, before the officers pressed him on any of the details. (Def. Ex. 1). The defendant said he got a lot of

9

things confused that day. (S.R. 138). However, the defendant's interview with the police was given at 4:51 am on October 30, 1997. It is very difficult to understand how the defendant could have been so "confused" as to give a radically different version of how he got to the Delatorre house, since is was the answer to one of the first questions the police asked, only hours after the event occurred.

George Gamboa testified in 98 CF 2326 that the defendant and Sandoval were with him the whole time the three men were at the Delatorre house. (S.R. 52). This conflicts with statements of Sonia Delatorre (Def. Ex. 3, p. 24) and the defendant (S.R. 120) that Gamboa and Sandoval might have stepped out or gone downstairs. Gamboa's statement is even more inconsistent with that of Ramiro Sandoval (C. 336), and Elizabeth Delatore (S.R. 73), who said that Sandoval and Gamboa left for an hour to get food and beer. Gamboa was impeached with testimony indicating that he had not mentioned anything about being at the Delatorre house when he was interviewed by the police less than 12 hours after the shooting. (S.R. 162).

Another oddity of the Delatorre sisters' testimony was the late evolution of a very specific time of 10:28 pm, as the time the three men left the Delatorre house. Sonia stated that she remembered they left specifically at 10:28 because she looked at the clock, and Elizabeth and Emma Delatorre both said they knew it was 10:28 because their sister saw a clock and it said 10:28. (S.R. 73, 94, 146). They had not mentioned this specific time in earlier interviews with the police. (S.R. 84, 96, 146). This circumstance is significant, because Sonia originally told the police the men left at 10:30 (S.R. 96), Elizabeth told the police they might have left as late as 11:00 (S.R. 82-83), and Emma said they went out

between 10 and 10:30 (S.R. 145), but the evidence showed that the men were arrested at 10:30 pm. (R. 608, 633). Since the defendant said he and his companions were stopped two minutes after they left the Delatorre house (S.R. 32), a jury could easily conclude that the girls were tailoring their story to fit the time line established by the time of the men's arrest, if Kliment had presented this evidence.

The testimony of Ramiro Sandoval was particularly inconsistent. He said at the trial in 98 CF 2326 that he was at the Delatorre house at about 10:00 pm on October 29, 1997. (S.R. 30). When asked if he left the home at some point that night, he replied "Just when the police stopped us. That's all." (S.R. 32). At the post-conviction hearing, in response to a question how he knew that the second shooting that night took place two hours after the first, Sandoval said "We went to buy some drinks and food, and then we went to the girls' house, and we were there the whole time" (R. 1255), also implying that he and the other two men did not leave temporarily before they left around 10:30. This conflicts with Elizabeth Delatore (S.R. 73), who said that, some time after they got to the Delatorre house, Sandoval and Gamboa left for an hour to get food and beer and with Sandoval's very own affidavit, which also said that he left with Gamboa to get food and beer. (C. 336).

The evidence above certainly confirms Mr. Kliment's opinion that the defendant's alibi had "gaps and so forth." (R. 1208). One cannot deny that it was a reasonable strategic decision to not subject such a flawed alibi to the jury, since it would shift the jury's attention from making the State prove its case to assessing whether the alibi was credible. This Court has noted that, when a defendant elects to explain the circumstances of what has occurred, he is bound to tell a reasonable story or be judged by its improbabilities. The State may

11

exclude the defendant's theory by introducing evidence which indicates that the defendant is lying, since the jury is not compelled to accept the defendant's account of what happened at the time of the crime, but may consider the surrounding circumstances and the probability or improbability of the defendant's story. People v. Lester, 145 Ill.App.3d 720, 738, 495 N.E.2d 1278, 99 Ill.Dec. 543 (2nd Dist. 1986).

The defendant's comparison of the instant case to People v. King, 316 Ill.App.3d 901, 738 N.E.2d 556, 250 Ill.Dec. 340 (1st Dist. 2000), is extremely unpersuasive. In King, defense counsel failed to call a defense witness whose testimony was readily apparent to be exculpatory in nature and who the State stipulated was credible. The State's case was weak, relying on the inconsistent statements of a victim who suffered from psychosis and bolstered only by inconsistent statements of other witnesses with mental problems. Defense counsel, while stating that he had spoken to the defense witness, never said why he rejected the witness, stating that he did not recall the reason he did not call her. Understandably, the appellate court ordered a new trial, noting that a "defendant can overcome the strong presumption that defense counsel's choice of strategy was *sound* if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." King, 316 Ill.App.3d at 916. Mr. Kliment's decision is hardly in that category. He knew what the witnesses were going to say, since he had reviewed transcripts of their testimony and discussed the alibi and potential strategies with the defendant before trial. (R. 1198-1199, 1207).

The People submit that the opinion in People v. Arroyo, 339 Ill.App.3d 137, 157, 790 N.E.2d 943, 274 Ill.Dec.170 (2nd Dist. 2003), in which this Court found that it was within

12

the realm of reasonable trial strategy not to call a witness who could be impeached, and which distinguishes King, may be more aptly compared to the instant case. In Arroyo too, the defendant complained that a witness who gave exculpatory testimony at an earlier trial should have been called at the subsequent trial which was the subject of the appeal. Your Honors found that, since the witness could have been impeached with her first-degree murder conviction, counsel could reasonably have concluded that she was so incredible that it was better not to call her. The same reasoning is, a fortiori, applicable to the instant case, since Mr. Kliment did not want to make the credibility of the alibi witnesses the focus of the jury's consideration. The proposed testimony would not have made a difference, coming as it did from the defendant and his friends, whose impartiality would be suspect, and being easily impeachable due to flaws in its details of time and order of events.

The defendant then argues that Judge Wegner erred by holding that any error by Kliment in failing to present the alibi was not prejudicial because this Court held in the direct appeal that there was "ample evidence" to support a finding of guilt as the principal. (Defendant's brief at 28). The defendant asserts that this is so because the original appeal was concerned with the question of whether giving an accountability instruction was reversible error, whereas here the question was whether the absence of alibi evidence to the effect that he was not at the scene of the crime prejudiced the defendant. The People maintain that Judge Wegner was correct. This Court's original opinion that the evidence of guilt was ample stands as an independent evaluation of the evidence, regardless of the argument context in which it is considered. To be sure, an utterly incontrovertible *credible* alibi defense could overcome even a strong prosecution case, but the alibi here was anything

13

but credible. Mr. Kliment's testimony disclosed it to be an outright lie, and even without

that, the evidence at the post-conviction hearing, at the trial in 98 CF 2326, and additional

documentary evidence in the record demonstrate that the proposed alibi could easily be torn

to shreds by the prosecution.

The defendant's attempt to naysay Your Honors' original determination by pointing

out minor inconsistencies and trivial considerations relating to credibility is fruitless. This

Court had this very record before it when it reached its original determination that the

evidence was ample and reiterating these considerations does not increase their significance.

Shayla Johnson and Nicole Pearson may indeed have had pending cases and the latter a

conviction, but there was no evidence that either had received any consideration from the

State for testifying. The fact that neither immediately came forward is similarly meaningless.

Johnson testified that she saw the people in the white Celebrity shouting gang slogans. (R.

459). Sergeant Langston was familiar with the area gangs and testified that the defendant

was a member of the Latin Kings. (R. 675). It is reasonable to assume that most of the

witnesses to the shooting knew the shooting was gang related and would not be anxious to

make enemies of the defendant's fellow gang members.

Defendant points to the fact that Pearson initially did not identify the defendant

because he looked different at the time of the shooting and Johnson may have discussed the

shooting with Pearson. (Defendant's brief at 30). However, both Johnson and Pearson knew

the defendant from previous sightings in the neighborhood. Johnson said she had seen him

at a house she had been visiting at, at a stoplight and at Pancho's Tacos. (R. 455). Pearson

had seen defendant near Pancho's Tacos at a stoplight. (R. 486). In People v. Austin, 328

14

Ill.App.3d 798, 805, 767 N.E.2d 433, 262 Ill.Dec. 973 (1st Dist. 2002), the appellate court rejected the defense contention that the failure of State witnesses to come forward immediately undermined their credibility. The court found that the witnesses were sufficiently familiar with the defendant to make both their identifications and fear of reprisals accurate and reasonable under the circumstances. The same may be said in the instant case.

The defendant also points to minor inconsistencies in descriptions given of the height, weight and clothing of the defendant and others involved in the shooting. (Defendant's brief at 31-34). However, where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. People v. Foster, 76 Ill.2d 365, 373, 392 N.E.2d 6, 29 Ill.Dec. 449 (1979). This Court extensively reviewed the evidence, including questions of inconsistency, and found the evidence "ample." People v. Amaya, 321 Ill.App.3d 923, 924-29, 748 N.E.2d 1251, 255 Ill.Dec. 181 (2nd Dist. 2001).

In summary, the defendant failed to demonstrate that his constitutional right to effective representation was defeated by Mr. Kliment's failure to present alibi witnesses. Mr. Kliment was ethically precluded from doing so when it became clear to him that the alibi was a lie and, even independent of that consideration, the alibi was clearly compromised by inconsistencies in time and order of events to the extent that the State could easily have impeached the defendant and his alibi witnesses. It was a reasonable defense strategy to focus the jury's attention on the question of whether the State had actually met its burden of proof rather than the flimsy alibi, the destruction of which through impeachment would have demonstrated the defendant's consciousness of guilt to the jury. For these reasons, the order of the trial court denying the defendant's post-conviction petition should be affirmed.

15

## CONCLUSION

WHEREFORE, the People of the State of Illinois respectfully request this Honorable Court to affirm the order of the trial court denying the post-conviction petition of the defendant, Armando Amaya, and assess attorney's fees pursuant to 55 ILCS 5/4-2002(a) and *People v. Nicholls*, 71 Ill.2d 166 (1978).

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the appendix, is 16 pages.

Respectfully submitted,

John A. Barsanti
State's Attorney
Kane County
St. Charles, Illinois 60175
(630) 232-3500

Martin P. Moltz
Deputy Director

By:_____
Marshall M. Stevens
Staff Attorney
State's Attorneys
 Appellate Prosecutor
2032 Larkin Avenue
Elgin, Illinois 60123
(847) 697-0020

COUNSEL FOR PLAINTIFF-APPELLEE

16