File Date:  5-29-2008

Case No:  07 cv 6793

ATTACHMENT # _____

EXHIBIT  K to Q

TAB (DESCRIPTION)

RECEIVED

MAR - 5 2007

SAAP SECOND DISTRICT

No. 2-05-0706

IN THE

**APPELLATE COURT OF ILLINOIS**

**SECOND JUDICIAL DISTRICT**

| | |
|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** ) | Appeal from the Circuit Court |
| ) | for the 16th Judicial Circuit, |
| Plaintiff-Appellee, ) | Kane County, Illinois, |
| ) | |
| -vs- ) | No. 98 CF 535 |
| ) | |
| **ARMANDO AMAYA,** ) | Honorable |
| ) | Grant S. Wegner, |
| Defendant-Appellant. ) | Judge Presiding. |

**REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

THOMAS A. LILIEN
Deputy Defender

PAUL ALEXANDER ROGERS
Assistant Defender
Office of the State Appellate Defender
2010 Larkin Avenue
Elgin, Illinois 60123
(847) 695-8822

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

EXHIBIT K

## ARGUMENT

**THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S POST-CONVICTION PETITION, WHERE THE RECORD SHOWS THAT MR. KLIMENT'S DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNREASONABLE AND PREJUDICIAL.**

The State initially argues that the defendant's ineffective assistance claim fails because Mr. Kliment made a "good faith determination" that the proposed alibi witnesses would not testify truthfully. (St. Br. at 5-6) Alternatively, the State argues that the proposed alibi testimony was so "flawed" and "compromised by inconsistencies" that it was reasonable for Mr. Kliment to forego it. (St. Br. at 7-11, 15) Finally, the State contends that Judge Wegner properly found that Mr. Kliment's omission was not prejudicial, given the strength of the State's case. (St. Br. at 13-15) None of these arguments has any merit.

*No "Good Faith Determination" That Proposed Alibi Was False*

As the State itself admits, (St. Br. at 5), under the "good faith determination test" counsel's decision to reject proposed testimony must not be "unreasonable under the circumstances." *People v. Flores*, 128 Ill. 2d 66, 107, 538 N.E.2d 481, 498 (1989). Here, Mr. Kliment's decision to forego the alibi defense was unreasonable because he assumed, without adequate inquiry, that the defendant had admitted being at the scene of this offense.

According to the State, Mr. Kliment just "knew" that the defendant meant he was at the scene of this offense, given the context in which the defendant made the supposed admission. (St. Br. at 6) The State further notes that Mr. Kliment never

1

expressed "any doubt regarding what the defendant meant," and that Mr. Kliment's "level of certainty" gave him "actual knowledge" that the alibi was false. (St. Br. at 6-7) These assertions, however, assume what is to be decided: whether Mr. Kliment had an adequate basis for concluding that the defendant had admitted being at the scene. Mr. Kliment's subjective confidence in his own conclusions is irrelevant. What matters is whether his confidence was objectively warranted.

The State emphasizes Mr. Kliment's ethical duty not to present false testimony. (St. Br. at 4-7) But as the defendant has noted, (Def. Br. at 26), Mr. Kliment was also ethically bound to represent his client zealously, and counsel must keep that latter obligation in mind when attempting to determine whether the client seeks to present false testimony. *People v. Simac*, 161 Ill. 2d 297, 309, 641 N.E.2d 416, 422 (1994); *People v. Calhoun*, 351 Ill. App. 3d 1072, 1082, 815 N.E.2d 492, 500 (4th Dist. 2004). In the case at bar, Mr. Kliment acknowledged that he did not ask the defendant any follow-up questions or otherwise attempt to determine precisely what the defendant meant when he allegedly admitted being "there at the shooting." (R1204-05) Given the unusual factual circumstances – the defendant was arrested at 10:31 p.m. in connection with an unrelated shooting that had occurred just minutes earlier at location not far from the site of the arrest, (Def. Ex. 3 at 35-38; R97-98; SR97, 132-35) – it was incumbent upon Mr. Kliment to ask the defendant to clarify exactly what he meant. As suggested in the opening brief, (Def. Br. at 25-26), the defendant may simply have been trying to tell Mr. Kliment that he had an alibi for both shootings, even though he was arrested near the scene of the second shooting shortly after it happened.

2

In his opening brief, the defendant also argued that Mr. Kliment should have asked the defendant to clarify what he meant because there was no apparent reason for him to sabotage his case by telling Mr. Kliment that the alibi was a lie. (Def. Br. at 26) The State responds by speculating that the defendant might not have realized that "lawyers have ethical limits that they will not cross." (St. Br. at 7) According to the State, Mr. Kliment could not explore the matter further without "tipping the defendant that his admission made it unacceptable to present the alibi." (St. Br. at 7) As the State sees it, Mr. Kliment reasonably decided not to "evade his ethical duty" by signaling that the defendant needed to retract his "admission." (St. Br. at 7) Again, the State is assuming the very issue to be decided: whether the defendant's statement was really an "admission" that he was at the scene of this offense. Mr. Kliment could only make that determination by making an additional inquiry, and, contrary to the State's contention, Mr. Kliment could have done so without "tipping" anything to the defendant. He could simply have asked the defendant to repeat what he said or asked the defendant directly, "When you say you were 'there' or 'at the scene,' exactly what place are you talking about?" If, as the State surmises, the defendant made the initial "admission" because he thought that Mr. Kliment would be willing to present a false alibi, he presumably would have continued with the same "admission" upon being asked to clarify what he meant, because merely asking him for clarification hardly would have made the defendant realize that Mr. Kliment would not be willing to go along with the scheme. Under the circumstances, Mr. Kliment should have given his client the benefit of the doubt and asked non-leading follow-up questions before concluding that his client was asking him to suborn perjury.

3

*Unreasonable Assessment of Alibi Defense*

There were six potential alibi witnesses in this case: the three Delatorre sisters, George Gamboa, Ramiro Sandoval, and the defendant himself. The State spends considerable time pointing out discrepancies among the various witnesses and between the accounts that certain witnesses gave at different times. (St. Br. at 9-11) The defendant has already argued that none of these discrepancies involved the key point of whether the defendant was at the Delatorre residence when this shooting occurred, (Def. Br. at 21-24), and he will not repeat that argument here.

The defendant does wish to point out a serious flaw in the State's analysis. The State argues as if Mr. Kliment's choice were between calling all six of the alibi witnesses or none of them. But Mr. Kliment was not facing an "all or nothing" choice. Mr. Kliment could have advised the defendant not to testify and opted to call only Sonia Delatorre and Elizabeth Delatorre, neither of whom could have been impeached with statements made by others.

Sonia and Elizabeth had given alibi testimony in 97 CF 2326 that was both mutually consistent and consistent with their prior statements. They each testified that the defendant had arrived at their house with Gamboa and Sandoval around 6:30 or 7:00 p.m. and that he left with them at approximately 10:30 p.m. (SR70-73, 80, 92-94) Sonia had said essentially the same thing when she was questioned by the police the day after the shooting, although she then said that the defendant had left with the other men just after 10:30 p.m. (Def. Ex. 2 at 2, 15)   Both Sonia and Elizabeth had given the same account when they testified at the bond reduction hearing in 97 CF 2326. (Def. Ex. 3 at 19-32) Sonia consistently indicated that Gamboa and Sandoval might

4

have left the house without the defendant at some point before they returned and left with the defendant later. Sonia explained that she and Elizabeth had stayed in one room with the defendant while Gamboa and Sandoval went into another room with the third Delatorre sister. (Def. Ex. 3 at 20, 23-24; SR93-94) At the bond reduction hearing, Elizabeth also said that she she had stayed in the room with Sonia and the defendant and that she had not seen Gamboa and Sandoval during part of the night. (Def. Ex. 3 at 28, 30) At the trial in 97 CF 2326, Elizabeth testified consistently that that Gamboa and Sandoval had "stepped out," that they said they were going to get something to eat, and that she was not sure if that had left the house. (SR73)

The State is particularly suspicious of the testimony by Sonia and Elizabeth at the trial in 97 CF 2326 regarding the time that the defendant had left the residence. According to the State, this testimony is an "oddity" and a "late evolution" because neither Sonia nor Elizabeth had mentioned an exact departure time in their prior statements. (St. Br. at 10) The State's suspicions are unwarranted.

First, the State is simply wrong when it says that Sonia and Elizabeth testified that the defendant left at exactly 10:28 p.m. (St. Br. at 10) Sonia testified that the defendant left with Gamboa and Sandoval "[a]t 10:30" and that she knew the time because she had looked at a clock before they left and noticed that it was 10:28 p.m. (SR94) Elizabeth testified that the men left "[l]ike at 10:30." (SR73) She knew the time because Sonia had told her about seeing the clock that showed 10:28 p.m. (SR73, 80, 87-88) In her prior statements, Sonia consistently estimated that the defendant left at or shortly after 10:30 p.m. (Def. Ex. 2 at 2, 25; Def. Ex. 3 at 19-25) Elizabeth acknowledged that she had "probably" told the police that the defendant might have

5

left as late as 11:00 p.m., (SR82-83), but at the bond hearing in 97 CF 2326 she also indicated that he had left at or slightly past 10:30 p.m. (Def. Ex. 3 at 29, 32)

More importantly, even if the "late evolution" of the testimony regarding the exact time of the defendant's departure is an "oddity," it is also a red herring. The record shows that the shooting in 97 CF 2326 had occurred at 10:17 p.m. and that the defendant, Gamboa, and Sandoval had been stopped by the police at 10:31 p.m. (Def. Ex. 3 at 35-38) According to the State, a jury might find that Sonia and Elizabeth were "tailoring their story" to fit the time of the arrest, and thus that Mr. Kliment had good reason to forego this testimony. (St. Br. at 11) But the shooting in this case had occurred no later than 9:00 p.m. (R379, 395) Thus, it would not make any difference whether the defendant left the Delatorre residence at exactly 10:28 p.m. or as late as 11:00 p.m. If Sonia and Elizabeth had testified in this case that the defendant left at exactly 10:28 p.m., they could have been impeached with their prior inconsistent statements, but even the inconsistent statements provided the defendant with an alibi in this case.

The State's reliance on *People v. Arroyo*, 339 Ill. App. 3d 137, 790 N.E.2d 943 (2nd Dist. 2003), is misplaced. In *Arroyo*, this Court held that trial counsel could reasonably conclude that a possible defense witness was so incredible that it was not worth calling her to corroborate the defendant's testimony. This Court noted that the proposed witness was subject to impeachment with a murder conviction, that there was other evidence to corroborate the defendant's testimony, and that the defendant had been found guilty by another jury (whose verdict had been overturned on appeal) even though the witness had testified for the defense at the first trial. *Arroyo*, 339 Ill.

6

App. 3d at 156-57, 790 N.E.2d at 960. By contrast, neither Sonia nor Elizabeth could have been impeached with prior convictions, and the decision to forego the alibi in this case meant that Mr. Kliment passed up the chance to bolster the defense theory, which focused on the lack of physical evidence linking the defendant to the shooting and the weakness of the eyewitness identification testimony. (R374-77, 796-813) Additionally, unlike defense counsel in *Arroyo*, Mr. Kliment had no basis for thinking that a jury would convict the defendant even if Sonia and Elizabeth were to testify. To the contrary, Mr. Kliment knew that the trial in 97 CF 2326 had ended with a hung jury. (R1210-11, 1224-25)

*Prejudice*

The State casually dismisses the significance of the proposed alibi testimony. According to the State, the outcome in 97 CF 2326 is "irrelevant" because a hung jury "represents neither a conviction nor an acquittal," and the defendant might have been convicted by a different jury if he had been tried again in 97 CF 2326. (St. Br. at 7) But the fact that there was no guilty verdict by the actual jury that heard the trial in 97 CF 2326 strongly suggests that that alibi testimony had raised doubts for at least some of the jurors. Also, the alibi testimony would have been particularly helpful in the instant case, given the the dearth of evidence against the defendant. As noted in the opening brief, (Def. Br. at 29), there was no physical evidence to connect the defendant to this shooting, and three of the five eyewitnesses failed to identify him.

The State trivializes the numerous flaws in the testimony given by Shayla Johnson and Nicole Pearson. For example, the State acknowledges that both women

had pending cases and that Pearson had a prior conviction, but the State argues that they were nonetheless credible because there was no evidence that they had "received any consideration" in exchange for their testimony. (St. Br. at 14)  Even if they had not yet received any "consideration," however, Johnson and Pearson still had reasons to curry favor with the State, and that motive alone impeached their testimony. *People v. Triplett*, 108 Ill. 2d 463, 476, 485 N.E.2d 9, 15 (1985).

Similarly, the State insists that the failure of Johnson and Pearson to contact the police is "meaningless," because it would be "reasonable to assume that most of the witnesses to the shooting knew that the shooting was gang-related and would not be anxious to make enemies of the defendant's fellow gang members." (St. Br. at 14) There was no evidence, however, that Johnson kept silent because she was afraid of the defendant or anyone else.  When asked why she did not contact the police regarding this case, Johnson testified simply that she did not want to get involved, (R461) Pearson indicated that she was afraid of "these Mexican guys," (R516), but she admitted that she associated with members of a rival gang, giving her further motive to testify against the defendant. (R494, 679)

The State exaggerates the strength of the out-of-court identifications. The State admits that Pearson initially said that the defendant was not the shooter, but then claims that she failed to identify him because "he looked different at the time of the shooting." (St. Br. at 14)  Pearson testified that she told the police that "the person that did the shooting were [sic] skinnier than the line-up – than the guy in the line-up." (R493)  Although Pearson did not estimate the shooter's weight, other witnesses said that he weighed anywhere from 130-45 pounds. (R428-29, 472)  The shooting

occurred in late October, 1997, (C2), and the record shows that the defendant weighed 180 pounds when he was arrested in mid-March, 1998, just five weeks after Pearson had identified him at the line-up. (C22; R519-20)  Although Pearson said that she could identify the defendant because "his face [was] the same," (R515), her identification is questionable, given the improbability of the defendant having increased his weight by at least 24% in less than six months.  At a minimum, the defendant would had to have gained six pounds per month.

The State totally ignores the fact that Pearson ultimately identified the defendant only after the police asked her leading questions (R508-10, 543-50)  The State acknowledges that "Johnson may have discussed the shooting with Pearson" prior to the line-up, (St. Br. at 14), but neglects to mention two other important facts: (1) Pearson initially denied that she had talked to Johnson about the incident; and (2) Pearson eventually conceded that Johnson had told her that she (Johnson) thought the defendant was the shooter. (R504-05, 516-17)   The State correctly observes that Johnson and Pearson each claimed to have seen the defendant prior to the day of the shooting.  But Pearson had only seen him once, and she could not even remember when that had been, except that it had been at night. (R486-87)  Johnson had seen the defendant a handful of times, but not within the two months prior to the shooting. (R454-56)   Even if the women were  familiar with the defendant, the relevant question is not whether they could recognize him when they saw him at the line-up, but rather whether their identification of him as the shooter was reliable, given their limited opportunity to observe the shooting and the conflicting descriptions of the shooter given by the various eyewitness. (Def. Br. at 30-33)

Finally, the State mistakenly relies on this Court's finding on direct appeal that there was "ample evidence" to support the conviction. *People v. Amaya*, 321 Ill. App. 3d 923, 930, 748 N.E.2d 1251, 1256 (2nd Dist. 2001). As the defendant has pointed out, (Def. Br. at 28), this Court made that finding in the context of determining whether an allegedly improper jury instruction would require a new trial, even if it was found to be error, whereas the question here is whether the defendant was prejudiced by counsel's decision to forego the alibi evidence. According to the State, the difference in the "argument context" is irrelevant, and this Court's earlier finding "stands as an independent evaluation of the evidence." (St. Br. at 13)  But there is an obvious logical difference between asking whether a conclusion is warranted in light of a certain body of evidence and asking whether the same conclusion would still be warranted if new information were made available.  To establish the prejudice needed to support an ineffective assistance claim based on counsel's failure to present exculpatory evidence, a defendant need only show a "reasonable probability" that the addition of the exculpatory evidence would lead to a different result. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674, 698 (1984); *People v. Sutherland*, 194 N.E.2d 289, 297-99, 742 N.E.2d 306, 311-12 (2000).  In *Sutherland*, the Illinois Supreme Court found that the absence of the exculpatory evidence was prejudicial under *Strickland*, even though the Court had found in a prior appeal that a trial error did not warrant reversal "because of the substantial evidence linking the defendant to the crime." 194 Ill. 2d at 299, 742 N.E.2d at 312.   The situation here is the same as in *Sutherland*.

For these reasons, as well as those stated in the opening brief, this Court should

reverse the order denying the post-conviction petition, reverse the convictions in this case, and order a new trial.

## CONCLUSION

For the foregoing reasons, the defendant-appellant, Armando Amaya, respectfully requests that this Court reverse the order denying the post-conviction petition, reverse the convictions in this case, and order a new trial.

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief is 11 pages.

Respectfully submitted,

THOMAS A. LILIEN
Deputy Defender

PAUL ALEXANDER ROGERS,
Assistant Defender
Office of the State Appellate Defender
2010 Larkin Avenue
Elgin, Illinois 60123
(847) 695-8822

COUNSEL FOR PETITIONER-APPELLANT

This Order Is Not Precedential
And Is Not To Be Cited

No. 2--05--0706

FILED

JUN 2 2 2007

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

RECEIVED

JUN 2 5 2007

OFFICE OF THE STATE
APPELLATE DEFENDER
ELGIN, ILLINOIS

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellees | ) ) | |
| and | ) ) | No. 98--CF--535 |
| ARMANDO AMAYA, | ) ) ) | Honorable Grant S. Wegner, |
| Defendant-Appellant. | ) | Judge, Presiding. |

**RULE 23 ORDER**

Defendant, Armando Amaya, was found guilty of first degree murder, attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm. The aggravated battery convictions merged with the attempted murder convictions. The trial court sentenced defendant to 40 years' imprisonment for the first-degree murder conviction, 10 and 12 years' imprisonment for the two convictions of attempted murder, and 9 years' imprisonment for the aggravated discharge of a firearm conviction. The trial court ordered the sentences to be served consecutively for a total of 62 years. This court affirmed the defendant's convictions and sentences on direct review in People v. Amaya, 321 Ill. App. 3d 923 (2001). However, this court vacated the imposition of consecutive sentences. Amaya, 321 Ill. App. 3d at 933.

At trial public defender David Kliment represented defendant. Kliment did not call any alibi witnesses to testify at trial although Kliment had asserted an alibi defense in his discovery answer.

EXHIBIT L

No. 2--05--0706

However, in another trial (97 CF 2326) regarding another shooting that occurred later the same night as the instant shooting, defendant presented four alibi witnesses, Sonia Delatorre and her sister, Elizabeth Delatorre, George Gamboa and Ramiro Sandoval. This trial ended in a hung jury.

Kathleen Colton filed a postconviction petition for defendant in this case. The petition alleged that Kliment was ineffective because the four alibi witnesses had given alibi testimony in case No. 97 CF 2326 and that Kliment should have had them testify in the instant case as well. The petition was supported by the affidavits of Ramiro Sandoval and a private investigator who stated that Gamboa and Sandoval would both testify on defendant's behalf. Colton then filed a 651(c) certificate. 134 Ill. 2d R. 651(c). The trial court denied the State's motion to dismiss the petition.

At the hearing on defendant's postconviction petition, defendant testified that his alibi covered the times for both shootings; that he had been at the Delatorre house when both shootings occurred. Defendant repeatedly told Kliment about his alibi and Kliment kept saying he was looking into it. Kliment never told defendant that he had spoken with the alibi witnesses. Defendant spoke with the alleged alibi witnesses except for Elizabeth Delatore and they said they would testify for him at trial but they were not contacted by Kliment. Elizabeth Delatorre was living in Arizona at the time of the hearing. Defendant denied telling Kliment that he had been at the shooting in the instant case.

The following documents were admitted into evidence during defendant's testimony: transcripts of the taped statements given by defendant and Sonia Delatorre to the police on October 30, 1997; and a transcript of the December 11, 1997, bond reduction hearing in the other shooting wherein the Delatorre sisters stated that defendant was at their home during the shooting.

Private investigator Arnold Castillo testified consistently with his affidavit filed in support of the postconviction petition. Sandoval testified, through an interpreter, that nobody from the Kane

-2-

County Public Defender's office had contacted him prior to trial but he was in the courthouse during the trial. Sandoval acknowledged that he previously testified that he had been with defendant during the shooting that led to the charges in the other shooting. However, Sandoval also stated that he and defendant were with the Delatorre girls during both shootings.

Defense counsel David Kliment testified that he reviewed the police reports and witness statements including taped statements given by Sonia Delatorre. He also reviewed the transcripts from the testimony given in the other case by Gamboa, Sandoval and the Delatorre sisters. He did not recall reviewing the transcripts of the bond reduction hearing in the other case. When asked whether he knew that the prior case ended in a hung jury Kliment stated, "I'm sure I did [know]." Kliment also testified that he had investigators interview potential witnesses although he had no written reports. He spoke with defendant about potential alibi witnesses on at least "a couple of occasions." Kliment filed a supplemental discovery answer asserting an alibi defense and listed the potential alibi witnesses. But when he spoke to defendant later he told defendant that he didn't like the alibi defense because "putting on a bad alibi defense is worse than putting on no defense at all, because it makes you look like you're trying to lie if the alibi is going poorly." Kliment told defendant that "putting on any kind of defense was a matter of trial strategy" and that defendant would be "better off" without the alibi defense. Kliment explained that the alibi witnesses could not account for the entire 90-minute period between the shooting underlying the charges in the first shooting (the shooting in the instant case) and the second shooting. Kliment stated, "I think they tried to but when you piece it together, there were gaps and so forth, and I'm trying to remember back a long time, remember, but there were problems with it."

-3-

No. 2--05--0706

Kliment also testified that defendant made remarks which made it "impossible" for him to raise the alibi defense. According to Kliment, defendant said "that the witnesses were there to testify for him, they know what to say, but that he was there at the shooting, he just wasn't involved." Upon hearing that, Kliment became concerned "that the alibi witnesses would perhaps not testify truthfully." Kliment stated that the instant shooting and the time of the shooting was the topic of conversation when defendant made the statement so he did not need to explore the statement any further. Kliment believed that he was "barred from using" the alibi defense in light of defendant's remark.

After hearing arguments from counsel, the trial court denied defendant's postconviction petition. The trial court found, inter alia that the decision to forgo the alibi defense was reasonable because of the time gaps and it would have been unethical to pursue the alibi after defendant admitted being at the scene. This timely appeal followed.

On appeal, defendant contends that the trial court erred by dismissing his petition because his defense counsel was ineffective by failing to present alibi witnesses at trial. Defendant claims that these witnesses helped gain him a hung jury in another trial involving a shooting on the same night as the shooting in this case and failing to call them fell below the standard established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984).

At the hearing stage of postconviction proceedings, we will not reverse the trial court's decision to deny a petitioner's claim after conducting an evidentiary hearing unless it is manifestly erroneous. People v. Childress, 191 Ill. 2d 168, 174 (2000). "A decision is manifestly erroneous only if it contains error that is 'clearly evident, plain, and indisputable.' " People v. Frieberg, 305 Ill. App. 3d 840, 847 (1999), quoting People v. Ruiz, 177 Ill. 2d 368, 384-85 (1997).

-4-

To establish ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). The Strickland test requires a defendant to show that (1) his counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under the prevailing professional norm; and (2) the deficient performance so prejudiced defendant as to deny him a fair trial. People v. Nieves, 192 Ill. 2d 487, 494 (2000). To successfully claim ineffective assistance of counsel, a defendant "must overcome a strong presumption that the challenged actions of counsel were the product of sound trial strategy." People v. Metcalfe, 202 Ill. 2d 544, 561 (2002).

In this case, defendant fails to establish the first prong of the Strickland test, that is, he fails to establish that his counsel's performance was deficient. The Sixth Amendment (U.S.C.A. Const. Amend. 6) right of a criminal defendant to assistance of counsel is not violated when his attorney refuses to cooperate with the defendant in presenting perjured testimony at trial. Nix v. Whiteside, 475 U.S. 157, 171, 106 St. Ct. 988, 996 (1986). Thus, counsel's adherence to reasonable professional standards does not fall below an objective level of performance. Nix, 475 U.S. at 171. Under the Strickland test, effective counsel need have only a good-faith belief that witnesses will perjure themselves to forgo certain testimony. See People v. Taggart, 233 Ill. App. 3d 530, 558-59 (1992).

In this case there is ample evidence to support the trial court's finding that defense counsel Kliment had a good faith belief that defendant's alibi witnesses would lie if called to testify at trial. Kliment testified during the hearing that defendant told him that the alibi witnesses were there to testify for him, that they knew what to say, and that defendant told Kliment that he had been at the scene of the shooting but had not been involved. When defendant told this to Kliment it made

No. 2--05--0706

Kliment believe that the alibi witnesses would not testify truthfully. When defendant told Kliment that he was at the scene of the shooting, the topic of the conversation was the instant shooting and not the shooting that took place later that evening. When asked why Kliment did not put on an alibi defense, he replied: "That is what made it easy for me to decide, as it really was a matter of trial strategy, that would not have been an effective defense, but then I think I became barred from using it." Illinois Rules of Professional Conduct state that a lawyer appearing professionally before a tribunal shall not "offer evidence that the lawyer knows to be false." ILCS S. Ct. Rules of Prof. Conduct, RPC Rule 3.3(a)(4). The record reveals that Kliment made a good faith determination that defendant's alibi witnesses would offer perjured testimony. Therefore we do not believe the trial court's decision to deny defendant postconviction relief was manifestly erroneous.

Defendant argues that Kliment jumped to the conclusion that defendant was talking about the shooting in this case rather than the shooting in the other case when he allegedly told Kliment that he had been at the scene. Defendant's interpretation is not supported by the evidence. Kliment testified that when defendant told him that he was at the scene of the shooting the topic of conversation was the shooting at issue and the time of the shooting. Defendant denied making this statement but it was within the trial court's purview to weigh the testimony and determine the credibility of the witnesses. See People v. Morgan, 212 Ill. 2d 148, 155 (2004). The finding of the trial court implies that it believed that Kliment made a good faith determination that defendant's alibi witnesses would lie if called to testify. Based on the record before us, we cannot say that the trial court's findings are manifestly erroneous.

No. 2--05--0706

Because we have already determined that defendant cannot establish the first prong of the Strickland test regarding failure to present the alibi witnesses' testimony, we need not address the other issues raised by defendant.

For the reasons as stated, we affirm the judgment of Kane County in denying defendant's postconviction petition.

Affirmed.

McLAREN, J. with GROMETER, P.J. and GILLERAN JOHNSON, J., concurring.

NO.

IN THE

SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Plaintiff-Respondent,<br><br><br>-vs-<br><br><br>Armando Amaya,<br><br>    Defendant-Petitioner. | Petition For Leave to Appeal From the Appellate Court of ILLINOIS, Second Judicial District,<br><br>NO. 2-05-0706<br><br>There heard on appeal from The Circuit Court for the 16th Judicial District, Kane Co. ILLINOIS NO. 98-CF-535<br><br>Hon. Grant S. Wegner Judge, Presiding. |

## PETITION FOR LEAVE TO APPEAL

Armando Amaya, Pro se

Armando Amaya #K-75877
Tamms C-Max C.C
P.O. Box 2000
Tamms, ILL. 62988

Pro se.

## TABLE OF CONTENTS AND AUTHORITIES

THE APPELLATE COURT ERRED IN RULLING THAT Mr. KLIMENT MADE A GOOD FAITH DETERMINATION THAT DEFENDAT's ALIBI WITNESSES WOULD OFFE PERJURY TESTIMONY, WHERE THE RECORD SHOWS THAT Mr. KLIMENT DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNRESONABLE AND PREJUDICIAL.

Pages

PEOPLE V. Amaya; 321 ILL. App. 3d 923, 748 N.E. 2d 1251 (2ND Dist. 2001) . . . . . . . . . . . . . . . . . 3 - 14 - 16

Strickland V. Washinton, 466 U.S. 668, 104 S.Ct. 2052 80 L.Ed. 2d 674 (1984) . . . . . . . . . . . . - 5-7-18

Crip V. Duckworth, 743. F. 2d 580, 583 (7TH Cir. 1984) . . . . . . . . 7 - 13

People V. Albanese; 104 ILL. 2d. 504, 473 N.E. 2d 1246 (1984) . . . . . . . . . . 8

People V. Truly, 230 ILL. App. 3d. 948, 595 N.E. 2d 1230 (1st Dist. 1992) . . . 8

People V. West, 187 ILL. 2d 418, 719 N.E. 2d 664 (1999) . . . . . . . . . . 8

People V. Ramey; 152 ILL.2d. 41, 604 N.E. 2d 275 (1992) . . . . . . . . . . 8

People V. York; 312 ILL. App. 3d. 434, 727, N.E. 2d . . . . . . . . 8 674 (2nd Dist. 2000) . . . . . . . . . . . . .

CAVE V. Singletary; 971 F. 2d. 1513 (11TH Cir. 1992) . . . . . . . . . . . . 8

Horton V. Zant; 941 F. 2d. 1449 (11TH Cir. 1991) . . . . . . . . . 8

People V. Simac, 161. ILL. 2d 297, 641 N.E. 2d. 416 (1994) . . . . . . . . 13

Smotherman V. Beto, 276 F. Supp. 579, 588 (N.D. TEX 1967) . . . . . . . 13

People V. King; 316 ILL. 3d 901, 738 N.E. 556 (1st Dist 2000) . . . . . 13 - 14

People V. Tripett, 108 ILL. 2d. 463, 485 N.E. 2d 9 (1985) . . . . . . . . . 15

People V. Williams, 173 ILL. 2d. 48, 670. N.E. 2d. 638 (1996) . . . . . . . -15

TITION FOR LEAVE TO A EAL

TO THE HONORABLE JUSTICE OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May it please the court:

## PRAYE FOR LEAVE TO APPEAL

The Defendant, Armando Amaya, proceeding prose, pursuant to supreme Court Rule 315 and 612. Respectfully petition this court for leave to appeal from the decision of the Appellate Court OF Illinois, Second Judicial District, affirming the petitioner's Post-Conviction for ineffective assistance of counsel for, the offenses of First-Degree murder and attempted murder, and his consecutive sentences of 62 years imprisoment. The petitioner seeks an order of this Court Vacating his Convictions and remanding the case to the circuit court for a new trial.

## DATE OF JUDGMENT

ON, January 29, 1999, petitioner was found guilty of First-degree murder, attempted murder, 2 counts, Aggravated discharge of a firearm, and Aggravated battery with a fire arm, 2 counts. Petitioner subsequently sentenced to 62 years. On, June 22, 2007, The Appellate Court, 2nd Judicial District, affirmed the judgment of the circuit court (A copy of the opinion of the Appellate court is attached as Appedix A.) No petition for rehearing was file in the appellate court. An affidavit of intent to filed a petition for leave of appeal was filed, July 2nd, OF 2007.

(A hand copy of the Affidavit of intent to seek review is attached as Appendix B. And People v. Amaya as Appendix C.)

1

## STATEMENT OF FACTS

I, Defendent, Armando Amaya, was Found guilty of First degree murder, attempted murder, aggravated battery with a Firearm, and aggravated discharge of a Firearm. The aggravated battery conviction merged with the attempted murder convictions. The trial court sentenced me to 40 years imprisoment for the first-degree murder conviction, 10 and 12 years' imprisoment For the two conviction of attempted murder, and 9 years' imprisoment For the aggravated discharge of a Fiream conviction. The trial court Ordered that the sentences to be served consecutively For a total of 62 years. The Appellate Affimed the defendat's convictions and sentences on direct review in People v. Amaya; 321 ILL. App. 3d. 923 (2001). However, the Appellate court vacated the imposition of consecutive senteces. Amaya, 321 ILL. App. 3d at 933.

At trial public defender, David P. Kliment, represented defendant. Kliment did not call any of the alibi witness to testify at trial although Kliment had asserted an alibi defense in his discovery answer.

However, in another trial, (97 CF 2326), regarding another shooting that occurred late the same night as the instan shooting, defendant presented four alibi witnesses, Sonia Delatorre and her Sister, Elizabeth Delatorre, George Gamboa and Ramiro Sandoval. This trial ended in a hung jury.

Kathleen Colton File a post-conviction petition For defendant in this case. The petition alleged that Kliment was ineffective because the four alibi witnesses had given alibi testimony in case No. 97 CF 2326 and that Kliment should have had them testify in the instant case as well. The petition was supported by the affidavit of Ramiro Sandoval and a private investigator who stated that Gamboa and Sandoval, both would testify of defendant's behalf. Colton then File a 651(c) certificate. 134 ILL 2d R. 651 (c). The trial court denied the State's motion to dimiss the petition.

At the hearing on defendant's post-conviction petition, defendant testified that his alibi cover the time for both shootings; that he had been at the Delatorre house when both shooting occurred. Defendant repeatedly told Kliment about the alibi and Kliment kept saying he was looking into it. Kliment never told defendant that he spoke with the alibi defense witnesses. Defendant spoke with the alibi witnesses except for Emma Delatorre, and they said they would testify for him at trial, but they were not contacted by Kliment. Elizabeth Delatorre was living in Arizona at the time of the hearing. Defendent denied telling Kliment that he had been at the shooting in the instant case.

3

The following documents were admitted in to evidence during the defendant's testimony; transcripts of the tape statement given by the defendant and Sonia Delatorre to the police on October 30, 1997; and a transcript of the December 11, 1997 bond reduction hearing in the other shooting wherein the Delatorre sisters stated that the defendant was at their house on the time of the shooting.

Private investigator, Arnoldo Castillo testify consistently with his affidavit filed in support of the post-conviction, additionaly Castillo testify that he work for the Public Defenders Office for the year of 1998 into 1999 And that he was the Prawy for all the murder investigation being conducted during 1998 into 1999. Castillo also testify that to his knowledge there was no investigation done into the witnesses of, Armando Amaya case prosecuted by the state under 98 cf 535 done specifically by him. Sandoval testified, through Kara an interpreter, that nobody from the Kane county Defender's Office had contacted him prior to trial but he was at the court house during the trial. Sandoval testified that he was with the defendant at the time the shooting occurred, That he and the defendant were at the Delatorre house at the time of both shootings.

Defense Counsel David P. Kliment testified that he reviewed the police report and witness statements including tape statements given by Sonia Delatorre. He also reviewed the transcripts from the testimony given in the other case by Gamboa, Sandoval and the Delatorre sisters. We did not know if he was aware of the bond reduction held in 97cf2326. he stated, "I don't racall being aware. (R1209). When asked whether he knew that the prior case ended in a hung Jury Kliment stated, "Well, see, now, I would be confuse with my answer. I know now, I don't know if I knew then, I'm sure I did. I know now it was a hung Jury. I don't know if I knew that back then. I don't know why I would not have know it."(R1208-09) Kliment also testified that he had investigators interview potential witnesses although he had no written report, Kliment stated that the investigator who participaten, did the investigation where listed in the discovery file. (R1214-16) Kliment tetified that he never try to subpoena any of the alibi defense or tried to personally talk to them.(R1227) He spoke with defendant about pontetial alibi witnesses on at leas "a couple of occasions". Kliment filed a spplemtal discovery answer asserting an alibi defense and listed pontential alibi witnesses. But when he spoke to the defendant later he told defendant that he did not like the alibi defense because "putting on a bad alibi defense is worse then putting no defense at

4

all, because it makes you look like you trying to lie if the alibi is going poorly". Kliment told the defendant that "putting on any defense was a matter of trial strategy" and that defendant would be "better of" with out the alibi defense. Kliment explained that the alibi witnesses could not account for the entire 90-minute period between the shooting underlying the charges in the first shooting (the shooting in the instant case) and the second shooting. Kliment stated, "I think they tried to, but when you piece it together, there was gaps and so forth, and I'm trying to remember back a long time, remember, but there were problems with it".

Kliment also testified that defendant made remarks which made it "impossible" for him to raise the alibi defense. According to Kliment, defendat said "that the witnesses were there to testify for him, they know what to say, but that he was there at the shooting, he just wasn't involved". Upon hearing that, Kliment became concerned "that the alibi witnesses would perhaps not testify truthfully". Kliment stated that the instant shooting and the time of the shooting was the topic of the conversation when defendant made the statement and that he did not tried to explore the statement any further. Kliment believed that he was "barre from using" the alibi defense in light of that remark.

After hearing arguments from counsel, the trial court denied defendat's post-conviction petition. The trial court rule, inter alia that the decision to forgo the alibi defense was reasonable because of the time gaps and it would be unethical to pursue the alibi after the defendant allegedly admitted being at the scene. A timely appeal followed.

On appeal, defendant argue that the trial court erred by dismissing his petition because his counsel was ineffective by failing to present alibi witnesses at trial. Defendant claims where that his witnesses help him gain a hung jury in another trial involving a shooting on the same night, as the shooting in this case and failing to call them fell below the standar establish in <u>Strickland v. Washington</u>; 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984)

The appellate court affirmed defendants appeal in finding that, "The finding of the trial court implies that it believe Kliment made a good faith determination that the defendant's alibi witness would lie if call to testify, 'Base on the record before us, we cannot say that the trial court's findings are manisfestly erroneous.

ARGUMENT

THE APPELLATE COURT ERRED IN RULLING THAT MR. KLIMENT MADE A GOOD FAITH DETERMINATION THAT THE DEFEDANT ALIBI WITNESSES WOULD OFFER PERJURY TESTIMONY, WHERE THE RECORD SHOWS THAT MR. KLIMENT'S DECISION NOT TO RAISE THE ALIBI DEFENSE WAS BOTH UNRESONABLE AND PREJUDICIAL.

The Appellate court rule in a unpublished order, "We do not believe the trial court decision to deny defendants post-conviction relief was manifestly erroneus" (Appedix A)

This Court should review the judgment of the Appellate court because their opinion faile to consider that Kliment never did an interview OR an investigation of the alibi defense from the start.

Kliment testified that investigators have been participating in the investigation in the case, and that they investigators who work for his office, but that he does not know who his investigators interview because there is nothing in his file that indicates who they talk to. That the investigators who did the investigation where listed in the discovery file, That he had no recollection of specifically asking any one of the investigator to talk to any one involved in the alibi defense. (R1198, 1216-17)

The Irony of it is, That Arnoldo Castillo, was one of the two investigators listed in Mr. Kliments discovery file as a defense witness for 98 CF 535 (R99) Ironacally Arnoldo Castillo was the investigator retain for the purpose of locating the alibi witnesses in the post-conviction.

The appellate court faile to consider Castillo's testimony. Castillo testified for the defendant that he was employed as an investigator for the Kane county Public defenders office in 1998 for the intire year and also through January '99, That he was one of the Public Defender office criminal investigator. that upon an investigation to be initiated from an attorney a written request has to be made out and given to the designated investigator in the office. That he was a privy to all the murder investigations been conducted during 1998 into 1999. Castillo Ironically testified that to his knowledge there was not investigation into the witnesses of the defendant, Armando Amaya case prosecuted by the state under 98 CF 535, done specifically by him. (R1243-44)

The Appellate court faile to consider, that Mr. Kliment was not being honest when he said, "there was investigator participating in the case, And they where listed in the discovery files"... Castillo was listed (as one of the witness investigator at that time and he stated

4

To the court, that no investigation was done by him. Kliment was not honest, he stated in sum that there was an investigation done by the investigators listed in the discovery file. "Though there may be unusual cases when an attorney can make a ratinal decision that an investigation is unacessary, 'as a general rule and athorney must investigate a case in order to provide minimally copeten professional representation'." Crip V. Duckworth, 743. F.2d. 580, 587 (7th cirt. 1984)

The Appellate court error in not taking into consideration the history record of the case, where Mr. Kliment on November 9, 1998 in the transcripts of the proceedings in 98 CF 535, Kliment told the court, "I have not filed an answer in this case, but there is no affirmative defense I intend to raise" (R 1296-97, also see Trial transcripts Nov. 9, 1998)

The Appellate court fail in not considering the fact that Mr. Klimet in in '98 had made up his mind not to put an alibi defense... Mr. Kliment testified that he never tried to subpoena any of the alibi defense; that he never personally talk to the alibi, never spoke to any of the Delatorres' sisters' or, to Gamboa, or Ramiro Sandoval. (R1227)

The Appellat court error in quoting, Ramiro Sandoval testimony. IN their opinion they quoted, "Sandoval acknowledge that he previously ctestified that he had been with the defendant 'during' the shooting that led to the charges in the other shoothing". When in fact Sandoval testimony was, with the defendant at the "time" the shooting occurred, Not "during", the shooting like the Appellate court quote it.

Defendant ask this Court to take into consideration, that Mr. Sandoval testified through an interpreter name, Kara. (R1248) That whom at one point didn't understand Mr. Sandoval. Kara said "I'm sorry I don't understand the very last sentence he said." Sandoval at this time was stating that he was not in any shooting, that he and the defendant were just with the girls. (R1253)

Ineffective assistance claims are mesure against the standar set forth in, Strickland, which requires the defendant to establish that counsel's performance was both objectively unreasonable and prejudicial. 466 U.S. 668, 687-94, 104 S. Ct. 2052, 68 L. Ed. 2d. 674, 693-98 (1984) The resonablceness of counsel's performance is determined by "prevaling professional norms."

Strickland, 466 U.S. at 688, 104 S. Ct at 2065, 80 L. Ed. 2d at 694. Counsel's incompetence is prejudicial where it raise a resonable probability that the result of the proceeding would have been different, i.e., where the deficient performance undermines confidence in the outcome. Strickland, 466 U.S. at 694, 104 S. Ct at

2068, 80 L.Ed. 2d Cir [ ~ 8, Illinois has adopted the Strickland, test. People v. Albanese; 104 Ill. 2d. 504, 473 N.E. 2d 1246 (1984). The test set forth in, Strickland, requires a review court to undertake a "Fact sensitive analysis", that focus on the specific circumstances of the case being review. People v. Truly, 230 Ill. App. 3d 948, 952 595. N.E. 2d 1230, 1233 (1st Dist. 1992)

Originally, counsels decesions regarding which defense to raise and which witness to call are deemed to be matters of trial strategy that are entitled to great deference on review. People v. West, 187 Ill. 2d. 418; 432-33, 719 NE 2d 664, 673 (1999) People v. Ramsey 152 Ill. 2d. 41, 54, 604 N.E. 2d 275, 281 (1992). People v. York, 312 Ill. App. 3d 434, 437, 727 N.E. 2d 674, 677-78 (2nd Dist. 2000) Nevertheless, the "mere indication of word 'strategy', does not insulate attorney behavior from review," Cave v. Singletary, 971 F. 2d 1513, 1518 (11th Cir. 1992). "strategy" or not, an unsound or, unresonableness of counsel's decision is a question of law. West 187 Ill. 2d. at 432-33, 719 N.E. 2d. at 673; Cave, 971 F. 2d at 1518; Horton v. zant, 941 F. 2d. 1449, 1462 (11th Cir. 1991).

In this case, the post-conviction petition alleged that Kliment new that the defendant had raised an alibi in 97-CF-2326, that the alibi resulted in a hung jury in 97 CF 2326.(C320-24) During the evidentiary hearing on the petition, Kliment acknowledged that he was aware of potential alibi testimony in 98 CF 535, that the defendant vigorously urged him to raise it and that he had filed a supplemental discovery answer asserting the alibi defense and listed the alibi witness. Neverthless Kliment ultimetly rejected the alibi defense, despite the defendant's wishes (C98; R1196-98, 1203-16) Kliment offered two reasons for his decision to forgo the alibi, First, Kliment explained that he "did 'not' like the [alibi] defense." in this case because, in his opinion, it would not have been creedible or "effective." (R1203-05) second, Kliment claimed that the defendant made an admission that made the alibi defense "imposible". (R1204) According to Kliment the defendant admitted being at the scene of the shooting that related to the charge in 98 CF 535 (R 1204-05)

In denying the petition the trial court found that each of those reasons supported Kliment's decision not to pursue the alibi claim. (R1311-18), Additionally, the trial court found that the defendant was not prejudiced by the absence of the alibi evidence, given the finding of the Appellate court on direct appeal, that there was ample evidence to find the defendant guilty as the principal. (R1319)

8

for the reasons that follow, the trial court's ruling would be reversed.

Contrary to the trials court's conclusion, Kliment did not have any reasonable basis for ignoring his clients desire to assert the alibi defense in 98CF535. Although Kliment referred to "gaps" in the alibi testimony, he did not give any specific example. (R1208) He also could not identify the "others" in his office whom he claimed share his low opinion of the alibi. (R1227) In fact, the record shows that the alibi testimony was remarkably consisted on the crucial question of wheter the defendant could have been present when the shooting occured.

According to the record, the shooting that led to the charges in 98CF535, had occured at approximately 8:45 or 9:00 p.m. on October 29, 1997 (R379-414-19, 425-29) In discovery, Kliment had received a transcript of a taped statement that Sonia Delatorre, had given to the Aurora police on October 30, 1997 (Def. Ex.2 R1196-97) In that statement, Sonia, advised the police that the defendant had been at her house during the day on October 29, but that he had left the house at some point and then returned with Gamboa and Sandoval around 6:30 or 7:00 O'clock that evening. Sonia also told the police that the defendant, Gamboa and Sandoval, had left the house shortly after 10:30 p.m. and that her sisters Elizabeth and Emma were in the house when the defendant was there. (Def. Ex. 2 at 2-3, 8-9, 13-15, 22-23) Sonia related the same information when she testified at the bond reduction hearing in 97CF2326 on December 11, 1997 (Def. Ex.3 at 18-25) Elizabeth Delatorre also testified at the bond reduction hearing, and she corroborated Sonia's testimony. (Def. Ex.3 at 19-34) At the hearing Sonia and Elizabeth testified that they were not sure if Gamboa and Sandoval had left the house for part of the time between 6:30 and 10:30 p.m., but they knew defendant was there the entire time. (Def. Ex. 3 at 23-24, 28-30)

Kliment did not recall seeing the transcripts of the bond reduction hearing. (R1211) He did, however, review the transcripts of the testimony given by the alibi witnesses at the trial in 97CF2326. (R1196-98, 1207-09) At the trial, Gamboa, testified that although he was not sure exactly how long he, Sandoval and the defendant had been at the Delatorre residence on the night of the shooting, he was sure they had been there since sometime between 8:30 and 9:15 p.m. (SR44, 51-52) Gamboa was impeched with testimony indicating that he had not mentioned anything about being at the Delatorre residence when he was interviewed by the police less than 12 hours after the the shooting. (SR162) In his testimony at the trial in 97CF2326, Sandoval said that he, Gamboa, and the defendant had been at the

Delatorre residence for about three hours prior to leving at approximately 10:15 p.m. (SR 30-33, 36)

Elizabeth Delatorre testified at the trial in 97CF2326 that the defendant had arrived at her house with Gamboa and Sandoval between 6:30 and 7:00 p.m. on the night of the shooting. (SR 70-72) Elizabeth said that Gamboa and Sandoval had "stepped out" at some point, but they later returned and then left with the defendant shortly at about 10:30 p.m (SR73-74,80)

Sonia Delatorre testified at the trial in 97CF2326 that she and Elizabeth had gone to the store with the defendant during the day on October 29, 1997, that he went home later that afternoon but that he came to the Delatorre house with Gamboa and Sandoval around 6:30 or 7:00 p.m. Sonia further testified that Gamboa Sandoval, and the defendant left the house together just before 10:30 p.m. She was sure that the defendant had been at the house during the entire time, but she acknowledge that Gamboa and Sandoval may have been gone for part of the time. (SR 91-94)

Emma Delatorre, who was called as rebutal witness by the State in 97CF2326 testified that the defendant had been at her house with Gamboa and Sandoval until some time between 10:00 and 10:30 p.m. (SR142-47) A police officer testified that Emma had made a statement on the day after the shooting in which she stated that Gamboa, Sandoval and the defendant had been at her house from about 6:00 p.m. until about 10:30 p.m (SR 154-56) Emma admitted telling the officer "they" had left the house for about 10-15 minutes at some point before returning, but she testified that "they" referred only to Gamboa and Sandoval, not the defendant. (SR 144, 146) According to the police officer Emma was "pretty confused" about how long the individuals had been gone from the residence. (SR 157-58) The officer acknowledged that he did not ask Emma to whom she was referring when she use the term "they". (SR 157)

The defendant testified at the trial 97CF2326. In his testimony he stated that he had gone shopping with Sonia and Elizabeth on the afternoon of October 29, 1997. That he later went back to his house and that he went over to the Delatorre residence with Gamboa and Sandoval that evening. According to the defendant, it was "getting dark" when Gamboa and Sandoval picked him up to go to the Delatorre house, although he could not say exactly what

Time they arrived at the house (SR116-18) the defendant testified that he stay at the house for more then two hours before he left with Gamboa and Sandoval around 10:30 p.m. (SR120-22) He did not see Gamboa and Sandoval during the entire time. (SR-120,134) The defendant acknowledge that he had given a statement to the police in the early morning hours of October 30, 1997, in which he first said he had arived at the Delatorre residence around 8:00 p.m., but then said he was unsure of the exact arrival time (SR125) the defendant admitted that he had told the police that Sonia picked him up and brought him to the house around 8:00 p.m., but he testified he "must have gotten it confused because there was a lot of yelling between me and the officer". (SR 134) According to the defendant, the police was trying to trick him during the interview. (SR140) In his statement to the police the defendant also mistakely referre to Sandoval as "Rudy" insted of "Ramiro" because Ramiro had a brother name Rudy. (SR137) The defendant did not recall telling the police that Gamboa and Sandoval had picked him up at the Delatorre residence (SR138)

In sum, Kliment knew that the defendant and all the Delatorre sisters had respeatedly stated, starting on the day after the shooting, that the defendant was at there residence when the shooting occured. (Def. Ex 1-3; SR70-122,142-47). Although the defendant's intitial statement to the police conflicted with his testimony at trial in 97CF2326 on one detail—whethere he was brought to the Delatorre residence by Sonia or by Gamboa and Sandoval—his statement is subsequent testimony were consistent on the key point of when he arrived at the residence, and his initial miss-statement about who had brought him there was understandable, given the antaganistic circumstances of the police interview, and the fact that Sonia had actully picked him up and taken him to the store earlier in the day. (Def. Ex-1; Def. Ex.3; SR91-94,116-18) Kliment also knew that Sandoval and Gamboa had each given sworn testimony corroborating the Delatorre sisters. (SR30-52) Acoording to a police officer, Gamboa had not mention the alibi when he was interviewed on the day after the shooting. (SR162) But, even if that provided Kliment with a valid reason for not calling Gamboa to testify in 98cf635, it would hardly justified Kliments decision not to call the witnesses. Moreover, Kliment knew that the trial in 97CF2326 had resulted in a hung jury despite the "gaps" in the alibi testimony. (R1208-11) Given these facts, Kliment conclusion that the alibi would not been viable was objectively unreasonable.

In finding that Kliment had acted resonabley in deciding to forgo the alibi defense, the trial court relied not only on Kliment's opinion

that it "would not have been an effective defense" in 98 cf 535, but also on his allegation that the defendant had admitted being at the scene of the shooting in that case. Which occurred around 8:45 or 9:00 p. (R1204-05, 1312-18) Kliment's claim, however, was wholly uncorroborated and the defendant flatly denied making such, any such admission. (SR1217, 1270-71) additionally, Kliment acknowledge that he did not ask any follow up questions to explore exactly what the defendant meant when he supposely said that he had been at the scene. Kliment merely assumed that the defendant meant he had been at the scene of the shooting in 98 cf 535, "because of the context of the Conversation." (SR1215-16, 1225-26, 1231)

According to Kliment, the context was "the shooting, the time of the shooting", not the time of the arrest latter in that evening (R1224) But the record showed that the defendant had been arrested shortly after and in close proximity to the scene of the shooting that occurred at about 10:15 p.m., which led to the charges in 97 cf 2326. (R 97-98; SR 97, 132-35) Indeed, Kliment admitted that it was "pretty apparent" that the defendant had been at the scene or near the scene" of the second shooting. (R1225-26) Because Kliment himself already alleged he knew that the defendant was at the second shooting he jump to the conclusion that the defendant was admitting that he had also been at the scene of the first shooting. (R1226) Kliment apperantly never considered the possibility that the defendant was simply reapeating information that Kliment already knew- i.e., that he was arrested near the scene of the second shooting - to emphasize that he was nevertheless not involve in either shooting, and to explain why Gamboa and Sandoval, and the Delatorre sisters were in a position to provide him with an alibi for the entire evening. The defendant's alibi related to both shootings: he was at the Delatorre residence with Gamboa, Sandoval and the Delatorre sisters from early part of the evening untill approximately 10:30 p.m. when he left the residents with Gamboa and Sandoval, and then was stopped by the police moments later. (DEF EX 1-3; SR 30-147) Therefore, when the defendant alleged ly told Kliment that the alibi witness "know what to say", (since defendant also whent to trial with them, he heard them testified in the 97 cf 2326 bond hearing and trial ) and that "he was there at the shooting, he just wasn't involved" (R1204)

12

the defendant was re-aning Kliment of the whole story of what happened that evening and trying to tell Kliment that he had a valid alibi for the entire evening even though he was stopped near the scene of the second shooting almost immediatly after it happend. Without asking the following questions, Kliment could not resonably determine that the alibi was false. Although Kliment certaintly had an ethical duty not to present false evidence he also has a obligat--ion to present his client zealously, People V. Simac; 161 Ill. 2d. 297, 309, 641 N.E. 2d. 416, 422 (1994), and, thus to make sufficient inquiries of his client to determain wheter the evidence was in fact false. Kliment acknowledge that defendant was adamant about raising the alibi, (R1213-15), and he never explain, "why the defendant would essentially pull the rug out from under the defense by telling Kliment, it was a lie".

An attorney who fails even to interview a readilly available witness whos noncumulative testimony may pontentially aid the defense should not be allowed automaticaly to defend his omission simply by raising the shiel "Trial strategy and tatics". Crip V. Ducworth; 743 F. 2d 580, 583 (7th cirt. 1984). "The lawyer who does not probe, does not inquire and does not seek out all the Facts relevant to his client case is prepare to do little more then stand still at the time of trial, Smotherman V. Betu; 276 F. supp. 579, 588 (N.D. TEX 1967)

Kliments failure to clarify what the defendant meant when he allegedily said that he was at the scene was objectively unreasonable. Kliment knew that the defendant had secure a hung jury in 97CF 2326, where the alibi had been presented, and, contrary to Kliment's assertion, the alibi testimony did not contain any temporal "gaps" (R1204-11; SR 309-147; Def. Ex. 1-3) Under the circumstances, a resonable competent attorney would not have rejected a potential meritorious alibi defense without resolving the ambiguity as to what the defendant ment when allege to have said he was at the scene.

This istant case resembles People V. King; 316 Ill. App. 3d. 901, 738, N.E. 2d. 556 (1st Dist. 2000). In King, the review in court held that the trial court had manifestly erred by denying a post-conviction petition which alleged that the trial counsel had been ineffective for failing to call alibi witness testimony would have been "unequivocally exculpatory" and would have "complemented" counsel's trial strategy of raising doubt's abu the veracity of the defendat's accuser. 316 Ill. App. 3d. at

b. The State argue that trial counsel might have reasonably concluded that the alibi witness would have not been a credible witness, but the reviewing court noted that when Counsel testified at the evidentiary hearing on the petition, he said nothing about witness lacking credibility. King, 316 ILL. App. 3d. at 916, 738 N.E. 2d. at 569. Here, Kliment, likewise opted not to present alibi testimony that would have indisputably exculpated the defendent and lent weight to Kliment's chosen trial strategy, which focused on the lack of physical evidence linking the defendant to the shooting and the unreliability of the eye witness testimony. (R374-77, 796-813) Although Kliment opined that the alibi testimony was weak and possibly false, his opinion was base on the erroneous belief that there were "gaps" in the alibi testimony and on mere assuption from ambiguous comment by the defendant. (R1204-06, 1215-16, 1225-26, 1231) Failing to present a viable alibi defense with out having accuratly understood the statement and prior testimony of the alibi witness—and with out thorouhly examining the defendant to clarify whether he was at the scene of the shooting—is just as objectively unreasonable as not calling an alibi witness without making any determination as to her credibility, as occure in King.

The trial court in this case also manifestly erred by holding that Kliment's Failure to present alibi was not prejudicial. In reaching that conclusion, the trial court cited the appellate court's decision on the direct appeal, (R1319), which found that there was "ample evidence" to find the defendant guilty as the principal. People v. Amaya, 321 ILL. App. 3d 923, 930, N.E. 2d. 1251, 1256 (2nd Dist. 2001). The trial court's reliance on the Appellate Court's decision in the direct appeal is misplaced because the Appellate Court's finding occurred in the context of determining whethere giving the jury an unwarranted accountability instruction was reversible error. Amaya, 321 ILL App. 3d. at 929-30, 748 N.E. 2d. at 1256. the question here, by contrast is whether the defendant was prejudice by the absence of evidence indicating that he was not even at the scene of the shooting. Althoug the evidence presented to the jury may have been sufficient to convict the defendant as principal, and thus to dismiss the improper accountability instruction as harmles error, the Appellate Court has no occasion in the direct appeal to consider the potential impact of the alibi evidence, which the jury did not hear. A review of the record shows that the evidence against the defendant was far

from overwhelming. There was no physical evidence linking the defendant to the shooting. Three of the five witnesses who were present when the shooting occurred never identify the defendant as the shooter. (RU13-US-558-76) One of the surviving victoms, Alonzo matthews testified that he did not even see the defendant in the courtroom, even though he had told the police immediatly after the shooting that he would be able to identify the shooter if he saw the shooter again (RU37-719-20)

Two witnesses-Shayla Johnson and Nicole "Coco" Pearson did identify the defendant as the shooter (R453-54, 462, 485-90) But their testimony was undermined by several factors. Both women had pending criminal cases in Kane County, (R447, 479), giving them motive to testify for the state. People v. Triplett, 108 ILL. 2d. 463, 485, N.E. 2d 9 (1985). Pearson also had prior theft conviction (R478-79) further detracting from her credibility. People v. Williams, 173 ILL. 2d. 48, 670 N.E. 2d 638 (1996).

Neither Johnson or Pearson went to the police to report what they saw, even though they were friends with one of the victoms. (RU68-503) Almost two months later, after Pearson learned that her friend had die in the shooting, she and Johnson went to the police station, but merely to complain about another matter, not to talk about this case. Johnson and Pearson gave information about this case only because the police relized that they were the "Shayla" and "Coco", who have been named as possible witnesses. (RU61-63, 488-90, 503-04, 515-16, 521)

When the women finally viewed a line-up, more then three months had passed since the shooting. (R519-2) At the line-up, Pearson first said that the defendant was not the shooter because the shooter had been "more slimmer" and "skinnier". (RU93) Pearson identified the defendant as the shooter only after the police talked to her and asked her leading questions about whether she wanted to identified him as the shooter. (RU90-93, 508-10, 522-31, 543-50) Johnson also identified the defendant at the line-up, but she lived with Pearson and admitted she talk to Pearson about the incident prior to the line-up... ie (R453-64, 471, 506-08, 532-35)

Pearson denied talking to Johnson about the incident before they went to the police or viewed the line-up. (R504-06) At the same time, however, Pearson acknowledge that when she first spoke to the police, she indicated that she had learned the defendant's nickname from Johnson, who also told Pearson that she [Johnson] though the defendant was the shooter. (2486g 516-17)

15

Amaya, 321 Ill. App. __ at 926, 748 N.E. 2d a 239. Pearson had only
seen the defendant once prior to the shooting, but she was not sure
when she saw him, except that it was night. (R486-87) Consequently,
Person's identification of the defendant might have been influenced
by what Johnson told her. Pearson's opportunity to observe the shooter
was also questionable, given that she was involved in the argument
and was surrounded by the crowd which had gathered to watch
(R497-98)

Johnson claimed to have seen the defendant around the nieghbor-
-hood five or six times prior to the shooting, but she last saw him
about two months before the shooting. (R454-56) even if Johnson
was familiar with the defendant, that familiarty may have
simply predisposed her to identified the defendant when she saw him in
the line-up. Johnson admitted she was looking at the gun after
the shooting started, that the scene was "not really brightly lit", and
that she was "shocked" by the shooting. (R460-61, 464-65)

Johnson and Pearson also testified that they saw the defendant
and some other Hispanic male riding in a white car as the women
were walking together near the scene just prior to the shooting,
but their testimony was inconsistent. Pearson testified that she
did not hear any one in the car say anything, while Johnson testified
testified that the men in the car were shouting insults directed
towards a rival gang which "controlled" the area. (R448-49, 457-59, 470,
487-88, 495-96, 677-80)  Johson claim that the two men were
hanging out the car, but she does not recall mentioning that fact
when she talke to the police about the case prior to the trial
(R459-488)

Another witness - TRACY JOHNSON (no relation to Shayla). testified
that he saw three Hispanic men in a white car near the scene shortly
before the shooting, and that two men were making insulting
commets and gestures about a rival gang. (R580-84, 594). Mr. Johnson
did not describe the height, weigth, or age of those men, however, Mr.
Johnson claimed that he saw the same three men running from
the scene back to the car, right after the shooting (R584-87)
According to Mr. Johnson, he later saw the defendant, Sandoval and
Gamboa being stopped by the police, and he told the police at that
time he had seen those men running from the scene. (RS 589, 592, 662-
-64) At trial Mr. Johnson testified that all three men were lying on
the ground when he saw them in police custody, but he had given
an prior statement indicating that only one of the men was on

16

the ground, with the other two being on the square car. RS89-92, b03-04)
Mr. Johnson acknowledge that he did not see the shooting, and he never
identified the defendant, either in any subsequent line-up or in open
court. (R602-636-37) Moreover, Mr. Johnson had been drinking heavily at
the time of the incident, By his own admission, Mr. Johnson was a drug
addict with several prior felony conviction. (RS78-79, S95, b01, b05)
Finally, Mr. Johnson was a close friend of the deceased victim and
referre to the victim as his "cousin". (RS80)

    The reliability of the eye witnesses testimony is further eroded by
the fact that the witnesses gave conficting description of the shooter. Four
of the five witnesses who were present when the shooting occurred
describe the shooter as a Hispanic male who had approche from Lincoln
street (R381-94, 416-18 428-29, 451-52, 482), two of those witnesses said that
the shooter was in his teens or early twenties, while the other two
witnesses did not mention the shooter's age. (R418, 425-78, 483) All four
witnesses describe the shooter's height, but they variously describe
him as anywhere from 5'4" to 5'9" tall. (R418, 428-29, 472, 501) only two
of the witnesses describe the shooters weight, one saying he weighed
between 130-140 pounds, and the other saying he weighed between 140-
145 pounds. (R428-29, 472) The arrest warrant issued for the defendant
on March 11, 1998, indicate that he was 18 years of age, 5'8" tall and
180 pounds (C22).

    The same four witnesses gave remarkedly different description of
the shooter's clothing. One witness, Tarra Harris, said that the shooter was
wearing a black jacket and a white "hoodie," which cover his head.
(R416-17, S88) A second witness, Alonzo Matthews, testified that the
shooter was wearing a black hoodie. (R429) Nicole Pearson testified that
the shooter was wearing a black hoodie, but Pearson did not mention the
hoodie when she talked to the police. According to pearson, the shooter
was also wearing a black hat or skullcap. (R483-510-11, 548-50) Pearson
added that the shooter was wearing jacket and pants, or sweatsuit.
(R483) Shayla Johnson said only that the shooter was dressed in
clothing that "look black," but might have been "dark blue." (R477)

    A fifth witness, William McCalister, was also present when the
shooting occurred. He was standing near the southeast corner of the
building where the shooting took place, putting him on the other side
side of the building from Lincoln street. As noted earlier the other
eyewinesses said that the shooter had approched from Lincoln street
(R 381-94, 416-18, 428-29, 451-52, 482, 560-61) As he watche the argument
that was going on behind the building, McCalister notice a Hispanic

17

Male approached from New York Street, which was north of the scene. According to McCalister, the man was about 5'10" or 5'11 tall, about 160-175 pounds, and wearing "dark hooded clothing" specifically a dark jacket over a dark hooded jacket. (R562-65, 574) McCalister heard the gunshots, which sounded as though they had come to the area of his right, near where the Hispanic man had been standing. McCalister did not see who actully fire the shot, however. (R568-73)

Given the lack of physical evidence and the weak identification testimony, the alibi evidence might have swayed the jury in the defendant's favor, or at least left the jury with a reasonable doubt as to his guilt. Kliment's failure not to raise the alibi at trial was "sufficient" to undermine confidence in the outcome," and thus to establish prejudice. Strickland, 466 U.S. at 694, 104 S.ct. at 2068, 80. L. Ed. 2d at 698.

For these reasons, this court should reverse the order, reverse the order denying the defendant's post-conviction conviction, reverse his conviction in 98CF535 and order a new trial in that case.

## CONCLUSION

WHEREFORE, the defendant-Appellant, Armando Amaya, pray this Honorable court, grant his petition for Leave to appeal and reverse defendant's Post-conviction conviction, reverse his conviction in 98CF535 and order a new trial.

Respectfully submitted,

Armando Amaya

Armando Amaya, pro se
Inmate K-75877
P.O. Box 2000
Tamms, ILL 62988.

16

NO. 2-05-0706

IN THE

APPELLATE COURT OF THE STATE OF ILLINOIS SECOND JUDICIAL
District.

| | | |
|---|---|---|
| People OF THE STATE OF ILLINOIS<br>    Plaintiff-Appellee, | ) ) ) | Appeal From the Circuit Court<br>For the 16th Judicial Circuit<br>Kane County, Illinois |
| V. | ) ) | NO. 98 CF 535 |
| Armando Amaya<br>    Defendant-Appellant | ) ) ) ) | Honorable. Grant S. Wegner<br>Judge presiding |

## AFFidAVIT

   I, Armando Amaya, First being duly sworn upon oath, depose
and state that the facts avered in this affidavit are true and
correct in substance, to the best of my knowledge, understanding,
information and belief.

   1. Affiant is the defendant in the above entitle cause.

   2. On June 22, 2007, The Illinois Appellate Courts, second Judicial
District, issue an opinion affirming the defendant's Post-conviction
for ineffective assistance of counsel.

   3. No petition for Rehearing has been Filed.

   4. Affiant propose to File a petition for leave to appeal in the
Illinois Supreme Court within 35 days From June 22.

   5) Affiant respecfully request that this court stay the issue
of the mandate in the above-captione cause.

   Further Affiant sayeth NOT

Respectfully submitted.

Amaya, Armando
Amaya, Armando Pro se.
Inmate K7S877
TAMMS C-MAX C.C.
P.O.Box 2000
TAMMS, ILL. 62988.

In accord with 28 U.S.C. 1746, I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Amando Amaya
Armando Amaya. Pro se

That on the 2nd day of July 07, I place this affidavit in the U.S. mail at Tamms c-max C.C. Post Office mail Room In the hands of the working pot L.T

Amaya. Armando
Affiant

IN THE SUPREME COURT OF THE STATE OF ILLINOIS.

PEOPLE OF THE STATE OF ILLIONOIS )   Appeal from the Appellate Court for
    Plaintiff - Respondent, )   the Second Judicial District
                       )   No. 2-05-0786
                       )   Original Appeal From the 16th Judicial
    Vs. )   Circuit, KANE CO. ILLINOIS
                       )   NO. 98 CF 535
Armando Amaya )   HON. Grant S. Wagner
    Defendant - Appellant )

### MOTION FOR APPOINTMENT OF COUNSEL.

Now come, Armando Amaya, pro se, petitioner herein and respectfully move this Honorable court to appoint counsel for him.

In support, Defendant states:

1. I have been incarcerated continuosly since October 29, 1997, and am presently held in custody and residing at TAMMS C-Max C.C. in TAMMS ILLINOIS, County of Alexander.

2. I am without sufficient income or assets with which to pay for the cost of these proceeding or to employ an attorney to represent me in this matter.

3. I am without the services of counsel to represent me in this matter and wish the court to appoint counsel to represent me in this matter.

4. I have a constitutional right to access to the court, and without the assistance of counsel, My access to the court will not be adequate effective or meaningfull because, "I'm a layman to the law, and don't understand this legal stuff.

WherFore, Defendant, pray that this Honorable court will grant him counsel without prejudice prior to hearing this matter.

              Respectfully submitted
              Armando Amaya
              Armando Amaya Pro se
              Inmate K75877
              TAMMS C-Max C.C.
              P.O. Box 2000
              TAMMS, ILL. 62988

NO

IN THE SUPREME COURT OF THE STATE OF ILLINOIS.

| | |
|---|---|
| People of the State of Illinois<br>    Plaintiff - Respondent,<br><br>Vs.<br><br><br>Armando Amaya<br>    Defendant - Appellant | ) Appeal from the Appellate<br>) Court for the second<br>) Judicial District<br>) NO. 2-05-0206<br>) Original Appeal from the<br>) 16th Judicial Circuit,<br>) Kane County<br>) NO: 98 CF 535<br>) Hon. Grant S. Wegner<br>) Judge presiding. |

## Notice For Filing And Proof of Service.

TO: Kane Co. State's Attorney
    37w777 Route 30
    St. Charles ILL. 60175

TO Appellate prosecutor
    2032 Larkin Ave
    Elgin, ILL. 60123

TO: Supreme Court of Illinois
    Supreme Court Building
    Springfield, ILL. 62706

I, Armando Amaya, petitioner herby certify that on July 12 2007, I filed original and copy of documents, for Petition to leave to appeal to the listed obove people by placing it in the institutional mail at Tamm c-max c.c. properly addressed to parties listed above. From maling throug the U.S. state Postal service. Pusuant to 28 USC 1746, 18, USC 1621 or 735 ILCS 5/1-109. I declare under penalty of perjury. that I am a name party in the above action, that I have read the above documents, and that information containe therein is true and corect to the best of my knowledge and belief.

Dated:

Respectfully submitted.

Armando Amaya

Armando Amaya Pro.se
Inmate K75877
P.O. BOX 2000
Tamms ILL. 62988
(Tamms c-max c.c.)

105041

**SUPREME COURT OF ILLINOIS**
CLERK OF THE COURT
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

September 26, 2007

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 105041 - People State of Illinois, respondent, v. Armando
         Amaya, petitioner.  Leave to appeal, Appellate
         Court, Second District.

   The Supreme Court today DENIED the petition for leave to
appeal in the above entitled cause.

   The mandate of this Court will issue to the Appellate Court
on November 1, 2007.

EXHIBIT N

IN THE CIRCUIT COURT OF KANE COUNTY

People of the State of Illinois
Plaintiff

vs.

Armando Amaya,
Defendant / Petitioner

) Successive Petition for post-convic-
) -tion Hearing Relief / Petition
) For Post-Judgment relief
)
)
) Gen. No. 98-c.f.
)
)
)

Clerk of the Circuit Court
Kane County, IL

APR 27 2007

FILED
ENTERED

107

MOTION FOR LEAVE TO FILED THE ATTACHED PETITION
FOR, SUCCESSIVE PETITION FOR POST-CONVICTION
HEARING RELIEF AND/PETITION FOR POST-JUDGMENT
RELIEF

Now comes, Armando Amaya, pro-se, and moves this Honorable
Court for Leave to filed attache motions for succesive petition
for post-conviction hearing relief and/Petition for post-judgment
relief, In the interest of substansive justice and fundamental
fairness, were defendant was unable to raise this claim in
earlier petitions.

Defendant was unaware of evidence, that Ms. Weakly had
made a statement to the Aurora police on the night of 10/29/'97.
Because her statement was place in the wrong incident-
report 97-24443 to which she is not a witness too.

That Ms. Sharona c. Weakly, on the night of October 29,'97
Gave a statement for incident 97-24441 case 98cf535
which defendant was put on trial for. And not for the incident
her supplemental police report has been mark as ,97-24443, which
is case 97 cf 2326.

That because of that, defendant never had any knowledge
of crucial evidence, that could and would have help defendant
showed that the state witnesses were not being truthful.

That because defendant was not disclose Ms. Weakly
statement he could have not been able to know of her state-
ment in which she contradicts the state whole case and
witnesses, along with their exhibits, and because the state
did not disclose Weakly's, statement defendant could have not
know or been able to raise the evidence of her statemen in
earlier petitions and at the trial.

1 of 19

EXHIBIT O

That defendant became aware of Ms. Sharona C. Weakly statement in the course of the post-conviction appeal, when appelate assistant defender, Paul A. Rogers, ask defendant for the trial transcripts testimony for the alibis in case 97-cf-2326, which is incident 97-24443. Because my original post-conviction petition was base on the fact that, the same alibi, defendant presented in 97 cf 2326 was the same alibi, defendant had for 98 cf 535 and defendant counsel never investigated or talk to the alibi.

That is why, Mr. Rogers, requested of me to see if I had the transcripts "but I" didn't, defendant only had the police report Incident 97-24443 which is case 97-cf-2326, in which "I found Weakly's statement."

The evidence in Ms. Sharona C. Weakly, statement would have change the outcome and made a difference at the trial, base on the fact that, Ms. Weakly is an eye witness, whom witness the subject come up infront of her and started shooting. She, tells the Aurora police, that, she was not sure if the subject was Mexican or Black, "But!" That he was very, "light skinned", "and" had "no! facial hair". That when the subject finish firing the gun he pause and put the gun away, "and ran across New York st. towards the 'Nurcing home and in between some houses' northbound !" of the Incident

Ms. Weakly's statement would had made a big difference because the state whole case was base on, that the subject or subjects ran southboun of the incident, "across Galena Blv, towars the Lincoln Laundromat in to a white car that was facing south!" and that the subject had a goatee.

Ms. Weakly statement; would have controdicted, Tracy Johnson testimony to the jury, whom the jury use to reach their verdic, when they requested and was given Mr. Johnson trial transcript testimony.

Mr. Johnson, in his testimony said, that he was standing some were at Galena (which is about a block away from the Incident) when he 'heres the shots and seen three people running across Galena, towards the Lincoln Laundromat in to a white car that was facing southbound.

Mr. Johnson claims he was sure defendant was one of the subjects.

Ms. Weakly would have also challenge, the fact, that the state put testimony, that the defendant had hair, facial hair, in which they presented officer Wolter and William McCalister and Exhibit 38 to show the subject had facial hair.

Ms. Weakly statement would have challenge, the state Exhibit 1 and 21, which is a diagram of the area, of the incident, the state use to point the location of the, Lincoln Laundromat, and Galena BN. she, Weakly, would have controdicted, what officer Hilgenber, sargent Langston testimonies and the Exhibit 40—43 that they use to corroborate their case that the subject, had facial hair, and ran southbound towards Lincoln laundromat.

Ms. Weakly's statemen would and will showed, that defendant had nothing to do with any shooting, That the person who committed the shooting was light skinned, That he had no facial hair, and that the subject was alone when he came up infront of her, and that when he pause to put the gun away, he ran northbound, "alone," across New York st. Towars The Nurcing home between some houses

Defendant is asking for permission to Filed this claim that, showes that, some one else committed the crime. That the subject acted alone, and that he rangaed North, and Not south. Ms. Weakly, statement show evidence that conflicts, the states case and theory they presented to the jury and court.

Ms. Weakly, would have and is conflicting everything the state is saying. Ms. Weakly's connflicts every evidence the state use. And because the state failed to disclose Ms. Weakly statement in this case, defendant was unaware of the evidence, to even raise the claim earlier.

Wherefore, defendant respectfully request that this Honorable court grants him permission to Filed the attache petition of successive petition for post-conviction and / Post-Judgment Petition relief.

respectfully submitted.

Armando Amaya
Armando Amaya, Pro se.

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ST. CHARLES, ILLINOIS

Case No. **98 CF 535**

| | | |
|---|---|---|
| **THE PEOPLE OF THE STATE OF ILLINOIS** | **ARMANDO AMAYA** | Clerk of the Circuit Court<br>Kane County, IL<br><br>APR 27 2007<br><br>FILED **107**<br>ENTERED |
| Plaintiff/Petitioner | Defendant/Respondent | File Stamp |

## NOTICE OF FILING
## POST CONVICTION HEARING PETITION

TO:  Kane County State's Attorney
     37W777 Route 38, Suite 300
     St. Charles IL 60174

    The undersigned states that the attached Petition for Post Conviction Hearing has been filed with the Clerk of the Circuit Court on _____ **APRIL 27, 2007** _____.

### AFFIDAVIT OF SERVICE

The undersigned on oath states that on _____ **April 30, 2007** _____, he/she served a copy of the foregoing Notice of Filing Petition for Post Conviction Hearing by personally delivering same to the following:

    ☑ Kane County State's Attorney
       37W777 Route 38, Suite 300
       St. Charles IL 60174

and a copy personally delivered to below named judge.

    ☑ Judge **WEGNER** _____
       37W777 Route 38, Suite 300
       St. Charles IL 60174

Subscribed and Sworn to before me on
_____ **April 30, 2007** _____ (Date)

_____
Clerk of the Circuit Court
(Seal)

_____
Signature



PI CR 08   (4/01)

STATE OF ILLINOIS

COUNTY OF KANE } SS

Clerk of the Circuit Court
Kane County, IL

APR 27 2007

FILED
ENTERED    107

IN THE CIRCUIT COURT FOR THE 16th JUDICIAL
CIRCUIT, KANE COUNTY.

People of the State of Illinois )
                          Plaintiff )
                                    )
                                    ) Gen.No. 98 CF 535
                                    )
vs.                                 )
                                    )
Armando Amaya                       )
          Defendant/Petitioner )

SUCCESSIVE PETITION FOR POST-CONVICTION HEARING
RELIEF. PURSUANT TO 725 ILCS 5/122-1 et. seq. AND
PETITION FOR POST-JUDGMENT RELIEF. PURSUANT TO
735 ILCS 5/2-1401 et. seq.

Now comes, Armando Amaya, pro-se petitioner herein and
Pursuant to 725 ILCS 5/122-1 et seq and / 735 ILCS 5/2-1401
et. seq. to address the point of law and constitutional violation
herein Filed Pro-se and here by petition this honorable court to
grant petitioner petition for an order, For. entry of all order
setting aside the verdic of the jury returned on 1/29/1999 and
grant him a new trial.

IN SUPORT THE DEFENDANT/PETITIONER STATE AS FOLLOW:

1. That the defendant, Armando Amaya, was Found guilty under
the above case number of Felony offenses. on January 29, '99

2. That the office of the public defender was appointed to
represent the defendant on APRIL 16, 1998, and that the case
proceeded to trial on January 25, 1999, assigned to
David P. Kliment.

3. That on May 7, 1998. assistant state attorney, JAMES GUAGLIARDO,
gave the answer to discovery to, DAVID P. KLIMENT. Kane co. Public

defender, along with a list of witnesses and continue on given the defense supplemental answer to discovery on AuG. 16. 1998 JAN. 15, 1999 and JAN. 21 1999.

4. That defendant was unaware of Sharona C. Weakly's statement at the time of the trial

5. That defendant only became aware of Weakly's statement during the course of defendants post-conviction appeal.

"I became aware of it only, because, Mr. Paul A Rogers from the assistant appellate defenders office, had ask me, if I had any of the alibi transcript testimonies for the 97-cf-2326 case. I was not sure, so, "I sent a letter home asking my family to please send me all the big envelops I had send home mark with 97-cf-2326". I could not have ask my family to look for something they can not even read.. so, I had them mail me the papers. When I did received the papers. I started searching for the alibi transcripts. But, I didnot have any of the transcripts for 97-cf-2326 I only had the police report for incident 97-2443, the trial Kathleen did for me. I read the incident report in the hope to find something that may help Mr. Roger in the post-conviction appeal. (because Mr. Roger at some point believed that I had no merit for the P.C. appeal) Thats when I found Ms. Weakly's statement and it shock me. But only thought some how I misplace the report, Thats when I went to place it with the rest of the paper for 98-cf-535. Thats when I took notice that the incident number were not the same. Thats when I search for Ms. Weakly's name in the discovery motions given by the state and Mr Kliment. But her name was not on there (SEE EXHIBIT C          ) Thats when I started asking Mr. Roger questions and for help and thats how I became aware of Ms. Weakly's statement".

6. That defendant has tried to find out if, Mr. Kliment was aware of, Weakly's statement but that he has not responded to any of my letters or request. Defendant has send him some transcripts. The motions for discovery and Ms. Weakly's

statement, along with a drawing of a map by defendant, in the hope that he may remember anything and draft an affidavit but, I had not received any respond.

7. That defendant is alleging either, That the state violated defendants due process rights by not disclosing, Weakly's, statement to Mr. Kliment during discovery for 98-cf-535, or alternatively, That defendant was deprived of his 6th amendment right to the effective assistance of counsel because Mr. Kliment had Weakly's statement but failed to interview her or call her as a witness.

8. That Ms. Weakly's statement is mark as Incident 97-24443 an Incident that she is not a witness to... and that her statement is for incident 97-24441

9. That incident 97-24443 and Incident 97-24441 are two very different cases that have nothing to do with each other. SEE EXHIBIT. B

10. That Ms. Weakly's statement will/would, have cast doubt on the states case, witnesses and exhibits. In which the state presented that the subject whom committed the crime for Incident 97-24441 ran southbound, across Galena Blv. into a white car that was park facing south infront of the Lincoln Laundromat. And they also presented evidence that the subject had facial hair. SEE exhibit E — H

11) That Ms. Weakly conflicts everything the state said took place that night. And that because the state failed to provided defendant with Ms. Weakly's statement in Case 98cf535/Incident 97-24441 violated defendants right to a fair trial. "My due process right."

12. That because defendant was not provided with Ms. Weakly's statement. The state was preju dice. Because the jury relied on Tracy Johnson trial testimony when

the jury ask for tracy Johnson testimony in their dileveration, because it was given to them. SEE Memorundum argument.

13. That defendant counsel was ineffective for not investigating anything in the case that may have lead him to Ms. Weakly's statement.

14. That because Ms. Weakly's statement was misplace and mark with the wrong incident. defendant was unaware of her statement and therefore, unable to raise the issue in earlier Petitions.

15. And that the state failed to provide /disclose, crucial evidence that show. that the person whom committed the shooting was light skinned and had NO! facial hair; evidence that show that the person/subject who Committed the crime ran Northbound, "alone across New York st", from the incident 97-24441. And because the state failed to disclose Weakly's statement, defendant was deprived of his constitutional right.

16. That defendant filed a timely notice of appeal of his conviction. And that defendant has filed a Post-conviction in which he only raise the ineffective assistant of counsel. For counsel failing to call an alibi defense. Defendant post-conviction appeal is pending.

17. That defendant has attached to this petition, a motion for leave to filed the attached petition for successive petition for Post-conviction /Petition for Post-Judgment relief, a Memorandum at law, Discovery exhibits, Ms. Weakly's statement, A Drawing by the defendant of the incident 97-24441 and defendants whole trial as an exhibit and his own affidavit.

WHEREFORE, The defendant, Armando Amaya, respectfully request that this, Honorable court grant his petition for hearing and relief, for resons stated.

Respectfully submitted

Armando Amaya

Armando Amaya, Pro se

Armando Amaya K78877
Tamms C-Max
P.O. Box 2000
Tamms, ILL. 62988

STATE OF ILLINOIS )
                  ) SS
COUNTY OF KANE    )

### IN THE CIRCUIT COURT FOR THE SIXTEETH JUDICIAL CIRCUIT, KANE COUNTY

People of the state of Illinois )
              Plaintiff          )
                                 )    Gen. No. 98-CF-53
                                 )
Vs.                              )
                                 )
Armando Amaya                    )
         Defendant/Petitioner)

Clerk of the Circuit Court
Kane County, IL

APR 27 2007

FILED
ENTERED    107

### MEMORUMDUM AT LAW

Now comes, Armando Amaya, in support of the attache Petition(s), Successive Petition for post-conviction hearing relief and / Petition for post-judgment relief.

### SUMMARY OF FACTS SUPPORTING CLAIM

SHARONA, CHENILE, WEAKLY, on the night of October 29, 1997, made a statement to the, Aurora Police, for Inciden 97-24441. The shooting at the intersection of New York st. and Lincoln Ave. apartments... In her statement, she stated, that the subject came up from behind her, That, once the subject was infront of her, he started shooting. That, the subject shot 2 times to the subjects east of him and took of running after the subjects as he fire 3 to 4 more times.

WEAKLY, describe the subject as a male, "probably Hispanic," Light skinned! "With No," Facial hair!". She stated that the subject was dress in black, wearing a black coat, black hat, black pans. And she stated, "The subject was wearing, "a large outer coat, thight length, "black in color." She stated, that the subject was wearing a "hat." "A loose fitting wool-type hat", pull down to above his eye brows.

WEAKLY, also stated that, she was not sure if the subject was black of Mexican, But! "That he was very ligth skinned".....

And that after the subject had finished firing, "He paused, put the gun away in his pocket, and, 'ran Northbound', in the direction of the nurcing home and some houses."
SEE EXHIBIT A

Defendant, is arguing that Ms. Weakly's statement conflicts the states case, and, what their witnesses said at the trial.

Tracy Johnson on the 27 day of January '99, testify for the prosecution, that he was sure, the 3 people whom he seen running "south bound (away from incident 97-24441) across Galena Blv. in the direction of the Lincoln laundromat and jump in to a white car that was facing and heading south", were the same people or subjects the Aurora police had pull over in the intersection of Downer and Jackson st. The night of October 29, 1997.
SEE EXHIBIT F "1-53 (SEE pg 34-42)

Mr. Johnson, testify that he was standing/walking on Galena Blv. toward Randall liquor and was talking to a gril when he heard the shots, and seen 3 people running, in a group and they were comming from the area of 309 East New York st, and saw them run to a place called the Linconln Laundromat.
SEE EXHIBIT F pg 1-53 (SEE pg-47-48)

Ms. Weakly's statemen which has been mark as incident 97-24443. with out any doubt conflicts, Tracy Johnson testimony. "Mr. Johnson" at the trial, testify that he was, "sure", that the subjects the Aurora police had pull over at Downer and Jackson were the people that he seen running southaboun across Galena Blv. in to a car at the Lincoln Laundromat, when he was standing/walking on Galena Blv. (which in-fact does not make him an eye witness).. Ms. Weakly, whom, is an eye witness to incident 97-24441 and not 97-24443. Conflicts Mr. Johnson testimony. On the night of Oct 29, '97, tells the A-P-D that the pearson whom she seen commit the shooting, when he finish shooting, he", ran across New York st. "Northboun" in the direction of the Nurcing home and some houses (EXHIBIT "A")

Ms. WEAKLY's statemen cast doubt on Tracy Johnson testimony to the jury... The jury in there deliberation use Mr. Johnson statement to reach their verdic when they ask the court:

> We want a copy of the transcripts of, the testimonies --- testimonies, Plura of 1) Shayla Johnson 2) Nicole Pearson 3) Tracy Johnson.
> (SEE Exhibit G pg 93 - 98)
> The court: We're back on the record, people versus Amaya, the jury has answer the courts information to them. that it would take at least two hours to have transcripts prepared and the jury response was very terse --- asked them if they still want the transcripts please advise, The answer was in large letters.
> "YES, the jury"   (The statment was given to the jury)
> (SEE EXHIBIT G Pg - 97 - 98)

Ms. weakly's statement conflicts. Mr. Johnson whole statement. Mr. Johnson in his testimony claims that he was sure the people he seen running southbound were the same the A.P.D had pull over that night. But, the true is that Mr. Johnson, only seen people running. he never witness a crime being commit. he was standing on Galena Blv. a good half of Block away or better from were the incident took place. But, Ms. weakly on the other hand would bring doubt to that. because her statement clearly shows that she is an eye witness (Exhibit A) that SEEN with her own eyes, the person who committed the shooting ran. Northbound of incident 97-24441 alone.

> "DEFENDANT is Entering his own drawing to show the direction Mr. Johnson said the subjects ran in a group and to show were he was standing. Also to show, the direction Ms. WEAKLY witness the person who committed the crime run to and were she was standing. to show the two directions" SEE EXHIBIT D

11 of 19

Ms. Weakly's, statement also conflicts the Foundation Assistant states Attorney, James Guagliardo set for the Jury... On the 26th day of January '99, the state call their first witness officer, Andrew Hilgenber, whom in his testimony to the jury set the groundwork of were a buisness known as the lincoln Laundromat was located at. To corroborate the officers testimony and to paint "in image" to the jury the location of the Lincoln Laundromats, the streets and aerial surroundings of incident 97-24441, the state use people's exhibit 1 and 21 which are aireal map diagrams, in which he draws an arrow to indicate the North direction on it. The officer also draws on the diagrams. X for the apartments, MC for Mccarty park and LL for the location of the Lincoln Laundromat.
SEE EXHIBIT. E Pg 20-46 (SEE 45-50)

Ms. Weakly's statement also conflicts the second part of the foundation they set for the Lincoln Laundromat, which is Exhibits 40-43 of the people and the testimony of sargent, Michale Lanston. Whom the State call as a gang expert... To corroborate the sargents testimony they also use the diagram (people's Exhibit 21) in which he points out for the jury the areas surrounding the bounderings of the Easter Disciples territory, And, testifies that the Lincoln laundromat is located "on the southwest, corner of Galena and Lincoln".
SEE EXHIBIT. F Pg 113-149 (SEE 129-136, 141-144)

Sargent, Michale Langston, also identifies for the jury peoples exhibit 40-43 which are pictures in the daylight of different looks of the lincoln Laundromat, "looking at it from Galena Blv. SEE EXHIBIT F Pg 113-149 (SEE 132-136)

Ms. Weakly, cast doubt on the groundwork the state set for their case. by statedling that the pearson whom she saw commit the shooting ran Northbound, across New Yorkst towards the Nurcing home and some houses (Exhibit A)

Their is no doubt here, that the state case was that the subject or subjects ran southboun, across Galena Blv. into a white car on the Lincoln Laundromat.

The state first set the foundation of their case, of the location of the Lincoln Laundromat, by calling officer Andrew Hilgenber first. Then they had tracy Lamart Johnson testify, in which he tells the jury the people he seen running towards the lincoln laundromats was the defendant whom the A.P.D had pull over on Downer and Jackson st. Then to corroborate the location of the Lincoln Laundromat, in sargents Langston testimony, they show the jury pictures of the Laundromat

Not once, has or were there evidence at all showen to the jury that the subject whom did the shooting ran in a whole different direction. to show that defendant has enter his whole case as an Exhibit, along with Ms. Weakly's statement to show that she conflicts the states whole case, along with their exhibits. And with out a doubt would cast doubt in the state case.

Ms. Weakly's statement also conflicts, Mr. William McCalister statement, whom testifies for the state on the 27th day of January '99, that the male subject he saw coming from New York st had a light goatee.
SEE Exhibit F pg 6-24 (SEE pg 12-14)

Ms. Weakly's statement cast doubt on, McCalisters statement and conflicts it... in her statement, she tells the A.P.D that the pearson whom she saw commit the shooting had No Facial hair. (SEE Exhibit A    )

Ms. Weakly's statement also conflict the support the state use for their case of the description of the subject (whom they allege to be the defendant) whom committed the crime.

To support McCalister's testimony, the state on the 27th day of January '99 call Detective Scott A Wolter whom testify that the defendant had Facial hair and everything on the night of October 29, 1997. Detective Wolter, also Identify people's Exhibit 38, which was a picture of Me, the defendant.
SEE EXHIBIT F pg 54-80 (SEE pg 67-68)

13 of 19

Ms. WEAKLY's statement also cast doubt On The states accountability Theory argument. The state argument for the accountability instruction was, that their evediece show during the murder the subjects were riding in the car before the murder, That the subjects in that car were out the car during the time shots are Fired and That the same subjects were running back to the car, which is park Just south OF the Gaster Disciples territory Fleeing the scene after the Murder. SEE EXHIBIT F 170-190 (see pg)

They the state use's TRACY Johnson testimony to corroborate what all their witnesses said. SEE EXHIBIT F pg 170+190

the state tells the Judge in the argument for the accountability instruction that their whole point was that "WILLIAM McCalister corroborated what TRACY Johnson says" They said that, WILLIAM McCalister puts a second Male hispanic at the scene. That had a goatee. The state said "You look at the Photo of Armando Amaya and George Gamboa You would see that they both have goatee" exhibit F p 181

Judge Hudson, accepted the instruction base on what Tracy Johnson said.    Judge Hudson said:

"There is also testimony, however, that he was seen in a car shortly before the shooting in which gang slogans were allegedly yelled. There is also evidence that he was seen with an individual Fleeing the scene that was identified as the car the individual were to. As Mr Johnson, testified, as we went over earlier that the three people that had gotten out of the car being detained by the police were in Fact the three people he saw the time the shots were Fired"

SEE EXHIBIT F pg 187-190

Ms. WEAKLY with out any doubt conflicts that whole argument. and everything the state said in their closing arguments. OF all the witnesses and their Exhibits.    SEE Exhibit A        and Exhibit E, F and G and H

Defendants is arguing that Ms. Weakly's statement does conflicts the states whole case.

The states case was very strongly clear that the subject whom committed the crime, in which one person was murder and two shot. was the subjec or subjects whom were seen running, across Galena Blv. and jump in to a car that was facing south infront of the Lincoln laundromat. Even the foundation they laid for the accountability is conflicted by Ms. Weakly's statement.

Even she, Weakly, alone would cast doubt on the states whole witnesses. whom they give conflicted testimonies of what they seen that night.

Shayla Johnson, testify, that she was walking back from the liquor store with her friend Nicole Pearson when saw a white car, in which she claims the defendant and some one else were hanging out yelling gang slogans

SEE EXHIBIT E Pg 88-119 (see Pg 91 and 101)

But Nicole Pearson, conflict shayla Johnson testimony whom testify that the people in the car just drove on with out saying nothing.

SEE EXHIBIT. E Pg 120-159 (see 137-138

Ms. Weakly's statement destroy's' the state whole case with out any doubt her statement will (would) have showed that the subject whom committed the crime ran a whole different direction.

There is no reason why Ms. Weakly's, statement or name was not disclose in the discovery

SEE EXHIBIT C

AND, Theres NO excuse why Mr. Kliment, did not go out and talk to witnesses whom could have probably lead him to such crucial evidence for the defendant.

Memoradum at law/Armando Amaya.

Respectfully submitted

Armando Amaya

Armando Amaya, Pro se

15 of 19

# AFFIDAVIT OF AFFIRMATION UNDER PENALTY OF PERJURY.

I, Armando Amaya, affiant, do here by declare and affirm under penalty of perjury as defined in 735 ILCS 5/1-109. That everything contained herein is true and accurate to the best of my kwoledge and belief. I Further declare and affirm that the contents of the foregoing documents are known to me and are accurate to the best of my knowledge and belief. Finally, I do declare and affim that the matter at hand is not taken either Frivolously or maliciously and that I believe the foregoing matter is taken in good Faith.

sing on this 22 day of April, 2007

Armando Amaya.
Armando Amaya, affiant

Armando Amaya K75877
Tamms C-Max
P.O. Box 2000
Tamms, ILL. 62988

16 of 19

STATE OF ILLINOIS )
                  ) SS
COUNTY OF KANE )

## AFFIDAVIT

I, Armando Amaya, First being duly sworn upon oath, deposes and states that the Facts covered in this affidavit are true and correct in substance, to the best of my knowledge, understanding, information and belief.

I am the movant in the attached petitions, seccessive petition for post-conviction and / petition for post-judgment, relief.

That I found out about Sharona C. Weakly's statement, during the process of of my post-conviction appeal... Thats I c didnot even know of her statement, to raise it at the trial or at stept of any petition, because, her statement was mark with a whole different incident number that, she was not a witness to, and her name, not once, was her name disclosed at any of the discovery process (Exhibit C )

That, I, in the attached petitions have done my best to raise the costitutional issue herein the petition. That I don't know the law. But, have seek probono help. "But, no one has answer me".

That, I, have ask Mr. kliment, what he knew of Ms. Weakly statement. and if he didnot, to please send me an affidavit in any way. with either information. I have send him transcripts, Ms. Weakly statement. and a draw of the incident (Map) to help him. recall the case 98-CF-535. But, he has not once answer any of my letters or requests.

That, the drawing of the map. is closed enough to, people's Exhibit 1 and 21. that were shown to the jury. That it may not be exact but, I have drew it from the information in the transcripts of the trial, which are part of my exhibits.

That if I would have knowen of Ms. Weakly statement before now, I would have raise it. the information in her statement is crucial. Beccause, the state whole case is set on, that, the subject, was with other subjects when he committed the crime and then they ran southbound. Ms. Weakly's statement conflicts all that. she tell the A-P-D that the subject ran alone Northbound. because she seen him. I would have never left this information out.

That, at some point I have believe, that either Mr. Kliment or, the state had no Knowledge of Ms. Weakly's statement. because her statement has been place in the wrong incident report.

There is no excuse why Mr. Kliment if he did Know of such crusial evidence he did not bring them to light... And there is no excuse why the state could not have disclose her to Mr. Kliment.

I'm also pointing out, That, I'm not even dark or light skinned. "That I had facial hair the day of my arest, and still do." That can be seen in people's exhibit 38".

That, I have attache a motion to leave and a petition for successive petition for post-conviction / post-judgment.

That I'm a lay-man to the law and don't understand "all this legal stuff."

That in light of the circuimstances, and all the above, I bring the attache motions in good faith for proper disposal. And that the above is true and correct to the best of my kwoledge. understanding, and, belief.

Respectfully submitted,
Armando Amayel
Armando Amaya. affiant


In accord with 28 U.S.C. 1746, I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Armando Amayel.
Armando Amaya. affiant

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

Case No. _98-CF-535_

| | | |
|---|---|---|
| *People*<br>Plaintiff(s) | *Armando Amya*<br>Defendant(s) | Clerk of the Circuit Court<br>Kane County, IL<br>**MAY 9 2007**<br>FILED<br>ENTERED    97<br>File Stamp |
| *Hajdokar*<br>Plaintiff(s) Atty. | Defendant(s) | |
| Judge *Wegner* | Court Reporter | Deputy Clerk |

A copy of this order [X] should be sent [ ] has been sent
Present
[ ] Plaintiff Atty. [ ] Defense Atty. [X] Other _Defendant_

## ORDER    1 of 2

This cause coming on to be heard upon Defendant's Motion for leave to file a successive Post-Conviction Petition, and the Court being fully advised of the premises:

The Court hereby finds as follows:

1. Case is currently on appeal from last post-conviction petition ruling on July 15, 2005. P v Harris, an opinion of the Illinois Supreme Court filed on January 19, 2007, held that there is no provision barring a post-conviction case from proceeding at the same time as a direct appeal.

1. 725 ILCS 5/122-1(f) states as follows: "Only one post-conviction petition may be filed by a petitioner without leave of court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (1) a prisoner shows cause be identifying an objective factor that impeded his or here ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process."

2. Cause for purposes of the cause and prejudice test, has been defined as some objective factor external to the defense that impeded counsel's efforts to raise the claim in an earlier proceeding, P v Pitsonbarger, 2002, 205 Ill 2d 444.

    a.. Defendant alleges that he was unaware of a statement given by Sharona Weekly because her statement was placed in the wrong incident file. However, a review of the proposed post-conviction petition indicates that defendant previously possessed Weekly's statement.

    b. 725 ILCS 5/122-2 requires that a petition shall have attached affidavits, records, or other evidence supporting its allegations or shall state why the same is not attached.
    The defendant has not attached an affidavit to his Motion to Allow with respect to Weekly's statement. It is unknown whether Weekly would give the same statement at trial .

Date: _____    [ ] Yes  Disposal  [ ] No  Disposal

Judge

EXHIBIT Q

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

Case No. _98-CF-535_

| | |
|---|---|
| Plaintiff(s) | Defendant(s) _Amaya_ |
| Plaintiff(s) Atty. | Defendant(s) |
| Judge | Court Reporter | Deputy Clerk |

A copy of this order ☐ should be sent ☐ has been sent
Present
☐ Plaintiff Atty. ☐ Defense Atty. ☐ Other _____

File Stamp

## ORDER     2 of 2

c. Nothing impeded defendant from raising this issue previously

3. The second prong of the analysis, as to whether a successive post-conviction petition may be filed, relates to prejudice, in terms of whether an error so infected the trial that the resulting conviction or sentence violated due process.

a. The defendant concludes that Weekly's testimony would have made a "big difference" in that it would have contradicted Tracy Johnson's testimony.

b. Credibility of Weekly's statement has not been tested nor is the statement in affidavit form.

c. According to the facts set forth in the first appeal, Tracy testified that just prior to the shooting, he had been drinking alcohol with his friends. He admitted before and after the incident that he drank a pint of gin and some beer and that he previously received substance abuse treatments. In addition, Tracy admitted that he had a prior conviction of a felony drug charge and convictions of several residential burglaries, burglary, attempted burglary, and retail theft.
Victims, Alonzo Matthews and Tara Harris testified, giving a description of the shooter and the facts surrounding the shooting. Shayla Johnson and Nicole Pearson also gave a description of the shooter with Shayla Johnson testifying that she recognized the shooter as someone she knew as "Scarecrow."

d. Defendant has failed to support the prejudice component necessary to file a successive post-conviction petition.

It is hereby Ordered that based upon the foregoing and other considerations, defendant's Motion for Leave to file a Successive Post-Conviction Petition, is denied.

It is further Ordered that the Clerk shall forward a copy of this Order to ASA Mark Stajdohar and the defendant. The defendant's copy to be sent certified mail within 10 days from the date hereof.

Date: _5/9/07_          ☐ Yes - Disposal  ☐ No - Disposal                    _____ Judge

P7MISC001 (11/99)          White Copy - Clerk          Yellow and Pink Copies - Parties