File Date: _____5 - 29 - 2008_____

Case No: _____07cv6793_____

ATTACHMENT # _____

EXHIBIT _____R to S_____

TAB (DESCRIPTION)

_____

1998 CF 000535  Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
                                                         User: LC1
     Case Names_____ Attorney Names_____  Wsid: CICSWITG0
              VS                                         All Entries Fo
     AMAYA ARMANDO            COLTON KATHLEEN
     FANCSALI JIM INV

__Date__

3/11/1998 Charge 01 Count 001 MURDER/INTENT TO KILL/INJURE Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/9-1(a)(1)  Class M  CSA O  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 NO BOND No Bond Oct 29,1997 Defendant AMAYA ARMANDO

3/11/1998 Charge 01 Count 002 MURDER/STRONG PROB KILL/INJURE Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/9-1(a)(2)  Class M  CSA O  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 Charge 01 Count 003 ATTEMPT MURDER/INTENT TO KILL/INJURE Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/9-1(a)(1)  Class M  CSA A  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 Charge 01 Count 004 ATTEMPT MURDER/INTENT TO KILL/INJURE Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/9-1(a)(1)  Class M  CSA A  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 Charge 01 Count 005 AGG BATTERY W/FIREARM/PERSON Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/12-4.2(a)(1)  Class X  CSA O  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 Charge 01 Count 006 AGG BATTERY W/FIREARM/PERSON Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/12-4.2(a)(1)  Class X  CSA O  Orig.
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 Charge 01 Count 007 AGG DISCHARGE FIREARM/OCC VEH Oct 29,1997
          Defendant AMAYA ARMANDO
          Statute 720 5/24-1.2(a)(2)  Class 1  CSA O  Added
          Agency: AURORA POLICE DEPT  Charge Instr: Complaint

3/11/1998 WARRANT ISSUED; COPY FILED

3/11/1998 ORD ISSUE WARRANT; FLD

3/11/1998 CHDC - COMPLAINT FOR PRELIMINARY HEARING; FLD

3/11/1998 CASE MAINTENANCE - JUDGE CHANGED

3/14/1998 PROCESS MAINTENANCE - PRCS STATUS UPDATED FROM OUT

3/14/1998 WARRANT SERVED; COPY FILED

C O N T I N U E D   O N   N E X T   P A G E

EXHIBIT R

COURT DOCKET - KANE COUNTY CIRCUIT CLERK                    CSF048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 3 of 11   3/20/2008
                    Criminal Felony                        Time: 14/37/02
                                                           Page:   2
        1998 CF 000535   Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
                                                           User: LC1
_Date_
3/14/1998 PROCESS MAINTENANCE - PRCS STATUS DATE UPDATED

3/14/1998 ORD REMAND CUSTODY; FLD
          STATUS HEARING Mar 19,1998 09:00AM Rm217  Judge GOLDEN

3/14/1998 ORD DEFT REMANDED FOR CCTV APPEARANCE

3/17/1998 ORD REMAND CUSTODY, SERVED

3/17/1998 SAO DATA TO TCX

3/19/1998 CT REPORTER THIS DATE - JEANINE MC CLERNON

3/19/1998 DEFT PRESENT IN OPEN COURT AND RIGHTS EXPLAINED

3/19/1998 ORDER CASE CONTINUED - STATUS
          STATUS HEARING Mar 26,1998 09:00AM Rm217  Judge GOLDEN

3/19/1998 MOTION FOR CONTINUANCE BY DEFENSE

3/19/1998 ORD DEFT REMANDED FOR CCTV APPEARANCE

3/26/1998 CT REPORTER THIS DATE - MARY BUSCH

3/26/1998 DEFT PRESENT IN OPEN COURT AND RIGHTS EXPLAINED

3/26/1998 MOTION FOR CONTINUANCE BY DEFENSE

3/26/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

3/26/1998 ORDER CASE CONTINUED - PRELIM HEARING
          STATUS HEARING Apr 16,1998 09:00AM Rm217  Judge GOLDEN

4/16/1998 CT REPORTER THIS DATE - L.A.N. NIELSEN

4/16/1998 DEF PENALTIES AND RIGHTS EXPLAINED VIA CCTV

4/16/1998 ORDER CASE CONTINUED - PRELIM HEARING
          PRELIMINARY HEARING Apr 30,1998 09:00AM Rm217  Judge HON ROGER W EICH

4/16/1998 MOT FOR CONTINUANCE BY PROSECUTION

4/16/1998 ORD APPOINT PUBLIC DEFENDER; FLD

4/16/1998 ORD DEFT REMANDED FOR CCTV APPEARANCE

4/21/1998 SUBPOENA DUCES TECUM; FLD
          AURORA POLICE DEPT./ATTN: LT. SKAGGS

4/21/1998 PROOF OF SERVICE; FLD

4/28/1998 CHDC - INDICTMENT; FLD

          C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 4 of 111    3/20/2008
                              Criminal Felony

                                                          Time: 14/37/02
                                                          Page:   3
       1998 CF 000535   Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
                                                          User: LC1

Date
4/28/1998 NOTICE TO APPEAR ISSUED

4/30/1998 ORD SUBPOENAED MATERIALS RECEIVED; FLD

4/30/1998 PEOPLE'S OMNIBUS DISCOVERY MOTION; FLD

4/30/1998 MO/DISCOVERY;FLD

4/30/1998 SPEEDY TRIAL DEMAND; FLD

4/30/1998 ARRAIGNMENT ORDER; FLD

4/30/1998 DEFT ARRAIGNED THIS DATE; FLD

4/30/1998 IN ABSENTIA EXPLAINED

4/30/1998 CT REPORTER THIS DATE - PAULA QUETSCH

4/30/1998 DEFT PRESENT IN OPEN COURT

4/30/1998 DEFT PRESENT IN OPEN COURT AND RIGHTS EXPLAINED

4/30/1998 MOTION FOR CONTINUANCE BY AGREEMENT

4/30/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

4/30/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING May 07,1998 09:00AM Rm313  Judge BRAWKA

4/30/1998 CASE MAINTENANCE - LOCATION CHANGED

4/30/1998 CASE MAINTENANCE - JUDGE CHANGED

5/07/1998 ANS TO DISCOVERY; FLD

5/07/1998 LIST OF WITNESSES; FLD

5/07/1998 CT REPORTER THIS DATE - ROSEANN GRADY

5/07/1998 DEFT PRESENT IN OPEN COURT

5/07/1998 MOTION FOR CONTINUANCE BY AGREEMENT

5/07/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

5/07/1998 DOCUMENTS TENDERED (SEE FF)
          DISCOVERY

5/07/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING May 21,1998 09:00AM Rm313  Judge DOYLE

5/21/1998 CT REPORTER THIS DATE - ROSEANN GRADY

          C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 5 of 111
Criminal Felony

1998 CF 000535   Judge: WEGNER GRANT S

CSP048
Date  3/20/2008
Time: 14/37/02
Page:   4
From  0/00/0000 To 99/99/9
User: LC1

Date
5/21/1998 DEFT PRESENT IN OPEN COURT

5/21/1998 ORDER CASE CONTINUED - STATUS
          STATUS HEARING May 29,1998 09:00AM Rm313  Judge DOYLE

5/21/1998 MOTION FOR CONTINUANCE BY DEFENSE

5/21/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

5/29/1998 COURT REPORTER THIS DATE - SUSAN BLOOM

5/29/1998 DEFT PRESENT IN OPEN COURT

5/29/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Jun 19,1998 09:00AM Rm313  Judge HUDSON

5/29/1998 MOTION FOR CONTINUANCE BY AGREEMENT

5/29/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

6/19/1998 CT REPORTER THIS DATE - BILL O'CONNELL

6/19/1998 DEFT PRESENT IN OPEN COURT

6/19/1998 MOTION FOR CONTINUANCE BY DEFENSE

6/19/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

6/19/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Jul 02,1998 09:00AM Rm313  Judge HON JOHN L PETERS

7/02/1998 CT REPORTER THIS DATE - L.A.N. NIELSEN

7/02/1998 DEFT PRESENT IN OPEN COURT

7/02/1998 ORDER CASE CONTINUED - STATUS
          STATUS HEARING Jul 16,1998 01:00PM Rm313  Judge HUDSON

7/02/1998 MOTION FOR CONTINUANCE BY AGREEMENT

7/02/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

7/16/1998 CT REPORTER THIS DATE - L.A.N. NIELSEN

7/16/1998 DEFT PRESENT IN OPEN COURT

7/16/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Aug 06,1998 01:00PM Rm313  Judge HUDSON

7/16/1998 MOTION FOR CONTINUANCE BY DEFENSE

7/16/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK    5    CSP048
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 6 of 111  3/20/2008
Criminal Felony
Time: 14/37/02
Page:  5

1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
User: LC1

Date
8/05/1998 NO COURT REPORTER PRESENT

8/05/1998 DEFT NOT APPEARING IN OPEN COURT

8/05/1998 MOTION FOR CONTINUANCE BY AGREEMENT

8/05/1998 ORD TRANSPORT DEFT; FLD

8/05/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Aug 06,1998 09:00AM Rm313  Judge HUDSON

8/06/1998 NO COURT REPORTER PRESENT

8/06/1998 DEFT PRESENT IN OPEN COURT

8/06/1998 MOTION FOR CONTINUANCE BY AGREEMENT

8/06/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

8/06/1998 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
          MOTION/PETITION HEARING Aug 12,1998 01:00PM Rm313  Judge HUDSON

8/12/1998 SUPPLEMENTAL DISCLOSURE; FLD

8/12/1998 CT REPORTER THIS DATE - PEGGY STEINBERG

8/12/1998 DEFT PRESENT IN OPEN COURT

8/12/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

8/12/1998 MOTION FOR CONTINUANCE BY DEFENSE

8/12/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Sep 25,1998 09:00AM Rm313  Judge HUDSON

9/25/1998 CT REPORTER THIS DATE - KATHY NIELSEN

9/25/1998 DEFT PRESENT IN OPEN COURT

9/25/1998 MOTION FOR CONTINUANCE BY DEFENSE

9/25/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

9/25/1998 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Oct 30,1998 09:00AM Rm313  Judge HUDSON

10/30/1998 CT REPORTER THIS DATE - BILL O'CONNELL

10/30/1998 DEFT PRESENT IN OPEN COURT

10/30/1998 MOTION FOR CONTINUANCE BY AGREEMENT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK                    6    CSP048
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 7 of 111  3/20/2008
                  Criminal Felony                              Time: 14/37/02
                                                               Page:    6
        1998 CF 000535  Judge: WEGNER GRANT S        From  0/00/0000 To 99/99/9
                                                             User: LC1

__Date__

10/30/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

10/30/1998 ORDER CASE CONTINUED - STATUS
           STATUS HEARING Nov 06,1998 09:00AM Rm313  Judge WEGNER

11/06/1998 CT REPORTER THIS DATE - ROSEANN GRADY

11/06/1998 DEFT PRESENT IN OPEN COURT

11/06/1998 ORDER CASE CONTINUED - PRE-TRIAL
           STATUS HEARING Nov 09,1998 09:00AM Rm313  Judge DOYLE

11/06/1998 MOTION FOR CONTINUANCE BY AGREEMENT

11/06/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

11/09/1998 CT REPORTER THIS DATE - L.A.N. NIELSEN

11/09/1998 DEFT PRESENT IN OPEN COURT

11/09/1998 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
           MOTION/PETITION HEARING Dec 18,1998 09:00AM Rm313  Judge HUDSON

11/09/1998 ORDER CASE CONTINUED - JURY TRIAL
           JURY TRIAL Jan 25,1999 09:00AM Rm313  Judge HUDSON

11/09/1998 MOTION FOR CONTINUANCE BY AGREEMENT

11/09/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

11/09/1998 DEFENDANT TO APPEAR IN STREET CLOTHES

12/18/1998 CT REPORTER THIS DATE - L.A.N. NIELSEN

12/18/1998 DEFT PRESENT IN OPEN COURT

12/18/1998 ORDER CASE CONTINUED - JURY TRIAL
           JURY TRIAL Jan 25,1999 09:00AM Rm313  Judge HUDSON

12/18/1998 MOTION FOR CONTINUANCE BY AGREEMENT

12/18/1998 ORD DEFT REMANDED/ORD TO TRANSPORT

12/18/1998 DEFENDANT TO APPEAR IN STREET CLOTHES

12/23/1998 SUBPOENA DUCES TECUM; FLD
           MERCY CENTER HOSPITAL/KEEPER OF THE RECORDS

12/23/1998 PROOF OF SERVICE; FLD

12/23/1998 SUBPOENA DUCES TECUM; FLD
           MERCY CENTER HOSPITAL/KEEPER OF THE RECORDS

          C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          7   CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 8 of 111 3/20/2008
          Criminal Felony                                Time: 14/37/02
                                                         Page:    7
     1998 CF 000535  Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
                                                         User: LC1

__Date__

12/23/1998 PROOF OF SERVICE; FLD

1/08/1999 CRIMINAL SUBPOENA RETURNED, F
          DR. LAWRENCE COGAN

1/08/1999 PROOF OF SERVICE; FLD

1/11/1999 CRIMINAL SUBPOENA RETURNED, F
          GEORGE GAMBOA

1/11/1999 PROOF OF SERVICE; FLD

1/14/1999 PETN FOR WRIT/HABEAS CORPUS; FLD

1/14/1999 ORD WRIT OF HABEAS CORPUS; FLD
          TRACEY LAMAR JOHNSON
          JURY TRIAL Jan 27,1999 09:00AM Rm313  Judge HUDSON

1/15/1999 NO FILE IN COURT THIS DATE

1/15/1999 CT REPORTER THIS DATE - L.A.N. NIELSEN

1/15/1999 DEFT NOT APPEARING IN OPEN COURT

1/15/1999 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
          MOIL
          MOTION/PETITION HEARING Jan 21,1999 09:00AM Rm313  Judge HUDSON

1/15/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/15/1999 SUPPLEMENTAL DISCLOSURE; FLD

1/15/1999 VERIFICATION OF FILING; FLD

1/15/1999 PROOF OF SERVICE; FLD

1/15/1999 CRIMINAL SUBPOENA RETURNED, F
          SHAYLA DUSHUN JOHNSON

1/15/1999 PROOF OF SERVICE; FLD

1/19/1999 CRIMINAL SUBPOENA RETURNED, F
          INV. GENE GAUER, INV. JEFF SAUER, INV. BRIAN
          OLSEN, SGT. MICHAEL PEREZ, SGT. MIKE LANGSTON,
          INV. JAMES FANCSALI, OFC. HILGENBERG

1/19/1999 PROOF OF SERVICE; FLD

1/21/1999 CT REPORTER THIS DATE - DEBBIE SCHWEER

1/21/1999 DEFT PRESENT IN OPEN COURT

          C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 9 of 111   3/20/2008
Criminal Felony   Time: 14/37/02
Page:   8

1998 CF 000535   Judge: WEGNER GRANT S   From  0/00/0000 To 99/99/9
User: LC1

Date
1/21/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/21/1999 ORDER CASE CONTINUED - STATUS
          STATUS HEARING Jan 21,1999 01:00PM Rm313  Judge HUDSON

1/21/1999 MO/ IN LIMINE; FLD

1/22/1999 CT REPORTER THIS DATE - DEBBIE SCHWEER

1/22/1999 DEFT PRESENT IN OPEN COURT

1/22/1999 ORDER CASE CONTINUED - PRE-TRIAL
          STATUS HEARING Jan 22,1999 09:00AM Rm217  Judge HUDSON

1/22/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/22/1999 SUPPLEMENTAL DISCLOSURE; FLD

1/22/1999 MO/ IN LIMINE; FLD

1/22/1999 SUPPLEMENTAL DISCLOSURE; FLD
          TO STATE

1/22/1999 ANS TO DISCOVERY; FLD
          DEFT'S

1/22/1999 MO/ IN LIMINE; FLD
          STATE'S

1/22/1999 SUPPLEMENTAL DISCLOSURE; FLD
          DEFT'S

1/22/1999 LIST OF WITNESSES; FLD
          DEFT'S

1/22/1999 MO/ IN LIMINE; FLD

1/22/1999 CT REPORTER THIS DATE - DEBBIE SCHWEER

1/22/1999 DEFT PRESENT IN OPEN COURT

1/22/1999 ORDER CASE CONTINUED - JURY TRIAL
          JURY TRIAL Jan 25,1999 09:00AM Rm313  Judge HUDSON

1/22/1999 MOTION FOR CONTINUANCE BY AGREEMENT

1/22/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/22/1999 DEFENDANT TO APPEAR IN STREET CLOTHES

1/22/1999 SUPPLEMENTAL DISCLOSURE; FLD

CONTINUED ON NEXT PAGE

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 10 of 111 3/20/2008
Criminal Felony

9   CSP048
Date: 3/20/2008
Time: 14/37/02
Page:   9

1998 CF 000535  Judge: WEGNER GRANT S        From 0/00/0000 To 99/99/9
User: LC1

Date
1/22/1999 CT REPORTER THIS DATE - DEBBIE SCHWEER

1/22/1999 ORD GRANT; FLD *
          STATE'S MOIL: PART 1 - GRANTED
          PART 2- DEFENSE CAN BRING OUT FACT THAT POUCH
          WAS FOUND AT THE SCENE            PART 3- GR
          ANTED

1/22/1999 STATUS ORDER
          DEFT'S MOIL:  POINT 2- DENIED RE: GANG EVID
          POINT 3- GRANTED RE: OTHER OFFENSES
          POINT 4- WITHDRAWN RE: "SCARECROW" NICKNAME

1/25/1999 ANS TO DISCOVERY; FLD
          DEFT'S SUPPLEMENTAL ANSWER TO DISCOVERY

1/25/1999 LIST OF WITNESSES; FLD
          STATE'S

1/25/1999 MO/ IN LIMINE; FLD
          STATE'S SECOND

1/25/1999 CRIMINAL SUBPOENA RETURNED, F
          NICOLE PEARSON

1/25/1999 CRIMINAL SUBPOENA RETURNED, F
          SHAYLA DUSHUN JOHNSON

1/25/1999 CT REPORTER THIS DATE - L.A.N. NIELSEN

1/25/1999 STATUS ORDER
          WARRANT TO ISUE INSTANTER FOR NICOLE NAOMI PEARSON
          (A WITNESS IN THIS CASE) DUE TO HER FALURE TO APPE
          AR PURSUANT TO A SUBPEONA

1/25/1999 STATUS ORDER
          WARRANT TO ISSUE INSTANTER FOR SHAYLA DESHUN
          JOHNSON (A WITNESS IN THIS CASE) DUE TO HER FAILUR
          E TO APPEAR PURSUANT TO A SUBPEONA

1/25/1999 CT REPORTER THIS DATE - L.A.N. NIELSEN

1/25/1999 CLERK'S MINUTE ORDER; FLD

1/25/1999 CT REPORTER THIS DATE - PAULA QUETSCH

1/25/1999 DEFT PRESENT IN OPEN COURT

1/25/1999 ORDER CASE CONTINUED - JURY TRIAL
          JURY TRIAL Jan 26,1999 09:00AM Rm313  Judge HUDSON

1/25/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK        10   CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 1 of 11 3/20/2008
                    Criminal Felony                                    Time: 14/37/02
                                                                       Page:  10
        1998 CF 000535  Judge: WEGNER GRANT S        From  0/00/0000 To 99/99/9
                                                               User: LC1

Date

1/25/1999 DEFENDANT TO APPEAR IN STREET CLOTHES

1/26/1999 CLERK'S MINUTE ORDER; FLD

1/26/1999 CT REPORTER THIS DATE - PAULA QUETSCH

1/26/1999 DEFT PRESENT IN OPEN COURT AND RIGHTS EXPLAINED

1/26/1999 ORDER CASE CONTINUED - PRE-TRIAL
          JURY TRIAL Jan 27,1999 09:00AM Rm313   Judge HUDSON

1/26/1999 MOTION FOR CONTINUANCE BY THE COURT

1/26/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/26/1999 DEFENDANT TO APPEAR IN STREET CLOTHES

1/26/1999 Clerk's minute order; filed
          Jury B
          Judge:WEGNER GRANT S    Clerk:LC1    M

1/27/1999 AGREED ORDER; FLD *

1/27/1999 NO COURT REPORTER PRESENT

1/27/1999 ORD OF RELEASE; FLD
          WITNESS SHAYLA DESHUN JOHNSON TO BE RELEASED FROM
          CUSTODY (WARRANT ON THIS CASE)

1/27/1999 CRIMINAL SUBPOENA RETURNED, F
          TARA HARRIS

1/27/1999 CLERK'S MINUTE ORDER; FLD

1/27/1999 WARRANT SERVED; COPY FILED
          ON WITNESS SHAYLA D JOHNSON/ORDER OF RELEASE

1/27/1999 CT REPORTER THIS DATE - PAULA QUETSCH

1/27/1999 DEFT PRESENT IN OPEN COURT

1/27/1999 ORDER CASE CONTINUED - PRE-TRIAL
          JURY TRIAL Jan 28,1999 09:00AM Rm313   Judge HUDSON

1/27/1999 DEFENDANT TO APPEAR IN STREET CLOTHES

1/28/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/28/1999 JURY - REFUSED INSTRUCTIIONS; FLD
          5 PAGES FILED

1/28/1999 CRIMINAL SUBPOENA RETURNED, F

                C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 12 of 111 3/20/2008
Criminal Felony

Time: 14/37/02
Page:  11

1998 CF 000535  Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
User: LC1

Date
1/28/1999 INV. DOERZAPH
          A.P.D.

1/28/1999 Court reporter this date-Paula Quetsch

1/28/1999 Defendant present in open court

1/28/1999 ORDER CASE CONTINUED - JURY TRIAL
          STATUS HEARING Jan 29,1999 09:00AM Rm313  Judge HUDSON

1/28/1999 Order defendant remanded with order to transport

1/28/1999 Defendant to appear in street clothes

1/28/1999 CLERK'S MINUTE ORDER; FLD

1/28/1999 CRIMINAL SUBPOENA RETURNED, F
          INV. SCOTT WOLTERS #157 A.P.D.

1/28/1999 Court Exhibit Sheet; filed

1/29/1999 STATUS ORDER
          THE DEFT IS ALLOWED TO CHANGE INTO A CLEAN SHIRT
          PROVIDED BY HIS ATTY.  ATTY TO TAKE OLD SHIRT WITH
          HIM

1/29/1999 JURY INSTRUCTIONS; FLD

1/29/1999 UNUSED VERDICTS; FLD
          8 PAGES

1/29/1999 CLERK'S MINUTE ORDER; FLD

1/29/1999 VERDICT OF GUILTY; FLD
          6 PAGES

1/29/1999 ORDER CASE CONTINUED - SENTENCING HEARING
          SENTENCING HEARING Apr 08,1999 01:00PM Rm313  Judge HUDSON

1/29/1999 ORD CHDS - DISMISSED / STATE MOTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

1/29/1999 ORD CHDS - GUILTY CONVICTION

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 13 of 111   Date: 3/20/2008
Criminal Felony                                                Time: 14/37/02
                                                               Page:  12
                                        From  0/00/0000 To 99/99/9
1998 CF 000535   Judge: WEGNER GRANT S                           User: LC1

Date
1/29/1999 ORD REVOKE BOND; FLD

1/29/1999 ORD PRE-SENTENCE INVESTIGATION; FLD

1/29/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

1/29/1999 EXHIBIT SHEET(S); FLD
          4 PAGES

1/29/1999 EXHIBIT LOCATED IN VAULT # *

1/29/1999 JUROR QUESTIONS; FLD

1/29/1999 JUROR QUESTIONS; FLD

1/29/1999 Judgment order; filed
          Judge:WEGNER GRANT S   Clerk:LC1   M

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/02/1999 DISPOSITION REPORTED TO AOIC - SOS

2/25/1999 NOT/FILING; FLD

2/25/1999 CERT OF SERVICE; FLD

2/25/1999 POST TRIAL MOTION; FLD

3/18/1999 NOT/FILING; FLD

3/18/1999 PROOF OF SERVICE; FLD

3/18/1999 SUPPLEMENTAL DISCLOSURE; FLD

3/25/1999 Supplemental disclosure; filed

3/25/1999 Notice of filing; filed

3/25/1999 Proof of service; filed

3/31/1999 CRIMINAL SUBPOENA RETURNED, F
          INV JAMES FANCSALI 221 APD, INV MARK WEEKS 273 APD
          MIKE GUMZ 165 APD, SGT MICHAEL PEREZ 127 APD

C O N T I N U E D   O N   N E X T   P A G E

Criminal Felony

1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9

__Date__

4/08/1999 ORDER CASE CONTINUED - SENTENCING HEARING
          SENTENCING HEARING May 05,1999 01:00PM Rm313  Judge HUDSON

4/08/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

4/19/1999 CRIMINAL SUBPOENA RETURNED, F
          OFC. LONG, OFC. DEAN, OFC. MIKE GUMZ, SGT. MICHAEL
          PEREZ, INV. MARK WEEKS, INV. JAMES FANCSALI

4/19/1999 PROOF OF SERVICE; FLD

4/22/1999 NOT/MOTION; FLD
          INV. JEWEL HARRIS

4/22/1999 CERT OF MAILING; FLD

4/22/1999 CRIMINAL SUBPOENA RETURNED, F
          PATRICK CRIMMINS

4/22/1999 PROOF OF SERVICE; FLD

5/05/1999 CT REPORTER THIS DATE - PEGGY STEINBERG

5/05/1999 DEFT PRESENT IN OPEN COURT

5/05/1999 MOTION FOR CONTINUANCE BY AGREEMENT

5/05/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

5/05/1999 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
          SENTENCING HEARING Jun 10,1999 01:00PM Rm313  Judge HUDSON

5/05/1999 CLERK'S MINUTE ORDER; FLD

5/05/1999 PRE-SENTENCE REPORT; FLD

6/10/1999 CT REPORTER THIS DATE - DEBBIE SCHWEER

6/10/1999 DEFT PRESENT IN OPEN COURT

6/10/1999 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
          MOTION/PETITION HEARING Jul 15,1999 01:00PM Rm313  Judge HUDSON

6/10/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

7/15/1999 CT REPORTER THIS DATE - L.A.N. NIELSEN

7/15/1999 DEFT PRESENT IN OPEN COURT

7/15/1999 MOTION FOR CONTINUANCE BY DEFENSE

7/15/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          14   CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 15 of 111 3/20/2008
Criminal Felony                          Time: 14/37/02
                                         Page:  14
1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
                                         User: LC1

Date
7/15/1999 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
          POST TRIAL SENTENCING
          MOTION/PETITION HEARING Aug 12,1999 01:00PM Rm313  Judge HUDSON

8/12/1999 CT REPORTER THIS DATE - PEGGY STEINBERG

8/12/1999 DEFT PRESENT IN OPEN COURT AND RIGHTS EXPLAINED

8/12/1999 CLERK'S MINUTE ORDER; FLD

8/12/1999 EXHIBIT SHEET(S); FLD

8/12/1999 EXHIBIT LOCATED IN VAULT # *

8/12/1999 PRE-SENTENCE REPORT; FLD

8/12/1999 JUDGEMENT ORDER; FILED

8/12/1999 I.D.O.C JUDGEMENT ORDER; FLD

8/12/1999 MOTION FOR CONTINUANCE BY AGREEMENT

8/12/1999 I.D.O.C JUDGEMENT ORDER; FLD

8/12/1999 ORD DEFT REMANDED/ORD TO TRANSPORT

8/12/1999 I.D.O.C JUDGEMENT ORDER; FLD

8/12/1999 ORD SENT TO DEPT OF CORRECTIONS
          040YR 00MO 000DY    1

8/12/1999 ORD SENT - CREDIT FOR TIME SERVED

8/12/1999 ORD SENT TO DEPT OF CORRECTIONS
          012YR 00MO 000DY    1

8/12/1999 ORD SENT - CREDIT FOR TIME SERVED

8/12/1999 ORD SENT TO DEPT OF CORRECTIONS
          010YR 00MO 000DY    1

8/12/1999 ORD SENT - CREDIT FOR TIME SERVED

8/12/1999 SENT MAINTENANCE - SENT LENGTH ELEMENTS UPDATED

8/12/1999 SENT MAINTENANCE - SENT LENGTH ELEMENTS UPDATED

8/12/1999 SENT MAINTENANCE - CONSEC/CONCRNT INDICATOR UPDT

8/12/1999 SENT MAINTENANCE - CONSEC/CONCRNT INDICATOR UPDT

8/12/1999 SENT MAINTENANCE - CONSEC/CONCRNT INDICATOR UPDT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Criminal Felony
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 16 of 111

15    CSP048
3/20/2008
Time: 14/37/02
Page:  15

1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
User: LC1

__Date__

8/12/1999 ORDER CASE CONTINUED - SENTENCING HEARING
          SENTENCING HEARING Aug 13,1999 09:00AM Rm313  Judge HUDSON

8/12/1999 CHDS MAINTENANCE - PLEA UPDATED

8/12/1999 CHDS MAINTENANCE - TYPE UPDATED

8/12/1999 ORD CHDS - MERGE W/OTHER CHARGE

8/12/1999 CHDS MAINTENANCE - CHDS DATE UPDATED

8/12/1999 CHDS MAINTENANCE - PLEA UPDATED

8/12/1999 CHDS MAINTENANCE - TYPE UPDATED

8/12/1999 ORD CHDS - MERGE W/OTHER CHARGE

8/12/1999 CHDS MAINTENANCE - CHDS DATE UPDATED

8/13/1999 CT REPORTER THIS DATE - PEGGY STEINBERG

8/13/1999 I.D.O.C JUDGEMENT ORDER; FLD

9/21/1999 MO TO RECONSIDER; FLD
          SENTENCE

9/27/1999 CASE MAINTENANCE - PHASE CHANGED

9/27/1999 Case Closed
          Status:Closed  Report:Terminated  Sep 27,1999

10/22/1999 NOT/MOTION; FLD

10/22/1999 PROOF OF SERVICE; FLD

10/29/1999 CT REPORTER THIS DATE - DEBBIE HOGAN

10/29/1999 DEFT NOT APPEARING IN OPEN COURT

10/29/1999 ORDER  CASE CONTINUED - MOTION/PETITION HEARING
           MOTION/PETITION HEARING Dec 16,1999 01:00PM Rm313  Judge HUDSON

10/29/1999 MOTION FOR CONTINUANCE BY DEFENSE

10/29/1999 ORD STATE TO WRIT; FLD

10/29/1999 NO FILE IN COURT THIS DATE

12/16/1999 NO COURT REPORTER PRESENT

12/16/1999 DEFT NOT APPEARING IN OPEN COURT

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          16   CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 17 of 111 3/20/2008
Criminal Felony                                   Time: 14/37/02
                                                  Page:  16
1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
                                                  User: LC1

__Date__
12/16/1999 ORDER CASE CONTINUED - PRE-TRIAL
           STATUS HEARING Jan 18,2000 01:00PM Rm313  Judge HUDSON

12/16/1999 ORD STATE TO WRIT; FLD

12/21/1999 WRIT OF HABEAS CORPUS ISSUED; FLD

12/21/1999 PETN FOR WRIT/HABEAS CORPUS; FLD

12/21/1999 ORD WRIT OF HABEAS CORPUS; FLD

 1/18/2000 CT REPORTER THIS DATE/VICKI COHEN

 1/18/2000 DEFT PRESENT IN OPEN COURT

 1/18/2000 ORD DENY MO/PETN/REQUEST; FLD_*
           DEFENSE MOTION TO RECONSIDER SENTENCE
           DENIED FOR THE REASON STATED ON THE RECORD

 1/18/2000 APPEAL NOTICE; FLD

 1/18/2000 PETN FOR APPOINTMENT OF COUNSEL; FLD

 1/18/2000 REQUEST FOR PREP OF COMMOM LAW RECORD; FLD

 1/18/2000 REQUEST FOR TRANSCRIPT; FLD

 1/18/2000 ORD APPOINT APPELLATE DEFENDER; FLD

 1/21/2000 RECEIPT; FLD

 1/21/2000 Appeal record receipt; filed
           from Appellate Court
           Judge:WEGNER GRANT S   Clerk:LC1   M

 1/24/2000 REPORT OF PROCEEDINGS; FLD
           DEBRA HOGAN
           10-29-99

 1/24/2000 REPORT OF PROCEEDINGS; FLD
           DEBBIE HOGAN - 10-29-99

 1/25/2000 RECEIPT; FLD

 1/27/2000 PUBLIC DEFENDER WITHDRAWN

 1/27/2000 RECEIPT; FLD

 1/28/2000 RECEIPT; FLD

 2/09/2000 REPORT OF PROCEEDINGS; FLD
           MARIANN BUSCH - 3-26-98

           CONTINUED  ON  NEXT  PAGE

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 18 of 111 3/20/2008
Criminal Felony
Time: 14/37/02
Page:  17
17   CSF048

1998 CF 000535  Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
User: LC1

__Date__

2/09/2000 Verification of filing; filed
from Mariann Busch
Judge:WEGNER GRANT S    Clerk:LC1    M

2/10/2000 REPORT OF PROCEEDINGS; FLD
MARGARET STEINBERG - 8-12-98 / 5-5-99 / 8-12-99
8-13-99

2/10/2000 Verification of filing; filed
Peggy Steinberg
Judge:WEGNER GRANT S    Clerk:LC1    M

2/14/2000 REPORT OF PROCEEDINGS; FLD
PAULA QUETSCH - 4-30-98 / 1-25-99 / 1-26-99 /
1-27-99 / 1-28-99

2/14/2000 Verification of filing; filed
from Paula Quetsch
Judge:WEGNER GRANT S    Clerk:LC1    M

2/17/2000 REPORT OF PROCEEDINGS; FLD
KATHERINE NIELSEN - 9-25-98

2/17/2000 Verification of filing; filed
from Kathy Nielsen
Judge:WEGNER GRANT S    Clerk:LC1    M

2/18/2000 REPORT OF PROCEEDINGS; FLD
SUSAN BLOOM - 5-29-98

2/18/2000 REPORT OF PROCEEDINGS; FLD
DEBBIE SCHWEER - 6-10-99 / 1-22-99 / 1-21-99

2/18/2000 Verification of filing; filed
from Susan Bloom
Judge:WEGNER GRANT S    Clerk:LC1    M

2/18/2000 Verification of filing; filed
from Debbie Schweer
Judge:WEGNER GRANT S    Clerk:LC1    M

3/01/2000 REPORT OF PROCEEDINGS; FLD
LAN NIELSEN - 4-16-98 / 7-2-98 / 7-16-98 /
11-9-98 / 12-18-98 / 1-29-99 / 7-15-99 / 1-25-99

3/01/2000 Verification of filing; filed
From LAN Nielsen
Judge:WEGNER GRANT S    Clerk:LC1    M

3/06/2000 REPORT OF PROCEEDINGS; FLD
LAN NIELSEN - 1-15-98 NO RECORD TAKEN

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Criminal Felony
1998 CF 000535  Judge: WEGNER GRANT S          From  0/00/0000 To 99/99/9

Date: 3/20/2008
Time: 14/37/02
Page:  18
User: LC1

Date
3/06/2000 REPORT OF PROCEEDINGS; FLD
          WILLIAM O'CONNELL - 6-19-98 / 10-30-98

3/06/2000 Verification of filing; filed
          from Bill O'Connell
          Judge:WEGNER GRANT S    Clerk:LC1    M

3/10/2000 CORRESP/APPELLATE COURT; FLD

3/14/2000 REPORT OF PROCEEDINGS; FLD
          JEANINE PERINA - 3-19-98

3/14/2000 Verification of filing; filed
          from Jeanine Perina

3/16/2000 REPORT OF PROCEEDINGS; FLD
          VICKI COHEN - 1-18-00

3/16/2000 Verification of filing; filed
          from Vickie Cohen

3/20/2000 RECEIPT; FLD
          5-VOL. REPORT OF PROCEEDINGS
          1-VOL. COMMON LAW RECORD
          CERT. IN LIEU OF RECORD ON APPEAL      G. JOSEPH
          WELLER

3/20/2000 CERTIFICATE OF MAILING

8/23/2000 RECEIPT; FLD
          LARRY WECHTER

8/30/2000 REPORT OF PROCEEDINGS; FLD
          FROM L.A.N DATE OF 4-8-99 SENT TO THE OFFICE OF
          THE APPELLATE DEFENDER.

8/30/2000 Verification of filing; filed
          from LAN Nielsen

9/06/2000 RECEIPT; FLD
          FROM LARY WECHTER

9/27/2000 MOTION; FLD
          MOTION FOR LEAVE TO FILE THE ATTACHED MOTION FOR
          A NEW TRIAL

9/27/2000 MO/PETN FOR NEW TRIAL; FLD

9/27/2000 AFFIDAVIT SIGNED BY; FLD

9/27/2000 MEMORANDUM OF LAW; FLD

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK

Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 20 of 111

19    CSP048
Date: 3/20/2008
Time: 14/37/02
Page:   19

Criminal Felony

1998 CF 000535  Judge: WEGNER GRANT S        From  0/00/0000 To 99/99/9
User: LC1

Date
9/27/2000 PROOF OF SERVICE; FLD

1/08/2001 STATES ATTORNEY STATEMENT; FLD

11/16/2001 APPEAL MANDATE AFFIRMING; FLD
AOND VACATED IN PART

1/14/2002 COPY APPEAL RECPT<RECORDS/ ROPS/ EXHIBITS; FLD
11-29-01

2/13/2002 No file in court this date
Judge:HUDSON DONALD C   Rep:NIELSEN LOUIS A      M

2/13/2002 Appearance; filed

2/13/2002 Status order
clerk is to turn over to either attorney jennifer waaler
or attorney colton  copy of record of appeal
including transcripts, for purposes of preparation of

post conviction petition
Judge:HUDSON DONALD C   Rep:NIELSEN LOUIS A   Clerk:JLS   M

3/15/2002 Notice of filing; filed
Judge:HUDSON DONALD C   Clerk:JME   M

3/15/2002 Proof of service; filed

3/15/2002 Motion
petition for post-conviction hearing and relief
Judge:HUDSON DONALD C   Clerk:JME   M

3/28/2002 Receipt *
Judge:HUDSON DONALD C   Clerk:LMF   M

7/09/2003 Notice of

7/09/2003 Certificate of mailing; filed

7/09/2003 MOTION/PETITION HEARING Aug 14,2003 09:00AM Rm313

8/14/2003 STATUS HEARING Oct 02,2003 09:00AM Rm313  Judge GOLDEN

8/14/2003 Defendant not appearing in open court
in IDOC
Judge:GOLDEN PATRICIA P   Rep:LE COMTE KATHLEEN D   M

8/14/2003 Motion for continuance by agreement

10/02/2003 Defendant present in court via close circuit video; filed
Judge:GOLDEN PATRICIA P   Rep:WELTMER JACQUELINE S   M

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 21 of 111   Date: 3/20/2008
Criminal Felony   Time: 14/37/02
Page:   20
From  0/00/0000 To 99/99/9
User: LC1

1998 CF 000535  Judge: WEGNER GRANT S

Date

10/02/2003 STATUS HEARING Dec 04,2003 09:00AM Rm313  Judge GOLDEN
           on petition and setting

10/02/2003 Motion for continuance by agreement

10/03/2003 Notice of filing; filed
           Judge: HUDSON DONALD C

10/03/2003 Affidavit signed by
           Judge: HUDSON DONALD C

10/03/2003 Affidavit signed by
           Judge: HUDSON DONALD C

12/04/2003 STATUS HEARING Jan 29,2004 09:00AM Rm313  Judge HUDSON

12/04/2003 Defendant not appearing in open court
           IN IDOC
           Judge: HUDSON DONALD C   Rep: LEDVORA MARGARET M     M

12/04/2003 Order State to writ; filed
           Judge: HUDSON DONALD C   Rep: LEDVORA MARGARET M     M

12/04/2003 Motion for continuance by agreement

1/29/2004 STATUS HEARING Mar 04,2004 09:00AM Rm313  Judge HUDSON

1/29/2004 Defendant not appearing in open court
          IDOC
          Judge: HUDSON DONALD C   Rep: HOGAN DEBRA A     M

1/29/2004 Case note/STATE TO WRIT

3/04/2004 Writ of Habeas Corpus issued; filed Defendant AMAYA ARMANDO
          Judge: HUDSON DONALD C   Clerk: MKW    M

3/04/2004 Defendant not appearing in open court
          in idoc
          Judge: HUDSON DONALD C   Rep: KADLEC JILL A     M

3/04/2004 MOTION/PETITION HEARING May 19,2004 01:00PM Rm313  Judge HUDSON

3/04/2004 Order State to writ; filed
          Judge: HUDSON DONALD C   Rep: KADLEC JILL A     M

3/04/2004 Motion for continuance by agreement

3/04/2004 Motion to dismiss; filed
          state's to dismiss post-conviction
          petition
          Judge: HUDSON DONALD C   Rep: KADLEC JILL A     M

C O N T I N U E D   O N   N E X T   P A G E

1998 CF 000535  Judge: WEGNER GRANT S

__Date__

3/04/2004 Notice of filing; filed
          Judge:HUDSON DONALD C    Rep:KADLEC JILL A      M

3/04/2004 Certificate of Attorney Citation Proceedings; fld
          pursuant to supreme court rule 651c

3/04/2004 Petition for writ of Habeas Corpus; filed
          Judge:HUDSON DONALD C    Clerk:JLS    M

3/04/2004 Order writ of habeas corpus; filed

4/29/2004 Notice of MOTION

4/29/2004 Proof of service; filed

4/29/2004 Motion
          for findings pursuant to ILCS 5/122-2.1(a)(2) post-conviction
          petition act

4/29/2004 Motion to strike; filed *
          motion to dismiss post-conviction petition

5/19/2004 Defendant present in open court
          Judge:HUDSON DONALD C    Rep:SCHWEER DEBBIE D      M

5/19/2004 RULING Jul 29,2004 01:00PM Rm313  Judge HUDSON
          RULING ON STATE'S MOTION TO DISMISS

5/19/2004 Motion/Petition withdrawn
          DEFT'S MOTION TO STRIKE MOTION TO DISMISS POST CONVICTION PETITION IS
          WITHDRAWN
          STATE WITHDRAWS PARAGRAPH 9 OF MOTION DISMISS
          Judge:HUDSON DONALD C    Rep:SCHWEER DEBBIE D      M

5/19/2004 Writ to continue for next date
          Judge:HUDSON DONALD C    Rep:SCHWEER DEBBIE D      M

7/29/2004 Defendant present in custody
          in IDOC
          Judge:HUDSON DONALD C    Rep:STEINBERG MARGARET E      M

7/29/2004 RULING Jul 29,2004 01:00PM Rm313  Judge HUDSON

7/29/2004 Motion/Petition withdrawn
          Def's motion to strike motion to dismiss post conviction post
          conviction is withdrawn / State with/s paragraph 9 of motion dismiss
          Judge:HUDSON DONALD C    Rep:STEINBERG MARGARET E      M

7/29/2004 Writ to continue for next date
          Judge:HUDSON DONALD C    Rep:STEINBERG MARGARET E      M

8/31/2004 Case note Aug 31,2004 08:00AM Judge HUDSON

          C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          22    CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 23 of 111/20/2008
Criminal Felony                              Time: 14/37/02
                                                       Page:  22
1998 CF 000535  Judge: WEGNER GRANT S    From  0/00/0000 To 99/99/9
                                                     User: LC1

Date

8/31/2004 Report of Proceedings- 5 volumes- box 4-24

9/01/2004 Answer to motion / petition; filed
          state's answer to post-conviction petition

9/01/2004 Defendant present in custody
          of i.d.o.c.
          Judge:HUDSON DONALD C   Rep:FASSNACHT JEANINE H   Clerk:JME    M

9/01/2004 Motion for continuance by agreement

9/01/2004 Order writ of habeas corpus; filed

9/01/2004 Writ to continue for next date
          for 1/18/05

9/01/2004 DEFT'S PRESENCE WAIVED
          for 11/18/04

9/01/2004 STATUS HEARING Nov 18,2004 09:00AM Rm313

9/01/2004 MOTION/PETITION HEARING Jan 18,2005 01:00PM Rm313

11/18/2004 Defendant not appearing in open court
           not required
           Judge:HUDSON DONALD C   Rep:NIELSEN KATHERINE J    M

11/18/2004 MOTION/PETITION HEARING Jan 18,2005 01:00PM Rm217   Judge HUDSON
           pcp

11/18/2004 Motion for continuance by agreement

11/18/2004 Order body writ continued; filed
           BODY WRIT CONTINUANCE Jan 18,2005 01:00PM Rm313  Judge HUDSON
           Judge:HUDSON DONALD C   Rep:NIELSEN KATHERINE J     M

1/12/2005 Writ of Habeas Corpus issued; filed Defendant AMAYA ARMANDO
          STATUS HEARING Jan 18,2005 01:00PM Rm217   Judge HUDSON
          Judge:HUDSON DONALD C   Clerk:PSS    M

1/12/2005 Petition for writ of Habeas Corpus; filed

1/12/2005 Order writ of habeas corpus; filed

1/18/2005 Defendant present in custody
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D     M

1/18/2005 Agreed order; filed
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D     M

1/18/2005 MOTION/PETITION HEARING Apr 07,2005 01:00PM Rm313   Judge WEGNER
          PCP

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          23   CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 24 of 111 3/20/2008
Criminal Felony                                Time: 14/37/02
                                               Page:  23
1998 CF 000535   Judge: WEGNER GRANT S      From   0/00/0000 To 99/99/9
                                               User: LC1

Date
1/18/2005 Writ to continue for next date
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

1/18/2005 Writ of Habeas Corpus issued; filed Defendant AMAYA ARMANDO
          STATUS HEARING Apr 07,2005 01:00PM Rm313  Judge HUDSON
          Judge:HUDSON DONALD C   Clerk:PSS   M

1/18/2005 Petition for writ of Habeas Corpus; filed

1/18/2005 Order writ of habeas corpus; filed

3/31/2005 Order appoint interpreter; filed
          the chief judge's office is directed to supply a spanish language
          interpreter on april 7, 2005 at 1:00pm, room 313
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/07/2005 Defendant present in custody
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/07/2005 MOTION/PETITION HEARING Apr 20,2005 01:00PM Rm313  Judge WEGNER
          POST CONVICTIN

4/07/2005 Order grant MOTION TO CONTINUE IS GRANTED OVER DEFT'S OBJECTION

4/07/2005 Writ to continue for next date
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/20/2005 Defendant present in custody
          idoc/cont of pcp & arguement
          CONTINUED FOR HEARING May 12,2005 09:00AM Rm313   Judge WEGNER
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/20/2005 Motion for continuance by agreement

4/20/2005 Order State to writ; filed
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/20/2005 Judges notes - not filed of record

4/20/2005 Exhibit(s) filed - location:  court file
          in one yellow env in file

4/20/2005 List of exhibits; filed

4/20/2005 Clerk's minute order; filed
          Judge:WEGNER GRANT S   Rep:LE COMTE KATHLEEN D      M

4/20/2005 Case note JUDGE WEGNER REQUESTING 97CF2326
          on next crt date  05-12-05 to be brought to crt/ also that trial
          transcripts are available that day if needed/trial transc are in box
          424 per lana appeal team.

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK                     24      CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 25 of 111 3/20/2008
                        Criminal Felony                              Time: 14/37/02
                                                                      Page:  24
            1998 CF 000535   Judge: WEGNER GRANT S        From  0/00/0000 To 99/99/9
                                                                      User: LC1
__Date__

4/22/2005 Case note/FILE CK OUT KATHY L/REPORTER

5/03/2005 Report of proceedings; filed
          from post conv hrg/04-20-05

5/12/2005 Clerk's minute order; filed
          post conviction

5/12/2005 Defendant present in custody
          in custody of idoc

5/12/2005 RULING Jun 17,2005 09:00AM Rm313  Judge WEGNER

6/02/2005 Writ of Habeas Corpus issued; filed Defendant AMAYA ARMANDO
          STATUS HEARING Jul 01,2005 09:00AM Rm313  Judge WEGNER Canceled
          Judge:WEGNER GRANT S    Clerk:PSS    M

6/02/2005 Petition for writ of Habeas Corpus; filed

6/02/2005 Order writ of habeas corpus; filed

6/02/2005 Defendant not appearing in open court
          in custody IDOC

6/02/2005 Order court date stricken *
          6-17-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

6/02/2005 Motion for continuance by agreement
          case continued to 7-1-05 9Am RM 313 Ruling on Post.Conv.Petition

6/17/2005 RULING Jul 15,2005 09:00AM Rm313

6/17/2005 Defendant present in custody
          of idoc

6/17/2005 Motion for continuance by agreement

6/17/2005 Court reporter this date - Kathi LeComte

7/15/2005 Defendant present in custody
          Judge:WEGNER GRANT S

7/15/2005 Order deny motion/petition request DEFT'S FOR POST CONVICTION RELIEF

7/15/2005 Court reporter this date - Kathi LeComte

7/15/2005 Order appoint Appellate Defender; filed
          and for court reporters to prepare transcripts at no cost
          Judge:WEGNER GRANT S    Clerk:LC1    M

7/15/2005 Appeal notice; filed
          Judge:WEGNER GRANT S    Clerk:LC1    M

CONTINUED   ON   NEXT   PAGE

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          25    CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 26 of 111
                Criminal Felony                    Time: 14/37/02
                                                   Page:  25
1998 CF 000535   Judge: WEGNER GRANT S     From  0/00/0000 To 99/99/9
                                                   User: LC1

Date

7/15/2005 Appeal report of proceedings due Sep 02,2005 Judge WEGNER
          Judge:WEGNER GRANT S    Clerk:LC1    M

7/15/2005 APPEAL DUE Sep 16,2005 Rm313  Judge WEGNER Canceled
          Judge:WEGNER GRANT S   Clerk:LC1    M

7/18/2005 Appeal record receipt; filed
          from Appellate Defenders Office

7/18/2005 Appeal record receipt; filed
          from Appellate Prosecutor

7/18/2005 Appeal record receipt; filed
          from Appellate Court

7/19/2005 Verification of filing; filed
          from Kathy Nielsen

7/19/2005 Report of proceedings with appeal, court reporter*
          from Kathy Nielsen 11-18-04

7/19/2005 Appeal record receipt; filed
          from Chief Judges Office

7/20/2005 Appeal record receipt; filed
          from Chief Judges Office

7/22/2005 Correspondence; filed
          from Joe Weller

7/22/2005 Verification of filing; filed
          from Deb Hogan

7/22/2005 Report of proceedings with appeal, court reporter*
          from Deb Hogan 1-29-04

7/27/2005 Verification of filing; filed
          from LAN Nielsen- no reports for 2-13-02

7/28/2005 Report of proceedings with appeal, court reporter*
          from Peggy Steinberg 7-29-04

8/02/2005 Correspondence from Appellate Court; fld
          Appellate # 02-05-0706

8/16/2005 Report of proceedings with appeal, court reporter*
          from Marg Ledvora- 12-4-03

8/18/2005 Report of proceedings with appeal, court reporter*
          from Debbie Schweer- 5-19-04

8/18/2005 Verification of filing; filed

              C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK                    26      CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 27 of 111 3/20/2008
                    Criminal Felony                                Time: 14/37/02
                                                                   Page:  26
        1998 CF 000535   Judge: WEGNER GRANT S          From  0/00/0000 To 99/99/9
                                                                   User: LC1

___Date___

8/18/2005 from Jackie Weltmer
          Judge:WEGNER GRANT S    Clerk:LC1    M

8/18/2005 Report of proceedings with appeal, court reporter*
          from Jackie Weltmer- 10-2-03

8/26/2005 Verification of filing; filed
          from Jill Kadlec

8/26/2005 Report of proceedings with appeal, court reporter*
          from Jill Kadlec- 3-4-04

8/29/2005 Correspondence; filed
          from Inmate- Armando Amaya

8/29/2005 Instant Answer
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Verification of filing; filed
          from Kathy LeComte
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Affidavit; filed
          from Kathy LeComte- no reports for 1-18-05 and 3-31-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 8-14-03
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 4-7-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 6-2-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 6-17-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 7-15-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 4-20-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/01/2005 Report of proceedings with appeal, court reporter*
          from Kathy LeComte- 5-12-05
          Judge:WEGNER GRANT S    Clerk:LC1    M

        C O N T I N U E D   O N   N E X T   P A G E

__Date__

9/06/2005 Verification of filing; filed
          from Jeanine Fassnacht

9/06/2005 Report of proceedings with appeal, court reporter*
          from Jeanine Fassnacht- 9-1-04

9/07/2005 CERT MAIL SEND
          Sent CLR and ROPS to Inmate# K-75877 at Menard Correctional Center
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/08/2005 AP04 LETTER - CERT. OF NOTICE OF APPEAL FILED
          copy of

9/08/2005 AP07 LETTER - RECEIPT FOR ATTY PICK-UP; FLD

9/08/2005 Appeal record receipt; filed
          from Appellate Court

9/12/2005 Certified mail receipt; filed
          Judge:WEGNER GRANT S    Clerk:LC1    M

9/14/2005 Certified mail returned found; filed
          Judge:WEGNER GRANT S    Clerk:LC1    M

12/06/2005 Correspondence; filed FROM DEFT, RE: TRANSCRIPTS, SENT TO JUDGE

12/21/2005 Correspondence; filed FROM DEFT, RE: EXHIBITS, LETTER SENT

4/27/2007 Motion petition to file FOR LEAVE TO FILE ATTACHED
          Judge:HUDSON DONALD C    Clerk:SLP    M

4/27/2007 Notice of filing post conviction petition; filed
          POST CONVICTION PETITION 90 DAY DATE Jul 26,2007 Rm313   Judge HUDSON
          Judge:HUDSON DONALD C    Clerk:SLP    M

4/27/2007 POST CONVICTION PETITION 90 DAY DATE Jul 26,2007 Rm313   Judge HUDSON
          Judge:HUDSON DONALD C    Clerk:SLP    M

4/27/2007 Memorandum of law; filed
          Judge:HUDSON DONALD C    Clerk:SLP    M

4/27/2007 Motion petition to file FOR APPOINTMENT OF COUNSEL
          Judge:HUDSON DONALD C    Clerk:SLP    M

4/27/2007 Proof of service; filed
          Judge:HUDSON DONALD C    Clerk:SLP    M

5/09/2007 Findings of court; filed
          Re: post conviction petition, see long form
          Judge:WEGNER GRANT S    M

5/09/2007 Order deny motion/petition request, post conviction petition
          Judge:WEGNER GRANT S    M

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK          28    CSP048
Case 1:07-cv-06793   Document 24-4   Filed 05/29/2008   Page 29 of 113 20/2008
Cri nal Felony                           Time: 14/37/02
Page:  28
1998 CF 000535   Judge: WEGNER GRANT S        From   0/00/0000 To 99/99/9
User: LC1

Date

5/23/2007 Petition for appointment of counsel; filed
         Judge:WEGNER GRANT S    Clerk:JKJ    M

5/23/2007 Proof of service; filed
         Judge:WEGNER GRANT S    Clerk:JKJ    M

5/23/2007 Appeal notice; filed
         APPEAL DUE Jul 23,2007 08:00AM RmAPP  Judge ADMIN CIRCUIT CLE Cancele
         Judge:ADMIN CIRCUIT CLERK   Clerk:JKJ    M

5/23/2007 Appeal report of proceedings due
         APPEAL REPORT OF PROCEEDINGS DUE Jul 09,2007 08:00AM RmAPP
         Judge ADMIN CIRCUIT CLE

5/29/2007 Appeal record receipt; filed
         Chief Judge' Office

5/29/2007 Appeal record receipt; filed
         Appellate Defender

6/01/2007 Appeal record receipt; filed
         Appellate Prosecutor

6/01/2007 Appeal record receipt; filed
         Appellate Court

6/05/2007 Motion
         For appointment of counsel

6/05/2007 Affidavit; filed by Armando Amaya

6/05/2007 Proof of service; filed
         Judge:WEGNER GRANT S    Clerk:JKJ    M

6/05/2007 Appeal notice; filed
         Judge:ADMIN CIRCUIT CLERK   Clerk:JKJ    M

6/05/2007 Appeal report of proceedings due

6/20/2007 Correspondence; filed   FROM Armando Amaya

6/20/2007 Correspondence; filed   TO Armando Amaya

6/25/2007 Correspondence from Appellate Court; fld
         Appointment of Appellate Defender

6/25/2007 Correspondence; filed

6/26/2007 Appeal record receipt; filed
         Appellate Defender

6/27/2007 Correspondence; filed

C O N T I N U E D   O N   N E X T   P A G E

COURT DOCKET - KANE COUNTY CIRCUIT CLERK
Case 1:07-cv-06793    Document 24-4    Filed 05/29/2008    Page 30 of 111 3/20/2008
Criminal Felony
Time: 14/37/02
Page: 29
1998 CF 000535   Judge: WEGNER GRANT S      From  0/00/0000 To 99/99/9
User: LC1

Date
6/27/2007 Appellate Defender - Appointed

6/28/2007 Correspondence; filed
          Appellate Defender

7/20/2007 AP04 LETTER - CERT. OF NOTICE OF APPEAL FILED
          Appellate Defender

7/20/2007 AP07 LETTER - RECEIPT FOR ATTY PICK-UP; FLD
          Appellate Defender

7/24/2007 Certified mail receipt; filed
          Judge:WEGNER GRANT S   Clerk:JKJ    M

7/24/2007 Correspondence from Appellate Court; fld
          2-07-0519

7/25/2007 Appeal record receipt; filed
          Appellate Court

11/13/2007 Mandate Affirming; filed
           Appellate # 2-05-0706
           Judge:WEGNER GRANT S   Clerk:LC1    M

1/17/2008 Copy of Appeal Receipt filed  - returned
          returned- 3 clr's, 1 env, 6 rop's and 1 supl. rop
          Appellate Court # 2-05-0706

1/18/2008 AP07 LETTER - RECEIPT FOR ATTY PICK-UP; FLD
          for rops and 1 envelope for appeal 2-07-0519

1/18/2008 CERTIFICATE IN LIEU OF RECORD ;FLD  Copy of

1/22/2008 Appeal record receipt; filed
          from Appellate Court received cert. in lieu
          Judge:WEGNER GRANT S   Clerk:LC1    M

A true copy of the original of this
document is on file in my office
Attest: _____ Date _____
       Deborah Seyller
Circuit Court Clerk, Kane County, Illinois
By: _____
           Deputy Clerk

1

1   STATE OF ILLINOIS      )
                           ) SS.
2   COUNTY OF KANE         )

3      IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                    KANE COUNTY, ILLINOIS

4

5   PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
6                          PLAINTIFF,   )
                                        )
7                  VS.                  )  NO. 98 CF 535
                                        )
8   ARMANDO AMAYA,                      )
                                        )
9                          DEFENDANT.   )

10

11      REPORT OF PROCEEDINGS had at the hearing in the

12   above-entitled cause before the Honorable Donald C.

13   Hudson, Judge of said Court, on the 26th day of

14   January, A. D. 1999.

15      PRESENT:

16          MR. DAVID R. AKEMANN,
             State's Attorney, by
17        JAMES GUAGLIARDO and JAMES WASLH,
             Assistant State's Attorney,
18             appeared for the People of the
               State of Illinois.

19

20          MR. DAVID KLIMENT,
             Public Defender, and
           SANDRA PARGA,
21           Assistant Public Defender,
               appeared for the Defendant.

22

23

    PAULA M. QUETSCH, CSR
24   Official Court Reporter

FEB 14 2000

```
 1                              (Whereupon, the following

 2                              proceedings were had

 3                              before Court and counsel

 4                              in open court:)

 5            THE COURT:  Calling for the record People

 6  versus Armando Amaya.

 7            Counsel for the record, please?

 8            MR. GUAGLIARDO:  Jim Guagliardo and James

 9  Walsh on behalf of the State.

10            MR. KLIMENT:  Dave Kliment and Sandra Parga

11  on behalf of Mr. Amaya, who is present.

12            THE COURT:  This comes on for trial.  Where

13  do we stand?

14            MR. GUAGLIARDO:  Obviously we have a jury

15  picked.  The witness that we did not get here

16  yesterday was picked up on a warrant last night.  She

17  is in custody of the Kane County jail.

18            I have basically three of the four people

19  that are supposed to be here today.  I'm fairly

20  confident that the fourth one will be here.

21  Unfortunately, she's my second witness.

22            What I would ask is I'm ready to have the

23  jury sworn, if I could put on my first witness, who is

24  a scene police officer, after openings and then if we
```

1  could take a short recess to see if that witness is

2  here or not, and if not, I'll just go out of order.

3          THE COURT:  All right.  Or could Mr. Walsh

4  possibly go out and check on the witness' status

5  without having to take a 10 or 15 minute recess if the

6  witness is out there?

7          MR. GUAGLIARDO:  Sure, Judge.

8          THE COURT:  Or somebody in your office, if

9  it's just a matter of bringing the witness in.

10          MR. GUAGLIARDO:  Sure.

11          THE COURT:  All right.  Mr. Kliment, are you

12  ready?

13          MR. KLIMENT:  We've been ready, Judge.

14  We're still ready.

15          THE COURT:  All right.  Then let's line up

16  the jury and we'll bring the jury in.

17                          (The following proceedings

18                           were had in the presence of

19                           the jury.)

20          THE COURT:  Good morning.  Calling for the

21  record 98 CF 535, People versus Armando Amaya.  The

22  jury has returned to open court, all counsel are

23  present, the defendant is present.

24          Madam, would you kindly swear in the jury to

4

1  try the case?

2                                    (Jury sworn.)

3          THE COURT:  Thank you.  You may be seated.

4          Ladies and gentlemen, you have now been

5  sworn as the jury to try this case.  By your verdicts

6  you will decide the disputed issues of fact.  The

7  Court will decide the questions of law that arise

8  during the trial, and the Court will instruct you as

9  to the law at the conclusion of the case.  It will be

10 your obligation to follow the law as the Court

11 instructs.

12         You should give careful attention to the

13 testimony and evidence as it is received and presented

14 for your consideration, but you should not begin to

15 form or express any opinions about the case or about

16 the evidence until you have retired to the jury room

17 to deliberate on your verdicts after you've heard all

18 the evidence, the arguments of the attorneys and the

19 instructions of the Court.

20         Now, from time to time during the course of

21 the trial I may be called upon to make certain rulings

22 on issues or questions of law or objections made by

23 the attorneys.  You should not infer from any ruling

24 that I make that I have any opinion as to the facts or

1   as to what your verdicts should be.

2          When I sustain an objection to a question,

3   you will hear me say objection sustained, and if I say

4   objection sustained, you must disregard the question

5   and/or any answer that may have been given to the

6   question, and you should not speculate as to what the

7   answer would have been, nor draw any inference from

8   the question itself.  When I overrule an objection --

9   that is to say when you hear me say objection

10  overruled, then you may consider that question and any

11  answer that was given in response to the question.

12          Now, you should be provided with notebooks

13  to take notes during the course of the trial, and

14  again, your notes will remain confidential and no one

15  will be allowed to see them.

16          Ladies and gentlemen, at present our court

17  system does not allow the jurors to ask questions

18  directly of the witnesses on the witness stand

19  itself.  That is done by the attorneys, and your

20  verdicts must be based on all the evidence in the

21  courtroom.

22          Now, in just a moment you're going to hear

23  opening statements from the attorneys.  The opening

24  statements are made by the attorneys to acquaint you

6

1  with the facts that they expect the evidence to prove

2  in this case.  Opening statements are not themselves

3  evidence.  Any statement made by the attorneys that is

4  not based on the evidence should be disregarded.

5          After the opening statements, the State will

6  present their case first, because they have the burden

7  of proof.  After the prosecution has rested their

8  case, then the defense, if they so choose, will be

9  given the opportunity to present their evidence, again

10  keeping in mind as we discussed extensively yesterday,

11  the defendant has no obligation to present any

12  witnesses or evidence of any type or kind.  The

13  prosecution has the burden of proof.  The defendant,

14  if he so chooses, may simply rely on the presumption

15  of innocence.  If the defense presents evidence,

16  however, the State would have the right to present

17  rebuttal evidence to rebut any evidence that may have

18  been presented by the defense.

19          Following all of the evidence, the attorneys

20  will address you in closing arguments.  The Court will

21  then instruct you as to the law, and you will retire

22  to deliberate on your verdicts.

23          You should also know there may be times when

24  the attorneys are up here with the Court having a

1   quiet discussion or we may have to retire to chambers

2   to discuss some type of a matter. ·Please do not feel

3   anyone is attempting to hide anything from you, and we

4   will try and keep those conferences to a minimum; we

5   will try and utilize the day effectively.  It will

6   become our priority to move the case along

7   expeditiously, but there will be times when we are

8   delayed and we're doing something necessary for a

9   court purpose.

10          Again, we should normally begin around 9:00

11  and conclude about 4:30.  On the day you have the case

12  for deliberations we can't predict how long that will

13  take.  We always take at least one 15-minute break in

14  the morning and one 15-minute break in the afternoon.

15  Should you need a break at any other time, try to get

16  the attention of the bailiff or myself.  I don't

17  believe the trial should become an endurance contest

18  for the jurors.

19          At this time do the People wish to make an

20  opening statement?

21          ·   MR. GUAGLIARDO:  We do, your Honor.

22          THE COURT:  Mr. Guagliardo, you may proceed.

23          MR. GUAGLIARDO:  Thank you, your Honor.

24          May it please the Court, counsel, ladies and

8

1   gentlemen of the jury, good morning.

2          I think that most people would agree that we

3   live in a beautiful county, Kane County, some

4   beautiful landscape, there's the beautiful Fox River

5   Valley towards the eastern part of the county, there's

6   some of the old historic districts and historic homes,

7   and there's some quaint downtown areas.  As you move

8   out west, there's some new growth areas, sprawling

9   subdivisions, and out west of the subdivisions there's

10   still mile after mile of open space and farm land.

11          Taken as a whole, it really is a beautiful

12   county, and for the most part it's a beautiful place

13   to live, but there is another side out there, and

14   there are serious problems out there, and when I say

15   out there, I mean right here in Kane County.  There's

16   a gang war going on, a street gang war going on right

17   here in Kane County, and for those people, innocent

18   people caught in the cross-fire of that gang war,

19   those people that don't look for conflict, those

20   people that don't solicit conflict but just happen to

21   be caught up in this gang war, Kane County is not a

22   beautiful place to live.

23          You're going to see and hear from some of

24   those people this week, because this week in this

1    courtroom you're going to see that other side of Kane

2    County.   This week in this courtroom you're going to

3    see that gang war at its absolute worst, its absolute

4    ugliest.

5            As you know by now from the mere charges,

6    this case is not about name calling, it's not about

7    graffiti, it's not about rock throwing; it's about

8    senseless, random shooting with innocent people struck

9    by gunfire.

10           There are three victims in this case.   One

11   is dead.   His name is Germaine Lambert.   He was 24

12   years old when he died.   He died well before his time,

13   obviously.   There are two other victims.   They live --

14   they were struck by gunfire and wounded, but they

15   lived miraculously.   One is a woman named Tara Harris,

16   the other one is a man named Alonzo Matthews.

17           Now, the three victims in this case, Tara

18   Harris, Alonzo Matthews and Germaine Lambert, were not

19   gang members.   They weren't out looking for conflict,

20   they weren't out looking for battle; they were just in

21   the wrong place at the wrong time, because back on

22   October 29th of 1997 those three victims were standing

23   behind an apartment building on New York Street in

24   Aurora, Illinois.   They were standing in a group when

1  that man over there, the defendant in this case,

2  walked up to that group and into that group with a

3  loaded gun and started unloading that gun into the

4  group trying to hit somebody, anybody, a random

5  shooting.

6        And he does hit somebody. He hit three

7  people, and he killed one and he wounded two others,

8  and when the one was killed and when the other two

9  were wounded, they weren't threatening anybody, they

10  weren't hurting anybody, they weren't shot in

11  self-defense; they were just there in the wrong place

12  in the wrong neighborhood at the wrong time.

13        Now, as Judge Hudson told you, this is

14  what's called an opening statement. It gives us an

15  opportunity to tell you what we believe the evidence

16  in this case is going to turn out to be. I want to

17  emphasize to you up front that this is not our

18  opportunity to argue to you why you should find the

19  defendant guilty. It's premature to do that,

20  obviously; you haven't heard any evidence yet. You

21  can't find him guilty without hearing evidence. He's

22  presumed innocent; right now he's innocent in your

23  minds. I'll get the chance to argue his guilt at the

24  close of the evidence based on all of the evidence.

1   This is simply our opportunity to try and familiarize

2   you in a general way with what we expect the facts to

3   be and in a general way to introduce you to some of

4   the witnesses you'll be hearing from.

5          This offense happened in Aurora, Illinois,

6   so you will be hearing from some Aurora police

7   officers and Aurora investigators.  You'll be hearing

8   from some civilian witnesses, non-police witnesses who

9   were present at the scene of the shooting and near the

10  scene of the shooting at the time of the shooting.

11  You'll be hearing from a pathologist who did an

12  autopsy on Germaine Lambert.  I believe his testimony

13  will be Germaine was shot right at close range.  And

14  you'll be hearing from a veteran gang investigator at

15  the Aurora Police Department.  I believe he'll be

16  qualified as an expert in the area of street gangs in

17  Aurora, Illinois.

18          Those are the witnesses.  What are the

19  facts, in general what are the facts?  Let's go back

20  to October 29th, 1997 at about 8:40 in the evening.

21  At that time the defendant, Armando Amaya, was riding

22  around in the area of 309 East New York Street in a

23  white Chevrolet Celebrity.  At that time and now the

24  defendant, Armando Amaya, was a member of the street

1    gang known as the Latin Kings.  The defendant was

2    riding around in that white Chevy Celebrity with

3    friends of his who were also members of the Latin King

4    street gang, and they were riding around in so-called

5    rival gang territory, territory which so-called

6    "belonged" to a gang called the Gangster Disciples, a

7    rival gang to the Latin Kings.

8         As the defendant and his friends were riding

9    around in rival gang territory, they were flashing

10   threatening gang signs and shouting out threatening

11   gang slogans in the direction of just about anybody in

12   the area including some of the witnesses you're going

13   to hear from in this trial.

14        In the meantime, while the defendant and his

15   friends are riding around flashing these gang signs,

16   shouting these gang slogans, a small group of people

17   had begun to form behind an apartment building located

18   at the southeast corner of New York and Lincoln

19   Streets in Aurora, Illinois.  The small group of

20   people was forming because there was an argument going

21   on back there.  The argument was about something or

22   other really unrelated to this case, but it was

23   attracting a crowd like most arguments do.  It was

24   attracting children, there were kids back there, it

C000563

1 was attracting other people.  And this group started

2 to form behind this apartment building.  Well -- and

3 this apartment building is located in Gangster

4 Disciple territory.

5      As this group was forming, the defendant and

6 his friends were getting out of their white Chevy to

7 make good on those threatening gang signs and

8 slogans.  They were getting out of that white Chevy to

9 carry out those threatening gang signs and slogans.

10 The defendant walked up behind that apartment building

11 where that group was located.  He walked up a walkway

12 -- and you're going to see photos of the walkway and

13 see a diagram.  He walked up that walkway, and as he

14 did, he put a hoodie up, not covering his face but up

15 on his head, a gang trademark, don't cover your face

16 but put the hoodie up.  After he put the hoodie up, he

17 walked into the crowd and started firing.

18      The crowd scattered, those that weren't

19 shot, and the defendant scattered, as well.  He was

20 seen running with two others back to that Chevy

21 Celebrity that he was in earlier throwing the gang

22 signs and slogans.  He was seen running with two

23 others, a man named George Gamboa and a man named

24 Rivera Sandoval, also Latin King gang members, and

14

1  that white Chevy Celebrity was seen fleeing the area.

2  This all happens around 8:50 in the evening.

3       At 10:30 in the evening that white Chevy is

4  back out on the streets, it is stopped by the police.

5  Armando Amaya, the defendant, George Gamboa and Rivera

6  Sandoval are in the back of that car, and that's when

7  this investigation began, and that's what this trial

8  is about.

9       Now, I asked a lot of you in jury selection

10 whether you could resist the temptation to rush the

11 judgment to make a decision in this case, and it's a

12 natural human temptation to want to say, oh, I've got

13 it figured out.  The law says you can't do that.  You

14 have to wait until all the evidence is in; you have to

15 wait until you get those jury instructions; you have

16 to wait until you start deliberating before you make

17 up your mind in this case.

18       I didn't ask you another question in jury

19 selection, but I'm going to ask you as a group now --

20 of course, you don't answer me anymore, but I'm going

21 to ask you now to do something else.  We all see

22 trials on TV shows and movies.  Everybody's at least

23 seen a TV show or movie that features a trial.

24 There's obviously a lot of TV shows like L.A. Law,

15

1  Matlock, whatever you can't even name them all, and
2  we form a certain expectation of what a trial should
3  be like based on watching TV and movies. I've got to
4  ask you to put those expectations out of your mind
5  this week. Get TV out of your mind, get movies out of
6  your mind, get TV trials and movie trials out of your
7  mind, because you won't see any professional actors or
8  actresses on that witness stand this week. You're not
9  going to see any professional, slick actors or
10 actresses on that witness stand this week. Think
11 about it, in Hollywood you have a professional actor,
12 they have a script, they deliver it perfectly,
13 forcibly and dramatically, and if they don't, they
14 just refilm it until they get it forceful and dramatic
15 and perfect. You're not going to see Sidney Portierre
16 or Tom Cruz or Jimmy Smitz or Jack Nicholson here this
17 week; you're going to see real people who have seen a
18 real crime committed in front of their eyes. They're
19 not perfect, some have criminal histories. . . he is in
20 prison, he  going to be here as a witness. . nd when
21 the 're don , they don't go back to Hollywo    manager
22 when this trial is all over; they go back t    n area
3  lik  the o  they were in the night the shoo  ng
   happened,  d that's a fact.

16

1          So, please, I ask you, I implore you to get

2    TV and movie expectations out of your mind.  It's not

3    reality.  What you'll see in this courtroom this week,

4    the witnesses you'll see trumped up to this witness

5    stand this week, that's reality.

6          Ladies and gentlemen, again, it's not my

7    opportunity to argue guilt at this phase, you haven't

8    heard any evidence.  I will just ask you to listen

9    carefully to the evidence, all the evidence.  I'm not

10   asking you to rely on one piece or another but every

11   piece of evidence put together like a puzzle, the

12   testimonial evidence, the circumstantial evidence, the

13   identification evidence.  Based on all that evidence

14   together, put together like a puzzle, when the

15   evidence is over at the close of this case, I will

16   respectfully ask you to return findings of guilty.

17          Thank you.

18          THE COURT:  Thank you, Mr. Guagliardo.

19          Mr. Kliment, does the defense wish to give

20   an opening statement?

21          MR. KLIMENT:  Yes, Judge.

22          THE COURT:  You may proceed.

23          MR. KLIMENT:  Good morning, ladies and

24   gentlemen of the jury.  If this were a TV trial or a

17

1    movie trial, it would be a who-done-it.  The victims
2    in this case, they weren't the only people that were
3    in the wrong place at the wrong time that night.
4    Armando Amaya was also in the wrong place at the wrong
5    time that night.  He was riding around with his
6    friends that night; he was doing things that you and I
7    might find abhorrent or wrong, but he didn't shoot
8    those three people.  He didn't get out of the car, he
9    didn't have a gun; he didn't go out and shoot those
10   three people.

11           He was in the car, and he was seen by
12   people, and he was seen by some of those same people
13   when he was arrested in the same area at 10:40 that
14   night by the Aurora police.  Some of those people saw
15   what he was wearing, some of them saw what the others
16   were wearing, and two months later this is the first
17   time his name comes up in connection with the
18   investigation.  The shooting takes place October 29th
19   of 1997, witnesses are interviewed December 19th,
20   1997, and his name comes up -- not even his name, his
21   nickname, by one person.  In February of 1998
22   coincidentally that person goes to the Kane County
23   jail where Mr. Amaya was and coincidentally brings
24   along a friend who also remembers now that he was

1  there, and they gave his name to the police, and

2  that's how Mr. Amaya comes before you today.

3      He wasn't at the scene, nobody did that,

4  nobody saw anything.  It was dark, there was a hood,

5  some people have different clothing descriptions.

6  Nobody really saw what was going on.  And when you see

7  photographs the State will show you, it was very

8  dark.  Think about it, put yourselves there, there's

9  somebody shooting randomly into a crowd, you're not

10  looking at him, you're ducking for cover.  Nobody saw

11  a face.

12      Mr. Amaya was there.  He was in a car, and

13  he was an easy target for them to decide he was the

14  guy.  And they didn't even do it the night that it

15  happened, they did it much later.

16      When Mr. Amaya was arrested with his

17  friends, he was arrested by the Aurora police.  They

18  searched the car, they searched Mr. Amaya, they

19  searched the other two individuals, Gamboa and

20  Sandoval, who were with him.  There were no weapons

21  found, there were no bullets found, there was no

22  physical evidence whatsoever found in that car, none.

23  The State will probably argue they had an opportunity

24  to get rid of it, but I think you will hear that's not

C000560

1   the case.   There are other things that will brought to

2   your attention during the course of the trial that

3   would rule that out.

4          Now, opening statements, once again,

5   Mr. Guagliardo is correct, I can't argue to you what I

6   want you to believe or don't want you to believe; we

7   can only tell you what we think the evidence is going

8   to show.   I think the evidence is going to show that

9   -- in fact, Mr. Guagliardo used the word trumped up,

10  the witness are going to be trumped up to the witness

11  stand, that's what's happening here.   I think the

12  evidence will show the evidence against Mr. Amaya is

13  trumped up, and we'll be asking you to sign not-guilty

14  verdicts on all counts against Mr. Amaya at the close

15  of the trial.

16         Thank you.

17         THE COURT:  Thank you.   The State may call

18  their first witness.

19         MR. GUAGLIARDO:  Thank you, Judge, we'll

20  call Officer Hilgenberg of the Aurora Police

21  Department.

22                                   (Witness sworn.)

23         THE COURT:  Thank you.   Officer, please have

24  a seat on the witness stand.

1    OFFICER ANDREW HILGENBERG,

2  called as a witness herein, having been first duly

3  sworn, was examined and testified as follows:

4    DIRECT EXAMINATION

5  BY MR. GUAGLIARDO:

6    Q.    Sir, could you please state your full name

7  and spell your last name for the ladies and gentlemen

8  of the jury?

9    A.    Andrew Hilgenberg, H I L G E N B E R G.

10    Q.    Your current occupation?

11    A.    Police officer, City of Aurora.

12    Q.    How long have you been a police officer with

13  the City of Aurora?

14    A.    Eight years.

15    Q.    Mr. Hilgenberg, I'd like to direct your

16  attention back to October 29th of 1997 at about 8:45

17  in the evening.  Were you on duty at that time?

18    A.    Yes, I was.

19    Q.    What were the nature of your duties?

20    A.    Regular patrol.

21    Q.    Patrol?

22    A.    Yes.

23    Q.    Were you alone, or were you with a partner?

24    A.    Alone.

1      Q.   Were you in uniform in a marked squad car?

2      A.   Yes, I was.

3      Q.   At about that time, 8:45 on October 29th,

4   1997, were you dispatched to 309 East New York Street

5   reference a shooting?

6      A.   Yes, I was.

7      Q.   Now, 309 East New York Street, would that be

8   a house, a business or an apartment building?

9      A.   It's an apartment complex.

10      Q.   How many stories does that apartment complex

11   have?

12      A.   Three stories.

13      Q.   Is that apartment building all one address,

14   or are there other addresses other than 309 East New

15   York Street?

16      A.   There are other addresses attached to that

17   same building.

18      Q.   Is the front of the apartment building right

19   on New York Street?

20      A.   Yes.

21      Q.   Is that apartment building at an

22   intersection?

23      A.   Yes, it is.

24      Q.   What intersection is it at?

1    A.    New York and Lincoln.

2    Q.    Mr. Hilgenberg, I'm going to show you a

3  diagram that has been previously marked as People's

4  exhibit number 1 for identification.

5         MR. GUAGLIARDO:    Let the record reflect that

6  I'm showing counsel that diagram.

7  BY MR. GUAGLIARDO:

8    Q.    Mr. Hilgenberg, I'm showing you a diagram

9  that's been marked People's exhibit number 1 for

10  identification.    Do you recognize what's portrayed by

11  that diagram?

12    A.    Yes, I do.

13    Q.    What is portrayed by that diagram?

14    A.    That would be the intersection of Lincoln

15  Street and New York Street and the apartment complex

16  consisting of 301, 303, 307, and 309 New York Street.

17    Q.    Is that a fair and accurate diagram of what

18  the apartment building looked like back on October

19  29th, 1997?

20    A.    Yes.

21    Q.    The directions are correct and the streets

22  are correct?

23    A.    Yes, that is correct.

24    Q.    Would this diagram aid you in your testimony

1  here before the jury today?

2      A.   Yes, it would.

3          MR. GUAGLIARDO:  I ask to publish the

4  diagram to the jury and ask that the diagram be used

5  during the officer's testimony.

6          MS. PARGA:  No objection.

7          THE COURT:  Okay.  Officer, you may step

8  down.

9          Did everyone in the jury see the diagram?

10  Okay, you may proceed.

11  BY MR. GUAGLIARDO:

12      Q.   Officer, let me give you a pointer.  I know

13  they're labeled somewhat small.  Could you point out

14  New York Street on that diagram?

15      A.   New York Street would be the street running

16  right up in here, running east and west.

17      Q.   And the top of that diagram would be -- the

18  direction would be north?

19      A.   Yes, it would.

20      Q.   And could you point out Lincoln Street?

21      A.   Lincoln Street is the street immediately to

22  the west.

23      Q.   And there's another street to the east

24  called West Park.  Could you just point that out?

1      A.   Yes.  That street would be right here.

2      Q.   And directly -- so West Park Street is east

3  of the building?

4      A.   Correct.

5      Q.   And directly east of the building is what?

6      A.   Referring to the vacant lot?

7      Q.   Yes.

8      A.   Yes.

9      Q.   And that vacant lot is basically made up of

10  what; is that a parking lot or what?

11     A.   It's just overgrown grass, that's basically

12  it.

13     Q.   Now, there are a couple little blips on the

14  front of that building.  What are those two things?

15     A.   We have some porches running here into these

16  two apartment complexes and another porch over here

17  running into these two apartment complexes.

18     Q.   The various addresses are 309, 307, 303 and

19  301?

20     A.   Correct.  There's one entrance for 301 and

21  303, one entrance for 307 and 309.

22     Q.   What is behind that building, directly

23  behind the building?

24     A.   Directly behind the building there's a

1   covered walkway that runs the length of the entire

2   building.

3       Q.   And that walkway, is it a contained walkway,

4   or is it wide open?

5       A.   It's basically an open walkway.  It covers

6   all three stories of the building and runs the entire

7   length.

8       Q.   Now, are there any inclines or declines in

9   that diagram?

10      A.   Yes, there are.

11      Q.   What would be the incline or decline, if you

12  could describe that?

13      A.   Directly behind this walkway there's a

14  raised area which consists of a parking lot over

15  here.  So the walkway is actually down about maybe two

16  to three feet from where this is at.

17      Q.   If you were in the walkway, let's say you

18  were standing in the walkway area, could you get into

19  any of the apartments?

20      A.   Yes, you could.

21      Q.   How could you do that?

22      A.   The -- all the first level apartments first

23  of all have doors right off the walkway.  Then there's

24  also a set of stairs right about the center here

1    running up to the second level and again back doors

2    and then another set of stairs. I believe that would

3    also be just right above that leading up to the third

4    level and back.

5    Q. So if I were -- if I were in this walkway

6    back here, I could get into an apartment building?

7    A. Yes, you could.

8    Q. If I understood your testimony, there are

9    doors back here that lead into the apartment building?

10   A. Yes.

11   Q. Describe the sources of lighting in the back

12   of the apartments where that walkway is located.

13   A. In the back parking lot there is lighting

14   that would be illuminating the parking lot area, and

15   in the walkways themselves there are just single

16   overhead bulbs by the stairways to light the access to

17   the stairs.

18   Q. You can take a seat, officer.

19   A. Thank you.

20   Q. Sir, I'm going to show you a group of

21   photographs that have been previously labeled as

22   People's exhibit number 2 for identification, People's

23   exhibit 3 for identification, People's exhibit 4 for

24   identification, People's exhibit 5 for identification,

1   People's exhibit number 6 for identification, People's

2   exhibit number 7 for identification, People's exhibit

3   8 for identification, People's 9 for identification,

4   and People's 10 for identification.  Before you study

5   those too hard, let me show these to counsel.

6           Sir, once again showing you the group of

7   photos, People's exhibits 2 through 10, I ask you to

8   look at those photos.  Do you recognize what is

9   portrayed by those photographs?

10      A.    Yes, I do.

11      Q.    What is portrayed by those photographs?

12      A.    This would be the walkway on the south side

13   of the apartment complex itself.

14      Q.    Just to get the record straight, would it be

15   this walkway here that is on People's exhibit number 1

16   labeled porch, slash, rear walkway area?

17      A.    Yes.

18      Q.    Do those photographs fairly and accurately

19   portray what that rear walkway area looks like?

20      A.    Yes.

21          MR. GUAGLIARDO:  Your Honor, I would move

22   People's 2 through 10 into evidence.

23          THE COURT:  Ms. Parga, any objection?

24          MS. PARGA:  No, Judge.

1    THE COURT: They will be received.

2    MR. GUAGLIARDO: Judge, I would ask to

3 publish those by using the projector.

4    THE COURT: Any objection?

5    MS. PARGA: No, Judge.

6    THE COURT: You may do so. Would you like

7 me to dim the lights at this time?

8    MR. GUAGLIARDO: If you would, your Honor.

9    Officer, if you could step down from the

10 witness stand.

11 BY MR. GUAGLIARDO:

12  Q. Putting People's number 3 for identification

13 on the projector, is that a photo of the walkway

14 behind the apartment building?

15  A. Yes, it is.

16  Q. I'm going to take this one by one, Officer.

17 I'll put People's number 4 for identification down.

18 Is that a photo of the walkway back there?

19  A. Yes, it is.

20  Q. And this here, although it doesn't show up

21 that well on the projector, this here is what?

22  A. I believe what you're referring to as a

23 barbecue grill.

24  Q. And right to the left of the barbecue grill

C000579

1    is what?

2         A.    Oh, that doorway?

3         Q.    Yes.

4         A.    That's a doorway leading into one of the

5    apartments.

6         Q.    That's one of the rear doorways where you

7    can get into an apartment from the walkway; correct?

8         A.    Correct.

9         Q.    Is that also just a different angle of the

10   walkway?

11        A.    Yes.

12        Q.    Is that also a photo of the walkway?

13        A.    Yes, it is.

14        Q.    Putting down People's exhibit number 12 for

15   identification on the projector, which direction is

16   that looking in?

17        A.    That would be facing to the west.

18        Q.    So, in other words, Officer, if you could

19   step around to the front of the diagram, would that be

20   -- this is west?

21        A.    Correct.

22        Q.    So that photo would be taken here facing

23   this way?

24        A.    Correct, looking in that direction.

C000580

1     Q.   Putting down People's exhibit number 10 for

2  identification, what would that be?

3     A.   That would be the rear entrance to one of

4  the apartments off the walkway.

5     Q.   So that's what the doors look like back

6  there?

7     A.   Yes.

8     Q.   Now it is showing People's number 8 for

9  identification.  Can you describe what that is and

10  where someone would be standing who took that photo?

11     A.   That would be the walkway looking east or

12  standing on Lincoln Street, that would be exactly

13  right there on the sidewalk looking in this direction

14  here.  The meters themselves were on that side.

15     Q.   So, in other words, if somebody was coming

16  off of Lincoln Street and was going to walk into that

17  walkway, that's what they would be looking at?

18     A.   Correct.

19     Q.   And that is People's exhibit number 8?

20     A.   Yes, it is.

21     Q.   Now putting People's exhibit number 9 for

22  identification down on the screen, is that the same

23  view but a little further back?

24     A.   Yes, it is.

31

1      Q.   So, in other words, that's somebody standing

2   basically on Lincoln Street?

3      A.   Yes, that would be somebody standing in this

4   area here looking at the building from this direction.

5      Q.   So basically if I were to walk into that

6   walkway from that, the first apartments I would go by

7   are 3301?

8      A.   Correct.

9      Q.   And the last apartments I would go by are

10  3309?

11     A.   Correct.

12     Q.   Finally I'm going to put People's number 7

13  for identification.   It's a little dark, but, Officer,

14  what direction is -- you're looking at that walkway

15  again in that photo?

16     A.   Right.   That particular direction we're

17  looking at the walkway from right about here where a

18  dumpster is located and then looking in that

19  direction.

20     Q.   That's People's 7?

21     A.   Correct.

22          MR. GUAGLIARDO:   You can retake your seat.

23          THE COURT:   Mr. Guagliardo, are you going to

24  be using the slide --

C000582

1    MR. GUAGLIARDO:  Very soon, your Honor.  I

2  think he can see without that.

3    Let the record reflect I'm showing counsel

4  People's number 11, 12, 13 and 14.

5  BY MR. GUAGLIARDO:

6    Q.  Sir, I'm now showing you that same group of

7  photos, ask you to look at those photos and ask you if

8  you recognize what is portrayed by those photos?

9    A.  Yes, I do.

10    Q.  What is portrayed by that group of photos?

11    A.  This would be the vacant field that would be

12  to the east of 309 East New York Street.

13    Q.  And right now I'm pointing on People's

14  number 1 to what's labeled vacant lot.  Would those

15  photos be of that?

16    A.  Correct.

17    MR. GUAGLIARDO:  Let the record reflect I'm

18  showing counsel People's 15, 16 and 17.

19  BY MR. GUAGLIARDO:

20    Q.  The group of photos that you have in front

21  of you right now, Officer, do they fairly and

22  accurately portray the vacant lot?

23    A.  Yes.

24    Q.  And those are 11, 12, 13 and 14?

33

1    A.    Yes.

2          MR. GUAGLIARDO:   I would at this time move

3  People's 11, 12, 13 and 14 into evidence.

4          THE COURT:   Any objection, Ms. Parga?

5          MS. PARGA:   No.

6          THE COURT:   They will be received.

7  BY MR. GUAGLIARDO:

8    Q.    Officer, I'm showing you what's been labeled

9  People's exhibit 15, 16 and 17 for identification, and

10 I ask you to take a look at those and tell me if you

11 recognize what is portrayed by those.

12   A.    Yes, I do.

13   Q.    And what is portrayed by 15, 16 and 17?

14   A.    This would be views of the rear of the

15 building from the vacant parking lot -- from the

16 parking lot that would be directly south of that porch

17 area on the diagram.

18   Q.    Are you talking about a parking lot here?

19   A.    Yes.

20   Q.    And those photos would be taken from there?

21   A.    Correct.

22   Q.    Is that parking lot lighted?

23   A.    Yes, it is.

24   Q.    What kind of lights?

C000584

1    A.  Just overhead illumination.

2        MR. GUAGLIARDO:  Officer, if you could step

3   down back to the projector.

4        Your Honor?

5        THE COURT:  I'm beginning to feel like

6   Steven Speilberg up here.

7   BY MR. GUAGLIARDO:

8    Q.  Officer, I just put down People's exhibit

9   number 11 for identification.  What is portrayed by

10  People's 11?

11   A.  People's 11 has the dumpster all the way

12  over on the right side of that photograph and the

13  vacant lot.  You can barely see the chain link fence.

14  On this diagram here this would be looking at it in

15  this direction down here, the dumpster being here, and

16  the chain link fence is running along here with the

17  vacant lot.

18   Q.  I'm now putting on People's 12, which

19  doesn't illuminate too well on that.  If you could

20  perhaps just look at People's 12 on the projector, I

21  think you can see the fence now, Officer.  If you can

22  point out on the diagram where someone who took that

23  photo would have been standing --

24   A.  This would be the same field, but it's more

1  this area going over to West Park.  The dumpster is

2  not in the picture anymore, so it's further over this

3  way.

4      Q.    What is portrayed by this photo?

5      A.    This would be the vacant lot, and you're

6  looking westbound at this point in time, so basically

7  we're standing right about over in here looking in

8  that direction here with the cement wall just in front

9  of the walkway being right here for the dumpster.

10     Q.    What about this photo here, what are you

11 looking at here if you could point out on the diagram

12 for the ladies and gentlemen of the jury?

13     A.    Basically this area right in here with the

14 pathway going in between where the dumpster and the

15 building meet.  There is a pathway right here on that

16 rear walkway.

17     Q.    So, in other words, if I were trying to walk

18 back there from this vacant lot, Officer, if you look

19 at the diagram, if I were to walk down here and turn,

20 that's what I'm seeing there up on that photograph?

21     A.    Correct, looking at it from right about in

22 here.

23     Q.    What are we looking at there?

24     A.    That would be specifically the rear of 309

1  looking at it from the parking lot area, taken about

2  in this area here and facing north.

3      Q.   This area is 309?

4      A.   Correct.

5      Q.   And is that also a photo of the rear?

6      A.   That would be the photo of the rear of 301

7  and 303, which would be all the way on the west side.

8  So it would be taken from back there facing this way

9  on the back side of these two buildings here.

10     Q.   The back of 301 and 304 are People's exhibit

11 16; what you referred to as the back of 309 is, for

12 the record, People's exhibit number 15?

13         MS. PARGA:  Judge, I would object.  I don't

14 believe those have been admitted into evidence yet.

15         MR. GUAGLIARDO:  Judge, I would move 15, 16

16 and 17 into evidence at this point.

17         THE COURT:  Any objection to them being

18 received in evidence?

19         MS. PARGA:  No.

20         THE COURT:  All right.  They will be

21 received.  You may now refer to them.

22         MR. GUAGLIARDO:  Officer, you can retake the

23 stand.

24         THE COURT:  Are you through with the

1    projector, Mr. Guagliardo?

2              MR. GUAGLIARDO:  Yes, your Honor.

3    BY MR. GUAGLIARDO:

4         Q.    Officer, let's go back to 8:45 p.m. on

5    October 29th, 1997.  At that time, 8:45 p.m., did you

6    go to 309 East New York Street after you were

7    dispatched to do so?

8         A.    Yes, I did.

9         Q.    What did you see when you first got there?

10        A.    On my arrival I found one subject on the

11   parkway between the sidewalk and the street who

12   appeared to have been wounded.

13        Q.    In what way was the subject wounded?

14        A.    By gunfire.

15        Q.    Was this a male or female?

16        A.    He was a male victim.

17        Q.    Could you -- do you still have that pointer?

18        A.    Yes.

19        Q.    Could you point out on the diagram where you

20   found this male victim when you arrived?

21        A.    The male victim was approximately in this

22   area here.

23        Q.    In front of the apartment building?

24        A.    Yes.

C000588

1      Q.    What was his condition?

2      A.    He was upright and breathing and conscious.

3      Q.    Was medical personnel contacted?

4      A.    Yes, they were.

5      Q.    Were other police officers en route by that

6   time?

7      A.    Yes.

8      Q.    Where did you go after contact with that

9   victim?

10     A.    I went in through the front door -- up the

11  porch, through the front door of 309, Apartment One.

12     Q.    Now, Apartment One, that would be the first

13  floor of 309?

14     A.    Correct.

15     Q.    Is there an Apartment Two of 309?

16     A.    Yes.

17     Q.    Is that on the second floor?

18     A.    Yes.

19     Q.    And Apartment Three of 309 would be the

20  third floor?

21     A.    Yes.

22     Q.    You may retake your seat, Officer.

23           What did you see when you got into Apartment

24  One of 309 East New York Street?

1      A.    I entered the living room, and there was a

2  female that was on the couch in the living room who

3  was also suffering from a gunshot wound.

4      Q.    What was her condition?  Was she conscious?

5      A.    Yes, she was.  She was also conscious and

6  breathing.

7      Q.    Were other officers and/or medical personnel

8  beginning to arrive at the scene at this point?

9      A.    Yes, they were.

10     Q.    Where did you go after dealing with the

11  female victim on the couch?

12     A.    I went directly into the kitchen area of the

13  apartment, which would have been going south, through

14  the apartment south.

15     Q.    What did you see in the kitchen?

16     A.    In the kitchen I found one male subject who

17  was on his back with his arms down at his side.  He

18  was a male, and the sweatshirt that he was wearing had

19  been pulled up over his head so it was obstructing his

20  identity.

21     Q.    What was his condition?  You say he was

22  laying on the kitchen floor?

23     A.    Yeah, he was laying on the kitchen floor.  I

24  saw a pool of what appeared to be blood coming out

C000590

40

1   from beneath him and heard what sounded to be labored

2   breathing coming from the subject.

3           MR. GUAGLIARDO:   May the record reflect I'm

4   showing counsel what's been labeled at People's 18, 19

5   and 20?

6   BY MR. GUAGLIARDO:

7       Q.   Sir, I'm going to show you what has been

8   labeled as People's exhibits 18, 19 and 20 for

9   identification, which are three photographs.  I ask

10  you to look at those photographs and tell me if you

11  recognize what's portrayed by those photographs.

12      A.   Yes, I do.

13      Q.   What is portrayed by those photographs?

14      A.   This would be the victim that I had found

15  laying on the kitchen floor.

16      Q.   Does that fairly and accurately portray his

17  position when you arrived, or is there anything

18  different?

19      A.   The photographs do not portray the way he

20  was when I first arrived, no.

21      Q.   What's different?

22      A.   The victim's arms are now above his head,

23  and he is no longer wearing a shirt in this

24  photograph.

1     Q.   Other than the fact he's no longer wearing

2  shirt and his arms are above his head, was that the

3  position he was in when you arrived?

4     A.   Yes, it is.

5         MR. GUAGLIARDO:  Your Honor, I would move

6  People's 18, 19 and 20 into evidence.

7         THE COURT:  Any objection?

8         MS. PARGA:  No, Judge.

9         THE COURT:  They will be received.

10         MR. GUAGLIARDO:  Judge, I would ask to

11  publish those, also.

12         THE COURT:  With the --

13         MR. GUAGLIARDO:  With the projector, yes.

14         MS. PARGA:  Judge, may we approach?

15         THE COURT:  Yes.

16                         (The following proceedings

17                          were had out of the presence

18                          of the jury.)

19         MS. PARGA:  Can I see your photos for a

20  second?  Judge, we would object to publishing -- we

21  would not object to publishing 18, but we would object

22  to publishing 19 and 20.

23         THE COURT:  On what basis?

24         MS. PARGA:  They're very bloody photos.  I

1  think that they would be prejudicial.  18 I think

2  depicts the victim as he was laying.

3          THE COURT:  Give me the two you're objecting

4  to, let me see them.

5          What's your position?

6          MR. GUAGLIARDO:  Well, Judge, one of the

7  things, I'm going to have to ID Lambert -- a couple of

8  witnesses I'm calling are going to have to identify

9  him based on those photos, that is him that night, he

10  was Germaine Lambert, he was alive.  I have to get one

11  of them with his face in.

12          THE COURT:  I'm looking at the photos.  I

13  don't believe them to be inflammatory or highly

14  gruesome.  I think the probative value outweighs the

15  prejudicial value.  They will be received and

16  published.

17                          (The following proceedings

18                           were had in the presence of

19                           the jury.)

20  BY MR. GUAGLIARDO:

21      Q.   Officer, you may step up to the projector.

22          Putting People's number 18 for

23  identification on the projector, if you could describe

24  what is portrayed in People's number 18 for

1    identification.

2        A.    What is portrayed is from the living room

3    looking towards the back door -- or to the south

4    through the apartment complex.  There's a small

5    hallway leading into the kitchen area, and the victim

6    is right about in the middle of that hallway lying on

7    his back with his feet towards us.

8        Q.    So the blue pants and the tennis shoes, that

9    is the victim?

10       A.    Yes, it is.

11       Q.    I am now putting People's 19 for ID on the

12   projector.  What is portrayed by that?

13       A.    This is the victim again with the arms

14   raised above the head.  He is also shirtless at this

15   point in time, and he is still in the kitchen area

16   facing -- his head on the south side and his feet

17   facing to the north.

18       Q.    And People's 20 is from what view?

19       A.    The opposite view, facing north from the

20   south.

21       Q.    And that fairly portrays what the victim

22   looked like other than his arms and he was wearing a

23   shirt when you arrived; correct?

24       A.    Correct.

1      Q.   You may retake your seat.

2           What, if anything, did you do when you first

3    saw that victim laying on the kitchen floor in that

4    condition?

5      A.   Well, hearing the victim with possible

6    labored breathing I immediately moved his clothing out

7    of the way so I could inspect his body for any kind of

8    wounds to determine what kind of wounds he had and

9    also to determine what kind of medical personnel we

10   were going to need.

11     Q.   And when you moved his clothing, what kind

12   of wounds did you see?

13     A.   I found one gunshot wound to the left chest

14   area.

15     Q.   Did paramedics shortly thereafter arrive on

16   the scene?

17     A.   Yes, they did.

18     Q.   Did you assist them?

19     A.   Yes, I did.

20     Q.   And was that person you saw on the kitchen

21   floor pronounced dead by a paramedic?

22     A.   Yes, he was.

23     Q.   About what time was that?

24     A.   Approximately 9:03 p.m.

1    Q.    Did the deputy coroner eventually arrive at

2    the scene?

3    A.    Yes, he did.

4    Q.    What did he do with that body?

5    A.    The deputy coroner after we had done the

6    processing of the scene itself removed the body from

7    the scene.

8    Q.    About this time, 9:00, 9:03, were several

9    other officers arriving at the scene?

10    A.    There was quite a few officers at the scene,

11    yes.

12    Q.    Were they processing the scene?

13    A.    Yes, they were.

14    Q.    What does it mean to quote-unquote process a

15    scene?

16    A.    First of all, we have to secure the scene to

17    make sure no other personnel are entering the scene

18    itself so we don't contaminate the scene.  Processing

19    the scene just basically is recovering evidence,

20    looking for possible new evidence, things of that

21    nature.

22    Q.    Sir, if you could step down to the diagram

23    again with the pointer.  Is there a business

24    establishment known as the Lincoln Laundromat in the

1  area of that apartment building?

2      A.    Yes, there is.

3      Q.    Where, approximately -- is it shown on that

4  diagram?

5      A.    No, it's not.

6      Q.    Where approximately is it vis-a-vis the

7  apartment building?

8      A.    It's approximately another block south and

9  on the opposite side of the street.

10     Q.    Of Lincoln Street?

11     A.    Yes.

12     Q.    Between that apartment building and Lincoln

13  Laundromat, what kind of area is that?  Is it

14  residential, business; what's located in there?

15     A.    Directly across the street going that way

16  there's what we call the Hope Chest, which is --

17     Q.    The Hope Chest?

18     A.    Hope Chest, which is a secondhand store for

19  -- it's like a Salvation Army type thing.  On the

20  other side of the street as well directly down the

21  street there's a church.  Directly behind this there

22  is also a church, and then we have Galena Boulevard,

23  and there's a Mexican restaurant on one corner over

24  there, on that corner there would be a gas station.

C000597

1          Q.    Are there street lights between Lincoln

2    Laundromat and the apartment building?

3          A.    Yes, there are.

4          Q.    And the businesses you described, do they

5    have lights in them?

6          A.    Yes.

7          Q.    Is there a McCarty Park in the area?

8          A.    Yes, there is.

9          Q.    Where on that diagram -- let me ask you

10   first of all, on People's exhibit number 1 for

11   identification is McCarty Park located on that?

12         A.    No, it's not.

13         Q.    Where would McCarty be?

14         A.    That would be to the east of West Park, in

15   this area.

16               MR. GUAGLIARDO:  May the record reflect that

17   I'm showing counsel what I'm going to mark as People's

18   number 21 for identification?

19   BY MR. GUAGLIARDO:

20         Q.    Sir, I'm showing you now what I've marked as

21   People's exhibit 21 for identification, an aerial

22   map.  Do you recognize the area portrayed on that

23   aerial map?

24         A.    Yes, I do.

1    Q.    What is that area portrayed on that map?

2    A.    That would be -- that would encompass the

3  locations of the Lincoln Laundromat, Garden Park 301

4  through 309, East New York Street, all the major areas

5  through the downtown area.

6    Q.    Would this diagram help you in your

7  testimony to the jury here today?

8    A.    Yes, it would.

9          MR. GUAGLIARDO:  Your Honor, I ask that the

10  officer be allowed to use People's exhibit 21 for

11  identification and it be allowed to be published to

12  the jury.

13         THE COURT:  Any objection?

14         MS. PARGA:  No, Judge.

15         THE COURT:  You may do so.

16  BY MR. GUAGLIARDO:

17    Q.    Officer, I put the diagram on the board.

18  Can I have you draw an arrow on the diagram in the

19  direction of north?  If you need to take the diagram

20  down to do that, feel free to do so.

21    A.    North would be in that direction.

22    Q.    For the record, you drew an arrow up towards

23  the ceiling?

24    A.    Yes.

1    Q.    Now, the apartments at 309 East New York

2  Street, or the apartments that include 309 East New

3  York Street, are they on this diagram?

4    A.    Yes, they are.

5    Q.    Could you point out where they are?

6    A.    The location of those apartments would be

7  right here.

8    Q.    And that's at the southeast corner of the

9  intersection of Lincoln and New York, for the record?

10    A.    Correct.

11    Q.    If you could just make a red X with those

12  apartments on it.

13         And McCarty Park, is that also on that

14  diagram?

15    A.    Yes, it is.

16    Q.    Can you point that out?

17    A.    McCarty would be this area here surrounded

18  by West Park Place, East Park Place, Galena and New

19  York Street.

20    Q.    So it's that entire block there?

21    A.    Right.

22    Q.    Could you just put in an MC inside that

23  block?

24         The Lincoln Laundromat, is that on that map?

50

1    A.    Yes, it is.

2    Q.    Could you point that out for the ladies and

3   gentlemen of the jury?

4    A.    Lincoln Laundromat would be right there on

5   the west side of Lincoln south of Galena.

6    Q.    Is it south of Downer, also, or is it before

7   Downer?

8    A.    It's north of Downer.

9    Q.    Could you put in an LL where Lincoln

10  Laundromat would be?

11   A.    Uh-huh.

12   Q.    That entire area on that map, is that in the

13  Kane County portion of Aurora?

14   A.    Yes, it is.

15       MR. GUAGLIARDO:  Judge, I have no further

16  questions of this officer on direct.  I tender the

17  witness.

18       THE COURT:  Officer, you may resume your

19  seat on the witness stand.

20       Cross examination, Ms. Parga?

21       MS. PARGA:  Thank you, Judge.

22                CROSS EXAMINATION

23  BY MS. PARGA:

24   Q.    Good morning, Officer.

1    A.    Good morning.

2    Q.    I'm going to move the easel so I can see

3 you.

4         Officer, when you arrived at 309 East New

5 York Street on October 29th, it was dark outside?

6    A.    Yes, ma'am.

7    Q.    It was almost 9:00 p.m. then?

8    A.    Correct.

9    Q.    And you were not the first officer on the

10 scene?

11   A.    I don't believe so, no.

12   Q.    Other officers had already arrived?

13   A.    Correct.

14   Q.    In fact, there was an officer speaking with

15 the victim on the curb?

16   A.    Yes.

17   Q.    Now, you testified that to the east of the

18 building there's a vacant lot?

19   A.    Correct.

20   Q.    Was there anyone in that lot when you

21 arrived?

22   A.    I don't recall whether there was or not.

23 There may have been officers over there stringing up

24 tape to secure the scene.

1      Q.   And your responsibility when you arrived at

2   the scene was to make sure that the inside of the

3   crime scene was secured?

4      A.   Correct.

5      Q.   And you also told us you assisted the

6   paramedics?

7      A.   Yes.

8      Q.   You helped remove Mr. Lambert's sweatshirt?

9      A.   Yes.

10      Q.   And he was the person that you found inside

11   of the apartment -- of Apartment 309?

12      A.   In the kitchen, yes.

13      Q.   He was in the hallway?

14      A.   Yes.

15      Q.   And you testified Mr. Lambert had been shot?

16      A.   Correct.

17      Q.   And Mr. Lambert died shortly after?

18      A.   Yes.

19      Q.   Officer, you did not secure the exterior of

20   that apartment building; did you?

21      A.   No, I did not.

22      Q.   That was not your responsibility?

23      A.   No.

24           MS. PARGA:   Judge, may I have a moment?

C000603

1          THE COURT:   Yes.

2                          (Off the record discussion.)

3   BY MS. PARGA:

4      Q.   Officer Hilgenberg, did you see any civilian

5   witnesses when you arrived?

6      A.   I don't know if there was or not.

7          MS. PARGA:   Thank you.  I have no further

8   questions.

9          THE COURT:   Any redirect?

10         MR. GUAGLIARDO:   Just very briefly.

11                   REDIRECT EXAMINATION

12  BY MR. GUAGLIARDO:

13     Q.   Officer, you did not secure the exterior of

14  the apartment building, but other officers did;

15  correct?

16     A.   Yes, that's correct.

17     Q.   There were several officers on the scene

18  with you; is that correct?

19     A.   Yes.

20     Q.   Do you know if they were talking to people

21  on the scene or not?

22     A.   I believe they were.

23         MR. GUAGLIARDO:   I have nothing further.

24         THE COURT:   Ms. Parga, any recross?

1    MS. PARGA:  No, Judge.

2    THE COURT:  Thank you, Officer Hilgenberg.

3  You may step down.

4    All right, ladies and gentlemen, as I

5  indicated, we try and take one 15-minute break before

6  we have another possible lengthy witness.  Please do

7  not discuss the case amongst yourselves or anyone else

8  during the recess, do not allow anyone to discuss it

9  in your presence, and do not form or express any

10  opinions about the case until after you have received

11  all the evidence.  Thank you.

12                                    (Recess taken.)

13    THE COURT:  All right.  We're back on the

14  record, People versus Amaya.  The jury has returned,

15  all counsel are present, Mr. Amaya is present.

16    At this time, Mr. Guagliardo, you may call

17  your next witness.

18    MR. GUAGLIARDO:  Thank you, your Honor.  The

19  People would call Tara Harris.

20                                    (Witness sworn.)

21    THE COURT:  Thank you.  Ms. Harris, if you

22  would please have a seat on the witness stand, that

23  would be in this blue chair here.

24    Ms. Harris, please keep your voice up so

1    that everyone here can hear you.  If you would, please

2    wait until the attorney has finished asking the

3    question before you attempt to answer it, and please

4    answer all of the questions out loud.

5         Mr. Guagliardo, you may proceed.

6                  TARA HARRIS,

7    called as a witness herein, having been first duly

8    sworn, was examined and testified as follows:

9                  DIRECT EXAMINATION

10   BY MR. GUAGLIARDO:

11        Q.   Ma'am, could you please state your name?

12        A.   Tara Harris.

13        Q.   H A R R I S?

14        A.   Correct.

15        Q.   How old are you, Ms. Harris?

16        A.   28.

17        Q.   Do you have any children?

18        A.   Yes.

19        Q.   How many?

20        A.   Three.

21        Q.   What are their ages?

22        A.   7, 6 and 2.

23        Q.   Ma'am, I know you don't like me asking you

24   this, but you've been convicted of a crime before;

1    correct?

2          A.    Yes.

3          Q.    Was this a drug offense?

4          A.    Yes, it was.

5          Q.    Are you currently on probation for that?

6          A.    Yes, I am.

7          Q.    Is that in this county?

8          A.    Yes.

9          Q.    And let's go back to October 29th of 1997.

10   Where did you live back then?

11         A.    309 East New York Street.

12         Q.    Is that an apartment complex?

13         A.    Yes, it is.

14         Q.    And is that in Aurora?

15         A.    Yes.

16         Q.    Let's go back to about 8:50, about ten

17   minutes to 9:00 on that evening of October 29th,

18   1997.  Were you home at that time?

19         A.    Yes, I was.

20         Q.    What, if anything, did you hear going on?

21         A.    I heard a lot of arguing going on in the

22   back area where I live.

23         Q.    What did you do when you heard that

24   argument?

1      A.    I was changing my daughter at the time the

2  arguing was going on, so I had to take the Pamper out

3  to the dumpster, so I said that I would check and see

4  what was going on after that, and it was two girls

5  arguing in the back.

6      Q.    Were there others standing behind there

7  watching this argument, as well?

8      A.    Yes, there was.

9      Q.    Did you stay to watch the argument for a

10 while?

11     A.    Yes, I did.

12     Q.    How many people were back there, do you

13 remember?

14     A.    Not exactly.

15     Q.    What -- and what apartment were you standing

16 behind watching this argument?

17     A.    I don't understand.

18     Q.    There's more than one apartment number in

19 that building; correct?

20     A.    Correct.

21     Q.    Is there also a 307 and a 303 and a 301?

22     A.    Yes.

23     Q.    And you're in 309; correct?

24     A.    Correct.

C000609

1    Q.   Which one of those apartments were you

2  standing behind?

3    A.   309, my apartment.

4    Q.   What happened while you were watching this

5  argument?

6    A.   Well, two girls were arguing, and I was

7  standing there, and I seen someone come up from the

8  other end of the building walking up with a hoodie on

9  and a jacket on with his hands in his pockets, and as

10 I glanced and turned away, I heard gunshot fires.

11   Q.   This person that walked up with a hoodie on

12 with his hands in his pockets, what area did he come

13 from?

14   A.   He come from the Lincoln side, on Lincoln

15 Street.

16   Q.   And this hoodie that he had on, did that

17 cover his face?

18   A.   What do you mean, the front part of his

19 face?

20   Q.   Yeah, the front.

21   A.   No.

22   Q.   So the hoodie was over the top of his head?

23   A.   Correct.

24   Q.   You said he walked up -- you saw him with

1  his hands in his pockets. What happened next? What's

2  the next thing you remember happening?

3      A.  Well, I don't remember anything after

4  hearing two shots, and I guess at that time I realized

5  I was shot. Once I entered back into my home I

6  realized I was back in my home.

7      Q.  So you were shot?

8      A.  Yes, I was.

9      Q.  And after you were shot, did you say you

10  went back into your apartment?

11      A.  I had to. Because it happened so fast, when

12  I heard the two gunshots, I didn't know anything else

13  until I was in my home at that time.

14      Q.  Did the bullet that you -- how many bullets

15  went into you, ma'am?

16      A.  One.

17      Q.  Did that go through you, or did it stay in

18  you?

19      A.  It's still in my lower back.

20      Q.  Still today as you testify?

21      A.  Yes.

22      Q.  This person you saw walk up with a hoodie,

23  was that person a male for a female?

24      A.  It was a male.

C000610

1    Q.   Were you able to see that it was a male?

2    A.   Yeah, I could tell it was a male.

3    Q.   Could you tell what that person's race was?

4    A.   He was Mexican, Spanish.

5    Q.   About how old was he?

6    A.   To me it looked like he was in his late

7    teens, early 20s.

8    Q.   And about how tall was he?

9    A.   I would say maybe around 5'5" or 5'6".

10   Q.   Now, did you ever actually see the gun?

11   A.   No, I did not.

12   Q.   Did you get what you would call a good look

13   at his face?

14   A.   No, I did not.

15   Q.   Do you remember going to the hospital that

16   night?

17   A.   Yes, I do.

18   Q.   Now, I'm sorry, let me back up a little

19   bit.

20        The lighting back in the walkway, is it real

21   bright back there?

22   A.   At night you mean?

23   Q.   Yes.

24   A.   Well, not real bright, no.

C000611

61

1      Q.   Is it good enough where you can see

2   someone's face if you're close enough?

3      A.   Yes.

4      Q.   How long were you in the hospital?

5      A.   Approximately nine days.

6      Q.   Did you have any surgery?

7      A.   Yes, I did.

8      Q.   Have you had any surgery since you were

9   discharged from the hospital?

10     A.   No, I have not.

11     Q.   Ma'am, are you a member of any street gang?

12     A.   No, I'm not.

13     Q.   Are you familiar with the Gangster Disciple

14  gang?

15     A.   I've heard of them.

16     Q.   You're not a member of that gang?

17     A.   No, I'm not.

18     Q.   Do you have any idea why somebody would want

19  to shoot you back then?

20     A.   I don't think nobody was trying to shoot

21  me.  No, I wouldn't have no idea, no clue.

22     Q.   You didn't know anybody who was like after

23  you?

24     A.   No.

C000612

1      Q.    Do you remember -- do you know a man named

2  -- going back to October 29th, 1997, did you know a

3  man named Germaine Lambert?

4      A.    Yes, I do.

5      Q.    Right before the shooting occurred and at

6  the time the shooting occurred, was Germaine Lambert

7  back on that porch with you?

8      A.    Yes, he was.

9      Q.    Was he alive, was he talking?

10     A.    Yes, he was.

11     Q.    I'm going to show you a photograph marked

12  People's exhibit 22 for identification, and I'm

13  showing counsel -- ma'am, I'm showing you what's been

14  marked as People's Exhibit Two 2 for identification.

15  It's a photograph, and I'm going to ask if you

16  recognize the person in the photograph.

17     A.    Yes, Germaine Lambert.

18     Q.    And that's the same Germaine that was out on

19  the walkway with you before the shooting occurred?

20     A.    Yes, it was.

21     Q.    Does the photograph fairly and accurately

22  portray what Germaine looked like?

23     A.    Yes, it does.

24         MR. GUAGLIARDO:   I would move to admit

63

1    People's exhibit 22 into evidence.

2           THE COURT:  Any objection?

3           MS. PARGA:  No, Judge.

4           THE COURT:  All right.  It will be received.

5           MR. GUAGLIARDO:  If I could have a moment,

6    Judge.

7           THE COURT:  All right.

8           MR. GUAGLIARDO:  I tender the witness over

9    to the defense.

10          THE COURT:  Thank you.

11          Cross examination, Ms. Parga?

12          MS. PARGA:  Thank you, Judge.

13                    CROSS EXAMINATION

14   BY MS. PARGA:

15       Q.   Good morning, Ms. Harris.

16       A.   Good morning.

17       Q.   Ms. Harris, you testified that on October

18   29th you were living at 309 East New York Street?

19       A.   Correct.

20       Q.   And you went outside of your apartment?

21       A.   Correct.

22       Q.   At about ten to 9:00 p.m.?

23       A.   Yes, I guess it was about that time.

24       Q.   Okay.  And you heard some people arguing?

64

1      A.   Correct.

2      Q.   And you told us that there were other people

3 outside as well?

4      A.   Correct.

5      Q.   And you're not sure how many?

6      A.   No, I'm not.

7      Q.   And it was dark outside?

8      A.   Yes.

9      Q.   Now, you testified that while you were out

10 there you saw someone walking up the walkway?

11     A.   Correct.

12     Q.   And that was on Lincoln?

13     A.   Correct.

14     Q.   And you told us that the person was a male?

15     A.   Correct.

16     Q.   And you said that you thought he was

17 Mexican?

18     A.   Yes.

19     Q.   And you said he was wearing -- you said he

20 was wearing a hoodie?

21     A.   Yes.

22     Q.   And you said he was also wearing a jacket?

23     A.   Correct.

24     Q.   And you told us today that this person had

C000615

1　his hands in his pocket?

2　　　A.　Yes, he did.

3　　　Q.　Now, you had talked to the police about what

4　you saw on that night before?

5　　　A.　Yes.　They came to the hospital.

6　　　Q.　Okay.　And they came to the hospital on the

7　night that you were shot?

8　　　A.　No.

9　　　Q.　They did not come to the hospital --

10　　　A.　Well, yeah.　I didn't talk with them that

11　night, though.

12　　　Q.　And then they came to the hospital on

13　October 31st, 1997?

14　　　A.　I guess that was the day.

15　　　Q.　About two days after --

16　　　A.　Correct.

17　　　Q.　And when you spoke with the police on

18　October 31st, you told them that the person was

19　wearing a white hooded sweatshirt?

20　　　A.　I told them it could have either been white

21　or black.

22　　　Q.　And you told the police on that day that you

23　heard two shots?

24　　　A.　Correct.

C000619

1      Q.    And then you fell back into your apartment?

2      A.    I blacked out once -- after the two shots,

3  blacked out, so the next thing I knew I was in my

4  home, in my apartment.

5      Q.    Now, you told us today you didn't get a good

6  look at this person?

7      A.    No, I did not.

8      Q.    And it was not very bright in that walkway?

9      A.    Correct.

10     Q.    And there was a lot of commotion?

11     A.    Yes, there was.

12     Q.    Because there were people arguing?

13     A.    Uh-huh.

14     Q.    And, Ms. Harris, you don't recall speaking

15  with the police on October 29th, the night that you

16  were shot?

17     A.    I don't remember.

18         MS. PARGA:  I have no other questions.

19         THE COURT:  Any redirect, Mr. Guagliardo?

20         MR. GUAGLIARDO:  If I could have one moment,

21  Judge.

22                        (Off the record discussion.)

23         MR. GUAGLIARDO:  No, your Honor.

24         THE COURT:  Thank you very much,

1    Ms. Harris.  You may step down.

2         The People may call their next witness.

3         MR. GUAGLIARDO:  Judge, we would call

4    Mr. Alonzo Matthews.

                                (Witness sworn.)

5

6         THE COURT:  Thank you.  Mr. Matthews, please

7    have a seat on the witness stand on this blue chair

8    here.

9         Mr. Matthews, if you could, please keep your

10   voice up when you speak so everyone can hear you.

11   Please wait until the attorney has finished with the

12   question before you attempt to answer it, and please

13   make sure you give all of your answers out loud.

14        Mr. Guagliardo, you may proceed.

15             ALONZO MATTHEWS,

16   called as a witness herein, having been first duly

17   sworn, was examined and testified as follows:

18             DIRECT EXAMINATION

19   BY MR. GUAGLIARDO:

20        Q.   Sir, could you please state your name?

21        A.   Alonzo Matthews.

22        Q.   Could you lean forward a little bit?  There

23   is a microphone on that thing, if you could kind of

24   talk in that direction.

1            Mr. Matthews, how old are you?

2     A.   22.

3     Q.   I know you don't like getting into this, but

4 you've been convicted of a crime before; correct?

5     A.   Yeah.

6     Q.   Is that out of Wisconsin?

7     A.   Yeah.

8     Q.   Are you currently on probation?

9     A.   Yes.

10    Q.   What were you convicted of in Wisconsin?

11    A.   Drugs.

12    Q.   What town in Wisconsin was that?

13    A.   Milwaukee.

14    Q.   Sir, I want to go back to October 29th of

15 1997 at about 8:45 in the evening. Were you behind an

16 apartment building at 309 East New York Street at that

17 time?

18    A.   Yes.

19    Q.   Were you behind the apartment building?

20    A.   Behind? I don't know what you mean by

21 behind.

22    Q.   I'm sorry. Were you -- the front of the

23 building is on New York Street; correct?

24    A.   Uh-huh.

1    Q.   And the back of the apartment building backs

2  up to a parking lot?

3    A.   Yeah.

4    Q.   Were you back there in a walkway?

5    A.   Yes.

6    Q.   What were you doing there?

7    A.   I was down there with a friend visiting

8  somebody.  I just got down there about ten minutes

9  ago, and I heard somebody arguing and stuff, you know,

10  so we was just sitting there.

11    Q.   Who was arguing?

12    A.   Some girls.

13    Q.   Were you watching that argument?

14    A.   Yes.

15    Q.   Were there other people watching that

16  argument?

17    A.   Yes.

18    Q.   About how many people?

19    A.   15.

20    Q.   What happened as you were watching this

21  argument?

22    A.   Well, they was arguing and stuff, getting

23  ready to fight, and all of a sudden I hear somebody

24  creeping up behind me, and I turned around and I just

1    seen a Mexican with a hoodie on, and then he shot me,

2    and then that was it.

3        Q.    When you say he shot you, were you struck by

4    a bullet?

5        A.    Yes.

6        Q.    Where were you shot?

7        A.    In my stomach.

8        Q.    Did the bullet stay in you, or did it go

9    through you?

10       A.    It went through.

11       Q.    Now, you say the shooter came from behind

12   you.  Where did he come from?

13       A.    Lincoln.

14       Q.    From Lincoln Street, that area?

15       A.    Yes.

16       Q.    Was the shooter male or female?

17       A.    Male.

18       Q.    And I believe you said his face was

19   Hispanic, Mexican?

20       A.    Yes.

21       Q.    Were you able to see him good enough to see

22   what his race and sex were?

23       A.    Yes.

24       Q.    About how tall was he?

C000621

1  A. About 5'8", 5'9".

2  Q. And about how much did he weigh?

3  A. About 140, 145.

4  Q. How was he dressed?

5  A. Like black was all I could see was black,

6 and he had a hoodie on.  That's all I seen.

7  Q. What color was that hoodie?

8  A. Black.

9  Q. Did you see the gun?

10  A. Yes.

11  Q. What color was the gun?

12  A. I think it was chrome.

13  Q. Do you remember being interviewed by the

14 police back on October 31st, 1997 while you were in

15 the hospital?

16  A. Yes.

17  Q. And do you remember being interviewed by a

18 detective named Detective Fancsali?

19  A. Yes.

20  Q. Do you recall him asking you the question

21 did you see the gun, and you saying, yeah, it was a

22 black gun?

23  A. Yes, but it's -- somehow I don't understand

24 the reason why I said black gun or that it was an

C000622

1  automatic, because it says in my little thing that he

2  gave me yesterday that it had a wheel on it.

3        MR. KLIMENT:   I'm going to object to him

4  testifying about the little thing he got -- was given

5  him yesterday.

6        THE COURT:   Sustained.

7  BY MR. GUAGLIARDO:

8     Q.   The only question pending is do you remember

9  telling Detective Fancsali it was a black gun?

10     A.   No.

11     Q.   Other than what you've described of the gun,

12  what else do you remember about the gun?

13     A.   It was a long gun, it had a wheel on it,

14  that's the only thing I seen.

15     Q.   When you say a wheel, do you mean one of

16  those chambers that goes around like that?

17     A.   Right.

18     Q.   Your understanding would that be --

19        MR. KLIMENT:   I'm going to object to his

20  understanding.

21        THE COURT:   Sustained.

22        MR. GUAGLIARDO:   I'll strike that, Judge.

23  BY MR. GUAGLIARDO:

24     Q.   Did you go to the hospital that night?

1    A.    Yes.

2    Q.    How long were you in the hospital?

3    A.    Nine days.

4    Q.    Any surgery?

5    A.    Yes.

6    Q.    Have you had any -- after you got out of the

7    hospital after nine days, have you been back to the

8    hospital?

9    A.    Yes.

10    Q.    Any surgery since being discharged?

11    A.    No.

12    Q.    Mr. Matthews, are you a gang member?

13    A.    No.

14    Q.    Are you familiar with a gang called the

15    Gangster Disciples?

16    A.    Yes.

17    Q.    You're not a member of that gang?

18    A.    No.

19    Q.    Going back to October 29th, 1997, do you

20    have any idea why anybody would want to shoot you?

21    A.    No.

22    MR. GUAGLIARDO:  May I have one moment,

23    Judge?

24    THE COURT:  All right.

1                              (Off the record discussion.)

2              MR. GUAGLIARDO:  Judge, I would tender the

3    witness to the defense.

4              THE COURT:  Thank you.

5              Cross examination?

6              MR. KLIMENT:  Thank you.

7                         CROSS EXAMINATION

8    BY MR. KLIMENT:

9         Q.   Good morning, Mr. Matthews.  Can you hear me

10   all right?

11        A.   Yes.

12        Q.   Now, you talked to the police a couple of

13   times about what happened to you on October 29th,

14   1997; right?

15        A.   Yes.

16        Q.   You talked to them on the 29th?

17        A.   Yes.

18        Q.   You talked to them a couple times on the

19   29th; right?  Once at the scene?

20        A.   Yes.

21        Q.   And once at the hospital?

22        A.   Yes.

23        Q.   But you were hurt then and were taken back

24   into surgery?

1      A.   Yes.

2      Q.   So you didn't talk to them long?

3      A.   Right.

4      Q.   Then you also talked to them on the 31st,

5  and you gave a tape recorded statement at that time;

6  right?

7      A.   Right.

8      Q.   You've given some description today of the

9  person you saw with the gun?

10     A.   Right.

11     Q.   You said it was a male Mexican; right?

12     A.   Yes.

13     Q.   You said the person was wearing all black

14  with a black hood up?

15     A.   Yes.

16     Q.   And you said now you remember it was a

17  chrome colored gun?

18     A.   If I'm not mistaken, yes.

19     Q.   That's what you remember as you sit here

20  today?

21     A.   Right.

22     Q.   And it had --

23     A.   A wheel on it.

24     Q.   Circular chamber, a wheel?

C000636

1       A.      Right.

2       Q.      Now, when you were shot, you were shot in

3   the stomach I think you said?

4       A.      Right.

5       Q.      Were you facing the person who shot you?

6       A.      Yes.

7       Q.      How close were you to the person who shot

8   you?

9       A.      Three feet.

10      Q.      So three feet is not very far; arm's length?

11      A.      Yes.

12      Q.      Was it light out or dark out at the time you

13  were shot?

14      A.      It was dark.

15      Q.      Were there any lights where you were?

16      A.      Not much, not many.  One at the beginning of

17  the staircase, and that was it.

18      Q.      Was it so dark that you could not then see

19  the person who shot you, you could not see their face

20  clearly?

21      A.      Right.

22      Q.      So from three feet you couldn't see the face

23  of the person who shot you?

24      A.      I could see the face of the person who shot

1    me, but it happened so fast, as soon as he seen me, I

2    seen him, it was over with.

3        Q.    Now, when you talked to the police both on

4    October 29th of 1997 and October 31st of 1997 you said

5    that you thought you could tell them who it was if you

6    saw that person again, the person who shot you; right?

7        A.    I don't remember.

8        Q.    You don't remember telling the officers if

9    you saw the person who shot you, you could identify

10   them?

11       A.    No.

12       Q.    All right.    I'm going to refer to you to

13   October 29th.    Do you remember talking to an

14   investigator Kip Rose at the hospital?

15       A.    No.

16       Q.    Do you remember speaking to an officer at

17   the hospital?

18       A.    Yes.

19       Q.    This would have been before you went to

20   surgery?

21       A.    Yes.

22       Q.    Do you remember him asking you if you'd

23   recognize the person if you saw him again and you

24   telling him that yes, you could.    Do you remember

1  being asked that question and giving that answer?

2      A.   No.

3      Q.   No, you don't recall, or no, you didn't say

4  that?

5      A.   I don't recall.

6      Q.   I'm going to ask you then about the three.

7  October 31st you spoke to another officer?

8      A.   Yes.

9      Q.   Do you remember Detective Fancsali?

10      A.   Yes.

11      Q.   Do you know who that is?

12      A.   Yes.

13      Q.   Do you remember talking to him that day, and

14  that would be a tape recorded statement?

15      A.   Yes.

16      Q.   Do you remember him -- do you remember him

17  asking you if you would recognize who shot you?

18      A.   Yes.

19      Q.   And do you remember telling him that you

20  thought you could identify him?

21      A.   No.

22      Q.   You don't remember saying that?

23      A.   No.

24      Q.   Now, this person who shot you, did he say

1  anything at all?

2      A.    No.

3      Q.    You never heard him say a word to anybody?

4      A.    No.

5      Q.    And you see a lot of people in the courtroom

6  today; right?

7      A.    Yes.

8      Q.    Do you see the person who shot you in the

9  courtroom?

10     A.    No -- no.

11          MR. KLIMENT:  Thank you, Mr. Matthews.

12          I have nothing further of the witness at

13  this time.

14          THE COURT:  All right.  Redirect,

15  Mr. Guagliardo?

16          MR. GUAGLIARDO:  Yes, Judge.

17                  REDIRECT EXAMINATION

18  BY MR. GUAGLIARDO:

19     Q.    How long -- I know this is a tough question,

20  but asking you to think back to October 29th, 1997,

21  how long of a look -- and I mean in terms of time --

22  did you get at this person who shot you?

23     A.    About two seconds.

24     Q.    And did you get a good look at the person?

1      A.    No.

2      Q.    If the person -- I'm sorry.  You got enough

3 a look of him to tell what his race was; correct?

4      A.    Right.

5      Q.    And you could tell if he was a male or

6 female?

7            MR. KLIMENT:  I'm going to object to the

8 leading questions.

9            THE COURT:  Sustained.

10 BY MR. GUAGLIARDO:

11      Q.    Can you see back there; can you see faces if

12 you're close enough to someone?

13      A.    Yes.

14      Q.    Do you remember if you were shot first or

15 were other people shot first?

16      A.    I was shot first.

17      Q.    Then what do you remember happening?

18      A.    After I got shot, I seen Tara get shot, and

19 I ran the same way that he came, and I don't know what

20 happened after that.

21      Q.    Now, if the person who shot you was in this

22 courtroom, do you think you saw him good enough to

23 identify him?

24      A.    I didn't hear you.

C000631

1          Q.    If the person who shot you was in this

2    courtroom, did you get a good enough look at him to

3    identify him?

4          A.    No.

5               MR. GUAGLIARDO:   I have nothing further,

6    Judge.

7               THE COURT:   Any recross based on that,

8    Mr. Kliment?

9                    RECROSS EXAMINATION

10   BY MR. KLIMENT:

11         Q.    The person who shot you was three feet away

12   when they shot you?

13         A.    Yes.

14         Q.    And it was light enough that if a person was

15   close enough to you, you could see their face?

16         A.    Yes.

17              MR. KLIMENT:   I have nothing further.

18              THE COURT:   Thank you very much,

19   Mr. Matthews.  You may step down.

20              Where do we stand in terms of your next

21   witness?

22              MR. GUAGLIARDO:   If we could approach,

23   Judge, make a decision.

24              THE COURT:   All right.