File Date:  5-29-2008

Case No:  07cv6793

ATTACHMENT # _____

EXHIBIT  5 (continued)

TAB (DESCRIPTION)

_____

1                         (The following proceedings

2                         were had out of the presence

3                         of the jury.)

4          MR. GUAGLIARDO:  My next witness is the

5   woman in jail, Shayla Johnson.  I'm not going to get

6   her done in 15 minutes, Judge, especially with cross.

7          MR. KLIMENT:  I expect the next two

8   witnesses are two crucial witnesses, and they are

9   going to be --

10         THE COURT:  Lengthy?

11         MR. KLIMENT:  I would think so.

12         THE COURT:  We can recess now and have them

13  come back and start at 1:00 promptly.

14         MR. GUAGLIARDO:  Or even earlier.

15         THE COURT:  You don't think you can get them

16  done in half hour?

17         MR. GUAGLIARDO:  I couldn't get direct done

18  and cross done.

19         MR. KLIMENT:  It wouldn't bother me if we

20  broke, but --

21         MR. GUAGLIARDO:  We have to bring her up,

22  Judge.  I don't know where she is.

23         THE COURT:  She's not in the holding room?

24         MR. GUAGLIARDO:  I don't think so.  She's

C000633

1    downstairs.

2              THE COURT:   All right.

3                        (The following proceedings

4                        were had in the presence of

5                        the jury.)

6              THE COURT:   Ladies and gentlemen, the good

7    news is we're going to be taking our lunch recess a

8    little earlier than perhaps anticipated.  As you know,

9    we have the cafeteria downstairs and some restaurants

10   in the area.  We should convene promptly at 1:00.

11        So please do not discuss the case amongst

12   yourselves or anyone else or allow anyone to discuss

13   it in your presence.  Do not read any outside

14   accounts, news accounts of the case, do not form or

15   express any opinions about the case, and do not

16   attempt to visit the scene, of course, of any alleged

17   occurrence unless the Court were to direct you

18   otherwise.

19        So if you could check in downstairs at I

20   would say ten to 1:00 -- counsel, can we start

21   promptly at 1:00, please?

22              MS. PARGA:   Yes, Judge.

23              MR. GUAGLIARDO:   Yes, Judge.

24                        (Recess taken.)

1          THE COURT:  Back on the record on People

2   versus Amaya, jury is present, all counsel are

3   present, and the defendant is present.

4          Ms. Parga?

5          MS. PARGA:  Judge, may we approach?

6          THE COURT:  Yes.

7                         (The following proceedings

8                          were had out of the presence

9                          of the jury.)

10          MS. PARGA:  Judge, I think there were some

11   issues regarding the next witness that we wanted to

12   address with the Court, I think both sides.

13          THE COURT:  That's why I asked the bailiff

14   to find out if you were ready.  I was told you were

15   ready.

16          MR. GUAGLIARDO:  We were ready for you,

17   Judge.  She didn't say ready for the jury.

18          THE COURT:  Go ahead.

19          MS. PARGA:  Judge, the issue that I wanted

20   to raise is Ms. Johnson is in custody right now.  My

21   concern is I didn't want her to come forth and say in

22   front of the jury that the reason she didn't come to

23   court was out of some fear from Mr. Amaya, because the

24   fact is she has two other warrants pending out of

 1  McHenry and Cook County.

 2       THE COURT: Are you planning on bringing up

 3  the reason why she's in custody?

 4       MR. GUAGLIARDO: The fact that she didn't

 5  show up yesterday, yes, Judge.

 6       THE COURT: Are you intending to elicit

 7  she's afraid of somebody?

 8       MR. GUAGLIARDO: It depends on her

 9  testimony, Judge. I think it's certainly a possible

10  area if she goes south or something.

11       THE COURT: I'd be very careful in staying

12  away from that. It's very dangerous ground.

13       MR. GUAGLIARDO: It goes to perception of

14  the witness. I don't know what she's going to say. I

15  think one of the theories of the defense in this case,

16  Judge, is these people are coming in to set Armando

17  Amaya up, and if she's afraid of the gang he's a

18  member of, that tends to refute that theory of

19  defense.

20       MR. KLIMENT: I think if she can come up

21  with some articulable reason like Armando made some

22  kind of threat against her since she became a witness,

23  but just to say I'm afraid of what someone else might

24  do to me, there's no specific threat related to this

1   case.

2   THE COURT: You could theoretically have

3   every witness in a gang shooting case come up with

4   that.

5   MR. GUAGLIARDO: There is one specific

6   threat he has made to her before, though, and, Judge,

7   that happened during the summer of 1997, Judge, and

8   this is an ID case. The big issue in this case is

9   whether she can identify him, and I think --

10   THE COURT: Is she an alleged victim or just

11   a witness?

12   MR. GUAGLIARDO: A witness. And the fact --

13   any conversation she's had with him before goes to her

14   identification, her opportunity to observe, how far

15   she was.

16   THE COURT: So what is she going to testify

17   to?

18   MR. GUAGLIARDO: Well, he at one time

19   threatened to kill her before this case.

20   THE COURT: Your response to that?

21   MS. PARGA: Judge, our response would be

22   that she says that a person named Scarecrow threatened

23   to kill her. There's no foundation for the

24   statement. We don't know when this was said, where,

1   if any other witnesses were present.

2          THE COURT:  That's true.  She would have to

3   identify him in court as the person who she spoke

4   with, so I don't see how Scarecrow would come into

5   this.  You have to lay the foundation.

6          MR. GUAGLIARDO:  Yes.

7          THE COURT:  Then you can get into -- if she

8   identifies him by face.

9          MR. KLIMENT:  I don't think they should be

10  allowed to relate that conversation.

11         THE COURT:  I have a problem with the

12  threat.

13         MR. GUAGLIARDO:  Well, I'll just say I'll do

14  my best to anticipate.

15         THE COURT:  You're saying this goes to ID,

16  which is legitimate.  However, does the prejudicial

17  value outweigh the probative?  I think it does.  So

18  I'll let you get into the fact that she had met him as

19  the basis for the identification, but stay away from

20  any threats.

21                        (The following proceedings

22                        were had in the presence of

23                        the jury.)

24         THE COURT:  The People may call their next

C000638

1  witness.

2          MR. GUAGLIARDO:  Judge, we would call Shayla

3  Johnson.  She's in custody, Judge.

4          THE COURT:  All right.  Let's bring her out,

5  please.

6                                      (Witness sworn.)

7          THE COURT:  Ms. Johnson, would you please

8  have a seat on the witness stand in the blue chair at

9  the far end of the bench?

10         Ms. Johnson, if you could keep your voice up

11 so that everyone could hear you, if you could please

12 wait until the attorney has finished with the question

13 before you attempt to answer it, and if you would,

14 please answer all of the questions out loud.

15         Mr. Guagliardo, you may proceed.

16         MR. GUAGLIARDO:  Thank you, your Honor.

17                  SHAYLA JOHNSON,

18 called as a witness herein, having been first duly

19 sworn, was examined and testified as follows:

20                 DIRECT EXAMINATION

21 BY MR. GUAGLIARDO:

22     Q.   Could you please state your name?

23     A.   Shayla Dushun Johnson.

24     Q.   How old are you, Ms. Johnson?

```
 1          A.    17 years old.

 2          Q.    Ma'am, you have some charges currently

 3     pending against you; correct?

 4          A.    Yes, sir.

 5          Q.    In Kane County?

 6          A.    Yes.

 7          Q.    You have a retail theft pending against you?

 8          A.    Yes, sir.

 9          Q.    Is that in the Aurora branch court?

10          A.    No.  I went to jail in Batavia, sir.

11          Q.    And the retail theft you have pending

12     against you is a misdemeanor; correct?

13          A.    Yes, sir.

14          Q.    Do you have cases in any other counties?

15          A.    No, sir, just -- I have different cases in

16     this county like curfew and seat belt driving, that's

17     about it, misdemeanors.

18          Q.    Now, you're currently in custody; correct?

19          A.    Yes, sir.

20          Q.    You didn't show up for this case yesterday;

21     correct?.

22          A.    Right.

23          Q.    And you were picked up on a warrant; is that

24     right?
```

C000640

1    A.    Yes.   Well, I called him when I was able to

2  get -- well, I called the officer when I was able to

3  get to a phone, and I had them come get me.

4    Q.    So the reason you're in custody right now is

5  the warrant on this case; correct?

6    A.    Yes, sir.

7    Q.    You were supposed to be here yesterday

8  morning, and for whatever reason, you weren't here;

9  correct?

10    A.    Uh-huh.

11    Q.    Why are you saying you weren't here?

12    A.    My ride canceled at the last minute, and I

13  wasn't by a phone for them to call.

14    Q.    Ms. Johnson, I want to go back to the night

15  that Jermaine Lambert was killed, October 29th of '97,

16  about 8:50 at night, right before the killing

17  happened.   Where were you at that time?

18    A.    I was standing -- I believe the street is

19  West Park on the -- and --  well, actually at first I

20  was walking down from the liquor store, I'm not sure

21  what the name of it is, but the liquor store is on

22  Galena.   I was coming down from the liquor store.   I

23  had been on the scene for like five minutes.

24    Q.    When you say on the scene, what do you mean

C000641

1   by on the scene?

2         A.   Like right where it actually happened.

3         Q.   Was that behind an apartment building?

4         A.   Yes, on the side kind of more.

5         Q.   Is that the apartment building in Aurora,

6   Illinois?

7         A.   Yes, sir.

8         Q.   Did you live at that apartment complex?

9         A.   Not at the time, no.

10        Q.   Do you know what street that apartment

11  complex is on?

12        A.   Yes, sir.

13        Q.   What street?

14        A.   It's on New York Street and Lincoln, New

15  York and Lincoln.

16        Q.   What were you doing at those apartment

17  buildings that night?  Why were you there?

18        A.   Well, I was just there because -- I mean,

19  just hanging out basically.

20        Q.   Were you alone or were you with some

21  friends?

22        A.   Yes, I was with a friend, and we met a

23  couple of more friends down there.  I was with Nicole

24  Pearson.

C000642

1    Q.    And what other friends did you meet down

2  there?

3    A.    Let's see, Toni, a girl named Toni Lesure.

4  I met Jermaine Lambert down there and another girl

5  named Regina Bedford, I think.

6    Q.    Okay.  Now, did you eventually go to the

7  back of that building at New York Street, or was what

8  you put the side the back of the building?

9    A.    It's like right at the corner.

10    Q.    By the side and the back?

11    A.    Yeah.  Where I was standing, yes.

12    Q.    And was there an argument going on back

13  there?

14    A.    Yes, sir.

15    Q.    Were there children, were there kids out

16  there?

17    A.    Yes, sir.

18    Q.    How many children or kids were out there?

19    A.    I'd say it was at least, I don't know, maybe

20  about nine or ten kids.

21    Q.    Were there other people, adults watching the

22  argument with you?

23    A.    Yes, sir.

24    Q.    What, if anything unusual, happened as you

C000643

93

1   were watching this argument?

2        A.   Excuse me, I'm sorry?

3        Q.   Do you want me to rephrase that?

4        A.   Yes, please.

5        Q.   What happened as you were watching this

6   argument?

7        A.   Well, as I was watching the argument I saw

8   someone walk up from the Lincoln side; okay?  It was

9   like some stairs.  You came up from the Lincoln side

10  up the stairs and walked where we were.  And I saw him

11  kind of move this girl out the way, you know, and then

12  started shooting.  But it was like -- I was shocked, I

13  couldn't do nothing.  I couldn't run until after, you

14  know, the shooting was done.

15       Q.   You say you saw this person walking up from

16  the Lincoln way.  Were you facing that direction?

17       A.   Yes, sir.

18       Q.   Did you see him before the shooting started?

19       A.   Yes.  That was actually when I saw his face,

20  when he was walking up.  When he started shooting, I

21  was like looking at the gun.  I was out of there.

22       Q.   You say this person moved a lady or

23  something.  Can you explain what you mean by that?

24       A.   Kind of like -- you know how you walk up and

C000644

1   you bump into somebody like, excuse me, you know,

2   like --

3       Q.   What did he do after he pushed this lady out

4   of the way?

5       A.   Well, after he pushed her out the way, he

6   walked up maybe about three or four more steps, and he

7   just started shooting.

8       Q.   What kind of a gun did he have?

9       A.   Well, I think it is -- I thought it was a

10  revolver, because it was kind of big, and there were

11  only like five or six shots.

12      Q.   How did he handle the gun?

13      A.   Kind of like wild.

14      Q.   What do you mean by that?

15      A.   Like, you know, shooting like after shot

16  like that.   It was like he couldn't handle it or

17  whatever.

18      Q.   Approximately how many times did he fire the

19  gun?

20      A.   Five or six.

21      Q.   Was the shooter a man or a woman?

22      A.   A man.

23      Q.   Was he black, white or Hispanic?

24      A.   Hispanic.

1      Q.    Did you get a look at the shooter's face

2  before he started to shoot?

3      A.    Yes, I did.

4      Q.    How far from him were you when you saw his

5  face?

6      A.    Maybe from, I don't know, like me to that--

7  like that black thing on top of that counter right

8  there in front of these people.

9      Q.    For the record, are you speaking about the

10 microphone?

11     A.    Okay, the microphone.

12     Q.    When you say in front of these people, are

13 you referring to the jury?

14     A.    Yes, sir.  Maybe a little bit closer,

15 though, but not very much closer.

16     Q.    Did he look you in the face?

17     A.    Yes.

18     Q.    Do you see that person anywhere in this

19 courtroom today?

20     A.    Yes, I do.

21     Q.    Is he in the courtroom?

22     A.    Yes, he is.

23     Q.    Could you point that person out and identify

24 clothing that person's wearing?

1    A.   Right there, sitting next to a woman wearing

2  like a blue shirt, button-down.

3         MR. GUAGLIARDO:  Judge, let the record

4  reflect that this witness has identified the defendant

5  in this case, Armando Amaya.

6         THE COURT:  The record will so reflect.

7  BY MR. GUAGLIARDO:

8    Q.   Now, had you ever seen the defendant before

9  the night of October 29th, 1997, the night of the

10  shooting?

11   A.   Yes.

12   Q.   Where had you seen him?

13   A.   I seen him at I believe it's 718 East New

14  York or 709, somewhere -- it's like two houses from

15  Poncho's Tacos, two or three houses from Poncho's

16  Tacos.

17   Q.   How many times had you seen the defendant

18  before the night of this shooting?

19   A.   I'd say about maybe five or six times.

20   Q.   And could you kind of explain for the jury

21  under what circumstances would you see him?  You say

22  near Poncho's Tacos five or six times.  What would be

23  the circumstances that you would see the defendant?

24   A.   Well, he'd come and see -- okay, there was

C000647

1    these two sisters.  I come to see the older sister.  I

2    guess he come to see the younger sister.  And, you

3    know, we would -- me and my friends, we would go

4    upstairs, and him and the girl and a couple other

5    guys, they'd be downstairs on the front porch.

6             And I saw him one time I was about to stop

7    at a red light -- well, actually, I was stopped at the

8    red light, and he said something like I'm --

9             MS. PARGA:  Objection.

10   BY MR. GUAGLIARDO:

11        Q.   I don't want you to say what he said.  You

12   said you were stopped in a red light?

13        A.   I was in a, yeah, truck.

14        Q.   Did he come up to the car?

15        A.   Not like right in the street, but --

16        Q.   How far was he from you?

17        A.   Maybe where I am from this man right here.

18        Q.   And the other times that you saw him -- you

19   saw him IN a car that one time.  What about Poncho's

20   Tacos?  Would you see him there or around there?

21        A.   Yes, I see him there, and I saw him maybe

22   like twice at -- 'cause my friend, April Hardline, she

23   used to live on 4th Street, and he would either live

24   across the street from her or something, I saw him

C000648

1   once or twice in that area.

2       Q.    In addition to when you would see him at

3   Poncho's Tacos or in that area?

4       A.    Yeah.

5       Q.    When was this these times that you would see

6   him?  The shooting happened in October of '97.  When

7   did you see the defendant in this case before that

8   shooting?  You don't have to give me a day, but was

9   it --

10      A.    Yeah, I'd say it had to be between maybe

11  like from the end of June and then, you know, to the

12  end of July -- or no, August, too.  All while it's

13  warm but after -- you know, after the end of June.

14      Q.    You're talking about the same year the

15  shooting occurred?

16      A.    Yes.

17      Q.    Are you aware back -- let's go back to the

18  night of the shooting.  Were you aware of any

19  nicknames that the defendant used?

20      A.    What do you mean, nicknames that --

21      Q.    Well, let me rephrase the question, it's a

22  poorly phrased question.

23            Were you aware of any nicknames that he went

24  by?

1  A. He as in --

2  Q. The defendant.

3  A. Scarecrow. I just found out his name

4 yesterday, his real name.

5  Q. So you knew him as what?

6  A. Scarecrow, and that's all, just Scarecrow.

7  Q. When you saw him, that's what he'd be

8 referred to as, and that's what you knew him as,

9 Scarecrow?

10  A. Yes, because like I said, I never heard his

11 real name until yesterday.

12  Q. Let's go back to the night of October 29th,

13 1997, the night of the shooting. Where were you just

14 prior to the time you went behind the apartment

15 building at 309 East New York Street?

16  A. I believe I was coming from my apartment. I

17 stayed at 583 East Galena.

18  Q. You said something about -- I'm sorry?

19  A. Which is I'd say about four or five blocks

20 away from the building.

21  Q. You said something about a liquor store?

22  A. Yes. There's a liquor store maybe not even

23 a full block away from the building.

24  Q. Were you walking towards the building on

1       A.    He as in --

2       Q.    The defendant.

3       A.    Scarecrow.   I just found out his name

4    yesterday, his real name.

5       Q.    So you knew him as what?

6       A.    Scarecrow, and that's all, just Scarecrow.

7       Q.    When you saw him, that's what he'd be

8    referred to as, and that's what you knew him as,

9    Scarecrow?

10      A.    Yes, because like I said, I never heard his

11   real name until yesterday.

12      Q.    Let's go back to the night of October 29th,

13   1997, the night of the shooting.   Where were you just

14   prior to the time you went behind the apartment

15   building at 309 East New York Street?

16      A.    I believe I was coming from my apartment.   I

17   stayed at 583 East Galena.

18      Q.    You said something about -- I'm sorry?

19      A.    Which is I'd say about four or five blocks

20   away from the building.

21      Q.    You said something about a liquor store?

22      A.    Yes.   There's a liquor store maybe not even

23   a full block away from the building.

24      Q.    Were you walking towards the building on

1    Lincoln and New York Street?

2        A.    No, I wasn't on Lincoln or New York Street.

3    I was on West Park.

4        Q.    Did you see any vehicles that caught your

5    attention at that time?

6        A.    Yes, I did.

7        Q.    What kind of car did you see?

8        A.    I saw a four-door white might be a Celebrity

9    or a Buick Century with like a red line on the side.

10        Q.    Now, you gave a taped statement in this case

11    back on December 19th, 1997; correct?

12        A.    Yes, sir.

13        Q.    That was to Detective Fanscali and Detective

14    Sauer?

15        A.    Yes, sir.

16        Q.    And that was a tape recorded statement?

17        A.    Yes, sir.

18        Q.    Was that tape recorded statement with your

19    permission?

20        A.    Yes, sir.

21        Q.    And is it true that at that time you

22    described the car as a white car, white four-door

23    Celebrity?

24        A.    Yes, that's true.

Q.    You didn't describe it as anything else but that; correct?

A.    You mean a Celebrity, saying Celebrity, yeah.

Q.    That's the only thing you called it is a white four-door Celebrity; correct?

A.    Yes, that's true.

Q.    Were there people in this white four-door Celebrity when you saw it that night?

A.    Yes, sir.

Q.    Was it males or females in the car?

A.    All males.

Q.    Were they white, black or Hispanic?

A.    Hispanic.

Q.    What were the Hispanic males doing in the car when you saw them?

A.    Well, I'd say about maybe two were hanging out the car, the passenger and the back passenger window hanging out saying stuff like King Love and GDK and Kings Rule.

MS. PARGA:    Objection, Judge, hearsay.

THE COURT:    Response?

MR. GUAGLIARDO:    Judge, it's not for the truth of any matter asserted.

C000653

```
 1            THE COURT:  Simply what was being said.

 2   Taken simply as what was being said, the objection is

 3   overruled if it's something she personally has

 4   knowledge of.

 5            Proceed.

 6   BY MR. GUAGLIARDO:

 7       Q.   Was Scarecrow in that white four-door

 8   Celebrity?

 9       A.   Yes, he was.

10       Q.   And could you kind of describe again you

11   were saying you were on West Park Street.  Where else

12   is -- well, you tell me.  Where were you about when

13   you saw this Celebrity driving by shouting these

14   slogans?

15       A.   Well, when I saw the car, I was maybe like

16   halfway to the building.  I'd say like in the middle

17   of the block, in the middle of West Park.

18       Q.   Did you see the car anywhere else that

19   night?

20       A.   No, not that night, no.

21       Q.   Now, back to the shooting, as the shooting

22   was happening, what did you do?

23       A.   Well, as the shots were being fired I was

24   just staring at the -- at the barrel.  I man, I was
```

C000654

1  shocked.  I couldn't do nothing, I couldn't do nothing

2  at all.

3      Q.  Did you eventually run from the scene?

4      A.  Yes, I did, I ran back to the liquor store,

5  down West Park back to the liquor store.  And I caught

6  -- I got a ride from a guy that lives in that

7  building, but I think he was -- you know, I don't

8  really even remember where he got us from.  But I do

9  remember I ran back to the liquor store, ran back to

10  the liquor store and ran back, you know, just to see

11  if everything was okay.

12      Q.  Did you talk to any police officers that

13  night?

14      A.  No.

15      Q.  Did you go back to the scene and volunteer

16  information to police officers?

17      A.  No.

18      Q.  Did you want to get involved in this at all?

19      A.  Not at that time, no.

20      Q.  You said you were with a woman named Nicole

21  Pearson that night?

22      A.  Yes, sir.

23      Q.  Does she go by any nicknames?

24      A.  Yes, she does.

C000655

Q. What name does she go by?

A. Coco.

Q. That's C-O-C-O?

A. Uh-huh, C-O-C-O.

Q. Okay. Did you and Nicole Pearson eventually go to the Aurora police station on December 19th, 1997?

A. Yes, I believe that was the date.

Q. Now, when you and Nicole went to the police station that day, did you go to talk about this offense?

A. No.

Q. Were you there to talk about some other offense?

A. Yes.

Q. Without getting into that other offense, were you making a complaint basically?

A. Yes.

Q. And who started talking about that offense when you went to the police on December 19th?

A. You mean his case?

Q. Yes. Who started talking about the shooting behind these Lincoln apartments when you went to the police?

C000658

1    A.  The police.

2    Q.  They started asking you questions?

3    A.  Yes.

4    Q.  And did you start to tell them what you knew

5    at that time?

6    A.  Yes, I did.

7    Q.  Had the police ever approached you to talk

8    to you about this offense before then?

9    A.  No.

10   Q.  Do you remember participating in a what's

11   called live lineup back in February of 1998?

12   A.  Yes, I do.

13   Q.  Do you remember where that lineup took

14   place?

15   A.  Yes, I do.

16   Q.  Where did that lineup take place?

17   A.  At the Kane County jail.

18   Q.  And was that, to the best of your memory,

19   February 4th, 1998, about 6:20 in the evening?

20   A.  Yes, sir, the best of my memory.

21   Q.  And did you view a lineup that night?

22   A.  Yes, I did.

23   Q.  What were you asked to be looking for in

24   that lineup?

C000657

1      A.   What do you mean, what was I asked it be --

2   the person.

3      Q.   Let me ask the question in a little more

4   clear way, if I could.

5           Were you asked if the shooter from this

6   offense at Lincoln was in that lineup?

7      A.   Oh, yeah.

8      Q.   And did you pick somebody out as the

9   shooter?

10     A.   Yes, I did.

11     Q.   Is that person in this courtroom?

12     A.   Yes, he is.

13     Q.   Would that be the defendant on trial,

14   Armando Amaya?

15     A.   Yes, sir.

16     Q.   Now, in back of the apartment building on

17   New York and Lincoln Street, it's fair to say it's not

18   really brightly lit; isn't it fair to say that?

19     A.   Yes, sir.

20     Q.   Were you close enough so you could see the

21   shooter's face?

22     A.   Yes, I was.

23     Q.   And did you recognize him from your previous

24   contacts with him?

1    A.    Yes, I did.

2          MR. GUAGLIARDO:  If I may have a moment,

3  Judge.

4          THE COURT:  Yes.

5  BY MR. GUAGLIARDO:

6    Q.    Did you see anybody actually get shot that

7  night, or was there just so much confusion you didn't

8  see that part?

9    A.    No, I didn't see who was shot.  Actually, I

10  didn't think no one got shot.

11          MR. GUAGLIARDO:  Judge, I would tender the

12  witness.

13          THE COURT:  Okay.  Thank you.  Cross

14  examination, Ms. Parga?

15          MS. PARGA:  Thank you, Judge.

16                    CROSS EXAMINATION

17  BY MS. PARGA:

18    Q.    Ms. Johnson, you told us today that you were

19  close enough to the shooter to see his face?

20    A.    Yes, I did.

21    Q.    You were looking right at the gun you said?

22    A.    No, this is what I said.  I said when he

23  walked up, I saw his face, but when he started

24  shooting, I was looking at the gun, at the barrel, you

1   know.

2        Q.   So you were standing between another person

3   and the shooter?

4        A.   No.   It was a whole bunch of people out

5   there.   It was I'd say at least 20 people, about 20

6   people out there.

7        Q.   Okay.  And you didn't see anybody get shot?

8        A.   No, I did not.

9        Q.   The first time you spoke to the police was

10  on December 19th of 1997?

11       A.   I believe so.

12       Q.   And you told police when you spoke to them

13  in December that you had been at the shooting in

14  October of '97?

15       A.   Yes, I did.

16       Q.   But you didn't talk to the police on the

17  night of October 29th; did you?

18       A.   No, I did not.

19       Q.   And you didn't talk to the police at any

20  time in October; did you?

21       A.   No, I did not.

22       Q.   And you didn't talk to the police in

23  November?

24       A.   Uh-huh.

C000660

1      Q.    In fact, you didn't talk to the police until
2   the middle of December?

3      A.    Yeah, that's the -- yes.

4      Q.    And when you spoke to the police, you told
5   them that you had seen someone you know as Scarecrow
6   on October 29th?

7      A.    Yes.

8      Q.    And you told the police that you had seen
9   this person that you know as Scarecrow prior to the
10  shooting that you were at?

11     A.·   Yes.

12     Q.    You told the police that you had been coming
13  back from the liquor store; true?

14     A.    Yes, I had been coming from that way.  I was
15  there earlier, but --

16     Q.    You were coming from the liquor store?

17     A.    ·Yes.

18     Q.    And you were coming back with your friends?

19     A.    :My friend, one friend.

20     Q.    With one friend.  And that's when you saw a
21  car on West Park?

22     A.    Yes, ma'am.

23     Q.    And you told the police it was a white car?·

24     A.    Yes, I did.

Q. And you said that you thought the car had a red line around it?

A. Yes.

Q. You thought it might be a stripe?

A. Yes.

Q. And you told the police you thought there were five people in that car?

A. Yes.

Q. And you told us today that two of those people had been hanging out of the passenger's side of the car?

A. Yes, like the passenger front and the passenger back.

Q. Okay. But you didn't tell the police that when you spoke with them in December; did you?

A. I don't think so. I can't remember.

Q. And you told the police that you had seen the person who had done the shooting in the car that you saw on West Park?

A. Yes, I did.

Q. You told the police you thought you knew who the shooter was?

A. I knew.

Q. And you told us in court today that Jermaine

1    Lambert was a friend of yours?

2         A.    Yes, ma'am.

3         Q.    You had seen Jermaine earlier that day?

4         A.    Yes, I did.

5         Q.    And when you went to 309 East New York

6    Street, you had been there about five minutes?

7         A.    'Yes -- before the shooting -- I mean, yeah,

8    before the shooting.

9         Q.    And you said there was somebody arguing

10   outside?

11        A.    Yes, ma'am.

12        Q.    And you told the police you heard somebody

13   arguing?

14        A.    Uh-huh.

15        Q.    And you told the police there were a lot of

16   kids outside?

17        A.    Uh-huh.

18        Q.    And that there were little kids?

19        A.    Yes.

20        Q.    And then you told the police that you were

21   there?

22        A.    Yes, ma'am.

23        Q.    And you also told the police your

24   girlfriends were there?

C000663

A.   Right.

Q.   The same friends you had been walking back from the liquor store with?

A.   No, I walked back from the liquor store with Nicole Pearson.  When I got there, Toni Lesure and Regina Bedford were there already.

Q.   And Nicole Pearson was no longer with you?

A.   When?

Q.   When you were at 309 East New York Street.

A.   No.  She was there with me the whole time.

Q.   You told police, Ms. Johnson, that you saw the shooter walk up --

MR. GUAGLIARDO:  Your Honor, I would have to object to getting into the prior interview unless it's impeachment.

MS. PARGA:  Judge, I'm getting there.

THE COURT:  All right.  Is there an objection at the moment?

MR. GUAGLIARDO:  No, Judge.

THE COURT:  On your representation you're getting there, you may proceed.

MS. PARGA:  Thank you, Judge.

BY MS. PARGA:

Q.   Ms. Johnson, you told the police that you

1    heard the shooter say something?

2        A.   No, I didn't say that.

3        Q.   You didn't say that to the police on

4    December 19th?

5        A.   Okay, that I heard him say something when he

6    walked up or --

7        Q.   That you heard -- that before he started

8    shooting, you heard the shooter say something?

9        A.   No, I didn't say that.  I said that I think

10   it was -- I'm not sure if it was the first or the

11   second interview, but I told the police that the girl

12   was saying that what he said was excuse me, but I

13   never told him that I haired, you know, anything come

14   out his mouth.  I don't remember telling them.

15       Q.   Before you went to speak with the police on

16   December 19th you had spoken with other people about

17   what happened on October 29th?

18       A.   Yes.

19       Q.   And you had talked to your friends about

20   what happened?

21       A.   Uh-huh.

22       Q.   And you talked with Nicole Pearson about

23   what had happened on that night?

24       A.   Yeah.

Q.   And on that day, December 19th, you and Nicole went to the police station together?

A.   Yes, we did.

Q.   You gave the police on December 19th a description of the shooter; yes?

A.   Yes.

Q.   And you told the police he was about five feet four inches; yes?

A.   Yes.

Q.   You told the police he wasn't even five feet tall?

A.   Excuse me?

Q.   You told the police that he was not even five feet tall?

A.   No.  I thought I told them he was about 5'4" between 130 and 140 pounds.

Q.   And you told the police -- you described him as a skinny guy?

A.   Yes.

Q.   Now, when you talked to the police on December 19th, you told them everything that you remembered?

A.   Yes -- well, yes, about everything I remember, yes.

C000668

Q.    And you wanted to cooperate with the police?

A.    Yes.

Q.    Because your friend had been shot?

A.    Yes.

Q.    And the State asked you earlier you had been subpoenaed to come to court?

A.    Yes, I have.

Q.    And that was for yesterday?

A.    Right.

10    Q.    But you didn't come to court yesterday?

11    A.    No.

12    Q.    And you knew that that subpoena was a court

13 order?

14    A.    Yes, I did.

15    Q.    And you knew if you didn't come to court

16 yesterday, you could get in trouble?

17    A.    Yes, I did.

18    Q.    And, in fact, today you're in the custody of

19 the Kane County jail?

20    A.    Yes, I am.

21    Q.    And you were arrested on a warrant that was

22 issued yesterday?

23    A.    I guess you could call it arrested, but I

24 called them when I was able to get to a phone and told

1  them to come get me, but I called and turned myself

2  in.

3      Q.   What time did you call, Ms. Johnson?

4      A.   I called I believe it was 7:00, between 7:00

5  -- I want to say between 7:00 and 7:45.

6      Q.   In the morning or at night?

7      A.   No, at night.

8      Q.   And that subpoena was for yesterday morning?

9      A.   Yes, ma'am, 8:45.

10     Q.   Ms. Johnson, you told us earlier you have a

11  misdemeanor case pending in this county?

12     A.   Yes, I do.

13     Q.   And that's for retail theft?

14     A.   Yes, ma'am.

15     Q.   And that case isn't done with?

16     A.   No.

17     Q.   And it's being prosecuted by the Kane County

18  State's attorney's office?

19     A.   I believe so.

20          MS. PARGA:  If I can have a moment, Judge.

21          THE COURT:  Yes.

22                    (Off the record discussion.)

23  BY MS. PARGA:

24     Q.   Ms. Johnson, if I could go back to the night

1   of the shooting on October 29th, you said there were

2   about 20 people there?

3       A.   Yes.

4       Q.   And there were people there who were taller

5   than you are?

6       A.   Uh-huh, yes.

7       Q.   And they were all gathered around?

8       A.   Uh-huh, yes.

9       Q.   And there were people who were in front of

10   you?

11       A.   No.

12       Q.   So the shooter was directly in front of you?

13       A.   Yes, he was.

14       Q.   He was facing you?

15       A.   Yes, he was -- I want to say he was facing

16   me not like directly in front of me, but he was facing

17   me, yes, he was, when he walked up.

18       Q.   There was no one between you and the

19   shooter?

20       A.   No.  A garbage can, but no person, no.

21       MS. PARGA:  I have no further questions,

22   Judge.

23       THE COURT:  Thank you.

24       Any redirect?

C000669

1          MR. GUAGLIARDO:  Briefly, your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. GUAGLIARDO:

4          Q.    The theft you have pending is in what town?

5          A.    Batavia.

6          Q.    That's what it's out of.  Where are you

7    going to court for that?

8          A.    Here.

9          Q.    There's no agreement between you and the

10   State's Attorney's Office regarding that charge;

11   correct?

12         A.    No.  We just like -- okay, when I came to

13   court for my first court date, they told me I couldn't

14   plead guilty because I was 17 for some reason.

15         Q.    What I'm getting at is I haven't talked to

16   you about if you testify a certain way here we're

17   going to do something with that theft case; I have not

18   done that?

19         A.    Oh, no.

20         Q.    We have no agreement?

21         A.    No.  I didn't think you was gonna find out

22   about it.  I don't know why, but --

23         Q.    In your recollection, did you ever tell the

24   police the shooter was less than five feet tall?

1      A.   No, I did not.

2      Q.   What color was the shooter dressed in,

3  clothes was he dressed in?

4      A.   Black or maybe navy, you know, dark, dark

5  blue, but it looked black.

6           MR. GUAGLIARDO:  Judge, I have nothing

7  further.

8           THE COURT:  Ms. Parga, any recross based on

9  that?

10          MS. PARGA:  No, Judge.

11          THE COURT:  Thank you very much,

12  Ms. Johnson.  You may step down.

13          Before you call the next witness, counsel,

14  please approach.

15          This is off the record.

16                         (Off the record discussion.)

17          THE COURT:  Is the State ready to call their

18  next witness?

19          MR. GUAGLIARDO:  Sure, Judge.  We call

20  Nicole Pearson.

21                         (Witness sworn.)

22          THE COURT:  Ms. Pearson, if you'd please

23  have a seat on the witness stand, that will be in the

24  blue chair here at the far end of the bench.

1          Ms. Pearson, please keep your voice up for

2     us.  Wait until the attorney has finished answering

3     the question before you attempt to answer it, and

4     please answer all of your questions out loud.

5          Mr. Guagliardo, you may proceed.

6          MR. GUAGLIARDO:  Thank you, your Honor.

7               NICOLE PEARSON,

8     called as a witness herein, having been first duly

9     sworn, was examined and testified as follows:

10               DIRECT EXAMINATION

11    BY MR. GUAGLIARDO:

12         Q.   Ma'am, could you please state your full

13    name?

14         A.   Nicole Naomi Pearson.

15         Q.   Naomi is your middle name?

16         A.   Yes.

17         Q.   How old are you?

18         A.   18.

19         Q.   Ma'am, I have to go through some of your

20    court cases.  You've been previously convicted of a

21    retail theft; is that correct?

22         A.   Yes.

23         Q.   That was in 1997?

24.        A.   Yes.

C000672

1      Q.   And you have some cases currently pending?

2      A.   Yes.

3      Q.   What courtroom are they in?

4      A.   Downstairs, 217 and 203.

5      Q.   And 203 you have some misdemeanors pending?

6      A.   No, it's a felony.

7      Q.   Is that in 203 or 217?

8      A.   203, in both of them.

9      Q.   What's the felony that's pending?

10     A.   A mob action battery.

11     Q.   And what is the case you have pending in

12  203?

13     A.   That's the mob action and battery.

14     Q.   What do you have pending in the other

15  courtroom?

16     A.   Same thing.

17     Q.   How about a resisting a peace officer,

18  disorderly conduct, criminal trespass to land; are

19  those pending?

20     A.   No, I have to do community hours for those.

21     Q.   You've pled to those?

22     A.   Yes.

23     Q.   Do you remember what you pled to exactly?

24     A.   Guilty.

C000673

122

1      Q.   Do you remember what charge you pled to?

2      A.   All of them.

3      Q.   Do you have any other cases pending that

4  you're aware of?

5      A.   No.   Traffic, that's about it.

6      Q.   Ms. Pearson, I want to go back to October

7  29th, 1997 at about 8:50 in the evening when Jermaine

8  Lambert was shot.

9           Where were you when that happened?

10     A.   I was by the garbage can.  The dumpsters on

11  the West Park side, West Park and New York.

12     Q.   Is that an apartment building you're talking

13  about?

14     A.   Yes.

15     Q.   Is that in Aurora, Illinois?

16     A.   Yes.

17     Q.   Just so we're clear on everything, let me

18  show you what's previously been introduced into

19  evidence as People's exhibit 15.  That's a photo.  Do

20  you recognize what that's a photo of?

21     A.   Yes.

22     Q.   What is that a photo of?

23     A.   The building on West Park and New York.

24     Q.   So that the building you were talking about

1    that you were at?

2        A.    Yes.

3        Q.    Did you live there?

4        A.    No.

5        Q.    What were you doing back there that night?

6        A.    Hanging around.

7        Q.    Why were you in the back of the building or

8    by the dumpsters?  What were you doing back there?

9        A.    Well, in my -- in my statement I had said it

10   was -- we were arguing --

11            MR. KLIMENT:  I'm going to object.  This is

12   not responsive to the --

13            THE COURT:  Sustained.

14            MR. GUAGLIARDO:  I agree.

15   BY MR. GUAGLIARDO:

16       Q.    Ma'am, don't tell me what you said in any

17   other statements.  Just right now as you sit here

18   answer my questions talking to me.

19            What were you doing back there?

20       A.    I was going to tell you.

21       Q.    Okay.

22       A.    It was -- I was back there.  We was arguing

23   with some girls.  It was an argument -- just arguing

24   with some girls back there.

124

1    Q.   So you were in an argument?

2    A.   Yeah.

3    Q.   Did you see any kids out there, back there?

4    A.   Yep, yes.

5    Q.   What happened as you were arguing?  Anything

6  big happen or unusual happen?

7    A.   Not while we were arguing, no.

8    Q.   What about right after you were done

9  arguing?

10    A.   Yes.

11    Q.   What happened?

12    A.   A Mexican man, he approached us from the

13  back way off of Lincoln and just started shooting.

14    Q.   Now, he came from Lincoln?

15    A.   Yes.

16    Q.   Now, when you say he just started shooting,

17  was he -- where was he when he was shooting?  Was he

18  in the crowd or what?

19    A.   He came off of Lincoln into the bottom level

20  in the hallway, in a little hallway, whatever, and

21  just started shooting.

22    Q.   Was this a male or female?

23    A.   Male.

24    Q.   How was he dressed?

C000676

1      A.   In hood -- in his black hoodie down, black

2  hat.

3      Q.   Hoodie down did you say?

4      A.   Yeah, black hood, black jacket, pants, sweat

5  suit.

6      Q.   Was this person black or Spanish?

7      A.   Spanish.

8      Q.   About how old was he?

9      A.   I couldn't tell you.  He looked like he was

10  in his teens, though.

11      Q.   Now, you just said he started shooting.  Did

12  you see a gun he was carrying?

13      A.   Not when he started shooting -- not at first

14  when he started shooting, but afterward.

15      Q.   What kind of gun did you see him carry?

16      A.   I couldn't really tell.  It was a big gun.

17  I think it was maybe a .357.  I'm not sure, I don't

18  know.

19      Q.   Well, would you call it -- if you had to

20  describe it, would it be an automatic or revolver?

21      A.   A revolver.

22      Q.   How was he handling it?

23      A.   Like he couldn't hold it right, like the gun

24  was too big for him to hold, so like cocking his hand

C000677

126

1    up after everybody --

2        Q.    I'm sorry, you have to speak a little

3    clearer.  You said --

4        A.    I said he could not handle it, he couldn't

5    handle the gun, so it's like cocking his arm back.

6        Q.    Did you hear him say anything?

7        A.    I think I heard him tell somebody that he

8    was passing by, excuse me, or something, but besides

9    that, no.

10       Q.    How far away were you -- did you see him

11   before he started shooting?

12       A.    Yes.

13       Q.    How far away were you from him?

14       A.    When he started shooting?

15       Q.    Well, when you saw him before he started

16   shooting, how far were you from him?

17       A.    I couldn't tell.  He was back on the first

18   level a little bit back by the stairs, so I couldn't

19   -- I don't know.

20       Q.    How about when he started shooting?  How far

21   away were you from him?

22       A.    About from where I am to the judge.

23       Q.    Did you get a look at the shooter's face?

24       A.    Yes.

127

1    Q.    Do you see the shooter anywhere in this

2    courtroom here today?

3    A.    Yes.

4    Q.    Could you identify that person that you say

5    is the shooter?

6    A.    Yes.

7    Q.    Could you point the person out and tell us

8    what kind of clothing he's wearing?

9    A.    Do I have to?  Yeah.  He got a nice little

10   blue shirt on with a collar on it, gray, two-tone

11   shirt.

12   Q.    You're going to have to point at the

13   person.

14   A.    (Indicating.)

15   MR. GUAGLIARDO:  Judge, let the record

16   reflect that she has described the clothing of the

17   defendant and pointed in the direction of the

18   defendant.

19   THE COURT:  Yes, the record will so reflect.

20   BY MR. GUAGLIARDO:

21   Q.    Now, had you seen the defendant before that

22   night?

23   A.    Before that night?  Have I seen him before

24   that night?

C000679

Q.   Yes.

A.   Once when I was riding past Poncho's Tacos restaurant.

Q.   You had seen him before near Poncho's Tacos?

A.   Yeah.

Q.   When was that, approximately?

A.   I don't know, but I seen him before he started shooting in the car.

Q.   Okay.  I'm going to get to that in a moment.  What I'm talking about right now is before this entire day of the shooting?

A.   Yes, I seen him one night by the restaurant on the New York.

Q.   Poncho's Tacos is on New York?

A.   Yeah.

Q.   Under what circumstances did you see him at that time?

A.   At a traffic stop, stop light.

Q.   How far were you from him this previous occasion?  Not this night that Jermaine Lambert was killed, but on the previous occasion when you saw him, how far were you from him?

A.   It's a four-way intersection.  I was going like -- turning left on New York and I forgot the

129

street, and he was at the corner where the light post is.

Q.    Were you with any of your friends at that time?

A.    Yeah.

Q.    Was that at day or night?

A.    At night.

Q.    Before this night of the shooting, were you aware of any nicknames that the defendant uses?

A.    Yes.

Q.    What nickname?

A.    Scarecrow.

Q.    And so when you had seen him before that night, what did you know him as?

A.    Scarecrow.

Q.    Let's go back to the night of the shooting. Had you seen the defendant you know as Scarecrow that night before the shooting?

A.    What?

Q.    Let me rephrase it. Back at the night of the shooting of Jermaine Lambert, had you seen the defendant that night before the shooting?

A.    Yes.

Q.    Where did you see him?

         A.    I seen him on the street of West Park riding

down in a car.

         Q.    In a car?

         A.    Yeah.

         Q.    What color was that car?

         A.    It was white.

         Q.    Do you recall how many doors it had?

         A.    It was a four-door I think.

         Q.    Was he in that car alone, or were there

others in the car with him?

         A.    Others in the car.

         Q.    Were they men or women?

         A.    Men.

         Q.    What race were they?

         A.    Spanish.

         Q.    What were they doing in that car?

         A.    Just ride by, they just road by.

         Q.    Did you hear them say anything?

         A.    No.

         Q.    After the shooting on that night of October

29th, 1997, did you stay around and talk to the

police?

         A.    Nope.

         Q.    Did you want to talk to the police?

1      A.    Nope.

2      Q.    Do you want to be here right now?

3      A.    Nope.

4      Q.    Did you know that a lot of police came to

5  that apartment building after the shooting?

6      A.    Do I know that?

7      Q.    Yeah.

8      A.    No, I don't.

9      Q.    You eventually did talk to the police about

10  this case; correct?

11     A.    Yes.

12     Q.    And was that in December of 1997?

13     A.    It was after -- after Jermaine got killed.

14  It was after that.

15     Q.    Was it a couple months after?

16     A.    I think.  I'm not sure.

17     Q.    Did you go to the police station with

18  anyone?

19     A.    To do what?

20     Q.    Well, let me try to make this clear.  I

21  apologize.

22           Did you and your friend, Shayla Johnson,

23  ever go to the Aurora police station to make a

24  complaint about something in December of 1997?

C000683

A.   Yeah.  About a different incident, yes.

Q.   Did you go to the police station to talk
about this offense at all?

A.   I did, but not to just go there and about
trying to tell nobody or anything.

Q.   Let me try to be clear.  When you and Shayla
Johnson went to the police to complain about that
other incident, were you there to talk about this
shooting?

A.   No.  I wasn't there to talk about that, but
an officer had asked me to talk about that.

Q.   Now, do you go by any nicknames?

A.   Yes.

Q.   What's your nickname?

A.   Coco.

Q.   C-O-C-O?

A.   Uh-huh.

Q.   Did you agree -- once you did talk to the
police about this offense, did you agree to view a
lineup?

A.   Yes.

Q.   And back in February of 1998 did you go to
the Kane County jail to view a lineup?

A.   Yes.

1    Q.    And when you viewed that lineup, did the

2    police ask you -- strike that.

3          The lineup was men standing next to each

4    other; correct?

5    A.    Uh-huh, yes.

6    Q.    I believe there were five men; correct?

7    A.    Yes.

8    Q.    And did the police ask you if the man who

9    had done the shooting of Jermaine Lambert back on that

10   might was in that lineup?

11   A.    Yes.

12   Q.    And did you pick somebody out in that

13   lineup?

14   A.    Yes.

15   Q.    And do you see the person in this courtroom

16   that you picked out?

17   A.    Yes.

18   Q.    Who is that?

19   A.    (Indicating.)

20          MR. GUAGLIARDO:  Judge, could the record

21   could reflect that she's pointed again in the

22   direction of the defendant, Armando Amaya?

23          THE COURT:  Any objection?

24          MR. KLIMENT:  She pointed this way.

1          THE COURT: The record will so reflect she

2    pointed that way.

3          MR. GUAGLIARDO: Okay. I'll ask her some

4    other questions.

5    BY MR. GUAGLIARDO:

6          Q.   You pointed in the area of the three

7    people. Which one of the three people over there is

8    the person you picked out in the lineup?

9          A.   The male right here on the end.

10          Q.   The person on the end?

11          A.   Yeah.

12          Q.   Is he wearing a suit and tie or a shirt?

13          A.   No, he's not one of the public defenders,

14    attorneys or whatever, this man right here.

15          Q.   Going back to that lineup at the jail, at

16    first did you -- after you picked the defendant in

17    that lineup, the police asked you what the role of the

18    defendant was. Do you recall that? Do you recall

19    saying he was in the car but he didn't do the

20    shooting?

21          A.   Yes, I --

22          MR. KLIMENT: I'm going to object to

23    Mr. Guagliardo testifying.

24          THE COURT: Mr. Guagliardo?

1          MR. GUAGLIARDO:  I will rephrase the

2    question.

3    BY MR. GUAGLIARDO:

4          Q.   When the police first asked you about the

5    person you picked out of the lineup, what did you tell

6    them?

7          A.   I said he was in the back of the car but he

8    didn't do the shooting because he looked more slimmer

9    when he was shooting than I seen him in the lineup.

10         Q.   What -- did you change that afterwards?

11   What did you say after that?  At first you told the

12   police that you didn't -- you said he was involved but

13   he didn't do the shooting.  Then what did you tell the

14   police?

15         A.   Then I told him that I wasn't sure because

16   the person that did the shooting were skinnier than

17   the lineup -- than the guy in the lineup.

18         Q.   What did you tell the police after that?

19         A.   I told him that he did.

20         Q.   That who did?

21         A.   He was the shooting -- he was shooting.

22         Q.   Did you really want to be at that lineup, to

23   do that lineup?

24         A.   No.

1    Q.    When you went in to talk to the police on

2    December 19th, 1997, about that other incident, were

3    you happy that this incident came up and they started

4    asking you about this incident?

5    A.    Nope -- no.

6    Q.    Are you a gang member?

7    A.    No.

8    Q.    Do you associate with some people in gangs?

9    A.    Yes.

10   Q.    What gang?

11   A.    Gangster Disciples, whatever you all want to

12   say, GDs.

13   Q.    You're not a member, you don't flash signs?

14   A.    Do I flash signs?  No.

15   Q.    Do you shout slogans?

16   A.    No.

17   Q.    Do you go to meetings?

18   A.    No.

19   Q.    Do you have friends who are in that gang?

20   A.    Yes.

21         MR. GUAGLIARDO:   Judge, I would tender the

22   witness at this point.

23         THE COURT:   Thank you.

24         Cross examination, Mr. Kliment?

1                    CROSS EXAMINATION

2    BY MS. PARGA:

3        Q.    Do you know what the colors of the Gangster

4    Disciples are?

5        A.    Yes.

6        Q.    What are they?

7        A.    Black and blue.

8        Q.    Do you ever where black and blue?

9        A.    Yes.

10       Q.    Now, I'm going to ask you to go back to

11   October 29th of 1997.

12             You were at the back side of the apartment

13   at 309 New York; right?

14       A.    Yes.

15       Q.    Who did you go there with?  Shayla?

16       A.    Yes.

17       Q.    Did you go with anybody else?

18       A.    No.

19       Q.    Did you come from the direction of the

20   liquor store; is that right?

21       A.    Yes.

22       Q.    You two were walking down the street, you

23   say you saw the white car with Mr. Amaya and some over

24.  people?

C000689

1        A.   Yes.

2        Q.   How many people did you see in that car?

3        A.   There was three people in the car.

4        Q.   Three altogether, not five?

5        A.   No, not five, three.

6        Q.   And these three people drove by, didn't do

7   anything?

8        A.   Nothing.

9        Q.   As an associate of the Gangster Disciples,

10  you're aware of where their territory is?

11       A.   Yes.

12       Q.   Their so-called hood?

13       A.   Yes.

14       Q.   Where you were that night was in Gangster

15  Disciple hood; right?

16       A.   Yeah.

17       Q.   Do you know what Latin Kings are in Aurora?

18       A.   Do I know what they are?

19       Q.   Where they are.

20       A.   Where?

21       Q.   Where their hood is?

22       A.   I know areas, but not where they be at.

23       Q.   Do you know some people who are Latin Kings?

24       A.   No.

C000690

1      Q.   You don't know anybody that is a Latin King?

2      A.   No.

3      Q.   You don't know if Mr. Amaya is a Latin King?

4      A.   I don't know if he is or not.

5      Q.   Isn't it unusual to see a car full of

6 Gangster Disciple people?

7      A.   Usually see Spanish people riding around.

8      Q.   Didn't strike you as unusual at all?

9      A.   No, not at first.

10      Q.   Now, then you find yourself in the back of

11 309 New York Street; right?

12      A.   Yes.

13      Q.   And there were some 20 people present back

14 there?

15      A.   There was a lot of people. I don't know if

16 there was 20.

17      Q.   There was an argument going on?

18      A.   Yeah.

19      Q.   And you were having the argument?

20      A.   Yes.

21      Q.   Was Shayla involved in the argument?

22      A.   For a minute, but she wasn't arguing really.

23      Q.   It was mostly you?

24      A.   Yes.

1  Q. Is that the sort of thing that happened that

2 got you wound up with mob action and so forth?

3  A. No.

4  Q. This wasn't that serious?

5  A. No.

6  Q. So you weren't getting ready to fight?

7  A. No.

8  Q. So you were arguing with somebody else?

9  A. Yeah.

10  Q. A woman, man?

11  A. A female.

12  Q. Just you two?

13  A. Yes.

14  Q. And everybody else was watching?

15  A. Yeah.

16  Q. They were all crowded around watching?

17  A. Yeah.

18  Q. And you were kind of in the middle of the

19 group?

20  A. Yes.

21  Q. Because you're more or less the focus of

22 attention; right?

23  A. Yes.

24  Q. You were arguing loud?

C000692

1     A.   Yes.

2     Q.   So you're standing in the middle of the

3  group, focus of attention, and you see someone come

4  from the side with a gun?

5     A.   I didn't see no gun at first.

6     Q.   You saw the person?

7     A.   Yes.

8     Q.   And this is from inside this group of 20

9  people you can see out and see someone coming?

10     A.   Yes.

11     Q.   It's dark back there; isn't it?

12     A.   Yes, but not that dark.

13     Q.   There's no -- it was nighttime?

14     A.   Yes, it was night.

15     Q.   The sun wasn't up?

16     A.   No.

17     Q.   There's no spotlights shining anywhere, are

18  there?

19     A.   They has lights, but I'm not sure where they

20  at.

21     Q.   Were they where you were standing?

22     A.   No.

23     Q.   Could you see real clearly the person's face

24  you were talking to?

C000693

142

1        A.    Yes.

2        Q.    Could you see the faces of the people around

3    you?

4        A.    Yes.

5        Q.    You could see the face of the person walking

6    up from the Lincoln side?

7        A.    I couldn't see his face when he was under

8    the -- under the third level, I couldn't see his face

9    when he was coming towards us.

10       Q.    Now, in this whole group of people you were

11   in the back of the apartments with and there was this

12   argument going on, people were watching, there were no

13   Hispanic people back there; were there?

14       A.    No.

15       Q.    And then from inside this group of 20 people

16   you're still arguing?

17       A.    No -- we argued for a minute, but then it

18   had stopped.

19       Q.    So now you're just all standing around this

20   a circle?

21       A.    Uh-huh.

22       Q.    Yes?

23       A.    Yes.

24       Q.    And you're still in the middle of the

1    circle?

2        A.    Yes.

3        Q.    And that's when you see the face of the

4    shooter?

5        A.    I saw the face after he came from underneath

6    the third level.

7        Q.    You're still in this group of people?

8        A.    Not when he was shooting.

9        Q.    The group scattered when the shots fired?

10       A.    Yeah.

11       Q.    But when he first came up from the third

12   level or down from the third level, whereever, you

13   could see his face then?

14       A.    Yeah, after he was from the third level.

15       Q.    Now, this person you said was how tall?

16       A.    Maybe a little bit taller than me.

17       Q.    How tall are you?

18       A.    5'4".

19       Q.    So maybe the person was 5'5", 5'6", short?

20       A.    Taller than me.

21       Q.    Not as tall as me?

22       A.    No.

23       Q.    A short guy?

24       A.    Yeah.

144

1     Q.   So between you and the person you have

2  identified as Mr. Amaya there was nobody blocking your

3  view?

4     A.   No.

5     Q.   There was no people in front of you?

6     A.   Huh-uh.

7     Q.   And he was facing you square like I'm facing

8  you now?

9     A.   Yeah.

10     Q.   So you got a good look at his face?

11     A.   Yeah.

12     Q.   So you didn't see Alonzo Matthews get shot

13  right in front of you?

14     A.   He was there, but I didn't see that.

15     Q.   He was not in your way?

16     A.   No.

17     Q.   The shooting starts, and you ran?

18     A.   No.

19     Q.   You stood there --

20     A.   I had fell to the ground, and he walked

21  around the dumpster, walked around that way, and then

22  he pointed the gun at me, but I was already on the

23  ground, so it didn't hit me.  And I got up, and I

24  still seen him shooting, and he left.

C000690

```
 1        Q.   And was he alone?

 2        A.   Yes.

 3        Q.   No other people up there with him?

 4        A.   No.

 5        Q.   So you're laying on the ground, and you're

 6   seeing all this stuff happening.  And then when he

 7   left, you ran?

 8        A.   Yeah.

 9        Q.   Did you know at that point if anybody had

10   been shot?

11        A.   No, I didn't know if anybody was hurt.

12        Q.   Did you run?  Did you run with Shayla?

13        A.   I don't know where she was at.  I ran by

14   myself.

15        Q.   You ran from the scene and never came back?

16        A.   No.

17        Q.   You didn't know what had happened that

18   night?

19        A.   No.

20        Q.   You found out Jermaine had been killed?

21        A.   Yes.

22        Q.   And he was your friend?

23        A.   Yes.

24        Q.   When you found out your friend had been
```

C000697

1  killed and you knew the person was Scarecrow that had

2  done it, you went and told the police?

3      A.   No.

4      Q.   As a matter of fact, it wasn't until almost

5  two months later that you told the police what had

6  happened that night?

7      A.   Yeah.

8      Q.   In between that time October 29th of 1997

9  and December 19th of 1997 you were still friends with

10 Shayla; right?

11     A.   Yes.

12     Q.   And you talked her about it?

13     A.   About --

14     Q.   About what happened on October 29th, 1997?

15     A.   Did I talk just talk about it or --

16     Q.   Yeah, did you talk about it?

17     A.   We didn't talk about it.

18     Q.   Never came up?

19     A.   No.

20     Q.   You're at a place three people get shot,

21 you're lying on the ground getting shot at, Shayla's

22 there, and you never talk about it?

23     A.   No.

24     Q.   Shayla ever tried to talk to you about it?

A.   Nope.

Q.   Do you know Toni Lesure?

A.   Yes.

Q.   Was she there that night?

A.   Yeah.

Q.   Did you talk to her about it at all?

A.   No.

Q.   How did you find out Jermaine had been killed?  Did somebody tell you, or did you read it in the paper?

A.   Somebody told me about it.

Q.   Like to tell Shayla, hey, you hear Jermaine got killed, you never talked to Shayla about it?

A.   No.

Q.   Shayla, you don't know what she saw; do you?

A.   No.

Q.   She never told you she saw Scarecrow there, too; did she?

A.   No.

Q.   So when you went to the police station together, that was just a coincidence -- and started talking about this particular case, you and Shayla being together, that was just a coincidence?

A.   That we got on that subject, yeah.

C000699

Q.   Same when you went to the jail in February;
right?

A.   Yeah.

Q.   Just a coincidence the two of you happened
to be together?

A.   No, because that's my friend, but the flight
-- December that we had went down there, that was a
coincidence that we talked about this subject.  It
wasn't on my mind to bring it up or nothing.

Q.   So when you went to the Kane County jail on
February 4th of 1998, you didn't know that Shayla was
going there to do the same thing you were; did you?

A.   Yeah, I live with her.

Q.   So at that point you had talked about this
incident?

A.   No, we didn't talk about it, but we knew we
were going to the lineup or whatever.

Q.   So you didn't know she thought it was
Scarecrow, too; right?

A.   No.

Q.   You didn't know that at all?

A.   No.

Q.   You didn't know that until I said something?

A.   No.

149

Q.   You've never known that?

A.   No.

Q.   And you live with her; did you say that?

A.   Yeah.

Q.   How long have you lived with her?

A.   For -- I know in '97 and a little bit of '98.  Not that long.

Q.   You lived with her for all of 1997?

A.   No.

Q.   Were you living with her in October of 1997?

A.   Yeah.

Q.   And then into you said 1998?

A.   Into December '98.

Q.   In 1998?

A.   Yeah.

Q.   Past February?

A.   I'm not sure.

Q.   Were you living with her when you went to the Kane County jail?

A.   I was jumping back and forth.

Q.   You mean you were living different places?

A.   Yeah.

Q.   So you're not sure if you were living with her on February 4th of 1998?

C000701

1      A.   Not because -- no.

2      Q.   You're not living with her now?

3      A.   No.

4      Q.   Now, you had -- so I don't confuse you, I'm
5  talking now about February 4th of 1998.  Do you
6  remember that's when you went and did what we call a
7  live lineup?

8      A.   Yeah.

9      Q.   That's when you go to the Kane County jail
10 and you look through some glass, and there's people
11 standing there and you're asked to identify somebody
12 if you can?

13     A.   Uh-huh.

14     Q.   Yes?

15     A.   Yes.

16     Q.   And when you first were talking to the
17 police officers, you said that the person you knew as
18 Scarecrow, you saw him around, but he wasn't the
19 shooter?

20     A.   Yes, that's what I said.

21     Q.   After you talked to the officer for a while,
22 you changed your mind and said, yeah, he actually was
23 the shooter?

24     A.   Yes.

C000702

Q.   As a matter of fact, you had an interview with the police, a tape-recorded interview?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   She can't write down uh-huh.  That's why I keep doing that to you.

The interview was over, and at that point you had told him that you saw Mr. Amaya around but he wasn't the shooter.  At that point the interview was over, is that right, and the tape recorder was shut off?

A.   No.

Q.   The interview never stopped?

A.   The interview stopped, but I had told him that whatever his name is did do the shooting before it stopped.

Q.   So do you remember Detective Sauer and Detective Fancsali; do you know who those two people are?

A.   I'm not sure.

Q.   But there were two officers present?

A.   Yes.

Q.   And the interview took place after you saw

C000703

```
 1   the live lineup?

 2       A.   Yes.

 3       Q.   And you told them the person you knew as

 4   Scarecrow didn't do the shooting, but he was there;

 5   right?

 6       A.   Say it again.

 7       Q.   You told the police officers that the person

 8   you know as Scarecrow was there at the shooting but he

 9   wasn't the shooter; right?

10       A.   Yes, and -- but then I changed --

11       Q.   Let me ask another question.

12       A.   Yes, yes.

13       Q.   You went on after an while and changed your

14   mind and said, yeah, it was, that he was the shooter?

15       A.   Yeah.

16       Q.   Now, you told the police that he had a skull

17   cap on?

18       A.   Yeah.

19       Q.   Do you remember now that he had a skull cap

20   on?

21       A.   A hat, yes.

22       Q.   You do remember that he had a hat on?

23       A.   Yes.

24       Q.   So you told the officers he had a skull
```

1    cap.  You mean a hat that covers the top of his head?

2         A.   Yes.

3         Q.   He had that on and a hood?

4         A.   Yes.

5         Q.   And he had nothing over the his face?

6         A.   No.

7         Q.   You said when you saw his face it was as far

8    from you as the judge is from you right now?

9         A.   Yes.

10        Q.   Would you say that's maybe 12 feet?

11        A.   I don't know.

12        Q.   So you can't put that into feet?

13        A.   No.

14        Q.   Would you agree with me that it's more than

15   three feet?

16        A.   Yes.

17        Q.   And certainly more than an arm's length?

18        A.   Yes.

19        Q.   When you were looking at the shooter from

20   the distance of you to the judge, there was no one in

21   between you like the court reporter is now?

22        A.   No, the apartment is level from where the

23   third level is to where the grass is, so I was like

24   more on the grass than on the third level.  So I was

1   -- be able to look over the people that was

2   surrounding me.  You know what I'm saying?

3        Q.   So the people were all down below you?

4        A.   There was people behind me and in front of

5   me, but the part I was standing at is higher than

6   where Jermaine got shot at.

7        Q.   So he's looking at you, and there's no one

8   in between you because all of a sudden you were up

9   higher?

10       A.   All of a sudden?  Yes, when you look at the

11  pictures.

12            MR. KLIMENT:  Judge, can I have a minute,

13  please?

14            THE COURT:  All right.

15  BY MR. KLIMENT:

16       Q.   The person you were arguing with, weren't

17  you facing that person?

18       A.   They was there.  Not when the dude came up,

19  she wasn't right in my face then.

20       Q.   She was in your face for a while because you

21  were at each other?

22       A.   Yes.

23       Q.   You were yelling face to face?

24       A.   We wasn't close like that.

1    Q.   By the time the shooter came up, that was

2  all over?

3    A.   Yeah.

4    Q.   The argument was over, and things were fine?

5    A.   I don't know about fine, but we wasn't

6  arguing no more.  There wasn't no distractions.

7    Q.   In any of the conversations you had with the

8  police, either on December 19th or in February when

9  you talked to the police, did you tell them that you

10 were up higher and that's how you had such a good view

11 of the person who did the shooting?

12   A.   No, I didn't.

13        MR. KLIMENT:  I have no other questions,

14 Judge, at this time.

15        THE COURT:  All right.  Thank you.

16 Redirect, Mr. Guagliardo?

17        MR. GUAGLIARDO:  Yes, Judge.

18                REDIRECT EXAMINATION

19 BY MR. GUAGLIARDO:

20   Q.   Ms. Pearson, back in February 1998 when you

21 went to the jail you knew what you were going to the

22 jail for; correct?

23   A.   Yes.

24   Q.   And Shayla went with you; correct?

C000707

```
 1       A.   Yes.

 2       Q.   And did you both know what you were going to

 3  say if you could identify someone --

 4            MR. KLIMENT:  Objection.  Two bases.  First,

 5  that this person knows what's in Shayla's mind;

 6  second, the leading question.

 7            THE COURT:  Sustained.

 8  BY MR. GUAGLIARDO:

 9       Q.   You going for the jail lineup in February,

10  was that arranged by the police?

11       A.   To the Kane County?

12       Q.   Yes.

13       A.   Yeah.

14       Q.   By February 4th of '98 when you went to do

15  that lineup, did you want to do that lineup?

16       A.   No.

17       Q.   Did you want to be there?

18       A.   No.

19       Q.   Did you want to pick out the defendant in

20  this case as the shooter?

21       A.   No.

22       Q.   Were you hesitant to do so?

23       A.   What did you say?

24       Q.   Were you hesitant to pick him out as a
```

C000708

1    shooter?

2        A.    Yeah, at first I thought he'd kill my

3    friends.

4        Q.    At first you said he wasn't the shooter;

5    right?

6        A.    Yes.

7        Q.    Were you telling the truth when you said he

8    wasn't the shooter?

9        A.    Was I telling -- I couldn't tell because he

10   looked like he gained weight since he been in the

11   county jail, so I couldn't tell, but his face the

12   same.

13       Q.    When you went to the Aurora Police

14   Department in December, were you there to complain

15   about something?  It was a month and a half after the

16   shooting you and Shayla went to the police department;

17   correct?

18       A.    Uh-huh.

19       Q.    Did you go there to make a complaint about

20   something?

21       A.    I'm not sure.  I think so.

22       Q.    Was it you that brought up the shooting, or

23   was it the police that brought up the shooting?

24       A.    About Jermaine?

158

1      Q.   Yes.

2      A.   The police did.

3      Q.   Did you and Shayla have a plan to go to the

4   police station and talk to the police about the

5   shooting?

6      A.   Nope.

7      Q.   When you originally talked to the police

8   about this in December, did you tell them anything

9   about whether you wanted to go to court or not?

10      A.   Yeah.

11      Q.   What did you tell them?

12      A.   Told them I didn't want to go in front of

13   these Mexican guys because they might try to kill me

14   or something.

15      Q.   So you didn't tell them you wanted to go to

16   court?

17      A.   Yep.

18          MR. GUAGLIARDO:   Nothing further, Judge.

19          THE COURT:   Thank you.   Mr. Kliment, any

20   recross?

21                    RECROSS EXAMINATION

22   BY MR. KLIMENT:

23      Q.   Do you remember the December 19th interview?

24      A.   Uh-huh.

1      Q.   Yes?

2      A.   Yes.

3      Q.   And the police officers asked you for a

4   name; right?

5      A.   Yeah.

6      Q.   Said you got to give us a name; right?

7      A.   Yeah.

8      Q.   And you told hem that Shayla knows one of

9   the guys, and you said, I think his name is Scarecrow?

10      A.   I don't know I said that, but yeah, Shayla

11   told me his name's Scarecrow.

12      Q.   So Shayla told you about the name Scarecrow?

13      A.   Yeah, and some more people.

14      Q.   You had then talked about this; right?

15      A.   Not Shayla.  She told me his name was

16   Scarecrow or whatever, that's who she think did it.

17      Q.   But you didn't know until Shayla told you

18   that it was Scarecrow?

19      A.   No, not about his name.

20           MR. KLIMENT:  I have nothing further, Judge.

21           THE COURT:  Thank you very much,

22   Ms. Johnson.  You may step down.

23           All right.  Ladies and gentlemen you've been

24   sitting there patiently now for about an

1  hour-and-a-half.  I think this would be the

2  appropriate time to take our afternoon recess.

3          Again, do not discuss the case amongst

4  yourselves or with anyone else or allow anyone to

5  discuss it in your presence or discuss any opinions

6  during the recess.  We'll take about a 15-minute

7  recess at this time.  Thank you.

8                                   (Recess taken.)

9          THE COURT:  We're back on the record, People

10  versus Amaya.  The jury has returned, all counsel are

11  present, the defendant is present.

12          At this time Mr. Guagliardo, you may

13  proceed.

14          MR. GUAGLIARDO:  Thank you, your Honor.  We

15  call detective Jim Fancsali.

16                                   (Witness sworn.)

17          THE COURT:  Detective, please have a seat on

18  the witness stand.

19              :     DETECTIVE JAMES FANCSALI,

20  called as a witness herein, having been first duly

21  sworn, was examined and testified as follows:

22                      DIRECT EXAMINATION

23  BY MR. GUAGLIARDO:

24      Q.    Sir, could you please state your full name,

1   spell your last name for the ladies and gentlemen of

2   the jury?

3       A.   James Fancsali, F-A-N-C-S-A-L-I.

4       Q.   Your current occupation?

5       A.   Police officer for the City of Aurora.

6       Q.   And are you a patrol officer, or what's your

7   -- an investigator, what do you do?

8       A.   I'm assigned as an investigator in the gang

9   crimes unit.

10      Q.   I'm going to direct your attention -- were

11  you an investigator in this case involving Armando

12  Amaya?

13      A.   Yes, sir, I was.

14      Q.   I direct your attention to February 4th of

15  1998 approximately 5:50 in the evening.   Were you on

16  duty at that time?

17      A.   Yes, I was.

18      Q.   Were you working on this case?

19      A.   Yes, I was.

20      Q.   Did you have an occasion to meet with a

21  Nicole Pearson and a Shayla Johnson at that time?

22      A.   Yes, I did.

23      Q.   For what purpose were you meeting with those

24  two?

1      A.    To show a live lineup.

2      Q.    Was there an assistant state's attorney

3  present to supervise that lineup?

4      A.    Yes, there was.

5      Q.    Now, had you previously interviewed Nicole

6  Pearson and Shayla Johnson regarding the shooting

7  incident that occurred back on October 29th, 1997?

8      A.    Yes, I had.

9      Q.    Those interviews occurred on December 19th,

10 1997?

11     A.    That's correct.

12     Q.    Had you ever spoken to Nicole Pearson and

13 Shayla Johnson before December 19th, 1997 regarding

14 this case?

15     A.    No, sir, I had not.

16     Q.    What happened on December 19th, 1997, that

17 lead you to talk to them?

18     A.    They had come to the police department to

19 report being victims of another crime, and during the

20 process of interviewing them on the crime that they

21 were the victims of we recognized their names as

22 having been named as witnesses in this crime.

23     Q.    Specifically what was it, their full name

24 that jogged your memory or what?

1    A.   No.   During the investigation of this crime

2  we only had the street name of Coco and a first name

3  of Shayla as being witnesses to this crime.

4    Q.   So you had heard that a Shayla and Coco were

5  possible witnesses to the crime of October 29th, 1997,

6  correct?

7    A.   That's correct.

8    Q.   Did you know who Shayla and Coco were?

9    A.   No.   We had been working trying to identify

10  them.

11    Q.   Then on December 19th, 1997 two women came

12  to the Aurora police station; correct?

13    A.   That's correct.

14    Q.   And what makes the light bulb go off that

15  these two women are the Shayla and Coco that know

16  about these events?

17    A.   While we were interviewing them in the crime

18  in which they were victims, Nicole Pearson let it drop

19  that her name on the street was Coco, and put two and

20  two together and Shayla was also a victim of this

21  crime, we thought it was a good possibility that they

22  were the witnesses we had been trying to identify.

23    Q.   You realized that they were the Shayla and

24  Coco as identified as being present at the shooting?

1    A.   Yes.

2    Q.   Did they initiate conversations about the

3  shooting at 309 East New York Street, or were you the

4  one that initiated that?

5    A.   No, I initiated that.

6    Q.   And speaking with Shayla Johnson and Nicole

7  Pearson on December 19th, 1997, did they agree to view

8  a live lineup?

9    A.   Yes, they did.

10    Q.   Let's go back now to February 4th, 1998.

11      In short what was the purpose of this lineup

12  that was going to take place?

13    A.   To see if they could identify a possible

14  suspect in this crime.

15    Q.   When you say this crime, you're talking

16  about the shooting of October 29th, 1997?

17    A.   That is correct.

18    Q.   Let's get into some details of the lineup.

19  How many subjects were in the lineup?

20    A.   There was the suspect and four other men.

21    Q.   And were they all about the same hairstyle?

22    A.   That's correct.

23    Q.   Did they all have about the same build and

24  height?

C000716

1    A.    Yes, they did.

2    Q.    And were they all wearing the same outfit?

3    A.    Yes, they were.

4    Q.    As a matter of fact, this lineup took place

5  at the Kane County jail; correct?

6    A.    That's correct.

7    Q.    Was the defendant, Armando Amaya, one of the

8  five men in the lineup?

9    A.    Yes, he was.

10    Q.    So it was the defendant, Armando Amaya, and

11  four others?

12    A.    That's correct.

13        MR. GUAGLIARDO:  I'm marking as photographs

14  People's exhibit 23, People's exhibit number 24 and

15  People's exhibit number 25 for identification.  Let

16  the record reflect that I'm showing these photographs

17  to counsel for Mr. Amaya.

18        May I approach?

19        THE COURT:  You may.

20  BY MR. GUAGLIARDO:

21    Q.    Detective Fancsali, I'm showing you what has

22  been marked People's exhibit 23, People's exhibit 24

23  and People's exhibit 25 for identification.  For the

24  record, those are three photographs.  Do you recognize

C000717

1  what is being portrayed in those three photographs?

2     A.   Yes.   They are all photographs of the lineup

3  that was shown to the witnesses.

4     Q.   And just to be clear, the lineup being the

5  one on February 4th, '98, with Nicole Pearson and

6  Shayla Johnson?

7     A.   That's correct.

8     Q.   Do those photographs fairly and accurately

9  portray what the lineup looked like?

10     A.   Yes, it does.

11          MR. GUAGLIARDO:  Judge, I would move those

12  three photographs into evidence, 25, 24 and 23.

13          MR. KLIMENT:  No objection.

14          THE COURT:  They will be received.

15          MR. GUAGLIARDO:  Judge, I'd ask to publish

16  using the projector.

17          THE COURT:  You'd like the lights dimmed?

18          MR. GUAGLIARDO:  Yes, and I'm going to have

19  to get this movie screen down.

20          THE COURT:  Okay.

21  BY MR. GUAGLIARDO:

22     Q.   For the record, Investigator Fancsali, that

23  is People's exhibit number 25 for identification.

24  Does that fairly and accurately portray the lineup?

1   A.   Yes, it does.

2   Q.   What position is the defendant in?

3   A.   Number one, the far left.

4   Q.   People's exhibit number 24, does that fairly

5   and accurately portray the lineup?

6   A.   Yes, it does.

7   Q.   People's number 23, does that fairly and

8   accurately portray the lineup?

9   A.   Yes, it does.

10  Q.   So, if I understand correctly, the defendant

11  was number one in the lineup; he was in the first

12  position in the lineup?

13  A.   Yes.

14  Q.   Did Shayla Johnson and Nicole Pearson

15  actually view that lineup that day?

16  A.   Yes, they did.

17  Q.   Did they view it at the same time together

18  or at different times separately?

19  A.   No, they viewed the lineup separately.

20  Q.   You're going to have to speak up.

21  A.   They viewed the lineup separately.

22  Q.   Who viewed the lineup first?

23  A.   Nicole Pearson.

24  Q.   Where was Shayla Johnson when Nicole Pearson

C000719

1    viewed the lineup?

2        A.   She was kept separate out in the hallway.

3        Q.   Where did Nicole Pearson view the lineup?

4    Where was she physically located when she viewed the

5    lineup?

6        A.   It's a room that's divided by a wall, and it

7    has one-way glass so the people on the other side

8    cannot see who is viewing the lineup.

9        Q.   So the persons who were the subject of the

10   lineup could not view who was viewing the lineup;

11   correct?

12       A.   That's correct.

13       Q.   When Nicole Pearson was in this room viewing

14   the lineup, who was present in the room -- if you

15   could hold off on the answer to that and if I could

16   approach one second with Mr. Kliment.

17                        (The following proceedings

18                         were had out of the presence

19                         of the jury.)

20            MR. GUAGLIARDO:  Mr. Amaya had an attorney

21   there, Ms. Colton.  I don't know if you want that to

22   come out or if that's something that probably

23   shouldn't come out.

24            THE COURT:  Would you rather that not come

1  out?

2          MR. KLIMENT:  I don't think it matters.

3          THE COURT:  I don't think it matters,

4  either.  I don't think you need to bring it out.

5          MR. GUAGLIARDO:  Well, I'm just going to ask

6  who was there, and he's going to give me an answer.

7          THE COURT:  Any objection?

8          MR. KLIMENT:  No.

9                          (The following proceedings

10                          were had in the presence of

11                          the jury.).

12  BY MR. GUAGLIARDO:

13      Q.  Who was present in the room with Nicole

14  Pearson when reviewed?

15      A.  Myself, Kane County Deputy, Assistant

16  State's Attorney Lopiccolo, and defendant's attorney,

17  Kathleen Colton.

18      Q.  Did you give Nicole Pearson instructions

19  prior to the time she viewed the lineup?

20      A.  Yes, I did.

21      Q.  What did you tell her?

22      A.  I advised her that she would be looking at

23  five individuals and the person who committed this

24  crime may or may not be in the lineup and she should

1   not feel under any obligation to make an

2   identification unless she was absolutely certain.  I

3   also advised her that I was going to give her a 3x5

4   card, and if she saw the person who committed the

5   shooting that night, she should just write the

6   position he was standing in on the index card.

7       Q.   Did you provide her with a card?

8       A.   I did.

9       Q.   Did she view the lineup?

10      A.   Yes.

11      Q.   Did she make any requests while she was

12  viewing it?

13      A.   She asked the deputy if the subjects in the

14  lineup could turn different ways.

15      Q.   Did the subjects turn different ways and

16  give different views of themselves?

17      A.   Yes, they did.

18      Q.   For how long did Nicole Pearson look at the

19  lineup?

20      A.   Approximately five minutes.

21      Q.   Did she eventually write down a number on

22  the index card?

23      A.   Yes, she did.

24      Q.   What number did she write?

1   A. She wrote the number one.

2   Q. Did you ask her to write anything else on

3 that index card a little later that evening?

4   A. Later that evening I asked her to print her

5 name on the card -- on the back of the card, the time

6 and the date and then to sign the bottom of the card.

7   Q. I've marked this exhibit as People's exhibit

8 26 for identification, showing counsel.

9    Detective Fancsali, I'm showing you what has

10 been marked as People's exhibit number 26 for

11 identification, which is a clear plastic bag with a

12 red evidence seal on it with some contents.  Do you

13 recognize People's exhibit 26 for identification?

14   A. Yes, I do.

15   Q. What is that?

16   A. That's the card that was used and marked by

17 Nicole Pearson at the live showup at the county jail.

18   Q. And the card is inside that plastic bag

19 there?

20   A. Yes, I placed it in there before putting it

21 into evidence.

22   Q. Did you seal that?

23   A. Yes, I did.

24   Q. Is that in a sealed condition right now?

1      A.    Yes, it is.

2      Q.    I'm going to ask you to cut the plastic bag

3   and take the card out.  The plastic bag you're cutting

4   right now is completely sealed; is that correct?

5      A.    Yes.

6      Q.    And it has evidence tape on it?

7      A.    Yes, it does.

8      Q.    When did you create that package you're now

9   cutting open?

10      A.    The same evening I did the show-up.

11      Q.    February 4th, 1998?

12      A.    Yes.

13      Q.    Is that card today as you look at it in the

14   same condition, as it was when Nicole Pearson wrote on

15   it back on February 4th, 1998?

16      A.    Yes, it is.

17          MR. GUAGLIARDO:  Your Honor, I would move

18   People's number 26 for identification into evidence at

19   this time.

20          THE COURT:  Any objection?

21          MR. KLIMENT:  No.

22          THE COURT:  It will be received.

23   BY MR. GUAGLIARDO:

24      Q.    On one side that has a number one on it?

C000734

1    A.    Yes, it does.

2    Q.    And the defendant Armando Amaya was in the

3    number one position in the lineup?

4    A.    Yes, he was.

5    Q.    What does it have on the other side of it

6    written down?

7    A.    On the top in printing has Nicole Pearson,

8    underneath has a signature of Nicole Pearson, the

9    time, 02/08/98.

10    Q.    Whose writing is that?

11    A.    Nicole Pearson's.

12    Q.    Did you see her make that card?

13    A.    Yes, I did.

14    Q.    Where did Nicole Pearson go after

15    identifying the defendant as the shooter in this

16    offense?

17    A.    After she was finished with the lineup, I

18    escorted her to another office and turned her over to

19    Investigator Sauer and Investigator Kinney so she

20    could take a short statement.

21    Q.    Is that statement on tape?

22    A.    I believe it was, yes.

23    Q.    What happened next after you turned Nicole

24    Pearson over to those investigators to get a taped

1   statement?

2       A.   At that time I went and got Shayla Johnson

3   and took her into the viewing room.

4       Q.   Was Nicole Pearson allowed to meet with

5   Shayla Johnson after Nicole viewed the lineup but

6   before Shayla viewed the lineup?

7       A.   No, she was not.

8       Q.   So after Nicole picked out this number one

9   guy as being the shooter, she was not allowed to talk

10  to Shayla?

11      A.   That's correct.

12      Q.   Did Shayla Johnson then view the lineup?

13      A.   Yes, she did.

14      Q.   Was she in the same room as Nicole had been

15  when she viewed the lineup?

16      A.   Yes, she was.

17      Q.   Did you instruct Shayla Johnson before she

18  viewed the lineup?

19      A.   Yes, I did.

20      Q.   What did you tell her?

21      A.   I advised her that she would be seeing five

22  individuals and that the person involved in this

23  shooting may or may not be one of the five people and

24  that she should not feel under any obligation to make

1    an identification unless she was certain.  I also

2    advised her that I would be giving her a 3x5 card and

3    if she saw the person involved she should write the

4    number of the position he was in on the card.

5         Q.   And did you provide her with an index card?

6         A.   Yes, I did.

7         Q.   Did Shayla Johnson view the lineup?

8         A.   Yes, she did.

9         Q.   Did she make any requests while she was

10   viewing it?

11        A.   Yes, she asked for the subjects to turn

12   different ways.

13        Q.   Did you have a deputy tell the subjects to

14   turn different ways?

15        A.   Yes, the deputy used the intercom to

16   instruct them which way to turn.

17        Q.   How long did Shayla Johnson look at the

18   lineup?

19        A.   Approximately five minutes.

20        Q.   Did she eventually write down a number on

21   the index card you provided her with?

22        A.   Yes, she did.

23        Q.   What number did she write down?

24        A.   She wrote down the number one.

176

1   Q.   The lineup was the same?

2   A.   The lineup stayed the same.

3   Q.   And the position number one was the

4   defendant?

5   A.   Yes.

6       MR. GUAGLIARDO:   I'm showing counsel what

7   I've marked People's exhibit 27 for identification.

8   BY MR. GUAGLIARDO:

9   Q.   I'm showing you what I've marked People's

10  exhibit 27 for identification, a plastic bag with some

11  red evidence tape on it.  I know it's somewhat

12  tedious, but could you explain what that is?

13  A.   It's a card Ms. Johnson used during the live

14  show-up and I then entered into the evidence safe.

15  Q.   So you created that package, the plastic bag

16  with the little red evidence tape?

17  A.   Yes.

18  Q.   That's in a sealed condition right now?

19  A.   Yes, it is.

20  Q.   Could you cut that package open so you can

21  get the contents out?

22      Have you taken the contents out of People's

23  27?  And what is the contents?

24  A.   The 3x5 index card used by Shayla Johnson

C000728

1   during the live showup.

2       Q.   Is it in the same condition now as it was

3   when it was created on February 4th, '98?

4       A.   Yes, it is.

5           MR. GUAGLIARDO:  I would move People's

6   exhibit 27 into evidence.

7           THE COURT:  Any objection?

8           MR. KLIMENT:  No, sir.

9           THE COURT:  It will be received.

10  BY MR. GUAGLIARDO:

11      Q.   On one side is the number one.  What is

12  written on the other side?

13      A.   On the other side is the signature of Shayla

14  Johnson, underneath that is the printed name, Shayla

15  Johnson, the time, and 02/04/98.

16      Q.   Were you out at the scene on October 29th,

17  1997?  Did you eventually go out to the scene of 309

18  East New York Street?

19      A.   Yes, I did.

20      Q.   Was there a search for evidence that night?

21      A.   Yes, there was.

22      Q.   What was searched basically?

23      A.   The entire exterior of the building, as I

24  recall, and the interior of the building where the

1   victim was found.

2       Q.   The difference between a revolver and an

3   automatic, what's the difference between the two?

4       A.   The revolver has a cylinder that turns as

5   the trigger is fired, and the shells stay in the

6   weapon after the shell fires.  The semiautomatic, when

7   the shell is fired, the empty shell is ejected one

8   side or the other of the gun.

9       Q.   So in other words, an automatic or

10  semiautomatic ejects shell casings?

11      A.   That's correct.

12      Q.   And a revolver does not eject shell casings?

13      A.   Not unless it's intentionally unloaded.

14      Q.   Not in the firing process does it eject

15  shell casings?

16      A.   That's correct.

17      Q.   Are you familiar with the search for

18  evidence that went on that night?

19      A.   No, I turned that over to the evidence tech.

20      Q.   In reviewing this file and being an

21  investigator in this file, are you familiar with the

22  results of those?

23      A.   Yes.

24      Q.   Were there any shell casings found back in

1    this area, the back walkway of 309 East New York?

2        A.    No, there were not.

3            MR. GUAGLIARDO:  If I can have one second,

4    your Honor.

5            THE COURT:  All right.

6                    (Off the record discussion.)

7            MR. GUAGLIARDO:  No further questions.  I

8    tender the witness, Judge.

9            THE COURT:  Thank you.

10           Cross examination?

11                    CROSS EXAMINATION

12   BY MR. KLIMENT:

13       Q.    Detective Fancsali, I'm going to go a little

14   bit away from what Mr. Guagliardo has been asking you

15   about.

16           You interviewed somebody named Tanya Harris;

17   is that correct?

18       A.    Correct.

19       Q.    That would have been October 31st, 1998, at

20   the hospital?

21       A.    Yes, sir.

22       Q.    And you were with Detective Sauer?

23       A.    I believe so, yes.

24       Q.    That was a tape recorded statement?

1     A.   Yes, it was.

2     Q.   Do you recall asking her what the individual

3 who did the shooting was wearing?

4     A.   I'm sure I did, yes.

5     Q.   Do you recall asking her -- basically the

6 statement being:  You said he had a black coat on.

7 Are you talking a black hoodie?  Do you recall asking

8 her that?

9     A.   I believe I did, yes.

10     Q.   And do you remember her saying:  Oh, he had

11 a white hoodie on his head; your response to that was,

12 oh, he had a white hoodie, and what kind of coat did

13 he have, and she replied black?

14     A.   Yes.

15     Q.   So she never told you it was white or black;

16 she said it was a white hood?

17     A.   That's correct.

18     Q.   Now we'll go back on to February about the

19 things Mr. Guagliardo was talking to you about, the

20 lineup.

21     Shayla Johnson and Nicole Pearson, they came

22 together to the jail; is that right?

23     A.   That's correct.

24     Q.   And they were not transported there by