File Date: _5-29-2008_____

Case No: _07cv6793_____

ATTACHMENT # _____

EXHIBIT _S part 2_____

TAB (DESCRIPTION)

_____

1  police officers; they came on their own in their own

2  car?

3      A.    No, a partner of mine picked them up at

4  their home and brought them to the jail.

5      Q.    They were living together at the time?

6      A.    Yes.

7      Q.    Do you recall where that was?

8      A.    1319 East Wilson Road, Apartment 211,

9  Batavia, Illinois.

10     Q.    That would be yes then?

11     A.    Yes.

12     Q.    That was Batavia, they had moved out of

13  Aurora at that point?

14     A.    Yes.

15     Q.    Now, you used the phrase after Nicole

16  Pearson viewed the lineup you turned her over to other

17  investigators where she gave a short statement?

18     A.    Yes, sir.

19     Q.    And I take by that then that you did not

20  participate in that statement?

21     A.    No, sir, I did not.

22     Q.    So you were not present in the room when she

23  gave that statement?

24     A.    No, sir, I was not.

1    MR. KLIMENT:  I have nothing further, Judge.

2    THE COURT:  All right.  Thank you.

3    Any redirect, Mr. Guagliardo?

4    MR. GUAGLIARDO:  Judge, just Mr. Kliment and

5  I agreed that we could get into impeachment as long as

6  Officer Fancsali was on the stand rather than recall

7  him even though it's beyond the scope, if that's okay

8  with the Court.

9    THE COURT:  All right, that's fine.

10    MR. KLIMENT:  We have no objection.  That's

11  what I just did.

12    THE COURT:  If it's by agreement, then you

13  may proceed.

14                REDIRECT EXAMINATION

15  BY MR. GUAGLIARDO:

16    Q.  Investigator Fancsali, you took a taped

17  statement of Shayla Johnson back on December 19th,

18  1997, when they started to talk about that offense?

19    A.  Yes.

20    Q.  Isn't it true that in the taped statement of

21  Shayla Johnson you asked her:  And about how tall?

22    A.  Yes, I did.

23    Q.  When you were referring to the shooter?

24    A.  Yes.

1    Q.   And her answer was:  He was about -- he

2  wasn't that tall, maybe five four or five, he wasn't

3  that tall?

4    A.   Correct.

5    Q.   She never had said that he was below five

6  feet tall; correct?

7    A.   Not that I recall, no.

8         MR. GUAGLIARDO:  Nothing further, Judge.

9         THE COURT:  Any recross?

10        MR. KLIMENT:  No, Judge.

11        THE COURT:  Thank you, Detective Fancsali,

12  you may step down.

13        The People can call their next witness.

14        MR. GUAGLIARDO:  We would call Detective

15  Sauer.

16                              (Witness sworn.)

17        THE COURT:  Detective Sauer, please have a

18  seat on the witness stand.

19        Mr. Guagliardo, you may proceed.

20        MR. GUAGLIARDO:  Thank you,

21  Judge.

22              DETECTIVE ROBERT SAUER,

23  called as a witness herein, having been first duly

24  sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GUAGLIARDO:

 Q. Could you state your name and spell you last

name for the jury?

 A. Jeffrey Robert Sauer, S-A-U-E-R.

 Q. And your current occupation?

 A. I'm a detective with the Aurora Police

Department.

 Q. How long have you been with the Aurora

Police Department?

 A. In two days I will celebrate my 9th year

completed.

 Q. You are one of the investigators in this

Armando Amaya case?

 A. Correct.

 Q. Detective Sauer, I'd like to direct your

attention back to February 4th of 1998 at about 6:10

in the evening.  Were you on duty at that time?

 A. Yes.

 Q. Were you working on this case?

 A. Yes, I was.

 Q. And were you, using the words loosely,

participating in a live lineup that was occurring that

day at the Kane County jail?

1       A.    Yes.

2       Q.    What role did you play in the lineup

3    procedure?

4       A.    Detective Fancsali asked me to interview

5    each witness that was to come out of the room after a

6    show-up was done.

7       Q.    And there were two witnesses that were

8    viewing the lineup?

9       A.    That's correct.

10      Q.    Those were Nicole Pearson and Shayla

11   Johnson?

12      A.    Correct.

13      Q.    Did you have an opportunity to interview

14   Nicole Pearson after she viewed the live lineup?

15      A.    Yes.

16      Q.    Who was present for that interview?

17      A.    Myself and Investigator Tompkin.

18      Q.    Was that interview tape recorded?

19      A.    Yes, it was.

20      Q.    Did Nicole Pearson agree to that tape

21   recording?

22      A.    Yes, she did.

23      Q.    At first did you ask Nicole Pearson if she

24   saw anyone involved in the shooting in the lineup?

1    A.    Yes.

2    Q.    And what position did she say that person

3  was in?

4    A.    She indicated position number one.

5    Q.    What did she indicate was that person's

6  involvement at first?

7    A.    She indicated that person was in a car, in a

8  white car the night that this occurred.

9    Q.    Did she in fact say, well, he wasn't the

10  person that did the shooting; correct?

11    A.    That's correct.

12    Q.    She said:  Because whoever did the shooting

13  was skinny and light, lighter than him, you know?

14    A.    That's what she said.

15    Q.    You turned the tape off -- you ended the

16  interview; correct?

17    A.    Yes, I did.

18    Q.    And what did you do when you ended the

19  interview?

20    A.    I turned the tape off, as I wanted to go and

21  discuss this with Investigator Fancsali right across

22  the hallway in the next room.  I wanted to forewarn

23  him exactly what was told.  We did not talk about what

24  would happen if someone were to say that person was

187

1  not involved or whatever. So I wanted to see if he

2  wanted me to ask anything else.

3     Q.  When you turned the tape off, did you go

4  talk to Investigator Fancsali?

5     A.  Yes, I did.

6     Q.  How long did you talk to him?

7     A.  A matter of seconds.

8     Q.  What did you and Investigator Fancsali agree

9  to do?

10     A.  He advised me that he wanted to go over it

11  again with her, go over it again with her and see what

12  she says. I said okay. I went back to the interview

13  room with Investigator Kinney and reactivated the tape

14  player.

15     Q.  Did you re-go over it with her?

16     A.  Yes.

17     Q.  What did she say?

18     A.  Ultimately she advised me that the person in

19  position number one was the person that had done the

20  shooting.

21     Q.  What was -- what did her demeanor seem to be

22  like during this?

23     A.  She seemed hesitant to begin with. It was

24  interesting to me that here someone could be IDed in

1    this lineup, but yet when she was talked to about

2    this, no, that person didn't do the shooting.  So it

3    struck me as strange she would make an ID and then say

4    that.  So I felt she was hesitant to tell me exactly

5    what had taken place in there.

6        Q.    When you were done interviewing Nicole

7    Pearson, did you interview Shayla Johnson?

8        A.    Yes.

9        Q.    And had she just viewed the lineup?

10       A.    Yes, she did.

11       Q.    What did she tell you?

12       A.    She advised me that the person in number one

13   was the person responsible for the shooting.

14       Q.    The person that did the shooting?

15       A.    Correct.

16            MR. GUAGLIARDO:  Judge, I have no further

17   questions.  I tender the witness.

18            THE COURT:  Thank you.

19            Cross examination?

20                      CROSS EXAMINATION

21   BY MR. KLIMENT:

22       Q.    Good afternoon, Detective.

23       A.    Good afternoon, Mr. Kliment.

24       Q.    When you first talked to Nicole Pearson, she

1   told you that Armando Amaya, Scarecrow -- she never

2   used the word Armando Amaya; right?

3       A.   Are you referring to the first interview I

4   did with her or at the jail?

5       Q.   I'm talking about at the jail, the first

6   half the second interview.

7       A.   Yes, sir.

8       Q.   Never knew his name?

9       A.   Position number one.

10      Q.   She told you that that person wasn't the

11  shooter?

12      A.   That's correct.

13      Q.   That he was somehow involved but he wasn't

14  the shooter?

15      A.   Yes, sir.

16      Q.   So you turn the tape off, talk to Detective

17  Fancsali and a minute later continue the interview?

18      A.   That's true.

19      Q.   I believe you said ultimately she said the

20  person in position number one was the shooter?

21      A.   That's correct.

22      Q.   But even though you turned on the tape the

23  second time she said he was?

24      A.   She made --

C000741

1      Q.    Ultimately?

2      A.    That's correct.

3      Q.    But you asked her again a question, this

4  whole situation, what part did Scarecrow play in it?

5      A.    Yes.

6      Q.    This is after the tape has been turned back

7  on?

8      A.    Yes.

9      Q.    She said: I couldn't -- I don't know if he

10  was the person that shot him, because I know he had a

11  hair in the back, but he had a skull cap on, so I

12  really couldn't see; she told you that?

13     A.    That's correct.

14     Q.    So at this point she's still not sure?

15     A.    That's correct.

16     Q.    And then you asked the question: Okay, so

17  it is safe to assume or do you want me to put on this

18  tape here that the person you saw in position number

19  one, and you know him as Scarecrow, is that the person

20  that did the shooting? Yeah.

21     A.    That's what she said, correct.

22     Q.    She said the yeah; you said the stuff before

23  that?

24     A.    That's correct.

1    Q.   Okay.   Then you talked about her having seen

2    them in the car beforehand, before the shooting took

3    place?

4    A.   Yes.

5    Q.   There was some conversation on the tape

6    about at that?

7    A.   Yes, there was.

8    Q.   She basically said, yeah, because they

9    rolled by first.   And then you stated, they rolled by

10   first and you saw them in the car, yeah?

11   A.   Correct.

12   Q.   And then you said:   So that's what you meant

13   the first time, and she answered yeah?

14   A.   Correct.

15   Q.   So then you asked her:   So what do you mean

16   by all this in a ballpark -- in a roundabout way is

17   you're saying they drove by once in a car, you saw him

18   in the car?   Yes.

19   A.   Correct.

20   Q.   Then you asked the question:   Then when you

21   guys were outside, you saw Scarecrow get out of or

22   come up onto the porch and do the shooting, and her

23   answer was, yes, I didn't see him come up on the

24   porch, but yes?

1    A.    That's correct.

2    Q.    But you saw him on the porch?  Yeah, I saw

3    him on the porch?

4    A.    That's correct.

5    Q.    She told you in that interview that she saw

6    hair in the back of his head?

7    A.    That's what she stated.

8    Q.    And she told you he had a skull cap on?

9    A.    Correct.

10    Q.    Ever mention a hood?

11    A.    No.

12    MR. KLIMENT:  I have nothing further.

13    THE COURT:  Any redirect, Mr. Guagliardo?

14    MR. GUAGLIARDO:  No, your Honor.

15    THE COURT:  Thank you, Detective Sauer.

16    THE WITNESS:  Thank you, your Honor.

17    THE COURT:  You may step down.

18    All right.  Are we --

19    MR. GUAGLIARDO:  We're out of witnesses for

20    today, Judge.

21    THE COURT:  Ladies and gentlemen, the good

22    news is we're going to be adjourning a little bit

23    early this afternoon.

24    Can we proceed promptly at 9:00 tomorrow

1   morning, Counsel?

2            MR. GUAGLIARDO:   Yes, Judge.

3            THE COURT:   Again, with our ongoing request,

4   do not discuss the case with anyone or allow anyone to

5   discuss it in your presence; please do not read any

6   outside accounts or media accounts of the case if

7   there are any; do not form or express any opinions

8   about the case until you receive it for your

9   deliberations, and do not, of course, attempt to visit

10   and view the scene of any occurrence unless the Court

11   were to direct to you to otherwise.   With those

12   thoughts, we wish you a pleasant evening, and if you

13   would please report downstairs tomorrow morning at

14   8:45 a.m.   Thank you.

15            (Which were all the proceedings had

16              in said matter on said date.)

17

18

19

20

21

22

23

24

C000745

194

STATE OF ILLINOIS )
                   ) SS.
COUNTY OF KANE     )

    I hereby certify that I reported in shorthand
the proceedings had at the hearing in the above-
entitled cause, and that the foregoing Report of
Proceedings is a true, correct and complete transcript
of my shorthand notes so taken at the time and place
herein set forth.


                         _____
                         PAULA M. QUETSCH, CSR
                         No. 084-003733
                         Official Court Reporter,
                         16th Judicial Circuit of
                         Illinois

```
1   STATE OF ILLINOIS    )
                          ) SS.
2   COUNTY OF KANE        )

3       IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                       KANE COUNTY, ILLINOIS

4

5   PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
6                          PLAINTIFF,   )
                                        )
7              VS.                      )  NO. 98 CF 535
                                        )
8   ARMANDO AMAYA,                      )
                                        )
9                          DEFENDANT.   )

10

11      REPORT OF PROCEEDINGS had at the hearing in the

12  above-entitled cause before the Honorable Donald C.

13  Hudson, Judge of said Court, on the 27th day of

14  January, A. D. 1999.

15      PRESENT:

16          MR. DAVID R. AKEMANN,
             State's Attorney, by
17          JAMES GUAGLIARDO and JAMES WALSH,
             Assistant State's Attorney,
18              appeared for the People of the
                State of Illinois.

19
            MR. DAVID KLIMENT,
20           Public Defender, and
            SANDRA PARGA,
21           Assistant Public Defender,
                appeared for the Defendant.

22

23
    PAULA M. QUETSCH, CSR
24  Official Court Reporter
```

1　　　　　　　　　　　　(Whereupon, the following

2　　　　　　　　　　　　proceedings were had

3　　　　　　　　　　　　before Court and counsel

4　　　　　　　　　　　　in open court:)

5　　　　THE COURT:　Back on the record, People

6　versus Armando Amaya 98 CF 535.　All counsel are

7　present, Mr. Amaya is present.　We're outside the

8　presence of the jury to begin the third day of trial.

9　　　　Mr. Guagliardo?

10　　　　MR. GUAGLIARDO:　Good morning, your Honor,

11　Jim Guagliardo and James Walsh present on behalf of

12　the State.

13　　　　Judge, we kind of talked about scheduling

14　informally off the record.　We plan today to call the

15　following witnesses:　William McCalister, who is

16　present; Tracy Johnson, who is in the Department of

17　Corrections and was writted for 10:00 this morning, it

18　is currently 9:25.　After Tracy Johnson, two police

19　officers who should be fairly brief, and a gang

20　expert, Detective Langston, who cannot be here until

21　1:00.　We are going to stipulate to the pathologist's

22　testimony.　The doctor couldn't be here until tomorrow

23　morning, so we're going to do away with that, so to

24　speak.　So we will finish our case after Detective

C000748

1   Langston at 1:00.

2           Judge, also I just want to let you know that

3   obviously we can't argue these issues, there will

4   probably -- if the defense does not put on a case,

5   we'll probably do our jury instruction conference

6   today, and I'm going to be asking for an

7   accountability instruction at the jury instruction

8   conference, and I just want to let the Court know, and

9   I've tendered some cases.

10          I think today is the date when this

11  accountability evidence will come out.  I wouldn't

12  argue there's enough for an accountability instruction

13  at this point in the trial, but I believe the three

14  witnesses you'll be hearing from today, William

15  McCalister, Tracy Johnston and Mike Langston, would

16  provide enough evidence to I believe prove

17  accountability beyond a reasonable doubt.  But I

18  wanted to let the Court to know up front this isn't

19  something we're throwing in as an afterthought.  This

20  is a serious part of our case and a theory of the

21  case, and it needs to be argued.

22          THE COURT:  It appears the prosecution is

23  giving you a heads up on their theory of the case.  I

24  don't know if you want to respond at this point.

C000749

1    MR. KLIMENT:  Well, we argue that.

2    THE COURT:  You believe Mr. McCalister may

3    be on the stand 20 or 25 minutes awaiting arrival of a

4    witness from DOC.  There's two ways to go, either we

5    bring the witness out, listen to Mr. McCalister and

6    then take a recess -- my thought is to bring them out,

7    let's get something done, then if we take a recess,

8    they understand there's a witness and there's a few

9    minutes' delay.  Any problems with that?

10    MR. KLIMENT:  Not from our perspective, no.

11    MR. GUAGLIARDO:  The other issue is there

12    were transcripts typed up in this case of taped

13    statements.  I have listened to the tapes and gone

14    through the transcripts and made some revisions,

15    tendered those to Mr. Kliment.  I don't know if he

16    wants a chance to listen to the tapes and check my

17    revisions, but those taped statements do have to do

18    with Tracy Johnson.

19    MR. KLIMENT:  At this point I'm inclined to

20    accept -- I'll listen to the tapes briefly during the

21    break, but there's nothing significant in the changes.

22    THE COURT:  Do these apply to McCalister?

23    MR. GUAGLIARDO:  Well, there is one, but

24    there's nothing particularly significant on the

1    changes with McCalister.  There are some with Tracy

2    Johnson that I believe to be significant, and I'll

3    point out to Mr. Kliment so he can focus in on the

4    tape what he perhaps needs to listen to.

5         THE COURT:  Why don't you do that.  We'll

6    take Mr. McCalister's testimony, you can call his

7    attention to what you wish him to consider, and he can

8    have a chance to listen to the tapes if he'd like.

9         All right.  I'm going to get the jury lined

10   up so we can get going here.

11                        (The following proceedings

12                        were had in the presence of

13                        the jury.)

14        THE COURT:  All right.  We're back on the

15   record in 98 CF 535, People versus Armando Amaya.  The

16   jury is present, all counsel are present, Mr. Amaya is

17   present.

18        At this time I believe you're still in the

19   presentation of your evidence, Mr. Guagliardo, so you

20   may proceed.

21        MR. GUAGLIARDO:  Thank you, your Honor.  We

22   would call William McCalister.

23        THE COURT:  All right.

24                        (Witness sworn.)

C000751

1          THE COURT:  Mr. McCalister, if you'd kindly

2   have a seat on the witness stand.  That would be in

3   the blue chair at the far end of the bench, please.

4          Please keep your voice up so everyone can

5   hear you, if you would.  Please wait until the

6   attorney has finished asking the question before you

7   answer the question, and please make sure all of your

8   answers are out loud.

9          Mr. Guagliardo, you may proceed.

10          MR. GUAGLIARDO:  Thank you, your Honor.

11                  WILLIAM MCCALISTER,

12   called as a witness herein, having been first duly

13   sworn, was examined and testified as follows:

14                  DIRECT EXAMINATION

15   BY MR. GUAGLIARDO:

16      Q.   Sir, could you please state your full name,

17   spell your last name for the ladies and gentlemen of

18   the jury?

19      A.   William Keith McCalister, W-I-L-L-I-A-M,

20   K-E-I-T-H, M-C-C-A-L-I-S-T-E-R.

21      Q.   Sir, how old are you?

22      A.   I'm 33.

23      Q.   Are you married?

24      A.   Yes, I am.

1    Q.   Do you have any children?

2    A.   Yes, I do.

3    Q.   How many?

4    A.   I have five kids.

5    Q.   Do you work?

6    A.   No.   At the present moment I don't.

7    Q.   Sir, I want to -- I have to ask you about

8 one thing.   You currently have a charge pending in

9 this county?

10    A.   Yes, I do.

11    Q.   And that would be a theft charge?

12    A.   Yes, it is.

13    Q.   And that is unresolved; correct?

14    A.   Yes, it is.

15    Q.   And you understand that your testimony here

16 today has nothing to do with the way that case is

17 going to be resolved?

18    A.   Right, I understand.

19    Q.   We have not talked about that case until --

20 as a matter of fact, I never brought it up until this

21 second; correct?

22    A.   Right.

23    Q.   Sir, I want to go back to October 29th of

24 1997, the day when a man named Germaine Lambert was

1    killed.  Do you remember that date?

2          A.    Yes, I do.

3          Q.    I want to go back to about 8:50 or so in the

4    evening right before the shooting occurred.  Where

5    were you at that time?

6          A.    The time before the shooting occurred I was

7    standing on the east side of the building on New York

8    Street between a walkway, a dumpster and a big tree.

9          Q.    So you were kind of to the eastern part of

10   the building?

11         A.    Yes.

12         Q.    What were you doing there at that time?

13         A.    Okay.  I was on my way out to my car going

14   to the store for my kids.

15         Q.    There's a walkway behind that apartment;

16   correct?

17         A.    Yes, it is.

18         Q.    Where were you in relation to that walkway?

19         A.    Okay.  The walkway behind the building,

20   pretty much on the walkway on behind the building and

21   a walkway on the side of the building, the corner.

22         Q.    So you were kind of at the corner of the

23   building?

24         A.    Right.

C000754

1    Q.    Are you familiar with directions in that

2  area?

3    A.    Sort of, yeah.

4    Q.    Would that have been at the south corner by

5  309?

6    A.    Yeah, pretty much, southeast.

7    Q.    Was it by the dumpsters?

8    A.    Yes, sir.

9    Q.    What were you doing?  What was going on?

10    A.    Two females, blacks, were arguing, and I was

11  observing the argument just to see what was going on.

12    Q.    Did you eventually hear gunshots?

13    A.    Eventually I did hear gunshots as the

14  argument continued.

15    Q.    Did you see anybody approach the scene where

16  this argument was occurring prior to the time you

17  heard gunshots?

18    A.    No, sir, I didn't.  When I heard the

19  gunshots, I took off running.

20    Q.    Let me rephrase.  Before you heard the

21  gunshots --

22    A.    Yes, sir.

23    Q.    -- while you were standing watching the

24  argument, did you see anybody approach the group?

C000755

1    A.    Oh, well there were maybe five or six people

2    approaching just to see what the commotion was all

3    about.

4    Q.    Did you see a Hispanic approach the group?

5    A.    There was a gentleman across the street from

6    behind me, which is I'd say the north, the north

7    behind me across the street from New York Street.

8    Q.    Was this a male Hispanic?

9    A.    He seemed to be a male Hispanic.

10    Q.    Well, where did he come from?

11    A.    Like I said, he crossed New York Street, and

12    that would be coming from the north across New York

13    Street.

14    Q.    And where did he go?

15    A.    And he stood maybe like -- maybe five or six

16    feet behind me.

17    Q.    I tell you what, Mr. McCalister, I'm going

18    to use a diagram.

19    A.    Yes.

20    Q.    It's what I've marked as People's exhibit

21    number 1 for identification.  I want you to take a

22    look at that.

23    A.    Okay.

24    Q.    Just take a look at that for a moment and

C000756

1   study it, and let me ask you, do you recognize what's

2   portrayed there?

3        A.   Yes, I do.

4        Q.   And what appears to be portrayed there?

5        A.   Okay.  The dumpster is on here.  The

6   gentleman came from the north on New York Street.

7        Q.   Let me interject a question.  Does that

8   appear to be a diagram of the apartment building we're

9   talking about?

10       A.   Yes, it is.

11       Q.   Would it help you in your testimony here

12   today?

13       A.   Yeah, probably would.

14            MR. GUAGLIARDO:  Your Honor, I would ask

15   that Mr. McCalister be allowed to use the diagram in

16   this his testimony.

17            THE COURT:  Would you position the diagram

18   so the jury can see it?

19            MR. GUAGLIARDO:  Certainly.

20            Mr. McCalister, I'm going to have you step

21   down from where you're at, and I'll get you a pointer,

22   also.

23            Judge, if you can inquire if all the jury

24   members can see.

1          THE COURT:  If you would come a little

2   closer to the diagram so the jury members behind you

3   can see it, and use a pointer.  Can everyone see

4   diagram from there?  Okay.

5   BY MR. GUAGLIARDO:

6       Q.   On that diagram could you show where you

7   were at?

8       A.   This is a dumpster.  I am a maybe six feet

9   from the dumpster right there in the vacant lot.

10      Q.   Where is this Hispanic male you say you saw

11  coming?

12      A.   He come across the street from New York and

13  stood maybe five or six feet behind me.

14      Q.   You can retake the stand, sir.

15      A.   Okay.

16      Q.   Describe in person that you said you saw

17  come across New York Street and stand there.

18      A.   Height-wise he's probably 5'10", 5'11", sort

19  of thin maybe, maybe a light goatee a little bit, with

20  a dark hooded clothing on.

21      Q.   Could you give an approximate weight?

22      A.   Probably 151, maybe 155.

23      Q.   Now, sir, you gave a statement previously in

24  this case; correct?

1    A.    Uh-huh.

2    Q.    And that was a taped statement?

3    A.    Yes, sir, it was.

4    Q.    And you gave that taped statement to

5  Detective Tom Reid, R-E-I-D, of the Aurora Police

6  Department?

7    A.    Yes, sir.

8    Q.    Do you remember telling Detective Reid that

9  -- he asked the question:  Okay.  Describe this man,

10  whether he's Hispanic, white, male or black.  And you

11  answering:  He was a male Hispanic, see him 5'10",

12  approximately 160, 175 pounds?

13    A.    Yes, sir.

14    Q.    Would you still agree with that, what you

15  told --

16    A.    Yes, I'd say probably about 155, somewhere

17  in that area here.

18    Q.    You told Detective Reid 160, 175?

19    A.    Yes, sir.

20    Q.    You say he had on all dark clothing?

21    A.    Yes, he did.

22    Q.    This individual that crossed New York Street

23  and came from the north, what did he do?

24    A.    He was, like I said, observing the argument

1    just like I was, and he was just standing there.

2        Q.   How far was he from you?

3        A.   Like I just showed on the diagram, he was

4    standing maybe six feet behind me.  He was just

5    standing there.

6        Q.   Did he ever say anything to you?

7        A.   No, he didn't.

8        Q.   Now, when he walked up, was his head down or

9    up?

10       A.   Pretty much not down like this but halfway,

11   maybe, between up and down.  Not all the way down; not

12   all the way up.

13       Q.   But his head was -- if you could show, maybe

14   demonstrate.

15       A.   Not like this but maybe just sort of looking

16   like that.

17       Q.   Did he seem to look at where he was going?

18       A.   Yeah.

19       Q.   What happened as that man was standing there

20   by you where you pointed out the diagram?

21       A.   Well, like I said, he just stood there, and

22   nothing happened.  People was coming from the vacant

23   lot, which is west, and people was coming, they were

24   standing up on the second floor of the balcony, they

1  were standing there, and there was also people coming

2  from the south end of the lot, which is also an

3  apartment area, too, and he was just standing there.

4      Q.   Why did this man stand out over anybody else

5  at this point?

6      A.   Well, because he was behind me, and like I

7  said, I took a look, because I didn't want anybody to

8  be just walking up behind me.

9      Q.   Were there any other male Hispanics on the

10  scene that you saw?

11      A.   No more than people that lived in the

12  building.

13      Q.   Where were they?

14      A.   They was on the second floor balcony.

15      Q.   Were there any other Hispanic males that you

16  saw down there watching the argument?

17      A.   Not that I could see at that time.

18      Q.   Did you eventually hear gunshots?

19      A.   After the argument carried on for another

20  15, 20 minutes, yes, gunshots rung out.

21      Q.   How long was this man standing there before

22  the gunshots went off?

23      A.   Maybe five to eight minutes.

24      Q.   What happened when the gunshots went off?

C000761

16

1     A.   I didn't know.  I took off running then.  I

2  didn't see nobody, I just took off to my car.

3     Q.   Did you see this man -- where did you hear

4  the gunshots come from, let me ask you that?

5     A.   From the east side between the dumpster and

6  the sidewalk, the tree, which was on the east side of

7  me.

8     Q.   That appears to be where you hear the

9  gunshots come from?

10     A.   Yes.

11     Q.   Was that's in the area of where this man was

12  standing?

13     A.   No.  It was more towards where the girls

14  were arguing at.

15     Q.   Did you ever see this man that you saw walk

16  down with a gun?

17     A.   No, I didn't.

18     Q.   Did you ever see him shoot anyone?

19     A.   No, I didn't.

20     Q.   Did you see where this man ran after the

21  shooting?

22     A.   No, sir, I didn't.

23     MR. GUAGLIARDO:  Judge, I tender the

24  witness.

C000762

17

1        THE COURT:  Thank you.

2        Cross examination, Mr. Kliment?

3        MR. KLIMENT:  Thank you, Judge.

4                    CROSS EXAMINATION

5    BY MR. KLIMENT:

6        Q.   Mr. McCalister, I'm going to use the diagram

7    to make things a little clearer.  Now, I'm going to

8    point to the diagram here.  This is supposed to be the

9    dumpster?

10       A.   Yes, it is.

11       Q.   You were standing in this area where the

12   dumpster is?

13       A.   More back here.

14       Q.   So you were more to the side of the

15   building?

16       A.   Right.

17       Q.   That would be east?

18       A.   That would be east, right.

19       Q.   So you're off to the side over here?  I'm

20   indicating to the east side of the dumpster.

21       A.   Right.

22       Q.   And the argument's taking place down here

23   closer to Lincoln Street?

24       A.   No, the argument is right here where this

1    doorway is.

2         Q.    By 309?

3         A.    Right.

4         Q.    So it was you, a dumpster and all the folks

5    that were arguing?

6         A.    Right.

7         Q.    The person you saw come from East New York

8    Street came from the north and stood approximately

9    five or six feet behind you?

10        A.    No, he come more this way.

11        Q.    So kind of on an angle?

12        A.    Right.

13        Q.    He took five or six feet behind you?

14        A.    Right, behind me on the east side.

15        Q.    And he just stood there?

16        A.    Yeah.

17        Q.    For five to eight minutes?

18        A.    Yeah.

19        Q.    And he never walked towards the area where

20    the argument was taking place, he just stood?

21        A.    He just stood there.

22        Q.    You said today that you heard the gunshots

23    come from the area of the argument?

24        A.    Right.

C000704

19

1    Q.   Okay.  We'll let you sit back down.

2         Do you recall talking to the police officer

3    an Investigator Reid, on October 29th of 1997?

4    A.   Right.

5    Q.   That would be the same night that this

6    occurred; right?

7    A.   Yes, sir.

8    Q.   Do you recall telling Officer Reid that you

9    heard three shots being fired and you stated that the

10   shots came from your right side, which is where the

11   male Hispanic was standing?

12   A.   Right.

13   Q.   You told him that?

14   A.   That's where -- like I said, he was standing

15   by the east side of me, and that's where the shots

16   come from.

17   Q.   There was only him there; right?

18   A.   Right.

19   Q.   You didn't see him shoot a gun?

20   A.   No.

21   Q.   You didn't see anybody shoot a gun?

22   A.   No, sir, I didn't.

23   Q.   As you're standing in your location by the

24   dumpster, you're looking kind of down that back

1  walkway; right?

2      A.    Right.

3      Q.    You can see the argument out towards where

4  Lincoln Avenue would be?

5      A.    Not -- pretty much.  Not all the way down.

6      Q.    It gets dark; right?

7      A.    Right.

8      Q.    You didn't see anybody down there; did you?

9      A.    No, I didn't see anybody, because -- I'm

10  sorry, go ahead.

11     Q.    You heard gunshots?

12     A.    Yes, I did.

13     Q.    You heard the first gunshots, and after you

14  heard them, you turned and you ran towards West Park?

15     A.    Right.

16     Q.    But when you first heard the shots, you're

17  still looking at the argument?

18     A.    When I first heard the shots, I was still

19  looking.

20     Q.    Didn't see any muzzle flashes?

21     A.    Right.

22     Q.    So the shots came off from your right side?

23     A.    Yes.

24     Q.    Where that man was standing?

1     A.    In that area, yes.

2     Q.    And he was the only person you saw in that

3  area?

4     A.    Right.

5     Q.    Now, the area where the argument was taking

6  place you indicated is behind that little doorway

7  behind 3309?

8     A.    Correct.

9     Q.    All these people who are arguing are all

10  standing around together the same level?

11     A.    Yes, they are.

12     Q.    There was none up high or down low; they

13  were all standing together in a group?

14     A.    They·was all together, right.

15     Q.    You said there were people coming from the

16  field, the vacant lot, people from the second floor;

17  lots of people coming?

18     A.    Right.

19     Q.    At the time you heard the shots, what were

20  they 15, 20 feet?

21     A.    At the time, there were.

22     Q.    Of course, when the shots were fired,

23  everybody ran?

24     A.    Everybody ran.

22

1    Q.    You ran?

2    A.    To my car.

3    Q.    Later on you came and talked to the police?

4    A.    Yeah, as I returned from the store with the

5    items, the officer stopped me, asked me where I was

6    going, and at that time he asked questions and stuff.

7    Q.    Sent you to another officer?

8    A.    Right.

9    Q.    Okay.  The person who was standing five to

10    six feet to your side, the male Hispanic you

11    described?

12    A.    Right.

13    Q.    He stood with his hands in his pocket the

14    whole time?

15    A.    He had like a hooded jacket, he had it

16    inside.

17    Q.    And he had a jacket on over that hooded

18    jacket?

19    A.    Right.

20    Q.    You said it was all dark clothing?

21    A.    Yes.

22    Q.    You never saw his hands?

23    A.    No, I didn't.

24    Q.    You never saw if anything in was his in --

C000768

23

1   he was holding anything or not holding anything?

2        A.   I couldn't tell.  He had his hands in his

3   pockets.

4             MR. KLIMENT:   Nothing further.

5             THE COURT:   Redirect?

6                      REDIRECT EXAMINATION

7   BY MR. GUAGLIARDO:

8        Q.   Fifteen or 20 people were there when the

9   shooting occurred at the upstairs balcony?

10       A.   Upstairs balcony west of the parking lot and

11  south of the parking lot.

12       Q.   So of the 15 or 20 people, they weren't all

13  right here?

14       A.   No, of the girls that was arguing, maybe

15  five at that time in that area by the door.

16       Q.   Did you know Germaine Lambert?

17       A.   I didn't know him that well.  I just know

18  him when I saw him just by name.

19       Q.   Did you see him there that night?

20       A.   No, I didn't.

21       Q.   You weren't focusing on him?

22       A.   No.  I was just focusing on the girls

23  arguing at that time.

24       Q.   Did you know Tara Harris at that time?

1    A.    No.

2    Q.    Did you know Alonzo Matthews?

3    A.    No, I'm sorry, I don't.

4    Q.    So you weren't focused at that time?

5    A.    No.

6    Q.    You don't know where they were standing?

7    A.    No, sir, I don't.

8          THE COURT:  Any recross?

9                  RECROSS EXAMINATION

10   BY MR. KLIMENT:

11   Q.    I think you said there were four or five

12   girls actually doing the arguing?

13   A.    Yes.

14   Q.    They were actually standing in that lower

15   walkway by the door?

16   A.    Yes, they were.

17         MR. KLIMENT:  Nothing further.

18         THE COURT:  Thank you, Mr. McCalister, you

19   may step down.

20         THE COURT:  All right.  Ladies and

21   gentlemen, before the next witness testifies, it will

22   be necessary to take a very brief recess.

23         So again, if you would not discuss the case

24   during the recess in any way or express any opinions,

25

1   we'll have you back in here very shortly I

2   anticipate.  Thank you.

3                               (Recess taken.)

4         THE COURT:  Back on the record, People

5   versus Amaya, the jury has returned, all counsel are

6   present, the defendant is present.

7         At this time, Mr. Guagliardo, you may call

8   your next witness.

9         MR. GUAGLIARDO:  Your Honor, we would call

10  Tracy Lamar Johnson.  He's in custody.

11                              (Witness sworn.)

12        THE COURT:  All right.  Mr. Johnson, would

13  you please have a seat on the witness stand?  That

14  would be in this blue chair here at the far end of the

15  bench.

16        Mr. Johnson, if you would please keep your

17  voice up so everyone can hear you.  Please wait until

18  the attorney has finished asking the question before

19  you attempt to answer it, and please give your answers

20  out loud.

21        Mr. Guagliardo, you may proceed.

22                   TRACY JOHNSON,

23  called as a witness herein, having been first duly

24  sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GUAGLIARDO:

    Q.   Could you state your name, please?

    A.   Tracy Johnson.

    Q.   Is your middle name Lamar?

    A.   Yes, sir.

    Q.   How old are you, Mr. Johnson?

    A.   37.

    Q.   Mr. Johnson, you're currently an inmate at the Illinois Department of Corrections; correct?

    A.   Yes, sir.

    Q.   You were there because you were convicted of a drug felony case in 1998?

    A.   Yes, sir.

    Q.   And when did you get to the Illinois Department of Corrections, what date?

    A.   August 11th.

    Q.   Would that be August 11th, 1998?

    A.   Yes, sir.

    Q.   You have other convictions, too; correct?

    A.   Yes.

    Q.   In 1998 you were convicted of a misdemeanor retail theft?

    A.   Yes.

1      Q.    And in 1997 you were convicted of a felony

2  burglary?

3      A.    Yes.

4      Q.    In '96 you had a misdemeanor retail theft;

5  is that correct?

6      A.    Yes.

7      Q.    And you have some criminal convictions out

8  of Cook County, as well; correct?

9      A.    Yes.

10     Q.    In 1994 were you convicted of a residential

11  burglary in Cook County?

12     A.    Yes.

13     Q.    And in '92 were you convicted of an attempt

14  burglary in Cook County?

15     A.    Yes.

16     Q.    And were you also that year convicted of a

17  burglary?

18     A.    Right, yes, sir.

19     Q.    And in 1991 you were convicted of another

20  burglary in Cook; correct?

21     A.    Yes.

22     Q.    So you've been convicted of several

23  burglaries?

24     A.    Yes.

C000773

28

1   Q.   Sir, we met today a little while ago;

2   correct?

3   A.   Yes.

4   Q.   Me, you and the man over there, Dave

5   Kliment?

6   A.   Yeah.

7   Q.   Had you ever seen me before today?

8   A.   No.

9   Q.   Had we ever discussed this case before

10  today?

11  A.   Nope.

12  Q.   Have you ever discussed this case with a

13  prosecutor before today?

14  A.   Nope.

15  Q.   Did you know why you were being brought here

16  today?

17  A.   Yeah, I pretty much had a good idea.

18  Q.   Sir, I wanted to direct -- let me ask you

19  this:  Were you related to a man named Jermaine

20  Lambert?

21  A.   Not related to him, but we've been so close

22  we were like cousins.

23  Q.   Did you refer to him as your cousin?

24  A.   Yes, I did.

C000774

29

1      Q.    Do you remember the night that Jermaine

2  Lambert was killed?

3      A.    Yes, I do.

4      Q.    You were out of custody at that time?

5      A.    Yes, I was.

6      Q.    Let's go to about 8:30 that evening, the

7  night that Jermaine was killed.  Were you and some

8  friends in the area of Church Street and 4th -- excuse

9  me, in the area of 4th and Galena Streets?

10     A.    Yes.

11     Q.    What were you and your friends doing?

12     A.    We was standing out there drinking and

13 laughing, having a good time, you know.

14     Q.    What did you see?

15     A.    I seen a white car drive by and start

16 throwing out gang signs, and that kind of started it,

17 so we kind of chilled out for a minute.

18     Q.    Sir, you're going to have to maybe possibly

19 lean forward a little bit.  That little black thing on

20 the counter there is actually a microphone.  Because

21 everybody needs to hear what you have to say.

22           This white car you say was throwing out some

23 gang signs?

24     A.    Yes.

C000775

30

1    Q.    Specifically what kind of --

2    A.    Throwing out forks.

3    Q.    You mean F-O-R-K-S, forks?

4    A.    Yeah.

5    Q.    What is throwing down a fork?

6    A.    (Indicating.)

7    Q.    So there's a gang sign called a fork, and

8  they were throwing it down; correct?

9    A.    Yeah.

10    Q.    What does that mean to you?

11    A.    To me?  That don't mean nothing to mean.

12    Q.    What do you understand it to mean?

13    A.    Throwing down gang signs.  Didn't mean

14  nothing to me then.

15    Q.    Are you a member of a gang?

16    A.    No.

17    Q.    Were you a member of a gang back then?

18    A.    No.

19    Q.    If a person were a Gangster Disciple, what

20  would throwing down the forks mean to them?

21    A.    You'd be insulted.

22    Q.    So if you were a Gangster Disciple, you'd be

23  insulted by that?

24    A.    If I was, yeah.

C000776

31

1    Q.   I don't mean you personally, I mean if a

2 person were a Gangster Disciple, they'd be insulted?

3    A.   Oh, yeah.

4    Q.   You saw this white car on 4th and Galena.

5 Could you give a better description than that?

6    A.   Yeah, it was a white four-door Chevy.

7    Q.   Did you see that car anymore after you saw

8 it on 4th and Galena?

9    A.   Yes.

10    Q.   Where did you next see it?

11    A.   It rolled back around twice, I think about

12 to or three times at the most.

13    Q.   When you say it rolled back around again --

14    A.   Yeah, drove.

15    Q.   Drove back by you again?

16    A.   Yeah.

17    Q.   What streets were you on when it drove back

18 by you?

19    A.   We was on -- still by the church, but it had

20 turned down West Park.

21    Q.   West Park Street?

22    A.   Yeah.

23    Q.   Let's go a few minutes up.  Did you hear --

24 do you recall what kind of white Chevy it was?

C000777

32

1    A.    Yeah.  At first at the time I thought it was

2  Impala, but then as time went on I knew it was a

3  Celebrity.

4    Q.    White Chevy Celebrity?

5    A.    Yes.

6    Q.    Now, when me, you and Mr. Kliment met just

7  moments ago, you went through a transcript of a taped

8  statement you gave before; correct?

9    A.    Yes.

10    Q.    You read through that?

11    A.    Yes.

12    Q.    Now, the people that were in this white

13  Chevy Celebrity, were they men or women?

14    A.    Men.

15    Q.    Were they white, black or Hispanic?

16    A.    Hispanic.

17    Q.    Did you -- after you saw this car roll by a

18  couple times, did you eventually hear some gunshots?

19    A.    Yeah.

20    Q.    How many gunshots did you hear?

21    A.    Three.

22    Q.    What did you see right after hearing those

23  three gunshots?

24    A.    I seen three people running from the area

C000778

1    that the gunshots had came from.

2        Q.   Had you seen those three people before that

3    night?

4        A.   Before that night?

5        Q.   No, not before that night.  When you saw

6    them running from where you heard the gunshots, was

7    that the first time you had seen those three people

8    that night?

9        A.   No.

10       Q.   When had you seen them before that?

11       A.   As I noticed, it was the same ones that was

12   in the car.

13       Q.   Did you notice the guys -- how many guys did

14   you see running from where you heard the gunshots?

15       A.   Three.

16       Q.   Let's go one by one.  What was one of them

17   wearing, if you remember?

18       A.   One had on a black leather jacket.  Another

19   one had on a Green Bay jacket.  I'm not certain about

20   the other one.

21       Q.   One was wearing a black leather jacket?

22       A.   Yes.

23       Q.   One was wearing a Green Bay -- when you say

24   Green Bay, do you mean Green Bay Packers?

1      A.    Right.

2      Q.    Are you certain those were the same people

3  that you saw in that white car before flashing gang

4  signs?

5      A.    Yeah.

6      Q.    Do you know where your cousin, Jermaine, was

7  killed?

8      A.    On Lincoln and New York.

9      Q.    Do you know specifically where he was

10  killed?

11      A.    In the building, right, the building on the

12  corner of Lincoln and New York.

13      Q.    Is that where the three people were running

14  from?

15      A.    Yes.

16      Q.    Where did you see them run to?

17      A.    They ran across Lincoln -- I mean across

18  Galena towards the laundromat on Galena -- I mean on

19  Lincoln.

20      Q.    So they ran over Galena Street?

21      A.    Right.

22      Q.    Across Galena Street to a laundromat on

23  Lincoln?

24      A.    Right.

C000780

1      Q.    Do you know what the name of that laundromat

2   is?

3      A.    No, I do not.

4      Q.    It's on Lincoln Street?

5      A.    Yeah.

6      Q.    What was -- where did they run to?  Did they

7   go into the laundromat?  What did they do?

8      A.    No, they ran into a car.

9      Q.    What car did they run to?

10     A.    The same white car.

11     Q.    What did they do when they got to that car?

12     A.    Got in and left.

13     Q.    Do you know what direction that car was

14  facing?

15     A.    South.  It was headed south, yeah.

16     Q.    Do you remember which one drove when they

17  got to the car?

18     A.    No, I don't.

19     Q.    Let's go to about five minutes or so after

20  you saw these three guys running into the car?  Did

21  you hear anyone scream anything out at that time?

22     A.    Yeah.

23     Q.    What did you hear?

24     A.    Someone yelled out, they killed Jermaine.

36

1    Q.   Let's go -- let's go forward to about 10:30

2  that same night, hour-and-a-half after you saw all

3  this happening.  Were you in the area of the

4  intersection of Jackson and Downer Streets at that

5  time?

6    A.   Yes.

7    Q.   What were you doing?

8    A.   I was going over to a friend's house.

9    Q.   Were you in a car or on foot?

10   A.   On foot.

11   Q.   Did you see a car that had been pulled over

12  by the police near that intersection?

13   A.   Yes.

14   Q.   Had you seen that car before?

15   A.   Yes.

16   Q.   When and where had you seen that car before?

17   A.   That was the same car that was driving by

18  throwing down the gang signs.

19   Q.   Was it a white Chevy Celebrity?

20   A.   Yes.

21   Q.   Was it the same one you had seen?

22   A.   Yes.

23   Q.   Was it the same one you had seen the three

24  guys run into at the Lincoln Laundromat?

1        A.    Yes.

2        Q.    Now, when you saw the -- when you say a car

3   was pulled over, did the police have that car pulled

4   over at Jackson and Downer?

5        A.    Yes.

6        Q.    Did you recognize any of the officers there?

7        A.    Yeah.

8        Q.    Which officer did you recognize?

9        A.    Officer Jacobs.

10       Q.    Jacobs?

11       A.    Yeah.

12       Q.    Now, when you saw the police had this car

13   pulled over, did you see any of the guys you had seen

14   earlier in that car?

15       A.    Yeah, laying down on the ground.

16       Q.    You said they had them laying down on the

17   ground.  Who had them laying down on the ground?

18       A.    Police.

19       Q.    Who did the police have laying down on the

20   ground?

21       A.    The three that was in the car that I seen

22   earlier.

23       Q.    Were they the same three you saw run to the

24   car after you heard the shooting?

C000783

1     A.   Yes.

2     Q.   Now, when you saw the police had this car

3 pulled over at Jackson and Downer, were all three out

4 of the car at that time?

5     A.   Yeah.

6     Q.   Now, you gave a taped statement to the

7 police that night of October 29th, 1997; correct?

8     A.   Uh-huh, yes.

9     Q.   After you had seen what you had seen at

10 Jackson and Downer, you went to the police station;

11 correct?

12     A.   Yes.

13     Q.   And you talked to some detectives; correct?

14     A.   Yeah.

15     Q.   And you gave -- they interviewed you;

16 correct?

17     A.   Yes.

18     Q.   And they interviewed you on tape; correct?

19     A.   Yes.

20     Q.   And it was tape recorded with your

21 permission; correct?

22     A.   Yes.

23     Q.   Do you remember the following questions

24 being asked and you giving the following answer?  I'm

C000784

1    going to tell you what the question was, I'm going off

2    the taped statement you gave, bear with me.

3        A.    All right.

4        Q.    Do you remember the question:

5            Jacobs:  Okay.  So a police officer had the

6    car stopped?

7            Your answer:  Yeah, they had them.

8            Question:  Now, you saw the three men

9    stretched out on the ground?

10           Answer:  I seen one.  They had the others --

11   the other ones in the car.

12           Question:  Which one did you see?

13           Answer:  I seen the one in black, he had on

14   black hoodie or something.

15           Do you remember telling them that when you

16   saw the car stopped at Jackson and Downer only one was

17   on the ground and the other two were in the car?

18       A.    Do I remember?  I don't remember that.    I

19   thought I seen three of them -- all of them stretched

20   out.

21       Q.    Do you remember giving -- I understand what

22   you're saying, and my question is just a little bit

23   different, and it's kind of a technical legal thing,

24   but do you remember being asked those questions and

C000795

1  giving those answers?

2      A.   Yes.

3      Q.   As you sit here today, you remember the

4  three of them were stretched out?

5      A.   Yeah.

6      Q.   What were the three wearing?

7      A.   One had on a black leather coat, the other

8  one had on a Green Bay jacket, and the other one had

9  on a hoodie, I'm not for sure.

10     Q.   Do you remember again being asked the

11  questions:

12          Which one did you see?

13          Answer:  I seen the one in the black, he had

14  on a black hoodie or something?

15     A.   Yeah, I remember saying that.

16     Q.   Do you have any doubt that those were the

17  same three you had seen running from the shooting?

18     A.   No.

19     Q.   You have to speak up, sir.

20     A.   No.

21     Q.   Now, when you first saw this white Chevy

22  Celebrity pulled over at Jackson and Downer, did you

23  yell anything out to the police who had the car

24  stopped?

C000788

1        A.    Yeah.

2        Q.    What did you yell at them?

3        A.    I said, that's the car right there.

4        Q.    Do you remember specifically -- when you say

5    that's the car right there, do you remember

6    specifically yelling anything out about that car or

7    the people in the car?

8        A.    I mean, that's the car that I seen that

9    drove away.  I don't remember every word I said.

10        Q.    You don't remember the exact words you

11    yelled out?

12        A.    Right.  It's been a year or so ago.

13        Q.    I'm sorry?

14        A.    I said that's been a year or so ago.

15        Q.    I understand.  You don't remember the exact

16    words you yelled out as you sit here?

17        A.    Right.

18        Q.    I understand.

19            Did you talk to the police at Jackson and

20    Downer and tell them about that car and what you knew

21    about the occupants in that car?

22        A.    Yeah.

23        Q.    I asked you if you were positive about the

24    same three men running.  Are you positive that that

1  car stopped at Jackson and Downer was the same one you
2  saw three guys get into at Lincoln Laundromat?
3      A.    Yes.
4      Q.    Are you related to a woman named Shayla
5  Johnson?
6      A.    Who?
7      Q.    Do you know a Shayla Johnson?
8      A.    No.
9      Q.    Have you ever talked to Shayla Johnson about
10  this case?
11      A.    Huh-uh.
12      Q.    You have to answer out loud.
13      A.    No.
14      Q.    Do you even know a Shayla Johnson?
15      A.    Nope.
16      Q.    Do you know a woman named Nicole Pearson?
17      A.    Nope.
18      Q.    Have you ever talked to a Nicole Pearson
19  about this case?
20      A.    Nope.
21      Q.    Does the name Scarecrow mean anything to you
22  at all?
23      A.    Nope.
24      Q.    Ever heard that before?

C000788

1     A.   Nope.

2     Q.   Sir, you said you were drinking.  Did you

3  say that earlier?

4     A.   Yeah.

5     Q.   How much had you had to drink that night?

6     A.   Probably pint or so.

7     Q.   A pint or so?

8     A.   Pint or so, yeah.

9     Q.   When were you at Jackson and Downer, did you

10  get there by yourself?

11     A.   Yeah.

12     Q.   Anything to do with a bicycle -- were you

13  riding a bike?

14     A.   I was pushing my bike.

15     Q.   Were you alone at that point?

16     A.   No, I had my friend with me.

17     Q.   Now, you were with friends earlier when you

18  saw this car rolling by throwing gang signs; correct?

19     A.   Right.

20     Q.   And the police asked you -- did the police

21  ask you who that friend was or who those friends were?

22     A.   Yeah.

23     Q.   You didn't want to tell them; right?

24     A.   No.

C000799

44

1      Q.   You never did tell the police who those

2  friends were?

3      A.   Huh-uh.

4      Q.   You didn't want them to get involved in

5  this?

6      A.   Huh-uh.

7           MR. GUAGLIARDO:  If I could have one moment.

8           THE COURT:  All right.

9                     (Off the record discussion.)

10          MR. GUAGLIARDO:  No further questions,

11  tender the witness.

12          THE COURT:  Before you begin your cross

13  examination, Mr. Kliment, please approach.

14                    (Proceedings  were had out of

15                     the presence of the jury.)

16              CROSS EXAMINATION

17  BY MR. KLIMENT:

18      Q.   I'm going to put a map up here, People's

19  exhibit number 21.  With the Court's permission I'm

20  going to ask you to come down and take a look at it;

21  okay?

22          THE COURT:  You may step down, Mr. Johnson.

23  BY MR. KLIMENT:

24      Q.   See that map there?

1    A.    Yes, sir.

2    Q.    Now, the folks in the jury have to be able

3 to see what you're pointing at, so if you could stand

4 off to the side.

5         You testified you first saw this car with

6 the people throwing down the forks, as you described

7 it, in the area of 4th and Galena; is that right?

8    A.    That's right.

9    Q.    So is this true I'm pointing out 4th Street

10 here?

11    A.    Right.

12    Q.    And over here we have Galena; right?

13    A.    Okay.

14    Q.    Because this would be north?

15         MR. GUAGLIARDO:   Your Honor, could I suggest

16 that Mr. Kliment use a pointer, because it seems to be

17 blocking --

18         THE COURT:   Hand him the pointer.   We also

19 don't want him to obstruct the jury's viewpoint.

20 BY MR. KLIMENT:

21    Q.    So East Galena and 4th, right, so that would

22 be over here I'm indicating?

23    A.    Right.

24    Q.    That's where you first saw this car

1    traveling that way?

2        A.    Right.

3        Q.    Was the car traveling on Galena or --

4        A.    Galena.

5        Q.    Was it going east or west?

6        A.    East.

7        Q.    So it was going as I'm indicating down this

8    way?

9        A.    Right.

10       Q.    So away from Lincoln?

11       A.    Yes.

12       Q.    And then I think you testified that the next

13   time -- you then walked towards Danino's food; right?

14       A.    Yes.

15       Q.    And that's on Root Street?

16       A.    Yes.

17       Q.    I'm pointing to Root Street.  Where would

18   Danino's be in relation to the intersection of Galena

19   and Root?

20       A.    It would be on --

21       Q.    North or south of Galena?

22       A.    North.

23       Q.    So I'm indicating in the area up here would

24   be north?

C000792

1     A.    Yeah.

2     Q.    And that's where you went?

3     A.    Right.

4     Q.    And you saw the car come back down the

5 street behind Danino's?

6     A.    Right.

7     Q.    So that would be which street, New York?

8     A.    West Park toward New York.

9     Q.    That's where you saw the car again?

10    A.    Yeah.

11    Q.    After that, you went somewhere else, you

12 went back to 4th and Galena, and you were talking to a

13 girl?

14    A.    Yeah.

15    Q.    That's when you hear the shots?

16    A.    Yeah.

17    Q.    You were standing at the intersection of 4th

18 and Galena?

19    A.    We was walking, yeah.

20    Q.    You were walking which way?

21    A.    Toward Randall Liquor.

22    Q.    Where is that?

23    A.    Galena and Lincoln.

24    Q.    That's where you say you saw three people

C000793

1　running together in a group?

2　　　　A.　Right.

3　　　　Q.　Not one person then another person and

4　another person; three people all in a group?

5　　　　A.　Right.

6　　　　Q.　They were coming from the area of 309 East

7　New York?

8　　　　A.　Right.

9　　　　Q.　You saw them at a place called the Lincoln

10　Laundry, is that where you saw that car again?

11　　　　A.　Yeah.

12　　　　Q.　You can sit back down.

13　　　　　　Now, the subjects that were running -- you

14　didn't see any guns?

15　　　　A.　No.

16　　　　Q.　You didn't hear anybody yelling anything,

17　did you, of the three subjects that were running?

18　　　　A.　No.

19　　　　Q.　And it didn't appear to you they came from

20　different directions; did they?

21　　　　A.　No.

22　　　　Q.　I'm sorry, you said no?

23　　　　A.　No.

24　　　　Q.　They were all together in their group?

1 A. Yeah.

2 Q. Now, you said you had been drinking at that

3 point. You said you had about a pint. A pint of

4 what?

5 A. Gin.

6 Q. A pint of gin?

7 A. Yeah. Not by myself, though. There were

8 two or three people drinking with me.

9 Q. So you had part of a pint of gin by 8:30?

10 A. Yeah.

11 Q. By 10:30 had you had more to drink?

12 A. Probably a couple beers.

13 Q. And at 10:30 then you were by yourself?

14 A. No.

15 Q. You were with somebody when you were walking

16 towards the police?

17 A. Yeah.

18 Q. You saw this car. Who were you with?

19 A. I was with a friend.

20 Q. What was that friend's name?

21 A. Bobbie. He's dead now.

22 Q. Bobbie's dead now?

23 A. Yeah.

24 Q. That's the person you were with?

1    A.   Right.

2    Q.   And when you saw the people on the ground,

3  you told the police that those are the people had you

4  seen before?

5    A.   Yeah.

6    Q.   But you didn't see anybody shoot anybody?

7    A.   No.

8    Q.   You didn't see anybody shooting a gun or

9  holding a gun or pointing a gun?

10    A.   No.

11    Q.   When these people drove by and threw gang

12  signs to you, they didn't display weapons to you?

13    A.   No.

14    Q.   You didn't see anybody holding a gun in

15  their hand?

16    A.   No.

17    Q.   And it's some hour-and-a-half later that you

18  saw the car at the intersection of Jackson and Downer?

19    A.   Right.

20    Q.   If we look back at this map again, I think

21  Jackson and Downer is on here.  Can you see this all

22  right?

23    A.   Yeah.

24    Q.   Is that about where you saw it?  You can

C000796

1    step town if you need to.

2         A.   I see it, I see it.

3         Q.   There's actually two intersections with

4    Jackson because it's offset?

5         A.   Right.

6         Q.   Was it at the westernmost intersection or

7    easternmost intersection?

8         A.   The eastern.

9         Q.   So at the last street on the corner of the

10   map?

11        A.   Right.

12        Q.   These guys who were running, were they all

13   about the same height?

14        A.   Appeared to be.

15        Q.   Nobody was very much taller than anybody

16   else?

17        A.   Not too much.

18        Q.   All right.  As you sit here today, you

19   remember all three people being stretched out on the

20   ground?

21        A.   Yeah.

22        Q.   But you told the police there was only one

23   person on the ground, the others were in the car; is

24   that right?  Is that what you told Mr. Guagliardo?

C000797

1      A.   Yeah, right.

2      Q.   You were out that night on the street with

3   your friends drinking this gin; right?

4      A.   Yeah.

5      Q.   Prior to 8:30 where had you been?

6      A.   Prior?

7      Q.   Yeah.  Before 8:30, what were you doing?

8      A.   I was walking around riding my bike.

9      Q.   Were you drinking on and off the whole day

10   long that day?

11      A.   Huh?

12      Q. .  Were you drinking on and off the whole day

13   long?

14      A.   No.

15      Q.   Started right about 8:30?

16      A.   About 6:00, 6:30.

17      Q.   You heard the shots, and you went back to

18   the liquor store?

19      A.   Yeah.

20      Q.   Get more liquor?

21      A.   Yeah.

22      Q.   Now, you've been treated for substance abuse

23   in your past; haven't you?

24      A.   Yeah.

1     Q.    That was back in '91 when you were in the

2  department of rehabilitation, that was a drug program?

3     A.    Yeah.

4     Q.    That's because you're a drug addict?

5     A.    Yeah.

6     MR. KLIMENT:  I have nothing further of this

7  witness, Judge.

8     THE COURT:  Thank you.  Any redirect,

9  Mr. Guagliardo?

10     MR. GUAGLIARDO:  If I could have one moment,

11  your Honor.

12         (Off the record discussion.)

13     MR. GUAGLIARDO:  No redirect, Judge.

14     THE COURT:  All right.  Thank you very much,

15  Mr. Johnson.  You may step down.

16     The People may call their next witness.

17     MR. GUAGLIARDO:  Judge, I would call

18  Detective Wolters of the Aurora Police Department.

19     THE COURT:  All right.

20     MR. KLIMENT:  Judge, may we approach

21  briefly?

22     THE COURT:  All right.

23         (The following proceedings

24          were had out of the presence

1              of the jury.)

2              MR. KLIMENT:  I just want to make sure that

3   the prosecutor recalls our motion in limine.  I

4   believe this is going to go to the arrest of Mr. Amaya

5   and his friends that took place at 10:15 or whatever.

6   It's not to come out, any testimony why they were

7   arrested.

8              MR. GUAGLIARDO:  Do you want him to step up

9   here so we can remind him?

10             THE COURT:  Can't you guide him through

11  that?

12             MR. KLIMENT:  This is Ms. Parga's witness,

13  but if I hear it coming, I'm going to object.

14             THE COURT:  All right.

15                        (The following proceedings

16                         were had in the presence of

17                         the jury.)

18             THE COURT:  Mr. Guagliardo, you may proceed.

19             DETECTIVE SCOTT WOLTERS,

20  called as a witness herein, having been first duly

21  sworn, was examined and testified as follows:

22                  DIRECT EXAMINATION

23  BY MR. GUAGLIARDO:

24      Q.   Sir, could you please state your full name

1    and spell your last name for the ladies and gentlemen

2    of the jury?

3         A.    Scott A. Wolters, W-O-L-T-E-R-S.

4         Q.    Your current occupation?

5         A.    Police officer with Aurora.

6         Q.    How long have you been a police officer with

7    Aurora?

8         A.    Ten years.

9         Q.    Directing your attention back to October

10   29th, 1997 about 10:30 in the evening, do you recall

11   what day of the week that was, by chance?

12        A.    I don't.

13        Q.    Were you on duty at that time?

14        A.    Yes.

15        Q.    And were you on patrol with some other

16   officers?

17        A.    Yes.

18        Q.    Were you in a marked or unmarked squad car?

19        A.    Unmarked.

20        Q.    Who was driving the car?

21        A.    I was driving.

22        Q.    Who else was in the car with you?

23        A.    Mike Doerzaph and Robert Downs.

24        Q.    Doerzaph?

1     A.   Doerzaph.

2     Q.   Robert Downs?

3     A.   Yes.

4     Q.   Are they both police officers with Aurora

5  Police Department?

6     A.   Yes.

7     Q.   Were the three of you in the intersection of

8  Downer and Jackson in Aurora at about 10:30 p.m.?

9     A.   Yes.

10    Q.   Did you make a traffic stop of another

11  vehicle at that time?

12    A.   Yes, we did.

13    Q.   What make and model vehicle did you stop?

14    A.   It was a white Celebrity, white Chevy

15  Celebrity.

16    Q.   Did the white Chevy Celebrity stop?

17    A.   Yes, it did.

18    Q.   Where did it stop?

19    A.   It stopped at Downer and Jackson -- on

20  Jackson just short of-- between Benton and Downer.

21    Q.   Sir, you're going to have to speak up.

22    A.   On Jackson Street between Benton and

23  Downer.

24          MR. GUAGLIARDO:  I'm going to mark a diagram

1   as People's exhibit number 28 for identification.  Let

2   the record reflect that I'm showing counsel People's

3   exhibit 28.

4        Q.   Detective Wolters, I'm showing you what I've

5   marked People's exhibit number 28 for identification,

6   which is a diagram.  Do you recognize the area

7   portrayed by the diagram?

8        A.   Yes, I do.

9        Q.   What is portrayed by that?

10       A.   The dead end intersection of Jackson into

11  Downer Street.

12       Q.   Is that an accurate representation of the

13  intersection where you stopped this white Chevy

14  Celebrity?

15       A.   Yes.

16       Q.   Would it help you in your testimony here

17  today?

18       A.   Yes.

19            MR. GUAGLIARDO:  I'd ask that the witness be

20  allowed to use People's exhibit 28 in his testimony.

21            THE COURT:  Okay.  Do you wish to have him

22  to step down?

23            MR. GUAGLIARDO:  Yes, if he could step down

24  now.

C000803

1  BY MR. GUAGLIARDO:

2      Q.   Are you right-handed?

3      A.   Yes.   I can point with my left hand, too.

4      Q.   Why don't you stand over where I'm

5  standing.

6           That's a three-way intersection, correct,

7  for the record?

8      A.   Actually, it's a two-way intersection,

9  because Downer is one way heading west.

10     Q.   So Downer on that portion of the diagram is

11  one way heading west?

12     A.   Yes.

13     Q.   Is Jackson a two-way street?

14     A.   Yes, it is.

15     Q.   Could you point out where the white Chevy

16  Celebrity stopped?

17     A.   Probably here, 20 feet from the intersection

18  on the east side, which would be the right-hand side.

19     Q.   Could you just mark an X approximately on

20  that diagram where the white Chevy Celebrity was

21  stopped?

22     A.   Can you see that?

23     Q.   Thank you.   Is there any lighting at that

24  intersection?

1     A.    Yes, there is.  There's a school right here,

2   a middle school, lighting in front of it, lighting in

3   front of the school.  There's a street light I believe

4   right here on Downer Street.

5     Q.    You may retake the stand.

6         Now, sir, I'm going to show you some

7   photographs I'm going to mark as People's exhibit

8   number 29 for identification, People's exhibit number

9   30 for identification, People's exhibit number 31 for

10  identification --

11        MR. GUAGLIARDO:  Let the record reflect that

12  I'm showing counsel those photos.

13    Q.    Sir, I'm now showing you 29, 30 and 31,

14  three photographs.  I ask you to look at those

15  photographs, and I'll ask you do you recognize what is

16  portrayed in those photographs?

17    A.    This is the white Chevy Celebrity I made a

18  traffic stop on on Jackson and Downer.

19    Q.    Are those photographs a fair and accurate

20  portrayal of what that car looked like that night when

21  you stopped it on Jackson and Downer?

22    A.    Yes.

23        MR. GUAGLIARDO:  I would admit those three

24  photographs, 29, 30 and 31, into evidence at this

1  time.

2        THE COURT:  Any objection?

3        MS. PARGA:  No, Judge.

4        MR. GUAGLIARDO:  Judge, we could just

5  briefly publish them with the projector.

6        THE COURT:  This is the point where you want

7  me to dim the lights; is that correct?

8        MR. GUAGLIARDO:  Yes, Judge.

9  BY MR. GUAGLIARDO:

10       Q.  Officer, I have up on the screen People's

11  exhibit 31.  Is that the car you stopped at Jackson

12  and Downer?

13       A.  Yes, it is.

14       Q.  I have on the screen People's 29.  Is that

15  the car that you stopped?

16       A.  Yes, it is.

17       Q.  And I'm now putting on the screen People's

18  30.  Is that also the car that you stopped?

19       A.  Yes, it is.

20       Q.  And that is a white Chevy Celebrity?

21       A.  Yes.

22       Q.  What did you and your partners do when you

23  first stopped the car?  Did you get the three

24  occupants out of the car?

1    A.   Yes, we did.

2    Q.   I'm sorry, I kind of jumped the gun.  How

3 many occupants were in the car?

4    A.   Three, two in the front seats and one in the

5 back.

6    Q.   And what was the race and sex of those

7 occupants?

8    A.   All male Hispanic.

9    Q.   Do you see anyone in this courtroom that was

10 in that car?

11    A.   Yes.

12    Q.   Could you point out that person and describe

13 clothing?

14    A.   I think it's a brown shirt left to the

15 counsel table, very short hair, Armando.

16    Q.   Would it be the defendant in this case,

17 Armando Amaya?

18    BAILIFF:  Sir, could you speak louder?

19    THE WITNESS:  Sure, sorry.

20 BY MR. GUAGLIARDO:

21    Q.   For the record loudly, was the defendant,

22 Armando Amaya, in the car?

23    A.   Yes, he was.  He was the front passenger in

24 that white Celebrity.

1      Q.   He was in the front passenger seat?

2      A.   Yes.

3      Q.   Was there a subject driving the car?  Who

4  was that?

5      A.   George Gamboa.

6      Q.   Who was the third person in the car?

7      A.   Romero -- I can't remember his full name.

8      Q.   Was it Romero Sandoval?

9      A.   Yes.

10     Q.   Did you order the defendant and Mr. Sandoval

11 and Mr. Gamboa out of the car?

12     A.   Yes, we did.

13     Q.   And did you search them for weapons?

14     A.   Yes, we did.

15     Q.   Were any weapons found on them?

16     A.   No.

17     Q.   Did you search the car for weapons?

18     A.   Yes.

19     Q.   Were any weapons found in the car?

20     A.   No.

21     Q.   I'm marking these two photographs as

22 People's exhibit number 32 for identification and

23 People's exhibit number 33 for identification, two

24 photos.

C000808

1          MR. GUAGLIARDO:  Let the record reflect I am

2    showing counsel.

3    BY MR. GUAGLIARDO:

4       Q.   Do you recall what the driver, George

5    Gamboa, was wearing?

6       A.   No, I do not.

7       Q.   I'm going to show you two photographs,

8    People's exhibit number 32 for identification and

9    People's exhibit number 33 for identification, and ask

10   you if you recognize what is portrayed by those?

11      A.   Green Bay starter type jacket and then

12   George Gamboa in a white T-shirt, a subject urinating

13   on the front of it, and black pants.

14      Q.   Was that what Mr. Gamboa was wearing --

15      A.   It is.

16      Q.   -- when you stopped him on Jackson and

17   Downer?

18      A.   Yes.

19      Q.   Do these photographs fairly and accurately

20   portray what he was wearing?

21      A.   Yes, they do.

22          MR. GUAGLIARDO:  Your Honor, I would move

23   People's exhibit 32 and 33 into evidence.

24          THE COURT:  Any objection?

1          MS. PARGA:  No, Judge.

2          THE COURT:  They will be received.

3          MR. GUAGLIARDO:  I'm going to mark these

4    next set of photos as People's exhibit number 34,

5    People's exhibit number 35, People's exhibit number

6    36, and People's exhibit number 37 for

7    identification.  Let the record reflect that I am

8    showing counsel.

9    BY MR. GUAGLIARDO:

10         Q.   Detective, I'm going to show you what has

11   been marked as People's exhibit number 36 for

12   identification.

13         A.   A photograph.

14         Q.   Do you recognize what is portrayed in that

15   photograph?

16         A.   Yes, I do.

17         Q.   And what is -- what or who is portrayed in

18   that photograph?

19         A.   That's Romero Sandoval.

20         Q.   You're going to have to speak up real loud.

21         A.   That's Romero Sandoval.  He was the rear

22   passenger in the Celebrity.

23         Q.   I show you People's exhibit 34, 35 and 37

24   and ask you if you recognize what's portrayed in those

C000810

1   BY MR. GUAGLIARDO:

2        Q.   Detective, I'm going to put People's

3   32 for identification on the projector.   Sir,

4   could maybe step over here, is that the Green

5   jacket that Mr. Gamboa was wearing when you s

6   him?

7        A.   Yes, it is.

8        Q.   And I'm going to put number 33 for

9   identification on the screen.   Number 33, is

10  George Gamboa?

11       A.   Yes.

12       Q.   Was that the man driving the white

13  Celebrity?

14       A.   That was the driver.

15       Q.   Are those the pants he was wearing?

16       A.   Yes.

17       Q.   And is that the clothes he was wear

18  than the fact he was wearing a Green Bay jack

19       A.   Yes.

20       Q.   That Green Bay jacket, is that a ho

21       A.   Yeah.

22       Q.   So it does have a hoodie to it?

23       A.   Yeah, it's a pullover.

24       Q.   I'm going to put People's number 36

C000811

1  identification on the screen.  Is that Romero

2  Sandoval?

3       A.    Yes.

4       Q.    And other than the clothing he had over

5  that, is that what Mr. Sandoval was wearing that

6  evening?

7       A.    Yes, it is.

8       Q.    People's 34, that black jacket, was that

9  also something Mr. Sandoval was wearing?

10      A.    Yes, it is.

11      Q.    People's number 37, which is a gray jacket,

12 was Mr. Sandoval also wearing that?

13      A.    Yes, he was.

14      Q.    And finally I'm going to put People's number

15 35 for identification on.  Is that what Mr. Sandoval

16 was wearing over all that?

17      A.    Yes, it's the leather coat.

18      Q.    And that is the leather jacket?

19      A.    Yes.

20      Q.    I'm going to mark these -- if you could just

21 stay there for one second, officer.

22           MR. GUAGLIARDO:  I'm going to mark these

23 next photos as People's number 38, People's number 39

24 for identification.  Let the record reflect I've shown

1   counsel.

2   BY MR. GUAGLIARDO:

3       Q.    Detective Wolters, I'm going to show you

4   People's exhibit 38 for identification, a photograph

5   and ask if you recognize who is portrayed in that

6   photograph.

7       A.    This is the defendant, Armando Amaya.

8       Q.    Is that what he looked like when you stopped

9   him that night?

10      A.    Yes.

11      Q.    Facial and hair and everything else?

12      A.    Yes.

13      Q.    Is that part of what he was wearing?

14      A.    This fairly and accurately represents part

15  of what he was wearing, yeah.

16      Q.    I'm going to show you People's exhibit 39

17  for identification.  What is People's exhibit 39?

18      A.    It's the hooded overcoat that he was

19  wearing, kind of a dark picture.

20      Q.    Other than that fact, does it fairly and

21  accurately portray what Armando Amaya was wearing when

22  you stopped him that evening?

23      A.    Yes, it does.

24          MR. GUAGLIARDO:  I would move People's 38

1    and 39 into evidence.

2            THE COURT:   Any objection?

3            MS. PARGA:   No, Judge.

4            THE COURT:   They will be received.

5            MR. GUAGLIARDO:   It's a very dark photo.

6    We're going to have to publish it to the jury some

7    other way, Judge.

8    BY MR. GUAGLIARDO:

9        Q.   Is that the black hoodie sweatshirt that the

10   defendant, Armando Amaya, was wearing?

11       A.   Yes, it is.

12       Q.   Are those the rest of the clothes that

13   Armando Amaya was wearing; is that what he looked like

14   that evening?

15       A.   Yes.

16       Q.   Did you search the white Chevy Celebrity?

17       A.   Yes.

18       Q.   You weren't looking for clothes at that

19   time; correct?

20       A.   No.

21       Q.   You can retake the stand, sorry.

22            Do you recall if there were other clothes

23   found in the car?

24       A.   I don't recall, actually.

1     Q.   As you were in the process of getting the

2 three persons out of the car, Mr. Sandoval, Mr. Gamboa

3 and Mr. Amaya, patting them down, did anybody approach

4 the area of Jackson and Downer?

5     A.   Yes.

6     Q.   What did this person do who approached the

7 intersection of Jackson and Downer?

8     A.   As we were getting them out, we heard a male

9 black yell from on Downer Street, just the other side

10 of Downer Street something to the effect of, that's --

11     MS. PARGA:  Objection, Judge.

12     THE COURT:  Sustained.

13     MR. GUAGLIARDO:  Judge, is it a hearsay

14 objection?  I need a basis.

15     THE COURT:  Hearsay, sustained.

16     MR. GUAGLIARDO:  If I could approach, Judge.

17     THE COURT:  All right.

18             (The following proceedings

19             were had out of the presence

20             of the jury.)

21     MR. GUAGLIARDO:  It's both an excited

22 utterance and a present sense impression exceptions to

23 hearsay.  There's 115-12, excited utterance, and

24 there's present sense impressions.

1      THE COURT:   115-12 is identification of

2  someone after perceiving them.

3      MR. GUAGLIARDO:   That's what it is, Judge.

4      THE COURT:   What about, a car or a person?

5      MR. GUAGLIARDO:   The people.

6      THE COURT:   So far what came out was the

7  car.   Excited utterance, I don't see any foundation

8  for that.   You had Mr. McCalister on the stand.   Did

9  you ask him if he was excited?

10      What's the third?

11      MR. GUAGLIARDO:   Present sense impressions

12  is the third.

13      MS. PARGA:   Judge, we -- these statements of

14  Mr. Johnson, we already heard what Mr. Johnson had to

15  say regarding what he saw.   I don't think that this

16  qualifies as an exception.

17      MR. GUAGLIARDO:   Judge, also it's

18  impeachment of Mr. Johnson, because he barely

19  remembered what he said.   He said something like,

20  yeah, that's them there.   Basically what I expect him

21  to testify to is, that's them, you've got them, those

22  are the ones that killed my cousin.

23      THE COURT:   First of all, since Johnson's

24  already said he approached the police officers and

1 identified the three as being the ones at the scene

2 why are you trying to get this --

3    MR. GUAGLIARDO:  Corroboration, Judge.

4 That's not the question.  The question is the legal

5 basis.

6    THE COURT:  I'll think about the present

7 sense impression.  If you will go on with him a little

8 bit, then I will call you back up.  That's the only

9 one that's even in the ballpark for the moment, but

10 don't get back into it right now, sustained for the

11 moment.

12        (The following proceedings

13        were had in the presence of

14        the jury.)

15 BY MR. GUAGLIARDO:

16  Q. After this person -- well, if you can step

17 down.

18    Where was this person standing when he

19 yelled something?

20  A. Right here, there's a sidewalk that runs

21 along the side.

22  Q. So the first one's up in that area?

23  A. Pushing a bicycle.

24  Q. And the car stopped right there?

1     A.    Right.

2     Q.    Retake the stand, Officer.

3         About how far was he -- obviously this

4  diagram doesn't have feet or inches or miles on it.

5  About how far was this person who yelled out to you

6  guys from where the car stopped was?

7     A.    30 to 50 feet.

8     Q.    What did you do when you heard him yell

9  something?

10     A.    I didn't do anything.  I looked at my

11  partner, and one of my partners, Mike Doerzaph, went

12  over to speak to him.

13     Q.    Was Officer Jacobs present at the stop, do

14  you recall?

15     A.    Dave Jacobs, yes, I believe he was.

16     Q.    Dave Jacobs?

17     A.    I believe so, yes.

18     Q.    Did Detective Doerzaph go over to talk to

19  the subject?

20     A.    Yes.

21     Q.    Did Detective Doerzaph, after he talked to

22  the subject, did he relate his conversation to you

23  what the subject had said?  Without telling us what

24  the subject had said, did he relate to you what the

1    subject had said?

2        A.    Yes, he did.

3        Q.    Where were the three persons in the car when

4    the subject came by and yelled something out?

5        A.    At least two of them were out of the car.

6    I'm not sure if we had all three or not.  We were in

7    the process of getting them out of the car, and we had

8    them standing over on I believe it was the east side

9    of Jackson Street almost up to Downer.

10       Q.    If you could point out where you had them.

11   You're not sure if it's two or three --

12       A.    I'm not sure how many we had out.  It was

13   during the process of getting them out of the car.  As

14   we got them out, we brought them over here to the rear

15   of the car, which would be in front of the school,

16   which is the middle school.  So about right here.

17       Q.    Where was the subject when he was talking to

18   Investigator Doerzaph?

19       A.    I believe -- when I first heard him yell, he

20   was over here.  I believe when Doerzaph went to talk

21   to him, he approached him, and he walked away, walked

22   away from the subjects in the car.

23       Q.    You can retake your seat.

24            Was the defendant, George Gamboa and Romero

1  Sandoval -- from that traffic stop were they taken

2  down to the Aurora police station?

3       A.   Yes.

4       Q.   Is that where the photographs of their

5  clothes were taken?

6       A.   Yes.

7            MR. GUAGLIARDO:  Judge, I have no further

8  questions.  I tender the witness.

9            THE COURT:  Thank you.

10            Cross examination, Ms. Parga?

11            MS. PARGA:  Thank you, Judge.

12                      CROSS EXAMINATION

13  BY MS. PARGA:

14       Q.   Good morning, Detective.

15       A.   Good morning.

16       Q.   Detective, you testified that you're not

17  sure how many people were out of the car at the time

18  that the person started yelling?

19       A.   That's correct.

20       Q.   And you said possibly two were out of the

21  car?

22       A.   Yes.

23       Q.   And you had them standing?

24       A.   Yes.

C000820

1    Q.    Now, if I could just refer back to People's

2   exhibits 38 and 39 for a moment, can you see from

3   there?

4    A.    Yes, actually I can.

5    Q.    You testified that that is a photograph of

6   Mr. Amaya?

7    A.    Yes.

8    Q.    And that's what he was wearing on the night

9   they were arrested?

10    A.    Yes.

11    Q.    He obviously has blue jeans on?

12    A.    Yes.

13    Q.    Faded somewhat, yes?

14    A.    Yes.

15    Q.    They're definitely not black?

16    A.    No.

17    Q.    You searched all three of the people in the

18   car?

19    A.    Myself, no.

20    Q.    No?

21    A.    Myself and the other officers did, yes.

22    Q.    You were there, and there were two other

23   officers with you?

24    A.    Initially, yes, when we first made the

1    stop.  Others came subsequently.

2        Q.    And did you search any of the people?

3        A.    I'm sure I searched at least one.  I don't

4    remember which one.

5        Q.    But you know the three were searched?

6        A.    Correct.

7        Q.    They were patted down?

8        A.    Yes.

9        Q.    And you told us no weapons were found on

10   their persons?

11       A.    Correct.

12       Q.    And nothing was found in the car, either?

13       A.    I searched the car at the scene.  Nothing

14   was found.

15       Q.    Didn't find any weapons?

16       A.    No.

17       Q.    No guns?

18       A.    Correct.

19       Q.    No ammunition of any kind?

20       A.    Correct.

21       Q.    Now, Detective, were any of the subjects

22   processed for any gun residue or powder on their

23   hands?

24       A.    Not that I'm aware of.

1    Q.    Now, when you made the traffic stop, it was

2   on Jackson Street close to the intersection of Downer?

3    A.    Yes.

4    Q.    And you did not see them throw anything out

5   the window before you stopped them?

6    A.    No.

7        MS. PARGA:   Thank you.   I have no further

8   questions.

9        THE COURT:   Mr. Guagliardo, any redirect?

10        MR. GUAGLIARDO:   Sure.

11                REDIRECT EXAMINATION

12   BY MR. GUAGLIARDO:

13    Q.    Both Mr. Sandoval and Mr. Amaya were wearing

14   blue pants; correct?

15    A.    Yes.

16    Q.    This traffic stop was made about what time?

17    A.    10:00, 10:30, I think.

18    Q.    Which one, 10:00 or 10:30?

19    A.    I believe 10:30, I don't recall exactly.

20    Q.    Would your police report refresh your

21   recollection on that point?

22    A.    Yes, it would.

23        MR. GUAGLIARDO:   I'm going to mark this as

24   People's exhibit number 40.

C000823

1          MS. PARGA:  Judge, we would stipulate that
2    the stop was made at 10:30.

3          THE COURT:  Do you accept the stipulation?

4          MR. GUAGLIARDO:  I accept the stipulation.

5          THE COURT:  All right.  It will be so noted.

6    BY MR. GUAGLIARDO:

7      Q.   Counsel asked you about tests for gun

8    residue or powder?

9      A.   Yes.

10     Q.   Are you familiar with the effect of time on

11   those tests?

12     A.   In the six years I've been an investigator

13   in SOG I've never done one, so no.

14     Q.   Are you aware of the effect of time in the

15   accuracy on those tests?

16     A.   No.

17     Q.   Are you aware if somebody washes their

18   hands?

19     A.   The test then becomes ineffective.

20     Q.   Are you aware that there are false positives

21   that can occur with those tests?

22     A.   Yes.

23         MS. PARGA:  Objection, Judge.

24         THE COURT:  Basis?.

1      MS. PARGA:  The detective testified he

2  wasn't familiar with those tests.

3      THE COURT:  Sustained.

4  BY MR. GUAGLIARDO:

5      Q.  Are you somewhat familiar with those tests?

6      A.  I'm familiar enough with that test to know

7  that's why we hardly ever use it.

8      Q.  When you say that's why we hardly ever use

9  it, what are you talking about?

10      A.  They're inaccurate, fairly ineffective.

11      MR. GUAGLIARDO:  I have no further

12  questions.

13      THE COURT:  Any recross?

14      MS. PARGA:  No, Judge.

15      THE COURT:  Thank you, Detective Wolters.

16  You may step down.

17      Mr. Guagliardo, do you have another witness

18  that would be relatively short in duration?

19      MR. GUAGLIARDO:  I believe so, Judge.

20      THE COURT:  All right, you may call your

21  next witness.

22      MR. GUAGLIARDO:  Judge, we'd call

23  Investigator Doerzaph.

24                          (Witness sworn.)

C000825

1        THE COURT:  Mr. Doerzaph, if you'd kindly

2   have a seat on the witness stand.

3        Mr. Guagliardo, you may proceed.

4        INVESTIGATOR MICHAEL DOERZAPH,

5   called as a witness herein, having been first duly

6   sworn, was examined and testified as follows:

7                    DIRECT EXAMINATION

8   BY MR. GUAGLIARDO:

9        Q.    Could you please state your name?

10       A.    Mike Doerzaph.

11       Q.    Could you spell Doerzaph for the ladies and

12  gentlemen of the jury?

13       A.    D-O-E-R-Z-A-P-H.

14       Q.    Your occupation?

15       A.    Police officer, City of Aurora.

16       Q.    How long have you been a police officer in

17  the City of Aurora?

18       A.    Six years.

19       Q.    Detective Doerzaph, I'm going to direct your

20  attention back to October 29th, 1997 at about 10:30 in

21  the evening.  Were you on duty at that time?

22       A.    Yes, I was.

23       Q.    Were you riding around in a squad car with

24  Detectives Wolters and Detective Downs?

C000829

1      A.    Yes, I was.

2      Q.    In the process of riding with them did you

3  make a traffic stop on a white Chevy Celebrity at that

4  time?

5      A.    Yes, I did.

6      Q.    I'm going to show you what has been admitted

7  as People's exhibit 29, 30 and 31 for identification.

8  Is that the car that you guys stopped?

9      A.    Yes, it is.

10      Q.    Where was that traffic stop actually made?

11      A.    It was made at the intersection of Jackson

12  and Downer.

13      Q.    Detective Doerzaph, if you could step down

14  from the stand, there is a diagram which is labeled as

15  People's number 28.  Is that a fair and accurate

16  depiction of that intersection of Jackson and Downer?

17      A.    Yes, it is.

18      Q.    Do you recall about where the car was

19  stopped?

20      A.    Yes, I do.

21      Q.    Using this pointer -- and if you could step

22  over to the side so all the jury can see, could you

23  point out on the diagram approximately where the white

24  Chevy Celebrity was actually stopped?

83

1     A.   Right about where the X is already drawn on

2   the board.

3     Q.   You may retake the stand.

4         How many people were in the car that was

5   stopped?

6     A.   Three.

7     Q.   Did you see anyone in this courtroom here

8   today that was in the car that was stopped?

9     A.   Yes, I do.

10    Q.   Could you point that person out and tell us

11  what he or she is wearing?

12    A.   The gentleman wearing the colored shirt,

13  shaved head, brownish color shirt.

14    Q.   And you pointed in the direction of Armando

15  Amaya?

16    A.   Correct.

17    Q.   Who else was in the car besides Defendant

18  Amaya?

19    A.   George Gamboa and Romero Sandoval.

20    Q.   Were the three subjects removed from the

21  car?

22    A.   Yes, they were.

23    Q.   Were they removed for a search of weapons?

24    A.   Correct.

1      Q.    What, if anything, unusual happened when you

2   guys were in the process of removing the three to pat

3   them down for weapons?

4      A.    I heard somebody yell --

5          MR. GUAGLIARDO:   Hold on one second.

6          THE COURT:   Approach.

7          MR. GUAGLIARDO:   Sure, Judge.

8                        (The following proceedings

9                        were had out of the presence

10                       of the jury.)

11         THE COURT:   What is your proffer he's going

12   to testify to?

13         MR. GUAGLIARDO:   Either the car or the guy,

14   Judge.

15         THE COURT:   I believe this is a good

16   opportunity for me to make a definitive ruling.   I

17   don't think person means object or car, so that

18   doesn't come in under any theory.   If you are able to

19   lay the foundation that he identified somebody there

20   which corroborates his testimony in court he made the

21   statement --

22         MS. PARGA:   Judge, he didn't make an

23   identification.   He said that's the car.

24         THE COURT:   He didn't make an identification

C000839

1    in court; did he?

2              MR. GUAGLIARDO:  Not of the person, no.

3              THE COURT:  How would 115-12 apply?

4              MR. GUAGLIARDO:  That's one -- the officer

5    is saying he yelled.  To me, that shows it's an

6    excited utterance, as well.

7              THE COURT:  You didn't ask him anything

8    about his state of mind or his feelings.  Are you

9    going to -- he doesn't know what is going through his

10   mind.

11             MR. GUAGLIARDO:  What about the

12   impeachment?  Remember Tracy Johnson said something

13   like, that's them there.  What he actually yelled is,

14   you got them, that's the car, those are the ones that

15   killed my F-ing cousin.

16             THE COURT:  We don't know what it's based

17   upon, so you have a problem under the law getting this

18   in, and I'm not going to go on a tangent here.

19             MR. GUAGLIARDO:  I guess my next question is

20   if I ask Detective Doerzaph about Tracy Johnson

21   saying, those are the three I saw running from the

22   scene, to me, that's 115-12, that's a prior

23   identification.

24             THE COURT:  Find some cases that may allow

1   it even though there's not an in-court identification,

2   and I may allow you to recall him.  Proceed as far as

3   you can.

4           MR. GUAGLIARDO:  There cannot be an in-court

5   identification.  What I'm saying is he told Detective

6   Doerzaph, those are the three I saw running from the

7   scene.

8           THE COURT:  What I'm saying is unless there

9   are cases that may allow that to come in even though

10  there's not an in-court identification as long as the

11  declarant was on the stand, I'm going to hold my

12  ruling in abeyance, because this is a critical issue.

13          MR. GUAGLIARDO:  I can't go much further.

14          MR. KLIMENT:  He talked about Gamboa and the

15  leather coat, I remember he said that twice.

16          THE COURT:  This is good for us to take up

17  over the lunch hour.

18          MR. GUAGLIARDO:  I can't go any further at

19  this point.

20          THE COURT:  There's nothing else you can ask

21  him about cars or clothes or anything like that?

22          MR. GUAGLIARDO:  It's pretty much

23  intertwined.  I can say he yelled something, I went

24  over and it was Tracy Johnson I spoke to, and then we

```
 1   can recess.

 2                THE COURT:  If you want to just cut it off

 3   here for the lunch hour -- is that what you want to

 4   do?  Okay.

 5                          (The following proceedings

 6                           were had in the presence of

 7                           the jury.)

 8                THE COURT:  All right.  Ladies and

 9   gentlemen, at this time we're going to take our lunch

10   recess, there are some matters that we need to take

11   up, no reason for you to sit there and take up part of

12   your lunch hour.

13                So we'll adjourn at this time with our

14   standard ongoing request not to discuss the case over

15   the lunch hour, please do not read any outside

16   accounts or media accounts of the case, do not form or

17   express any opinions about the case at all until you

18   receive it for deliberations, and again, of course, do

19   not attempt to visit the scene of any alleged

20   occurrence.  Thank you.

21                          (The following proceedings

22                           were had out of the presence

23                           of the jury.)

24                THE COURT:  We're outside the presence of
```

1    the jury.  If you want to remove your easel, we can

2    have further arguments on these issues.  All counsel

3    are present, Mr. Amaya is present.

4         When we adjourned, Mr. Guagliardo, you had

5    been seeking to have the witness testify as to some

6    out-of-court statements made by other witnesses.  What

7    is your proffer on this testimony and why do you

8    believe it's admissible?

9         MR. GUAGLIARDO:  Well, your Honor, first of

10   all, there's a yelling.  Basically I believe the

11   proffer would show that Mr. Johnson yelled out while

12   the officers were patting down these three subjects,

13   Amaya, Sandoval and Gamboa, he yelled out -- the

14   report says yelled out, you got 'em, that's the F-ing

15   car, no doubt about it, they killed my cousin.  And

16   that's being yelled out.  Judge, to me, that is an

17   excited utterance, number one.

18        THE COURT:  And why do you believe it's an

19   excited utterance, and in particular in telling me why

20   it is, reference yourself to the absence of time to

21   fabricate.

22        MR. GUAGLIARDO:  Absence of time to

23   fabricate, he basically sees them right then.  There's

24   no evidence here that Tracy Johnson was watching this

1   car stopped for 20, 25 minutes and then suddenly comes

2   up in his mind and says, oh, you know what, I'm going

3   to say that's the car. The evidence is he arrives on

4   the scene with a bike and he yells this out.

5           THE COURT: The time to fabricate refers to

6   the time delay between perceiving the statement and

7   making the statement. It's the difference between the

8   event, the alleged shooting, and the statement by the

9   witness, that's the time.

10          MR. GUAGLIARDO: Your Honor, he arrives at

11  Jackson and Downer and sees this car, and basically

12  the evidence is when he arrives, he yells this out.

13  What he's yelling out -- he doesn't know he's going to

14  run into a white car being stopped by the police with

15  three Hispanics in it. So his time to fabricate,

16  there is none.

17          I understand the shooting happened an

18  hour-and-a-half earlier, but are we saying for an

19  hour-and-a-half he was going around saying, okay, as

20  soon as I see a white car with three Hispanics being

21  stopped by the police I'm going to yell out that's

22  them, they killed my cousin?

23          There is no time to fabricate here. The key

24  words are, "No doubt about it, they're the ones that

1    killed my cousin." Of course, what he's really saying

2    is, they're the ones I saw running from the scene.

3           MR. KLIMENT: I'm objecting. What they say

4    is, they killed my cousin. It's not what he's really

5    saying.

6           THE COURT: First of all, how could that

7    ever possibly come in? Your witness is on the witness

8    stand, he says he didn't see anybody shoot anybody.

9    That's an opinion without any foundation.

10          MR. GUAGLIARDO: Well, it's an opinion with

11   the foundation, Judge, that he saw them running from

12   the scene where the shooting was right after he heard

13   bang, bang, bang. Of course, he's drawing a

14   conclusion based on that, which you argue to the jury

15   just because he said they killed my cousin, he saw

16   them running from the scene.

17          THE COURT: In any event, the Court has to

18   weigh the prejudicial value to the probative. Don't

19   even go there, it's not even in the ballpark. Any

20   statements like they killed my cousin are not coming

21   in under any circumstances. So let's confine

22   ourselves to either identifications --

23          MR. GUAGLIARDO: That is an ID, Judge.

24          THE COURT: No. We're not going to debate

C000835

1 | it any further. Move on. No witness who is on the
2 | witness stand who can't even put the person shooting
3 | the gun is going to be allowed to testify that
4 | somebody killed somebody. I don't think you would
5 | want to retry the case two years from now.
6 | MR. GUAGLIARDO: I don't think I would.
7 | THE COURT: I think you would have to retry
8 | it.
9 | MR. GUAGLIARDO: You're the judge, and you
10 | ruled.
11 | Other than that, what is really at issue is
12 | identification of the three that he saw running from
13 | the scene. Detective Doerzaph went over there and
14 | spoke to him, and he's going to tell Detective
15 | Doerzaph that those are the three he saw running from
16 | the scene of where the shooting occurred. To me that
17 | is a 115-12 statement.
18 | THE COURT: All right. As I indicated at
19 | the exchange at the bench, that could possibly fall
20 | within that exception if it is qualifying as an
21 | identification. So your proffer is -- and I'll hear
22 | from defense counsel. How is that an identification
23 | of someone? And secondly, in the absence of an
24 | in-court identification, as I see their point, can

1   115-12 apply.

2          Quite frankly, I'm not so sure it could not

3   apply as long as the declarant is on the witness

4   stand.  I'm going to be doing some research over the

5   lunch hour.  I suggest you do, too, but this statute

6   has become very liberalized as long as the declarant

7   is on the witness stand at some point.  What exactly

8   would they be proposing to identify?

9          MR. GUAGLIARDO:  Because of the research and

10  perhaps because it's the same counsel and the same

11  judge, we already did all this in People versus Omar

12  Soto where the case law is clearly you don't have to

13  have an in-court identification.

14         THE COURT:  That's my understanding,

15  Ms. Parga, you don't need an in-court identification

16  by the declarant to allow an out-of-court

17  identification by the witness.  He could have a memory

18  lapse, he could have forgotten, but I'll confirm it

19  when he brings in the case law if you're in doubt

20  about it.  But how is this identification,

21  Mr. Guagliardo?

22         MR. GUAGLIARDO:  I think the elements are

23  established here under 115-12.  The statute says the

24  statement is not rendered inadmissible by the hearsay

C000827

1  rule if the declarant testifies at trial, which he

2  has, the defendant is subject to cross examination

3  concerning the statement, he was, and the statement is

4  one of identification of a person made after

5  perceiving him.  Tracy Johnson perceived these three

6  running from the area of the shooting, and now he is

7  reperceiving those three, identifying those three at

8  Jackson and Downer.

9          THE COURT:  And what does he say to identify

10 them?

11         MR. GUAGLIARDO:  To Detective Doerzaph?  I

12 believe he tells them it -- I'm going off memory from

13 a pretrial, Judge.  We may actually have to have the

14 officer here, because this officer, Doerzaph, did not

15 do a police report; Wolters did the police report for

16 the stop at Jackson and Downer.  So rather than answer

17 that question, I think the safest thing to do, your

18 Honor, is ask Detective Doerzaph what Tracy Johnson

19 told him and see what part of that is within 115-12,

20 which part isn't, get rid of the part that isn't, and

21 this way the officer will also know and understand

22 exactly what he said, if anything.

23         THE COURT:  Subject to what Officer Doerzaph

24 says, what's your response?

1          MS. PARGA:  Mr. Johnson is primarily

2     identifying a car.  What he says is, that's the car,

3     referring to the car.  He never identifies -- he tells

4     us in court he saw three people running.  He saw three

5     people in the car.  He said that he recognized the

6     coats of two people.  It's not really an

7     identification.  He recognized the coats of two

8     people, but it's really the car that he's certain

9     about, and that's not a person.

10          THE COURT:  I've already ruled that clearly

11    115-12 for very obvious reasons doesn't apply to the

12    identification of an object or a car.  I think,

13    Mr. Guagliardo, you would concede that it has to be

14    identification of a person.

15          MR. GUAGLIARDO:  Yes.

16          THE COURT:  So the witness can't testify

17    that Mr. Johnson said that's the car; that doesn't

18    fall within the hearsay exception.  So the question

19    becomes is there enough to construe this as

20    identification of some sort of Mr. Amaya.

21          MS. PARGA:  And I don't think that there is,

22    Judge.  He refers to two coats, a jacket and --

23          MR. GUAGLIARDO:  You identify people by face

24    and by clothing.  You can convict people by

1  identification of clothing.  He said, I remember the
2  clothes of the two running from the scene, the Green
3  Bay Packer jacket and a guy with a leather jacket.
4  Then he says when we get to Jackson and Downer, those
5  are the two I remember with the clothing and that was
6  the third guy, no doubt about it.

7          THE COURT:  If he says -- if Officer
8  Doerzaph is going to testify that Mr. Johnson said
9  those are the three that ran from the scene, I believe
10 that that qualifies under 115-12.  It doesn't matter
11 -- it's a matter for cross examination over what
12 clothing if he says -- and I believe he testified the
13 three that were there are the ones that were running.
14 Unless you give me some case law to the contrary, that
15 falls under the category of an identification of
16 someone.  I don't know that it has to be of face,
17 that's what you seem to be arguing.  However, if he
18 doesn't specifically say those three, I would agree we
19 can't lump Mr. Amaya in with some nebulous group
20 unless he says those three were there.

21         MR. GUAGLIARDO:  At Jackson and Downer?

22         THE COURT:  Where the stop was made.

23         MS. PARGA:  But he testified he saw two of
24 the three at Jackson and Downer.

1    MR. GUAGLIARDO:  He did not testify to that,

2    Judge.

3    MR. KLIMENT:  My recollection is he

4    described two and the third he didn't know, he said

5    I'm not sure.

6    MS. PARGA:  Because the other one was still

7    in the car I thought.

8    MR. GUAGLIARDO:  No, Judge, I think he said

9    I'm positive those are the three I saw running from

10   the scene.  The confusion seems to be he remembers

11   clothing of two, the black leather jacket and the

12   Green Bay jacket.

13   THE COURT:  What I'm going to have to do is

14   sit down with the court reporter and read over his

15   testimony.

16   MR. GUAGLIARDO:  He also identifies those

17   three persons, and he doesn't say I'm not identifying

18   them by face, either.  He doesn't say, I just

19   recognize the clothes.  He says that those were the

20   three that were in the car beforehand flashing gang

21   signs.

22   THE COURT:  Ms. Parga has a point.  If he

23   says there are two -- and we don't know if Mr. Amaya

24   falls within the two, but if he says -- and I seem to

1   recall there were three and I'm certain those were the

2   three, then I would think under 115-12, quite frankly,

3   that would come in, because then the argument's going

4   to go more to weight than admissibility.  You can

5   cross examine him on what he's talking about.

6   Mr. Kliment has already acknowledged it doesn't have

7   to be a facial identification.  If the witness says

8   those are the three, that's the identification; is it

9   not, Mr. Kliment?

10          MR. KLIMENT:  To the extent that he's

11   identified three people.

12          THE COURT:  So apparently I'll be spending

13   part of the lunch hour with the court reporter going

14   over the exact testimony, and I'll obviously try and

15   call your attention to the specific parts that are in

16   controversy.  It's going to come down to what

17   Mr. Johnson said, and if he says what Mr. Guagliardo

18   said, it will be admissible.

19          MR. GUAGLIARDO:  We may still have to get

20   Detective Doerzaph -- again, I'm working at the

21   disadvantage of him not having a police report and

22   going off of a pretrial that happened two weeks ago

23   and memory.

24          THE COURT:  The first order of business, as

1    I say, is for me to determine what the witness said,

2    and then the second part is to get Doerzaph in here so

3    he relates what you believe he's going to relate,

4    because if he didn't hear the witness say that, then

5    it doesn't come in even if Johnson believed he said

6    it.   And also bring those cases over the lunch hour

7    about the lack of an in-court identification by the

8    declarant.

9         Anything further?

10        MR. KLIMENT:   No.

11        THE COURT:   Okay.   Have a pleasant lunch

12   hour.   We'll see you about 1:00.

13                      (Recess taken.)

14        THE COURT:   Let's go back on the record,

15   People versus Armando Amaya, 98 CF 535.   The record

16   should reflect we're currently outside the presence of

17   the jury, all counsel are present, Mr. Amaya is

18   present.

19        There are some legal issues for the Court to

20   deal with regarding the propriety of having one of the

21   officers testify as to the alleged out-of-court

22   identification of the defendant by the witness,

23   Mr. McCalister.

24        Just to follow up additionally,

1    Mr. Guagliardo, just to conceptualize for you and for

2    the record, you obviously appear to be somewhat

3    troubled by the Court's ruling that the witness could

4    not say -- the officer could not testify that the

5    witness made the out-of-court statement to the effect

6    that those were the guys that killed my cousin,

7    because when you stop and think about it further is

8    the exception you would be referring to, excited

9    utterance, would obviously be admitted for the truth

10   of the matter asserted in the statement.  If you stop

11   and think about it, the statement itself can't go

12   beyond the knowledge of the declarant.  The declarant

13   has no knowledge that the three alleged suspects

14   killed anybody, because he testified on cross he

15   didn't see anyone.

16         So totally aside from the prejudicial

17   outweighing the probative it would be improper under

18   any exception to the hearsay rule that the statements

19   uttered would be beyond the knowledge of the

20   declarant.  If the witness had seen somebody shooting,

21   perhaps if that had happened, you might be closer in

22   the ballpark, but since the witness admittedly didn't

23   see anyone shooting anyone, he's not qualified to give

24   an opinion as to who killed anyone.

100

1      Be that as it may, we need to move on to the

2   next issue, and that is the 115-12 identification. Do

3   you have the case law regarding the lack of the

4   in-court identification by the declarant?

5      MR. GUAGLIARDO:  Yes, Judge, I understand

6   your ruling on the previous issue, but I do disagree

7   with it.

8      I grabbed the file actually from People

9   versus Omar Soto, because I was trying to round up a

10  new witness over lunch and trying to round up

11  accountability stuff I didn't have time to make three

12  copies.

13     THE COURT:  Do you have one for me?

14     MR. GUAGLIARDO:  Yes, People versus Holbeck,

15  supreme court of Illinois at 141 Ill.2d page 84.  It

16  stands for the basic proposition that an in-court

17  identification is not necessary in order to get in a

18  prior out-of-court identification.

19     MR. KLIMENT:  That's my recollection from

20  the Soto case.  They've expanded that well beyond I

21  think its intended meaning, but --

22     THE COURT:  Ms. Parga, in fairness, had been

23  going under the strict statutory case.

24     MR. KLIMENT:  I think she was relying on the

1  fact that that witness never made an in-court

2  identification and you were going to look at the

3  transcript or talk to the court reporter.

4        THE COURT:  It's clear the witness did not

5  make an in-court identification of --

6        MS. PARGA:  Or any identification.

7        THE COURT:  The first issue of whether

8  in-court identification is necessary, and I just --

9  you're conceding it's not?

10        MR. KLIMENT:  It's not.

11        THE COURT:  Ms. Parga?

12        MS. PARGA:  Yes, Judge.

13        THE COURT:  All right.  That is the holding

14  in Holbeck that the in-court identification is not

15  necessary in order to get in a prior out-of-court

16  identification.

17        So the issue then becomes one of a factual

18  matter being what the witness, Mr. McCalister,

19  testified to.  As I indicated to counsel, over the

20  lunch hour I sat down with the reporter.  She read

21  back to me all of McCalister's testimony --

22        MR. GUAGLIARDO:  It's Mr. Johnson.

23        THE COURT:  Correct.  And the reporter read

24  his testimony from the point where the vehicle was

1  stopped at approximately 10:30 in the evening, and

2  according to the notes, Mr. Johnson did testify that

3  he saw the three suspects there -- he testified in

4  court that he saw one suspect on the ground and two

5  were in the car which -- excuse me, he believed he saw

6  three on the ground here today.  It was somewhat

7  different than what he told the officers the night he

8  was interviewed.  However, he testified that he

9  recognized the three as running from the scene of the

10  shooting.  He did not say he saw them shoot anybody,

11  but, however, here is the key question:

12  Mr. Guagliardo asked Mr. Johnson, is there any doubt

13  that the three that you saw there were the three that

14  you saw running from the scene of shooting, and

15  Mr. Johnson said no.  I mean, that's as clear as it

16  could be.  That's what he testified to, which is a

17  little different than what Ms. Parga was arguing that

18  it was unclear as to whether or not there were three

19  people he identified as running from the scene of the

20  shooting.  Unless you're trying to argue that

21  Mr. Amaya wasn't one of the three that he said he saw

22  there at the scene, then I think it would properly

23  come in under 115-12.  I don't know if there's any

24  further arguments, but that question was clearly what

C000847

1    was asked, and he said there wasn't any doubt.

2           Anything further, Ms. Parga?

3           MS. PARGA:  No, Judge.

4           THE COURT:  Mr. Kliment?

5           MR. KLIMENT:  No.

6           THE COURT:  Mr. Guagliardo?

7           MR. GUAGLIARDO:  The only issue now is

8    Investigator Doerzaph did not do a report, and I guess

9    in the spirit of discovery of not getting something in

10   at trial that shouldn't come out maybe we want to voir

11   dire him as to what Mr. Johnson told him.  I wish I

12   had a report.  I met with him a couple weeks ago.

13   Honestly, all I have in my outline question-wise is

14   did Tracy Johnson identify these three subjects and

15   how did he identify them, in other words, what did he

16   say about them.

17           THE COURT:  All right.  It's going to be

18   very difficult to unring a bell if the jury hears it.

19   My suggestion would be to lessen any prejudice to

20   Mr. Amaya that Doerzaph be allowed to testify outside

21   the presence of the jury first to determine what in

22   fact was said, and if it doesn't meet the standards

23   under 115-12, it won't come in at all.  Obviously I've

24   already ruled that Doerzaph cannot testify that the