File Date: _5 - 29 - 2 008_

Case No: _07cv6793_

ATTACHMENT # _____

EXHIBIT _5 part 3_

TAB (DESCRIPTION)

_____

```
 1    witness identified the car.

 2            MR. GUAGLIARDO:  I understand.  We have to

 3    let him know that, though.  He does not know that.

 4            THE COURT:  Any objection if he testifies

 5    first outside the presence of the jury?

 6            MS. PARGA:  No, Judge.  I think we also have

 7    to let him know he wouldn't be able to testify to they

 8    killed my cousin.

 9            THE COURT:  Yes.  That will be made

10    eminently clear.

11            MR. GUAGLIARDO:  I understand.

12            THE COURT:  Do you want to bring him in and

13    we'll have him testify now?

14            MR. GUAGLIARDO:  Yes, Judge.

15            THE COURT:  All right.  Officer Doerzaph has

16    resumed his seat on the witness stand.  Preliminary to

17    laying the foundation for any testimony before the

18    jury, Mr. Guagliardo, if you'd like to question

19    Officer Doerzaph relative to the issue before the

20    court.

21            MR. GUAGLIARDO:  Sure.  Could we inform --

22    sure, I'll question him.

23            THE COURT:  We can do that after you --

24            MR. GUAGLIARDO:  Okay.
```

1                    DETECTIVE DOERZAPH,

2 called as a witness herein, having been first duly

3 sworn, was examined and testified outside the presence

4 of the jury as follows:

5                     EXAMINATION

6 BY MR. GUAGLIARDO:

7     Q.   Did you go over and speak to the subject who

8 yelled something out?

9     A.   Yes, I did.

10    Q.   Basically what did you say to him and what

11 did he say to you?

12    A.   I kind of heard what he was saying.  I heard

13 him saying, that's it, you got 'em, you got the ones

14 that killed my cousin.  I told the other officers I

15 was going to go over and speak with him.  He was

16 actually on Downer.  So I went and I spoke with him.

17 He just pointed to the car and said, that's the car,

18 those are the guys, and then I brought him on the

19 other side of Downer, and he explained in more

20 detail.

21       I asked him, so what exactly did you see.

22 He told me that he saw some subjects running, the two

23 subjects -- two of them that we had stopped had jumped

24 into the same white Chevy Celebrity we had stopped,

C000850

1   that was the same car he saw with the subject that was

2   in the Green Bay Packers coat, which was George

3   Gamboa, he said he was driving, those were them, I had

4   seen them driving around earlier in the day, the two

5   guys were the ones, and at that time I said, okay,

6   we're going to need you to come in and give a

7   statement.

8           MR. GUAGLIARDO:  Judge, that's what I'd be

9   asking him.

10          THE COURT:  All right.  There's going to

11  have to be some tailoring of some of his testimony,

12  but do you wish to cross him, Mr. Kliment?

13          MR. KLIMENT:  No.  I don't know that he

14  needs to be cross examined at this point.  I think

15  most of what he said now I don't think he can say in

16  front of the jury.

17          THE COURT:  At least part of it in my

18  opinion, but I'm not going to rule until I hear

19  arguments.  Mr. Guagliardo, what, if any, parts of

20  those statements do you believe would be admissible?

21          MR. GUAGLIARDO:  Your Honor, I believe any

22  time he is referring to previously perceiving those

23  people that evening is admissible.  In other words,

24  when he said, those are the three I saw riding around

```
 1   in that car -- I guess we can't put in that car, those
 2   are the three I saw riding around earlier -- the way
 3   Detective Doerzaph put it, obviously the two on the
 4   ground or whatever or the two I saw with the Green Bay
 5   Packer jacket running from the scene, those are them.
 6        We take everything about what he yelled
 7   about those are the ones that killed my cousin, that's
 8   the car, take that out obviously pursuant to your
 9   ruling and take out any identification of the car.
10        THE COURT:  Mr. Kliment, what's your
11   position?
12        MS. PARGA:  Judge, we wouldn't have an
13   objection to that.
14        THE COURT:  That was going to be my exact
15   suggestion.  The car doesn't fall within under 115-12,
16   as I pointed out, since the witness didn't see anyone
17   shoot anyone, the opinion that those are the people
18   that killed my cousin is a rank opinion not based on
19   any factual knowledge within the scope of the witness'
20   personal knowledge, so that has to come out.  Absent
21   that, as long as it is essentially that he pointed out
22   the people --
23        Officer Doerzaph, you need to stay away from
24   the witness saying those were the guys that shot or
```

C000852

1  killed my cousin, that's the car, avoid any references

2  to the car and that they allegedly killed his cousin.

3          Absent that, is there an objection?

4          MS. PARGA:  No, Judge.

5          THE COURT:  Okay.  So we're clear on that

6  then?

7          MR. GUAGLIARDO:  Just so the officer's

8  clear, you can talk about --

9          THE WITNESS:  I can talk about the subjects,

10  that they were running, that all three were driving

11  around earlier, but not specifically the car and not

12  that he stated that those are the ones that killed my

13  cousin.

14          THE COURT:  Right.  The fact that he pointed

15  them out is okay.

16          THE WITNESS:  Okay.

17          MR. GUAGLIARDO:  I'm just going to ask an

18  open-ended question of the detective of what did you

19  say to him, what did he say to you.

20          THE COURT:  All right.  Now, where do we

21  stand in terms of -- Officer Doerzaph will obviously

22  be on the stand when the jury comes out.  What do we

23  follow that with?

24          MR. GUAGLIARDO:  Officer Kahle, who is an

1  evidence tech, arrives, I can call him next -- or

2  Officer Langston.  I think Officer Kahle wants to look

3  at his report.  He's really not prepared for this,

4  things came up this morning which make him I believe

5  necessary, probably call Officer Langston next.

6              THE COURT:  And then you would be inclined

7  to rest?

8              MR. GUAGLIARDO:  Yes, we'll get in the

9  stipulation as to Dr. Cogan, and we would be ready to

10  rest.

11             THE COURT:  And then I will turn to you,

12  decide what you want to do, and I may have some brief

13  questions about Mr. Amaya, about whether or not he

14  wants to testify or not.

15             MR. KLIMENT:  We've discussed that with him

16  and discussed the fact that you would ask him about

17  it.

18             THE COURT:  All right.  Let's line up the

19  jury.

20                          (The following proceedings

21                           were had in the presence of

22                           the jury.)

23             THE COURT:  The jury has returned, all

24  counsel are present, Mr. Amaya is present.  Officer

 1   Doerzaph is on the witness stand.

 2          At this time, Mr. Guagliardo, you can resume

 3   your examination.

 4          MR. GUAGLIARDO:   Thank you, your Honor.

 5              CONTINUED DIRECT EXAMINATION

 6   BY MR. GUAGLIARDO:

 7      Q.   Detective Doerzaph, after the subject yelled

 8   out, did you go and speak to the subject?

 9      A.   Yes, I did.

10      Q.   Did you get the subject's name?

11      A.   Yes, I did.

12      Q.   What was the subject's name?

13      A.   Tracy Johnson.

14      Q.   Was he a male black?

15      A.   Yes, he was.

16      Q.   Did you have a conversation with him?

17      A.   Yes, I did.

18      Q.   What did you say to him and what did he say

19   to you?

20      A.   Mr. Johnson stated to me that the three

21   subjects that we had stopped, two of which he had seen

22   earlier in the evening running from the area of the

23   shooting, the third subject in addition with the other

24   two, he had seen all three driving around earlier in

C000855

INCRIMINATIO OF TESTED MORE. ~~HO~~ JOSHON
NEGER SAID THAT THE DRIVER WAS WEARRING
4 GREEN BAY JAKET AND THE OTHE TWO
WERE THE ONES WHO HE SEEN RUNNING
FROM THE SHOTAL. 115-12 PAWRULES

JOSHON SAID THAT HE SEEN TREE
PEOPLE RUNNING FROM THE SHOTING
THE DITE. DORZART SAID A NOTHE
THING IFFREN FROM JONSHON

||/

C000856

1  the day in the area of the shooting on one or two

2  different occasions.

3      Q.   Did he say something about a Green Bay

4  Packer jacket?

5      A.   Yes, he did.

6      Q.   How did that work into what he had told you?

7      A.   Stated that when they were driving around

8  earlier in the day, the driver of the car that they

9  were driving around in was -- he said he recognized

10  him as being the subject we had on the stop that was

11  wearing the Green Bay Packers jacket.

12      Q.   Just to be clear, what did he say about the

13  three subjects that were there?  Did he distinguish

14  one with Green Bay and the others?

15      A.   Yes, the subject wearing the Green Bay

16  Packers jacket that we had on the stop, he stated that

17  was the subject driving the other two around earlier

18  in the day and the other two subjects were the ones he

19  saw running from the area of the shooting.

20      Q.   Did he see them running with the guy with

21  the Green Bay Packers jacket?

22      A.   No, they ran into a car that the subject

23  with the jacket was in that they got into.

24      Q.   Did you arrange for him to go to the Aurora

C000857

1    police station and give a more thorough statement?

2        A.    Yes, I did.

3        Q.    If you could, just point out on People's

4    exhibit number 28 where you had this conversation with

5    Tracy Johnson.

6        A.    Initially when he got my attention he was

7    standing on Downer here on the north side of Downer.

8    I brought him over about this location, because I

9    believe the subjects were over here.  That's where he

10   was talking to me and identifying himself.

11       Q.    Do you remember if the subjects were in or

12   out of the car when you were talking to

13   Mr. --

14       A.    They were out of the car.

15       Q.    This Jackson and Downer intersection, is it

16   anywhere on People's exhibit number 21 for

17   identification, or is it not shown on there?

18       A.    Yes, it is, right here.

19       MR. GUAGLIARDO:  Your Honor, I have no

20   further questions.

21       THE COURT:  Thank you.

22       Cross examination at this time?

23       MS. PARGA:  No questions, Judge.  Thank you.

24       THE COURT:  Thank you very much,

1  Mr. Doerzaph.  You may step down.

2          Mr. Guagliardo, do you want the photographs

3  back?

4          MR. GUAGLIARDO:  You can leave them.

5          THE COURT:  The People may call their next

6  witness.

7          MR. GUAGLIARDO:  We would call Detective

8  Mike Langston.

9          THE COURT:  All right.

10                              (Witness sworn.)

11         THE COURT:  Sergeant Langston, please have a

12  seat on the witness stand.

13         Mr. Guagliardo, you may proceed.

14              SERGEANT MICHAEL LANGSTON,

15  called as a witness herein, having been first duly

16  sworn, was examined and testified as follows:

17              DIRECT EXAMINATION

18  BY MR. GUAGLIARDO:

19     Q.   Would you please state your full name and

20  spell your last name for the jury, please?

21     A.   Sergeant Mike Langston, L-A-N-G-S-T-O-N.

22     Q.   Your current occupation?

23     A.   I'm a police sergeant with the City of

24  Aurora.

1    Q.   How long have you worked for the City of

2  Aurora?

3    A.   A little over 16 years.

4    Q.   What unit, if any, are you currently

5  assigned to?

6    A.   I'm assigned to special operations group.

7    Q.   What is the special operations group?

8    A.   Special operations group is an investigative

9  unit within the Aurora Police Department primarily

10  works on gang and drug related cases.

11    Q.   Is there a unit known as the gavel unit?

12    A.   Yes.

13    Q.   What is the gavel unit?

14    A.   The gavel unit is an investigative unit

15  within the special operations group which works on

16  gang violence and serious violent crimes such as

17  homicide, things of that nature.

18    Q.   Do you work in the gavel unit as well as the

19  SOG unit?

20    A.   Yes.

21    Q.   What's your position in the gavel unit?

22    A.   I supervise the gavel unit.

23    Q.   How long have you supervised the gavel unit?

24    A.   Approximately three years.

C000809

1    Q.    How long have you been in the SOG, the

2  special operations group?

3    A.    The units that were the predecessor to the

4  special operations group I've been in a total of ten

5  years.

6    Q.    What sort of crimes does the special

7  operations group investigate?

8    A.    Investigates the gang activities type calls

9  such as aggravated batteries, shootings, gang fights,

10  drug related gang activity, some gang related auto

11  thefts, that type.

12    Q.    Are all those offenses in the City of

13  Aurora?

14    A.    Yes.

15    Q.    Sergeant Langston, have you had any training

16  in the area of investigating gang incidents, any

17  specialized training?

18    A.    Yes.

19    Q.    What type of specialized training have you

20  had?

21    A.    I've attended numerous seminars and courses

22  that deal with gang awareness, gang investigation,

23  identification of gangs, gang apprehension and

24  suppression strategies, as well as prevention

1    programs.

2        Q.    About how many hours of that specialized

3    training have you underwent?

4        A.    More than 350 hours.

5        Q.    Over what time frame have you taken those

6    classes?

7        A.    Those classes would have been during a

8    period of being in the gang related unit of the Aurora

9    Police Department, which is the last ten years.

10        Q.    What are the last couple of seminars or

11    courses that you've taken?

12        A.    Most recently would have been the National

13    Gang Crimes Research Center training conference held

14    in Chicago.  I attended a number of courses there that

15    dealt with those issues as well as instructed some of

16    those courses.

17        Q.    I was just going to ask you about

18    instructing or training that you've done.  What kind

19    of training have you done, training of others in the

20    field of gang related crime or gangs?

21        A.    I've taught classes to police officers,

22    court services personnel, educators, medical staff,

23    employers, citizens in general that deal with those

24    same issues, the gang awareness identification

1   investigation, suppression and apprehension and

2   prevention programs.

3       Q.    Over what time period have you taught these

4   courses?

5       A.    Basically since about 1992.

6       Q.    In your experience as a gang crimes

7   investigator have you had an occasion to receive

8   information related to gang activities in Aurora?

9       A.    Yes.

10      Q.    What different sources of information do you

11  use to learn information about gang related

12  activities?  What are your quote-unquote sources?

13      A.    As many sources as I can find.  Individuals

14  who are involved in gang activity out on the streets

15  as members or associates, family members of those

16  persons, people who live in the areas where the gangs

17  are active, other police officers, documentation that

18  the gangs manufacture, information from the seminars

19  that I attend, police reports, confiscated documents

20  that have been passed between the gangs from within

21  the prison system to the outside.

22      Q.    Do you have contacts with actual admitted

23  gang members?

24      A.    Yes.

C000862

1        Q.    Do you speak with them?

2        A.    Yes.

3        Q.    Is that always in an arrest context, or is

4    it also often just out on the street talking?

5        A.    It's in both situations.

6        Q.    Have you ever had occasion to go out into

7    the community and personally survey gang activity?

8        A.    Yes.

9        Q.    Approximately how many times?

10       A.    I've conducted gang surveillances more than

11    1,000 times.

12       Q.    Have you viewed and familiarized yourself

13    with gang graffiti?

14       A.    Yes.

15       Q.    Have you personally investigated gang

16    related crimes during the last ten years you spent in

17    the gang unit, we'll call it?

18       A.    Yes.

19       Q.    Approximately how many gang related crimes

20    have you personally investigated as the investigator?

21       A.    I've investigated several hundred gang

22    related crimes.

23       Q.    Have you ever seen, read or reviewed

24    documents that are written and distributed by gangs in

C000864

1  Aurora?

2      A.   Yes.

3      Q.   How do you come into possession of those

4  documents?

5      A.   Sometimes we're given those documents by

6  maybe family members of persons involved in gangs.

7  Occasionally the persons involved in gangs themselves

8  will turn the documents over.  Quite often they're

9  obtained during search warrant executions, things of

10  that nature.

11      Q.   What sort of documents are we talking

12  about?  What are they called?

13      A.   Gang constitutions, manifestos, some that

14  deal with the hierarchy issues of the gang, notes from

15  gang meetings, graffiti drawings.

16      Q.   Are you familiar with the different gangs in

17  Aurora, Illinois?

18      A.   Yes.

19      Q.   Are you familiar with the different gangs

20  back in October of 1997?

21      A.   Yes.

22      Q.   Are you familiar with the various gang

23  colors and symbols and signs, territory, leadership

24  structure, and graffiti back in October of '97?

C000865

1　　　　A.　　Yes.

2　　　　Q.　　Have you previously been qualified as a gang

3　expert in criminal courts here in Kane County?

4　　　　A.　　Yes.

5　　　　Q.　　Approximately how many times?

6　　　　A.　　Approximately 114 times.

7　　　　　　　MR. GUAGLIARDO:　Your Honor, at this point I

8　would tender Detective Langston as an expert in the

9　field of street gangs in Aurora, Illinois.

10　　　　　　　THE COURT:　Any objection?

11　　　　　　　MR. KLIMENT:　No.　We accept his

12　qualifications, Judge.

13　　　　　　　THE COURT:　He will be so declared.

14　BY MR. GUAGLIARDO:

15　　　　Q.　　Is there a street gang in Aurora known as

16　the Latin Kings?

17　　　　A.　　Yes.

18　　　　Q.　　Was that gang in existence back in October

19　of 1997?

20　　　　A.　　Yes.

21　　　　Q.　　In your duties as a gang investigator have

22　you had opportunities to monitor activities of the

23　Latin King gang in Aurora prior to October 1997?

24　　　　A.　　Yes.

C0008CC

1      Q.    Approximately how many such surveillances

2  have you done?

3      A.    I've conducted hundreds on that gang.

4      Q.    Describe a particular surveillance.   What's

5  involved in that?

6      A.    There are basically two types of

7  surveillance operations, covert and overt.   The covert

8  surveillance operations would be situations where we

9  would view the activity of the gang unbeknownst to

10 them at the time usually from a secret location

11 wherever they're being active at that particular

12 time.   The overt operations would be situations where

13 we monitor their activity where they may in fact know

14 we're doing so, again in areas where they're active at

15 that time.

16     Q.    Have you had opportunities to speak to

17 persons who are admittedly members of the Latin King

18 gang?

19     A.    Yes.

20     Q.    Approximately how MANY such conversations

21 have you had in let's take the period '95, '96, '97?

22     A.    Probably more than 100.

23     Q.    And have you also had conversation with

24 friends and family members of gang members in the

C000867

1    Latin King gang during that period?

2        A.    Yes.

3        Q.    How about have you had conversations with

4    other police officers prior to October of '97 about

5    Latin King activities in Aurora, Illinois?

6        A.    Yes.

7        Q.    And have you had an occasion to review

8    various literature of the Latin Kings in Aurora,

9    Illinois, prior to October of '97?

10       A.    Yes.

11       Q.    What kind of Latin King literature did you

12   review prior to that time in your duties?

13       A.    The gang constitutions that are used by the

14   Latin Kings in Aurora.

15       Q.    Have you viewed any photos or things of that

16   nature?

17       A.    Photographs of individuals that are involved

18   in the gang activity, reviewing gang minutes from

19   meetings that were held within Aurora, some membership

20   lists, some graffiti drawings.

21       Q.    So you're familiar with the slogans and

22   graffiti and hand gestures and colors and symbols of

23   the Latin Kings?

24       A.    Yes.

1          Q.    Is black one of the colors of the Latin

2    Kings?

3          A.    Yes.

4          Q.    What's primarily the other color?

5          A.    Gold.

6          Q.    Are you familiar with a man named Armando

7    Amaya?

8          A.    Yes.

9          Q.    Do you see him anywhere in this courtroom

10   today?

11         A.    Yes, I do.

12         Q.    Do you know if he was a member of a street

13   gang back in October of 1997?

14         A.    Yes.

15         Q.    What gang was Mr. Amaya a member of?

16         A.    The Latin Kings.

17         Q.    What are you basing that opinion on?

18         A.    It's based on numerous admissions by he,

19   himself, by meeting criteria factors that indicate

20   gang membership over several years.

21         Q.    Any tatoos?

22         A.    Yes.

23         Q.    So basically based on tatoos, admissions and

24   other criteria -- well, we'll get into that.

1          Are you familiar with a nickname that

2     Mr. Amaya has in that gang?

3          A.    Yes.

4          Q.    What is that?

5          A.    Scarecrow.

6          Q.    Are you familiar with a man named George

7     Gamboa?

8          A.    Yes.

9          Q.    Is Mr. Gamboa -- let me ask you the more

10    relevant question.  Was Mr. Gamboa a member of any

11    street gang back in October of 1997?

12         A.    Yes.

13         Q.    What street gang was he a member of?

14         A.    The Latin Kings.

15         Q.    What are you basing that on?

16         A.    Based also on his own admission numerous

17    times as well as meeting other criteria factors and

18    tatoos.

19         Q.    What kind of tattoo?

20         A.    He has a tattoo of two faces commonly known

21    as the theater faces or the drama faces, one in a

22    smiling posture, the other one in a frowning posture.

23         Q.    What does that mean to you?

24         A.    That's a common tattoo seen among gang

C000870

1   members.    It basically indicates smile now, cry later,

2   follows the philosophy of numerous gang members, which

3   is enjoy the good life now and you may have to pay for

4   it later.

5        Q.    How about Romero Sandoval; are you familiar

6   with him?

7        A.    Yes.

8        Q.    Back in October of 1997 was he a member of

9   any street gang?

10       A.    Yes.

11       Q.    What street gang was he a member of?

12       A.    The Latin Kings.

13       Q.    What are you basing that on?

14       A.    Also on his own admission as well as meeting

15   the criteria of gang membership.

16       Q.    Are you familiar with a gang in Aurora

17   called the Gangster Disciples?

18       A.    Yes.

19       Q.    Was that gang in existence back in October

20   of 1997?

21       A.    Yes.

22       Q.    In your duties as a gang investigator, have

23   you had opportunities to monitor activities of the

24   Gangster Disciple street gang in Aurora prior to

1    October of 1997?

2        A.   Yes.

3        Q.   And have you had an opportunity to do

4    surveillance of -- to survey Gangster Disciple

5    activity?

6        A.   Yes.

7        Q.   And prior to October '97 have you had

8    opportunity to speak the persons who were admittedly

9    in that gang?

10        A.   Yes, I have.

11        Q.   And prior to October '97 have you spoken to

12    the family members or friends of people who were

13    admittedly in that gang?

14        A.   Yes.

15        Q.   And did you have an occasion also at any

16    time prior to October of '97 to review various

17    literature of the Gangster Disciple gang?

18        A.   Yes.

19        Q.   Would that be the same sort of literature

20    that you talked about with the Latin Kings?

21        A.   Yes, it would.

22        Q.   Approximately how many Gangster Disciples

23    are in Aurora now?

24        A.   As an estimate in general, in the

1    neighborhood of 200 to 250.

2         Q.    And a lot of them have automobiles, as far

3    as you know?

4         A.    Yes.

5         Q.    A lot of them also have cases pending in

6    this building, as far as you know?

7         A.    Yes.

8         Q.    Are in -- let's go back to October of '97

9    for that matter as well, but let's focus on October

10    '97.  Are there various gangs in Aurora?

11         A.    Yes.

12         Q.    What was the relationship between the

13    Gangster Disciples and the Latin Kings in October of

14    1997?

15         A.    They were rival gangs.

16         Q.    Are they still?

17         A.    Yes.

18         Q.    Are you familiar with the term, quote, gang

19    territory, unquote?

20         A.    Yes.

21         Q.    Would you define gang territory?

22         A.    Gang territory as it's known out on the

23    street is known as a hood.  A hood or a gang territory

24    would be an area that a particular gang is active in.

C000872

1    You would expect to see persons involved with that

2    gang in that area on a regular basis.  It's kind of

3    like a home ground where they feel that they can be

4    active and somewhat secure.

5        Q.    Back in October of '97 did the Gangster

6    Disciples lay claim or stake out certain territories

7    in Aurora?

8        A.    Yes.

9        Q.    Are you familiar with an apartment complex

10    at the southeast corner of Lincoln and New York

11    Streets in Aurora, Illinois?

12        A.    Yes.

13        Q.    Is that or was that located in a

14    quote-unquote gang territory back in October of '97?

15        A.    Yes.

16        Q.    Back in October of '97 what gang territory

17    was that located in?

18        A.    Gangster Disciple.

19        Q.    Is it any sort of special branch of the

20    Gangster Disciples?

21        A.    It's a faction that calls themselves

22    Midtown.

23        Q.    Does that Midtown Gangster Disciple -- or

24    Gangster Disciple territory extend beyond just that

1  apartment complex?

2      A.   Yes.

3      Q.   Detective Langston, if you could step down

4  from the witness stand and step up to People's exhibit

5  number 21 for identification, I'm going to ask you to

6  stand over here.  First of all, if you could take a

7  look at People's exhibit 21 for identification, do you

8  recognize what that portrays?

9      A.   Yes.

10     Q.   And would that apartment building at the

11  southeast corner of Lincoln and New York be located on

12  that map?

13     A.   Yes, it would.

14     Q.   Could you kind of point out using that

15  diagram, that map on that diagram Gangster Disciple

16  territory or area back in October of '97?

17     A.   You're saying in the area of New York and

18  Lincoln?

19     Q.   Yes.

20     A.   It would be along the boundering streets of

21  Lincoln to in general the area of East Galena and back

22  up to East Park Place and then back along New York

23  Street to the west back to Lincoln.

24     Q.   So how about West Park place; would that be

C000875

1    on there?

2         A.    Yes.

3         Q.    Is Lincoln Laundromat technically in the

4    Gangster Disciple territory?

5         A.    Lincoln Laundromat would be on the southwest

6    corner of Galena and Lincoln, which would be the outer

7    edge of that boundary.

8         Q.    If I may just take the pointer for a moment,

9    West Park place here, would that be considered

10   Gangster Disciple territory back then?

11        A.    Yes.

12        Q.    What about Galena Street here in this area,

13   would that be?

14        A.    Yes.

15        Q.    Are you familiar with Lincoln Laundromat,

16   the location of it?

17        A.    Yes.

18        Q.    You pointed to this area.   Would it be in

19   that area?

20        A.    Yes, right over there.

21        Q.    And there's an LL on the map where you're

22   pointing to?

23        A.    Yes.

24        Q.    I'm going to ask you to mark a couple other

1   spots.  Are you familiar with a Randall Liquors?

2        A.   Yes.

3        Q.   Would it be in the area of this map?

4        A.   Yes, it would.

5        Q.   If you could just put an RL where Randall

6   Liquors is located?

7        A.   Uh-huh.

8        Q.   Are you familiar with a store -- just for

9   the record, you marked an RL on the south side of East

10  Galena Boulevard between West Park place and South

11  Lincoln; correct?

12       A.   Yes.

13       Q.   Are you familiar with a store building

14  Donino's?

15       A.   Yes.

16       Q.   Would Donino's be somewhere on that map?

17       A.   Yes.

18       Q.   Could you mark with a D where the

19  approximate location of Donino's is?

20       A.   Donino's would basically occupy the majority

21  of this block, there's one other store that sits on

22  this corner, but generally in that area.

23       Q.   And on the corner of 4th and Galena, is

24  there a church located on that corner?

1    A.   On the corner of 4th and Galena?

2    Q.   Yes.

3    A.   There's -- I don't know if you would call

4 that a church building.  There is a building there.

5 recall what it used to be.  I don't know if it would

6 be considered a church at this point in time or not.

7    Q.   Do you recall what it was back in October of

8 '97?

9    A.   It would be in the same status that it is

10 now, but I'm not aware that it's an active church.  It

11 had been known as the Stillman building, it held small

12 offices inside.

13    Q.   You may retake the stand.

14    Mr. Langston, I'm going to mark some

15 photographs here, People's exhibit number 40 for

16 identification, People's 41 for identification,

17 People's 42 for identification, People's 43 for

18 identification.  I've shown these to counsel, and now

19 that I've marked them I'll show them again.

20    Detective Langston, I'm showing you what

21 I've marked as People's exhibits 40, 41, 42 and 43,

22 which are some photographs.  I'm going to ask you to

23 look at those photographs and tell me if you recognize

24 what is portrayed in those photographs?

1       A.    Yes.

2       Q.    To the best of your knowledge, were those

3   photographs recently taken?  Were they taken

4   yesterday?

5       A.    I'm not aware whether they were taken

6   yesterday or not, but recently they appear to be.

7       Q.    They're taken in winter, you can tell that

8   much?

9       A.    Yes.

10      Q.    What is portrayed by those photographs in a

11  general fashion, what areas are portrayed by those

12  photographs?

13      A.    In general it would be the intersection area

14  of east Galena Boulevard and Lincoln Avenue.

15      Q.    In different angles?

16      A.    Yes.

17      Q.    Is Lincoln Laundromat portrayed in some of

18  those photographs?

19      A.    Yes, it is.

20      Q.    Are you familiar with that area today as

21  well as back in October of '97?

22      A.    Yes.

23      Q.    Do those photos fairly and accurately

24  portray what that area looked like back in October of

1    '97?

2       A.   Yes.

3            MR. GUAGLIARDO:  Your Honor, I would move

4    the four photographs into evidence.

5            THE COURT:  Any objection?

6            MR. KLIMENT:  No.

7            THE COURT:  They will be received.

8    BY MR. GUAGLIARDO:

9       Q.   Mr. Langston, if you could kind of step over

10   to this projector, I'd like to ask you some questions

11   about these.

12           I put People's exhibit number 43 on the

13   projector.  If you could kind of describe what we're

14   looking at using the pen -- first of all, if you could

15   point out where Lincoln Laundromat is -- you could use

16   the pointer.

17      A.   That would be the building right here.

18      Q.   Where is the intersection of Galena and

19   Lincoln?

20      A.   It would be right here.

21      Q.   Is that an intersection obviously with

22   traffic lights?

23      A.   Yes.

24      Q.   Do you see the apartments located at the

1   southeast corner of Lincoln and New York Streets

2   anywhere in the photo?

3        A.   Yes.

4        Q.   Could you point those out?

5        A.   They would be over here.

6        Q.   And is that basically where Lincoln

7   laundromat is down between those apartment buildings

8   -- well, let me ask you this question instead.  If

9   you were to turn this way on Galena Street, is that

10  basically a business district or a residential

11  district?

12       A.   It's actually a combination.  It would be

13  within the business district northbound along Lincoln

14  Avenue between Galena and New York here there's a

15  church and business as well as residences.

16       Q.   And there are street lights in this area;

17  correct?

18       A.   Yes.

19       Q.   Are there also lights from the businesses in

20  that area?

21       A.   Yes.

22       Q.   Let me put down another photograph, People's

23  exhibit 42 for identification.  Can you tell from that

24  what direction you're looking in?

C000881

1    A.    You would be looking southbound.

2    Q.    Towards Lincoln Laundromat?

3    A.    Yes.

4    Q.    So this is again the other section of Galena

5  and Lincoln just looking towards Lincoln Laundromat?

6    A.    Yes.

7    Q.    People's number 41 for ID, could you point

8  out Lincoln Laundromat on that?

9    A.    That would be this building right here.

10   Q.    Are we looking again northbound?

11   A.    Yes.

12   Q.    So 309, the apartments at the southeast

13  corner of Lincoln and New York would be approximately

14  where?

15   A.    They would be right over here.

16   Q.    You can retake your seat.

17        I asked you to look up -- is there a list,

18  so-called list of what are known under the criteria of

19  Aurora Illinois gang members in Illinois?

20   A.    There is.

21   Q.    I asked you to look up some people on that

22  list; correct?

23   A.    Yes.

24   Q.    I asked you that in the last couple weeks?

```
 1        A.    Yes.

 2        Q.    Have you looked into the background on those

 3   people?

 4        A.    Yes.

 5        Q.    Did you look into the background of an

 6   Alonzo Matthews?

 7        A.    Yes.

 8        Q.    Was he a member of a street gang in Aurora

 9   back in October of '97?

10        A.    Not that I was able to find, no.

11        Q.    What about Tara Harris?  Did you see if she

12   was a member of any street gang back then?

13        A.    Yes.

14        Q.    Was she a member of any street gang back

15   then?

16        A.    Not that I was able to find, no.

17        Q.    Did you look into Germaine Lambert?

18        A.    Yes.

19        Q.    Was he a member of a street gang back then?

20        A.    No supporting documentation that I was able

21   to find.

22        Q.    Now, just to be clear, there is a difference

23   between member and associate; correct?

24        A.    Yes.
```

1      Q.    Could you basically define the difference

2   for the ladies and gentlemen of the jury, the

3   difference between a member and an associate?

4      A.    A member would be somebody who basically

5   functions on a day-to-day basis for the gang, would

6   have taken possibly some type of an official

7   initiation into the gang, would in our criteria either

8   have given a self-admission, may bear a tattoo that

9   represents for that gang or would have met a number of

10   other criteria, two or more on more than two occasions

11   within the past year.

12          An associate would be a person who may

13   function with a gang occasionally, may associate with

14   known members of that gang or may admit to associating

15   with known members of the gang, would not be normally

16   as devoted to the gang as a full-fledged member is and

17   may possibly be in line to take initiation within a

18   gang and become a gang member.

19      Q.    So when we're saying Alonzo Matthews and

20   Germaine Lambert were not members, it didn't mean they

21   weren't an associate of the gang?

22      A.    Yes.

23      Q.    They may have friends or relatives involved

24   with that gang; correct?

1     A.   Yes.

2     Q.   What about Shayla Johnson, was she a member

3 of a gang back in October of '97?

4     A.   Not that I was able to determine, no.

5     Q.   How about now?

6     A.   Not that I've been able to find.

7     Q.   How about Nicole Naomi Pearson, did you look

8 into her background?

9     A.   Yes.

10    Q.   Is she currently a member of a gang?

11    A.   No.

12    Q.   Was she a member of a gang back in October

13 of '97?

14    A.   Not that I was able to find.

15    Q.   I'm going to throw out some slogans and ask

16 if you're familiar with them.

17         The slogan King love, what does that

18 represent to you?

19    A.   That's typically a respect slogan for the

20 Latin Kings.  It's as it states, respecting love for

21 the King.

22    Q.   What about GDK, what does that mean?

23    A.   GDK stands for Gangster Disciple killer.

24    Q.   Are you familiar with a hand sign known as

C000885

1    the pitchforks?

2        A.   Yes.

3        Q.   What does it mean to quote, throw down

4    pitchforks or throw down forks?

5        A.   Throwing down the forks would be a

6    disrespectful gesture using the pitchfork hand sign in

7    a downward direction.  Any time a symbol

8    representative of a gang is thrown in a downward

9    direction that's to show disrespect for a gang.

10       Q.   In your experience as a gang investigator,

11   is it risky for a member of one gang to go into the

12   rival gang territory on foot?

13       A.   Yes.

14       Q.   What are some of the things that can happen

15   to a gang member that walks into a rival territory on

16   foot?

17           MR. KLIMENT:  I'm going to object.  That's

18   pure speculation.

19           THE COURT:  Even though he's an expert, I

20   think that's a little conjectural.  Sustained.

21   BY MR. GUAGLIARDO:

22       Q.   Is it common -- in your experience as an

23   investigator have you learned whether or not it's

24   common for gang members to use getaway drivers and

```
 1   lookouts when they go into rival territory?

 2        A.    They do, yes.

 3             MR. GUAGLIARDO:   If I could have a moment,

 4   Judge.

 5             THE COURT:   All right.

 6                       (Off the record discussion.)

 7             MR. GUAGLIARDO:   Judge, we would tender the

 8   witness.

 9             THE COURT:   Cross examination,

10   Mr. Kliment?

11                    CROSS EXAMINATION

12   BY MR. KLIMENT:

13        Q.    People's exhibits 41, 42 and 43, they all

14   appear to have been taken during the day; is that

15   right?

16        A.    Yes.

17        Q.    So they don't accurately portray what the

18   lighting conditions would be at 9:00 at night?

19        A.    That's correct.

20        Q.    You said that the businesses there, there's

21   a mixture of businesses and residences; is that right?

22        A.    Yes.

23        Q.    In that general area?

24        A.    Yes.
```

1      Q.   And the businesses close at night generally?

2      A.   Yes.

3      Q.   There may or may not be some 24-hour

4 businesses there?

5      A.   Yes.

6      Q.   And as you sit here today, you can't tell us

7 the number of functioning street lights there were in

8 that area back on October 29th, 1997; can you?

9      A.   Specifically, no.

10      Q.   So while those photographs may truly and

11 accurately portray what the area in the general area

12 of Lincoln and New York and Galena look like today in

13 the daylight, they do not accurately portray what they

14 looked like on October 29th, 1997 at 9:00 at night?

15      A.   That would generally be correct.

16      Q.   What are the colors of the Gangster

17 Disciples?  Blue and black; right?

18      A.   Yes.

19      Q.   Would it have any significance in your

20 capacity as an expert in gang activity and members and

21 associations if an individual associated with gang

22 members in Gangster Disciple territory while wearing

23 those colors, would that have any significance to you?

24      A.   It could.

C000888

1    Q.   What would that be?

2    A.   It could show an affiliation of the Gangster

3  Disciples.

4    Q.   What if a person were to wear those colors

5  in a courtroom in a trial such as this; would that

6  have any significance?

7    A.   It could.

8    Q.   What would that be?

9    A.   Possible affiliation of Gangster Disciples.

10   Q.   Or support for the Gangster Disciples?

11   A.   Could be, yes.

12        MR. KLIMENT:  I have no other questions.

13        THE COURT:  Thank you.

14        Any redirect of Sergeant Langston?

15              REDIRECT EXAMINATION

16  BY MR. GUAGLIARDO:

17   Q.   Do you know what the business hours of the

18  Lincoln Laundromat are, by any chance?

19   A.   I don't specifically know the closing time

20  as far as the laundromat goes.  I do know that it is

21  open in the evening.

22   Q.   And as far as you know, the street lights in

23  that area are kept on all night?

24   A.   Yes.

1          MR. GUAGLIARDO:  Judge, I have no further

2    questions.

3          THE COURT:  Any cross based on that?

4          MR. KLIMENT:  No, sir.

5          THE COURT:  Thank you very much, Sergeant

6    Langston.  You may step down.

7          Mr. Guagliardo?

8          MR. GUAGLIARDO:  Your Honor, at this time we

9    called an investigator who wasn't really expecting

10   that we'd call him over the lunch hour to try and get

11   him here as a rush.  I don't know if he's arrived

12   yet.  I do want to ask him to briefly look over the

13   report.  We do have a stipulation regarding the

14   pathologist; we can do that now.

15         THE COURT:  Are you prepared to do that

16   now?

17         MR. KLIMENT:  Yes, your Honor.

18         THE COURT:  Let me explain to the jury what

19   the nature of a stipulation is.

20         Ladies and gentlemen, the attorneys and the

21   defendant have entered in a stipulation in this case.

22   You take the stipulation as additional evidence in

23   this case along with all the other evidence in this

24   case.  That is the purpose of the stipulation is an

1   agreement that you consider it as evidence in this

2   case.

3           So, Mr. Guagliardo, are you reading the

4   stipulation to the jury?

5           MR. GUAGLIARDO:  Mr. Walsh will.

6           THE COURT:  When you're prepared, Mr. Walsh,

7   you may do so.

8           MR. GUAGLIARDO:  We're going to label it

9   People's exhibit number 44.

10          MR. WALSH:  Now come the People of the State

11  of Illinois by and through their attorney, David R.

12  Akemann, State's Attorney for Kane County, Illinois,

13  by and through his assistants, James G. Guagliardo and

14  James M. Walsh, and the defendant, Armando Amaya, by

15  and through his attorneys, David P. Kliment and Sandra

16  Parga, and for their stipulation in this cause state

17  as follows:

18          We, the undersigned parties, do stipulate

19  and agree to the following:

20          That if called to testify, Dr. J. Lawrence

21  Cogan, C-O-G-A-N, a physician duly licensed to

22  practice medicine in the State of Illinois with a

23  specialty in forensic pathology would be qualified as

24  an expert witness in the field of forensic pathology

1    and would testify essentially as follows:

2              That Dr. Cogan performed an autopsy on

3    October 30th, 1997 on the same person who was

4    identified in People's exhibit number 22 as Germaine

5    Lambert.  Dr. Cogan performed the autopsy in

6    accordance with accepted procedures of forensic

7    pathology.  Dr. Cogan's examination would reveal a

8    single, penetrating gunshot wound to the chest.  In

9    Dr. Cogan's expert medical opinion the entrance wound

10   was consistent with a contact wound, that is, a wound

11   that result from the barrel of the gun being placed

12   directly upon the chest.  The entrance wound was

13   located just to the left of the left nipple.

14             In Dr. Cogan's expert medical opinion, the

15   exit wound was located over the right side of the

16   back.

17             In Dr. Cogan's expert medical opinion, the

18   course of the gunshot wound was through the skin of

19   the left front of the body, through the muscle and

20   third and fourth intercostal spaces on the left, left

21   chest cavity, pericardial sac, heart, right chest

22   cavity, right lung and right intercostal space.  As a

23   consequence of the wound there was hemorrhage into

24   both the right and left chest cavities and the

C000892

1   pericardial sac.  There was also collapse of the

2   lungs.

3           In Dr. Cogan's expert medical opinion, the

4   direction of the wound was consistent with the

5   individual being in a standing position, although this

6   may not have been the position of the body at the time

7   the gunshot wound was inflicted.  The gunshot wound

8   was very serious and potentially lethal although not

9   immediately so.  The victim may have been able to move

10  and breath in a labored manner.

11          In Dr. Cogan's expert medical opinion and

12  with a degree of reasonable medical certainty, the

13  cause of death was the gunshot wound to the chest.

14          This is so stipulated to on January 27th,

15  1999, and signed by James G. Guagliardo, David P.

16  Kliment, Sandra Parga, and Armando Amaya.

17          THE COURT:  Mr. Kliment?

18          MR. KLIMENT:  That would be the stipulation

19  of the parties as to Dr. Cogan's testimony, Judge.

20          THE COURT:  All right.  The jury may

21  consider that as such.

22          Do you need time to check with your

23  witness?

24          MR. GUAGLIARDO:  We have just a couple

```
 1   things.  We are going to mark the death certificate in

 2   this case as People's exhibit 45 for identification.

 3   I believe Mr. Kliment has a copy of that.

 4              MR. KLIMENT:  That's correct.

 5              MR. GUAGLIARDO:  We would move that into

 6   evidence at this time.

 7              THE COURT:  Any objection?

 8              MR. KLIMENT:  No.

 9              THE COURT:  It will be received.

10              MR. GUAGLIARDO:  Judge, we would also move

11   the stipulation, People's number 44, into evidence.

12              THE COURT:  Any objection?

13              MR. KLIMENT:  No objection.

14              THE COURT:  It will be received.

15              MR. GUAGLIARDO:  Judge, we're going to mark

16   the autopsy protocol as People's number 46.

17              MR. KLIMENT:  We have no objection to the

18   admission of the protocol.

19              THE COURT:  It will be received.

20              MR. GUAGLIARDO:  We'll mark that as number

21   46, and we move that into evidences, also.

22              THE COURT:  It will be received.

23              MR. GUAGLIARDO:  I don't know if you want me

24   to run and see if my witness is ready.
```

C000804

1        THE COURT:  Do you need to talk to him

2   first?

3        MR. GUAGLIARDO:  He would like to briefly

4   look at his report.

5        THE COURT:  Any objection if we take a brief

6   recess of -- is he here do you even know?

7        MR. GUAGLIARDO:  I don't even know, Judge.

8        THE COURT:  Why don't you find out if he's

9   here, and then we can decide the length of the recess.

10       MR. GUAGLIARDO:  He's here, your Honor.

11       THE COURT:  All right.  Do you need more

12   than ten minutes?

13       MR. GUAGLIARDO:  No.

14       THE COURT:  Ladies and gentlemen of the

15   jury, before the next witness testifies we'll take a

16   brief ten-minute recess without discussing it during

17   the recess with anyone and expressing any opinions.

18   Thank you, we'll see you in about ten minutes.

19                          (Recess taken.)

20       THE COURT:  All right.  We're back on the

21   record, People versus Amaya.  The jury has returned to

22   open court, all counsel are present, the defendant is

23   present.

24       At this time, Mr. Guagliardo, you may

1   proceed.

2           MR. GUAGLIARDO:  Thank you, your Honor.  We

3   would call Evidence Tech Kahle, K-A-H-L-E.

4                                       (Witness sworn.)

5           THE COURT:  Officer Kahle, could you please

6   have a seat on the witness stand?

7           Mr. Guagliardo, you may proceed.

8                   OFFICER STAN KAHLE,

9   called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. GUAGLIARDO:

13      Q.  Could you please state your full name and

14  spell your last name for the ladies and gentlemen of

15  the jury?

16      A.  Stan Kahle, K-A-H-L-E.

17      Q.  Your occupation?

18      A.  I am a police officer with the City of

19  Aurora.

20      Q.  How long have you worked with the City of

21  Aurora as a police officer?

22      A.  22 years.

23      Q.  What is your current assignment?

24      A.  I'm currently assigned to the evidence unit.

1    Q.   How long have you been assigned to the

2  evidence unit?

3    A.   Seven years in this coming March.

4    Q.   Are you what would be referred to as an

5  evidence technician?

6    A.   Yes.

7    Q.   What are your duties?

8    A.   We process crime scenes for physical

9  evidence, we're responsible for the storage of all the

10  police department's evidence.  We do photography work,

11  latent print work.

12    Q.   Directing your attention back to October

13  30th of 1997, were you on duty that day working as an

14  evidence tech?

15    A.   Yes, sir.

16    Q.   Were you assigned to do a search of a 1987

17  white Chevrolet Celebrity four-door?

18    A.   Yes.

19    Q.   Where was that search conducted at?

20    A.   In the north garage of the Aurora Police

21  Department.

22    Q.   Did you take photographs of that car as you

23  searched it?

24    A.   Yes.

1    Q.   And what were you searching for when you

2    were looking through that car or processing that car?

3    A.   The request that was made was to photograph

4    the vehicle and search for firearms and/or evidence of

5    firearms such as bullets, cartridge cases, etcetera.

6    Q.   So you were looking specifically for

7    cartridge cases and bullets and things of that nature?

8    A.   Any type of firearm evidence.

9    Q.   Were you looking for anything other than

10   that?

11   A.   No.

12   Q.   If you had found anything other than that,

13   would you have collected anything other than firearm

14   evidence?

15   A.   No.

16   Q.   In front of you are People's exhibits 31, 29

17   and 30 for identification.  They've been admitted into

18   evidence.  Do you recognize what is portrayed in those

19   photos?

20   A.   Yes.

21   Q.   What is portrayed in those photos?

22   A.   The white Chevy Celebrity that I

23   photographed and searched.

24   Q.   Detective Kahle, I show you what I've marked

1    People's exhibit 47, 48, 49, 50, 51, 52 and 53 for

2    identification, which are all photographs. Do you

3    recognize what is portrayed by those photographs?

4        A.    Yes.

5        Q.    And what is portrayed by those photographs?

6        A.    They're all -- they're different shots of

7    the interior passenger compartment.

8        Q.    Of the white Chevy Celebrity there?

9        A.    Yes.

10       Q.    Did you take those photographs?

11       A.    Yes.

12       Q.    Do they fairly and accurately depict your

13   search of that Chevy Celebrity?

14       A.    Yes.

15       Q.    Again, if there were things like clothes

16   laying around, would you have collected those given

17   your assignment?

18       A.    No.

19       Q.    Do there appear to be clothes laying around

20   in that white Chevy Celebrity?

21       A.    Yes.

22       Q.    Do some of those photographs depict the

23   clothes?

24       A.    Yes.

1        Q.    Did you also search the trunk?

2        A.    Yes.

3        Q.    Were there any photographs taken of the

4   trunk?

5        A.    No.

6        Q.    Do you recall as you sit here today whether

7   or not there were any clothes in the trunk?

8        A.    No, I do not.

9        Q.    You don't recall?

10        A.    I do not recall, sir.

11        MR. GUAGLIARDO:  Judge, I would move all

12   those photographs into evidence up to People's exhibit

13   53 for identification.

14        THE COURT:  Any objection?

15        MS. PARGA:  No, Judge.

16        THE COURT:  They will be received.

17        MR. GUAGLIARDO:  Judge, I have nothing

18   further.

19        THE COURT:  Cross examination?

20        MS. PARGA:  Thank you, Judge.

21                  CROSS EXAMINATION

22   BY MS. PARGA:

23        Q.    Good afternoon, Detective Kahle.

24        A.    Good afternoon.

1      Q.    Detective Kahle, you did not find any

2  firearms in the car?

3      A.    No.

4      Q.    You found no bullets?

5      A.    No.

6      Q.    No cartridges?

7      A.    No.

8      Q.    No firearm evidence at all?

9      A.    Correct.

10      Q.    And that goes for the trunk, as well?

11      A.    Yes, ma'am.

12      MS. PARGA:   Thank you.

13      THE COURT:   Anything further, Ms. Parga?

14      MS. PARGA:   No, Judge.

15      THE COURT:   Any redirect?

16      MR. GUAGLIARDO:   No, your Honor.

17      THE COURT:   Thank you, Officer Kahle.   You

18  may step down.

19      The People may call their next witness.

20      THE COURT:   Just briefly, Judge, we'd call

21  Officer Fancsali.

22      THE COURT:   All right.

23                              (Witness sworn.)

24      THE COURT:   Thank you, Officer Fancsali.

1    Please have a seat again on the witness stand.

2                        OFFICER FANCSALI,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. GUAGLIARDO:

7        Q.    Officer Fancsali, for the record, obviously

8    all in the courtroom can see who you are, you are the

9    same Officer Fancsali that testified yesterday,

10   Tuesday, the 26th of January, 1999?

11       A.    That's correct.

12       Q.    Officer Fancsali, I want to direct your

13   attention back to October 29th of '97 at about 11:50

14   in the evening.  Did you have an opportunity to

15   interview a Tracy Johnson at that time?

16       A.    I did.

17       Q.    Who was present with you when you

18   interviewed Mr. Johnson?

19       A.    As I recall, Detective Sauer.

20       Q.    Was that down at the Aurora Police

21   Department?

22       A.    Yes, it was.

23       Q.    Was that interview put on tape or tape

24   recorded?

1      A.   Yes, it was.

2      Q.   As you spoke to Mr. Johnson, how far were

3  you from Mr. Johnson?

4      A.   Approximately five, six feet.

5      Q.   Was it at a table or a desk?

6      A.   There's an office desk that you sit behind.

7      Q.   Did you smell any alcohol on Mr. Johnson

8  from where you were at?

9      A.   No, I did not.

10     Q.   Was Mr. Johnson -- did he appear to be

11 attentive during the interview?

12     A.   Yes, he did.

13     Q.   Did he stay awake throughout the interview?

14     A.   Yes, he did.

15     Q.   Did he pass out at any time during the

16 interview?

17     A.   No, he did not.

18     Q.   Did he slur his speech at any time during

19 the interview?

20     A.   No, he did not.

21     Q.   Did he sit up during the interview?

22     A.   Yes, he did.

23     Q.   Do you remember him leaving the interview

24 room at all?

```
 1          A.    Not that I recall.

 2          Q.    When the interview was over, do you recall

 3    him walking out of the interview room?

 4          A.    Yes, I do.

 5          Q.    Did you have an opportunity -- did you see

 6    anything unusual as he walked out?

 7          A.    No.  He appeared to be walking normally.

 8          Q.    He didn't stagger or fall over or anything?

 9          A.    Not that -- he didn't fall over.

10          Q.    Okay.  Did he stagger?

11          A.    Not that I noticed.

12                MR. GUAGLIARDO:  Judge, I have nothing

13    further.

14                THE COURT:  Any cross?

15                     CROSS EXAMINATION

16    BY MR. KLIMENT:

17          Q.    You didn't smell any alcohol on his breath

18    at all?

19          A.    No, sir.

20          Q.    So he gave no sign outwardly either by odor

21    or appearance or actions that he had been drinking at

22    all?

23          A.    Not that I could detect, no.

24                MR. KLIMENT:  Nothing further.
```

1          THE COURT:  Anything further,

2    Mr. Guagliardo?

3          MR. GUAGLIARDO:  No, your Honor.

4          THE COURT:  Thank you again, Officer

5    Fancsali.  You may step down.

6          Mr. Guagliardo?

7          MR. GUAGLIARDO:  Your Honor, I would just

8    inquire at this point of the Court or the clerk, I

9    believe we've tendered 53 exhibits, which ones have

10   not been admitted.

11         THE COURT:  All right.  We'll take a moment

12   to compare notes.

13         Apparently the diagrams have not been

14   formally admitted.

15         MR. GUAGLIARDO:  I would move to admit those

16   at this time.

17         THE COURT:  Any objection?

18         MR. KLIMENT:  No.

19         THE COURT:  They will be received.

20         MR. GUAGLIARDO:  The State would rest at

21   this point.

22         THE COURT:  All right.  The State has

23   rested, ladies and gentlemen.  It will be necessary

24   for us to take up some legal issues for a few

1    moments.  We'll excuse you for a few moments again

2    without discussing the case.  We'll have you back in

3    here as soon as we can.  Thank you.

4                              (The following proceedings

5                              were had out of the presence

6                              of the jury.)

7              THE COURT:  People versus Amaya.  We're

8    outside the presence of the jury, all counsel and

9    Mr. Amaya are present.  The State has rested.

10             MR. KLIMENT:  I have a motion at this time

11   for directed verdict of not guilty.

12             I believe there are seven pending counts.

13   The issue in the case is not whether or not shots were

14   fired, not whether or not an individual was killed but

15   rather the identity of the person who did the

16   shooting.  I think the State has failed even at this

17   stage to prove that Mr. Amaya was the person who shot

18   the gun.

19             The witnesses that testified were

20   inconsistent with one another and through the course

21   of the trial I believe were incredible to the point

22   where they even at this stage of the proceeding are

23   not to be believed.  So we would ask for a directed

24   verdict of not guilty with respect to all seven counts

161

1    of the indictment.

2            THE COURT:   Thank you, Mr. Kliment.

3            Response?

4            MR. GUAGLIARDO:   I agree with Mr. Kliment

5    that the issue is ID, identification as to all seven

6    counts.   There have been two in-court

7    identifications.   Every other witness has said that

8    the shooter was, as far as they could tell, a male

9    Hispanic teenager about the same height and weight,

10   although there have been slight variations.   Two

11   people gave lineup identifications at the Kane County

12   jail.   We ask that directed verdict should be found --

13   or denied, I'm sorry.

14           MR. KLIMENT:   I have nothing further.

15           THE COURT:   When the defendant makes a

16   motion for a directed finding at the close of the

17   State's case in a jury trial, it requires the Court to

18   consider whether a reasonable mind could fairly

19   conclude the guilt of the accused beyond a reasonable

20   doubt considering the evidence in the light most

21   favorable to the prosecution.   That is the standard by

22   which the Court has to address the motion, and that is

23   set forth in People versus Hawkins, H-A-W-K-I-N-S, 284

24   Ill.App.3d 1311.

1          Certainly while there are arguments as to

2    whether or not there may have been some

3    inconsistencies or discrepancies in the testimony

4    between the witnesses, those are primarily matters for

5    the trier of fact, which in this case is the jury.

6          Viewing the evidence in the light most

7    favorable to the State I do not believe that any

8    alleged inconsistencies would compel the Court to

9    enter directed findings of not guilty.  Accordingly,

10   the motion for directed finding of acquittal is hereby

11   denied.

12         Now, before we bring the jury back out,

13   Mr. Kliment, I would like if you could give me a

14   preview of what you are proposing, and I need to know

15   if the defendant has a desire to testify, and if he

16   does not, I need to address certain issues with him.

17         MR. KLIMENT:  It would be our intention to

18   read into the record a stipulation that's been signed

19   by all parties I've marked as defendant's exhibit

20   number 1 and then rest.

21         THE COURT:  You do not believe Mr. Amaya is

22   going to testify?

23         MR. KLIMENT:  No.  We discussed it on

24   several occasions to this point and as recently as

1   right before the last break to confirm that nothing

2   occurred this afternoon that would cause him to want

3   to change his mind.  Nothing has occurred, and so he

4   will -- he is exercising his right not to testify in

5   this case.

6           THE COURT:  All right.  Then I will need to

7   address him directly, but the Court notes under the

8   Illinois Supreme Court case of People versus Smith,

9   176 Ill.2d 217, actually, in that case the Illinois

10  Supreme Court held that the trial court has no duty to

11  advise the defendant represented by counsel of his

12  right to testify, nor is the court required to ensure

13  that an on-the-record waiver has occurred, but I

14  believe the better policy is to address the issue with

15  the defendant in any event to make sure there's no

16  pressure or coercion being utilized.

17          Mr. Amaya, there's certain things in a

18  criminal case that only the defendant can decide for

19  himself such as whether or not to waive a jury trial,

20  whether or not to plead guilty, whether or not to

21  testify.  Those are such things that only you can

22  decide for yourself.  By that I mean, in other words,

23  even if your attorneys thought it was a good idea for

24  you not to testify, if you wanted to testify, you

1  would have the right on those kinds of issues to

2  overrule them.  If you tell me you want to take the

3  witness stand, I will allow you to take the witness

4  stand.

5          The question is, do you want to testify in

6  this case?

7          THE DEFENDANT:  No.

8          THE COURT:  Is your decision not to testify

9  something that you personally have thought about?

10          THE DEFENDANT:  It's something I thought

11  about.

12          THE COURT:  And you, of your own free and

13  voluntary will, have decided not to testify?

14          THE DEFENDANT:  Yes, I decided not to

15  testify.

16          THE COURT:  Has anybody put any pressure on

17  you or forced you to waive your right to testify?

18          THE DEFENDANT:  No.

19          THE COURT:  Nobody's offered you anything to

20  get you to waive your right to testify?

21          THE DEFENDANT:  No.

22          THE COURT:  You're telling me you, Armando

23  Amaya, after thinking about it has decided he does not

24  wish to testify?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you have any questions about

3   anything?

4          THE DEFENDANT:  No.

5          THE COURT:  The record should reflect the

6   defendant has made a knowing, informed and voluntary

7   waiver of his right to testify in connection with the

8   proceeding.

9          Now, just to get a heads up a little bit,

10  I'm going to bring the jury back out in a few minutes,

11  somebody is going to read a stipulation, and then

12  you're going to rest?

13         MR. KLIMENT:  Yes.

14         THE COURT:  Then obviously you're not going

15  to have any rebuttal.

16         In terms of instruction where do we stand?

17         MR. GUAGLIARDO:  Judge, we have a set for

18  everyone and are ready.

19         THE COURT:  Let me make a suggestion,

20  something I've learned from instances.  I find where

21  we have multiple counts on the indictment, a lot of

22  times I'll see an instruction that says something

23  about verdict and you need to be consistent with

24  verdicts, so be attuned to that, just watch out for

1  that.

2            MR. GUAGLIARDO:  We will.

3            THE COURT:  Have you seen any instructions

4  yet?

5            MR. KLIMENT:  They were just handed to us.

6  I think 95 percent of the instructions will not be

7  objected to.  Accountability ones will.

8            THE COURT:  All right.  Let's bring in the

9  jury.

10                        (The following proceedings

11                         were had in the presence of

12                         the jury.)

13            THE COURT:  We're back on the record, People

14  versus Amaya.  The jury has returned to open court,

15  all counsel are present, the defendant is present.

16            The prosecution has rested.  At this time,

17  Mr. Kliment, Ms. Parga, we turn to you.

18            MR. KLIMENT:  Judge, I have a stipulation I

19  would ask to read to the jury marked defendant's

20  exhibit 1 for identification.

21            THE COURT:  Any objection, Mr. Guagliardo?

22            MR. GUAGLIARDO:  No objection, your Honor.

23            THE COURT:  Ladies and gentlemen, as I

24  indicated to you at the time the last stipulation was

1   read, the purpose of a stipulation is to be presented

2   as additional evidence in the case to be considered by

3   you along with all of the other evidence that you have

4   heard in connection with the case.

5          So with those thoughts in mind, you may read

6   the stipulation.

7          MR. KLIMENT:  People of the State of

8   Illinois versus Armando Amaya, stipulation:

9          Now come the parties to this cause, the

10  People of the State of Illinois by and through

11  Assistant State's Attorneys James Guagliardo and James

12  Walsh, and the defendant, Armando Amaya, by and

13  through his attorneys, David P. Kliment and Sandra

14  Parga, and for their stipulation in this cause state

15  as follows:

16         1. That J. Kip Rose is an investigator

17  employed by the City of Aurora Police Department and

18  that he was employed in that capacity on October 29th,

19  1997.

20         2. That, in the course of his duties as an

21  investigator with the City of Aurora Police

22  Department, J. Kip Rose, on October 29th, 1997,

23  conducted an interview at Mercy Hospital with Alonzo

24  T. Matthews, one of the shooting victims in this

1  cause.

2           3. That prior to conducting the interview,

3  Investigator Rose confirmed that Alonzo T. Matthews

4  had been given no sedatives or any other medication

5  that would cause drowsiness.

6           4.   That investigator Rose asked Alonzo T.

7  Matthews if he could recognize the person who shot him

8  if he saw him again, and Alonzo T. Matthews answered

9  that he could.

10          5.   That Investigator Rose asked Alonzo T.

11  Matthews if he was shown a series of pictures, could

12  he pick the person who shot him out of the photographs

13  and Alonzo T. Matthews stated he believed that he

14  could.

15          Agreed and stipulated to on the 27th day of

16  January 1999 signed by all the parties including the

17  defendant.

18          THE COURT:  Mr. Guagliardo?

19          MR. GUAGLIARDO:  That is correct, your

20  Honor, we so stipulate.

21          THE COURT:  All right.  Ladies and

22  gentlemen, again, you can consider that along with all

23  the other evidence in the case.

24          MR. KLIMENT:  I would move for admission of

C000911

1    defendant's exhibit one for identification.

2         THE COURT:  Any objection?

3         MR. GUAGLIARDO:  No, your Honor.

4         THE COURT:  It will be received.

5         MS. PARGA:  At this time the defense rests.

6         THE COURT:  Anything further,

7    Mr. Guagliardo?

8         MR. GUAGLIARDO:  No, your Honor.

9         THE COURT:  The State also rests?

10        MR. GUAGLIARDO:  Yes.

11        THE COURT:  Ladies and gentlemen, you have

12   heard all the evidence that you will hear in

13   connection with this case.  The next phase of the

14   trial that you will be involved in will be the closing

15   arguments by the attorneys.  Following that stage the

16   Court will instruct you as to the law that applies to

17   the case, and you will then retire to deliberate on

18   your verdicts.  However, the closing arguments will

19   take place tomorrow morning.

20        You will be leaving early, that's the good

21   news.  However, we will not be leaving, because we

22   will be engaged in court on an instruction conference

23   to get everything to go for your consideration

24   promptly tomorrow morning.

1           At this time we will be adjourning for the

2    day with the standard ongoing instruction not to

3    discuss the case over the evening hours with anyone

4    else or allow anyone to discuss it in your presence or

5    even talk amongst yourselves in any way about the

6    case.  Do not read any news accounts of the case,

7    please do not form or express any opinions about the

8    case until you have receive it sometime tomorrow for

9    your deliberations and do not visit the scene of any

10   occurrence.

11           With those thoughts in mind, we thank you

12   for putting in a productive day; we wish you a

13   pleasant evening.

14           Is there any reason we cannot have the

15   closing arguments begin promptly at 9:00 tomorrow?

16           MR. GUAGLIARDO:  We'll be ready.

17           MR. KLIMENT:  We'll be ready.

18           THE COURT:  Please check in tomorrow morning

19   at 8:45 a.m.  We'll see you in the morning.  Thank

20   you.

21                        (The following proceedings

22                        were had out of the presence

23                        of the jury.)

24           THE COURT:  We are now outside the presence

1   of the jury for purposes of conducting an instruction

2   conference.   The Court has before it proposed

3   instructions tendered by the prosecution.

4          Mr. Kliment, Ms. Parga, have you received

5   copies of the instructions?

6          MS. PARGA:  Yes, Judge.

7          THE COURT:  Are you ready to proceed,

8   Ms. Parga?

9          MS. PARGA:  Yes.

10         THE COURT:  Mr. Guagliardo, Mr. Walsh, are

11  you ready to proceed?

12         MR. GUAGLIARDO:  We are ready, Judge.

13         THE COURT:  State's instruction number one,

14  IPI criminal number 1.01.  I see one paragraph in here

15  on a quick glance that I would be concerned about,

16  that is the fourth paragraph.  Did the issue of

17  punishment come up in this case at all?

18         MR. GUAGLIARDO:  No, Judge, it did not.  We

19  drafted it this way in an abundance of caution.  It's

20  easier to take things out.

21         THE COURT:  Right.  In looking at it,

22  Mr. Kliment, Ms. Parga, the only thing I can see is

23  I'm not sure four would be applicable here, but absent

24  that is there any objection?

1    MR. KLIMENT:  No.

2    THE COURT:  That will be given as modified

3    If you'd take out the fourth paragraph, please, and

4    when it's corrected, it will being given.

5    State's instruction number two is taken from

6    IPI criminal number 1.02, any objection?

7    MR. KLIMENT:  No objection.

8    THE COURT:  That will be given.

9    MR. GUAGLIARDO:  Judge, we would withdraw

10   number three then, which says you should judge the

11   testimony of the defendant in the same manner as you

12   judge the testimony of any other witness.

13   THE COURT:  State's instruction number three

14   will be withdrawn.

15   State's instruction number four is taken

16   from IPI criminal number 1.03.  Any objection?

17   MR. KLIMENT:  No.

18   THE COURT:  That will be given.

19   State's instruction number five taken from

20   IPI criminal number 1.05 relative to note taking.  Any

21   objection?

22   MR. KLIMENT:  No.

23   THE COURT:  That will be given.

24   State's instruction number six is taken from

1   IPI criminal number 2.01, which lists the offenses

2   that the defendant is charged with.  Any objection?

3            MR. KLIMENT:  No.

4            THE COURT:  That will be given.

5            State's instruction number seven is taken

6   from IPI criminal number 2.02 relative to the

7   indictment not being any evidence against the

8   defendant.  Any objection?

9            MR. KLIMENT:  No.

10           THE COURT:  That will be given.

11           State's instruction number eight taken from

12  IPI criminal number 2.03 setting forth the proposition

13  that the defendant is presumed to be innocent of the

14  charges and the State has the burden of proving him

15  guilty beyond a reasonable doubt, any objection?

16           MR. KLIMENT:  No.

17           THE COURT:  That will be given.

18           State's instruction number nine says that

19  the fact that the defendant did not testify must not

20  be considered in any way in arriving at a verdict.

21  Here we have "verdict," so that's what I was talking

22  about.  So I will give that as modified.

23           MR. KLIMENT:  I think that is to be given at

24  the request of the defense, and we make that request.

1       THE COURT:  You're correct, but I'm going to

2  make a note, please have it modified so it shows

3  verdicts.

4       MR. GUAGLIARDO:  We will.

5       THE COURT:  All right.  State's instruction

6  number ten is taken from IPI criminal number 3.01

7  relative --

8       MR. GUAGLIARDO:  We're withdrawing that,

9  your Honor.

10       THE COURT:  I think that's appropriate since

11  it really wasn't an issue in the case.

12       State's instruction number 11 is taken from

13  IPI criminal number 3.02 relative to circumstantial

14  evidence.  Any objection?

15       MR. KLIMENT:  No.

16       THE COURT:  That will be given.

17       MR. GUAGLIARDO:  Judge, we will change the

18  last word to verdicts.

19       THE COURT:  Thank you, I see that.

20       State's instruction number 12 is taken from

21  IPI criminal number 3.11 regarding the believability

22  of witnesses.  Any objection?

23       MR. KLIMENT:  No.

24       THE COURT:  That will be given.

1          State's instruction number 13 taken from IPI

2   criminal number 3.122 which speaks about impeachment

3   by a prior conviction.  Any objection?

4          MR. KLIMENT:  No.

5          THE COURT:  That will be given.

6          State's instruction number 14 is taken from

7   IPI criminal number 3.15 relative to the

8   identification testimony.  Any objection?

9          MR. KLIMENT:  No.

10         THE COURT:  That will be given.

11         State's instruction number 15 is taken from

12  IPI criminal number 5.0 --

13         MR. GUAGLIARDO:  Judge, we will withdraw

14  that.

15         THE COURT:  All right.  We'll show that as

16  withdrawn.

17         State's instruction number 16, testimony --

18  so we're now getting into accountability, that's

19  5.03.  Any objection?

20         MR. KLIMENT:  Yes.

21         THE COURT:  We're at the juncture that was

22  anticipated, so at this time, Mr. Guagliardo, first I

23  would ask you your arguments --

24         MR. GUAGLIARDO:  I thought we were going to

176

1    go through the easy ones --

2           MS. PARGA:  I think if we decide the issue

3    now, the rest are going to become easy either way.

4           THE COURT:  We're going to get to it sooner

5    or later, so we may as well get to it now; okay?

6           MR. GUAGLIARDO:  Okay.  He's objecting?

7           THE COURT:  He's objecting.

8           MR. GUAGLIARDO:  Well, Judge, I'm going to

9    have to get out the easel to go over what the evidence

10   is.

11          THE COURT:  If you're convinced I'm going to

12   need the easel, but go ahead.

13          MR. GUAGLIARDO:  Judge, I tendered a couple

14   cases to the Court this morning.

15          THE COURT:  People versus Taylor, People

16   versus Mishki?

17          MR. GUAGLIARDO:  Yes.

18          THE COURT:  I've got them here.

19          MR. GUAGLIARDO:  I believe that the general

20   principles are laid out in these two cases, the

21   general principles of accountability, particularly the

22   general principles of the common design rule.  I

23   specifically go to People versus Taylor and Hudson,

24   which on page five of the opinion I gave to counsel

1  and the Court points out that active participation —
2  and this is on the right-hand column under headnotes
3  one and two about halfway down that paragraph starting
4  with the word nevertheless.

5           "Active participation has never been a
6  requirement for the imposition of criminal guilt under
7  an accountability theory; one may aid and abet without
8  actively participating in an overt act."

9           Then in headnote three, four, five, six and
10 seven the Court goes on to talk about the common
11 design rule.  Simply stated, I'm quoting:  "A
12 defendant may be deemed accountable for acts performed
13 by another if the defendant shared criminal intent of
14 the principal, or if there was a common criminal plan
15 or purpose."

16          Reading down a little further, Words of
17 agreement are not necessary to establish a common
18 purpose to commit crime." Obviously we do not have in
19 this case words of agreement.  We do not have somebody
20 bugging the white Chevy Celebrity where George Gamboa,
21 Romero Sandoval and Armando Amaya was say, okay, let's
22 get out of this white car now, one of us has a gun,
23 you be the shooter, we'll be the look-out, we'll help
24 you get away, whatever, if anything goes wrong, we'll

C000923

1  be there, we've got guns.  Obviously we don't have

2  those words.  The State goes on to say the common

3  design can be inferred from the circumstances

4  surrounding the perpetration of the unlawful conduct.

5       It goes on to then say, Judge, that proof

6  that the defendant was present during the perpetration

7  of the offense, that he maintained a close affiliation

8  with his companions after the commission of the crime

9  and that he failed to report the crime are all factors

10  that the trier of fact, which in this case is the

11  jury, not obviously the Court determining jury

12  instructions that the trier of fact may consider in

13  determining the defendant's legal accountability.

14       It goes on to say that defendant's flight

15  from the scene may also be considered in determining

16  whether defendant is accountable.  I do believe,

17  Judge, even though the words aren't stated here, when

18  the Court says "may also be considered," we're talking

19  about the trier of fact.

20       More key language, turning over to page six,

21  evidence that defendant voluntarily attached himself

22  to a group bent on illegal acts with knowledge of its

23  design also supports an inference that he shared the

24  common purpose and will sustain his conviction for an

1    offense committed by another.

2            Judge, those are the general principles, and

3    with those general principles in mind we have to look

4    at the facts of this case. And I can anticipate this

5    argument, so I'm just going to get into it now. The

6    argument's going to be, well, their theory of the case

7    is that he's the shooter; their theory of the case

8    cannot be that he's the shooter and that he's

9    accountable for the shooter.

10           Our theory of the case is irrelevant here.

11   Our theory of the case is that the defendant, Armando

12   Amaya, is guilty of murder; that's our one and only

13   theory of the case. There is evidence in this record

14   that he was the shooter, but, your Honor, a jury could

15   disbelieve that he was the shooter and still find that

16   he is accountable for the conduct of the shooter.

17           Judge, the evidence in this case has been,

18   number one, that Mr. Amaya, Mr. Sandoval and

19   Mr. Gamboa were all in the car prior to this murder.

20   Shayla Johnson put Mr. Amaya in that car prior to the

21   murder, Nicole Pearson put Mr. Amaya in that car prior

22   to this murder, and Tracy Johnson puts Mr. Amaya,

23   Mr. Gamboa and Mr. Sandoval in that car prior to this

24   murder.

1  There's also evidence that they're all out

2  of the car during the murder.  Tracy Johnson says he

3  hears three shots and the next thing he knows -- he

4  ducks behind a tree, and the next thing he knows that

5  he sees -- he doesn't know them at the time, Romero

6  Sandoval and Armando Amaya and George Gamboa running

7  towards that same white car that they were in sometime

8  before the gunshots.  So basically circumstantially

9  here we have the three in the car before the murder,

10  we have the three out of the car during the time that

11  shots are fired, and we have the three running back to

12  the car which is parked just south of the end of

13  Gangster Disciple territory fleeing the scene after

14  the murder.

15  Judge, this is corroborated by the testimony

16  of William McCalister, who is one of the witnesses

17  there that puts a second male Hispanic at the scene.

18  All witnesses, Shayla Johnson, Nicole Pearson, Tara

19  Harris and Alonzo Matthews said that the shooter came

20  from the Lincoln way, he came from Lincoln Street,

21  which, as your Honor can see on People's exhibit

22  number 1, the shooter would be coming here up the back

23  walkway and said, excuse me or got into this crowd

24  here at 309 and started shooting and fled.

C000928

1    That's what those four say.  That's not what

2  William McCalister says.  William McCalister says, I'm

3  standing here near this dumpster, and I notice a male

4  Hispanic up north of East New York Street come down

5  here, he's wearing dark clothes, he's wearing a

6  hoodie.  And the interesting part about what

7  Mr. McCalister says is the position of this person's

8  head.  He says he's kind of walking with his head kind

9  of half bent so he can kind of see where he's going

10  but not putting his face straight up so people can see

11  him.

12    My point with William McCalister is this:

13  He corroborates what Tracy Johnson says.  William

14  McCalister puts a second male Hispanic at the scene.

15  He says he has a thin goatee.  You look at the photos

16  of Armando Amaya and George Gamboa, you'll see that

17  they both have thin goatees.

18    Judge, basically the concern here -- let me

19  further go into a couple other points that go towards

20  accountability -- that's basically what the evidence

21  is.  Now, Judge, what other reason do these three

22  people get out of a car in rival gang territory?  You

23  have three people, Romero Sandoval -- and Mike

24  Langston said that south -- everything on here is

Gangster Disciple territory, where these guys are

running, where Tracy Johnson sees them running down

here, that's Gangster Disciple territory.  Where Tracy

Johnson sees them driving on West Park and Galena,

that's Gangster Disciple territory.  Why are these

three getting out of a car in rival gang territory?

Well, maybe they're going to buy a pizza.  I don't

think so.  Maybe they're going to visit some of their

Gangster Disciple friends.  I don't think so.  If they

are getting out of a car in rival gang territory, the

three of them together, Judge, it's to commit a

criminal act, there just is no other explanation.

        And why do they leave so quickly?  Remember

Tracy Johnson and Shayla Johnson say, we see them

driving around not too far before the shots were

fired, and again, there's evidence that they got out

of the car and then are running to their car.  So they

don't spend too much time in Gangster Disciple

territory, which shows that their purpose was not to

visit a friend or conduct business at some business

establishment.  A jury can infer that they got out of

that car to do an illegal act.

        And at least one is armed, we know at least

one is armed, the person who walked up that walkway

C000928

1  and started firing.  We don't know if the other two

2  were armed or not.  Why would the other two go with

3  the one into Gangster Disciple territory if they

4  didn't know he was armed, Judge?  Are they getting

5  into Gangster Disciple territory just for a walk to

6  see what's going on?

7        Judge, you have to look at the nature of the

8  act that happened in this territory.  This wasn't a

9  spur of the moment defensive act where you could say,

10 okay, three Latin Kings have gotten out of a car in

11 Gangster Disciple territory and are walking along when

12 suddenly someone starts shooting at them and they

13 start shooting back.  If that's the case, maybe you

14 could argue that the other two didn't know there was a

15 common design to go out and conduct a criminal act.

16 But here, Judge, this is an act of aggression.

17        There is no evidence that anybody was

18 threatening that shooter who walked up that rear

19 walkway area and that he shot in self defense.  That

20 was clearly an act of aggression.  I believe that

21 another one of these three was standing behind

22 Mr. McCalister.  Judge, could be a look-out, it can be

23 a safeguard just in case something goes wrong, just in

24 case somebody grabs him; it can be to help him run,

1    flee from the scene and turn if there's gunfire.  You
2    know the accountability instruction, it's aid, abet,
3    it's a bunch of things that you would go into rival
4    gang territory with a fellow gang member who is going
5    to do a shooting that you can do for him.
6         THE COURT:  Anything further?
7         MR. GUAGLIARDO:  Very briefly.  The concern
8    is this, Judge:  Back to this theory of the case, our
9    theory is he's guilty of murder.  A jury can believe
10   that, hey, you know what, I think that the three of
11   them were driving around beforehand, I think that
12   Armando Amaya was one of them, I think that Sandoval
13   and Gamboa were the others.  We believe they all got
14   out of the car, we believe they all went in the area,
15   we believe they were all fleeing, we believe they all
16   got in the same getaway car, we believe they all left
17   in the same getaway card.  A jury could say to
18   themselves, Amaya could have been that guy just
19   standing in the area and the real guilty guy is that
20   guy walking in the walkway, I just don't trust that
21   ID, the real guilty guy may be Gamboa or Sandoval.
22        What this jury should be allowed to do is
23   infer that even if the person who walked up that
24   walkway was not Amaya they should be allowed to infer

C000930

1    from all the circumstances I've gone through that the

2    other person who walked up with that person in the

3    walkway knew what was going to happen and aided and

4    abetted by helping to get away, etcetera.   Thank you.

5              THE COURT:   Thank you.

6              Response?

7              MR. KLIMENT:   I think it has to be supported

8    by the evidence, and the only evidence they have

9    regarding the shooter and Mr. Amaya's involvement in

10   this case was that Mr. Amaya was the shooter.   The

11   rest of what Mr. Guagliardo said is nothing but

12   theory, nothing but "could be" or "might be."

13             The second person standing alone by Mr.

14   McCalister, Mr. McCalister testifies that the shots

15   came by from right where that person was standing,

16   that he was facing the direction where Mr. Amaya was

17   walking towards.   If the State's theory is to be

18   believed, he says the shots came from his right.   It

19   certainly doesn't lend any credence to the theory of

20   accountability; it seems like he's simply wrong about

21   the location of the shooter.   Tracy Johnson, he sees

22   three people fleeing from the scene, nobody else

23   testified in this trial at any time that they see more

24   than one person present, even McCalister sees only one

1    person.  He just sees something that doesn't make any

2    sense really in light of all the evidence.

3            I think that there is no evidence to support

4    an accountability instruction.  It seems like it's

5    just an attempt by the State to try and, I don't know,

6    bootstrap this thing back together again for some

7    reason given the identification of Mr. Amaya.  But

8    that's the evidence.  He was identified as the

9    shooter.  Whatever weight the jury gives that

10   identification is up to them, but there's no evidence

11   I think on the record to support an accountability

12   instruction, and it should not be given.  This is not,

13   according to the evidence, an accountability case.

14           THE COURT:  Thank you.

15           Any brief response to that, Mr. Guagliardo?

16           MR. GUAGLIARDO:  Sure, very briefly.  There

17   are a lot of identifications of Amaya.  Like I said,

18   there's several identifications of him in the car

19   beforehand, there's an identification of him leaving,

20   running from the scene before the shots, Tracy said

21   running from.  Just to respond to the McCalister

22   thing, McCalister sees only one person.  Everybody

23   sees different things, Judge.  Just because McCalister

24   sees one person come from the north on New York

1  Street, four others see someone coming from the west,

2  the jury can infer that's two different people and

3  McCalister isn't focused on someone walking up that

4  walkway.  That's strong evidence that there are two

5  male Hispanics on the scene.

6          THE COURT:  I think that the Illinois

7  Supreme Court case of People versus Taylor of course

8  sets forth the general law in the area of

9  accountability, and it does state that words of

10  agreement are not necessary to establish a common

11  purpose to commit a crime; the common design can be

12  inferred from the circumstances surrounding the

13  perpetration of the unlawful conduct, proof that the

14  defendant was present during the perpetration of the

15  offense, that he maintained a close connection with

16  his companions after the offense, that he failed to

17  report the offense are all factors to consider in

18  determining the defendant's legal accountability, also

19  the defendant's alleged flight from the scene may also

20  be used in determining whether the defendant is

21  accountable.

22          Also, accountability is a method through

23  which criminal individuals may be charged with a

24  criminal offense, but their guilt is established

1   through behavior which makes them accountable for the

2   crimes of others.   There certainly is direct

3   testimony, I don't think it was at least not denied by

4   Mr. Kliment, that a witness took the stand, namely

5   Shayla Johnson, that would have put Mr. Amaya, if

6   believed, at the scene as the shooter, and that would

7   make him a principal, not someone accountable.   There

8   is also testimony, however, that he was seen in a car

9   shortly before the shooting in which gang slogans were

10  allegedly yelled.   There is also evidence that he was

11  seen with an individual fleeing the scene that was

12  identified as the car the individuals were to.   As

13  Mr. Johnson testifies, he comes onto the scene later

14  and clearly testified, as we went over earlier, that

15  the three people that had gotten out of the car being

16  detained by the police were in fact the three people

17  he saw driving around just prior to the time of the

18  shooting and at the time the shots were fired.

19          Actually, a case I believe almost is right

20  on point is a case cited by neither counsel here right

21  out of the second district, People versus Testa,

22  T-E-S-T-A, a case everyone should be aware of, cited

23  at 633 N.E.2d 1362, and it sort of advances at least

24  and considers the objection made by Mr. Kliment, and

1   in that case the State in essence had dual theories,

2   which also troubled the defense.  In that case the

3   defense complained because the State was arguing that

4   the defendant was either a principal or he was

5   accountable, and both theories were advanced in the

6   State's case in chief.  So the defendant was convicted

7   and the case went up, and the appellate court held

8   that some evidence on accountability along with

9   evidence that the defendant acted as a principal,

10  which is the situation I believe we clearly have here,

11  the appellate court holds is adequate to uphold an

12  instruction on accountability regardless of whether

13  both theories are advanced in the State's case in

14  chief.

15          It goes on to say again very similar to the

16  facts here the court specifically held accountability

17  instructions may be given even though the defendant is

18  on trial alone.  And finally it says, even the

19  slightest evidence in support of a theory of

20  accountability warrants giving the jury an

21  accountability instruction.

22          I think at a very minimum you have probably

23  more than slight evidence of accountability.  I find

24  the Testa case is on point.  I find the law is

C000935

1   controlling.  Accordingly, under the evidence and the

2   law that applies to this case an accountability

3   instruction shall be given, and I am compelled to

4   allow the giving of an accountability instruction.

5        MR. GUAGLIARDO:  Judge, we would move to

6   withdraw the second issue then, because the issue

7   never came up.

8        THE COURT:  I never got to 16 because there

9   was an objection.  As I read it, 16 is the

10  accountability instruction, number 5.03; is that

11  correct?

12       MR. GUAGLIARDO:  Yes.

13       THE COURT:  Okay.  I've ruled on the

14  applicability.  I'm going to note that it is given

15  over objection, Mr. Kliment.

16       MR. KLIMENT:  That's correct.

17       THE COURT:  All right.  State's instruction

18  number 17 is taken from IPI criminal number 5.06.

19       MR. GUAGLIARDO:  That is what we're

20  withdrawing.

21       THE COURT:  All right.  That will be

22  withdrawn.

23       State's instruction number 18 is taken from

24  IPI criminal number 6.05 X, which is the definition of

191

1  an offense of attempt first degree murder.  Any

2  objection other than in principle, Mr. Kliment?

3           MR. KLIMENT:  Can I have a moment?

4           THE COURT:  Sure.

5           MR. KLIMENT:  No.

6           THE COURT:  It will be given.

7           THE COURT:  State's instruction number 19 is

8  the propositions that must be proven to establish the

9  charge of attempt first degree murder taken from IPI

10  criminal number 6.07 X.  Any objection?

11           MR. KLIMENT:  No.

12           THE COURT:  That will be given.

13           State's instruction number 20 is taken from

14  IPI criminal number 7.01, which is the definition of

15  first degree murder.  Any objection?

16           MR. KLIMENT:  No.

17           THE COURT:  That will be given.

18           State's instruction number 21 is taken from

19  IPI criminal number 7.02.

20           MR. KLIMENT:  No objection.

21           THE COURT:  It will be given.

22           State's instruction number 22 -- have we

23  covered 22?

24           MR. KLIMENT:  That's what we're on, Judge.

1          MR. GUAGLIARDO:  This is the other theory of

2     first degree murder, Judge.

3          MR. KLIMENT:  No objection.

4          THE COURT:  701(a) will be given.

5          State's instruction number 23 is taken from

6     IPI criminal number 7.02(a).  Any objection?

7          MR. KLIMENT:  No.

8          THE COURT:  That will be given.

9          State's instruction number 24, IPI criminal

10    number 11.23, which is the definition of aggravated

11    battery with a firearm, any objection?

12          JUROR:

13          MR. KLIMENT:  No.

14          THE COURT:  That will be given.

15          State's instruction number 25 is taken

16    from --

17          MR. GUAGLIARDO:  Judge, we will withdraw

18    this one.  It's not been an issue in the case.

19          THE COURT:  All right.  It will be

20    withdrawn.

21          State's instruction number 26 is taken from

22    IPI criminal number 11.24, which is the charges of

23    aggravated battery with a firearm.  Any objection?

24          MR. KLIMENT:  No.

1           THE COURT:  Given.

2           State's instruction number 27 relative to

3   aggravate discharge of a firearm, IPI criminal number

4   18.11, any objection?

5           MR. KLIMENT:  No.

6           THE COURT:  That will be given.

7           State's instruction number 28 is taken from

8   IPI criminal number 18.12 relative to what must be

9   proven to sustain the charge of aggravated discharge

10  of a firearm.  Any objection?

11          MR. KLIMENT:  No objection.

12          THE COURT:  That will be given.

13          State's instruction number 29 is taken from

14  IPI criminal number 26.01, which are the verdict forms

15  -- let's take a moment, be very careful, counsel,

16  Mr. Kliment, Ms. Parga, make sure it's correct,

17  because you have a number of possibilities here.  Does

18  29 look okay?

19          MR. KLIMENT:  All the verdict forms are

20  covered.

21          THE COURT:  Any objection?

22          MR. KLIMENT:  No.

23          THE COURT:  That will be given.

24          Now I'll read the State's instructions,

1   which are the verdict forms -- 26.02, the first

2   finding the defendant not guilty of first degree

3   murder intent to kill, any objection?

4           MR. KLIMENT:  No.

5           THE COURT:  That will be given.

6           State's instruction number 31, other than

7   principle, any objection?

8           MR. KLIMENT:  No.

9           THE COURT:  State's instruction number 32,

10  any objection?

11          MR. KLIMENT:  No.

12          THE COURT:  Given.

13          State's instruction number 33, any

14  objection?

15          MR. KLIMENT:  No objection.

16          THE COURT:  It will be given.

17          State's instruction number 34 finding the

18  defendant not guilty of attempt first degree murder as

19  to Alonzo Matthews; any objection?

20          MR. KLIMENT:  No.

21          THE COURT:  State's instruction number 35,

22  any objection?

23          MR. KLIMENT:  No.

24          THE COURT:  State's instruction number 36,

195

```
1   find the defendant not guilty of attempted first

2   degree murder as to Tara Harris; any objection?

3           MR. KLIMENT:  No.

4           THE COURT:  That will be given.

5           State's instruction number 37, find the

6   defendant guilty of the attempt first degree murder of

7   Tara Harris; any objection?

8           MR. KLIMENT:  No.

9           THE COURT:  That will be given.

10          State's instruction number 38, find the

11  defendant not guilty of aggravated battery with a

12  firearm as to Alonzo Matthews; any objection.

13          MR. KLIMENT:  No.

14          THE COURT:  Given.

15          State's instruction number 39, find the

16  defendant guilty of aggravated battery as to Alonzo

17  Matthews; any objection?

18          MR. KLIMENT:  No.

19          THE COURT:  Given.

20          State's instruction number 40, find the

21  defendant not guilty of aggravated battery with a

22  firearm as to Tara Harris; any objection?

23          MR. KLIMENT:  No.

24          THE COURT:  Given.
```

1          State's instruction number 41, find the

2    defendant guilty of aggravated battery with a firearm

3    as to Tara Harris; any objection?

4          MR. KLIMENT:  No.

5          THE COURT:  42, find the defendant not

6    guilty of aggravated discharge with a firearm; any

7    objection?

8          MR. KLIMENT:  No.

9          THE COURT:  Finally, State's instruction

10   number 43 finding the defendant guilty of aggravated

11   discharge of a firearm; any objection?

12         MR. KLIMENT:  No.

13         THE COURT:  I'm showing just a few

14   instructions that have to be modified with the wrong

15   verdict forms and some other tenses.  Other than that,

16   do the People have any other instructions they wish to

17   tender?

18         MR. GUAGLIARDO:  No, your Honor.

19         THE COURT:  Does the defense have any

20   instructions you would like to tender on behalf of

21   Mr. Amaya?

22         MR. KLIMENT:  No, not at this time, Judge.

23         THE COURT:  Any lesser includeds?

24         MR. KLIMENT:  No.

1        THE COURT:  Do you want to take a moment to

2  discuss that issue with him?

3        MR. KLIMENT:  It's not an issue.

4                        (Off the record discussion.)

5        THE COURT:  Mr. Amaya, do you wish any

6  lesser included offenses in the jury instructions?

7        THE DEFENDANT:  No.

8        THE COURT:  Mr. Walsh, did you make notes on

9  which instructions had to be modified?

10       MR. WALSH:  I did, changing number one,

11 number nine and number eleven.

12       THE COURT:  All right.  That's what I'm

13 showing.

14       Mr. Kliment?

15       MR. KLIMENT:  Same thing, Judge.

16       THE COURT:  All right.  I want to compliment

17 all counsel for the way you tried the case.  I thought

18 both sides did a very professional job with their

19 presentation, very competent.

20       Is there anything further?  You can bring

21 these in tomorrow morning.

22       MR. GUAGLIARDO:  Sure, Judge.

23       MR. KLIMENT:  As long as we're here, in my

24 closing argument I anticipate using an exhibit and I

1  anticipate writing on it.  One is going to be the

2  State used an exhibit the street map of the city of

3  Aurora.  I don't know the number of it -- 21.  I will

4  be using a blowup of that and also a blowup of I think

5  it was number one, the back of the apartment complex

6  just so I can have some clarity in my argument, put it

7  on the easel, and they're big, but they're the same

8  thing that's been used already, and I'll write on the

9  -- they have plastic overlay with erasable marker,

10  I'll write on that.

11          THE COURT:  Any problem with that?

12          MR. GUAGLIARDO:  I have no problem with

13  using it in closing, but obviously you're not

14  proposing it go back to the jury with your writing on

15  it?

16          MR. KLIMENT:  No.

17          THE COURT:  You mean the subliminal

18  message?

19          MR. KLIMENT:  No, it would be just for

20  argument.

21          THE COURT:  Just for progress, let me jump

22  ahead.  In terms of what would be going back to the

23  jury, any thoughts now?  Other than stipulations is

24  there anything that would not go back?

1      MR. KLIMENT:  The death certificate and

2  autopsy report I don't think should go back.

3      THE COURT:  I'd be inclined to agree,

4  because they always have a coroner's inquest in there.

5      MR. KLIMENT:  I don't want to have anything

6  that's been marked on.

7      MR. GUAGLIARDO:  I think they're going to

8  balk very loudly if they don't get --

9      MR. KLIMENT:  They want a map.

10     THE COURT:  The fact that they've brought it

11 up a couple times, as you know, and I've disclosed it.

12     MR. KLIMENT:  One and 21 would be the two

13 I'd be using during the argument.  21 got marked on,

14 but that really just gives the location of different

15 things.

16     MR. GUAGLIARDO:  Not only that, it was

17 marked on by witnesses.

18     MR. KLIMENT:  So there would be no objection

19 to those two exhibits going back.

20     THE COURT:  And number one?

21     MR. KLIMENT:  One and 21.

22     THE COURT:  Any further thoughts,

23 Mr. Guagliardo?

24     MR. GUAGLIARDO:  I think everything except

1    death certificate, autopsy protocol.

2           MR. KLIMENT:  Stipulations.

3           MR. GUAGLIARDO:  Stipulations.

4           THE COURT:  So other than those, anything

5    further?

6           MR. GUAGLIARDO:  No, Judge.

7           THE COURT:  I'd like to start promptly at

8    9:00.  I'll make sure somebody else covers the status

9    call here.  So let's get started about 9:00.  Bring in

10   your instructions a few minutes before so we can go

11   over and make sure that they're changed, and we'll go

12   from there.

13          MR. KLIMENT:  Very well, Judge.

14                 (Which were all the proceedings had

15                  in said matter on said date.)

16

17

18

19

20

21

22

23

24

201

1  STATE OF ILLINOIS )
                    ) SS.
2  COUNTY OF KANE    )

3

4

5

6      I hereby certify that I reported in shorthand

7  the proceedings had at the hearing in the above-

8  entitled cause, and that the foregoing Report of

9  Proceedings is a true, correct and complete transcript

10 of my shorthand notes so taken at the time and place

11 herein set forth.

12

13

14

15  _____
                    PAULA M. QUETSCH, CSR
16                  No. 084-003733
                    Official Court Reporter,
17                  16th Judicial Circuit of
                    Illinois
18

19

20

21

22

23

24

1   STATE OF ILLINOIS     )
                          ) SS.
2   COUNTY OF KANE        )

3      IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                      KANE COUNTY, ILLINOIS

4

5   PEOPLE OF THE STATE OF ILLINOIS,    )
                                        )
6                       PLAINTIFF,      )
                                        )
7                  VS.                  )  NO. 98 CF 535
                                        )
8   ARMANDO AMAYA,                      )
                                        )
9                       DEFENDANT.      )

10

11      REPORT OF PROCEEDINGS had at the hearing in the

12   above-entitled cause before the Honorable Donald C.

13   Hudson, Judge of said Court, on the 28th day of

14   January, A. D. 1999.

15      PRESENT:

16          MR. DAVID R. AKEMANN,
             State's Attorney, by
17        JAMES GUAGLIARDO and JAMES WALSH,
             Assistant State's Attorney,
18               appeared for the People of the
                 State of Illinois.

19          MR. DAVID KLIMENT,
             Public Defender, and
20        SANDRA PARGA,
             Assistant Public Defender,
21               appeared for the Defendant.

22

23
    PAULA M. QUETSCH, CSR
24  Official Court Reporter

2

1               (Whereupon, the following

2               proceedings were had

3               before Court and counsel

4               in open court:)

5          THE COURT:  Back on the record, People

6   versus Armando Amaya, 98 CF 535.  At this time we're

7   outside the presence of the jury for purposes of

8   finalizing the instruction conference.  All counsel

9   are present with the momentary exception of

10  Ms. Parga.  Mr. Amaya is present.

11          When we adjourned yesterday, first of all,

12  the State was going to provide some amended

13  instructions; I believe there were three that needed

14  to be amended.

15          I'm showing State's instruction number one,

16  IPI 1.01, needed to be amended.  Do we have that?

17          MR. GUAGLIARDO:  Yes, Judge.  We've taken

18  out the paragraph about --

19          THE COURT:  Would you tender those?

20          MR. GUAGLIARDO:  At this point we have one

21  copy.  We do have the changed copy here, the paragraph

22  is gone.

23          THE COURT:  All right.  When are the copies

24  going to be forthcoming?

3

1    MR. GUAGLIARDO: As soon as we approve of

2 these. I can show Mr. Kliment.

3    MR. KLIMENT: The paragraph is in fact gone.

4    THE COURT: All right. There was additional

5 instructions here, I believe instruction number nine

6 needed to be changed and the word verdicts in lieu of

7 verdict.

8    MR. GUAGLIARDO: The fact that the defendant

9 did not testify and must not be considered by you in

10 arriving at your verdicts.

11    THE COURT: Verdicts plural.

12    MR. GUAGLIARDO: Yes, Judge.

13    MR. KLIMENT: It's there, the S has been

14 added.

15    THE COURT: Then I believe State's

16 instruction number 11 also needed to be modified also

17 in arriving at your verdicts plural.

18    MR. GUAGLIARDO: Judge, I have a blank

19 bottom. Circumstantial evidence.

20    THE COURT: Circumstantial evidence?

21    MR. GUAGLIARDO: Yes.

22    MR. KLIMENT: It's there, Judge.

23    THE COURT: Were there any other that you

24 recall the Court was inclined to give -- or would give

4

1    only upon modifications, any additional ones?

2            MR. GUAGLIARDO:  No, your Honor.

3            THE COURT:  Mr. Kliment, do you recall any

4    others that needed to be modified?

5            MR. KLIMENT:  No, Judge.

6            THE COURT:  What else do we have to take up

7    by way of instructions, Mr. Guagliardo?

8            MR. GUAGLIARDO:  Your Honor, my copy does

9    not have numbers on the bottom, we have the blank

10   bottoms to go to the jury, but the first issues

11   instruction we have inserted the words "or one for

12   whose conduct he is legally responsible" in every

13   issues instruction after the word defendant and the

14   word propositions -- in the proposition paragraphs, I

15   should say.

16           Your Honor, this is currently in a different

17   font than all the other -- that instruction is

18   currently in a different font than all the other

19   instructions.  In other words, the issues instructions

20   are a different font than all the other instructions.

21   I don't have a problem with that.  I know you are one

22   of the judges that doesn't care for that.  If it's not

23   a problem with the Court, it's not a problem with the

24   parties.

```
 1              THE COURT:  I don't have a problem with it
 2   unless Mr. Kliment does.
 3              MR. KLIMENT:  I don't know that I have a
 4   problem.
 5              THE COURT:  When you say font, I'm not sure
 6   that everyone would understand exactly what you mean.
 7   Could we use the word another time?
 8              MR. GUAGLIARDO:  I'll show you an example.
 9   I think we can get going and read these to the jury,
10   and if you want us to make the types consistent, we
11   can do that before you give it back to them.  I hate
12   to put off these closings much longer.
13              THE COURT:  I'll refer to Mr. Kliment.
14              MR. KLIMENT:  I don't have a problem with
15   that.
16              THE COURT:  So notwithstanding the different
17   font, as you say, we will give them in accordance with
18   the existing font.
19              Any objection to the instruction with the
20   accountability language?
21              MR. KLIMENT:  Beyond the accountability
22   argument I made yesterday, I don't think it applies in
23   this case, and you've already ruled on it, no.
24              THE COURT:  Because the instructions as he's
```