File Date:  5 - 29 - 2008

Case No:  07cv 6793

ATTACHMENT # _____

EXHIBIT  S part 4

TAB (DESCRIPTION)

_____

```
 1   now tendered them would in fact be the --

 2            MR. KLIMENT:  Do they need to be in the

 3   definition instruction?

 4            MR. GUAGLIARDO:  I don't believe so, Judge.

 5   The accountability instruction at least the IPI books

 6   -- if I can get to accountability, I can read the

 7   language.

 8            MR. KLIMENT:  IPI 605(x).

 9            THE COURT:  Accountability instruction is

10   IPI 5.03, State's instruction number 16 that defines

11   the term accountability.

12            MR. GUAGLIARDO:  Judge, the committee note

13   says when this instruction is given insert the phrase

14   "or one for whose conduct he is legally responsible"

15   after the word defendant in each proposition of the

16   issues instruction in the offense charged.  It doesn't

17   say anything about the definition.

18            THE COURT:  That's correct.

19            MR. KLIMENT:  That's fine.

20            THE COURT:  All right.

21            MR. GUAGLIARDO:  There is one other issue.

22   I don't know what State's instruction number is, but

23   3.11, prior inconsistent statements.

24            THE COURT:  Yes.
```

```
 1              MR. GUAGLIARDO:  Right now we have a 3.11
 2    instruction that does not include 115-10.1 statements
 3    in there; it just reads the believability of a
 4    statement made that was not consistent with his
 5    testimony in this case, evidence of this kind
 6    ordinarily may be considered by you only for the
 7    limited purpose of deciding the weight to be given the
 8    testimony you heard from the witness in this
 9    courtroom, and then it goes on obviously, it's for you
10    to determine the weight that should be given to that
11    statement.  In determining the weight to be given to
12    an earlier statement you should consider all of the
13    circumstances under which it was made.
14              Your Honor, at least on a couple occasions
15    throughout this trial I think both parties have asked
16    witnesses about previous taped statements, and the
17    witness acknowledged the questions and answers asked
18    in the taped statements.
19              THE COURT:  I think that's essentially
20    correct, Mr. Kliment, because the foundation was laid
21    was it on the tape.  I think arguably there is a
22    substantive impeachment issue in the case.  Do you
23    have any?
24              MR. KLIMENT:  No.  It was all his witnesses
```

C000954

1    that were impeached.

2         MR. GUAGLIARDO:  I think Mr. Kliment asked

3    Detective Sauer about a lot of different statements in

4    a taped statement.

5         MR. KLIMENT:  But it came out in

6    Mr. Guagliardo's case.

7         THE COURT:  That's a matter of strategic

8    consideration and perhaps discussion.

9         MR. GUAGLIARDO:  Well, I'm just trying to

10   get it right.  At this point I don't have strong

11   feelings about it, but I believe if we're going to get

12   it right, the following words should be inserted

13   between these two paragraphs:  "However, you may

14   consider a witness' earlier inconsistent statements

15   without this limitation when the statement is

16   accurately recorded by tape recorder, videotape

17   recording or a similar electronic means of sound

18   recording."

19         THE COURT:  Mr. Kliment?

20         MR. KLIMENT:  You know, that's true.  The

21   question I have, they acknowledge making the statement

22   on a tape, but they don't acknowledge having heard the

23   tape or acknowledging that that was accurate or

24   anything, knowledge having made the statement I'm --

C000955

1    generally speaking when this is given we've heard the

2    tape.

3          MR. GUAGLIARDO:  Judge, maybe this is the

4    language:  However, you may consider a witness'

5    earlier inconsistent statement when the witness

6    acknowledged under oath that he made the statement.

7          MR. KLIMENT:  "May" may be more appropriate.

8          THE COURT:  I would simply point out, though

9    -- and maybe this is an aside, I find this

10   instruction to be somewhat confusing to the jury.

11   They really I think have a difficult time

12   distinguishing between what you call regular

13   impeachment versus substantive impeachment without

14   some type of seminar being given to the jurors, which

15   obviously is not going to happen.

16          MR. GUAGLIARDO:  I would agree with that.

17          THE COURT:  So I don't have a problem in

18   this case with what I consider the minimal 115-10

19   instruction.  I'll let counsel decide if you want to

20   tender the instruction.

21          MR. GUAGLIARDO:  At this point we're willing

22   to keep it as it is.  I just wanted to flush the issue

23   out.

24          THE COURT:  Mr. Kliment, do you wish to

1  tender a 115-10 issue?

2         MR. KLIMENT:  No, Judge.

3         MR. GUAGLIARDO:  As long as in the closing

4  if I refer to a prior statement he doesn't say that

5  isn't actually evidence, it just goes to the weight of

6  what they said in this courtroom.

7         MR. KLIMENT:  It depends on which statement,

8  but, of course.

9         MR. GUAGLIARDO:  If they acknowledged on the

10  witness stand making a prior statement in a taped

11  statement, Mr. Kliment cannot get up in closing and

12  say, you can't consider what he said previously on the

13  taped statement as evidence, it only goes to the

14  weight of his testimony.  If he's going to say that,

15  Judge, we have to change the instruction.

16         MR. KLIMENT:  I don't think it's necessary

17  to change the instruction, Judge.

18         THE COURT:  In the event he would say that,

19  obviously I would give you time to prepare the

20  instruction.

21         MR. GUAGLIARDO:  Fair enough.

22         THE COURT:  Anything else?

23         MR. GUAGLIARDO:  No, we just need to make

24  the copies.

1        THE COURT:  Please do.

2        Mr. Kliment, do you have any additional

3   instructions you wish to tender at this time?

4        MR. KLIMENT:  Actually, I do.  It would be a

5   replacement for what would be People's instruction

6   two, IPI number 1.02.  I alluded to this yesterday

7   briefly that an instruction regarding intoxication,

8   and if you look at the IPI -- not intoxication, drug

9   addiction.  If you look at the IPI, it is mentioned in

10  the notes that this instruction is proper if the

11  testimony's been given provided it's in the proper

12  time context, and the time context issue is brought up

13  in the case of People versus Franz, F-R-A-N-Z, 368

14  N.E.2d 1091, a copy of which I gave to the Court

15  yesterday and Mr. Guagliardo yesterday and again

16  today.

17       We're asking that this language be added,

18  and I have given a modified IPI 1.02 which is

19  essentially identical to the State's with the

20  exception of the final sentence that says, "Evidence

21  that any witness is a drug addict can be used by you

22  when judging the believability of that witness and of

23  the weight to be given to the testimony of that

24  witness."

C000958

1    THE COURT:  People's response?

2    MR. GUAGLIARDO:  I don't disagree in

3 principle.  I have a little problem with the actual

4 language.  I think the Franz case is correct, and I

5 think that Mr. Kliment did solicit the correct time

6 frame, but the proposed language in Franz was

7 testimony that a witness is a drug user is to be

8 considered by you only insofar as it may affect the

9 credibility of a witness, whereas Mr. Kliment says

10 evidence a witness is a drug addict can be used by you

11 in judging the believability of that witness and to

12 the weight given to the testimony of that witness.

13    The standard language when talking about

14 prior inconsistent statements and other impeaching

15 factors is "may be considered by you only insofar as

16 it may affect the credibility."  I think we ought to

17 stick with that language, not this new language "can

18 be used by you in judging the believability of the

19 witness."  And, Judge, I'm looking at Franz, page 487,

20 headnote two, and the proposed language in that case

21 is in quotes there.

22    THE COURT:  All right.  Let me say this:  I

23 was inclined to give some form of an instruction on

24 the witness' addiction, because I believe the case law

1   indicates it would be appropriate.  Generally the

2   court is reluctant to give any instruction that is not

3   an IPI, but I think where the IPI instruction does not

4   adequately cover an issue the Court should be open to

5   modifying and giving an instruction, and I will be

6   giving an instruction on this issue as requested by

7   the defendant in some form.

8           He seems to have a logical point,

9   Mr. Kliment.  He's asking that the instruction be

10  tailored to the exact form that was approved in Franz.

11          MR. KLIMENT:  Actually, that was rejected in

12  Franz.

13          THE COURT:  Well, it was rejected, but the

14  appellate court said it would have allowed it had it

15  been --

16          MR. KLIMENT:  I can put it in just like it

17  says in the last sentence.

18          MR. GUAGLIARDO:  Then we're in agreement,

19  Judge.

20          MR. KLIMENT:  Headnote two, I'll put it in

21  just like it is in Franz.

22          THE COURT:  All right.  I'm going to give

23  defendant's instruction number one.

24          MR. GUAGLIARDO:  Do you want us to change

1    it?

2         MR. KLIMENT:  I can change it; it's on my

3    computer.

4         THE COURT:  Who can do it faster?

5         MR. GUAGLIARDO:  If it's on his computer,

6    then he can be faster.

7         THE COURT:  When will you be able to be

8    ready?

9         MR. GUAGLIARDO:  10:00 I hope.

10        THE COURT:  All right.  And then I'll take a

11   moment to make sure I have -- keep in mind I don't

12   have your instructions yet.

13        MR. GUAGLIARDO:  I'm making copies now.

14   And, Judge, obviously we're going to pull other

15   credibility instructions in lieu of Mr. Kliment's.

16        THE COURT:  Okay.

17                                (Recess taken.)

18        THE COURT:  Back on the record, all counsel

19   are present, the defendant is present.

20        Mr. Walsh, are you handing me a complete

21   copy of instructions?

22        MR. WALSH:  Yes, sir.

23        THE COURT:  Mr. Kliment, have you had an

24   opportunity to look at the proposed instructions?

1    MR. KLIMENT:  Yes, sir.

2    THE COURT:  Do you believe they are accurate

3    and correct as on the record?

4    MR. KLIMENT:  As tendered, yeah.

5    THE COURT:  Mr. Guagliardo?

6    MR. GUAGLIARDO:  We're ready.

7    THE COURT:  Mr. Kliment?

8    MR. KLIMENT:  We're ready, Judge.

9    THE COURT:  All right, let's line them up

10   and we'll have the closing arguments.

11                        (The following proceedings

12                         were had in the presence of

13                         the jury.)

14   THE COURT:  We're back on the record, 98 CF

15   535, People versus Amaya.  The jury has returned to

16   open court, all counsel are present, Mr. Amaya is

17   present.

18   Ladies and gentlemen, at this time you are

19   about to hear the closing arguments by the attorneys

20   in connection with this case.  Closing arguments are

21   made by the attorneys to discuss the facts and

22   circumstances in the case and should be confined to

23   the evidence and to reasonable inferences to be drawn

24   from the evidence.

1    Neither opening statements nor closing

2  arguments themselves are evidence.  Any argument made

3  by the attorneys which is not based on the evidence

4  should be disregarded by you.

5    With those thoughts in mind, Mr. Guagliardo,

6  are you prepared to give your closing argument?

7    MR. GUAGLIARDO:  I am, your Honor.

8    THE COURT:  You may proceed.

9    MR. GUAGLIARDO:  Thank you.

10    Good morning, ladies and gentlemen.  First,

11  on behalf of Mr. Walsh, myself, Kane County State's

12  Attorney's Office, everyone involved in this trial I'd

13  like to thank you for your service this week.  As you

14  saw from jury selection, it's really easy to get out

15  of jury service if you want to, I can't be fair, I

16  can't concentrate and you'd be out that door in a

17  minute.  So even though technically this is not

18  voluntary service, it really is voluntary because you

19  stuck in there, and we appreciate that, and we

20  appreciate your attention this week.

21    We have now reached the point in this case

22  where you, the members of the jury, must,

23  quote-unquote, decide this case.

24    What does it mean to decide a case?  What do

1   you do in the process of deciding a case?  Well, you

2   really do three different things to decide a case.

3            The first thing you do is you determine what

4   the facts are.  And in a jury trial you and only you

5   determine what the facts are.  The judge doesn't

6   determine what the facts are; the lawyers don't

7   determine what the facts are; you and only you

8   determine what the true facts of this case are.

9   That's the first thing you do.

10            The second thing you do is after determining

11   what the facts are, you apply those facts as you found

12   them to the law that you're going to get from the

13   judge, and the third thing you to is really a

14   compilation of those two, applying the facts as you

15   find them to the law you'll determine whether the

16   defendant committed the offense of first degree murder

17   and the other offenses he's charged with, attempt

18   first degree murder, aggravated battery with a

19   firearm, aggravated discharge of a firearm.

20            In going through this three-step process

21   you're going to use some important tools back there,

22   and I want to talk about those tools very briefly.

23            One of the most important tools you'll use

24   is your memory.  The beauty of the jury system is

1  you're going to have a collective memory back there,

2  12 different memories back there.  And certain of you

3  are going to remember certain things better than

4  others in this trial, and you can rely on each other

5  and rely on your notes.

6          The second tool you're going to use back

7  there are the jury instructions, the actual law that

8  applies to this case.  The judge is going to read that

9  law to you, and he's going to give you a copy of those

10 jury instructions to bring back there.  Those are very

11 important; I ask you to read those very carefully.

12          The third and most important tool you're

13 going to use in this process is good, old-fashioned

14 common sense.  That's the most important tool you're

15 going to use, your everyday observations and

16 experiences in life.  You don't leave your common

17 sense in the parking lot when you come in this

18 building to decide a case.  As a matter of fact,

19 you're going to get a jury instruction which more or

20 less says you should rely on your common sense.  Let

21 me read that instruction.  That instruction says:  You

22 should consider all the evidence in light of your own

23 observations and experience in life.  That says use

24 your common sense.

1    I want to talk about two things that we
2    commonly experience in everyday life.  I'm going to
3    throw two words out at you, corroboration and
4    accountability, corroboration and accountability.
5    Let's start with corroboration.  It sounds like a
6    fancy, mumbo-jumbo legal concept that only happens in
7    courtrooms, corroboration.  It's not; it's an everyday
8    part of our everyday lives even if we don't think of
9    it.  We experience corroboration every day in lives,
10   because, as you know, corroboration simply means to
11   verify, it means to confirm, it means to strengthen.
12   If something corroborates something else, it confirms
13   it, it strengthens it.
14       Let me give you an example, an example I'm
15   making up about the sort of thing that might happen in
16   everyday life.  Suppose you're hanging around the
17   house, you might be in the family room or something,
18   the TV's on in the other room, you're not really
19   paying close attention to that TV, and you hear
20   someone on the TV say that a meteorite landed in
21   Chicago today, more details to come.  And you overhear
22   that, and you think to yourself, a meteorite landed in
23   Chicago today, more details to come.  Was that a true
24   report, was that a joke, you know, was that just one

C000966

1   of these things that comedians do on TV, or is this a

2   real report?  You don't know, you're not sure what to

3   think of that.

4        Maybe an hour goes by, you walk outside to

5   take your garbage out, and you see a guy who lives up

6   the street.  He comes down and he says, you know, I

7   just got back from Chicago, and you wouldn't believe

8   the traffic problems they have in Chicago, what a mess

9   it is because that big rock that just fell out of the

10  sky.

11       Well, suddenly that report that you heard on

12  TV, you think of that report in a whole different

13  light.  Now you say to yourself, wait, that report I

14  heard on TV, that must not have been a joke, that was

15  true.  Corroboration.  We experience it every day in

16  our everyday lives, and it's an important concept in

17  resolving this case, and I'll get back to it in a few

18  minutes.

19       Mr. Kliment was right in his opening.  The

20  big issue in this case is who done it.  Well, let's

21  take a look at the evidence.  What is the evidence

22  that the defendant, Armando Amaya, is the shooter in

23  this case?  Well, the first piece of evidence is the

24  testimony of Tara Harris and Alonzo Matthews, the two

C000967

1   shooting victims you heard from on that stand that

2   lived.  They did not identify the defendant as the

3   shooter, but they didn't eliminate him, either, and

4   that's evidence, that's one small piece of this

5   puzzle.

6         Tara Harris testified that the guy who shot

7   her came from the Lincoln way.  Let me take out this

8   diagram.  She testified that the guy who shot came

9   from the Lincoln way.  She said, I turned and got a

10  quick look at him before being shot, and he was a

11  male, he was Hispanic, he was in his teens, he was

12  about 5'4", male, Hispanic, in his teens, about 5'4",

13  but I didn't get a good look at his face she said.

14        Alonzo Matthews said the shooter came from

15  Lincoln way, he was a male, he was Hispanic, he was

16  about 140 pounds with a black hoodie, and it was up,

17  but I didn't get a good look at his face.

18        Now, obviously Alonzo Matthews and Tara

19  Harris didn't identify the defendant as the shooter,

20  but they didn't eliminate him, either, and that is

21  evidence.  They didn't say the shooter was Asian,

22  African-American; they didn't say the shooter weighed

23  200, 300 pounds; they didn't say he was a little kid;

24  they're not saying he's seven feet tall; they're not

C000968

1    saying he's four feet tall.  They say 5'4", 5'5", 140

2    pounds, male, Hispanic, teenager.  Obviously none of

3    that eliminates the defendant in this case, Armando

4    Amaya.

5              You're going to have photos back there to

6    look at.  This was the jail lineup including Armando

7    Amaya.  He's in position number one, and there's a

8    height chart back there.  You're going to see that his

9    head rests somewhere between five and six feet.  And

10   look at his body, it's your guess as to his weight,

11   but we've heard things like 140, 150, 160 pounds, and

12   he certainly does fall in that range.  Although he's

13   not on a scale, he doesn't weigh 130 pounds, and he

14   doesn't way 250 pounds.

15             That's Tara Harris and Alonzo Matthews.

16   Let's look at the next piece of evidence.  The next

17   piece of evidence you hear in this case is the

18   testimony of Shayla Johnson and Nicole Pearson.  Now,

19   Nicole Pearson was on that walkway when the shooting

20   occurred.  She said she saw a male Hispanic teenager

21   about five-feet-five tall walk up the Lincoln way, and

22   she tells you that that person she saw she knows as

23   Scarecrow because she had seen him she said once

24   before.  And if you have any doubt about the fact that

1  she had seen him before, let's go to that jail

2  lineup.

3          Nicole Pearson knows his face.  That jail

4  lineup -- Nicole Pearson was the first one to view

5  this jail lineup.  It wasn't Shayla Johnson; it was

6  Nicole Pearson.  She reluctantly identified the

7  defendant as the shooter.  She immediately identified

8  the defendant as the person involved, but she

9  reluctantly identified the defendant as the shooter.

10 Nicole Pearson said the first guy in this lineup did

11 the shooting.  She picked him out all by herself

12 without any help because she knows his face, she

13 recognized his face back on October 29th in that back

14 walkway of those apartments.  She identified him in

15 the lineup as shooter, she identified him in court as

16 the shooter.

17         Let's go to Shayla Johnson.  She was

18 standing back there watching an argument that Nicole

19 Pearson was apparently involved in.  She sees the

20 defendant walk up the walkway.  Shayla Johnson was the

21 first witness you saw come through those doors with

22 handcuffs because she didn't show up on the first day

23 of this trial.  She sees the defendant walk up a

24 walkway from the Lincoln way up to the crowd before

C000970

1   shooting.  Her testimony is, I saw his face before the

2   shooting began, I saw him walk up, and I recognized

3   his face, because she knows him, she's seen him

4   before, several times before.

5          Now, Nicole Pearson said, I had seen him

6   once before.  Shayla Johnson said, I saw him several

7   times during the summer of 1997, and he's the guy I

8   know as Scarecrow.  She recognized his face before the

9   shooting started because she saw him walk up to the

10  group before he started shooting.  When the defendant

11  started shooting, she said she froze and focused on

12  the gun that was going like this.  She said he had a

13  hard time handling the gun, and she recognized it as a

14  revolver, and that's corroborated by the fact you

15  heard testimony there was a search of this entire area

16  including the inside of 309 and the walkway and the

17  vacant lot for any sort of physical evidence that

18  could leave something, and there were no shell casings

19  found back there.  Indeed, it was a revolver, and

20  that's what Shayla Johnson told you she saw.

21         Shayla Johnson recognized the shooter that

22  night as a guy she knew from the summer as Scarecrow,

23  and that guy is sitting in the courtroom right here.

24  That identification testimony is another piece of the

1    puzzle that you add to Nicole Pearson's testimony, and

2    you add it to the description testimony of Tara Harris

3    and Alonzo Matthews, and it fits the testimony of Tara

4    Harris and Alonzo Matthews.   It doesn't contradict

5    Tara Harris or Alonzo Matthews in any significant

6    way.

7            So now we have the descriptions of Tara

8    Harris and Alonzo Matthews added to the identification

9    testimony of Shayla Johnson and Nicole Pearson, and

10   that brings us to the next piece of the puzzle.   It

11   brings us to the testimony of Tracy Johnson that you

12   heard yesterday in this courtroom, and that brings me

13   back to the concept of corroboration that I talked

14   about.   You need to judge Shayla Johnson and Nicole

15   Pearson's identification testimony in the light of

16   Tracy Johnson's testimony, and when you do so, you see

17   that Tracy Johnson's testimony corroborates Shayla

18   Johnson's identification.   Tracy Johnson's testimony

19   strengthens Shayla Johnson's identification.

20           Tracy Johnson tells us that he's on Galena

21   Boulevard that night of the shooting.   This is where

22   the apartment building is.   He tells us he's on Galena

23   Boulevard that evening when he hears three gunshots.

24   He tells us that almost immediately after hearing

C000972

1   those shots he sees three guys running from the

2   direction of the apartments where his cousin, Jermaine

3   Lambert, was killed, and Tracy Johnson tells us who

4   those three persons were that were running from the

5   scene, because an hour-and-a-half later that night he

6   views a traffic stop at Jackson and Downer, and the

7   three persons that are being stopped at Jackson and

8   Downer are the defendant, Armando Amaya, Romero

9   Sandoval, and George Gamboa.  And Tracy Johnson tells

10  you on the stand that he's positive that those three

11  guys that were stopped at Jackson and Downer are the

12  same three guys he saw running from the shooting right

13  after he heard the shots, and a couple minutes after

14  he sees those three run from the scene he hears

15  someone yell, Jermaine is dead or Jermaine was just

16  killed.

17        Tracy Johnson saw the defendant running from

18  the scene of this murder just moments after that

19  murder occurred, and what Tracy Johnson saw

20  corroborates the identifications of Shayla Johnson and

21  Nicole Pearson.  What he sees strengthens the

22  identification of Shayla Johnson and Nicole Pearson.

23  Shayla Johnson and Nicole Pearson say, we saw that man

24  do the shooting behind the apartment, the 309 East New

1  York Street, and Tracy Johnson says, I saw that man

2  running from the scene of the shooting right after I

3  heard three gunshots.

4         It's like the television report of a

5  meteorite striking Chicago.  You see it in an entirely

6  different way once you hear someone down the street

7  say, oh, I couldn't get out of Chicago today because

8  that big rock fell.  Now you know that TV report

9  wasn't a joke; now that TV report has credibility.

10  What Tracy Johnson saw corroborates Shayla Johnson and

11  Nicole Pearson's identification.  You don't decide the

12  case on just one piece of evidence in a vacuum.  You

13  put the pieces of the puzzle together, and you start

14  to more clearly see the picture.

15         Let's bring in another piece of the puzzle.

16  What about the testimony of William McCalister

17  yesterday?  It corroborates what Tracy Johnson saw.

18  Tracy Johnson saw three male Hispanics running from

19  the scene of the shooting, and that observation is

20  corroborated in great part by William McCalister's

21  observations.  There was more than one male Hispanic

22  in dark clothing in the area of the scene at the time

23  of the shooting.  William McCalister's testimony tells

24  us that.  Everyone tells you -- when I say everyone,

1   Tara Harris, Alonzo Matthews, Nicole Pearson, and

2   Shayla Johnson tell us that the shooter came from the

3   Lincoln way, the male Hispanic dressed in dark

4   clothing came from the Lincoln way.  Here is where the

5   crowd is arguing, and those four, Harris, Matthews,

6   Johnson and Pearson, say the shooter came from this

7   way and started shooting, a male Hispanic in dark

8   clothing.

9         William McCalister is standing in this area

10   watching the argument by the dumpster, he says, at the

11   southeast corner of the building by the dumpster, and

12   he sees a male Hispanic come from the north across New

13   York Street before the shooting.  He says, I'm

14   watching this argument and a male Hispanic dressed in

15   dark clothing comes from the north across New York

16   Street.  He's dressed in dark clothing, William

17   McCalister tells us, with a hoodie up, and he has a

18   thin goatee.  Remember what William McCalister said

19   about the position of that subject's head as he

20   crossed New York Street and walked up.  I asked

21   Mr. McCalister to describe the position of his head,

22   and William McCalister said, well, he wasn't looking

23   straight up, he wasn't looking straight down, kind of

24   like this so he could see where he was going, but he

C000975

1  was keeping his head down to kind of keep concealed.

2  He has his hoodie on and he has his head down.  That

3  male Hispanic walking up that way doesn't want to be

4  showing his face off to that crowd.  And William

5  McCalister said that's the only other male Hispanic he

6  saw there except for some residents who were up on the

7  second floor balcony listening to the argument.

8        Now, who was that that walked across the

9  street over there?  It wasn't the shooter, everyone

10 knows the shooter came up this way and started

11 shooting over there.  Who was that?  Well, McCalister

12 says that he was a male Hispanic wearing dark clothes

13 and a thin goatee.  Well, that description fits the

14 defendant in this case, Armando Amaya, on the night of

15 this offense.  So the question is, did any of the two

16 people with the defendant that night, meaning George

17 Gamboa and Romero Sandoval, also fit that

18 description?  Well, let's look at the evidence.

19       Gamboa and Sandoval were both wearing dark

20 clothing.  Gamboa had on black pants and a Green Bay

21 Packer jacket, which is predominantly dark green, and

22 you're going to see photos of it.  Well, does either

23 Romero Sandoval or George Gamboa have a thin goatee?

24 Yes, George Gamboa does.  You're going to get exhibit

1  22 and 23 for identification.  George Gamboa does have

2  a thin goatee, and George Gamboa, when you put this

3  coat on with these pants, is dressed in dark

4  clothing.

5          Mr. McCalister testified that there was

6  another male Hispanic.  That fits in with Tracy

7  Johnson's testimony that he saw more than one person

8  running from the scene of that shooting.  That

9  corroborates Tracy Johnson's testimony.

10          Now, Tracy Johnson doesn't know Shayla

11  Johnson, and he doesn't know Nicole Pearson, and he's

12  never talked to them about this case.  So we have to

13  ask ourselves, is this just one big coincidence?

14  Well, here would be an analogy.  Let's go back to that

15  report on the news about a meteor landing in Chicago.

16  Let's say it really was a joke.  Let's say it was the

17  comedy channel on or something, meteor struck Chicago

18  date.  And the guy up the Street didn't see the

19  report, and yet miraculously the guy up the street

20  just happened to make up the same joke about the

21  meteor landing in Chicago on the same day you heard

22  that news cast.  That would be an incredible

23  coincidence.

24          No, Shayla Johnson is not making up the fact

that Scarecrow was on the walkway that night.  If she
was, it was a monstrous coincidence that Tracy Johnson
just happens to pick the same guy that she made up
being there as running from the scene.  Our common
sense tells us that's no coincidence, she just made up
that Scarecrow that was there, I'll just pick
Scarecrow, I've seen him during the summer.
Coincidentally Tracy Johnson picks that same guy as
running from the scene?  Not a coincidence.  She's not
making up the fact that she saw him walk into that
crowd and recognized him before the shooting began.

He was on that walkway, he was the shooter
in this offense.  Shayla Johnson tells us that, Nicole
Pearson tells us that, and Tracy Johnson tells us
that.  They're not making it up.  He's the shooter,
he's guilty of all these offenses as charged.

But the puzzle isn't complete yet.  There's
still another huge piece of this puzzle.  We've
covered the concept of corroboration.  But I threw two
words up to you, corroboration and accountability,
corroboration and accountability.

Now, accountability, like corroboration,
sounds like a big, fancy legal word.  It's not, it's
not at all.  You can be accountable for the conduct of

C000978

1   another if you're acting in concert with them, if

2   you're aiding and abetting them.  Like corroboration,

3   we experience accountability in our everyday lives.

4   And let me give you just an example before I get into

5   the specifics of this case.

6           Say you have a couple small kids, maybe your

7   children, maybe your little brothers, nieces and

8   nephews, a couple small kids.  One day you overhear

9   your children talking to each other.  You know they

10  just hate Johnny, you know both your kids just hate

11  Johnny who lives across the street.  You see them

12  whispering to each other and kind of overhear them

13  saying, let's get Johnny, you hear both kids say, he's

14  a rat, let's get Johnny.  Then you hear the other kid

15  say, I don't want to go alone, let's both go just in

16  case he comes out.  One says to the other, you can

17  watch my back, you can help me get away, or if Johnny

18  does come out, the two of us can take Johnny.  You, as

19  the adult, then see the two kids leave the house, you

20  go about your business.  A couple minutes later you

21  hear a window shattering.  You look out and see the

22  window of Johnny's house is broken, and you see your

23  two kids running away from where that window was

24  broken, from the direction of Johnny's house, and you

1    say to yourselves, oh, brother, they broke the

2    window.  And you confront them and you say, why did

3    you kids break the window.  And they say, we weren't

4    there.  And you say, no, I saw you, you both were

5    running from there.  And then they realize they were

6    caught, and one kid says, I didn't throw the rock, he

7    threw the rock, and the other one says, I didn't throw

8    the rock, he threw the rock.  What you say is, I know

9    you were both in on this, you're not fooling me, you

10   both go to your room.  Accountability, shared

11   responsibility.

12           What if the defendant wasn't the actual guy

13   that walked up that walkway into the crowd and pulled

14   that trigger?  What if it was Romero Sandoval that

15   walked up that walkway and pulled the trigger?  What

16   if it was George Gamboa that walked up that way?  What

17   if he didn't pull the trigger of the gun that killed

18   Jermaine Lambert and wounded Tara Harris and Alonzo

19   Matthews.  Could he still be guilty of first degree

20   murder and attempt murder?  Yes.  Yes, he could under

21   the law of the State of Illinois and the facts of this

22   case.

23           Accountability, shared responsibility,

24   aiding and abetting.  You're going to get a jury

1  instruction, the law of Illinois, the law you promised

2  you would follow, the law you took an oath to follow.

3  I'm going to read that jury instruction to you.  It

4  says -- and you'll want to read this over and over

5  again back in the deliberation room carefully.  I

6  quote, "A person is legally responsible for the

7  conduct of another person when either before or during

8  the commission of an offense and with the intent to

9  promote or facilitate the commission of an offense he

10  knowingly solicits, aids, abets, agrees to aid or

11  attempts to aid the other person in the planning or

12  commission of the offense.  The word conduct includes

13  any criminal act done in furtherance of a planned and

14  intended act." That's what is referred to on TV as

15  aiding and abetting.

16        Like I said, what if Romero Sandoval was the

17  guy that walked up that walkway and does the shooting

18  and Armando Amaya was the guy that William McCalister

19  saw walk down here?  It doesn't make any difference.

20  Under the law as set forth in this instruction and the

21  facts in this case he would still be guilty of first

22  degree murder and the other charges.  Clearly Armando

23  Amaya, Romero Sandoval and George Gamboa were acting

24  together in a common design back on October 29th,

1   1997, and thus, each is accountable for the acts of

2   the others, each one of them is the shooter, not

3   physically, but legally.

4          What are the facts?  How do we know they

5   were all in this together?  Well, we can infer it.  We

6   can infer it from the facts we have.  You say to

7   yourself, well, what do you mean infer it?  Well,

8   there's strong circumstantial evidence that they were

9   all acting together that way.  You said to yourself,

10  circumstantial evidence, that's a bad word, we're not

11  supposed to use that.  That's not true, circumstantial

12  evidence is not a bad word.  Circumstantial evidence

13  is something that you can rely on.  As a matter of

14  fact, you're going to get a jury instruction on

15  circumstantial evidence, and I'll read it to you now,

16  and I'll give you an example of circumstantial

17  evidence.

18          The jury instruction says, "Circumstantial

19  evidence is the proof of facts or circumstances which

20  give rise to reasonable inference of other facts which

21  tend to show the guilt or innocence of the defendant.

22  Circumstantial evidence should be considered by you

23  together with all other evidence in this case in

24  arriving at your verdicts."

1      So let's put this in English.

2  Circumstantial evidence is the proof of facts or

3  circumstances which give rise to reasonable inference

4  of other facts or circumstances.  And again, we

5  experience circumstantial evidence in our everyday

6  lives.  Let me give you an example.  There are two

7  kinds of evidence:  Direct evidence, you actually see

8  it happen, and circumstantial evidence, you infer that

9  it happened.  Let me give you an example of

10 circumstantial evidence and show how powerful it can

11 be.

12      You go to bed at night, it's 10:00 at night,

13 it's January, there's no snow on the ground at all,

14 none at all.  You go to bed, you sleep for eight

15 hours, you wake up at 6:00 in the morning, you look

16 out the window, the ground is covered with snow.  You

17 don't have any direct evidence that it snowed last

18 night because you didn't see it snow.  If somebody

19 says, how do you know it snowed; well, I have strong

20 circumstantial evidence that it snowed.  When I went

21 to bed, there was no snow on the ground; when I woke

22 up, the ground was covered with snow.  You don't have

23 any direct evidence, you have circumstantial evidence

24 that it snowed.

£000983

No, we don't have that white Chevy Celebrity bugged with microphones so we can hear Armando Amaya and George Gamboa and Romero Sandoval saying, you be the shooter, we'll help you get away, but we have strong circumstantial evidence that they were acting in concert.

Number one, their conduct before this crime shows that they were acting together. Shayla Johnson and Nicole Pearson tell us that they saw that man, the person they know as Scarecrow, riding around in a white Chevy Celebrity -- or white Chevy before this crime. They saw Scarecrow riding around in that car with other male Hispanics, and they were shouting things like King love and GDK -- K stands for killer.

Tracy Johnson corroborates that he told us he saw the defendant in a white Chevy before. The testimony was they're together and they're throwing down the folks call to battle. Call to battle. He sees him on the corner of Fourth and Galena, he sees them on West Park Street, they're riding together throwing down anti Gangster Disciple hand signs, shouting out anti Disciple slogans. Their conduct before that infers -- you can infer that from their conduct.

1      How about during?  We know all three of them

2   are out of the car at the time of the murder, and

3   they're in the area of the New York apartments.  Tracy

4   sees him running from the direction of the New York

5   apartments after hearing three gunshots.  They were

6   out of the car at the time, Tracy Johnson tells you

7   that, and William McCalister corroborates that.  He

8   puts a second male Hispanic with a dark hoodie and

9   thin goatee acting somewhat suspiciously walking up to

10  the scene, walking like this with a hoodie on, not

11  like this trying to see an argument, trying to conceal

12  his face.  He's standing there for five minutes not

13  advertising, look, I'm here everybody, there's about

14  to be a shooting, just want to let you know.

15      How about their conduct after the crime?

16  Tracy Johnson saw all three run to a get-away car

17  parked, not coincidentally, just outside Gangster

18  Disciple territory in front of Lincoln Laundromat.

19  They ran to a get-away car parked in front of Lincoln

20  Laundromat not coincidentally faced away.  You

21  certainly wouldn't face north and drive back by the

22  scene of the shooting where people are all in a

23  panic.  That white Chevy Celebrity, Tracy Johnson

24  tells us, was facing south in front of Lincoln

1   Laundromat.

2           How can we infer that they had a common

3   purpose? Again, common sense. You don't leave your

4   common sense in the parking lot when you come up here

5   and become jurors. How can we infer that they had a

6   common criminal purpose? Now, if they all three were

7   just going to buy a pizza together, they have a common

8   purpose, but there's nothing wrong with that. It has

9   to be a common criminal purpose.

10          Well, what's the evidence that when they all

11  got out of that car they had a common criminal

12  purpose? Number one, they're all Latin King gang

13  members. Number two, they're going into Gangster

14  Disciple territory on foot after yelling threatening

15  slogans about the GD's. You usually don't ride

16  around, threaten a gang and then walk off on foot into

17  the gang area to start greeting people.

18          You have to ask yourself why. Was it for a

19  legitimate purpose that they got out of that car and

20  went on foot to rival gang territory? Were they there

21  to buy a pizza? No. Were they there to see friends?

22  No. Were they there to get some walking exercise?

23  No. You can go on and on and on trying to think of

24  legitimate things that three rival gang members just

1   yelling rival gang slogans are going to do in rival
2   gang territory, and none of it fits.  At least one is
3   armed with a gun.  Would they bring a gun into rival
4   gang territory if all three didn't know that at least
5   one was armed with a gun?

6          Look at the illegal act that was performed.
7   It wasn't -- again the issue here is whether they knew
8   -- they were acting together and whether they went in
9   for a common criminal purpose.  Look at the act that
10  was performed here.  It wasn't a spur of the moment
11  act in self defense.  It was an aggressive act of
12  violence.  So we don't have three guys getting out of
13  a car, walking into rival gang territory trying to be
14  peaceful and all of a sudden they get threatened and
15  one of them has to shoot.  This was an aggressive act,
16  which shows it was a planned act, not a spur of the
17  moment act of defense.

18          What about aiding, abetting or attempting to
19  aid?  That's the other thing we have to show for
20  accountability.  There are two non-shooters here
21  obviously.  There's the shooter who walked up this
22  walkway, and then there are two non-shooters; one is
23  here and one is somewhere else.  What kind of things
24  do you do to aid and abet?  What does that mean?

1   Well, let me give you an example.

2          If you think that the other two non-

3   shooters were there to act as a look-out or if you

4   think that the other two were there to help out if

5   something went wrong or you think the other two were

6   there to help facilitate an escape or if you think the

7   other two were there to lend moral support and

8   encouragement, any of those, that's aiding and

9   abetting, then all three of them are the shooter, all

10  three of them are guilty of first degree murder in

11  these crimes.

12         Last thing.  Wait a minute, you say.  What

13  if the understanding when they got out of the car to

14  go into rival gang territory was not to commit a

15  murder, it was just maybe to shoot in the direction of

16  somebody and then the shooter got a little out of hand

17  and actually went up and started shooting people; how

18  can the other two be guilty for that if that wasn't

19  the plan?

20         The other two would be guilty for that even

21  if it wasn't the plan.  You go into rival gang

22  territory, if you have a common design to commit a

23  criminal act, then any conduct in furtherance of that

24  planned and intended act the others are responsible

C000988

1  for.  Read the instruction very closely, particularly
2  this last line, "The word conduct includes any
3  criminal act done in furtherance of a planned act."
4          Ladies and gentlemen, you'll get what are
5  called issues instructions.  They'll tell you what we
6  have to show to show be's guilty of first degree
7  murder.  There are two ways a person can be guilty of
8  first degree murder other than what I talked about.
9          If we show that the defendant, or one for
10  whose conduct he is legally responsible, performed the
11  acts which caused the death of Jermaine Lambert and we
12  show that when the defendant, or one for whose conduct
13  he is legally responsible, did so he intended to kill
14  or do great bodily harm to Jermaine Lambert, we show
15  those two things -- and you'll get this instruction --
16  he's guilty of first degree murder.
17          Or the other way we have to show that the
18  defendant, or one for whose conduct he is legally
19  responsible, performed the acts which caused the death
20  of Jermaine Lambert, and second, that when the
21  defendant, or one for whose conduct he is legally
22  responsible, did so, he knew his acts created strong
23  probability of death or great bodily harm to Jermaine
24  Lambert.  Obviously when you shoot somebody at close

1  range, any range, you know those acts constitute

2  strong probability of death or great bodily harm.

3  Ladies and gentlemen, when you go back to

4  the jury room and look at all the facts and all of the

5  law, the puzzle will be complete.  Under the facts of

6  this case and the law I'm respectfully asking you to

7  return findings of guilty.  Thank you.

8  THE COURT:  Thank you, Mr. Guagliardo.

9  Mr. Kliment, you may present your closing

10  argument.

11  MR. KLIMENT:  Thank you, Judge.

12  Good morning, ladies and gentlemen.  Give me

13  a second here we have our own expensive machine to

14  make our own visual aid, so I have to use one.  These

15  are basically the same only I can draw on it.

16  We have two cases, People versus Armando

17  Amaya, which you were told was going to be the trial,

18  and you have People versus Armando Amaya and George

19  Gamboa, which is the accountability stuff that you

20  heard about today for the first time.

21  Closing arguments are when we as the lawyers

22  get up here and tell you what we think the evidence

23  has shown.  I've sat at the table all week long --

24  this is only Thursday, we picked you guys and talked

```
 1   to you guys on Monday.  I sat at the table and
 2   listened to the evidence the State presented.  I heard
 3   the same things that you heard.  Ms. Parga, she heard
 4   the same things you heard.  If I misstate something
 5   that I thought I heard and I remember it wrong, I'm
 6   not doing it on purpose and I'm not trying to mislead
 7   you here today.  What I'm saying is not evidence.  We
 8   don't have to make closing arguments.  If I say
 9   something that's incorrect, I'm only mistaken.  I'm
10   not trying to mislead you.  When the 12 of you go back
11   and do your deliberation, it's what the 12 of you
12   think that counts.  If I say something that's wrong,
13   it doesn't count, but I'm not doing that on purpose,
14   and I don't want you to hold that against Mr. Amaya.
15            You have to determine the facts.  You as the
16   jury are the trier of fact in this case.  The Court
17   will give you the law, there's a package of
18   instructions, I think there's 40 of them.  Don't
19   worry, they're not all real long.  That's the law, but
20   you have to determine the facts.
21            How do you determine the facts?  He's got to
22   give you the facts.  The State's Attorney, their
23   office, has to give you the facts to make your
24   decision, because they have the burden of proof in the
```

1   case.  You can't make up the facts yourself, it has to

2   be what you heard from the witness stand, and you

3   don't have the facts you need to convict Armando Amaya

4   of first degree murder or attempt first degree murder

5   or aggravated battery with a firearm or aggravated

6   discharge of a firearm, because we don't have the

7   facts; they weren't given to you from the witness

8   stand.

9           The police officers don't really play

10  surprisingly that big a role in this case, so I'm not

11  going to go through all their testimony, but we'll

12  stay with Mr. Matthews, Ms. Tara Harris, Nicole

13  Pearson, Mr. McCalister and Tracy Johnson.

14          Let's talk about the first case, that

15  Armando Amaya there shot and killed Jermaine Lambert

16  and shot and wounded the other two.  What did Alonzo

17  Matthews say?  He said that had when he was shot --

18  I'm going to do it in red.  The only purpose to do it

19  in red is so it stands out.  He's down in this walkway

20  area, that's the door to 309, this area here is where

21  the argument is taking place.  That's what I gathered

22  from the testimony that we had heard.

23          Whoever did the shooting in this case came

24  from Lincoln.  Lincoln's over here on the far west of

1   this drawing, north being the top.  He comes down this

2   walkway, the shooter, and encounters Mr. Matthews

3   somewhere down in this walkway.  There's no evidence

4   to say for sure where that encounter took place.  In

5   the photographs that have been admitted into evidence

6   you'll see if you come down this walkway from the back

7   by the steps here, it's dark, and I think there's

8   stairs that actually come over it so you're almost in

9   a tunnel, but as you walk through, it becomes lighter,

10  and actually you can see that in the photographs.

11          Mr. Matthews says when he is shot, he's

12  three feet away from the person who shot him, and I

13  said, arm's length, and he said yes, arm's length.

14  Then he looks down, sees the gun and is shot in the

15  stomach.  Thank God he survived.

16          Let me talk a little bit about sympathy.

17  It's all right to have sympathy for Jermaine Lambert,

18  who was killed and Tara Harris, who has children, and

19  Alonzo Matthews who spent nine days in the hospital.

20  The thing is you can't allow sympathy to sway your

21  decision in this case.  You use your common sense and

22  experience, and that makes you feel sympathetic

23  towards them, but it also says sympathy can't rule the

24  day, evidence has to rule the day.  So while it's

C000923

normal for you to do that, please don't allow that to

be a basis for your decision. The State doesn't even

want that, I'm sure.

So I asked Mr. Matthews, how far away were

you, if you were close enough, was the persons's face

such that you could recognize it? Yes. Then I asked

the question: Do you see in the courtroom the person

who shot you? And his answer was, no, I don't

recognize anybody, or, it was too dark, I couldn't

see. His answer to my question was no, that's what he

said.

Mr. Guagliardo in his redirect examination

of Mr. Matthews tried to fix that, but the answer to

my question was no. He was close enough and certainly

had the opportunity to see him.

Tara Harris -- once again we don't know

where she was standing when she was shot, at least I

don't recall, on the walkway somewhere, and she's

shot, she goes into her apartment apparently.

Mr. Matthews I believe winds up in front of the

building on the street. So he walked around either to

the west or to the east of the building, we don't

know, but he's found in the front. Tara Harris was

actually found inside of an apartment, so we don't

C000994

know exactly where on that diagram she was shot.

Certainly she was shot. She said she saw the shooter, and she gave a description and she said he had on a white hood. She said on the witness stand she thought white or black, but the officer said she told her she thought it was white, which is different from what Mr. Matthews said in his description.

And I'm not up here trying to say that these people are at fault for not being able to do this. Mr. Matthews gave a straight answer. He said no. If anyone had a motive to make it up and lie, it would be him, but he said no. Ms. Harris doesn't remember anything after he was shot. And they are victims, they were shot; that can't be held against them, but you have to think about what they did say.

Let's go to Shayla Johnson now. How does she pick the name Scarecrow out of all the names in the world as being the person who did the shooting in the case? She knows he's in the area, she saw him in the car earlier, and she recognizes him. I don't recall which one said that, you'll have to do this for me, but either Shayla or Nicole said they were just in the car and they weren't doing any gang signs or anything, and I think it was Shayla that said they

1  were actually hanging out of the car flashing gang

2  signs, and Nicole Pearson said, no, they were just

3  sitting in the car.  A big difference, a difference in

4  their story.

5       We know, too, that Shayla Johnson and Nicole

6  Pearson are roommates.  We know that there are 15 to

7  20 people in this general area around where this

8  argument is taking place.  Some are on the walkway.

9  Apparently Nicole Pearson, who is involved in the

10  argument, is down on the walkway; others may have been

11  in back, down on the ground; others may have been in

12  the walkway, we don't know, but we know Nicole was

13  down on the walkway.  Mr. Guagliardo stated that he

14  believes she was down on the walkway.  It makes sense

15  that Shayla Johnson was with her.  They came from the

16  residence together, they were walking, they saw the

17  car with Scarecrow together, and they were standing

18  together down on this landing, this sunken sidewalk,

19  if you will.  You'll see from the pictures this

20  sidewalk is up above.  They're down on the sidewalk

21  where the shooter is walking, and they're surrounded

22  by people who are coming to watch this argument.

23       You saw Shayla Johnson, it's nothing to her,

24  she's a little tiny thing, but she can see over the

1  heads of all these people and sees this Scarecrow,

2  knows him to be a member of the Latin Kings, wearing

3  all black, walking towards a group in Gangster

4  Disciplehood.  What's he doing here?  He was flashing

5  gang signs before, he's here to cause trouble, she

6  doesn't say a word.  It's because she doesn't see him

7  that night there, not at the scene of the shooting.

8          Nicole Pearson.  You saw Nicole Pearson, she

9  came here dressed in gang colors, as I remember, black

10  pants and a blue shirt, which we know are the colors

11  of the Gangster Disciples, and she wants you to

12  believe she has no ties with the gangs.  She happens

13  to be Shayla's roommate, they happen to have waited

14  seven weeks before they talked to the police about

15  this offense, about seven weeks, they lived together

16  during that time, they were together during that time,

17  and Nicole says, of course, we never talked about it

18  until she told you from the witness stand, Shayla told

19  me it was Scarecrow.  Those are her words, as I

20  remember, Shayla told me it was Scarecrow who did

21  this.

22          She was in the midst of this argument.  I

23  asked her, I believe she said she's five-foot-five.

24  Once again, I'm remembering as best I can, I'm trying

C000907

1  not to use my notes.  She's in the midst of this fight

2  right here, but she can see over this crowd.  And she

3  doesn't give any warning, either.  Doesn't say a word,

4  claims to be able to see him in the dark from a

5  distance three, four times the distance that

6  Mr. Matthews saw this person from, she can identify

7  him from amidst this big crown of people.  And then,

8  of course, people scattered.

9           Of the 15 to 20 people who were back there

10  that day, back there at the time of the shooting --

11  because you have to believe that as people came,

12  people stayed and watched the argument, then when the

13  shooting took place, people scattered.  So at the time

14  of the shooting you have to believe -- you can infer

15  that the crowd was as big as it was going to be.  So

16  the 15 to 20 people who were there, depending on which

17  piece of testimony you want to rely upon, doesn't

18  really matter.

19           Isn't it a coincidence that the only two

20  people who identify Armando as the shooter in the case

21  are people who were staying together as late as

22  February 4th when the police pick them up from their

23  residence and take them to the jail to look at a

24  lineup?  Isn't that a coincidence that no one who was

C000908

1   there can make the identification, or does it show

2   they don't know who did it?  They know Armando was

3   there in the area, so he's an easy person to point

4   out.

5           I know you're thinking about, well, what

6   about Tracy Johnson, and I haven't forgotten about

7   him.  We'll get to that in a minute.  It's from this

8   you have to determine the truth.  The truth you have

9   to determine is is it more likely true than not true.

10  The proof here is beyond a reasonable doubt, and it's

11  on the State to prove to you beyond a reasonable doubt

12  what the truth is here, and they haven't done so, and

13  you can't do it from the evidence they've given you up

14  to this point with Nicole Pearson and Shayla Johnson.

15          Let's talk about Tracy Johnson for a

16  minute.  Interesting guy.  Tracy Johnson, he sees

17  things that no one else sees.  He sees things that

18  only Tracy Johnson saw that night.

19          You've all seen this before.  This is I

20  think People's exhibit 21 I think only bigger.  And

21  I've made some marks on here.  I've drawn a 309 here,

22  this is where I think the testimony showed that the

23  apartment was, I got the Lincoln Laundry over here on

24  South Lincoln between Downer and Galena, you've got

1   Randall Liquor over here between West Park and

2   Lincoln, and I think this is where they said Daninos

3   was bounded by East New York and Park.  That's how I

4   remember it.  You'll get the actual diagram back with

5   you.  If it's wrong, I'm sorry.

6           Tracy Johnson sees a group of guys riding

7   around in a car flashing gang signals.  He never says

8   Armando Amaya was one of the guys in the car.  He

9   never sat there and said, that's him.  He never made

10  what we call an in-court identification.  They're

11  riding around, and I don't know the blocks they're

12  riding around on, but the point is at some point Tracy

13  is walking around with a girl, he's been drinking, the

14  poor guy's a drug addict, he's been in rehab in the

15  Department of Corrections in 1991, which apparently

16  didn't work.

17          He's going to Randall Liquor.  He says he

18  sees three guys running, three guys, running from the

19  direction of 309 East New York and get into the car by

20  Lincoln Laundry, which is that way, I've indicated on

21  the diagram a red line.  He sees three guys.  No one

22  else, no one else sees any more than one guy, nobody

23  sees three guys -- we'll get to McCalister in a minute

24  we don't know for sure what he saw.  But now Tracy

1  Johnson is seeing things no one else sees. He does

2  know he saw three guys riding around in a Chevy

3  Celebrity flashing gang signs, and he does know an

4  hour-and-a-half later down here at Jackson and Downer

5  -- I don't know which intersection it is, I think

6  it's this one. He sees the car. He's coming down

7  this way, and he sees the car, and he says, those are

8  the guys I saw in that car, and he says those are the

9  guys I saw running.

10        This is an hour-and-a-half later. He knows

11  his cousin has been killed, and he saw this car in the

12  area. Mr. Guagliardo wants you to believe that's just

13  too big a coincidence, but not really. He sees some

14  of the stuff those girls see, he sees them riding

15  around in a car. He's never talked to Shayla Johnson

16  or Nicole Pearson, but it fits pretty much with what

17  the girls saw except this running to the car stuff,

18  which you look at the photographs and I argue would be

19  impossible for him to see this. There's businesses

20  all along here, he doesn't have from the street a

21  clear, unblocked view of where those people are

22  going. Once again, you look at the pictures, and you

23  decide. He sees something that no one else sees, and

24  that makes it easy for him to leap to the conclusion

1    that he drew down here when he talked to the police.

2    And that's what the State wants you to do.

3         Let's talk a little bit about William

4    McCalister.  Counsel talked a little bit about what

5    Mr. McCalister said he saw, and I left a few things

6    out I think.  Probably not intentionally, but he did.

7         I remember McCalister saying he's back in

8    this area over here by the dumpster.  That's what I

9    remember him saying.  And he says he saw a guy coming

10   from across New York Street.  So up in this area you

11   see coming from across New York Street, not from

12   around the building where a car parked on south

13   Lincoln would be, but from up here, across New York

14   Street, crosses New York, comes down and stands over

15   here, stands for I think five to eight minutes with

16   his hands in his pockets standing down, or maybe he

17   said he had a sweatshirt on with his hands in front

18   like that.

19        Either way, he's standing there --

20   apparently he's not involved in the gangs, but he

21   knows he lives in a Gangster Disciple neighborhood.

22   He sees this Hispanic male standing there acting

23   suspiciously for five to ten minutes and doesn't say

24   anything.  That certainly could be true.  What else

1    does he say?  What else does he say?  He's looking at

2    the fight, he's looking at the argument down there.

3    So he's standing there and he's looking and he's

4    looking down that walkway, because he's focused on

5    this, but your vision allows you to see a little bit

6    in front of you.  He notices this guy, he doesn't do

7    anything.

8              The next thing he knows he hears several

9    gunshots that are loud, very loud.  Where does he say

10   they're coming from?  They're coming from my right,

11   which is where this guy is.  They're not coming from

12   in front of me, they're not coming from off to my left

13   where the field is; they're coming from my right where

14   this male Hispanic is.  That's what he told you.  He

15   wasn't hesitant.  That's what he remembers.  Something

16   else that he -- and I asked him this, I think:  Did

17   you see any muzzle flashes or anything coming from in

18   front of you?  Now remember, we're talking about

19   supposedly some huge gun in the dark.  Did you see any

20   muzzle shots?  No, I did not; I heard the noise, I

21   turned and ran.  He didn't see what this guy did, he

22   didn't see what happened down here.  He turned and

23   ran, which certainly is a sensible thing to do.

24             So if this guy is not the look-out, which is

1  the explanation that Mr. Guagliardo would have you

2  believe, how do you explain Mr. McCalister's

3  testimony.  It could be that he's mistaken as to where

4  people were, because there's no other evidence to show

5  that this man was here, and Tara Harris came out of an

6  apartment, and I think she testified as to which ones

7  were hers, it might have been 309, she came out of

8  that apartment and went to that dumpster.  She didn't

9  say anything about a male Hispanic being there, but

10  she went to the same spot.

11          What about the theory of accountability,

12  this bit about accountability that Mr. Guagliardo told

13  you about today for the first time?  What does that

14  tell you about what I'm saying?  It tells you that I'm

15  right.  And I don't say that very often.  It tells you

16  that these girls, their testimony is so unreliable

17  that, gee, I better give you something else to hang my

18  hat on if I want to convict Armando Amaya of a crime.

19  Let's say you don't believe these girls, you don't

20  believe this identification.  Well, then it must be

21  one of the other guys, so you convict Armando Amaya

22  because of this accountability stuff.  It tells you

23  that the State doesn't believe in the strength of

24  their own case, they toss up this alternative theory

C001004

1  for you.

2      Even the theory of accountability doesn't

3  fit the facts that you have. Other than Tracy Johnson

4  nobody sees more than one person on the premises.

5  Yes, they're riding together beforehand, and yes, an

6  hour and a half later after they commit this murder,

7  this loud, three-victim shooting that took place, an

8  hour-and-a-half later are they hold up somewhere safe

9  in Latin King territory? No, they're in the same car,

10  the same clothes, still riding around a couple blocks

11  from where this happened, that's where these murderers

12  are. Not to say murderers don't have to be geniuses,

13  but that doesn't make sense, five blocks away, still

14  in the same car, still in the same clothes.

15      You see these pictures with these guys with

16  goatees, Gamboa has a goatee, Armando has a goatee

17  today still. The moon standing over by the dumpster

18  has a goatee and dark clothing. The State would have

19  you believe that that could be Mr. Gamboa because he

20  was wearing dark clothing. He wasn't wearing dark

21  clothing. He was wearing a Green Bay Packer coat.

22  Nobody would say that a Green Bay Packer coat is dark

23  clothing, they would say it's a Green Bay Packer

24  coat. Ever one of you who has seen one of those would

1  know that's what it is.  If the shooter walking down

2  the sidewalk had on a Packer coat, that's what you

3  would heard; he had on a Packer coat, not that he had

4  dark clothing.  It's not described as dark clothing,

5  it's described as what it is, a Packer coat.

6        So that doesn't make any sense.  This theory

7  of accountability does not fit the facts.  Were these

8  guys in the wrong place at the wrong time like I said

9  in my statement?  Yeah, they were, they were riding

10 around, maybe they were causing trouble flashing gang

11 signs, maybe they were looking for trouble, but

12 there's no evidence that any one of them killed

13 Jermaine Lambert, shot Tara Harris or Alonzo

14 Matthews.

15        The jobs of the police and the prosecutors

16 are to convict people of crime when they get in a

17 courtroom, their job is to win when you're in the

18 courtroom.  Your job is to seek the truth and to make

19 sure that justice is done in this case.  You are not

20 the investigators in this case.  You can't go back out

21 and reinterview witnesses.  You have to work with what

22 you have from here, and there's not enough to convict

23 Armando Amaya of any of those offenses.  It is a

24 who-done-it.  If you believe those twos girls and you

1   believe Armando Amaya was walking down the sidewalk

2   with a big gun in his hands and shot these people, it

3   always falls into place, but the evidence doesn't

4   support that certainly not beyond a reasonable doubt

5   but not in any capacity.

6        Now, I'm about done.  The State has the

7   burden of proof in the case, so they get to do what's

8   called a rebuttal argument.  I'm going to sit down in

9   a minute and you won't hear from me anymore.  I don't

10  get to respond to what he's about to tell you and what

11  I'd like to say is it's about a bunch whooey and don't

12  believe it.  When you go back in your deliberation and

13  do my rebuttal argument for me; the prosecutor said

14  this, this and this, what is the response.

15       The facts are as you heard.  The State has

16  not provided enough evidence to convict Mr. Armando

17  Amaya of the charges.  After you read the jury

18  instructions which I have not highlighted, but you

19  have to read them -- but after you do all that, come

20  back out here and let us read your verdicts of not

21  guilty in this case.  Thank you.

22       THE COURT:  Thank you, Mr. Kliment.  Ladies

23  and gentlemen of the jury, I notice you've listened

24  patiently to the arguments for almost an

1   hour-and-a-half, so before the prosecution addresses

2   you in a rebuttal argument I think it would be

3   appropriate for you to refresh yourselves.  When we

4   reconvene, Mr. Guagliardo will address you again.

5       Please do not discuss the case, do not allow

6   anyone to discuss it in your presence or discuss it

7   amongst yourselves, and did not form or express any

8   opinions about the case until you have finally

9   received it for your deliberations on your verdicts.

10      With those thoughts in mind, we'll take a

11  brief about ten-minute recess, thank you.

12                          (Recess taken.)

13      THE COURT:  Back on the record, People

14  versus Amaya, the jury has returned, all counsel are

15  present, the defendant is present.  At this time,

16  Mr. Guagliardo, you may present your final rebuttal

17  summation.

18      MR. GUAGLIARDO:  Thank you, your Honor.

19      Ladies and gentlemen, let me start by

20  talking about what Mr. Kliment and I are in agreement

21  about, and that's that sympathy can't rule the day.

22  Facts and evidence rule the day.  I'm not up here

23  saying there's a dead man and two shot.  No, you have

24  to hear the facts from the stand, read those

 1   instructions carefully, and that's what you base your

 2   decision on.

 3          Let me now address what Mr. Kliment and I

 4   disagree with.  He says the State's Attorney's job is

 5   to get up there and win.  That is not the State's

 6   Attorney's job.  The State's Attorney's job is to

 7   present evidence to you and try to do justice.  It's

 8   not just to win; it's to convict the right person.

 9          Mr. Kliment makes a lot of the fact that

10   Alonzo Matthews was never shown photographs or did a

11   live line-up in this case.

12          MR. KLIMENT:  I object.  That was not in

13   evidence, nor was it argued.

14          THE COURT:  Overruled.  It's argument.

15          MR. GUAGLIARDO:  Tyree Matthews said that, I

16   saw his face for about two seconds.  I'm not going to

17   start showing Tyree Matthews photographs and line-ups

18   for having seen someone's face for two seconds.  If

19   your job was just to win and get somebody convicted,

20   you would go around showing Tyree Matthews and saying,

21   I saw somebody for two seconds while gunshots were

22   going off, that's just a win, get somebody charged.

23   That is not the objective.

24          Now, Mr. Kliment did say that it's

C001009

1  suspicious that Tyree Matthews and Tara Harris can't

2  ID these people but Shayla Johnson and Nicole Pearson

3  can.   Well, it shouldn't be suspicious.   There's a big

4  difference between Tara Harris and Tyree Matthews on

5  one hand and Shayla Johnson and Nicole Pearson on the

6  other hand.   You're going to get a jury instruction

7  which talks about identification.   And it says, When

8  you weigh the identification testimony of a witness,

9  you should consider all of the facts and circumstances

10  in evidence, including, but not limited to the

11  following:

12         The opportunity the witness had to view the

13  offender at the time of the offense.   Both Tara Harris

14  and Tyree Matthews said, I didn't get a good enough

15  look at his face, good enough to say male Hispanic in

16  his teens.   Both Tara Harris and Tyree Matthews

17  testified that they didn't start looking at a face

18  until almost simultaneously during the gunshots.

19         The level of certainty shown by the witness

20  when confronting the defendant, the length of time

21  between the offense and the identification

22  confrontation, those are the facts listed, but it says

23  you should consider all of the facts and circumstances

24  in evidence.

1      And one fact and circumstance in evidence

2  that you should consider is that Shayla Johnson and

3  Nicole Pearson, particularly Shayla Johnson, had

4  numerous times before that shooting that night seeing

5  Scarecrow.  And it's a whole different story when you

6  have to identify someone you're seeing for the first

7  time or when you have to identify someone or if you're

8  trying identify someone who you know.  It's a whole

9  different story.  Shayla Johnson knew him.

10      Circumstances, also.  Shayla Johnson was at

11  a different angle than Tara Harris or Alonzo

12  Matthews.  They testified that, we turned and looked

13  at his face, it was close but very quickly.  Shayla

14  Johnson testifies that, I'm standing there and I see

15  him walk up and I see his face and I recognize him as

16  Scarecrow before he even starts shooting.  Then the

17  shooting starts, and I freeze and I focus on the gun.

18  There's different angles.  Shayla Johnson knows

19  Scarecrow.  Tara Harris and Alonzo Matthews do not.

20      So the defense is basically saying, look, if

21  Harris and Matthews couldn't identify him, it's too

22  dark for Shayla Johnson to identify him.  That's not

23  true, they're different people with different

24  experiences, prior contacts with him, different

C001011

1  angles.

2  Let me address the lighting. Never said,

3  never trying to say that it's Yankee stadium back

4  there illuminated like a football field. But listen

5  to some of details you did hear from some of the

6  witnesses, and that tells you about the lighting.

7  It's good enough for everyone to say the shooter was a

8  male Hispanic, in his teens, he had a revolver, Alonzo

9  Matthews said the gun had a wheel on it, and that's a

10  revolver, and Shayla Johnson said it was a revolver.

11  They all put the shooter between five and six feet and

12  basically of a medium build. So the light is good

13  enough to make out race, sex, the general build of a

14  person, and to see the wheel of a gun.

15  Shayla Johnson again here is another area I

16  agree with Mr. Kliment. Your memory counts, not my

17  memory, not his memory. If Mr. Kliment or I were to

18  say something up here that conflicts with your memory

19  as jurors, your memory counts, not ours. Neither of

20  us would do that purposefully. But think about the

21  testimony of Shayla Johnson. Did she ever say there

22  were tall people in front of her that she had to look

23  over? I don't recall. I don't recall her ever

24  saying, there was tall people in front of me I had to

C001012

1    look over.  There was a total of 15, 20 people out
2    there that night watching the argument.  When we say
3    out there, we mean outside in the area of the
4    argument.  You're going to get People's exhibit three
5    for identification, People's exhibit four for
6    identification which shows you that walkway back
7    there.  The testimony was not that there were 20
8    people crammed into that walkway.  The testimony is
9    that there were 20 people out there.  William
10   McCalister wasn't crammed into that walkway, the
11   Hispanic male by William McCalister wasn't crammed
12   into that walkway, and a lot of the testimony was that
13   of the 20 or so people out there that night some were
14   on the upstairs balconies on the second and third
15   floor.  So the evidence has not been that there are 20
16   people crammed in that walkway and short little Shayla
17   Johnson is looking over 19 people to see Scarecrow.  I
18   believe either Shayla Johnson or Nicole Pearson or
19   Tara Harris and Alonzo Matthews put the walkway more
20   in the range of four, five, six or seven.
21          Alonzo Matthews took that witness stand.
22   This trial is not a game of semantics and word games;
23   it's a game of truth.  Whatever was asked, what did he
24   answer, what did I ask of him, what did he answer?  He

1   was asked, do you see in the courtroom the person who

2   shot you.  He said no.  Now, he was asked that

3   question after he had said before, I didn't get a good

4   look at his face.  I asked the question in redirect

5   examination, did you get a good enough look at the

6   shooter to be able to identify him, and he said no.

7   In other words, I didn't -- if that was the shooter, I

8   didn't get a good enough look to identify him.  So

9   he's not saying, yeah, I did get a good enough look at

10  the shooter, I could identify him but that's not him.

11  Again, a trial is not a game of semantics and word

12  games, it's a game of truth.

13          William McCalister yesterday did not say he

14  heard shots coming from his right from this other

15  subject.  He said that he heard shots coming from down

16  there.  He said, yeah, that night I talked to the

17  police.  He said, yeah, I thought the shots were

18  coming from here, but now that I think about them,

19  they were coming from here.  We know from physical

20  evidence the shots were not coming from here, it was

21  coming from there.  Jermaine Lambert and Tara Harris

22  were all three down in this area.  Tyree Matthews,

23  Alonzo Harris basically said he saw the shooter when

24  he was shooting him right close to him, then he saw

him shoot Tara Harris, then he saw Jermaine shot, and

of course Jermaine was shot at point blank.  So the

evidence tells us that the shooting happened down

here.  The bullet did not come around the corner like

so.  This was not the shooter.

Mr. Kliment says that Tracy Johnson sees

things that other people don't see.  Well, first of

all, ladies and gentlemen, there's one thing that you

should know from this trial, be getting a strong sense

from the witnesses and just seeing and hearing what

you've seen and heard.  People aren't running to the

police to say what they saw in this case.  People

aren't anxiously going and saying, let me tell you

what I saw, I got the whole thing solved, I can give

you a description of them, I can pick them from a

lineup.  People were there, more or less saw stuff and

stumbled into it, and they don't stumble into having

contact with the police later and stumbling into it.

Tracy Johnson is a perfect example of that.

Well, Tracy Johnson had friends with him when he saw

what he saw, but you heard him yesterday, he didn't

want to give up those friends.  In other words, he

doesn't want to get them involved.  Maybe Tracy

Johnson himself didn't want to get involved.  Remember

1  at 10:30 at night Tracy Johnson had never by that time

2  gone to the police and said he saw three people

3  stumbling from the scene -- excuse me, running from

4  the scene.  He stumbled into his situation just like

5  Shayla Johnson and Nicole Pearson stumbled into their

6  situation.

7          Tracy Johnson was going about his business

8  at 10:30, an hour and a half after he saw three people

9  flee from the scene, and something spontaneous

10  happened which got him into this case.  He was walking

11  his bike by Jackson and Downer, and low and behold, he

12  sees the three guys that he saw running from that

13  scene and the car he had seen them in before, -- the

14  three people that were in that car before and the car

15  they ran to.  He sees them stopped by the police, and

16  spontaneously he yells to the police, and that's how

17  he gets involved.

18          Nicole Pearson, Shayla Johnson, same thing.

19  Same thing.  There's not a conspiracy going on here.

20  They also, much like Tracy Johnson, saw some important

21  information that night but didn't exactly go running

22  to the police with it.  Two months or so later they

23  went to the police with a complaint of their own, the

24  police heard that Nicole Pearson's nickname was Coco,

1   and they say, wait a minute, were you the Coco that

2   people are saying was present at the shooting?  Yeah.

3   And that's how they got involved.

4           You heard Mr. Kliment say that Tracy Johnson

5   couldn't have seen these guys run to the Lincoln

6   Laundromat.  I want you to look at these photos,

7   People's 42, People's 40, People's 41, People's 43.

8   I want you to look at that intersection of Galena and

9   Lincoln.  I want you to look at Lincoln Laundromat,

10  and I want you to see how wide open that space is.

11  This is a large intersection, this isn't a little

12  uncontrolled intersection in a residential

13  neighborhood with no stop signs, that is a large

14  intersection with streetlights and with stoplights.

15  And Tracy Johnson's testimony was that when I saw them

16  running -- remember, here is the Lincoln apartments,

17  Tracy Johnson is in this area of Randall liquors, when

18  I saw them running -- and Mr. Kliment asked him this

19  on cross examination.  When I saw them running down

20  here this way, I was moving towards Lincoln Street.

21  Tracy Johnson isn't just standing like this looking at

22  things.  He's moving towards Lincoln Street when he

23  sees these three guys running right in front of him

24  when he's walking towards Lincoln Street, and he keeps

1  walking towards Lincoln Street, and now he sees the

2  car that he saw earlier that evening.   Not true that

3  Tracy Johnson couldn't have seen them run towards

4  Lincoln Laundromat.   This was not some delusion that

5  he had that evening.

6      Ladies and gentlemen, a couple more points.

7  Also the defendant says you can't make up facts, and

8  Mr. Kliment is absolutely right, you cannot make up

9  facts.   There's a big difference between making up

10  facts and inferring facts from facts you've actually

11  heard.   You can't infer facts from made-up facts, but

12  you can infer facts from facts presented by

13  witnesses.   That's circumstantial evidence.

14      Now, Mr. Kliment says for the first time now

15  you're hearing accountability and that the State's

16  theory has changed or whatever.   The State's theory

17  has not changed.   The State's theory, so to speak, is

18  that Armando Amaya is guilty of fist degree murder.

19  There is strong evidence that he is the person who

20  actually pulled the trigger.   We have two ID witnesses

21  that put him back there as the shooter there, and

22  there is also strong evidence that the other two

23  people that are working with Armando Amaya, the

24  defendant, who walks up that walkway are working with

1  him, and those other two are also the shooter.

2       If you do not believe it has been proven

3  beyond a reasonable doubt, and I suggest it has been,

4  that that was Armando Amaya that walked up that

5  walkway but you think it was Romero Sandoval or George

6  Gamboa that walked up that walkway and actually pulled

7  that trigger -- and our position it is Armando Amaya,

8  we have a strong identification from Shayla Johnson

9  which is corroborated, but if you don't believe that's

10  been proven beyond a reasonable doubt, and there's

11  more than enough evidence for you to believe that's

12  been proven beyond a reasonable doubt, and you believe

13  it was George Gamboa or Romero Sandoval that pulled

14  that trigger and you believe those three were acting

15  in concert, then they're all the shooter, legally

16  they're all the shooter, not physically obviously, but

17  legally.

18       Mr. Kliment said that Mr. Guagliardo says

19  that the guy standing by William McCalister is a

20  look-out.  I'm not saying he's a look-out.  He might

21  be a look-out; he might be there to help the shooter

22  get away; he might be there to help lend moral support

23  for the shooter; he might be there to move in if

24  something goes wrong.  If it was any one of those,

1  he's aiding and abetting the shooter.  You don't have

2  to decide.  I can't decide if he's a look-out, I can't

3  decide whether he's helping to get away, just to lend

4  moral support, it could be all of them, but if it's

5  any of them, he is aiding and betting the shooter, and

6  he is also the shooter even if he didn't have his gun

7  in his hand to pull the trigger.

8          The State's theory is that Armando Amaya is

9  guilty of first degree murder.  Based on the facts,

10  based on the law that you will get I respectfully ask

11  you to find this defendant guilty of all counts.

12  Thank you.

13          THE COURT:  Thank you, Mr. Guagliardo.

14          Mr. Guagliardo and Mr. Walsh, would you

15  please remove the diagrams from the easel?

16          MR. GUAGLIARDO:  Yes, Judge.

17          THE COURT:  Thank you.

18          Members of the jury, the evidence and the

19  arguments in this case have been completed, and I will

20  now instruct you as to the law.

21          What I'm going to do at this time is read

22  the instructions to you, and then you will be provided

23  with a copy to refer to during your deliberations.

24          The law that applies to this case is stated

1   in these instructions, and it is your duty to follow

2   all of them. You must not single out certain

3   instructions and disregard others. When I use the

4   words "he" in these instructions, I mean a male or a

5   female.

6         It is your duty to determine the facts and

7   to determine them only from the evidence in this

8   case. You are to apply the law to the facts and in

9   this way decide the case.

10         Neither sympathy nor prejudice should

11   influence you. You should not be influenced by any

12   person's race, color, religion, or national ancestry.

13         From time to time it has been the duty of

14   the court to rule on the admissability of evidence.

15   You should not concern yourselves with the reasons for

16   these rulings. You should disregard questions and

17   exhibits which were withdrawn or to which objections

18   were sustained.

19         Any evidence that was received for a limited

20   purpose should not be considered by you for any other

21   purpose.

22         You should disregard testimony and exhibits

23   which the court has refused or stricken.

24         The evidence which you should consider

1  consists only of the testimony of the witnesses and
2  the exhibits which the court has received.

3       You should consider all the evidence in the
4  light of your own observations and experience in
5  life.

6       Neither by these instructions, nor by any
7  ruling or remark which I may have made do I mean to
8  indicate any opinion as to the facts or as to what
9  your verdicts should be.

10       Faithful performance by you of your duties
11  as jurors is vital to the administration of justice.

12       Only you are the judges of the believability
13  of the witnesses and of the weight to be given to the
14  testimony of each of them.  In considering the
15  testimony of any witness, you may take into account
16  his ability and opportunity to observe, his memory,
17  his manner while testifying, any interest, bias or
18  prejudice he may have, and the reasonableness of his
19  testimony considered in the light of all the evidence
20  in the case.  Testimony that a witness is a drug
21  addict is to be considered by you only insofar as it
22  may affect the credibility of a witnesses.

23       Opening statements are made by the attorneys
24  to acquaint you with the facts they expect to prove.

1  Closing arguments are made by the attorneys to discuss

2  the facts and circumstances in the case and should be

3  confined to the evidence and to reasonable inferences

4  to be drawn from the evidence.   Neither opening

5  statements nor closing arguments are evidence, and any

6  statement or argument made by the attorneys which is

7  not based on the evidence should be disregarded.

8         Those of you who took notes during trial may

9  use your notes to refresh your memory during jury

10 deliberations.

11        Each juror should rely on his or her

12 recollection of the evidence.   Just because a juror

13 has taken notes does not necessarily mean that his or

14 her recollection of the evidence is any better or more

15 accurate than the recollection of a juror who did not

16 take notes.

17        When you are discharged from further service

18 in this case, your notes will be collected by the

19 deputy and destroyed.   Throughout that process your

20 notes will remain confidential and no one will be

21 allowed to see them.

22        The defendant is charged with the offenses

23 of first degree murder, attempted first degree murder,

24 aggravated battery with a firearm, and aggravated

1   discharge of a firearm.  The defendant has plead not

2   guilty.

3           The indictment in this case is the formal

4   method of accusing the defendant of an offense and

5   placing him on trial.  It is not any evidence against

6   the defendant and does not create any inference of

7   guilt.

8           The defendant is presumed to be innocent of

9   the charges against him.  This presumption remains

10  with him throughout every stage of the trial and

11  during your deliberations on the verdicts and is not

12  overcome unless from all the evidence in this case you

13  are convinced beyond a reasonable doubt that he is

14  guilty.

15          The State has the burden of proving the

16  guilt of the defendant beyond a reasonable doubt, and

17  this burden remains on the State throughout the case.

18  The defendant is not required to prove his innocence.

19          The fact that the defendant did not testify

20  must not be considered by you in any way in arriving

21  at your verdicts.

22          Circumstantial evidence is the proof of

23  facts or circumstances which give rise to a reasonable

24  inference of other facts which tend to show the guilt

1  or innocence of the defendant.   Circumstantial

2  evidence should be considered by you together with all

3  the other evidence in the case in arriving at your

4  verdicts.

5      The believability of a witness may be

6  challenged by evidence that on some former other

7  occasion he made a statement that was not consistent

8  with his testimony in this case.   Evidence of this

9  kind ordinarily may be considered by you only for the

10  purpose of considering the weight to be given the

11  testimony you heard from the witness in this

12  courtroom.

13      It is for you to determine what weight

14  should be given to that statement.   In determining the

15  weight to be given to an earlier statement, you should

16  consider all of the circumstances under which it was

17  made.

18      Evidence that a witness has been convicted

19  of an offense may be considered by you only as it may

20  affect the believability of the witness.

21      When you weigh the identification testimony

22  a witness, you should consider all the facts and

23  circumstances in evidence, including, but not limited

24  to, the following:

1    The opportunity the witness had to view the

2    offender at the time of the offense.

3    The witness' degree of attention at the time

4    of the offense.

5    The witness' earlier description of the

6    offender.

7    The level of certainty shown by the witness

8    when confronting the defendant.

9    The length of time between the offense and

10   the identification confrontation.

11   A person is legally responsible for the

12   conduct of another person when, wither before or

13   during the commission of an offense, and with the

14   intent to promote or facilitate the commission of an

15   offense, he knowingly solicits, aids, abets, agrees to

16   aid, or attempts to aid the other person in the

17   planning or commission of an offense.

18   The word "conduct" includes any criminal act

19   done in furtherance of the planned and intended act.

20   A person commits the offense of attempt

21   first degree murder when he, without lawful

22   justification and with the intent to kill an

23   individual, does any act which constitutes a

24   substantial step toward the killing of an individual.

C001035

1   The killing attempted need not have been

2   accomplished.

3   To sustain the charge of attempt first

4   degree murder, the State must prove the following

5   propositions:

6   First proposition:  That the defendant, or

7   one for whose conduct he is legally responsible,

8   performed an act which constituted a substantial step

9   toward the killing of an individual; and.

10   Second proposition:  That the defendant, or

11   one for whose conduct he is legally responsible, did

12   so with the intent to kill an individual.

13   If you find from your consideration of all

14   the evidence that each one of these propositions has

15   been proved beyond a reasonable doubt, you should find

16   the defendant guilty.

17   If you find from your consideration of all

18   the evidence that any one of these propositions has

19   not been proved beyond a reasonable doubt, you should

20   find the defendant not guilty.

21   A person commits the offense of first degree

22   murder when he kills an individual without lawful

23   justification if, in performing the acts which cause

24   the death, he intends to kill or do great bodily harm

1    to that individual.

2        To sustain the charge of first degree murder

3    the State must prove the following propositions:

4        First proposition:  That the defendant, or

5    one for whose conduct he is legally responsible,

6    performed the acts which caused the death of Jermaine

7    Lambert; and.

8        Second proposition:  That when the

9    defendant, or one for whose conduct he is legally

10   responsible, did so he intended to kill or do great

11   bodily harm to Jermaine Lambert.

12       If you find from your consideration of all

13   of the evidence that each one of these propositions

14   has been proved beyond a reasonable doubt, you should

15   find the defendant guilty.

16       If you find from your consideration of all

17   of the evidence that any one of these propositions has

18   not been proved beyond a reasonable doubt, you should

19   find the defendant not guilty.

20       A person commits the offense of first degree

21   murder when he kills an individual without lawful

22   justification if, in performing the acts which cause

23   the death, he knows that such acts create a strong

24   probability of death or great bodily harm to that

1   individual.

2          To sustain the charge of first degree murder

3   the State must prove the following propositions:

4          First proposition:  That the defendant, or

5   one for whose conduct he is legally responsible,

6   performed the acts which caused the death of Jermaine

7   Lambert; and.

8          Second proposition:  That when the

9   defendant, or one for whose conduct he is legally

10  responsible, did so, he knew that his acts created a

11  strong probability of death or great bodily harm to

12  Jermaine Lambert.

13         If you find from your consideration of all

14  of the evidence that each one of these propositions

15  has been proved beyond a reasonable doubt, you should

16  find the defendant guilty.

17         If you find from your consideration of all

18  of the evidence that any one of these propositions has

19  not been proved beyond a reasonable doubt, you should

20  find the defendant not guilty.

21         A person commits the offense of aggravated

22  battery with a firearm when he, by means of discharge

23  of a firearm, knowingly causes injury to another

24  person.

1    To sustain the charge of aggravated battery

2  with a firearm, the State must prove the following

3  propositions:

4    First proposition:  That the defendant, or

5  one for whose conduct he is legally responsible,

6  knowingly caused any injury to another; and.

7    Second proposition:  That the defendant, or

8  one for whose conduct he is legally responsible, did

9  so by discharging a firearm.

10    If you find from your consideration of all

11  of the evidence that each one of these propositions

12  has been proved beyond a reasonable doubt, you should

13  find the defendant guilty.

14    If you find from your consideration of all

15  of the evidence that any one of these propositions has

16  not been proved beyond a reasonable doubt, you should

17  find the defendant not guilty.

18    A person commits the offense of aggravated

19  discharge of a firearm when he knowingly discharges a

20  firearm in the direction of another person.

21    To sustain the charge of aggravated

22  discharges of a firearm the State must prove the

23  following propositions:

24    First proposition:  That the defendant, or

1  one for whose conduct he is legally responsible,

2  knowingly discharged a firearm; and.

3  Second proposition:  That the defendant, or

4  one for whose conduct else legally responsible,

5  discharged the firearm in the direction of another

6  person.

7  If you find from your consideration of all

8  the evidence that each one of these propositions has

9  been proved beyond a reasonable doubt, you should find

10  defendant guilty.

11  If you find from your consideration of all

12  of the evidence that any one of these propositions has

13  not been proved beyond a reasonable doubt, you should

14  find the defendant not guilty.

15  Now, ladies and gentlemen, when you retire

16  to the jury room, you will first elect one of your

17  members as your foreperson.  He or she will preside

18  during your deliberations on your verdicts.

19  Your agreement on a verdict must be

20  unanimous.  Your verdicts must be in writing and

21  signed by all of you including your foreperson.

22  The defendant is charged in different ways

23  with the offense of first degree murder.  You will

24  receive two forms of verdict pertaining to each

1  particular way that the offense of first degree murder

2  is charged.  As to each particular way the offense of

3  first degree murder is charged you will be provided

4  with both a "not guilty" and "guilty" form of

5  verdict.  From these twos verdict forms as to each

6  particular way this the offense of first degree murder

7  is charged you should select the one verdict form that

8  reflects your verdict and sign it as I have stated.

9  Do not write on the other verdict form.  Sign only one

10  verdict form as to each particular way that the

11  offense of first degree murder is charged.

12         The defendant is charged with the offenses

13  of attempted first degree murder, two counts,

14  aggravated battery with a firearm, two counts, and

15  aggravated discharge of a firearm.  You will be

16  receiving ten forms of verdict.  As to each charge you

17  will be provided with both a "not guilty" and "guilty"

18  form of verdict.  From these two verdict forms with

19  respect to a particular charge you should select the

20  one verdict form that reflects your verdict on that

21  charge and sign it as I have stated.  Do not write on

22  the other verdict form on that charge.  Sign only one

23  verdict form on that charge.

24         And, for the record, I will read you the

1 verdict forms here.

2          We, the jury, find the defendant, Armando

3 Amaya, not guilty of first degree murder (intent to

4 kill).

5          We, the jury, find the defendant, Armando

6 Amaya, guilty of first degree murder (intent to

7 kill).

8          We, the jury, find the defendant, Armando

9 Amaya, guilty of first degree murder (creating a

10 strong probability of death or great bodily harm).

11          We, the jury, find the defendant, Armando

12 Amaya, not guilty of first degree murder (creating

13 strong probability of death or great bodily harm).

14          We, the jury, find the defendant, Armando

15 Amaya, not guilty of attempted first degree murder as

16 to Alonzo Matthews.

17          We, the jury, find the defendant, Armando

18 Amaya, guilty of attempted first degree murder as to

19 Alonzo Matthews.

20          We, the jury, find the defendant, Armando

21 Amaya, guilty of attempt the first degree murder as to

22 Tara Harris.

23          We, the jury, find the defendant, Armando

24 Amaya, not guilty of attempted fist degree murder as

C001083

1   to Tara Harris.

2          We, the jury, find the defendant, Armando

3   Amaya, not guilty of aggravated battery with a firearm

4   as to Alonzo Matthews.

5          We, the jury, find the defendant, Armando

6   Amaya, guilty of aggravated battery with a firearm as

7   to Alonzo Matthews.

8          We, the jury, find the defendant, Armando

9   Amaya, guilty of aggravated battery with a firearm as

10  to Tara Harris.

11         We, the jury, find the defendant, Armando

12  Amaya, not guilty of aggravated battery with a firearm

13  as to Tara Harris.

14         We, the jury, find the defendant, Armando

15  Amaya, not guilty of aggravated discharge of a

16  firearm.

17         And we, the jury, find the defendant Armando

18  Amaya, guilty of aggravated discharge of a firearm.

19         At this time you will take the instructions

20  from the court along with the exhibits the court has

21  received back to the jury deliberation room to begin

22  your deliberations on your verdicts.  When you have

23  arrived at your verdicts, you are to summon the

24  bailiff, who will notify court and counsel, and you

1  will be returned to open court to deliver your

2  verdicts.

3         Madam Clerk, please swear the bailiff to

4  tend to the jury.

5                                    (Jury sworn)

6         THE COURT:  All right.  All regular members

7  of the jury can retire now to begin your

8  deliberations.  I would ask that the three alternates

9  remain in the courtroom.  Thank you.

10                           (Jury retired to jury room

11                               for deliberations.)

12         THE COURT:  All right, we're going to be

13  discharging you with our sincere thanks at this time.

14  I'd like to thank you for your patience and diligence

15  during the week.  I did observe that you were

16  concentrating and listening to the evidence just as

17  intently as the regular members of the jury.  I want

18  to thank you very much for that.

19         Also, at this time I'm going to be relieving

20  you from your obligation not to discuss the case

21  amongst yourselves or with anyone else, but you're

22  under no legal obligation to do so.  In other words,

23  if the attorneys want to approach you to discuss the

24  case for your impressions or feelings about it, feel

1   free to talk to them.  On the other hand, you're not

2   obligated to do so.

3           I did ask the bailiff to extend the

4   privilege of lunch to you.  I don't know if you're

5   partaking of that, so at this time I'd like to give

6   you a certificate of appreciation for your service.

7           Counsel, approach the clerk, make sure she

8   has all the exhibits.  Anything else before we go off

9   the record?

10          MR. GUAGLIARDO:  No, your Honor.

11          THE COURT:  Mr. Kliment?

12          MR. KLIMENT:  No, Judge.

13          THE COURT:  Okay.  We will keep you posted.

14   Thank you.

15                               (Recess taken.)

16          THE COURT:  Let's go back on the record in

17   98 CF 535, People versus Armando Amaya.  We are

18   presently outside the presence of the jury, counsel

19   have assembled, the defendant is present.  We've just

20   received some questions from the jury.  I'm going to

21   read the questions into the record and in accordance

22   with proper procedure take input from counsel.

23          The communication reads as follows:  We want

24   all stipulations, especially, a) coroner report on

1   Jermaine Lambert; b) Alonzo Matthews in hospital on

2   October 29th, 1997.

3           Defense?

4           MR. KLIMENT:  That would be I think our

5   stipulation.

6           THE COURT:  All right.  So the jury wants

7   all stipulations, we'll deal with that part first.

8           First of all, it needs to be noted under the

9   Illinois supreme court case of People versus Childs

10  159 Ill.2d 210, court held the jury deliberation are a

11  critical stage of the trial and the court has an

12  obligation to attempt to answer the jury's questions

13  if possible.

14          So the first question is, are there any

15  objections if those written stipulations -- as you

16  might recall, I anticipated this would be -- because

17  it has happened in every trial I've done up here, the

18  jury wants to see those stipulations.

19          Any objections, first of all,

20  Mr. Guagliardo?

21          MR. GUAGLIARDO:  I don't know if there's any

22  law on that topic.  I understand the case you read is

23  a general principle that their concerns should be

24  addressed.  Obviously, that's a general principle.  I

1   am not familiar with law on specific stipulations

2   going back.

3            THE COURT:   I believe there is law that says

4   the court is authorized, there's nothing improper

5   about giving them stipulations.   Traditionally we

6   don't, but I don't believe there's any authority that

7   says it's improper for the court to do so.   After all,

8   they've already heard the stipulation, it was read to

9   them.

10           MR. GUAGLIARDO:   Judge, I have no problem

11  with them going back.

12           THE COURT:   Mr. Kliment?

13           MR. KLIMENT:   We have no objection to them

14  going back.

15           THE COURT:   All right.   I will answer the

16  jury's questions and let them know the stipulations

17  will be provided.

18           The second is the coroner's report.   I

19  believe that the autopsy and protocol were -- there

20  was discussion about them not going back.   Any problem

21  with sending back the coroner's certificate?

22           MR. GUAGLIARDO:   The death certificate?

23           THE COURT:   Well, they said coroner report--

24  I didn't talk to them personally obviously.   I don't

C001038

1   know if they mean the death certificate or the autopsy

2   protocol, all of which are properly admitted into

3   evidence, except clearly the coroner's inquest

4   wouldn't go back, because that contains hearsay and

5   inadmissible evidence.

6          Do you have an objection to some of it going

7   back, any of it, all of it?

8          MR. GUAGLIARDO:  I have no objection to it

9   going back.

10         THE COURT:  I don't know that the death of

11  Jermaine Lambert is an issue in this case anyway.

12         MR. KLIMENT:  I don't want the inquest going

13  back, but the death certificate and the autopsy report

14  -- although I just -- those are kind of gruesome

15  sometimes, but so be it.  If they want it, I don't

16  care.

17         THE COURT:  Before we send anything back,

18  let me take a look at it and let counsel take a look

19  at it to make sure there's nothing prejudicial going

20  back.

21         MR. GUAGLIARDO:  If you could.

22         THE COURT:  All right.  The death

23  certificate is the death certificate; there's nothing

24  that could be changed on that.

1    THE COURT:  Mr. Kliment, any objection?

2    MR. KLIMENT:  No.

3    THE COURT:  Mr. Guagliardo, any objection?

4    MR. GUAGLIARDO:  No objection.

5    THE COURT:  I will answer the question that

6    all stipulations referred to will be provided along

7    with the coroner's report.  We only had two

8    stipulations; correct?

9    MR. GUAGLIARDO:  Correct.

10    THE COURT:  All right.  The court is

11    exercising its discretion after receiving input from

12    counsel and will be sending back the stipulations and

13    the coroner's report.

14    Counsel be advised to stand by, and we'll

15    keep you posted.

16                                (Recess taken.)

17    THE COURT:  Back on the record, People

18    versus Amaya.  All counsel have assembled, the

19    defendant is present.

20    Mr. Amaya, we've just received some

21    additional questions from the jury, which I'm going to

22    read into the record at this time and ask for input

23    from counsel, and the questions are as follows:

24    We want a copy of the transcripts of the

1    testimonies -- testimonies, plural, of 1) Shayla

2    Johnson, 2) Nicole Pearson, 3) Tracy Johnson.  Thank

3    you.  That is verbatim the note.

4            Turning to you first, Mr. Guagliardo, what

5    is the State's position?

6            MR. GUAGLIARDO:  Well, Judge, what we

7    usually do in an instance like that is let them know

8    that this is not some instantaneous thing that they're

9    going to get in the next five minutes.  I imagine

10   preparing those transcripts is going to take several

11   hours.

12           THE COURT:  I'll confer with the court

13   reporter on that, but in terms of the jury asking for

14   transcripts of the testimony of witnesses, what would

15   be your prediction?

16           MR. GUAGLIARDO:  My prediction is a hung

17   jury.  I've never seen a jury ask for transcripts ever

18   reach a verdict --

19           THE COURT:  I'm not asking for predictions.

20           MR. GUAGLIARDO:  If I could have one

21   moment.

22                        (Off the record discussion.)

23           MR. GUAGLIARDO:  At this point they're

24   supposed to use their memory, rely on their memory,

C001041

1   their notes.  I would object to it at this point.

2          THE COURT:  Mr. Kliment?

3          MR. KLIMENT:  As a general rule I usually

4   ask for the opposite, but we don't like to give

5   transcripts because it highlights the testimony of

6   witnesses.  My response would be that they continue to

7   deliberate relying upon their individual memories and

8   collective memory and notes and try and reach a

9   verdict that way, and in the meantime perhaps the

10  transcripts can be begun, if that's possible, and if

11  they would be asked for again, the court could

12  reconsider that answer.

13         MR. GUAGLIARDO:  In the meantime I think

14  they're often under the impression that the transcript

15  is something they can get in five, ten or fifteen

16  minutes.

17         THE COURT:  They probably are.  All right.

18  Let me discuss this a little further with counsel.

19  Let me read you some relevant law.

20         There is some law set forth by the Illinois

21  Supreme Court, People versus Queen, 56 Ill.2d 560, and

22  it states in a jury's note concerns a request to

23  review or have read to them transcripts of testimony

24  during deliberations it is within the discretion of

1  the trial court to allow or refuse a jury's request

2  for a review of testimony while the jury is

3  deliberating.  When judges have refused such requests

4  under the mistaken belief they have had no discretion,

5  the refusals have been held to be reversible error.

6       So I am noting clearly for the record that I

7  recognize I have discretion to allow transcripts of

8  the proceedings.

9       Let me allow this suggestion:  I don't know

10  if I'm acquiescing even though for some reason you

11  have gone full cycle and for some reason agree.

12  Leaving the jury in the dark always concerns me, but

13  you're right, Mr. Guagliardo, they may seem to think

14  that the court reporter presses a button and we hand

15  it to them.  I'll inform the jury honestly what it may

16  take, it may take a couple of hours for the testimony

17  to be described, and ask them if they wish to wait.

18  One time we had a case of four hours, they said, we'll

19  wait, and about four hours later Kathy Nielsen came up

20  with a transcript.  I could get a time frame, but

21  perhaps we should explore that, because they may come

22  back and demand it anyway.

23       MR. GUAGLIARDO:  I agree with that.  That

24  was my suggestion; don't give it to them, let them

1   know how much time it's going to take.

2           THE COURT:  Mr. Kliment?

3           MR. KLIMENT:  That's fine.

4           THE COURT:  Let me talk to my reporter off

5   the record.

6                           (Off the record discussion.)

7           THE COURT:  Let's go back on the record.

8           The reporter indicates that it would be at

9   least two hours.  What about if I answered the

10  question and told them it's not immediately available,

11  it would be at least two hours for the transcripts to

12  be provided; do you still want the transcripts or

13  something along those lines?  Any problem with that?

14          MR. GUAGLIARDO:  No problem.

15          THE COURT:  Mr. Kliment?

16          MR. KLIMENT:  No, Judge.

17          THE COURT:  That's the way I'll answer it,

18  and I will suggest counsel stay within the immediate

19  area, because we may get a response.

20                          (Off the record discussion.)

21          THE COURT:  We're back on the record, People

22  versus Amaya.  The jury has answered the court's

23  information to them that it would take at least two

24  hours to have transcripts prepared, and the jury's

1   response was a very terse -- asked them if they still

2   want the transcripts, please advise. The answer was

3   in large letters, yes, the jury.

4           So it's terse and to-the-point they want the

5   transcripts. Unless I hear any further objections, I

6   am going to excuse the reporter and let her start

7   working on the transcripts.

8           MR. KLIMENT: They don't come out of the

9   public defender's budget; do they?

10          THE COURT: No.

11                              (Recess was taken.)

12          THE COURT: All right. We're back on the

13  report 98 CF 535. We're outside the presence of the

14  jury, all counsel are present, Mr. Amaya is present.

15          MR. GUAGLIARDO: For the record, Mr. Walsh

16  is not present here.

17          MR. KLIMENT: He walked in the building with

18  me. He's getting his jacket. Do we need Mr. Walsh?

19          THE COURT: If you want to consult with him,

20  you can. I'll read the question. It read as

21  follows:

22          We are physically and mentally exhausted, we

23  want to go home and resume in the morning, signed, the

24  jury.

1    So what sayeth the State?

2    MR. GUAGLIARDO:  I guess the rules recently

3  changed here in Kane County --

4    THE COURT:  The rules changed in the State,

5  not just Kane County.

6    MR. GUAGLIARDO:  -- where you allow juries

7  to go home overnight, and I don't think that

8  contemplates a situation like this, Judge.  It's 20 to

9  9:00.  This is a murder case, I don't think it's that

10 late.  They've been deliberating, no question, but,

11 you know, again, this isn't 2:00 in the morning, it's

12 not 1:00 in the morning.

13   THE COURT:  So you're sort of taking an

14 arbitrary time limit?  If the jury tells you they want

15 to go home, they're mentally and physically absolutely

16 exhausted, you think that should go ignored and tell

17 them to press on?

18   MR. GUAGLIARDO:  I don't think it should be

19 ignored, but I think they should try to press on and

20 reach a verdict.

21   THE COURT:  What's wrong with pressing on

22 tomorrow?

23   MR. GUAGLIARDO:  Again, Judge, it's kind of

24 setting an atmosphere of what we're trying to tell the

1    jury is work hard to reach a verdict, this is your day

2    of deliberation.  There is no time limit.  I

3    understand 1:00, 2:00 in the morning it gets a little

4    out of hand, but 8:30 at night?

5            THE COURT:  It seems to me the jury is

6    working, because they didn't say they don't want to

7    come back, they're deadlocked.  But I understand your

8    position.

9            Mr. Kliment?

10            MR. KLIMENT:  Judge, if they had gone out at

11    6:00 and come back at 8:30 and said they wanted to go

12    home, they were tired, I would have a problem.  The

13    fact is they've been in the building 12 hours.  It's

14    true they were told to be here at quarter to 9:00

15    today, it's right about 12 hours, assuming they were

16    here on time.

17            I have two fears.  If we make them stay,

18    they're going to rush to a verdict, which as far as

19    I'm concerned has got a 50/50 shot of being an unfair

20    verdict against Mr. Amaya.  The other fear is that

21    whenever you break the panel and send them home, all

22    the protections we have of them being in the jury

23    deliberation room are gone.

24            So I would request of the Court that if you

1   do send them home that you send them home with, you

2   know -- you admonish them every time they leave the

3   room here, but I would be extra clear, for lack of a

4   better phrase, that, you know, don't turn on your TV,

5   don't read any newspapers and in the morning have them

6   back here early.

7          THE COURT: You don't mean that literally,

8   don't turn on your TV. Is this case covered in the

9   national media?

10         MR. KLIMENT: What about if they see about a

11   gang rampage in Florida and says, this guy is clearly

12   in a gang, they could see any act of violence that

13   would somehow influence them. Or they could see

14   something about prosecutors that are just out to

15   convict somebody, that cuts both ways. So almost

16   watch the weather channel.

17         MR. GUAGLIARDO: Even the weather channel

18   can be dangerous.

19         THE COURT: Do you want me to give them an

20   itinerary of what they can and cannot do?

21         MR. KLIMENT: The reason we never sent them

22   home before is for that very reason. A spouse could

23   ask them about it, oh, he's in a gang, he must be

24   guilty. You don't know and you can't control it.

1          THE COURT:  So you don't have an objection

2     under the new statute to them going home in principle,

3     and you don't object to them going home on the proper

4     cautionary instructions?

5          MR. KLIMENT:  You're reading me clearly.

6          THE COURT:  Mr. Amaya, do you agree with

7     your attorney?

8          THE DEFENDANT:  Yes.

9          MR. GUAGLIARDO:  I think it's unrealistic

10    that they're not going to go home and say anything to

11    their spouse, Judge.  Mentally and physically

12    exhausted juries decide cases, mentally and physically

13    exhausted attorneys try cases.  In my experience, it's

14    often mentally and physically exhausted juries that

15    reach verdicts.  I just whispered to Mr. Walsh when he

16    came in that, you know, the question was the statement

17    they want to go home, and his natural reaction was,

18    it's kind of early, and I agree.  It' a quarter to

19    9:00.

20          THE COURT:  I think you're missing the

21    point.  They don't stay, we have been in the building

22    12 hours, we want to go home and resume in the

23    morning.  What Mr. Walsh didn't hear, obviously,

24    quote-unquote, we are mentally and physically

C001010

1  exhausted and want to go home.  That's what tips the

2  scales.  I have to listen to what the jury is saying.

3  We collectively have to listen to what the jury is

4  saying.  They're saying they're mentally and

5  physically exhausted.  They can't deal with it anymore

6  tonight.

7          Since the Illinois supreme court has said

8  there's no problem with sending jurors home anymore

9  even when they're in deliberations, I don't feel like

10 overruling the Illinois supreme court.  They obviously

11 must have contemplated in making the rules that juries

12 could go home; otherwise, why would they have amended

13 the rules.

14         Since the defense is not objecting, I am

15 going to send the jury home under the proper

16 admonitions so they can have a good night's rest and

17 start doing their job in the morning as they should be

18 allowed to do when they have a clear head and they're

19 not mentally and physically exhausted.

20         I couldn't quite cull out exactly what you

21 expected me to tell them in terms of giving them every

22 single activity they can do and not do.  I'll give

23 them the admonitions.  If you want, I'll suggest they

24 avoid watching the television or --

1    MR. KLIMENT:  They certainly should avoid

2  the media, news shows -- because I went down in the

3  jury lounge one day, and Oprah was having a special on

4  gang violence.  I mean, it could be anything as

5  innocuous as that, I'm going to watch Oprah for a

6  while.  That's what was on in the jury lounge the

7  morning we were picking a jury in a gang case.

8    MR. GUAGLIARDO:  I agree.

9    THE COURT:  All right.  I'll add that since

10  it's really not in the rules, but I will honor the

11  requests since you both agree that we make a strong

12  suggestion that they do not watch any TV or news

13  programs, avoid any newspaper accounts or media

14  accounts of anything, simply go home, have a good

15  night's rest and come back in the morning fresh.

16    MR. KLIMENT:  If they're tired, they should

17  go to sleep.

18                    (The following proceedings

19                     were had in the presence of

20                     the jury.)

21    THE COURT:  The jury has returned to court.

22  All counsel are present, Mr. Amaya is present.

23    Good evening, ladies and gentlemen.  It has

24  been decided that you will be permitted to go home

C001051

1  this evening and then return tomorrow morning to

2  resume your deliberations on your verdicts, but I need

3  to emphasize very strongly as I give you the standard

4  admonitions, and I'll go beyond that, that it is

5  imperative that overnight until you return together

6  tomorrow you are not to converse with anyone else on

7  any subject connected with this trial until you are

8  discharged.  You are not to knowingly read or listen

9  to any outside accounts or news accounts or media

10  accounts until you are discharged, not to discuss the

11  case amongst yourselves, with anyone or form and

12  express any opinions about the case until you have

13  been discharged from service, and obviously do not

14  attempt to visit the scene of any alleged occurrence.

15      We want to emphasize that we would very

16  strongly urge you not to listen to any TV shows or

17  news shows or any type of media accounts overnight.

18  We recommend you have a good night's rest and begin

19  tomorrow to continue your deliberations again.

20      So with those thoughts, we wish you a

21  pleasant evening.  We thank you for a very productive

22  and long day here.  We ask you to report downstairs at

23  9:00 a.m. at which time you are to resume your

24  deliberations again.  With those thoughts in mind,

1  have a pleasant evening, and we'll see you tomorrow

2  morning.

3                    (Whereupon the jury was excused

4                     for the evening.)

5           MR. GUAGLIARDO:  I'm just suggesting that

6  obviously the last thing we want is any mixture

7  between anybody in here, including myself and

8  Mr. Walsh, and the jury in the parking lot.  Mr. Walsh

9  and I are going to stay in the billing a good ten, 15

10  minutes just so there isn't any inadvertent contact.

11           THE COURT:  Is that a problem?

12           MR. KLIMENT:  We're going to bring

13  Mr. Amaya's family down to our waiting area, and we'll

14  be another ten minutes or so.

15           THE COURT:  Everyone have a pleasant

16  evening.  We'll see you tomorrow.

17                    (Which were all the proceedings had

18                     in said matter on said date.)

19

20

21

22

23

24

1  STATE OF ILLINOIS )
                    ) SS.
2  COUNTY OF KANE    )

3

4

5

6        I hereby certify that I reported in shorthand

7  the proceedings had at the hearing in the above-

8  entitled cause, and that the foregoing Report of

9  Proceedings is a true, correct and complete transcript

10  of my shorthand notes so taken at the time and place

11  herein set forth.

12

13

14

15  _____
    PAULA M. QUETSCH, CSR
16  No. 084-003733
    Official Court Reporter,
17  16th Judicial Circuit of
    Illinois
18

19

20

21

22

23

24