File Date: _5 - 29 - 2 0 0 8_

Case No: _0 7cv 6 793_

ATTACHMENT # _____

EXHIBIT _T_____

TAB (DESCRIPTION)

_____

ORIGINAL

1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF K A N E    )

3      IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                     KANE COUNTY, ILLINOIS
4

     PEOPLE OF THE STATE OF ILLINOIS,   )
5                                        )
                          Plaintiff,     )
6                                        )
               vs.                       )   No. 98 CF 535
7                                        )
     ARMANDO AMAYA,                      )    Deborah Seyller
8                                        )   Clerk of the Circuit Court
                          Defendant.     )       Kane County, IL
9                                            MAY 0 3 2005

10          REPORT OF PROCEEDINGS of the Hearing on            FILED
                                                              ENTERED
11   Post-Conviction Petition in the above-entitled

12   cause, heard before the HONORABLE GRANT S. WEGNER,

13   Judge of said Court, on the 20th day of April, A.D.

14   2005.

15

16   APPEARANCES:

17          KANE COUNTY STATE'S ATTORNEY, by
            MR. MARK STAJDOHAR,
18          Assistant State's Attorney,
                 appeared for the People;
19
            LAW OFFICES OF KATHLEEN COLTON, by
20          MR. KATHLEEN COLTON,
            Attorney at Law,
21               appeared for the Defendant.

22          DEFENDANT present in Open Court.

23
     KATHLEEN LeCOMTE, CSR, RDR
24   Official Court Reporter

EXHIBIT T

```
 1                    INDEX OF WITNESSES

 2       Witness              D      C      RD      RC

 3   FOR THE DEFENDANT:

 4   Armando Amaya . . . . .   4     53     74

 5

 6

 7   FOR THE PEOPLE:

 8   David Kliment . . . . .  79     91    110     113

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

C000385

1
                            (WHEREUPON the following

2
                             proceedings were had in

3
                             Open Court, before Court

4
                             and Counsel:)

5

6
        THE COURT:  98 CF 535, People of the State

7
versus Armando Amaya.  The matter comes on for

8
petition on post-conviction.

9
    Both sides ready to proceed?

10
        MR. STAJDOHAR:  State is ready.

11
        MS. COLTON:  Defense is ready as well,

12
Judge.

13
    Judge, I would be calling my client to testify.

14
Is it possible for him to be uncuffed?

15
        THE COURT:  It's okay with me.

16
    Do you want to raise your right hand?

17

18
                             (The witness was duly

19
                             sworn by the Court)

20

21
        THE COURT:  Just have a seat.

22
        MS. COLTON:  Can I retrieve those cases?

23
        THE COURT:  Sure.

24
        MS. COLTON:  Do you want me to hold onto

C000386

1    those while you testify?

2

3                          ARMANDO AMAYA,

4    called as a witness herein, having been first duly

5    sworn by the Court, was examined and testified as

6    follows:

7    DIRECT EXAMINATION

8    BY MS. COLTON:

9        Q.   Armando, would you please state your name

10   for the record and spell both your first and last

11   name?

12       A.   My name is Armando Amaya.  My first name is

13   an A-r-m-a-n-d-o.  My last name is A-m-a-y-a.

14       Q.   Armando, you were born in the U.S.; is that

15   correct?

16       A.   Correct.

17       Q.   And you don't have any difficulty with the

18   English language; is that also correct?

19       A.   Correct.

20       Q.   And back in 1997, specifically October 29th

21   of 1997, were you charged with any offenses from

22   that date?

23       A.   Yes.  I was indicted with attempt murder.

24       Q.   And do you recall the case number of that

                                4

1    case?

2        A.    No.  No, I don't.

3        Q.    But it was indicted as an attempt murder

4    and other various offenses; is that correct?

5        A.    Correct.

6        Q.    Now, when you were indicted, the date of

7    the alleged offense on the attempt murder was

8    October 29th of 1997, correct?

9        A.    Correct.

10       Q.    And did you have -- did you hire an

11   attorney on that case?

12       A.    Yes, I did.

13       Q.    And who was that?

14       A.    Kathleen Colton.

15       Q.    That was me, correct?

16       A.    Yes.

17       Q.    And was that, just that attempt murder, was

18   that the only case you were charged with at first

19   which stemmed from that particular date of October

20   29th, 1997?

21       A.    Correct.

22       Q.    Just so it's clear, later on is it correct

23   to say that you were then charged with a first

24   degree murder case under a different case number?

C000388

1          A.    Correct.

2          Q.    And that in fact is the case that you're

3     here on, on post-conviction petition; is that

4     correct?

5          A.    Yes.

6          Q.    I want to talk to you a little bit first,

7     though, about the attempted first degree murder case

8     that you were charged with.

9          Were you taken into custody by the Aurora Police

10    on October 29th of 1997?

11         A.    Yes.

12         Q.    And do you recall the time, the approximate

13    time that it was alleged that you committed an

14    attempted first degree murder?

15         A.    It was a few hours from that time.  I can't

16    recall the time, but --

17         Q.    Would it have been just shortly before

18    9:00?

19              MR. STAJDOHAR:  Objection.

20              MS. COLTON:  Judge, these are foundational

21    questions.

22              THE COURT:  Overruled.

23

24

BY MS. COLTON:

Q. Would it have been just shortly before 9:00?

A. Correct, yes.

Q. And once you were taken into custody by the Aurora Police -- first of all, were there any other persons present with you when you were taken into custody?

A. Yes. There was two other persons in the car with me.

Q. Can you state their names for the record?

A. One was George Gamboa and the other one was Ramiro Sandoval.

Q. Gamboa is G-a-m-b-o-a?

A. Yes.

Q. And Sandoval is S-a-n-d-o-v-a-l?

A. Correct.

Q. And were they both taken in to the police station with you?

A. Yes, they were.

Q. Other than yourself on that attempt first degree murder under the 1997 case number, was anybody else charged with that offense?

A. No. Just me.

C000390

1          Q.    Now, when you went to the Aurora police

2    station, that was on October 29th of 1997, correct?

3          A.    Correct.

4          Q.    And were you held at the station in that

5    attempt first degree murder case?

6          A.    Yes, I was.

7          Q.    And were you questioned by the police?

8          A.    Yes, I was.

9                MS. COLTON:  Judge, I'm showing to Counsel

10   what I have marked Defendant's Exhibit Number 1 for

11   purposes of this hearing, and I would ask to

12   approach the witness at this time.

13               THE COURT:  You may.

14               MS. COLTON:  Thank you.

15

16   BY MS. COLTON:

17         Q.    Armando, I'm going to show you what I've

18   marked Defendant's Exhibit Number 1 and ask you to

19   look through that and first of all ask you if you

20   recognize what that is.

21         A.    Yes.  It's a transcript of a taped

22   statement, my taped statement to the Aurora Police

23   Department.

24         Q.    Now, was that a videotaped statement?

1    A.   Yes.

2    Q.   And this is a transcript, correct?

3    A.   Correct.

4    Q.   And this is not the first time you've seen

5    that; is that correct?

6    A.   That's correct.

7    Q.   Do you recall when you first got a copy of

8    this transcript?

9    A.   I believe you gave it to me.

10    Q.   And that would have been in the 97 case?

11    A.   The 97 case.

12    Q.   Now, in the second case that was charged

13    from that date later on, the first degree murder,

14    did you also receive a second copy of this

15    transcript?

16    A.   Yes, I did.

17    Q.   And who did you receive that from?

18    A.   David Kliment from the Public Defender's

19    Office.

20    Q.   And was he representing you on the murder

21    case?

22    A.   Yes.

23    Q.   And do you recall, first of all, giving

24    that videotaped statement to the Aurora Police on

1    October 30th of 1997?

2        A.    Yes, I do.

3        Q.    And do you recall in the videotaped

4    statement explaining to the police anything about

5    your whereabouts that would rise to the level of a

6    defense?

7        A.    Yes, I did.  When they questioned me, they

8    asked me if I wanted to, you know, bet my life on

9    it, you know, because they had two crimes that

10   happened that night, that I was identified on a

11   Kendall shooting only, and when they said that, I

12   told them I could put where I was at.

13       Q.    And in fact did you say that more than one

14   time on your statement?

15       A.    Yes, I did.  I said it between three or

16   four times, I said it.

17             MS. COLTON:  Judge, at this time I would

18   ask to move into evidence for purposes of this

19   hearing Defendant's Exhibit Number 1.

20             MR. STAJDOHAR:  No objection.

21             THE COURT:  Admitted.

22             MS. COLTON:  Thank you.

23

24

1    BY MS. COLTON:

2        Q.   Now, when I represented you on the attempt

3    first degree murder case under the 97 case, did I

4    give you additional discovery and police reports in

5    addition to what I just showed you?

6        A.   Yes, you did.

7            MS. COLTON:  Showing Counsel what I've

8    marked Defendant's Exhibit Number 2 for purposes of

9    this hearing.

10

11   BY MS. COLTON:

12       Q.   I'm going to show you what I have marked

13   Number 2 and ask you if you recognize what that

14   document is.

15       A.   This is a taped transcript of Sonia

16   DeLaTorre's testimony.

17       Q.   And Sonia DeLaTorre is spelled

18   D-e-L-a-T-o-r-r-e; is that correct?

19       A.   Correct.

20       Q.   And who is Sonia DeLaTorre in relation to

21   the events of October 29th of 1997?

22       A.   She was a friend of mine.  We were dating

23   on and off.

24       Q.   And what did she have to do with the events

1   of that evening?

2       A.   I was at her house at the time they said

3   this crime happened.

4       Q.   And was she part of the alibi defense?

5       A.   Yes, she was.

6            MS. COLTON:  Judge, I would ask leave to

7   move into evidence for purposes of this hearing

8   Defendant's Exhibit Number 2.

9            THE COURT:  Any objection?

10           MR. STAJDOHAR:  No objection.

11           THE COURT:  Admitted.

12

13  BY MS. COLTON:

14      Q.   And, Armando, did you receive Defendant's

15  Number 2 in discovery from myself?

16      A.   Yes, I did.

17      Q.   Do you recall if you received it also from

18  Mr. Kliment in the murder case?

19      A.   Yes, I did.

20      Q.   Now, early on in the proceedings in the

21  attempt murder case, which was charged under 97 CF

22  2326, did I file a motion to reduce your bond?

23      A.   Yes, you did.

24      Q.   And was there a hearing on that motion to

1    reduce your bond?

2        A.   Yes, there was.

3        Q.   Do you recall who testified at that

4    hearing?

5        A.   Sonia DeLaTorre and Elizabeth DeLaTorre.

6        Q.   Did you also testify as well?

7        A.   I remember, I believe so, yeah.

8        Q.   Do you remember if your father testified?

9        A.   No, I don't remember if he testified.

10        Q.   And during the course of that bond

11    reduction hearing, were any questions asked about

12    the alibi defense that you had for October 29th of

13    1997?

14        A.   Yes, they were.

15        Q.   And do you recall if those questions were

16    asked of Sonia DeLaTorre?

17        A.   Yes.

18        Q.   And do you recall if those questions were

19    asked of Elizabeth DeLaTorre?

20        A.   Yes.

21        Q.   In fact there was more than one DeLaTorre

22    sister involved at the house where you were present

23    at; is that correct?

24        A.   Correct.

1                THE COURT:  Excuse me, Miss Colton.

2            Officer, if you want to sit down, you can sit

3     down.

4            DOC OFFICER:  No, thank you.  I'm okay.

5

6     BY MS. COLTON:

7        Q.    Armando, I know it's been a long time ago

8     since the date of hearing of the bond reduction.  It

9     was December 11th of 1997.  But do you remember if

10    either of the DeLaTorre sisters told the Judge

11    during the bond reduction hearing the time that you

12    had been present at their house?

13       A.    Yes, they did.

14            MS. COLTON:  Judge, I've marked this as

15    Defendant's Exhibit Number 3.  In consideration of

16    the court reporters, I know I am not to make copies,

17    so I'll show this to Counsel.  He may have already

18    seen it.  I know that Mr. Guagliardo had a copy of

19    it in the proceedings on the attempt murder case,

20    but I would show it to Counsel before I show it to

21    my client.

22

23    BY MS. COLTON:

24       Q.    And, Armando, I've marked this transcript

1     as Defendant's Exhibit Number 3.  Have you seen this

2     before?

3          A.   Yes, I have.

4          Q.   Do you recognize it to be something in

5     particular?

6          A.   This is from my bond reduction hearing.

7               MS. COLTON:  Judge, I would move into

8     evidence or ask leave to move into evidence

9     Defendant's Exhibit Number 3 for purposes of this

10    hearing.

11              MR. STAJDOHAR:  No objection.

12              THE COURT:  Admitted.

13

14    BY MS. COLTON:

15         Q.   Now, at some point did you proceed to trial

16    in 97 CF 2326, which was the attempt first degree

17    murder charge?

18         A.   Yes.  Yes, we did.

19         Q.   And at the time that you proceeded to

20    trial, first of all, was it a jury trial or a bench

21    trial?

22         A.   Jury trial.

23         Q.   And do you remember whether or not you had

24    been charged with the murder at the time we went to

c000398

```
 1      trial on the attempt?

 2           A.    I wasn't charged with the murder yet.

 3           Q.    And did the jury trial -- well, the jury

 4      trial in 97 CF 2326, the attempt first degree

 5      murder, did that go forward?

 6           A.    Yes, it did.

 7           Q.    And do you recall how long it lasted?

 8           A.    Between 18 to 22 hours.

 9           Q.    Not the actual deliberation, but the actual

10      trial itself, how many days, if you recall?

11           A.    Seven days, I believe the whole week, took

12      the whole week.

13           Q.    And did it start on March 16th of 1998?

14           A.    Yes, it did.

15           Q.    Now, did the jury deliberate on a verdict

16      on the case?

17           A.    Yes, it did.

18           Q.    And were you -- you were in custody at that

19      point, correct?

20           A.    Correct.

21           Q.    And you continued to be held in custody

22      during the deliberations; is that correct?

23           A.    Correct.

24           Q.    Do you recall, to the best of your
```

16

1   recollection, I know it's been a long time ago, how

2   long the jury deliberated in that case?

3       A.   It was a long time.  It was -- I believe it

4   was around 18 hours.

5       Q.   And before the jury deliberated, did we,

6   "we" being me on your behalf, did we present a

7   defense for you?

8       A.   Yes, we did.

9       Q.   And what defense did we present in the

10  attempt first degree murder case?

11      A.   Alibi defense, me and George Gamboa and

12  Ramiro Sandoval, Sonia DeLaTorre and Emma DeLaTorre.

13      Q.   So we did present witnesses, correct?

14      A.   Yes.

15      Q.   Did those witnesses, to the best of your

16  recollection, testify you were present somewhere

17  other than the scene of the attempt first degree

18  murder at the time of that offense?

19      A.   Yes.

20      Q.   And all four of them were placed under

21  oath; is that correct?

22      A.   Correct.

23      Q.   And all four of them were cross-examined by

24  the State's Attorneys in that case; is that correct?

1          A.    Correct.

2          Q.    And was there a court reporter present

3      during that trial?

4          A.    Yes.

5          Q.    Moving on then, again, to the

6      deliberations, do you recall about how long the jury

7      deliberated in that case?

8          A.    On the attempt murder case?

9          Q.    Yes.

10         A.    I know it was a while.  I'd say -- I know

11     both trials the jury deliberated for a long time,

12     so...

13         Q.    If you can't remember, that's fine.  Let me

14     ask you the more important question.

15         Was there a verdict reached in the attempt first

16     degree murder case?

17         A.    No.  It was a hung jury.

18         Q.    And did the Judge declare a mistrial in

19     that case?

20         A.    Yes.

21         Q.    Now, once the Judge declared a mistrial in

22     that case, do you recall if we answered ready again

23     for trial on the attempt first degree murder?

24         A.    Yes, we did answer ready.

1    Q.   And did something else happen as far as

2    another prosecution while we were waiting for

3    another trial in that case?

4    A.   Yeah.  I was indicted with a first degree

5    murder.

6    Q.   And that was under the case 98 CF 535, the

7    case we're here on today, correct?

8    A.   Correct.

9    Q.   And that's the case you're sentenced on and

10   in custody of the Department of Corrections; is that

11   correct?

12   A.   Correct.

13   Q.   Now, was the date of offense of the first

14   degree murder, was that the same or different from

15   the date of offense of the attempt first degree

16   murder?

17   A.   They had been the same -- they happened the

18   same day.

19   Q.   And do you know the time frame, how far

20   apart in time was the attempt first degree murder

21   alleged to have occurred, as opposed to the first

22   degree murder?

23   A.   I believe it was between two hours to an

24   hour and a half.

1   Q. And was the time of the alleged first

2 degree murder about 10:15?

3   A. Correct.  Yes.

4   Q. And was that time --

5     THE COURT:  Excuse me, is that p.m., a.m.?

6     MS. COLTON:  P.m., I'm sorry, Judge, p.m..

7

8 BY MS. COLTON:

9   Q. And that was in the evening, correct?

10   A. Correct.

11   Q. And to your knowledge, from going through

12 the previous trial in the 97 case, at 10:15 on

13 October 29th of 1997, did your alibi defense and

14 your witnesses cover that specific time?

15   A. Yes, it did.

16   Q. Now, once you were indicted for the first

17 degree murder case, you mentioned the Public

18 Defender.  Were you able to hire private counsel in

19 that case?

20   A. No, I wasn't.

21   Q. And was the Public Defender's Office

22 appointed to represent you in that case?

23   A. Correct.

24   Q. And specifically do you recall who the

1    Public Defender was that was appointed and

2    represented you and talked to you about that case?

3        A.   David Kliment, and Sandra Parga was his

4    assistant.

5        Q.   And is it true that you were still in

6    custody at that time?

7        A.   Yes, I was.

8        Q.   And at the time you were indicted, then, on

9    98 CF 535, did you then have two cases pending?

10       A.   Yes.  Yes, I did.

11       Q.   And that's the attempt first degree murder

12   and murder, correct?

13       A.   Correct.

14       Q.   And those were both from the same day,

15   correct?

16       A.   From the same day, yes.

17       Q.   Now, to your knowledge did Mr. Kliment file

18   a motion for discovery on the murder case?

19       A.   Yes, he did.

20       Q.   And do you recall -- and I know this is

21   difficult, again, going back so many years, but do

22   you recall the beginning of that prosecution; in

23   other words, when you first got appointed or he got

24   appointed to represent you?

1        A.    Yes.  I have some knowledge of it, yes.

2        Q.    Do you recall having any conversations with

3    either Mr. Kliment or Miss Parga about the first

4    degree murder case?

5        A.    Yes.  Miss Parga was the first person to

6    come see me at the County.  She interviewed me and

7    asked me what happened that night, who I was with.

8    And I told her Ramiro and George were in the car

9    when we got pulled over, and we were at the

10    DeLaTorre sisters' home.  We had gone to trial on

11    the attempted murder case and they should talk to

12    you about it.

13        Q.    And did you specifically give my name to

14    your Public Defenders?

15        A.    Yes, I did.

16        Q.    And did you make a request that they speak

17    to me?

18        A.    Yes, I did.

19        Q.    What was the reason you made that request?

20        A.    Because we went to trial on the attempted

21    murder, and the murder case happened the same night

22    as the attempted murder, and the time they say the

23    murder happened I was with the DeLaTorre sisters,

24    and I got arrested with George Gamboa and Ramiro

1    Sandoval.

2        Q.   And just to be clear, were Mr. Sandoval and

3    Mr. Gamboa also at the DeLaTorre house?

4        A.   Yes, they were.

5        Q.   To your knowledge did either Mr. Kliment or

6    Ms. Parga ever tell you that they talked to me about

7    what had happened in that first case, the first

8    trial?

9        A.   No, they didn't.

10       Q.   Did you ever see any transcripts of the

11   attempt first degree murder case?

12       A.   Yes, I did.

13       Q.   And when did you see those?

14       A.   As soon as I hired you, you gave them to

15   me.

16       You're talking about the attempted murder,

17   right?

18       Q.   Let me ask that question, if I could start

19   over again.

20       On the attempt first degree murder, the jury

21   trial itself, did you ever see any transcripts of

22   what happened during the jury trial?

23       A.   Oh.  No, no.

24       Q.   To your knowledge did anyone from the

1    Public Defender's Office ever order the transcripts

2    of our trial, the first -- the attempt first degree

3    murder trial?

4         A.   No.   Nobody ordered them.

5         Q.   Now, do you recall during the course of the

6    time that the Public Defender's Office represented

7    you on the first degree murder case how long it took

8    from the time you were charged until you actually

9    proceeded to jury trial in that case?

10        A.   It took a year.   A year.

11        Q.   And during that year, did you periodically

12   receive visits from the Public Defender, or how did

13   that work?

14        A.   Most of the time when they seen me was done

15   here.   The only time -- the only time I seen David

16   after they found me guilty, some lady came to talk

17   to me about my past history for the sentencing.   I

18   refused to talk to her and she came back with David.

19   That's the other time I seen him, the only time I

20   seen him in the County.

21        Q.   Now let me ask you, you referred to seeing

22   them here.   We're in the Kane County Judicial Center

23   in St. Charles.   This is for purposes of the record.

24   This is the building you're talking about, correct?

1      A.    Correct.

2          Q.    And this is where your jury trial took

3     place, in fact in this very courtroom?

4          A.    Correct.

5          Q.    313, both of your jury trials?

6          A.    Both of my jury trials.

7          Q.    And you mentioned talking to them here.

8     What exactly are you referring to the place here

9     that you had conversations with the Public

10    Defenders?

11         A.    We had conversation in this back room right

12    here, as soon as you open the door, we talked.

13         Q.    Is that what's referred to as the lockup

14    area?

15         A.    Yes, correct.

16         Q.    And did Mr. Kliment ever talk to you back

17    there?

18         A.    Yes, he did.

19         Q.    So is it fair to say that you did have

20    discussions with him about the case before it went

21    to the jury trial, correct?

22         A.    Correct.

23         Q.    It's just that they didn't happen at the

24    jail, they happened here in this building?

25                                    C000408

1      A.   They happened here, yes.

2      Q.   And you had -- is it fair to say you had

3    discussions with Miss Parga both at the jail and

4    here in this building?

5      A.   Correct.

6      Q.   Now, did you ever express either to Miss

7    Parga or Mr. Kliment that you wanted to proceed on

8    the alibi in the first degree murder case that you

9    had proceeded on in the attempt first degree murder

10   case?

11     A.   Yes, I did.

12          MR. STAJDOHAR:  Objection.

13          THE COURT:  Basis?

14          MR. STAJDOHAR:  Relevance.

15          THE COURT:  Overruled.

16

17   BY THE WITNESS:

18     A.   Yes, I did.  I told them they needed to

19   talk to the other lawyer because the crime happened

20   the same night as the attempted murder and that you

21   knew about it, Kathleen Colton knew about it, they

22   should talk to you.  And he told me he would look

23   into it.

24

1    BY MS. COLTON:

2         Q.    And who told you that, which of the two of

3    them?

4         A.    Mr. David.

5         Q.    And had you been aware, when we had the

6    trial in the attempt first degree murder case, that

7    I had actually issued subpoenas for the alibi

8    witnesses?

9         A.    Yeah, I was aware you issued them.

10        Q.    And all four of them appeared at trial; is

11   that correct?

12        A.    Correct.

13        Q.    Now, do you recall how many times you

14   mentioned to Mr. Kliment specifically the alibi

15   defense?

16        A.    Almost every time he talked to me back

17   there I asked him if he had talked to you about it.

18   All the time I received an answer that he was

19   looking into it.

20        Q.    And was there ever a time that came up that

21   he indicated to you that he had, number one, talked

22   to me?

23        A.    No.    He never -- he said he would talk to

24   you.    He never told me he talked to you.

1      Q.    Okay.  And secondly, was there ever a time

2   where he told you that he had talked to any of the

3   four witnesses that we had put on the stand during

4   the attempt first degree murder case?

5      A.    He never mentioned talking to them.

6      Q.    Did he ever tell you whether or not he had

7   sent an investigator out to talk to these people or

8   to try to find them?

9      A.    No.  Never.  He never told me nothing like

10   that.

11     Q.    And in regards to Miss Parga, did she ever

12   indicate to you that she had spoken to me about the

13   case?

14     A.    No.

15          MR. STAJDOHAR:  Judge, I'm going to object

16   to these questions.  They're hearsay answers.

17   They're negative information.  They don't go to

18   prove anything that it did or didn't happen, only

19   the knowledge of the Defendant as to whether he was

20   told they did or didn't happen.  So as it relates to

21   this hearing, it's irrelevant.

22          THE COURT:  Overruled.

23

24

```
 1    BY MS. COLTON:
 2         Q.   Did Miss Parga ever indicate to you that
 3    she had attempted to find or talk to any of the
 4    alibi witnesses?
 5         A.   No.
 6         Q.   And did you make the same request of her,
 7    or was that request to Mr. Kliment?
 8         A.   It was to Mr. Kliment, and she was in the
 9    room.
10         Q.   Now, going to the actual murder case, that
11    was tried in 1999; is that correct?
12         A.   Correct.
13         Q.   And is it correct that you started picking
14    a jury on January 29th of 1999 -- I'm sorry, on --
15    excuse me for a moment.
16              MS. COLTON:   Judge, may I have a moment to
17    talk to Kara?
18              THE COURT:   Sure.
19
20                             (There was a break in the
21                              proceedings)
22
23              MS. COLTON:   Thank you, Judge.
24
```

1    BY MS. COLTON:

2        Q.    You were found guilty on January 29th of

3    1999; is that correct?

4        A.    Correct.

5        Q.    And that was in the first degree murder

6    case; is that correct?

7        A.    Correct.

8        Q.    Do you know whether or not your Public

9    Defenders ever filed a written disclosure to the

10   State asserting alibi in your case, in the first

11   degree murder case?

12       A.    Right before trial.  The Friday before

13   trial they gave some motion, I think, with alibi on

14   it.

15       Q.    And did you ask them to do that or do you

16   know how that occurred?

17       A.    I just kept on telling them if they had

18   talked to the alibis.  I don't know why they put the

19   motion in.

20       Q.    And do you know whether or not, when they

21   listed the alibi that Friday before you started the

22   jury trial, whether or not they listed any

23   witnesses?

24       A.    No.  They listed, I think, five witnesses.

30          C000413

1        Q.   Do you know whether or not they listed any

2    addresses of any witnesses?

3        A.   No.   There was no addresses.

4             MS. COLTON:   Judge, I marked my copy of the

5    common law record of 98 CF 535, which I hope the

6    Court has a copy as well in the court file.

7             THE COURT:   What specifically are you

8    marking?

9             MS. COLTON:   I actually marked the whole

10   thing, but I'm going to direct my client's attention

11   to just a couple of different documents in there.

12   One is the January 22nd supplemental answer.

13            THE COURT:   I have the court file.

14            MS. COLTON:   Okay.   Then I guess I don't

15   have to -- I ask you to take judicial notice of it.

16            THE COURT:   I have the supplemental

17   disclosure.

18            MS. COLTON:   Thank you.   And that's dated

19   January 22nd, '99?

20            THE COURT:   Yes.

21            MS. COLTON:   Thank you, Judge.

22

23   BY MS. COLTON:

24        Q.   Armando, you proceeded to trial then that

31

1    Monday after January 22nd of 1999; is that correct?

2         A.    Correct.

3         Q.    And did you proceed to pick a jury in that

4    case?

5         A.    Yes, we did.

6         Q.    And were both Mr. Kliment and Miss Parga

7    present as your attorneys throughout the course of

8    that jury trial?

9         A.    Yes, they were.

10        Q.    And do you recall approximately how many

11   witnesses testified for the State in that case?

12        A.    I think it was five or six witnesses that

13   testified.

14        Q.    And how many witnesses were called in your

15   defense?

16        A.    None.

17        Q.    And did you testify in your defense?

18        A.    No, I did not.

19        Q.    While that case was proceeding in late

20   January of 1999, did you have a discussion with Mr.

21   Kliment or Miss Parga or both about testifying in

22   the case?

23        A.    Yes, I did.

24        Q.    And can you tell the Court what that

32

1   discussion was?

2       A.   Well, David told me that -- I asked him

3   first if I was going to testify.  He said --

4           MR. STAJDOHAR:  I'm going to object to this

5   question.  There is no mention in the

6   post-conviction petition of the Defendant's wanting

7   to testify.  It's simply an ineffective assistance

8   of counsel for not presenting an alibi defense and

9   not presenting the motion to quash, so it's

10  certainly outside the bounds of the post-conviction

11  petition.

12          MS. COLTON:  Judge, I think the answer will

13  be within the bounds of the post-conviction

14  assertions.

15          THE COURT:  On this particular issue, I

16  assume Judge Hudson discussed the issue of

17  testifying with the Defendant.

18          MS. COLTON:  There were admonishments in

19  the courtroom, yes.

20          THE COURT:  In terms of his choice?

21          MS. COLTON:  Yes.

22          THE COURT:  Okay.  Go ahead.

23          MS. COLTON:  Thank you.

24

C000416

1    BY MS. COLTON:

2         Q.   Go ahead.  You can answer.

3         A.   I asked David if he wanted me to testify.

4    He simply told me that the case against me was weak,

5    there was no physical evidence, no gunpowder tests,

6    that the case against me was weak, so he couldn't

7    advise me if I would testify, so I didn't testify

8    based on that, that the case -- he told me the case

9    against me was weak.

10        MR. STAJDOHAR:  Judge, I would renew my

11   objection and move to strike the answer, as the

12   answer was not part of the ineffectiveness claim

13   based on the alibi defense or not presenting a

14   motion to quash.

15        THE COURT:  Response?

16        MS. COLTON:  Judge, it certainly goes to,

17   if the State is going to argue that it was some sort

18   of strategic decision on the part of Mr. Kliment not

19   to have Mr. Amaya testify or not to present any

20   defense witnesses at all, it certainly goes to the

21   strategic choice, and I have case law that talks to

22   that.

23        THE COURT:  I guess my real concern, not

24   having any transcripts, is the fact if Hudson tells

1    the Defendant that's your choice whether to testify

2    or not, it makes moot to some degree this particular

3    information, unless you can tell me otherwise.  And

4    I don't have the transcripts, but you indicated you

5    thought he had been admonished.

6             MS. COLTON:  The only reason I'm saying

7    that, I don't have the transcripts at my fingertips,

8    but I know it was his policy back in those days to

9    admonish people on the record.  I can't say for sure

10   whether he did or not, but, Judge, again,

11   respectfully, I think it is relevant, because at

12   least in the federal case law that I'm going to

13   present to the Court it talks about strategic

14   decisions and defendants testifying and being

15   advised not to and so on and so forth.  So I think

16   certainly the answers are relevant to the argument.

17      I know you don't know what arguments I'm going

18   to make or what defense the State is going to raise,

19   but I think it is relevant to that issue because

20   under Strickland obviously strategic decisions are

21   up to the attorney, but when you have a situation as

22   unique as this, it would be my position that this

23   certainly is relevant.

24             THE COURT:  I think it would certainly be

C000418

1       relevant or possibly more relevant if Hudson hadn't

2       advised him, but if Hudson advised him in the

3       courtroom in the transcript that the issue of

4       whether or not he testifies is one of those

5       decisions you and you alone can make, then I don't

6       know this would be an appropriate basis to review at

7       this juncture.

8            I suppose what we could do is let the testimony

9       go in, reserve this question, you find out from the

10      trial transcript whether that admonishment was

11      given.  I would be willing to do that so we can

12      avoid bringing people back.

13               MS. COLTON:  That's fine.

14               MR. STAJDOHAR:  Judge, once again our

15      position is if you read the post-conviction

16      petition, it has nothing to do with strategic

17      decisions.

18               THE COURT:  I understand your objection.

19      I'm going to allow the testimony with the

20      understanding, and someone needs to show that, if

21      the transcript shows Judge Hudson advised this

22      Defendant that the choice of whether he testifies or

23      not is up to the Defendant, under those

24      circumstances I believe this evidence is irrelevant.

C000419

1       If that's not in the transcript, then I'll allow it.

2               MS. COLTON:  I'll review the transcript.

3

4       BY MS. COLTON:

5           Q.   And, Armando, going back to when I was

6       representing you on the attempt first degree murder

7       case, did I file a motion to quash your arrest in

8       that case?

9           A.   Yes, we did.

10          Q.   And did you have a hearing on that motion?

11          A.   Yes, we did.

12          Q.   Did Mr. Kliment or Miss Parga file a motion

13      to quash your arrest in the first degree murder

14      case?

15          A.   No, they didn't.

16          Q.   Do you recall if you ever talked to them

17      about filing a motion to quash your arrest in that

18      case?

19          A.   Yes, I did.

20          Q.   And do you recall, first of all, did you

21      talk to one or both of them?

22          A.   Talked to one.

23          Q.   Which one, do you recall?

24          A.   David.

C000420

1      Q.   And do you recall what he said to you in

2   regards to filing a motion to quash?

3      A.   That it had nothing to do with the case

4   since I was indicted while I was incarcerated.

5      Q.   Now, going back to the first degree murder

6   case, is it correct to say on January 29th of 1999

7   that you were convicted?

8      A.   Correct.

9      Q.   And you mentioned earlier in your testimony

10   that both of the juries deliberated for a long time;

11   is that correct?

12      A.   Correct.

13      Q.   Do you recall how long the jury in the

14   murder case deliberated?

15      A.   I believe it was 20 to 22 hours they

16   deliberated.

17      Q.   And they came back with verdicts of guilty;

18   is that correct?

19      A.   Correct.

20      Q.   And you mentioned somebody coming over and

21   talking to you after the conviction and then Mr.

22   Kliment coming back with this lady.  Did you have a

23   chance after the verdict to have any private

24   conversations with Mr. Kliment?

1            MR. STAJDOHAR:  Objection; relevance.

2            THE COURT:  Response?

3            MS. COLTON:  I'm just asking, Judge.  I'm

4     not going to ask the content of it.

5            THE COURT:  Overruled.

6

7     BY MS. COLTON:

8        Q.   Did you ever have any private conversations

9     after the conviction?

10       A.   No.

11       Q.   Now, you took an appeal of your conviction

12    on the first degree murder case; is that correct?

13       A.   Correct.

14       Q.   And did the Appellate Court uphold your

15    conviction?

16       A.   You mean overturned it?

17       Q.   Well, did --

18       A.   I don't understand.

19       Q.   What happened as a result of the appeal?

20       A.   They affirmed it and took 9 years back.

21    They gave me 9 years.

22       Q.   They affirmed the conviction?

23       A.   They affirmed the conviction, yes.

24       Q.   Did they send it back to the trial court

1       for resentencing?

2           A.   No, they didn't.

3           Q.   They simply cut part of the sentence,

4       correct?

5           A.   Yeah.

6           Q.   And was that in a published opinion?

7           A.   Was it --

8           Q.   Something you can read and actually put

9       your name into the computer system?

10          A.   Yes.

11               MR. STAJDOHAR:   I would object for the

12      basis for knowledge of that.

13               THE COURT:   Sustained.

14

15      BY MS. COLTON:

16          Q.   Did you have an opportunity to read that

17      published opinion?

18          A.   Yes, I did.

19          Q.   Showing what I've marked Defendant's Number

20      4 and approach the Defendant.

21          Armando, do you recognize that document?

22          A.   Yes.   This is my appeal to the Appellate

23      Court.

24          Q.   Is that the opinion of the Appellate Court?

1    A.   Yes, it is.

2    Q.   And is that cited at 321 Ill.App.3d 923?

3    A.   Yes.

4    MS. COLTON:  Judge, for purposes of this

5    hearing I would ask to admit as Defendant's Number 4

6    the appellate opinion.

7    MR. STAJDOHAR:  No objection.

8    THE COURT:  Admitted.

9

10   BY MS. COLTON:

11   Q.   Now, Armando, at some point after your

12   appeal was denied and your convictions were

13   affirmed, did your family retain me for purposes of

14   this post-conviction petition?

15   A.   Yes, they did.

16   Q.   And to your knowledge did I retain the

17   services of an investigator in regards to the

18   post-conviction petition?

19   A.   Yes, you did.

20   Q.   And are you aware whether or not the

21   investigator was able to locate George Gamboa?

22   A.   Yes, he did locate him.

23   Q.   And are you aware of whether or not he took

24   an affidavit or took a statement from Mr. Gamboa?

C000424

1          A.    Yes, he did.

2          Q.    And are you aware as to whether or not the

3     investigator that I hired did his own affidavit

4     about that?

5          A.    Yes, he did.

6          MS. COLTON:   Judge, I'm giving Counsel a

7     copy of what I've marked Defendant's Exhibit Number

8     5.   Show that to Mr. Amaya.

9

10    BY MS. COLTON:

11         Q.    Do you recognize what that is?

12         A.    It's an affidavit from Arnoldo Castillo.

13         Q.    And who is he?

14         A.    He's an investigator.  He's an investigator

15    on the post-conviction.

16         Q.    And which of the people does that relate

17    to, this affidavit?

18         A.    George Gamboa.

19         MS. COLTON:   I would move into evidence for

20    purposes of this hearing Defendant's Number 5.

21         MR. STAJDOHAR:   I would object.   There is

22    no foundation for this document.   This document is

23    hearsay.   If this witness wants to testify about

24    what he did, certainly I would have no objection to

1    that, and also if George Gamboa wishes to testify, I

2    have no objection to that.  But an affidavit of

3    somebody else who spoke with a witness who is not

4    present, neither of them are present, this witness

5    certainly has no basis for the foundation of this

6    document.

7          MS. COLTON:  Judge, my response is

8    two-fold.  First, these documents are already -- the

9    affidavits of Mr. Castillo dated July 25, 2003,

10   reference George Gamboa and Ramiro Sandoval, have

11   been filed in the court file on October 3rd of 2003

12   as by way of a supplemental to our post-conviction

13   petition.  So Counsel is already aware of them.

14      And secondly, Judge, Mr. Gamboa unfortunately

15   was shot and killed sometime shortly after this

16   affidavit was taken.

17      The purpose of the affidavits were to verify

18   that Mr. Gamboa and Mr. Sandoval were still around

19   and had not been contacted by the Public Defender's

20   Office.  And as I said, they are already in the

21   court file.

22         THE COURT:  The fact they're attached to a

23   petition does not necessarily set up the situation

24   where I should accept them as evidence in this case,

```
 1        but it seems to me that under the circumstances

 2        there is a foundational issue, and probably you at

 3        least need Castillo to come in and say he took them.

 4        So I would give you that opportunity, but at this

 5        point based on foundation alone I would not accept

 6        them.

 7

 8        BY MS. COLTON:

 9             Q.    Let me ask you this, then, Armando:  After

10        you were convicted of the murder offense, did you

11        ever have occasion before he was killed to talk to

12        George Gamboa?

13             A.    Yes, I did.

14             Q.    And did you ask him whether or not he had

15        been contacted by the office of the Public Defender

16        to testify in your murder trial?

17             A.    Yes, I did.

18             Q.    And what did he tell you?

19                   MR. STAJDOHAR:  Objection; hearsay.

20                   THE COURT:  Overruled.

21

22        BY MS. COLTON:

23             Q.    Go ahead.

24             A.    He said that nobody had talked to him on
```

C000427

1     this case.

2          Q.   Did you ask him if he had been willing to

3     testify at your murder trial?

4          A.   Yes, I did.

5          Q.   And what did he say?

6          A.   He said he would.

7          MR. STAJDOHAR:  Judge, I would just lodge a

8     continuing objection to all of his responses.

9          THE COURT:  I understand.

10

11    BY MS. COLTON:

12         Q.   Go ahead.

13         A.   He said he would come and testify for me.

14         Q.   Now, in regards to Ramiro Sandoval, after

15    you were convicted on the first degree murder case,

16    did you ever have an opportunity to talk to Ramiro

17    Sandoval?

18         A.   Yes, I did.

19         Q.   And did you ever ask him if anybody from

20    the Public Defender's Office had contacted him in

21    regards to testifying at your murder case?

22         A.   Yes.

23         MR. STAJDOHAR:  Objection; hearsay.

24         THE COURT:  Overruled.

1              MR. STAJDOHAR:  I would make the same

2       objection about any responses from Mr. Sandoval.

3              THE COURT:  Overruled.

4

5       BY MS. COLTON:

6          Q.   What did he tell you?

7          A.   He told me nobody had talked to him.

8          Q.   Did you ask him if he would have been

9       willing to come and testify again on a second trial

10      on the murder case?

11         A.   Yes.

12         Q.   And what did he tell you?

13         A.   He said he would have.

14         Q.   And in fact are you aware that Ramiro

15      Sandoval had been present a couple of months ago

16      when we were previously set for hearing in this

17      case?

18         A.   Yes.

19             MR. STAJDOHAR:  Objection; relevance.

20             THE COURT:  Sustained.

21             MS. COLTON:  Showing what I've marked

22      Defendant's Exhibits Number 6, 7, and 8.  If I may

23      approach the witness.

24

C0004429

1    BY MS. COLTON:

2        Q.    Armando, I'm going to show you first what

3    I've marked Exhibit Number 6.  Do you recognize what

4    that is?

5        A.    Subpoena.

6        Q.    And do you recognize which of the cases

7    that's from?

8        A.    The attempted murder case.

9        Q.    And who is that subpoena for?

10       A.    Elizabeth DeLaTorre.

11       Q.    Ask you to look at the second page of that

12   subpoena.

13           MR. STAJDOHAR:  I'm sorry, may I have a

14   moment to speak with Counsel?

15           THE COURT:  Sure.

16

17                              (A discussion was had off

18                                   the record)

19

20           MS. COLTON:  Judge, I'm sorry.  Could I

21   have just a minute?  I think I had not separated

22   these.  He's looking at Elizabeth's and I realize I

23   gave Mr. Stajdohar three copies of -- I apologize.

24   I marked them wrong.

C000430

1           THE COURT:  Why don't we do this:  Why

2     don't we go ahead and take a 10-minute recess and

3     you can straighten that part out?

4                 MS. COLTON:  Thank you.

5           THE COURT:  You can step down.  Just don't

6     discuss your testimony.

7

8                             (A recess was taken)

9                       *  *  *

10

11                            (AFTER RECESS the

12                             following proceedings

13                             were had in Open Court,

14                             before Court and

15                             Counsel:)

16

17          THE COURT:  Let's go back on the record.

18       Are you ready to proceed?

19

20    DIRECT EXAMINATION (Continued)

21    BY MS. COLTON:

22       Q.   Armando, I put three exhibits in front of

23    you, Defendant's 6, 7, and 8, and I ask you to look

24    again at Number 6, and you already identified that

1    as a subpoena for Elizabeth DeLaTorre, correct?

2        A.    Correct.

3        Q.    And does it have two addresses on it or one

4    address?

5        A.    It has two addresses.

6        Q.    And can you look at the second page of that

7    exhibit, and does it indicate on the second page

8    that --

9            MR. STAJDOHAR:    I'm going to object for the

10    foundation of all three of these exhibits.

11            THE COURT:    Are they in the court file, the

12    97 case?

13            MS. COLTON:    I believe they are, Judge.

14            THE COURT:    Why don't we proceed on that

15    basis, whatever is in there?    Be sure to bring the

16    file over.

17            MS. COLTON:    Okay.    Then I'll take this

18    back from you.    Thank you.

19

20    BY MS. COLTON:

21        Q.    Armando, after you were convicted on the

22    first degree murder case in 1999, did you ever have

23    any contact with any of the DeLaTorre sisters?

24        A.    I was only writing once with mail.

1  Q. And which of the sisters was it?

2  A. Elyse (sic) DeLaTorre.

3  Q. And was she one of the alibi witnesses?

4  A. Yes.

5  Q. And did you have occasion to ask her in any

6 of the correspondence whether she had ever been

7 contacted by the Public Defender's Office to testify

8 in the murder case?

9   MR. STAJDOHAR:  Objection.

10   THE COURT:  Overruled.

11

12 BY MS. COLTON:

13  Q. What was your answer?

14  A. Yes.

15  Q. Did she indicate to you whether she had

16 been contacted?

17  A. She only said at one time --

18   MR. STAJDOHAR:  I'm going to object again.

19 He's talking about answering the question based on a

20 document that was sent to him that we have no

21 information on the document.

22   THE COURT:  This is a discussion she has by

23 mail.

24   MR. STAJDOHAR:  I believe he said he

C000433

1     corresponded with her.

2              THE COURT:  By mail, and that's enough for

3     this proceeding.

4

5     BY MS. COLTON:

6         Q.   Did she ever tell you whether she was

7     contacted by the Public Defender to testify in your

8     murder case?

9         A.   She told me she was never contacted by the

10    Public Defender.

11        Q.   Did you ever ask her in your correspondence

12    with her whether she would have been willing to

13    testify for you?

14        A.   Yes, I did.

15        Q.   What was her response?

16        A.   That she would.

17        Q.   And do you know where Elizabeth DeLaTorre

18    lives at this point in time?

19        A.   I believe she moved out of the State.

20    Somewhere in Arizona now.

21        Q.   And do you know where Emma DeLaTorre lives?

22             MR. STAJDOHAR:  Objection; relevance to

23    where they live now.

24             THE COURT:  Response?

1          MS. COLTON:  I don't have a particular

2     response to that objection.

3          THE COURT:  Sustained.

4

5     BY MS. COLTON:

6          Q.   Did you ever have occasion after you were

7     convicted on the murder case to talk to Sonia

8     DeLaTorre at all or have any correspondence with

9     her?

10         A.   I talked to her by phone before I left the

11    County to go to the Department of Corrections.

12         Q.   Did any of the conversations that you had

13    with Sonia on the phone before you left the County

14    involve her being contacted by the Public Defender?

15         A.   Yes.

16         Q.   And what did she tell you in regards to

17    that?

18         A.   I asked her if anybody talked to her, and

19    she said nobody.  Nobody talked to her to come

20    testify.

21         Q.   Do you recall if you asked her if she would

22    have been willing to testify if she had been

23    contacted?

24         A.   Yes, I did.

1          Q.    And what was her answer?

2          A.    That she would.

3          Q.    Armando, in the murder case which was

4    charged under 98 CF 535, did you ever agree with

5    your lawyers not to proceed on the alibi defense?

6          A.    No.

7                MR. STAJDOHAR:  Objection.

8                THE COURT:  Overruled.

9

10   BY THE WITNESS:

11         A.    No, I never agreed with them.

12               MS. COLTON:  Thank you.  I have no further

13   questions of Mr. Amaya, Judge.

14               THE COURT:  Mr. Stajdohar?

15

16   CROSS-EXAMINATION

17   BY MR. STAJDOHAR:

18         Q.    How many meetings did you have with David

19   Kliment?

20         A.    The only meetings we had was that one time

21   when he talked to me in the County with the lady

22   that was asking about my background for the

23   sentencing.

24         Q.    How many meetings did you have with him

1     here in the lockup prior to going to trial?

2          A.    About four.  Four.

3          Q.    David Kliment was appointed to represent

4     you on April 16th of 1998, correct?

5          A.    Correct.

6          Q.    And your case went to trial in January of

7     1999?

8          A.    Correct.

9          Q.    How many times were you in court between

10    April and January?

11         A.    I'd say between six, eight times before the

12    trial.

13         Q.    And Mr. Kliment sat down and talked to you?

14         A.    Yes, he did.

15         Q.    And he talked to you about your witnesses?

16         A.    No.  I brought up my witnesses.

17         Q.    But he talked to you about it?

18         A.    Yeah.

19         Q.    And you had been in contact with those

20    witnesses while you were in jail, correct?

21         A.    Correct.  At the beginning of the time,

22    yeah.

23         Q.    You had talked to Sonia, you talked to

24    Emma?

1           A.    Correct.

2           Q.    And you had also talked to George Gamboa?

3           A.    Correct.

4           Q.    And you had talked to Ramiro Sandoval?

5           A.    Correct.

6           Q.    And Elizabeth DeLaTorre?

7           A.    Correct.

8           Q.    And when you met with Mr. Kliment and Miss

9     Parga, you reviewed the police reports?

10          A.    Yes, I did.

11          Q.    And you discussed the police reports, what

12    the evidence was against you?

13          A.    Yes, we did.

14          Q.    And the evidence in this case, the vast

15    majority of it was eyewitness testimony, correct?

16          A.    Two eyewitnesses, correct.

17          Q.    And there were four eyewitnesses who

18    identified you as shooting the victim in this case,

19    correct?

20          A.    No.  Only two.

21          Q.    You participated in two lineups, correct?

22                MS. COLTON:  Judge, I'm going to object.

23    It's outside the scope.  It's also irrelevant.

24                THE COURT:  I think it's important to know

1    the nature of the preparation, so overruled.

2

3    BY MR. STAJDOHAR:

4        Q.   You appeared in two lineups, right?

5        A.   Correct.

6        Q.   And you were identified in both of those

7    lineups?

8        A.   Correct.

9        Q.   And immediately after you --

10           THE COURT:   Excuse me.   There is one other

11   issue under Strickland, the second side of that

12   coin, whether or not there would have been an

13   ability to prevail had this information been

14   presented.   So on that basis it would also be

15   relevant.   So go ahead.

16

17   BY MR. STAJDOHAR:

18       Q.   You were also -- you also stood in a

19   showup, correct?

20       A.   That was the first lineup, and the one in

21   County.   That was the only two lineups I've been in.

22       Q.   Let me take you back to the day you were

23   arrested.   You were arrested on the street while you

24   were in a car, correct?

C000439

56

1          A.    Correct.

2          Q.    And immediately upon that arrest, you were

3     stood outside your car?

4          A.    Correct.

5          Q.    And the police stood next to a civilian who

6     pointed at you?

7          A.    No.   They were inside of a car.   They put

8     us underneath a streetlight.   Two officers stood

9     behind us, and the next thing you know somebody

10    turned the corner screaming something, and that was

11    it.   That was the showup.

12         Q.    And they were screaming that you did it,

13    that you were the shooter, correct?

14         A.    I didn't hear what they said.

15         MS. COLTON:   I would object.   This is going

16    way beyond.

17         THE COURT:   Sustained.

18

19    BY MR. STAJDOHAR:

20         Q.    You discussed all of the evidence against

21    you in the police reports?

22         MS. COLTON:   Objection to the form of the

23    question, who he discussed it with.

24         THE COURT:   Do you understand the question?

1    BY THE WITNESS:

2        A.   Are you talking about David, I discussed it

3    with David?

4    BY MR. STAJDOHAR:

5        Q.   You discussed with Mr. Kliment and/or Miss

6    Parga all of the evidence that was contained in the

7    police reports?

8        A.   Correct.

9        Q.   You reviewed all of the filings that Mr.

10   Kliment made when he listed your witnesses?  You saw

11   that?

12       A.   Yes.

13       Q.   And he filed an alibi defense for you?

14       A.   Yes.

15       Q.   And he filed motions in limine on your

16   behalf?

17       A.   Yes.

18       Q.   And when you proceeded to trial, he

19   cross-examined the witnesses?

20       A.   Which witnesses?

21       Q.   Every witness who testified.

22       A.   The State witnesses, yes, he did.

23       Q.   He asked them lots of questions?

24       A.   Yes, he did.

C000441

1        Q.    And you discussed with Mr. Kliment

2    different options for defenses, correct?

3        A.    No, we didn't.

4        Q.    Well, you discussed the alibi defense with

5    him?

6        A.    Yes, we did.

7        Q.    And you told him that you had these

8    witnesses, being the DeLaTorre sisters and George

9    Gamboa and --

10       A.    Yes.   I told them about the alibi

11   witnesses.

12       Q.    And you told him the witnesses were willing

13   to testify that at the time of the shooting you were

14   with them?

15       A.    Correct.

16       Q.    And you discussed other defenses, the

17   option of just talking about the strength of the

18   State's case, the fact that they failed to prove you

19   guilty beyond a reasonable doubt, you also discussed

20   that with Mr. Kliment and Miss Parga, correct?

21       A.    I don't understand.

22       Q.    Well, prior to going to trial, Mr. Kliment

23   said we're not presenting an alibi defense, correct?

24       A.    No.   He never said that to me.

C000442

1        Q.  He told you that he was going to

2   cross-examine the witnesses?

3        A.  State witnesses.

4        Q.  And he was going to argue that they haven't

5   proved you guilty beyond a reasonable doubt?

6        A.  Correct.

7        Q.  Because there was no physical evidence

8   against you.  There was no gun that was found, there

9   was no gunshot residue?

10       A.  Correct.

11       Q.  And he told you he thought that the case

12   wasn't strong?

13       A.  Correct.

14       Q.  He went over all the potential testimony of

15   each of the witnesses with you, correct?

16       A.  Correct.

17       Q.  And after discussing these with him, you

18   made other calls to the witnesses, correct?  You

19   were in contact with them?

20       A.  At the time of trial, closer to trial, we

21   weren't talking.

22       Q.  Did George Gamboa visit you when you were

23   in jail?

24       A.  No.

1      Q.   Did Ramiro Sandoval visit you in jail?

2      A.   No.

3      Q.   Any of the DeLaTorre sisters come to see

4   you?

5      A.   The first week I was in custody DeLaTorres

6   visited me.   That was all.

7      Q.   All three of them?

8      A.   No.   Emma.

9      Q.   And after you were convicted, you sat in

10   this courtroom and Judge Hudson spoke about your

11   appeal rights, correct?

12      A.   Correct.

13      Q.   And you were there with him and you were

14   listening to Judge Hudson when Judge Hudson advised

15   you of your appeal rights?

16          MS. COLTON:  Objection, Judge; relevancy as

17   to advising him of appellate rights.

18          THE COURT:  Response?

19          MR. STAJDOHAR:  Judge, I would ask to

20   address that outside the presence of the witness.

21      Judge, certainly one of the issues at a

22   post-conviction petition is could ineffective

23   assistance have been raised at the Appellate Court,

24   and it clearly was not in this case, and that would

1    be one of the bases we would be asking the Court to

2    deny this motion.

3           THE COURT: All right. Overruled.

4

5    BY MR. STAJDOHAR:

6        Q. You heard your appellate rights, correct?

7        A. Correct.

8        Q. And Judge Hudson told you that you had to

9    file a motion within 30 days?

10        A. Correct.

11        Q. And in fact you never filed a motion within

12    30 days?

13        A. To the Appellate Court, yes, we did.

14        Q. You filed a motion to appeal within 30

15    days?

16        A. Yes, we did.

17        Q. And prior to filing the notice to appeal,

18    you never filed a motion for a new trial?

19        A. Oh, yeah, yeah. Motion for a new trial,

20    yes, I did.

21        Q. That document was never filed in this Court

22    until September 27th of 2000, correct?

23        A. Correct.

24        Q. But you knew that you had wanted to put on

1    an alibi defense?

2        A.    Yes, I did.

3        Q.    And you knew that immediately after you

4    were found guilty?

5        A.    Yes, I did.

6        Q.    And at that time you felt that Mr. Kliment

7    was ineffective?

8        A.    Well, I -- at that time, at that point in

9    time I didn't understand half of the things that

10   were going on in the courtroom.

11       Q.    At that time, immediately after you were

12   convicted and Mr. Kliment did not put on an alibi

13   defense, you personally thought he was ineffective,

14   correct?

15       A.    Correct.

16       Q.    And you didn't get a motion on file into

17   this court until September 27th of 2000, long after

18   the 30-day period had elapsed, correct?

19       A.    No, I didn't.

20             MS. COLTON:    Judge, I'm going to object at

21   this point.    Attached to my motion or my petition

22   for post-conviction hearing and relief pursuant to

23   725 ILCS 5/122-1 and petition to incorporate

24   Defendant's pro se motion for new trial filed

63                     C000446

1     September 27, 2000, and February 15, 1999, Judge,

2     this issue has already been litigated as far as I'm

3     concerned.  No issue was raised prior to proceeding

4     on this.  The document that Mr. Stajdohar is

5     questioning my client about was incorporated by

6     reference and as an attachment to the

7     post-conviction petition that we're here for hearing

8     on today.  It's part of the court file in 98 CF 535.

9          THE COURT:  If the motion was filed, then

10    certainly the Defendant participated in the

11    preparation for that motion.  I think he should be

12    entitled to ask questions in preparation for that

13    motion.  The fact that it's been litigated really is

14    not the issue in this case.  Whether or not he did

15    participate for the preparation and to the extent he

16    did, it might be relevant.

17         MS. COLTON:  I understand, but I think

18    Counsel is trying to raise the specter of perhaps

19    the Defendant didn't raise the issue of ineffective

20    assistance based on the alibi, when in fact he did.

21    This is a pro se motion filed by the Defendant

22    himself, actually two pro se motions, including an

23    affidavit of Mr. Sandoval.  So if Counsel is asking

24    these questions for purposes of trying to argue

1    later on that this issue wasn't raised by the

2    Defendant, it most certainly was. It's incorporated

3    and filed in the court file.

4              THE COURT: What's the purpose?

5              MR. STAJDOHAR: Judge, the purpose is to

6    show that the Defendant, immediately after his

7    conviction, knew in his mind that his counsel was

8    ineffective. It was never raised on appeal, and

9    clearly it needs to be raised on appeal, and it

10   could have been raised on appeal, and there is no

11   reason why it wasn't raised on appeal; and this

12   post-conviction petition should be denied because

13   you cannot litigate it if it was not raised on

14   appeal for no reason.

15             THE COURT: I'll give you a chance to argue

16   that, but I don't think we need to talk about it any

17   further in terms of the evidence. What's in the

18   court file is in the court file.

19

20   BY MR. STAJDOHAR:

21       Q.   You discussed your appeal with your

22   appellate attorney, correct?

23       A.   By mail, yes, I did.

24       Q.   And you never raised ineffective assistance

1      of counsel with your appellate attorney?

2              MS. COLTON:  Objection, Judge.  Beyond the

3      scope of my direct examination.

4              THE COURT:  Overruled.

5

6      BY THE WITNESS:

7          A.   What was that?

8      BY MR. STAJDOHAR:

9          Q.   You never raised the issue of ineffective

10     assistance of counsel with your appellate attorney?

11         A.   No.  Yes, yes, I did.  Yes, I did.

12         Q.   Your appeal did not appeal on the issue of

13     whether your attorney filed a motion to quash,

14     correct?

15         A.   Correct.

16         Q.   And it did not address the issue of whether

17     your attorney was ineffective for failing to file an

18     alibi defense?

19         A.   Correct.

20         Q.   And you're aware that Mr. Kliment did in

21     fact have transcripts of all of the testimony of all

22     of the witnesses from your first trial?

23         A.   Correct.

24         Q.   Now, when you were arrested on this case,

C000449

1    you were arrested pursuant to an arrest warrant,

2    correct?

3         A.   No.

4         Q.   You weren't arrested on this case on the

5    street?

6         A.   On the murder case?

7         Q.   Correct.

8         A.   I was already in custody.

9         Q.   So you were arrested on a warrant?

10        A.   I guess, yeah.   I was in custody when they

11   came.

12        Q.   And no evidence was seized in this case

13   because you were already in jail?

14        A.   Correct.   I was in prison.

15        Q.   And in fact the motion to quash arrest in

16   the attempted murder case was denied?

17        A.   Correct.

18        Q.   And that was denied by Judge Hudson?

19        A.   Correct.

20        Q.   Now, how many alibi witnesses did you have

21   at the time of this shooting that would have

22   testified that you were with them?

23        A.   Five of them.

24        Q.   And the two shootings occurred at different

C000450

1      times?

2          A.   Correct.

3          Q.   One occurred on Kendall Street after the

4      shooting occurred in this case?

5          A.   Correct.

6          Q.   And earlier, when questioned by your

7      attorney, you said they happened on the same day?

8          A.   Yes, they did.

9          Q.   And you knew that because you were at the

10     scene of both shootings, correct?

11              MS. COLTON:   Objection, Judge.

12              THE COURT:   Response?

13              MR. STAJDOHAR:   What's the basis of the

14     objection?

15              THE COURT:   Well, that's not really the

16     issue before me here as far as I'm concerned, when

17     you talk about ineffective assistance of counsel.

18

19     BY MR. STAJDOHAR:

20         Q.   Did Mr. Kliment ask -- review the

21     transcripts of the first trial with you?

22         A.   No.  He talked about them, but he never

23     showed me those transcripts.

24         Q.   But he talked about them?  He had them?

C000451

1          A.   He said he had them.  He never showed me

2     those transcripts.

3          Q.   And you had a conversation with Mr. Kliment

4     January 21st of 1999, correct?

5          A.   January 21st, I believe so.

6          Q.   And did that occur here or at the Kane

7     County Jail?

8          A.   Here.  That happened here.

9          Q.   And when you talked with him, you were

10    talking about the alibi defense, correct?

11         A.   Correct.

12         Q.   And you told him that you didn't shoot the

13    victim in this case?

14         A.   Correct.

15         Q.   And you told him you were at the scene when

16    this victim was shot, but you didn't have a gun?

17         A.   I never told him that.

18              MS. COLTON:  Objection, Judge.  Again, this

19    is going way beyond the scope.

20              THE COURT:  Overruled at this time because

21    we're talking about in the attorney's presence.

22              Go ahead.

23

24

1    BY MR. STAJDOHAR:

2         Q.   You told your attorney that you were at the

3    scene of the shooting but that you didn't shoot him?

4         A.   I never told him that.

5         Q.   You told him you didn't have a gun?

6         A.   I told him I had no gun, but I never told

7    him I was at the scene.

8         Q.   And you told him that your witnesses were

9    willing to testify that you were with them?

10        A.   Correct.

11        Q.   But you told him you were at the scene of

12   the crime?

13        A.   I never told him I was at the scene of the

14   crime.

15        Q.   And in fact you knew that one of the alibi

16   witnesses said that you guys had gone out to dinner,

17   you and Ramiro Sandoval and George Gamboa?

18        A.   No.

19        Q.   Had gone out to dinner at the time of the

20   shooting?

21        A.   No.  If you look at Ramiro's testimony, he

22   tells you himself that only him and George left.

23        Q.   And in fact you knew that in your interview

24   with the police, you said that you were at Sonia's

    C000453

1    house at 8:00 and that you were picked up by George

2    and Rudy in a white car, and as soon as you left the

3    house, you were stopped by the police?

4        A.    As soon as we left the DeLaTorres' house we

5    were stopped by the police.

6        Q.    And the time you were stopped was after

7    both of the shootings had occurred?

8        A.    Correct.

9        Q.    You also knew that each of the witnesses

10   for your alibi had different times for you arriving

11   at the house?

12       A.    I was there most of the day.

13       Q.    And you knew that Emma DeLaTorre gave a

14   taped statement admitting that all three of you had

15   left for a short time in that period when you were

16   supposed to be at their house?

17       A.    Her statement was confusing, as the officer

18   stated.

19       Q.    And Elizabeth DeLaTorre made a statement

20   that you actually left the house at 6:00, that you

21   had been at the house since 11:00 that morning but

22   left the house at 6:00, came back at 7:00, and then

23   at 8:00 all three of you were in the house and left

24   and came back at 10:30?

1        A.    No.

2        Q.    I'm sorry.

3              MR. STAJDOHAR:   Strike that question,

4    Judge.

5

6    BY MR. STAJDOHAR:

7        Q.    You knew in addition to the witnesses who

8    testified that they saw you shoot the victim in this

9    case, there were other witnesses who could testify

10   that they saw you at the scene of the Kendall

11   shooting two hours later, correct?

12       A.    There was only one witness.

13       Q.    And he stated that he could positively

14   identify you?

15       A.    Correct.

16       Q.    And what was that witness's name?

17       A.    Kirkwood, I think.  I don't know his first

18   name.  I think it was Kirkwood.

19       Q.    And in addition to that, you knew that

20   Tracy Johnson could identify you because he said you

21   came by a few minutes later, throwing down the

22   forks, and he identified you, George Gamboa, and

23   Ramiro Sandoval as being in the car and a witness to

24   the shooting?

1     MS. COLTON: Judge, I'm going to object. I

2     don't know what this has to do with ineffective

3     assistance of counsel for failure to present the

4     alibi defense.

5     THE COURT: Well, obviously I'm going to

6     have to take a look at the transcripts to see

7     whether or not if the witnesses were available and

8     could testify what effect they would have had on the

9     outcome. That's the reason you're offering this, I

10    take it, isn't it, Mr. Stajdohar?

11    MR. STAJDOHAR: That's correct, and also

12    the strategic decision that Mr. Kliment was aware

13    these witnesses were available to testify and would

14    testify.

15    MS. COLTON: In regards to the way the

16    questions were asked, he's asking the Defendant you

17    knew this, you knew this. That's my objection,

18    Judge.

19    THE COURT: Certainly as it relates to

20    discussions with Counsel, I think it's appropriate.

21    Go ahead.

22

23    BY MR. STAJDOHAR:

24    Q. Going back to the conversation you had with

1   Mr. Kliment where you said that you didn't shoot the

2   victim, correct?

3        A.   I never told him I didn't shoot the victim.

4             MR. STAJDOHAR:  I have nothing further.

5             THE COURT:  Miss Colton?

6

7   REDIRECT EXAMINATION

8   BY MS. COLTON:

9        Q.   Armando, Counsel asked you questions about

10  January 21, 1999, this conversation you had with

11  David Kliment.  Do you remember that conversation?

12       A.   About the alibi defense and about the

13  trial?

14       Q.   Yes.

15       A.   Yes.

16       Q.   And where did that occur?

17       A.   Here in the back, in the lockup area

18  (indicating).

19       Q.   You're pointing to the door in the lockup

20  area, correct?

21       Did you ever, during that conversation or any

22  other conversation, ever make any admissions to Mr.

23  Kliment about committing this murder?

24       A.   No.  I never admitted to nothing to Mr.

C000457

1    Kliment.

2        Q.    And Counsel asked you about the appeal and

3    the conversation or communications you had with your

4    appellate attorney.  Did you write the appeal in

5    your case?

6        A.    No, I did not.

7        Q.    Did the attorney write it for you?

8        A.    Yes.

9        Q.    And Counsel asked you about a person by the

10   name of Kirkwood who was a witness in the murder

11   trial; is that correct?

12       A.    That was the attempt murder.

13       Q.    That wasn't in the murder case, was it?

14       A.    No.

15       Q.    And again, in the attempted murder case,

16   what was the ruling or the verdict of the jury in

17   that case?

18            MR. STAJDOHAR:  Objection; asked and

19   answered.

20            THE COURT:  Sustained.

21

22   BY MS. COLTON:

23       Q.    In your mind did Mr. Kirkwood have anything

24   to do with the murder case?

C000458

1          A.    No.

2                MR. STAJDOHAR:  Objection.

3                THE COURT:  Sustained.

4

5    BY MS. COLTON:

6          Q.    Did you, in any of these discussions with

7    Mr. Kliment, did you ever talk about the attempt

8    first degree murder case and the facts of that case?

9          A.    We only talked about -- well, I kept on

10   bringing up the alibi defense and the fact I was

11   arrested with George Gamboa and Ramiro Sandoval and

12   that I was the only one incarcerated.

13         Q.    Were you ever convicted for that attempt

14   first degree murder?

15         A.    No, I was not.

16               MR. STAJDOHAR:  Objection; relevance.

17               THE COURT:  Sustained.

18               MS. COLTON:  I don't have any further

19   questions.

20               THE COURT:  Mr. Stajdohar?

21               MR. STAJDOHAR:  I have nothing based on

22   that.

23               THE COURT:  Thanks.  You can step down.

24               MS. COLTON:  Judge, I would be asking leave

C000459

1    to call Mr. Castillo, who is not present today, but

2    since this is a bench matter, and I know Mr. Kliment

3    is available, I don't know if you want to proceed

4    with that portion of it.

5           THE COURT:  How long do you expect his

6    testimony will take?

7           MR. STAJDOHAR:  It could take quite long,

8    Judge.

9           THE COURT:  More than -- past 4:30?

10          MR. STAJDOHAR:  I wouldn't anticipate it.

11   I would anticipate the cross being quite a bit

12   longer than the direct.

13          THE COURT:  So what's your estimate of

14   time?

15          MR. STAJDOHAR:  I can only anticipate the

16   direct would probably last under 20 minutes.

17          THE COURT:  All right.  Why don't we take a

18   recess and try to get Mr. Kliment in and we'll

19   proceed?

20          MR. STAJDOHAR:  And, Judge, I would be

21   making a motion to deny the motion and that the

22   burden has not been shifted at this time.

23          THE COURT:  It will be denied.

24     We'll recess until Mr. Kliment is back with you.

C000460

1            (A recess was taken)

2                    * * *

3

4                    (AFTER RECESS the

5                    following proceedings

6                    were had in Open Court,

7                    before Court and

8                    Counsel:)

9

10        THE COURT:  Ready to proceed?

11        MR. STAJDOHAR:  I am, Judge.

12    The State would call David Kliment.

13        THE COURT:  Do you want to raise your right

14    hand?

15

16                    (The witness was duly

17                    sworn by the Court)

18

19        THE COURT:  Have a seat.

20

21                DAVID KLIMENT,

22    called as a witness herein, having been first duly

23    sworn by the Court, was examined and testified as

24    follows:

C000461

1    DIRECT EXAMINATION

2    BY MR. STAJDOHAR:

3        Q.    Mr. Kliment, you are the Kane County Public

4    Defender, correct?

5        A.    Yes.

6        Q.    And can you relate to the Court your

7    educational background?

8        A.    I graduated from Northern Illinois

9    University College of Law in 1984.

10       Q.    And have you passed the Illinois Bar?

11       A.    Yes.

12       Q.    When did that occur?

13       A.    1984.

14       Q.    Starting in 1984, what work experience have

15   you had working as an attorney?

16       A.    I was an Assistant State's Attorney for

17   about a month, then I worked for the law firm of

18   McNamee and Mahoney for about 7 months after that,

19   until July of 1985.  I then started my own practice

20   and did that until December 1st of 1994, when I

21   became the Kane County Public Defender.

22       Q.    And in your time of practice has it all

23   been criminal law, or have you done civil law?

24       A.    When I was in private law, private practice

C000462

1    I did civil law and corporate law and family law and

2    a lot of criminal.  I was Conflict Counsel for the

3    County for 5 years prior to becoming the Public

4    Defender.

5         Q.   In that period of time approximately how

6    many felonies have you represented defendants on?

7         A.   Hundreds.

8         Q.   And how many murder cases have you

9    represented defendants on?

10        A.   In excess of fifty.

11        Q.   And how many of those have you taken to

12   jury trials?

13        A.   I've probably tried at least forty or fifty

14   murder cases.

15        Q.   And --

16        A.   Half of those were capital cases.  I keep

17   more track of those.

18        Q.   And you're qualified under the Capital Bar?

19        A.   Yes.

20        Q.   You were assigned as the Public Defender's

21   Office this case, 98 CF 535, People versus Armando

22   Amaya, correct?

23        A.   Yes.

24        Q.   And that occurred in approximately April of

C000463

1    1998, correct?

2         A.    I believe so.

3         Q.    And at that time you assigned this case to

4    yourself; is that correct?

5         A.    Yes.

6         Q.    And co-counsel on the case was Sandra

7    Parga?

8         A.    Yes.

9         Q.    And during -- after you assigned yourself

10   the case, you proceeded to represent this Defendant.

11   You reviewed all of the discovery materials tendered

12   to you by the State; is that correct?

13        A.    Yes.

14        Q.    And that included all the police reports?

15        A.    Yes.

16        Q.    Tapes, transcripts of tapes, witness

17   statements; is that correct?

18        A.    Yes.

19        Q.    And you also reviewed transcripts from the

20   Defendant's trial in 97 CF 2326, which was an

21   attempted murder that occurred on the same day as

22   this murder occurred; is that correct?

23        A.    Yes.

24             MS. COLTON:    I'm going to object at this

1    point to the leading nature of the questions.

2         THE COURT:  Sustained.

3

4    BY MR. STAJDOHAR:

5         Q.   Did you review the transcripts from 97 CF

6    2326?

7         A.   Yes.  I'm not certain that I reviewed all

8    the transcripts, but I know I reviewed the

9    transcripts of and I have in my file a number of the

10   witnesses.

11        Q.   And those witnesses included the DeLaTorre

12   sisters?

13        A.   Yes.

14        Q.   And George Gamboa?

15        A.   Yes.

16        Q.   And Ramiro Sandoval?

17        A.   Yes.

18        Q.   And these were all alibi witnesses on the

19   97 case, correct?

20        A.   Yes.

21        Q.   And you had discussions with this Defendant

22   about the case, correct?

23        A.   Yes.

24        Q.   Did you specifically discuss the witnesses

1    that the Defendant wanted called as alibi witnesses?

2         A.   On a couple of occasions, yes.

3         MS. COLTON:  I would object on time frame,

4    if we could have a time frame.

5         THE COURT:  He can ask an introductory

6    question and follow up.  Overruled.

7

8    BY MR. STAJDOHAR:

9         Q.   How soon into the case did you begin to

10   discuss the alibi defense with the Defendant?

11        A.   I couldn't give you an exact date.  I know

12   I talked to him about it as soon as he made me aware

13   of the witnesses, because we went about getting the

14   transcripts then of those witnesses.

15        Q.   And did you ever receive those transcripts?

16        A.   Yes.  I have all those transcripts.

17        Q.   And you saw them as late as yesterday; is

18   that correct?

19        A.   Today.

20        Q.   And --

21        A.   I didn't read them.  I just know I have

22   them.  I mean I didn't read them today or yesterday.

23        Q.   Did you read them when they were first

24   tendered to you back in '97, '98?

1      A.   Of course.

2      Q.   And how many times did you discuss the

3   alibi defense with the Defendant during the pendency

4   of the case?

5      A.   I don't know.  I know the most recent time

6   I discussed them with him would have been -- the

7   case started I think on the 24th or 25th, I believe,

8   of January.

9      Q.   And that's 1999?

10     A.   '99.  And I talked to him -- we had a

11  pretrial the week before.  We talked to him, and I

12  think that was on the 21st of January.  I'm

13  remembering this from a combination of my notes and

14  my recollection outside of my notes.  January of

15  1999, January 21st of 1999 would be probably the

16  last time I discussed the alibi defense with him.

17     Q.   And did you discuss all of the potential

18  issues for trial on that day?

19     A.   On that date?  I don't know if we discussed

20  all the potential issues, but over the course of

21  preparing, yes, we discussed all the potential

22  issues as best I could.

23     Q.   Did you discuss different strategies

24  available?

1   A.   Yes.

2   Q.   Different defenses that were possible

3   defenses?

4   A.   Yes.

5   Q.   And did you have an investigator interview

6   potential witnesses?

7   A.   I did.   There were no reports prepared by

8   any investigators.

9   Q.   And your investigators, were they listed as

10   potential witnesses in the trial?

11   A.   Yes.

12   Q.   And in addition to that, even members of

13   your office, attorneys were listed as potential

14   witnesses in the trial; is that correct?

15   A.   Certainly one, and as I sit here now and I

16   see his name listed, I can't remember why, but

17   that's -- it's going on 6 years ago.

18   Q.   Did you also have the opportunity to

19   discuss the filing of motions with the Defendant?

20   A.   Yes.

21   Q.   And did you discuss specifically a motion

22   to quash arrest?

23   A.   Briefly.

24   Q.   And did your investigation reveal -- let me

C000468

1    ask you this:  Why didn't you file a motion to quash

2    arrest?

3        A.    Two reasons.  I believe there was a warrant

4    out for Armando's arrest at the time he was

5    arrested; and second, if my memory serves me

6    correct, in the police reports the car that he was

7    in when he was arrested that same night had been

8    seen and described by a witness, I want to say

9    Terrance Williams, but I'm not sure if that's

10   correct, the guy's name.  Earlier at the scene of

11   the shooting he was described by witnesses, and I

12   think the same witness, as running to that car with

13   others right after the shooting.  And this same

14   witness, somewhat later that night, I believe not

15   long after the shooting, was at the scene of where

16   that car was stopped and was drawn to it by the

17   flashing red lights of the police cars and

18   voluntarily told the police, "That's the car, that's

19   the guys who are in the car."  I didn't feel there

20   was a legal basis to file the motion.  I think they

21   certainly had probable causes, especially given the

22   warrant to arrest him.

23       Q.    And did you base that decision on all of

24   your knowledge of the law, your training, and your

1    legal education?

2       A.   Yes.  Not on my legal education.  They

3    don't teach you much about motions in law school.

4    But certainly on my experience and my understanding

5    of ethical rules, I don't like to file what I

6    believe to be frivolous motions.

7       Q.   And shortly before proceeding to trial, did

8    you file an alibi defense with the court?

9       A.   Yes, I did.

10       Q.   And did you file a list of witnesses,

11    including all of the potential alibi witnesses?

12       A.   I hope I did.

13       MR. STAJDOHAR:  And I would just ask the

14    Court to take judicial notice of the court file.

15

16    BY THE WITNESS:

17       A.   I think I remember seeing something in my

18    file.  I don't remember if it had a file stamp on

19    it.  I know I filed an answer to discovery, I

20    believe it was a supplemental answer to discovery,

21    where I disclosed an alibi defense, and those

22    witnesses would have been in that supplemental

23    disclosure.

24

C000470

BY MR. STAJDOHAR:

    Q.   And once you had discussed and actually prepared these documents, whether you filed them with the court or not, did you have a further discussion with the Defendant about the alibi defense?

    A.   Yes.

    Q.   And what did he relate to you at that time?

    MS. COLTON:  Judge, again objection, based on foundation.

    THE COURT:  Sustained.


BY MR. STAJDOHAR:

    Q.   Did you have a discussion with the Defendant on January 21st of 1999?

    A.   Yes.

    Q.   And do you recall where that discussion occurred?

    A.   It was in the lockup behind -- we were in court.  It was Judge Hudson's case, and we were in court.  It might have been this courtroom.

    Q.   And --

    A.   And we were talking about preliminary matters for the trial.  I know we talked about

C000471

1    clothes.

2         I also told him with respect to the alibi

3    defense and the witnesses that I didn't like the

4    defense, that it was always my opinion, based on my

5    experience, that putting on a bad alibi defense is

6    worse than putting on no defense at all, because it

7    makes it look like you're trying to lie if the alibi

8    is going poorly.  I believe that, and this is what I

9    was telling Armando, that he would be better off not

10   doing it.  He wanted me to do it.  He wanted me to

11   put on an alibi defense.  I explained to him that

12   putting on any kind of defense was a matter of trial

13   strategy.  He was upset a little bit because it was

14   his life on the line, I think was a phrase he used

15   more than once, which is true, and I certainly

16   empathize with that.  Then he made other statements

17   that I believe made it impossible for me to put on

18   the alibi defense.

19        Q.   And what specifically did he say that made

20   it impossible for you to put on an alibi defense?

21        A.   He told me that the witnesses were there to

22   testify for him, they know what to say, but that he

23   was there at the shooting, he just wasn't involved.

24   When he told me that, it made me believe that the

89

1    alibi witnesses would perhaps not testify

2    truthfully.

3        Q.   And when he said he was there at the scene

4    of the shooting, was he referring to the shooting

5    that he was charged with in this murder?

6        A.   That was the topic of conversation.  I

7    related to you what he said.  I didn't explore it

8    any further because I didn't want to go any further

9    with it.

10       Q.   And based on your understanding of the law

11   and your ethical obligations, your experience and

12   your training, that was why you made the decision

13   not to put on an alibi defense; is that correct?

14            MS. COLTON:  Objection; leading.

15            THE COURT:  Sustained.

16

17   BY MR. STAJDOHAR:

18       Q.   Is that why you did not put on an alibi

19   defense?

20       A.   That is what made it easy for me to decide,

21   as it really was a matter of trial strategy, that

22   would not have been an effective defense, but then I

23   think I became barred from using it.

24       Q.   And that was based on your knowledge of the

C000473

1    law?  Of the ethics of the law?

2        A.   Yes.

3        Q.   Were you present when the Defendant was

4    advised of his appeal rights?

5        A.   Yes.

6        Q.   And prior to the Defendant being advised of

7    his appeal rights, did you explain to him why you

8    could not put on the alibi defense at his trial?

9        A.   I don't recall ever having that

10   conversation.  I think I told him on the 21st,

11   basically I said we're not going to do that, I can't

12   now, and I went no further with it; but I don't know

13   that I ever talked to him about it again.

14            MR. STAJDOHAR:  I have nothing further.

15            THE COURT:  Miss Colton?

16            MS. COLTON:  Thank you.

17

18   CROSS-EXAMINATION

19   BY MS. COLTON:

20       Q.   Do you recall at what point in time you

21   obtained the transcripts from the 1997 case that

22   actually proceeded to trial?

23       A.   No.

24       Q.   And do you recall when you reviewed any of

C000474

1    those transcripts?

2        A.   Do I recall when I reviewed them?  No, I

3    don't recall the date I sat down and read them.  No,

4    I don't.

5        Q.   Do you know whether you reviewed them

6    before you proceeded to trial in the murder case?

7        A.   Certainly.

8        Q.   You said you don't know if you reviewed all

9    of the transcripts, correct?

10       A.   Like opening statements, jury selection,

11   closing arguments, I don't believe I have any of

12   those transcripts.  I have transcripts of witness

13   testimony.

14       Q.   Okay.  And I thought I understood you to

15   say that you weren't sure that you reviewed all of

16   the witnesses from the 97 case?

17       A.   I don't know that I have all the witness

18   transcripts from the 1997 case.  I'm not -- as I sit

19   here now, without looking at the list of transcripts

20   or the transcripts and the witnesses who were

21   called, I don't know if I have them or not.  I think

22   I do.  I think I have the police.  I know I have the

23   witnesses that Mr. Stajdohar mentioned, but that's

24   the best I can answer.

1     Q.   And from your knowledge of both of the

2    cases, the attempt murder and the murder were

3    alleged to have occurred on the same night, correct?

4     A.   Yes.

5     Q.   And about an hour and a half apart; is that

6    fair to say?

7     A.   Yes.

8     Q.   And was it your understanding from talking

9    to Mr. Amaya about the alibi defense that his alibi

10   witnesses covered that entire period of time which

11   encompassed both the attempt murder and the murder?

12    A.   No, I don't think that they did.  I think

13   that they tried to, but when you piece it together,

14   there were gaps and so forth, and I'm trying to

15   remember back a long time, remember, but there were

16   problems with it.

17    Q.   And that's not unusual when you have

18   civilian witnesses, correct?

19    A.   Not unusual when you have any witness.

20         MR. STAJDOHAR:  Objection.

21         THE COURT:  Sustained.

22

23   BY MS. COLTON:

24    Q.   Were you aware from the discovery that you

1 received in the murder case that Armando had given a

2 videotaped statement to the police on October 30th

3 of '97?

4   A. I have that, I believe.

5   Q. And were you aware that at least three

6 times in the videotaped statement he mentioned to

7 the police that he could prove where he was?

8   A. I haven't read that transcript in a long

9 time, so I don't remember that.  I know that I have

10 that transcript in the discovery that I have in my

11 office, and I know that I would have read it, so at

12 the time of the trial, yeah, I'm sure I knew that.

13   Q. And at the time of the trial you also would

14 have been aware that the word "alibi" was actually

15 used in the videotaped statement, correct?

16   A. If it's in there, yeah, I would have read

17 it.

18   Q. Do you recall whether the videotaped

19 statement of Armando Amaya was played at your trial,

20 the murder case?

21   A. I do not recall.

22   Q. You did not play it; is that correct?  You

23 did not attempt to introduce it into evidence?

24   A. No.

C000477

1       Q.  In fact you didn't call any witnesses at

2  the trial; is that correct?

3       A.  I don't believe that I did.

4       Q.  And were you also aware in the discovery in

5  the murder case that there was a taped or a

6  transcript of a taped statement of Sonia DeLaTorre

7  which was given on October 30th of '97?

8       A.  I have that, yes.

9       Q.  And she also had mentioned an alibi defense

10  in that case; is that correct?

11       A.  If it's in the transcript.  Once again,

12  Miss Colton, I haven't read the transcript since

13  back then, but I know I have the transcript.

14       Q.  You were -- at the time you were appointed

15  to represent Mr. Amaya in the murder case, you were

16  aware he had the attempt murder pending, correct?

17       A.  Yes.  I think you and I talked about it,

18  although I don't recall what we said.

19       Q.  And my next question has just been

20  answered.  You were aware I was representing him on

21  the attempt murder, correct?

22       A.  Yes.

23       Q.  Do you recall before you went to trial on

24  the murder case if you knew what the outcome was on

1    the attempt murder?

2        A.   Well, see, now, I would be confused with my

3    answer.  I know now.  I don't know if I knew then.

4    I'm sure I did.  I know now it was a hung jury.  I

5    don't know if I knew that back then.  I don't know

6    why I wouldn't have known it.

7        Q.   In fact at least on one court date both of

8    us appeared on behalf of Mr. Amaya; is that correct?

9        A.   I don't remember that.

10       Q.   Were you aware that late in '97, about a

11   month and a half after Armando was arrested, that

12   there was a bond reduction held when he was only

13   charged with the first case?

14       A.   I don't know if I was aware of that or not.

15   I don't recall being aware.

16       Q.   And if you weren't aware, then you weren't

17   in possession of a transcript of that bond

18   reduction; is that correct?

19       A.   I do not believe I have a transcript from

20   that bond reduction.  I tried -- I'm sorry.

21       Q.   Now, you said that you talked to the

22   Defendant about the alibi as soon as the Defendant

23   brought it up.  Is that fair to say?

24       A.   Certainly.

C000479

1      Q.   And was that early on in your

2   representation of him?

3      A.   I don't remember.

4      Q.   Going then to the questions about this

5   discussion on January 21st of 1999 that you said was

6   a pretrial for the case?

7      A.   Yeah.  I can't tell from looking at my

8   notes if we did the pretrial.  There were motions in

9   limine that were argued that may well have been

10   argued that afternoon, but it was -- at the very

11   least it was here in court and there was a court

12   date that day for something.  Judge Hudson doesn't

13   generally do pretrials the week before trial like

14   some of the judges do, but we were here, I know, on

15   the 21st.

16      Q.   On the 21st?

17      A.   Yes.

18      Q.   And was the -- and then the case was then

19   continued over to the 22nd, correct, the Friday?

20      A.   I was going to say before I reviewed the

21   file as carefully as I could, given the other work I

22   had to do yesterday and today, and I have an order

23   from the morning of the 21st continuing it over to

24   the afternoon of the 21st.  I did not find an order

C000480

1    from the afternoon of the 21st, so I don't know if

2    motions in limine were ruled on or not.  I have

3    notes that indicate rulings from a motion in limine,

4    but there is no date on the note, so I don't know if

5    that happened that day or if it happened the next

6    day.  I just don't recall.

7         Q.    At any rate your recollection of this

8    conversation that you had with Mr. Amaya in the

9    lockup is from the 21st of January, correct?

10        A.    Yes.

11        Q.    And --

12        A.    And I think it's from in the afternoon,

13   after lunchtime, because I believe I was not present

14   in the morning, and that's why it got put over to

15   the afternoon.

16        Q.    And you said during that conversation that

17   you had with Mr. Amaya in the lockup that again he

18   discussed with you the alibi defense?

19        A.    Yes.

20        Q.    And --

21        A.    We argued about the alibi defense.  It

22   wasn't a discussion.  We were arguing about it.

23        Q.    Why were you arguing about it?

24        A.    Because I didn't want to put it on.

1    Q.   And you said the Defendant was upset.   He

2    even said that it was his life on the line, correct?

3    A.   Yes.

4    Q.   And you didn't want to put it on because

5    you said you didn't like the defense, correct?

6    A.   Yes.   I thought it was going to come on

7    very poorly and look like a made-up lie.   That's how

8    I thought it was going to come out at trial.

9    Q.   And that wasn't based on anything that

10   Armando had told you; is that correct?

11   A.   Not at that point, no.

12   Q.   That was based on a decision that -- an

13   opinion that you had about the alibi defense,

14   correct?

15             MR. STAJDOHAR:   Objection; relevance.

16             THE COURT:   Overruled.

17

18   BY THE WITNESS:

19   A.   Yes.   That's my job, I think, to evaluate

20   the evidence before I put it on.

21   BY MS. COLTON:

22   Q.   And as I understand it, you told him it's

23   worse to put on an alibi defense?

24   A.   I don't know if I told him that.   That's my

C000482

1    belief.  I don't know if I told him that.  I would

2    hope that I did.  I know I wouldn't try to not tell

3    him something about it.

4        Q.    Is it fair to say he was insisting on

5    proceeding on the alibi defense?

6        MR. STAJDOHAR:  Objection; relevance.  The

7    decision of trial strategy is Counsel's, not his

8    client's.

9        THE COURT:  Overruled.

10

11   BY THE WITNESS:

12       A.    You could say that, yes.  That would be

13   fair to say.

14   BY MS. COLTON:

15       Q.    And as I understand your testimony this

16   afternoon, he told you the witnesses knew what to

17   say?

18       A.    Yes.

19       Q.    And did you ask him any questions of how is

20   it they know what to say?

21       A.    No, because it progressed beyond that

22   before I would have asked any other questions.

23       Q.    And the progression you're talking about is

24   his allegedly saying that he was there at the scene?

C000483

1      A.   Yes.

2      Q.   And you didn't ask him any questions about

3   "What do you mean, you were there at the scene?"

4      A.   No.

5      Q.   You didn't ask him what time, did you?

6      A.   No, I didn't ask specific questions about

7   it because of the context of the conversation.

8      Q.   In fact he was there at the scene when he

9   was stopped in the car at about 10:30, correct?

10     A.   That is not -- that's true, yes.

11     Q.   But you didn't explore what was in his mind

12   when he said to you, "I was there at the scene"?

13     A.   Not by asking specific questions, no.

14     Q.   And you said that it was during this

15   discussion that it wasn't really a discussion, it

16   was sort of a heated discussion?

17     A.   Well, it started out that way, and then it

18   didn't end up that way.  I mean we always got along

19   fine during the trial and everything else, and I

20   think by the time we left, we were seeing eye to

21   eye.  I mean he understood, I thought.

22     Q.   What did he understand?

23     A.   Why we weren't going to put an alibi

24   defense on.

C000484

1      Q.   You told him on the 21st you weren't going

2   to put an alibi defense on?

3      A.   I believe I said, "I can't do that now."

4   Can't or won't.  I don't remember my exact word.

5      Q.   So you may have said, "I won't do it"?

6      A.   Yeah.

7      Q.   And that was based on your understanding

8   that apparently he had made some sort of admission

9   to you?

10     A.   Yes.

11     Q.   Who else was present during the time you

12   had this conversation with him?

13     A.   Nobody.

14     Q.   Just so I understand your frame of mind

15   then, when you left Armando's presence on the 21st

16   of January of 1999, after having this discussion, it

17   was your position that you were barred from

18   asserting an alibi defense, correct?

19     A.   Yes.

20     Q.   Why then on January 22nd of 1999 did you

21   file with the Court a supplemental answer to

22   discovery which asserted alibi as an affirmative

23   defense?

24     A.   I would say that I didn't want to foreclose

1    it completely.  I left there knowing what I think

2    was the right thing to do, but I had the paperwork

3    done, and since we were getting right on top of

4    trial, I filed it, but -- and I don't recall what I

5    was thinking when I filed it, but I don't think I

6    had any intention of actually putting it on at that

7    point.

8         Q.  And in the supplemental answer to discovery

9    that was filed on January 22, 1999, you listed seven

10   witnesses, correct?

11        A.  I don't know.  I mean if that's what's

12   there, then that's seven witnesses.

13        Q.  If the court file reflects that you listed

14   Adan Torres, Joseph Dopp, Emma DeLaTorre, Sonia

15   DeLaTorre, Elizabeth DeLaTorre, George Gamboa, and

16   Ramiro Sandoval, would that sound right?

17        A.  Yes.

18        Q.  Do you recall with everyone, with the

19   exception of Adan Torres, who was in the Kane County

20   Correctional Center, that you listed "address

21   unknown" for all of those persons?

22        A.  Yes.  Now I remember, looking at those

23   yesterday or today, and I had no address for them.

24        Q.  Now, you said that investigators had been

1    participating in the investigation in this case?

2         A.   Yes.

3         Q.   And those were investigators who worked for

4    your office?

5         A.   Yes.

6         Q.   Who did your investigators interview?

7         A.   I don't know.  As I sit here now, I don't

8    know, and there is nothing in my file to indicate

9    who they talked to, if anyone.

10        Q.   Which investigators were involved in

11   interviewing people?

12        A.   I don't know.  It's listed on an answer to

13   discovery in the file.  On one of the answers I

14   believe I listed one or two investigators.

15        Q.   Do you have any recollection of

16   specifically asking any of the investigators that

17   worked in your office to talk to anybody involved in

18   the alibi defense?

19        A.   I have no recollection of that, if I did or

20   if I did not.  It would normally be in my file, a

21   written investigation request.  I could not find

22   one.

23        Q.   And at least as of January 22nd of '99,

24   which was the Friday before the trial started on

C000487

1    Monday, you didn't have addresses for Emma

2    DeLaTorre, Sonia DeLaTorre, Elizabeth DeLaTorre,

3    George Gamboa, or Ramiro Sandoval, correct?

4        A.   The day I prepared that document, I

5    certainly didn't have any addresses, no.

6        Q.   Were you aware that they had all or at

7    least four of them had testified in the attempt

8    murder case?

9        A.   I had their transcripts.

10       Q.   And there were addresses in the transcripts

11   as well, correct?

12       A.   There were, and I also have a note that

13   Armando had arranged to have some of the witnesses,

14   and I don't have the names written of which

15   witnesses, flown in from Phoenix, I think.  Some of

16   them were living in Phoenix.  I don't know this.

17   That's just what my notes say.

18       Q.   And Armando was in jail at that time,

19   correct?

20       A.   Yes.

21       Q.   And is it true that the reason that you

22   listed Joseph Dopp was because he was allegedly a

23   person who had a conversation with a jail inmate

24   that indicated that somebody else had in fact

1   committed this murder?

2       A.   As I sit here today, I cannot tell you why.

3   That name means nothing to me as I sit here today.

4   I'm sorry.

5       Q.   Were you aware that Adan Torres had

6   allegedly confessed in the jail to committing this

7   crime?

8           MR. STAJDOHAR:  Objection; facts not in

9   evidence.

10          THE COURT:  Not yet.  You can answer the

11  question, if you know.

12

13  BY THE WITNESS:

14      A.   As I sit here now, I don't know that, and I

15  don't know if I knew it back then.  There is nothing

16  in my file to indicate that I knew that.

17  BY MS. COLTON:

18      Q.   Do you recall the State filing a motion in

19  limine on January 21st of 1999, barring you from

20  calling Joseph Dopp or any other witness about a

21  hearsay conversation that Mr. Dopp had with a Kane

22  County Jail inmate on December 10th of '97, during

23  which conversation the inmate allegedly admitted the

24  commission of this murder?

C000489

1       A.   Obviously it's in the file.  I don't

2   remember it.

3       Q.   Did you ever talk to Armando about

4   testifying in his own defense?

5       MR. STAJDOHAR:  Objection.  Judge, once

6   again, it's far beyond the scope of the allegations

7   contained in the post-conviction petition.

8       THE COURT:  Overruled.

9

10  BY THE WITNESS:

11      A.   I know that I talked to him about it.  I

12  don't remember what I said to him or what he said to

13  me.  I could tell you what I say to everybody and

14  I'm sure I said it to him, that he has a right to do

15  so if he wants to.  As I sit here today, I don't

16  know what I advised him to do.  I just don't

17  remember.

18  BY MS. COLTON:

19      Q.   Do you remember giving him an opinion after

20  reviewing all the discovery in the case as to the

21  strength or weakness of the State's case?

22      A.   I don't remember if I did or not.  I

23  normally would, but I don't remember specifically

24  doing that.  So I can't answer your question yes.

1    Q.   Do you remember telling him that there was

2  no physical evidence against him in the case?

3    A.   I don't remember telling him that.  I'm not

4  saying that I did not.  I don't believe there was

5  any physical evidence against him.  I don't

6  remember.

7    Q.   You just simply don't recall?

8    A.   Right.

9    Q.   Do you remember telling him that the case

10 against him wasn't strong?

11    A.   I don't remember telling him that.  That

12 does not mean I did not.  I don't recall.

13    Q.   Mr. Kliment, in all the years of experience

14 that you've had and all the many cases that you've

15 tried, have you ever put on a defense that you

16 personally didn't like?

17          MR. STAJDOHAR:  Objection; relevance.

18          THE COURT:  Overruled.

19

20 BY THE WITNESS:

21    A.   Yes.

22 BY MS. COLTON:

23    Q.   Sometimes we, as lawyers, do that even

24 though we don't personally like the defense,

1    correct?

2        A.    Yes.

3        MR. STAJDOHAR:  Objection; relevance as to

4    what we as lawyers do.

5        THE COURT:  Sustained.

6

7    BY MS. COLTON:

8        Q.    Is it fair to say that when you had the

9    conversation with Armando on January 21st of 1999,

10   you started off from the position that you didn't

11   care for or you didn't like the alibi defense?

12       A.    Yes.  That would probably be a bad way to

13   describe it.  I didn't think it was going to be an

14   effective defense; therefore, I did not like it.

15   It's not like I personally didn't like the defense

16   of alibi.  I didn't think we had a good one.  That

17   opinion was shared by others.

18       Q.    Who would that have been?

19       A.    Oh, I don't remember.  In the office we

20   talked about it.

21       Q.    Were you aware that that same alibi defense

22   had resulted in a hung jury in the attempt murder

23   case?

24       A.    I have a letter in my file to that effect

1    from the lawyer that tried that case, yes.

2         Q.   And that would be me, correct?

3         A.   Yes.

4         Q.   And were you aware -- did you give any

5    thought to the fact of presenting the alibi defense,

6    hoping to get a hung jury as had happened in the

7    first case?

8              MR. STAJDOHAR:  Objection; relevance.

9              THE COURT:  Sustained.

10             MS. COLTON:  Judge, may I have a moment,

11   please?

12             THE COURT:  Sure.

13             MS. COLTON:  Thank you, your Honor.  I

14   don't have any further questions.

15             THE COURT:  Mr. Stajdohar?

16

17   REDIRECT EXAMINATION

18   BY MR. STAJDOHAR:

19        Q.   Once the Defendant told you he was at the

20   scene of this shooting, did you make the inference

21   that he couldn't possibly have been with the alibi

22   witnesses?

23        A.   That's -- that's the question Miss Colton

24   never asked, is yeah, I knew that he was at the

1    scene or near the scene of the shooting at 10:30

2    later on that night, that was pretty apparent, but

3    the context of our conversation was the shooting,

4    the time of the shooting, and so when he said to me

5    "I was there," it wasn't in the context of later on

6    when he was arrested.  It was in the context of at

7    the time of the shooting, and that's why I didn't

8    explore any further.

9        Q.   And once he made that statement to you, did

10    it make any difference legally or ethically what any

11    other witness had said about an alibi defense?

12        A.   Well, yeah.  I try to look at everything,

13    Mark -- Mr. Stajdohar.  I try to look at the big

14    picture, but that certainly narrowed our options.

15    And as I sit here, and Miss Colton asked a question

16    about whether we talked about him testifying.  While

17    I don't remember it, that certainly might have

18    played into our conversation of whether or not he

19    could testify, but I don't remember that.  I don't

20    remember that aspect of any conversation.  It would

21    make sense, though.

22        Q.   And you knew that if the Defendant

23    testified to something other than an alibi defense,

24    he was already on videotape claiming an alibi; is

1    that correct?

2          MS. COLTON:  Objection to the form of the

3    question.  There has been no indication he was going

4    to testify to anything but an alibi defense.

5          THE COURT:  I'll sustain the objection.

6

7    BY MR. STAJDOHAR:

8      Q.   Legally you couldn't put him on and have

9    him testify to an alibi defense, correct?

10     A.   Certainly it was my opinion at that time,

11   yes.

12     Q.   And were you under the understanding that

13   those alibi witnesses would have been at the trial

14   if you intended to call them?

15          MS. COLTON:  Objection, Judge, to the form

16   of the question.

17          THE COURT:  Overruled.

18

19   BY THE WITNESS:

20     A.   I don't remember.  My notes seem to

21   indicate that they could have been gotten ahold of.

22   BY MR. STAJDOHAR:

23     Q.   Were you aware whether the Defendant was in

24   contact with them?

C000495

1    A.   I don't remember that, but once again from

2    my notes it seemed that he was.

3             MR. STAJDOHAR:  I have nothing further.

4             THE COURT:  Miss Colton?

5

6    RECROSS-EXAMINATION

7    BY MS. COLTON:

8        Q.   Just so I'm clear, because the last couple

9    of questions are a little confusing to me --

10            MR. STAJDOHAR:  Objection.

11

12   BY MS. COLTON:

13       Q.   You said you knew where the witnesses were,

14   the alibi witnesses?

15       A.   No.  No.

16       Q.   That's why I'm confused.

17       A.   I think Mr. Stajdohar asked me was it my

18   understanding they could have been gotten ahold of

19   for trial.  I think Armando could have done that.

20   That's my recollection, is that he knew how to get

21   ahold of them.

22       Q.   Yet when you listed the supplemental

23   disclosure on the 22nd of January, right before the

24   trial, you put down that the addresses were unknown?

1    A.   That's correct.  They were unknown to me at

2  that time.

3         MR. STAJDOHAR:  Objection; argumentative.

4         THE COURT:  Sustained.

5

6  BY MS. COLTON:

7    Q.   You never tried to subpoena any of the

8  alibi witnesses; is that correct?

9    A.   No.

10   Q.   No, it's not correct, or no, you never

11 tried to subpoena them?

12   A.   No, I never tried to subpoena them that I

13 recall.  There are no subpoenas in my file, returned

14 or unreturned.  There is no indication I tried to

15 subpoena any of the alibi witnesses.

16   Q.   And you personally never spoke to any of

17 the DeLaTorre sisters or to George Gamboa or Ramiro

18 Sandoval; is that correct?

19        MR. STAJDOHAR:  Objection; beyond the scope

20 of the redirect.

21        THE COURT:  Overruled.

22

23 BY THE WITNESS:

24   A.   I have no recollection of doing that.

C000497

1    BY MS. COLTON:

2        Q.    And do you have any notes in your file that

3    you ever had any conversations with any of them?

4        A.    No.

5        Q.    Before this conversation on January 21st of

6    1999 in the lockup here in the jail, what defense

7    were you going to present on behalf Mr. Amaya?

8            MR. STAJDOHAR:  Objection.

9            THE COURT:  Sustained.

10

11    BY MS. COLTON:

12        Q.    Counsel asked you about the questions or

13    the inferences that you made or there was some

14    conversation on redirect about inferences that you

15    made about what Armando allegedly said about being

16    at the scene.  That was the first time you ever had

17    that conversation, correct?

18        A.    Yes.

19        Q.    And you didn't flesh it out or explore it

20    in any way, to my understanding of your answer,

21    correct?

22        A.    Correct.

23        Q.    And it's true you don't know what was in

24    his mind; is that correct?

C000498

1        MR. STAJDOHAR: Objection.

2        THE COURT: Sustained.

3

4    BY MS. COLTON:

5        Q.   You didn't ask him specifically what time

6    he was at the scene, correct?

7        MR. STAJDOHAR: Objection; asked and

8    answered.

9        THE COURT: Sustained.

10

11   BY MS. COLTON:

12       Q.   You assumed that he was referring to the

13   time of the shooting on the first degree murder

14   case, correct?

15       MR. STAJDOHAR: Objection.  That misstates

16   the testimony.

17       THE COURT: Overruled.

18

19   BY THE WITNESS:

20       A.   I --

21   BY MS. COLTON:

22       Q.   You assumed he was referring to being at

23   the scene at the time of the first degree murder?

24       A.   Based on the context of our conversation at

C000499

1     the time he said it, yes.

2              MS. COLTON:  I don't have anything further.

3     Thank you.

4              THE COURT:  Mr. Stajdohar?

5              MR. STAJDOHAR:  I have nothing based on

6     that.

7              THE COURT:  Thanks.  You can step down.

8         I would take it that Castillo's testimony would

9     be very short?

10             MS. COLTON:  Yes.

11             THE COURT:  We could set this possibly on a

12    morning call and you can argue and put Castillo's

13    testimony on?

14             MS. COLTON:  I don't see why not, Judge.

15             THE COURT:  How much time do you need to

16    arrange for that?

17             MS. COLTON:  It's probably going to -- I

18    would think if you gave me about three weeks.  I

19    don't want to set it on a date too close in time and

20    find out he's not available.

21             THE COURT:  May 12th or 13th?

22             MS. COLTON:  Either one of those dates

23    would be fine, Judge.  If we could go with the 12th?

24             THE COURT:  Sure.

1        MR. STAJDOHAR:  Judge, is it possible to do

2   it the afternoon of May 10th?  Strike that, Judge.

3   The 13th is fine.

4        MS. COLTON:  The 12th.  12th at nine?

5        THE COURT:  That would be fine.

6        MS. COLTON:  Can we ask that the writ

7   continue, Judge?

8        THE COURT:  Yes.

9        MS. COLTON:  Judge, I have case law that I

10  am going to tender to the Court.  Do you want that

11  now or do you want me to just --

12        THE COURT:  Bring it then, because I'll end

13  up taking it under advisement.

14

15                        (WHICH were all the

16                         proceedings in the

17                         above-entitled cause on

18                         April 20, 2005)

19                 *  *  *

20

21

22

23

24

118        C000501

```
STATE OF ILLINOIS  )
                   )  SS
COUNTY OF K A N E  )
```

## C E R T I F I C A T E

I, Kathleen LeComte, CSR, an Official Court Reporter for the State of Illinois, the Sixteenth Judicial Circuit, Kane County, do hereby certify that I reported in shorthand the proceedings of the Hearing in the above-entitled cause on April 20, 2005, before the Honorable Grant S. Wegner, Judge of said Court, and that the above and foregoing typewritten transcript is a true, correct and complete translation and transcript of my shorthand notes so taken at the time and place hereinabove set forth.

Dated at St. Charles, Illinois, this 28th day of April, A.D. 2005.


_Kathleen LeComte_
Kathleen LeComte, CSR, RMR, RDR
Official Court Reporter #84-1788
16th Judicial Circuit of Illinois

C000502