File Date: _5 - 29 - 2 0 0 8_____

Case No: _0 7 c v 6 7 9 3_____

ATTACHMENT # _____

EXHIBIT _U - W_____

TAB (DESCRIPTION)

_____

ORIGINAL

1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF K A N E    )

3        IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                       KANE COUNTY, ILLINOIS
4
     PEOPLE OF THE STATE OF ILLINOIS,    )
5                                        )
                         Plaintiff,      )
6                                        )
                  vs.                    )    No. 98 CF 535
7                                        )
     ARMANDO AMAYA,                      )
8                                        )
                         Defendant.      )
9

10           REPORT OF PROCEEDINGS of the Hearing in the

11   above-entitled cause, heard before the HONORABLE

12   GRANT S. WEGNER, Judge of said Court, on the 12th

13   day of May, A.D. 2005.

14

15   APPEARANCES:

16           KANE COUNTY STATE'S ATTORNEY, by
             MS. MARK STAJDOHAR,
17           Assistant State's Attorney,
                  appeared for the People;
18
             LAW OFFICES OF KATHLEEN COLTON, by
19           MS. KATHLEEN COLTON,
             Attorney at Law,
20                appeared for the Defendant;

21           DEFENDANT present in Open Court.

22

23   KATHLEEN LeCOMTE, CSR, RDR
     Official Court Reporter
24

EXHIBIT U

001235

FILED
ENTERED 40
2005 SEP - 1  P 1: 52
DEBORAH SEYLLER
CIRCUIT COURT CLERK
KANE COUNTY, IL

1

INDEX OF WITNESSES

2       Witness                        D        C        RD        RC

3    FOR THE DEFENDANT:

4    Arnoldo Castillo . . . . .    4        13       14

5    Ramiro Sandoval  . . . . .   17        20       32        33
                                                     34

6
     Armando Amaya  . . . . . .   36
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

001236

1                              (WHEREUPON the following

2                               proceedings were had in

3                               Open Court, before Court

4                               and Counsel:)

5

6          THE COURT:  98 CF 535, People of the State

7     versus Amaya.

8          MS. COLTON:  Good morning, Judge.  Kathleen

9     Colton on behalf of the Defendant, who is present in

10    custody.

11         MR. STAJDOHAR:  Mark Stajdohar on behalf of

12    the State.

13         MS. COLTON:  Judge, there was a motion to

14    exclude witnesses, but I don't see Mr. Kliment in

15    the courtroom at this time.

16         THE COURT:  All right.  Comes on for

17    further evidence.

18         MS. COLTON:  Yes, Judge.

19       Judge, I have Mr. Castillo present.

20         THE COURT:  That's fine.  Do you expect his

21    testimony to be very long?

22         MS. COLTON:  No.

23         THE COURT:  Why don't you just stand back

24    and I'll have Mr. Castillo stand right next to the

001237

1    court reporter?

2         Raise your right hand.

3

4                                    (The witness was duly

5                                     sworn by the Court)

6

7                        ARNOLDO CASTILLO,

8    called as a witness herein, having been first duly

9    sworn by the Court, was examined and testified as

10   follows:

11   DIRECT EXAMINATION

12   BY MS. COLTON:

13        Q.   Could you state your name, please, spell

14   your last name?

15        A.   Arnoldo Castillo, C-a-s-t-i-l-l-o.

16        Q.   How are you currently employed?

17        A.   I'm a private detective with Nationwide

18   Special Investigations Unit.

19        Q.   And previous to that were you employed for

20   the Potempa Associates, Incorporated?

21        A.   Yes, I was.

22        Q.   And what capacity was that in?

23        A.   As a private detective as well.

24        Q.   Before your employment with Potempa, were

                                            001238

                          4

1    you employed at some point as an investigator for

2    the Public Defender's Office?

3        A.   Yes, I was.

4        Q.   And were you employed specifically in 1998

5    into the early part of 1999 as an investigator for

6    the Public Defender's Office in Kane County?

7        A.   Yes, I was.

8        Q.   I want to direct your attention to May of

9    2003.  Were you working for Potempa Associates at

10   that time?

11       A.   Yes, I was.

12       Q.   And that is a licensed private detective

13   agency; is that correct?

14       A.   Yes, it is.

15       Q.   And as a part of your employment, were you

16   doing investigations for private counsel?

17       A.   Yes, I was.

18       Q.   And were you employed by my office in a

19   post-conviction petition entitled People versus

20   Armando Amaya under Case Number 98 CF 535?

21       A.   Yes, I was.

22       Q.   And was that for the purpose of

23   interviewing witnesses?

24       A.   Yes, it was.

001239

5

1      Q.   Now, in May of 2003, specifically May 22nd

2   of 2003, did you have an opportunity to interview a

3   gentleman by the name of George Gamboa?

4      A.   Yes, I did.

5      Q.   Do you remember where that took place?

6      A.   At his home in Aurora, on Beach Street.

7      Q.   When you interviewed him, was anyone else

8   present?

9      A.   No, ma'am.

10      Q.   Did that occur at about 7:00 at night?

11      A.   Yes.

12      Q.   Did you inquire of Mr. Gamboa as to whether

13   or not he had been contacted back in 1998 into early

14   1999 in regards to Armando Amaya's murder case?

15      A.   Yes, I did.

16      Q.   What was his response to you?

17      A.   His response was he was not contacted by

18   anybody.

19      Q.   Did you ask him specifically if he was ever

20   subpoenaed to appear as a witness at that murder

21   trial which was conducted in January of 1999?

22      A.   Yes, I did.

23      Q.   What was his response?

24      A.   He was not subpoenaed.

001240

1    Q.   And did you ask him specifically if he was

2    ever contacted by any investigator from the Kane

3    County Public Defender's Office in regards to that

4    murder prosecution?

5        A.   Yes, I did.

6        Q.   And what was his response?

7        A.   He was not contacted by no investigator

8    from the office.

9        Q.   Finally, did you ask Mr. Gamboa had he been

10   contacted, would he have been willing to testify in

11   the murder trial of Armando Amaya in January of

12   1999?

13       A.   Yes, he would.

14       Q.   I'm going to show you what I've marked

15   Defendant's Number 5 for identification, ask if you

16   recognize that.

17       A.   Yes.

18       Q.   What do you recognize that to be?

19       A.   An affidavit that I prepared.

20       Q.   And does that affidavit truly and

21   accurately reflect the conversation that you had

22   with Mr. Gamboa on May 22nd of 2003?

23       A.   Yes, it does.

24           MS. COLTON:   Judge, at this time I would

001241

1    ask leave to move into evidence Defendant's Number 5

2    for purposes of the post-conviction.

3         MR. STAJDOHAR:  Judge, I would object.

4    It's cumulative and is prior consistency of this

5    witness that just testified.

6         THE COURT:  Why would I want the affidavit

7    if I have him here to testify?

8         MS. COLTON:  That's fine, if you don't need

9    it, Judge.

10

11   BY MS. COLTON:

12   Q.   I'm going to move on to July 20, 2003.  Did

13   you have an opportunity, still in the capacity of

14   investigating on behalf of my office in Armando

15   Amaya's murder case, specifically the

16   post-conviction portion, to interview a person by

17   the name of Ramiro Sandoval?

18   A.   Yes, I did.

19   Q.   And do you recall where that took place?

20   A.   At his residence also on Beach Street.

21   Q.   Was anyone else present when you talked to

22   Mr. Sandoval?

23   A.   No.

24   Q.   Did you, before you actually spoke to

001242

8

1    Ramiro Sandoval, did you have contact with his

2    father?

3         A.    Yes, I did.

4         Q.    And did you learn through his father that

5    he lived at the address on Beach Street?

6         A.    Yes, I did.

7              MR. STAJDOHAR:  Objection.

8              THE COURT:  I'm sorry?

9              MR. STAJDOHAR:  It's all hearsay.

10             THE COURT:  Overruled.

11

12   BY MS. COLTON:

13        Q.    Again going back to July 20, 2003, did you

14   have -- actually have a conversation with Ramiro

15   Sandoval?

16        A.    Yes, I did.

17        Q.    Did you inquire of him as to whether or not

18   he had been contacted by anyone in regards to the

19   murder prosecution against Armando Amaya in either

20   1998 or into 1999?

21        A.    Yes, I did.

22        Q.    And what was his response?

23        A.    He was not contacted by anybody.

24        Q.    Did you specifically ask Mr. Sandoval if he

001243

9

1    had ever been subpoenaed to testify in the murder

2    prosecution against Armando Amaya?

3        A.    Yes, I did.

4        Q.    What was his response?

5        A.    He was not subpoenaed.

6        Q.    Did you specifically ask him if he was ever

7    contacted by any investigator from the Kane County

8    Public Defender's Office in regards to the murder

9    prosecution against Armando Amaya?

10        A.    Yes, I did.

11        Q.    And what was his response?

12        A.    He was not contacted by no investigator.

13        Q.    Did you then finally ask him if he had been

14    contacted if he would have been available to testify

15    in the prosecution of Armando Amaya as a defense

16    witness?

17        A.    Yes, I did.

18        Q.    What was his response?

19        A.    He would have been able to testify on his

20    behalf.

21        Q.    And he would have been willing as well; is

22    that correct?

23        A.    Yes.

24             MS. COLTON:   Judge, I don't have any

                                              001244

1    further questions of Mr. Castillo.

2        I'm sorry, I do have further questions.  I

3    apologize.

4

5    BY MS. COLTON:

6        Q.   Going back to your employment, you were

7    employed as an investigator for the Kane County

8    Public Defender's Office in 1998; is that correct?

9        A.   Yes, ma'am, criminal investigator.

10        Q.   And was that for the entire year of '98?

11        A.   Yes.

12        Q.   Were you also employed into and through

13    January of 1999?

14        A.   Yes.

15        Q.   And you said that was in the role of a

16    criminal investigator?

17        A.   Yes, ma'am.

18        Q.   Could you explain to the Court in your

19    capacity as criminal investigator what the process

20    was in the office at that time for investigations to

21    be done?

22        A.   Upon an investigation to be initiated from

23    an attorney, it would be given to the chief

24    investigator.  He would then make out an

001245

11

1    investigation request and give it to a designated

2    investigator in the office.

3        Q.   And the investigation request, is that a

4    written form?

5        A.   Yes.

6        Q.   Was that one copy or multiple copies?

7        A.   It could be multiple copies.  Depends on

8    how much information would need to be investigated.

9        Q.   And were you privy to all of the murder

10   investigations that were being conducted during 1998

11   into 1999?

12       A.   Yes.

13       Q.   And to your knowledge was any investigation

14   ever conducted into witnesses in the Armando Amaya

15   case prosecuted by the State under 98 CF 535?

16       A.   Not --

17            MR. STAJDOHAR:  Objection.

18            THE COURT:  Overruled.  He can testify to

19   his knowledge.

20

21   BY THE WITNESS:

22       A.   Not specifically by me, no.

23   BY MS. COLTON:

24       Q.   Do you know anyone in your office being

001246

12

1   assigned to investigate any witnesses in regards to

2   that prosecution?

3        A.   I don't remember.  I don't remember.

4             MS. COLTON:  Judge, I don't have any

5   further questions of Mr. Castillo.

6             THE COURT:  Mr. Stajdohar?

7

8   CROSS-EXAMINATION

9   BY MR. STAJDOHAR:

10       Q.   When you talked to George Gamboa, you asked

11  him more questions and more information was

12  exchanged than you've so far testified to, correct?

13       A.   Not that I recall, no.

14       Q.   Those were the only four questions?

15       A.   The principal questions that I asked him.

16       Q.   What were the nonprincipal questions?

17       A.   Those are the questions I asked him.

18       Q.   Did you have a discussion with whether or

19  not he was in contact with the Defendant in this

20  case?

21       A.   No, I did not.

22       Q.   He didn't tell you that he had spoken with

23  the Defendant, who was in jail?

24       A.   No, he did not tell me that.

001247

1        Q.    Did he tell you that when -- on the date of

2    the Defendant's trial, that he was going to show up

3    for the trial?

4        A.    I don't recall.  I don't remember him

5    saying that.

6        Q.    When you spoke to Ramiro Sandoval, did you

7    have further conversation outside of what you've

8    already testified to?

9        A.    No.

10        Q.    Did he tell you that he was going to show

11    up on the day of trial anyway without a subpoena?

12        A.    I don't remember.

13        Q.    Did he tell you that he had been in contact

14    with the Defendant while the Defendant was in jail?

15        A.    No.

16              MR. STAJDOHAR:  I have nothing further.

17              THE COURT:  Redirect?

18

19    REDIRECT EXAMINATION

20    BY MS. COLTON:

21        Q.    Did you specifically ask them any

22    questions, either Mr. Gamboa or Mr. Sandoval, about

23    whether or not they were intending to show up

24    without a subpoena?

001248

14

1          A.   No.

2          Q.   Did they offer any information to you,

3     other than the questions that you were asking and

4     the responses they gave to you?

5          A.   No.

6          Q.   And Mr. Gamboa was shot and killed about a

7     month after you contacted him; is that correct?

8          A.   Approximately one month, yes, ma'am.

9               MS. COLTON:   I don't have any further

10    questions of Mr. Castillo, Judge.

11              THE COURT:   Anything?

12              MR. STAJDOHAR:   Nothing based on that.

13              MS. COLTON:   Thank you.

14         May he be excused, Judge?

15              THE COURT:   Sure.

16              MS. COLTON:   Thank you.

17         Judge, Mr. Sandoval is actually here but I need

18    an interpreter.   I don't know if the Court wants to

19    hear from him.

20              THE COURT:   It's not a question of what I

21    want to hear.

22              MS. COLTON:   I would like to put him on.

23              MR. STAJDOHAR:   I would object to his

24    testimony.   The Defendant has already presented her

                                              001249

1    case in chief.  The State has presented witnesses in

2    rebuttal, and I don't believe his testimony would be

3    in rebuttal to anything Mr. Kliment testified to, so

4    I don't think it's proper for him to testify at this

5    time.  He was afforded the opportunity to be here on

6    the date of the -- the initial date of the hearing.

7              THE COURT:  Under the circumstances I'll

8    allow her to put him on, but obviously we need the

9    interpreter.

10             I'll pass it.

11

12                              (A recess was taken)

13                                    *  *  *

14

15                              (AFTER RECESS the

16                               following proceedings

17                               were had in Open Court,

18                               before Court and

19                               Counsel:)

20

21             THE COURT:  We'll go back on the record on

22    Amaya then.

23        Kara, would you want to raise your right hand?

24

                                              001250

16

FILED

OCT 2 5 2006

ROBERT J. MANGAN, CLERK
APPELLATE COURT 2nd DISTRICT

05-0706

1                                    (The Interpreter was duly

2                                    sworn by the Court)

3

4          THE COURT:  You are Armando Amaya?

5          THE WITNESS:  No.

6          THE COURT:  I'm sorry, you're Ramiro

7     Sandoval; is that right?

8          THE WITNESS:  Yes.

9          THE COURT:  Do you want to raise your right

10    hand?

11

12                                    (The witness was duly

13                                     sworn by the Court

14                                     through the Interpreter)

15

16          THE COURT:  Go ahead.

17

18               RAMIRO SANDOVAL,

19    called as a witness herein, having been first duly

20    sworn by the Court, was examined and testified

21    through the Interpreter as follows:          RECEIVED

22    DIRECT EXAMINATION                          OCT 2 5 2006

23    BY MS. COLTON:                          ROBERT J. MANGAN, CLERK
                                              APPELLATE COURT 2nd DISTRICT

24          Q.   Sir, back in 1998, and into early 1999,
                                              RECEIVED SEP 0 1 2005

                                                   001251

1    were you aware that Armando Amaya was being

2    prosecuted for a murder trial?

3         A.   Yes.

4         Q.   And before that, in 1997, were you called

5    as a witness by my office to testify in an attempt

6    murder trial?

7         A.   Yes.

8         Q.   Going to the murder case then, from 1998

9    into 1999, were you ever contacted by any member of

10   the Public Defender's Office to testify as a witness

11   at the murder trial?

12        A.   No.

13        Q.   Were you living in the Aurora area at that

14   time, in 1998 into 1999?

15        A.   Yes.

16        Q.   Now, specifically in January of 1999, did

17   you come to this courthouse for the murder trial

18   against Armando Amaya?

19        A.   Yes.

20        Q.   And where were you located in the building

21   when you came that day?

22        A.   When I said the things, I was sitting over

23   here on this side (indicating).

24        Q.   Okay.  That's the first trial.  For the

001252

18

1   second trial, did you come and appear for the second

2   trial?

3       A.   No, they didn't call me for that.

4       Q.   Okay.  But were you here in the building

5   while that trial was going on?

6       A.   Yes.

7       Q.   And who asked you to be present during that

8   trial, even though you weren't called as a witness?

9       A.   The family asked me to come to court and I

10  came.

11      Q.   And did anybody from the Public Defender's

12  Office talk to you during the time you were present?

13      A.   No.

14      Q.   At some point did you leave the building

15  then and not come back?

16      A.   No.

17      Q.   You stayed in the building the entire

18  trial?

19      A.   Yes.

20      Q.   Was a person by the name of George Gamboa

21  also with you during the time that you appeared when

22  you did not testify?

23      A.   No, he wasn't here.

24          MS. COLTON:   Thank you.

001253

1        I don't have any further questions of Mr.

2   Sandoval.

3           THE COURT:  Mr. Stajdohar?

4

5   CROSS-EXAMINATION

6   BY MR. STAJDOHAR:

7       Q.   Now, sir, when you testified at the first

8   trial, did you testify that you were with the

9   Defendant at the time that shooting occurred?

10      A.   I was with him.

11      Q.   And that shooting occurred approximately

12  two hours after the shooting that he was on trial

13  for murder occurred; is that correct?

14      A.   Could you repeat that again?

15      Q.   The shooting you testified about, to,

16  occurred about two hours after the shooting you

17  didn't testify about occurred, correct?

18      A.   Uh-huh.

19      Q.   And you know that because you were in the

20  car with the Defendant?

21           MS. COLTON:  Objection, Judge, to the form

22  of the question.

23           THE COURT:  Overruled.

24

001254

20

1    BY MR. STAJDOHAR:

2        Q.   Correct?

3        A.   I wasn't there for any shootings.  We were

4    just with the girls.  If we had done something, I

5    would be here -- I wouldn't -- I'm sorry, I don't

6    understand the very last sentence he said.

7        Q.   Let me ask you this:  How do you know that

8    the second shooting occurred two hours after the

9    first shooting?

10       A.   We went to buy some drinks and some food,

11   and then we went to the girls' house, and we were

12   there the whole time, and then when we went there,

13   that's when the police stopped us.

14       Q.   The first question I asked you was you knew

15   that the shooting was two hours after the other

16   shooting?

17       A.   No, I didn't know about those shootings.

18       Q.   Well, you testified to where you were

19   during one of the shootings?

20       A.   Um-hum.

21       Q.   And when I asked you if you knew that the

22   one shooting occurred two hours later, you said yes.

23   Do you remember saying yes?

24       A.   No.

001255

21

1  Q. You testified at the first trial that you

2 were with the girls when the shootings occurred?

3  A. Um-hum.

4  Q. But you also testified that you went out to

5 get some food between 7:00 and 8:00?

6  A. No.  It was between nine and ten, like it

7 was at about nine.  It was at about nine that we

8 went to buy beer.

9  Q. I'm showing you what's been marked as

10 Defendant's Exhibit B as part of the submission of

11 the post-conviction petition.

12   MS. COLTON:  Judge, before this document is

13 shown, I would like to know if Mr. Sandoval reads

14 English.  It's in English.

15   THE COURT:  You can ask.

16   MR. STAJDOHAR:  Your Honor, this was

17 submitted as part of the Defendant's affidavit,

18 signed by the Defendant.

19   THE COURT:  Just a minute.  That's not the

20 point.  The point is you want to ask him about

21 something he may not be able to read, so before you

22 can ask him about something he may not be able to

23 read, you should find out if he can read it.

24   MR. STAJDOHAR:  First I was going to ask

001256

1    him if he recognized it, if he signed it.

2              THE COURT:   You can ask that.

3

4    BY MR. STAJDOHAR:

5         Q.   I'm showing you what's previously been

6    marked as Defendant's Exhibit B as part of her

7    submission.   Do you recognize that?

8         A.   Yes.

9         Q.   Did you sign that document?

10        A.   Yes.

11        Q.   Did you write that document?

12        A.   If I wrote all of that?

13        Q.   Correct.   Did you write that?

14        A.   Well, when I was on the case they were just

15   investigating it, and I just said where we were and

16   everything.

17        Q.   You signed this document?

18        A.   Yes, that's my signature.

19        Q.   Who handed you this document to sign?

20        A.   At the jail they told me to sign the papers

21   just once.

22        Q.   Who told you?

23        A.   A police officer.

24        Q.   So you're saying this affidavit that was

001257

23

1    created on June 9th of 2001 was given to you by a

2    police officer?

3            MS. COLTON:  Judge, I'm going to object.

4

5    BY THE WITNESS:

6        A.   No, they didn't.

7            MS. COLTON:  Judge, I need to object.  The

8    question hasn't been asked -- obviously he says it

9    is his signature.  He needs to be asked if he can

10   read this document.  I don't know how he can

11   recognize it if he can't read English.

12           THE COURT:  He said he recognized it.  I'm

13   not sure how he recognized it, but he did tell me he

14   recognize it.  Now, certainly if you're going to

15   get to the impeachment status of this particular

16   document, we have to make sure he understands

17   specifically what's in there.

18       Go ahead.

19

20   BY MR. STAJDOHAR:

21       Q.   Who handed you that document to sign?

22       A.   I don't remember.

23       Q.   The trial occurred in 1999, correct?

24       A.   I only went to trial once.

001258

24

1        Q.   Correct.  And that was in 1999, correct --

2   strike that.  In 1998, correct?

3        A.   I don't remember very well.

4        Q.   And then approximately 3 years later is

5   when you signed this document, in 2001?

6        A.   I don't remember having seen that paper.

7        Q.   Is that your signature?

8        A.   That's my signature, but I don't remember

9   having been given that paper.

10       Q.   Do you read English?

11       A.   No.

12       Q.   Did someone read a document to you that

13  discussed where you were on the night of the

14  shootings?

15       A.   No.

16       Q.   Where were you on June 9th of 2001?

17       A.   I was at my house.

18       Q.   Did someone come to your house and bring

19  this document and ask you to sign it?

20       A.   Someone went to my house once.

21       Q.   And who was that?

22       A.   An investigator.

23       Q.   And would that be Mr. Castillo?

24       A.   Yes.  He spoke Spanish.

001259

25

1          Q.   And did he come to your house in 2001 or

2      did he come to your house in 2003?

3          A.   I think it was in 2001.

4          Q.   Did the Defendant send you a piece of paper

5      that you signed and sent back to him?

6          A.   No.

7          Q.   Did you talk to him when he was in jail

8      before the trial?

9          A.   No.

10         Q.   Well, you talked to him at some point,

11     correct?

12         A.   With who?

13             MS. COLTON:   Objection, Judge, "at some

14     point."

15             THE COURT:   I want to know also what trial.

16

17     BY MR. STAJDOHAR:

18         Q.   Did you talk to him before the trial you

19     testified at?

20         A.   If I spoke to who?

21         Q.   The Defendant.

22         A.   No.

23         Q.   Did you talk to him after that trial?

24         A.   No.

001260

26

1      Q.    When was the last time you talked to him?

2      A.    I haven't spoken to him.

3      Q.    Since when?

4      A.    He just called me like 3 days ago to come

5    to court, and that was all.

6      Q.    You weren't contacted earlier this week --

7    earlier this month or two months ago to come to

8    court?

9           MS. COLTON:  Objection, Judge, to the

10   compound question.

11          THE COURT:  Sustained.

12

13   BY MR. STAJDOHAR:

14     Q.    Did anybody else contact you to testify in

15   this hearing?

16     A.    His family.

17     Q.    Your family?

18     A.    No, Armando's family.

19     Q.    When did they talk to you?

20     A.    An about a month ago.

21     Q.    And you were scheduled to be here a month

22   ago?

23     A.    I didn't know that.

24     Q.    Well, when did they ask you to be here?

001261

27

1       A.   A month ago Armando's family went to my

2    house and said that Armando was going to have court

3    here, and I said I was willing to testify for him.

4       Q.   Today?

5       A.   Um-hum.

6       Q.   Did anybody ever contact you about being

7    here on the last court date?

8       A.   Just his family.

9       Q.   And this was the first time you were

10   contacted to be here, was for today's court date?

11      A.   Yes.

12      MR. STAJDOHAR:  Judge, I would move to

13   strike this witness's testimony at this time, in

14   that we were scheduled for a hearing last time,

15   there was no reason the witness was not here last

16   time.  We're now in the rebuttal portion of the

17   case, and this testimony did not rebut anything that

18   the State presented.

19      THE COURT:  Denied.

20      MS. COLTON:  Judge, I haven't rested.  I

21   want to be clear, I haven't rested.

22      THE COURT:  It's denied.

23

24

001262

28

1   BY MR. STAJDOHAR:

2       Q.   You signed this document on June 9th of

3   2001, correct?

4       A.   Um-hum.  Because the officer who went

5   there, the paper that he read to me was in English,

6   but I don't know if he was looking at what the paper

7   said or if he was looking at something else.

8       Q.   When you say "officer," who are you talking

9   about?

10      A.   The investigator.

11      Q.   Mr. Castillo?

12      A.   I don't remember what his name was.

13      Q.   Did you see him outside of the courtroom

14  today?

15      A.   No.

16          MR. STAJDOHAR:  Judge, I would ask if I can

17  go out and get Mr. Castillo and see if we're talking

18  about the same person.

19          MS. COLTON:  I released him; and I will

20  represent to the Court, as an officer of the court,

21  in 2003 was the only time he was under my employ for

22  purposes of the post-conviction petition.

23          THE COURT:  If you want to see if he's out

24  in the hallway, go take a look.

001263

1                              (Pause)

2

3          THE COURT:  He's gone?

4          MR. STAJDOHAR:  That's correct.  At least

5     he's not in the line of sight.

6

7     BY MR. STAJDOHAR:

8          Q.   When you were standing outside this morning

9     waiting to come into the court to testify, did you

10    see a man walk out, heavyset, wavy dark hair, with a

11    blue coat on?

12         A.   No.

13         Q.   Did you see Mr. Castillo, the investigator

14    who came to speak to you?

15         A.   No.

16         Q.   Where were you sitting, waiting to come

17    into court today?

18         A.   When I got here I came in here.

19         Q.   Did you watch when another witness

20    testified today?

21         A.   No.

22         Q.   What time did you arrive in the courtroom

23    today?

24         A.   At about fifteen minutes to nine.

001264

30

1          Q.    And you've been in the courtroom ever

2    since?

3          A.    Um-hum.

4          MR. STAJDOHAR:  I would ask to strike this

5    witness's testimony, as he sat here during the other

6    witness's testimony and there was a motion to

7    exclude witnesses that Counsel was obviously aware

8    of, since she brought it up today.

9          THE COURT:  Denied.

10

11   BY MR. STAJDOHAR:

12         Q.    Approximately twenty minutes ago, before

13   you testified, did you see Armando Amaya standing

14   here in front of the bench?

15         A.    Yes.

16         Q.    Did you see Counsel standing here?

17         A.    Yes.

18         Q.    Did you see me standing here?

19         A.    Yes.

20         Q.    And did you see a man standing where you're

21   standing?

22         A.    Yes.

23         Q.    Was that the investigator who came to speak

24   to you?

001265

31

1      A.   No.

2           MR. STAJDOHAR:  I have nothing further.

3           THE COURT:  Anything further?

4

5   REDIRECT EXAMINATION

6   BY MS. COLTON:

7      Q.   Mr. Sandoval, do you speak English?

8      A.   No.

9      Q.   Have papers been read to you from English

10  and translated into Spanish from time to time?

11     A.   Just once.

12     Q.   And have you been asked to sign that paper?

13     A.   Yes.

14     Q.   And do you remember being interviewed by an

15  investigator in 2003 about whether or not you were

16  ever called to testify at the murder trial for

17  Armando Amaya?

18     A.   Yes.

19     Q.   And did that person that interviewed you in

20  2003 speak English or Spanish?

21     A.   Spanish.

22     Q.   And did he ask for identification before he

23  talked to you?

24     A.   Yes.

                                        001266

1      Q.   And did you give him your identification?

2      A.   Yes.

3      Q.   Did it have your picture and your name and

4   address on it?

5      A.   Yes.

6      Q.   And at the time in 2003 that you talked to

7   the investigator, did you live at 367 Beach Street

8   in Aurora, Illinois?

9      A.   Yes.

10         MS. COLTON:   Judge, I don't have any other

11   questions, but I would ask leave to move Defendant's

12   6 into evidence at this point, specifically as to

13   Paragraph 8.  I know Mr. Castillo testified about

14   the interview, but this also contains information

15   about Mr. Sandoval producing identification.

16         MR. STAJDOHAR:   Objection; foundation.

17         THE COURT:   Sustained.

18      Do you have any questions?

19

20   RECROSS-EXAMINATION

21   BY MR. STAJDOHAR:

22      Q.   The investigator who talked to you in 2003,

23   you never saw him today?

24      A.   No.

001267

33

1              MR. STAJDOHAR:  Nothing further.

2

3    BY THE WITNESS:

4         Q.   I just only saw him once.  I don't remember

5    his face very well.

6              MR. STAJDOHAR:  I have no further

7    questions.

8              MS. COLTON:  May I ask something based on

9    that?

10             THE COURT:  Go ahead.

11

12   REDIRECT EXAMINATION

13   BY MS. COLTON:

14        Q.   Mr. Sandoval, it's been about two years ago

15   that you were interviewed; is that correct?

16        A.   Yes.

17        Q.   Would you recognize the interviewer or the

18   investigator again if you saw him?

19             MR. STAJDOHAR:  Objection; speculation.

20             THE COURT:  Sustained.  Just wait for

21   another question.

22

23   BY THE WITNESS:

24        A.   Maybe yes, I could.

                                        001268

34

1          THE COURT:  Anything further?

2          MS. COLTON:  No.

3          THE COURT:  Thanks.

4       Have a seat.

5

6                              (A recess was taken)

7                                * * *

8

9                              (AFTER RECESS the

10                                following proceedings

11                                were had in Open Court,

12                                before Court and

13                                Counsel:)

14

15         THE COURT:  Amaya, 98 CF 535.

16      Any further evidence?

17          MS. COLTON:  Judge, I would ask to call Mr.

18   Amaya in rebuttal to Mr. Kliment's testimony, just

19   ask him a few questions.

20          THE COURT:  Sure.

21      Raise your right hand.

22

23                              (The witness was duly

24                                sworn by the Court)

001269

1              ARMANDO AMAYA,

2    called as a witness herein, having been first duly

3    sworn by the Court, was examined and testified as

4    follows:

5    DIRECT EXAMINATION

6    BY MS. COLTON:

7         Q.   You are Armando Amaya, correct?

8         A.   Correct.

9         Q.   And you're the Defendant in this

10   post-conviction petition; is that correct?

11        A.   Correct.

12        Q.   Armando, I want to bring you back to

13   January 21st of 1999, which was just a few days

14   before your jury trial in your murder case.  Do you

15   remember being brought to court and being present in

16   the lockup on that date?

17        A.   Yes.

18        Q.   Do you remember having a conversation on

19   that date with Mr. David Kliment, who was your

20   Public Defender at the time?

21        A.   Yes.

22        Q.   During the course of that conversation, did

23   you ever tell Mr. Kliment that you were there at the

24   scene of the shooting?

                                            001270

                          36

1     A.   I never told him I was at the scene.

2     Q.   Did you ever tell Mr. Kliment during that

3 conversation that you did not do the shooting?

4     A.   Yes.  I told him many times I didn't commit

5 the shooting.

6     Q.   And did you ever tell him that you had

7 witnesses and that they knew what to say if they

8 were called to testify to court?

9     A.   I told them that I was arrested with George

10 Gamboa and Ramiro Sandoval and they were in the car

11 with me and they need to talk to them because I was

12 the only one locked up.

13     Q.   Did you ever indicate to him in any way

14 that the alibi testimony that you wanted to present

15 was made up or fabricated?

16     A.   No.

17     Q.   Thank you.

18         MS. COLTON:  Judge, I don't have any

19 further questions of Mr. Amaya.

20         MR. STAJDOHAR:  Nothing based on that.

21         THE COURT:  Thanks.

22         MS. COLTON:  Judge, I would rest at this

23 point.

24         THE COURT:  Argument?

1          MS. COLTON:  Judge, I have a substantial

2     number of cases to tender to the Court for your

3     consideration.  I've already given them to Counsel

4     for your consideration.

5          Judge, first I would ask leave to take judicial

6     notice of the court file in 98 CF 535; specifically,

7     the Defendant's supplemental answer to discovery

8     which was filed on January 22nd of 1999, signed by

9     Mr. David Kliment of the Kane County Public

10    Defender's Office, the Public Defender.  It lists

11    additional witnesses in the cause, seven witnesses

12    that were listed, including George Gamboa, Ramiro

13    Sandoval, Emma DeLaTorre, Sonia DeLaTorre, and

14    Elizabeth DeLaTorre, and the assertion in Paragraph

15    2 that the Defendant may or may not raise the

16    affirmative defense of alibi as set forth in the

17    discovery materials.  It also says the time, date,

18    locations of the alibi witnesses are those listed in

19    the State's disclosure to the Defendant.

20          MR. STAJDOHAR:  If I may object here.  Are

21    we presenting more evidence at this time or arguing?

22          MS. COLTON:  I'm arguing.

23          THE COURT:  She's arguing.  I'll allow her

24    to argue.

001272

1        MS. COLTON:  In the supplemental answer to
2   discovery that was filed the Friday before the jury
3   trial commenced, Mr. Kliment, even though he
4   acknowledged in the body of the supplemental answer
5   that the date, location, and names of the alibi
6   witnesses were listed in the State's disclosure, he
7   still listed them all as address unknown, putting in
8   parentheses that the statements were in the
9   possession of State.

10       Judge, I would also ask you also to note that
11  during the course of the trial the minute order that
12  was reflected and filed by the clerk of the court
13  during the course of the jury trial indicates that
14  no defense witnesses were called on behalf of Mr.
15  Amaya at the trial.

16       Judge, I've also tendered to you as an exhibit
17  Defendant's Number 4 for purposes of this hearing,
18  the Appellate Court opinion in People of the State
19  of Illinois versus Armando Amaya, which is cited at
20  321 Ill.App.3d 923, 748 N.E.2d 1251.  Judge, this is
21  the Appellate Court decision in regards to the
22  conviction.

23       Judge, I would ask the Court to consider in your
24  assessment of what we presented in the hearing today

001273

39

1   on our post-conviction petition, and obviously our

2   assertion is ineffective assistance of counsel --

3            THE COURT:  That's not in the packet you

4   gave me.

5            MS. COLTON:  No.  I had previously entered

6   that as an exhibit, Defendant's Number 4 when I

7   actually moved it into evidence.

8        Judge, the significance of this is going to the

9   Strickland standard, it's my understanding that we

10  have to show that the outcome may have been

11  different but for the ineffective assistance of

12  trial counsel.

13       Judge, I would ask you to consider in the

14  Appellate Court opinion, there was an issue raised

15  as to the propriety of the jury instructions.  When

16  you look at the ruling, it talks, starting at

17  Headnote 2, about a jury being improperly

18  instructed.  Obviously it's a harmless error

19  standard which is considered by the Court, but the

20  allegation in Mr. Amaya's appeal was that the jury

21  instructions were improper in that he was -- or the

22  jury was instructed on an accountability theory and

23  the State had also argued that he was a principal.

24       I think this is important, because if you look

001274

40

1   on Page 5 of the Westlaw edition of the Amaya
2   opinion, under Headnote One and Two, the first full
3   paragraph, very last statement, it says:  For
4   example, when a jury is improperly instructed
5   regarding the principles of accountability, a new
6   trial is not warranted if the evidence is sufficient
7   to find the defendant guilty beyond a reasonable
8   doubt as a principal.

9         And then it goes on to say:  In this case, there
10  was ample evidence to support a guilty verdict based
11  on the defendant's acting as a principal.  There was
12  uncontroverted evidence that, just prior to the
13  shooting, the defendant was riding in a car with two
14  other men, yelling insults and making insulting
15  gestures at a rival gang, and that the defendant and
16  his cohorts were members of the Latin Kings, rivals
17  of the Gangster Disciples.

18        Later on in this paragraph the court later notes
19  that:  It was uncontroverted that three people were
20  shot, one fatally, and that the shooting occurred in
21  territory "belonging" to the defendant's rivals, the
22  Gangster Disciples.

23        They go on at the bottom:  Considering this
24  evidence, we determine that there was ample evidence

001275

41

1    to find the defendant guilty beyond a reasonable

2    doubt as a principal.  Therefore, even if there was

3    not enough evidence to warrant instructing the jury

4    on the principles of accountability, the error was

5    harmless and a new trial is not required.

6        Well, Judge, the reason there was uncontroverted

7    evidence, as noted by the Appellate Court in the

8    decision on Mr. Amaya's case, is because Mr. Kliment

9    did not present the alibi defense.

10       Judge, the cases that I have tendered to the

11   Court, and I'll recite those for the record:  People

12   versus Morris, which is a First District case from

13   2002, found at 268 Ill.Dec. 890, 779 N.E.2d 504;

14   People versus Garza, G-a-r-z-a, which is 180

15   Ill.App.3d 263, 535 N.E.2d 968; People versus

16   Morales, 339 Ill.App.3d 554, 791 N.E.2d 1122 from

17   May 27th of 2003; People versus Montgomery, 327

18   Ill.App.3d 180, 763 N.E.2d 369, and that is again a

19   First District case; People versus Sutherland,

20   Supreme Court of Illinois from 2000 which is found

21   at 194 Ill.2d 289, 742 N.E.2d 306; and People versus

22   Wolff, W-o-l-f-f, which is a Seventh Circuit case

23   from 1984 found at 727 F.2d 656; People versus

24   Montgomery, which is also a Seventh Circuit case,

001276

1    found at 846 F.2d 407 from 1988; People versus

2    Lockhart, which is an Eighth Circuit case found at

3    738 F.2d 304 from 1984; People versus Truly,

4    T-r-u-l-y, which is a 1992 First District case found

5    at 230 Ill.App.3d 948, 595 N.E.2d 1230; People

6    versus Davis, 1990, First District case found at 203

7    Ill.App.3d 129, 560 N.E.2d 1072; People versus

8    Salgado, 635 N.E.2d 1367, 263 Ill.App.3d 238, Second

9    District case from 1994.

10       Judge, the vast majority of these cases

11   obviously have to do with ineffective assistance of

12   counsel.  Many of them are cases where alibi

13   witnesses were available and were not called.  But

14   the crux of our argument, Judge, and it is borne out

15   by the testimony and by the documentation that's

16   been submitted, Mr. Kliment did not investigate the

17   alibi defense.

18       When he testified before your Honor on, I

19   believe it was April 20th of this year, he testified

20   that he was aware that there was a prior trial, and

21   that was the attempt murder case which I had

22   actually represented Mr. Amaya on.  It occurred on

23   the same night, and it was a situation where there

24   were two shootings a couple of hours apart.  He was

001277

43

1    aware, I believe, according to his testimony, that

2    there had been a prior trial, that the alibi

3    witnesses had been called.  He wasn't sure,

4    according to his testimony, if he had reviewed all

5    of the witnesses from the 1997 case, but I don't

6    think there's any doubt that he was aware that they

7    had testified and that there had been a previous

8    trial.

9        He testified further that he had talked to Mr.

10   Amaya about the alibi as soon as Mr. Amaya talked to

11   him on their initial meeting, and yet on the January

12   21st date in 1999, which was just a few days before

13   jury selection, he went back to the lockup,

14   according to Mr. Kliment, and talked to Mr. Amaya

15   once again.  He reported to the Court that there was

16   a rather heated discussion between himself and Mr.

17   Amaya, because Mr. Amaya was telling him that he was

18   insisting on having the alibi witnesses called and

19   that he wanted them called and wanted an explanation

20   as to why they weren't being called to testify.

21   He -- I believe he testified this past April that

22   the Defendant was upset.  He quoted him as saying

23   that his life was on the line.

24       And then Mr. Kliment said that for some reason

                                              001278

44

1   he was -- and it's not clear to me exactly what

2   this -- what the conversation was, because I don't

3   think he actually quoted Mr. Amaya, but he said

4   something to the effect of supposedly Mr. Amaya said

5   he was there at the scene of the shooting but he

6   didn't do the shooting, and that caused him to

7   believe that the alibi defense wouldn't be an

8   effective defense.

9        And that's one thing, Judge.  But you cannot

10  ignore the total lack of investigation that had

11  occurred, even if you accept the conversation as Mr.

12  Kliment says it happens, and of course Mr. Amaya has

13  disputed that.  Even if you accept that, there was

14  absolutely no investigation of the alibi defense

15  prior to that conversation about six days before

16  jury selection.  And, Judge, I think that's where

17  the ineffective assistance of counsel begins.

18       These cases talk about the fact that counsel has

19  an obligation to investigate.  You can't just make

20  up your mind as a defense attorney that you don't

21  like the defense or you think it didn't work in

22  another trial.  In fact in the trial of the attempt

23  murder from the same day on which I represented Mr.

24  Amaya, you heard him testify about that, we went

1    through a jury trial, we presented the very same

2    alibi witnesses, so their testimony was on record.

3    There was some testimony on behalf of the State

4    against Mr. Amaya, obviously.  The jury deliberated

5    in excess of 18 hours and it was a hung jury.  There

6    was a mistrial.

7       So, Judge, I think it is certainly proper for me

8    to ask the Court to consider the unique

9    circumstances where you have two shootings on one

10   night and the alibi witnesses are the same.  And at

11   a trial on the attempt murder, there was no

12   definitive finding of guilty by the jury.  There was

13   in fact a mistrial declared because the jury could

14   not unanimously agree one way or the other.  So I

15   think that should be used to bolster our claim.

16      Obviously it's my position it bolsters our claim

17   that if in fact the alibi had been investigated, if

18   in fact the alibi witnesses had been called to

19   testify at Mr. Amaya's murder trial, the outcome

20   could have been different.  And I believe that that

21   is a burden that we bear, that we have to show.

22      As I said, these cases talk about the principles

23   of disclosing and calling witnesses.  Here we have a

24   case basically, because of the attempt murder that

                                               001280

                           46

1    had been pending for a couple of years before the

2    actual trial on the murder case, because it all

3    occurred on one night in 1997, and we have a

4    situation where we have an attorney who was the

5    Public Defender, not an Assistant Public Defender,

6    who acknowledges that he didn't do any

7    investigation.  He said he thought that he had

8    filled out some sort of investigative report but he

9    couldn't find it in his file, so there's nothing to

10   corroborate that.

11        And we did present testimony in our portion of

12   the hearing indicating that George Gamboa, who is

13   now deceased, and Mr. Sandoval, who was present here

14   before you today, were ready, willing, and able to

15   testify as they had testified in the attempt murder

16   trial to the alibi for Mr. Amaya.  There is no

17   evidence that they couldn't have testified.  In fact

18   all the evidence that you've heard in this

19   post-conviction hearing is that they could have

20   testified and they just simply weren't contacted.

21   We went so far as to present evidence to your Honor

22   to show that Mr. Sandoval was here during the murder

23   trial and was not contacted by anybody from the

24   Public Defender's Office.

001281

1      Judge, I think if you look at many of -- at

2   these cases, many of them are alibi cases.  Many of

3   them are cases where the failure to investigate

4   alibi witnesses is not per se ineffective assistance

5   of counsel, but in these cases was found to be

6   ineffective assistance of counsel.

7      If you look at Sutherland, which is the Supreme

8   Court case from 2001, it talks about defense counsel

9   providing ineffective assistance in failing to

10  investigate and present evidence that could have

11  played a prominent role in the defendant's strategy

12  in attempting to discredit in that case physical

13  evidence linking the defendant to a crime.

14     Well, here we have alibi witnesses who could

15  have challenged the eyewitness testimony.  When you

16  read the Amaya appellate court opinion, you will see

17  that there were only two persons that testified and

18  identified Mr. Amaya, one of whom actually had to be

19  brought to court in handcuffs, taken into custody

20  because she failed to appear and was held in

21  contempt of court.

22     So when you have that kind of testimony, from my

23  standpoint as a defense attorney, if you present

24  alibi testimony, eyewitnesses that say no, he wasn't

                                     001282

48

1    there, he was with me at the time, and certainly
2    there were at least five witnesses that were
3    available, the DeLaTorre sisters, three DeLaTorre
4    sisters, George Gamboa, and Mr. Sandoval.  If you
5    look at the Seventh Circuit court case, People
6    versus Wolff, in that case the trial counsel out of
7    hand rejected the witnesses without interviewing or
8    investigating them, and that was found to be
9    something that fell below the minimal standards of
10   professional competence, and I think that's what we
11   have here.
12       We have Mr. Kliment up to a couple of days
13   before trial not doing anything, knowing these
14   witnesses were there but not doing anything to have
15   them interviewed; and perhaps if that had been done,
16   he could have made a strategic decision based on
17   whatever interviews had been conducted, but the
18   simple fact was there were no interviews conducted.
19   Nobody from the Public Defender's Office ever
20   bothered to go out and talk to these people.  Nobody
21   ever assessed their testimony, made a decision as to
22   whether one, two, three, four, or all five of them
23   could have or should have testified.  He out of hand
24   rejected it.

001283

49

1    And then on the 21st of January, according to

2    Mr. Kliment's testimony, he gets into an argument

3    with Mr. Amaya because Mr. Amaya says I want my

4    alibi witnesses called, I had them called in my

5    first trial, this is where I was at the time this

6    offense took place; and for what reason, this vague

7    assertion that he was barred then from calling alibi

8    witnesses.  I just don't think it jibes, Judge, with

9    the fact that he failed to investigate.

10    I would ask the Court to look at People versus

11    Montgomery, which is the other Seventh Circuit case

12    that I've given to you, specifically on Page 5, and

13    it talks about the Strickland standard.  And it

14    says:  This case, like Strickland, involves an

15    ineffective assistance claim based on counsel's

16    failure to investigate.

17    It goes on to say:  Strategic choices made after

18    less than complete investigation are reasonable

19    precisely to the extent that reasonable professional

20    judgments support the limitations on investigation.

21    In other words, counsel has a duty to make

22    reasonable investigations or to make a reasonable

23    decision that makes particular investigations

24    unnecessary.

001284

1    Judge, from the evidence you have before you in

2    this post-conviction proceeding, nothing was done to

3    build a defense for Mr. Amaya.  Absolutely nothing

4    was done.  And I would ask the Court to consider

5    that that was not a reasonable decision that makes

6    particular investigations unnecessary.

7    They go on, on the next -- I'm still on Page 5,

8    in the right-hand column, to quote from United

9    States versus Debango, D-e-b-a-n-g-o, which is found

10   at 780 F.2d 81:  The complete failure to investigate

11   potentially corroborating witnesses can hardly be

12   considered a tactical decision.  An attorney who

13   fails even to interview a readily available witness

14   whose noncumulative testimony may potentially aid

15   the defense should not be allowed automatically to

16   defend his omission simply by raising the shield of

17   trial strategy and tactics.

18   And I think that's what has been attempted to be

19   done in this case.  Trial strategy is one thing.

20   Not interviewing witnesses and not building a

21   defense and then five or six days before trial

22   finally asserting a defense for whatever reason,

23   because that also, Judge, I would argue to you

24   doesn't jibe with what Mr. Kliment said.  He

001285

51

1    testified to you that on the 21st of January he gets
2    into this argument with Mr. Amaya, and Mr. Amaya
3    allegedly says something to him which makes him
4    think that ethically he can't call the alibi
5    witnesses, yet the next day, on the 22nd of January,
6    he files an alibi defense.  He files a list of
7    witnesses, saying I don't know where they are
8    because all the addresses are unknown.  But that
9    doesn't make any sense, either.  We had people that
10   were available.
11        If you look at all of the cases, and I'm not
12   going to go through each and every one, because I
13   know your Honor will read the cases and consider the
14   law in this area.  Judge, we have a situation where
15   we have an attorney who didn't do his job, and,
16   Judge, I would ask for a finding of relief on the
17   post-conviction petition, ask the Court to find that
18   the outcome could have been different, and certainly
19   based on the Appellate Court opinion and the problem
20   with the jury instruction and the fact that they
21   remark at least twice about the uncorroborated
22   testimony of the State, and it was uncorroborated,
23   Judge, because Counsel failed to do his job.
24        Thank you.

001286

1        THE COURT:  Mr. Stajdohar?

2        MR. STAJDOHAR:  Judge, the first thing you

3    must consider is the credibility of each of the

4    witnesses who testify before you in this hearing.  I

5    would suggest that the only credible witness in this

6    case was Mr. Kliment.

7        The Defendant obviously is severely biased in

8    his interest in this case.  Mr. Sandoval directly

9    contradicted things that the Defendant had testified

10   to, he directly contradicted things that Mr.

11   Castillo had testified to, he couldn't -- he said he

12   had never seen that man before, yet he said he

13   remembered Mr. Castillo coming to see him.  The

14   affidavit that he signed in 2001, he signed a

15   document in English that he had no recollection of

16   who had given it to him, who had signed it other

17   than Mr. Castillo.

18       He stated that he had not talked to the

19   Defendant.  The Defendant testified that he talked

20   to all the witnesses prior to trial, that he had

21   kept in touch with everybody and that everybody

22   would have been there if they had presented the

23   alibi defense, that he in fact contacted them.

24       It's the Defendant's burden to prove the

                                        001287

53

1   allegations that are contained in this

2   post-conviction petition.  The allegations allege

3   ineffective assistance of counsel, and the law is

4   clear that a post-conviction petition can only be

5   filed to allege constitutional violations that could

6   not have been raised on appeal.

7      The Defendant testified that it was very clear

8   that he knew all of the information contained in

9   this post-conviction petition prior to his appeal.

10   Each and every one of the allegations in the

11   operative paragraph, being Paragraph 9, could have

12   been raised during the Defendant's appeal to the

13   Appellate Court of Illinois, the Second District.

14   The Defendant admitted that he knew all of the facts

15   which are alleged in this post-conviction petition

16   prior to filing his appeal.  He admitted that he

17   corresponded with his appellate counsel prior to

18   filing the appeal.

19      But it is clear from the opinion of the Second

20   District, which you have before you as Defendant's

21   Exhibit 4, that the issue of ineffective assistance

22   of counsel was never raised on appeal.  Therefore,

23   and solely on that basis, this post-conviction

24   petition should be denied.

001288

54

1    Further than that, when a defendant alleges

2    ineffective assistance of counsel, we have to hold

3    them to the Strickland standard, and the defendant

4    must prove not only that despite a strong

5    presumption of counsel's professional competence,

6    counsel's alleged acts were outside the wide range

7    of professional competence, but also the defendant

8    must prove, and this is straight out of Strickland,

9    which can be found at 466 U.S. 668, the Supreme

10   Court said there is a reasonable probability that

11   but for counsel's unprofessional errors, the result

12   of the proceeding would have been different.

13   Reasonable probability.  Not "could have," but a

14   "reasonable probability" that the result of the

15   proceeding would have been different.

16       The court went on to say that the defendant must

17   show there is a reasonable probability that the

18   defendant's juries would have returned different

19   verdicts and findings, and that was a death case so

20   they speak of different verdicts and different

21   juries.  But the court speaks of different verdicts,

22   not mistrials.

23       The Defendant in this case has failed to prove

24   either prong of the Strickland test, so this must be

001289

55

1    denied.

2        The Defendant has alleged his counsel was

3    ineffective in that he failed to call any witnesses

4    in support of the Defendant's alibi defense.  The

5    Defendant failed to prove the prejudice prong on

6    this allegation.  At best his anecdotal evidence

7    proved that in a different trial for a shooting

8    which occurred two hours after the shooting, the

9    alibi defense merely resulted in a mistrial.  It

10   didn't result in a verdict of not guilty, and it

11   wouldn't have resulted in a verdict of not guilty if

12   it would have been presented here.

13       Mr. Kliment testified that based on his

14   extensive experience and training, he determined

15   there were holes in the Defendant's alibi defense

16   that made it incomplete.  He also noted that there

17   were discrepancies within the potential testimony of

18   the witnesses' prior testimony.  He noted there were

19   discrepancies with the potential testimony of the

20   alibi witnesses, and he based that determination on

21   a review of the alibi witnesses' prior testimony,

22   the written transcripts of their taped statements to

23   police, the taped statements and the police reports.

24       He stated -- he also stated that he obtained

001290

1    opinions from other attorneys who stated that in

2    fact this was a weak alibi defense, and included in

3    those opinions was an opinion of this current

4    Defense Counsel, Miss Colton, who --

5         MS. COLTON:  Objection, Judge.  There was

6    no testimony to that.

7         MR. STAJDOHAR:  There most certainly was.

8         MS. COLTON:  That I gave him an opinion of

9    a weak alibi defense?

10        MR. STAJDOHAR:  Absolutely correct.

11        THE COURT:  I'll have to take a look at my

12   notes.

13      Go ahead.

14        MR. STAJDOHAR:  Included in those opinions

15   was this Defense Counsel's opinion that it was a

16   weak alibi defense.

17      The Court has no evidence before it that would

18   lead it to believe that if Mr. Kliment had called

19   alibi witnesses, the result would have been a not

20   guilty verdict.

21      Furthermore, Mr. Kliment did act within the

22   realm of professional competence.

23      The Court has very specific evidence, credible

24   evidence from Mr. Kliment before it that shortly

001291

1   before the trial, the Defendant told Mr. Kliment

2   that he, the Defendant, was present at the scene of

3   the shooting, that he didn't have a gun and didn't

4   fire the shots.  The Defendant also stated that the

5   witnesses knew what they should testify to.

6       Clearly, based on these statements, Mr. Kliment

7   could not put on an alibi defense with these

8   witnesses.  He would have been acting unethically

9   and he would have been suborning perjury.  He would

10  have been committing a crime.  He acted in a most

11  professional manner in not presenting the alibi

12  defense as required by the law.  He presented the

13  best defense available, examined all the discovery

14  material, presented the best defense allowable to

15  him under the law.  He cross-examined the witnesses,

16  made his arguments to the jury.  Even before he was

17  told the alibi was false, he thought --

18       MS. COLTON:  Objection, Judge.  There was

19  no testimony he was told the alibi was false.

20       THE COURT:  Sustained.

21       MR. STAJDOHAR:  Even before he was told

22  that the Defendant was at the scene of the shooting

23  and had a gun -- did not have a gun and didn't shoot

24  anybody, he thought that the State's case was not

                                        001292

58

1    that strong, and he would have preferred to hold the

2    State to its burden.  He clearly made a trial

3    strategy decision in stating that he thought the

4    best defense was to hold the State to its burden of

5    proof and was therefore not ineffective.

6         Counsel makes great hay out of he didn't go out

7    and investigate, he didn't talk to these witnesses.

8    Each of the witnesses have made a taped statement to

9    the police.  He had those tapes.  He had the

10   transcripts of those tapes, and each of them had

11   testified at trial before.

12        What was he going to learn?  Things to impeach

13   his own witnesses with?  Were they going to change

14   their testimony?  Were things going to be different?

15   He had nothing to learn because they all testified,

16   they were all on record and it was in writing.

17        The Defendant also alleges that counsel failed

18   to find and interview the alibi witnesses.  The

19   Defendant testified here in court that he, himself,

20   was in communication with all of the witnesses and

21   would have had them here for the trial.  They were

22   all listed on the list of witnesses prior to trial

23   and were clearly available.

24        Counsel prepared -- counsel being Mr. Kliment,

001293

1    prepared an answer to discovery and listing the

2    alibi defense.  He clearly had considered it.  He

3    clearly was weighing the options when he had the

4    meeting with the Defendant where the Defendant said

5    he was at the scene of the crime at the time of the

6    crime.  He could not have possibly been with the

7    alibi witnesses, other than Gamboa and Sandoval, who

8    were also at the scene of the crime, but he couldn't

9    have been with the other alibi witnesses at a

10   different place at that time.  This was clearly a

11   trial strategy decision and not outside the realm of

12   professional competence.

13        Further, there is no evidence that if Mr.

14   Kliment had interviewed them that it would have

15   changed the outcome of the trial.  He was well aware

16   of the statements the witnesses would have testified

17   to based on the tapes and the transcripts from the

18   previous hearings.

19        The Defendant also alleged that Mr. Kliment

20   failed to obtain any transcripts of the testimony of

21   the alibi witnesses from 97 CF 2326, and that's

22   patently false.  Mr. Kliment testified that he had

23   in fact obtained the transcripts, he's still in

24   possession of the transcripts, he saw them on April

001294

60

1    20th, the day he testified in this hearing, he saw

2    them on April 19th, the day before he testified.

3    And even on cross-examination the Defendant admitted

4    that Mr. Kliment had the transcripts, but that I,

5    the Defendant, had not seen them.  There is no

6    evidence presented that he did not obtain the

7    transcripts.

8        And the fourth and final allegation is Mr.

9    Kliment was ineffective in that he failed to file a

10   motion to quash arrest and suppress evidence.  And

11   that claim also must fail on both prongs of the

12   Strickland test.

13       Certainly Mr. Kliment acted within the realm of

14   professional conduct, in that he stated that a

15   motion to quash would have failed in that he was

16   arrested while he was sitting in jail on a warrant

17   on another case, and the stop and arrest of the

18   Defendant on the other shooting was a proper stop

19   and probable cause existed for the arrest.

20       The Defendant was ID'd in the show-up as one of

21   the participants in the shooting and the car was

22   stopped based on a description of the car and the

23   occupants in the shooting.  Mr. Kliment stated he

24   would not file a motion which was frivolous.  This

                                            001295

                        61

1    was a trial strategy decision reasonable under the

2    circumstances.

3       Further, there was no evidence that even if

4    filed and granted, that the motion would have

5    changed the outcome of the trial.  No evidence that

6    was obtained as a result of the Defendant's arrest

7    was used at the trial.  The witnesses simply

8    testified at his trial, and first a motion was

9    already filed and a hearing was held on the '97

10   case, and at that time the motion was denied.  He

11   acted entirely reasonable and there was no

12   indication and no evidence before this Court that

13   the result of his trial would have been different.

14      Clearly the Defendant's motion must fail on each

15   and every respect as to both prongs of the

16   Strickland test, and for each and all of these

17   reasons we ask that you deny this Defendant's

18   petition for post-conviction relief.

19          THE COURT:  Miss Colton?

20          MS. COLTON:  Thank you.

21      Judge, the State argues that Mr. Kliment had

22   already seen what the defense alibi witnesses would

23   say by looking at the taped statements that were

24   taken by the police and reading the transcripts of

001296

1   the 1997 trial, attempt murder.

2       Mr. Kliment testified under oath that he wasn't

3   sure he reviewed all of the witnesses from the 1997

4   case; but, Judge, moreover and more importantly, I

5   don't think there is an attorney in this room that

6   would rely on what somebody else had done in a

7   murder prosecution.

8           MR. STAJDOHAR:  Objection to what any other

9   attorney in this room would or would not do.

10          THE COURT:  Sustained.

11          MS. COLTON:  It is ineffective assistance

12  of counsel if an attorney relies on what others have

13  done without investigating themselves.

14      This was a murder prosecution.  This was a

15  situation where literally, according to what Mr.

16  Amaya had told Mr. Kliment, his life was on the

17  line.  And he received a substantial sentence.

18          MR. STAJDOHAR:  I would object to that.

19  There was no death.

20          THE COURT:  Sustained.

21          MS. COLTON:  But the State is arguing that

22  Mr. Kliment already had this information and arguing

23  that he couldn't present it because of what

24  allegedly was said by Mr. Amaya to him on January

001297

1    21st.  And again, going back to what was actually

2    filed, if he had all this information, there was an

3    alibi out there, why didn't he prepare an alibi

4    defense?  Why didn't he assert it before he had this

5    conversation on January 21st?  Why did he only

6    assert it on the 22nd of January?

7        Judge, in the transcript of the proceedings in

8    98 CF 535, on November 9th of 1998, there is a

9    conversation between the Court, Judge Hudson, at

10   that time, and Mr. Kliment.  The Court inquires,

11   quote:  Where do we stand on discovery?  Are there

12   any other outstanding issues you anticipate?

13       MR. STAJDOHAR:  Objection.  There has been

14   no evidence of this presented at all.

15       MS. COLTON:  It was my understanding you

16   were going to be reviewing the transcript.

17       THE COURT:  I'm going to take a look at it.

18   Go ahead.

19       MS. COLTON:  Are there any other

20   outstanding issues you anticipate that may become a

21   problem before the trial?

22       Mr. Kliment:  No.  I have a lot of discovery

23   from the State.  I have not filed an answer in this

24   case, but there is no affirmative defense I intend

001298

64

1    to raise.

2    So in November, 1999, he didn't intend to raise

3    an affirmative defense. It's Mr. Amaya's case, too.

4    It's not just the defense attorney's case. In

5    cooperation with the Defendant, it's our obligation

6    as defense attorneys to consult with the Defendant

7    to see what the defense is.

8    Mr. Stajdohar argues that Mr. Kliment presented

9    a defense. No, he didn't. He may have

10    cross-examined the witnesses, he may have tested the

11    State's evidence, but he simply did not present a

12    defense in this case.

13    Judge, I would ask you to grant us relief on the

14    petition.

15    THE COURT: Set it over for ruling on June

16    17th?

17    MS. COLTON: If I could have a moment,

18    Judge.

19

20    (Pause)

21

22    MS. COLTON: That's fine, Judge. Is that

23    in the morning?

24    THE COURT: Yes. 9:00.

061299

1          MS. COLTON:   Thank you.

2

3                          (WHICH were all the

4                          proceedings in the

5                          above-entitled cause on

6                          May 12, 2005)

7                                *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

001300

1   STATE OF ILLINOIS  )
                       )  SS
2   COUNTY OF K A N E  )

3

4                C E R T I F I C A T E

5        I, Kathleen LeComte, CSR, an Official Court

6   Reporter for the State of Illinois, the Sixteenth

7   Judicial Circuit, Kane County, do hereby certify

8   that I reported in shorthand the proceedings of the

9   Hearing in the above-entitled cause on May 12, 2005,

10  before the Honorable Grant S. Wegner, Judge of said

11  Court, and that the above and foregoing typewritten

12  transcript is a true, correct and complete

13  translation and transcript of my shorthand notes so

14  taken at the time and place hereinabove set forth.

15       Dated at St. Charles, Illinois, this 30th day

16  of August, A.D. 2005.

17

18

19            _Kathleen LeComte_____
             Kathleen LeComte, CSR, RMR, RDR
20           Official Court Reporter #84-1788
             16th Judicial Circuit of Illinois
21

22

23

24                                    001301

67

ORIGINAL

1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF K A N E    )

3        IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                     KANE COUNTY, ILLINOIS
4
     PEOPLE OF THE STATE OF ILLINOIS,    )
5                                        )
                          Plaintiff,     )
6                                        )
                     vs.                 )   No. 98 CF 535
7                                        )
     ARMANDO AMAYA,                      )
8                                        )
                          Defendant.     )
9

10            REPORT OF PROCEEDINGS of the Judge's

11   Decision in the above-entitled cause, heard before

12   the HONORABLE GRANT S. WEGNER, Judge of said Court,

13   on the 15th day of July, A.D. 2005.

14


15   APPEARANCES:

16            KANE COUNTY STATE'S ATTORNEY, by
              MR. MARK STAJDOHAR,
17            Assistant State's Attorney,
                   appeared for the People;
18
              LAW OFFICES OF KATHLEEN COLTON, by
19            MS. KATHLEEN COLTON,
              Attorney at Law,
20                 appeared for the Defendant;

21            DEFENDANT present in Open Court.

22

23
     KATHLEEN LeCOMTE, CSR, RDR
24   Official Court Reporter

EXHIBIT V

1

1               (WHEREUPON the following

2                    proceedings were had in

3                    Open Court, before Court

4                    and Counsel:)

5

6          MS. COLTON:  People versus Armando Amaya.

7          THE COURT:  98 CF 535.

8          MS. COLTON:  Kathleen Colton on behalf of

9     the Defendant, who is present in the custody of the

10    Illinois Department of Corrections.

11         MR. STAJDOHAR:  Mark Stajdohar on behalf of

12    the State.

13         THE COURT:  This matter comes on with

14    respect to the ruling on the post-conviction

15    petition filed which alleges ineffective assistance

16    of counsel.

17        That petition was based upon failing to

18    investigate an alibi defense, failing to present an

19    alibi defense, failing to file a motion to quash

20    arrest and suppress evidence.

21        Defense Counsel clearly identified an

22    appropriate basis for not filing a motion to quash

23    arrest and suppress evidence based upon the

24    existence of an arrest warrant for the Defendant at

001310

2

1     the time of his arrest and the presence of probable

2     cause.  It would appear that no appropriate basis

3     for a motion to quash arrest and suppress evidence

4     existed.

5         The remaining two issues relating to an alibi

6     defense require further discussion.

7         All issues decided on direct appeal are res

8     judicata, and all issues that could have been raised

9     in the original proceeding but were not are waived,

10    based on People versus Montgomery, 2001, 327

11    Ill.App.3d 180.

12        There are circumstances under which the waiver

13    rule may be relaxed, based on Montgomery.  For

14    example, when appropriate under the principles of

15    fundamental fairness.  The doctrines of res judicata

16    and waiver do not apply, however, to issues raised

17    in a post-conviction petition which stem from

18    matters outside the record and thus could not have

19    been brought on direct appeal, based on People

20    versus Coleman, 1994, 267 Ill.App.3d 895.

21        It is not so much that such a claim could not

22    have been presented or raised on direct appeal, but

23    rather that such a claim was incapable of being

24    considered by the reviewing court because the

061311

3

1    claim's evidentiary basis was outside the record,

2    based on People versus Britz, 1996, 176 Ill.2d 163.

3        The alibi issues raised in Defendant's

4    post-conviction petition are based upon matters

5    outside of the record, and thereby precluding waiver

6    and requiring review.

7        In order to prevail on a claim of ineffective

8    assistance of counsel, a defendant must show that

9    counsel's representation fell below an objective

10   standard of reasonableness and that a reasonable

11   probability exists that, but for counsel's

12   unprofessional performance, the result would have

13   been different, thereby denying the Defendant of a

14   fair trial, based on Strickland versus Washington,

15   1984, 466 U.S. 668.

16       The fundamental issue in a claim of ineffective

17   assistance of counsel is whether counsel's conduct

18   so undermined the proper functioning of the

19   adversarial process that the trial cannot be relied

20   on as having produced a just result, based on

21   Strickland.  However, a defendant is entitled to

22   competent, not perfect representation, based on

23   People versus Morris, 2002, 779 N.E.2d 504.

24       There is a strong presumption that Defendant's

001312

1   representation fell within a range of reasonable

2   professional assistance and that the challenged

3   conduct might be considered sound trial strategy

4   under the circumstances, based on People versus

5   Bates, 2001, 324 Ill.App.3d 812.

6       In order to overcome the presumption, the

7   defendant must show that the outcome would have been

8   different, had it not been for counsel's ineffective

9   representation.  That's based on Bates.

10       Ineffective assistance is most likely to be

11   found when several, rather than isolated, errors

12   are made by a defense attorney and when the evidence

13   in the case is closely balanced, based on People

14   versus Salgado, 1994, 263 Ill.App.3d 238.

15       In determining whether a defendant has been

16   denied his right to the effective assistance of

17   counsel, the Court uses a fact-sensitive analysis

18   which seeks to measure the quality and impact of

19   counsel's representation under the circumstances of

20   the individual case.  That's based on Morris, which

21   is cited at, as previously indicated, 779 N.E.2d

22   504.

23       In addition, a court must consider the totality

24   of the circumstances and determine whether counsel's

001313

5

1   assistance was reasonable considering all the

2   circumstances, based on People versus Garza, 1989,

3   180 Ill.App.3d 263, and the Morris case.

4       The inquiry with respect to the objective

5   standard of reasonableness is not whether a court

6   would retrospectively consider counsel's advice to

7   be right or wrong, but on whether that advice was

8   within the range of competence demanded of attorneys

9   in criminal cases, based on People versus Jones,

10  1991, 144 Ill.2d 242.

11      Trial counsel has a duty to conduct both a

12  factual and legal investigation on behalf of the

13  client, based on Montgomery.  Attorneys have an

14  obligation to explore all readily available sources

15  of evidence that might benefit their clients, based

16  on Morris.  It is fundamental that defense counsel

17  must discuss an alibi defense with his client if

18  appropriate.  Failure to interview witnesses may

19  indicate actual incompetence, particularly when the

20  witnesses are known to trial counsel and their

21  testimony may be exonerating, based on People versus

22  Davis, 1990, 203 Ill.App.3d 129.  Failure to present

23  available witnesses to corroborate a defense has

24  been found to be ineffective, based on Morris.

001314

6

1    Whether defense counsel's failure to investigate

2    amounts to ineffective assistance is determined by

3    the value of the evidence that was not presented at

4    trial and the closeness of the evidence that was

5    presented, based on Montgomery.

6    In an ineffective assistance case, a particular

7    decision not to investigate must be directly

8    assessed for reasonableness in all the

9    circumstances, applying a heavy measure of deference

10   to counsel's judgment. Where circumstances known to

11   counsel at the time of his investigation do not

12   reveal a sound basis for further inquiry in a

13   particular area, it is not ineffective for the

14   attorney to forego additional investigation, based

15   on People versus Morales, 2003, 339 Ill.App.3d 554.

16   In the instant case defense counsel reviewed

17   sworn testimony of the alleged alibi witnesses who

18   testified in the trial relating to the second

19   incident that occurred the evening of the instant

20   case.  Defense counsel also discussed the testimony

21   of purported alibi witnesses with the Defendant.

22   It is well settled that strategic choices made

23   by defense counsel after a thorough investigation of

24   the law and facts relevant to the plausible options

001315

7

1    are virtually unchallengeable, based on Strickland.

2         Decisions concerning which witnesses to call at

3    trial and what evidence to present are matters of

4    trial strategy and cannot form the basis for a claim

5    of ineffective assistance of counsel unless a

6    strategy is so unsound that counsel can be said to

7    have entirely failed to conduct any meaningful and

8    adversarial testing, based on People versus Flores,

9    1989, 128 Ill.2d 66, People versus Jones, 2001, 323

10   Ill.App.3d 451.  Sound trial strategy embraces the

11   use of established rules of evidence and procedure

12   to avoid, when possible, the admission of

13   incriminating statements, harmful opinions, and

14   prejudicial facts, based on People versus Jones, 323

15   Ill.App. 451.

16        Trial counsel's apprehensions of what could

17   occur when a witness is subject to the full brunt of

18   adversarial cross-examination has been found to be a

19   reasonable basis for not calling a witness to

20   testify, again based on People versus Jones.

21        However, the complete failure to impeach the

22   sole witness when significant impeachment is

23   available is not trial strategy and thus may support

24   an ineffective assistance claim, based on Salgado.

001316

8

1    In the instant case Defendant and defense

2    counsel discussed the alibi defense even to the

3    extent of a possible argument on the issue during

4    one of the discussions. Defense counsel told

5    Defendant that, in his experience, a bad alibi

6    defense is worse than no defense.

7    Defense counsel felt there were gaps in the

8    alibi witness testimony, which allegedly covered

9    both offenses.

10   Also, when the Defendant admitted to being at

11   the scene but not being the shooter, defense counsel

12   felt it would be an ethical violation to perpetuate

13   the false testimony of alibi witnesses.  The

14   Illinois Rules of Professional Conduct, Rule

15   3.3(a)(4) states:  In appearing in a professional

16   capacity before a tribunal, a lawyer shall not offer

17   evidence that the lawyer knows to be false.

18   Based upon Defendant's statements to defense

19   counsel, defense counsel would have violated this

20   Rule had he offered an alibi defense.  Furthermore,

21   circumstances revealed a sound basis for no further

22   inquiry on the alibi defense.

23   The gaps in the alibi testimony and the

24   application of the Rules of Professional Conduct

001317

1   revealed there was no sound basis to further

2   investigate the alibi defense.

3       To prevail on a claim of ineffective assistance

4   of counsel, defendant must show that substantial

5   prejudice resulted and that there is a reasonable

6   probability that the final result would have been

7   different had counsel properly investigated, based

8   on People versus Rush, 1990, 294 Ill.App.3d 334.

9       A reasonable probability is a probability

10  sufficient to undermine confidence in the outcome,

11  based on People versus Davis, 1990, 203 Ill.App.3d

12  129, People versus Coleman, 1994, 267 Ill.App.3d

13  895.

14      The Second District Appellate Court in the

15  appeal of the trial court proceedings, cited at 321

16  Ill.App.3d 923, 2001, stated or determined there was

17  ample evidence to find Defendant guilty beyond a

18  reasonable doubt as a principal.

19      Sandoval, one of the alleged alibi witnesses,

20  testified during the hearing on post-conviction

21  relief.  His testimony lacked any credibility.

22      Considering the evidence presented at trial and

23  the foregoing, no substantial prejudice to the

24  Defendant resulted from the lack of presenting the

001318

1    alibi defense.   There was no reasonable probability

2    to undermine the confidence in the original outcome.

3        Based upon all the foregoing and other

4    considerations, the Defendant's petition for

5    post-conviction relief is denied.

6            MS. COLTON:  Judge, can I have a moment,

7    please?

8

9                        (A discussion was had off

10                           the record)

11

12            MS. COLTON:  Judge, at this time I would

13    ask leave to file a notice of appeal of your Honor's

14    ruling, file the original, tender a copy to the

15    State.

16        At this time, Judge, Mr. Amaya is incarcerated

17    for quite a period of time, is not able to afford

18    counsel for the appeal.  We would be asking for the

19    appointment of the State Appellate Defender for

20    appeal of your ruling.

21            THE COURT:  Mr. Amaya, do you want to raise

22    your right hand?

23

24

001319

11

1                              (The Defendant was duly

2                                   sworn by the Court)

3

4            THE COURT:  All right.  You can put your

5    hand down.

6        Do you have any source of income?

7            THE DEFENDANT:  No.

8            THE COURT:  Do you have anything worth more

9    than a hundred dollars?

10           THE DEFENDANT:  No.

11           THE COURT:  You have to answer yes or no.

12           THE DEFENDANT:  No.

13           THE COURT:  All right.  Under the

14   circumstances then I will appoint the Appellate

15   Defender.

16       In light of the fact that notice of appeal is

17   being filed, I suspect there is no reason to advise

18   you of that, because you know you have that right

19   because you're filing your notice.  Do you

20   understand?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Do you have anything else for

23   purposes of the record?

24           MS. COLTON:  No, your Honor.  I'll prepare

001320

1    a long form order for the Appellate Defender.   Thank

2    you.

3

4                              (WHICH were all the

5                               proceedings in the

6                               above-entitled cause on

7                               July 15, 2005)

8                          *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

001321

1    STATE OF ILLINOIS   )
                         )  SS
2    COUNTY OF K A N E   )

3

4                  C E R T I F I C A T E

5         I, Kathleen LeComte, CSR, an Official Court

6    Reporter for the State of Illinois, the Sixteenth

7    Judicial Circuit, Kane County, do hereby certify

8    that I reported in shorthand the proceedings of the

9    Judge's Decision in the above-entitled cause on July

10   15, 2005, before the Honorable Grant S. Wegner,

11   Judge of said Court, and that the above and

12   foregoing typewritten transcript is a true, correct

13   and complete translation and transcript of my

14   shorthand notes so taken at the time and place

15   hereinabove set forth.

16        Dated at St. Charles, Illinois, this 30th day

17   of August, A.D. 2005.

18

19

20        _Kathleen LeComte_____
          Kathleen LeComte, CSR, RMR, RDR
21        Official Court Reporter #84-1788
          16th Judicial Circuit of Illinois

22

23

24                                         001322

                            14

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| **PEOPLE** | ) | |
| | ) | |
| | ) | |
| **vs** | ) | **98 CF 535** |
| | ) | |
| | ) | |
| **ARMANDO AMAYA** | ) | |
| | ) | |
| | ) | |

OCT 03 2003

FILED 112

ENTERED

## AFFIDAVIT

Affiant Arnoldo Castillo hereby swears to the following,

1. That I am working as Private Detective and doing so under the agency License of Potempa Assoc. Inc.

2. That John Potempa is a licensed Private Detective in the State of Illinois.

3. That John Potempa's agency number 117-000664.

4. That John Potempa's Private Detective license number is 115-00147.

5. That I am DBA C.T. Investigations.

6. That on May 22nd, 2003 at approximately 7:00 p.m. I Arnoldo Castillo spoke directly with George Gamboa at 223 Beach St. Aurora, Ill Kane County.

7. That George Gamboa lives at 223 Beach St. Aurora, Ill Kane County.

8. That George Gamboa was not contacted by the Kane County Public Defender's Office, which office represented Armando Amaya 98 CF 535

9. That George Gamboa was not contacted by Kane County Public Defender's Office Investigators.

10. That George Gambo was not contacted by the Kane County Public Defender's Office via telephone, summons, or subpoena to testify on behalf of Armando Amaya 98 CF 535.

C000344

EXHIBIT W

11. That George Ganboa will testify on behalf of Armando Amaya 98 CF 535
When summoned or subpoenaed to court.


Further affiant sayeth not


Subscribed and sworn to before me this

_25th_     day of _July_ , 2003


Notary Public

OFFICIAL SEAL
PATRICK COLTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/12/06


C000345

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| **PEOPLE** | ) | |
| | ) | |
| | ) | |
| **vs** | ) | **98 CF 535** |
| | ) | |
| | ) | |
| **ARMANDO AMAYA** | ) | |
| | ) | |
| | ) | |

OCT 0 3 2003

FILED  112

ENTERED

## AFFIDAVIT

Affiant Arnoldo Castillo hereby swears to the following,

1. That I am working as Private Detective and doing so under the agency License of Potempa Assoc. Inc.

2. That John Potempa is a licensed Private Detective in the State of Illinois.

3. That John Potempa's agency number 117-000664.

4. That John Potempa's Private Detective license number is 115-00147.

5. That I am DBA C.T. Investigations.

6. That on July 20th, 2003 at approximately 6:30 p.m. I Arnoldo Castillo spoke directly with Ramiro Sandoval.

7. That Ramiro Sandoval lives at 367 Beach St. Aurora, Ill Kane County.

8. That Ramiro Sandoval produced Illinois identification with picture and identified himself as Ramiro Sandoval with a date of birth of 4-28-79

9. That Ramiro Sandoval was willing to testify on behalf of Armando Amaya.

10. That Ramiro Sandoval was never contacted by the Kane County Public Defender's Office, which office represented Armando Amaya.

11. That Ramiro Sandoval was not contacted by Kane County Public Defender's Office Investigators.

C000346

12. That Ramiro Sandoval was not contacted by the Kane County Public Defender's Office via telephone, summons, or subpoena to testify on behalf of Armando Amaya 98 CF 535.

13. That Ramiro Sandoval will testify on behalf of Armando Amaya 98 CF 535 When summoned or subpoenaed to court.

Further affiant sayeth not

Subscribed and sworn to before me this

_25th_ day of _July_ , 2003

Notary Public

OFFICIAL SEAL
PATRICK COLTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 03/12/06

C000347