File Date: _5-29-2008_

Case No: _07cv6793_

ATTACHMENT # _____

EXHIBIT _X_____

TAB (DESCRIPTION)

_____

1  STATE OF ILLINOIS        )
                            )  SS.
2  COUNTY OF KANE           )

3      IN THE CIRCUIT COURT FOR THE 16TH JUDICIAL CIRCUIT
                    KANE COUNTY, ILLINOIS

4

5  PEOPLE OF THE STATE OF ILLINOIS, )
                                    )
6                    PLAINTIFF,     )
                                    )
7                VS.                )   NO. 97 CF 2326
                                    )
8  ARMANDO AMAYA,                   )
                                    )
9                    DEFENDANT.     )

10     REPORT OF PROCEEDINGS had at the hearing in the

11  above-entitled cause before the Honorable PHILIP L.

12  DIMARZIO, Judge of said Court, on the 11th day of

13  December, A.D. 1997.

14     PRESENT:

15        MR. DAVID R. AKEMANN,
             State's Attorney, by
16        MR. JAMES GUAGLIARDO,
             Assistant State's Attorney,
17              appeared for the People of the
                State of Illinois;

18        MS. KATHLEEN COLTON,
19              appeared for the Defendant.

20

21

22

23  JACQUELINE S. WELTMER, CSR
    Official Court Reporter

24

EXHIBIT X

1

1

I N D E X

2    WITNESS                    EXAM              PAGE

3    Armando Amaya              Direct              6
     Armando Amaya              Cross              11
4    Armando Amaya              Redirect           13

5    Pablocito Amaya            Direct             14
     Pablocito Amaya            Cross              17
6
     Sonia DeLaTorre            Direct             18
7    Sonia DeLaTorre            Cross              23

8    Elizabeth DeLaTorre        Direct             26
     Elizabeth DeLaTorre        Cross              30
9    Elizabeth DeLaTorre        Redirect           33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                      (Whereupon, the following

2                          proceedings were had

3                          before Court and counsel

4                          in open court:)

5

6        MS. COLTON:  Good morning, may we call People

7    versus Armando Amaya, 97 CF 2326.

8        MR. GUAGLIARDO:  Jim Guagliardo on behalf of the

9    State.  This is over from Judge Hudson's courtroom.

10       MS. PECCARELLI:  Judge, our office is presently

11   assigned to the case, I believe Ms. Colton is entering

12   her appearance or has.

13       MS. COLTON:  I would ask leave to file my

14   appearance, motion for discovery, I also filed on

15   December 5th, a motion for bond reduction.

16            I do have witnesses present this morning; I

17   would first ask that the Public Defender's Office be

18   granted leave to withdraw upon my entry of appearance.

19       THE COURT:  Mr. Amaya, do you wish to have Ms.

20   Colton be your lawyer from this point forward?

21       THE DEFENDANT:  Yes.

22       THE COURT:  I will allow the Office of the Public

23   Defender to withdraw.

24            I will reserve ruling at this time as to

1    whether the defendant should be assessed costs,

2    payment towards the cost of legal representation

3    provided up to this point.

4         Sir, a hearing will be held at the end of the

5    case and at that time the judge will determine whether

6    you should be required to pay something towards the

7    cost of the public defender's representation.

8         Do you understand that that hearing will be

9    held at the end of the case?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Very well.

12        MS. PECCARELLI:  Judge, I would ask that it be

13   noted that I did tender to Ms. Colton, I believe, all

14   the discovery that I had received to date.

15        MS. COLTON:  I will acknowledge receipt of packet

16   of discovery and copy of the indictment, as well,

17   Judge.

18        THE COURT:  Very well.  How many witnesses should

19   I anticipate?

20        MS. COLTON:  I have the defendant who will

21   testify, his father and two additional witnesses.

22        THE COURT:  Are there other status matters that I

23   may call and dispense with briefly before we take up

24   this hearing?

1          What I am going to do is pass this, very

2     shortly, I will run through the cases I can do quickly

3     and then we will get back to this.

4          MS. COLTON:  Thank you, Judge.

5                         (Whereupon a brief recess was

6                          taken, after which the following

7                          proceedings were had in open

8                          court:)

9

10         THE COURT:  People vs. Amaya, 97 CF 2336.

11         MR. GUAGLIARDO:  Jim Guagliardo on behalf of the

12    State.

13         MS. COLTON:  Kathleen Colton on behalf of the

14    defendant.

15         Judge, the defendant is now present in open

16    court.  I would be asking to proceed on my motion to

17    reduce bond.

18         In addition to the defendant, I will have

19    three witnesses to briefly present.

20         THE COURT:  Very well.

21         MS. COLTON:  Did you want them to all approach at

22    this point?

23         THE COURT:  Yes; yes, please.

24         MS. COLTON:  Judge, the defendant's father is

1   Spanish-speaking and the interpreter is present this

2   morning.

3        THE COURT:  Ms. Interpreter, would you please

4   state your name?

5        THE INTERPRETER:  Patricia Gonzalez,

6   G-O-N-Z-A-L-E-Z.

7        THE COURT:  Thank you.  Will everyone who intends

8   to testify, please raise your right hand and the clerk

9   will administer the oath.

10                         (Witnesses sworn.)

11       THE COURT:  You may proceed.

12       MS. COLTON:  Thank you, Judge.

13            Judge, I'd ask to begin with the defendant.

14

15                    ARMANDO AMAYA,

16   called as a witness herein, having been first duly

17   sworn, was examined and testified as follows:

18                    DIRECT EXAMINATION

19   BY MS. COLTON:

20       Q    You are Armando Amaya; correct?

21       A    Yes.

22       Q    And you are the defendant in this case?

23       A    Yes.

24       Q    How old are you, Armando?

6

1    A    18.

2    Q    18 years old.  When did you turn 18?

3    A    September 24th.

4    Q    Armando, you are currently on juvenile

5    parole; is that correct?

6    A    Yes.

7    Q    And what is the case that you are on juvenile

8    parole for?

9    A    Discharge of firearm.

10    Q    That aggravated discharge of a firearm?

11    A    Aggravated.

12    Q    And that case happened when you were 14 years

13    old; is that correct?

14    A    Yes.

15    Q    And you were placed on probation and then

16    ultimately sent to the Youth Department of Corrections

17    on that case; is that correct?

18    A    Yes.

19    Q    When were you released on parole from the

20    Youth Department of Corrections?

21    A    It was January 22nd.

22    Q    January 22, 1997?

23    A    Yes.

24    Q    Make sure you speak nice and loud so the

1  Judge can hear.

2      A    Yes.

3      Q    And you have a parole officer assigned to you

4  from the Rockford office; is that correct?

5      A    Yes.

6      Q    Armando, other than that case as a juvenile,

7  and the charge for which you stand before the Court

8  this morning, do you have any other cases pending?

9      A    Yes.

10     Q    What is the other case that you have pending?

11     A    Resisting arrest, to a peace officer.

12     Q    That's in the Aurora branch court; correct?

13     A    Yes.

14     Q    And what is the court date set for that case?

15     A    I'm not sure if it's February or January.

16     Q    Is that case up for trial?

17     A    Yeah -- Yes.

18     Q    And did you appear on each and every one of

19  those court dates assigned to that case before you

20  were arrested on this charge?

21     A    Yes.

22     Q    Have you ever failed to appear for a court

23  date before?

24     A    No.

1       Q    Okay.  Have any warrants for your arrest ever

2    been issued for failure to appear for a court date?

3       A    No, but what I know right now, I got a

4    warrant cause I didn't go to court 'cause I was in

5    custody.

6       Q    And what case is that for?

7       A    Resisting arrest.

8       Q    That's the one you just mentioned; correct?

9       A    Yes.

10      Q    But other than that, there have never been

11   any warrants issued for your arrest to your knowledge

12   for failure to appear in court; correct?

13      A    Correct.

14      Q    Okay.  Other than that resisting arrest case

15   that is pending and set for trial, do you have any

16   adult misdemeanor convictions?

17      A    No.

18      Q    Do you have any adult felony convictions?

19      A    No.

20      Q    Okay.  Now, you need at this point $50,000

21   cash to post for bond; is that correct?

22      A    Yes.

23      Q    And are you able to post that amount of cash?

24      A    No.

1      Q      How much money do you believe you or your
2   family could post for cash bond if the Judge were to
3   reduce the bond in this case?
4      A      Probably ten.
5      Q      $10,000 cash?
6      A      Yeah.
7      Q      Would any of that be your money?
8      A      No.
9      Q      Okay.  Were you working prior to being
10  arrested on this charge?
11     A      If I was working?
12     Q      Yes.
13     A      Yes, I was working at temporary service.
14     Q      What's the name of that temporary service?
15     A      First Choice.
16     Q      I'm sorry?
17     A      First Choice.
18     Q      And how long had you been employed at that
19  temporary service?
20     A      Three months.
21     Q      And you were arrested on this case on October
22  29, 1997, and you have been in custody ever since;
23  correct?
24     A      Yes.

1      Q    Now, if you were released on bond, do you

2    understand that you would have to appear for each and

3    every court date?

4      A    Yes.

5      Q    And do you, can you promise the Judge that

6    you would, in fact, appear on each and every court

7    date if he lowered your bond and would be released?

8      A    Yes, I promise to be at every court date.

9      Q    Do you have a car that would get you back and

10   forth to court?

11     A    My dad is my transportation.

12     Q    Do you have a valid driver's license?

13     A    No.

14     Q    So, your father would be responsible for

15   taking you back and forth to court?

16     A    Yes.

17   MS. COLTON:  Thank you, Judge, I have no other

18   questions of the defendant.

19   THE COURT:  Mr. Guagliardo, you may inquire.

20

21                    CROSS-EXAMINATION

22   BY MR. GUAGLIARDO:

23     Q    How long have you been without a driver's

24   license?

```
1        A     I never had a driver's license.

2        Q     You don't own your own car?

3        A     No.

4        Q     Who do you live with?

5        A     My mom and my dad.

6        Q     Whose money would the $10,000 be?

7        A     My mom and my dad's.

8        Q     None of the money would be yours?

9        A     No.

10       Q     How long have you lived in Illinois?

11       A     Seven years.

12       Q     Where did you live before that?

13       A     California.

14       Q     Who did you live with in California?

15       A     Mom and dad.

16       Q     Do you still have relatives in California?

17       A     Yeah.

18       Q     Who do you know or what relatives do you have

19   in California?

20       A     My uncle, I'm not sure which one it is, it's

21   a bunch and I forget my uncle's name, I haven't seen

22   him in awhile.

23       Q     What part of California is that?

24       A     I think it's Long Beach.
```

1        MR. GUAGLIARDO:  Judge, no further questions of

2    the defendant.

3        THE COURT:  Any redirect?

4

5                       REDIRECT EXAMINATION

6    BY MS. COLTON:

7        Q    Armando, I neglected to ask you your address

8    in Aurora is 617 Spring Street; correct?

9        A    Correct.

10        Q    And that's the home that your parents own?

11        A    Yes.

12        Q    And your brothers and sisters also live

13    there; correct?

14        A    Yes.

15        Q    Now, you have lived in Illinois for 7 years,

16    during that 7 years, have you ever gone outside the

17    State of Illinois?

18        A    No, I haven't.

19        Q    Okay.  You haven't travelled back to

20    California for any reason?

21        A    No.

22        Q    Do you understand if the Judge were to

23    release you on bond and you post bond, you couldn't

24    travel outside the Illinois -- the State of Illinois

                              13

1    without permission of the Court; do you understand

2    that?

3        A    Yes.

4        MS. COLTON:  I have nothing further of the

5    defendant.

6        THE COURT:  Any recross?

7        MR. GUAGLIARDO:  No, Judge.

8                              (Witness excused.)

9        THE COURT:  You may call your next witness.

10       MS. COLTON:  Thank you, Judge, if the defendant

11   could step back, I will have the father step up.

12

13                    PABLOCITO AMAYA,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                    DIRECT EXAMINATION

17       Q    Sir, could you please state your name?

18       A    Pablocito (phonetic) Amaya.

19       Q    Could you spell your last name, please?

20       A    My last name?

21       Q    Yes, please, spell it?

22       A    A-M-A-I-A.

23       Q    And are you related to Armando?

24       A    Yes.

1      Q    You are his father; is that correct?

2      A    Yes.

3      Q    Sir, are you employed?

4      A    Yes.

5      Q    Where are you employed?

6      A    Central Shaw (phonetic).

7      Q    And how long --

8      THE INTERPRETER:  Sorry?

9   BY MS. COLTON:

10     Q    How long have you been employed there?

11     A    7 years.

12     Q    Have you lived in the State of Illinois for 7

13   years?

14     A    Um-hum.

15     Q    And is that with your wife and your children?

16     A    Yes.

17     Q    And what is your address in Aurora?

18     A    617 Spring.

19     Q    Now, if Armando would be released on bond,

20   would he be allowed to live with you at that address?

21     A    Yes.

22     Q    And would you be responsible for getting him

23   back and forth to court?

24     A    Yes.

1      Q      Have you been present at each of his court
2    dates before today's date?
3      A      Yes.
4      Q      And do you have a valid driver's license and
5    a car?
6      A      Yes.
7      Q      Sir, how much cash do you believe that you
8    and your family can raise to post as bond in this
9    case?
10      A      It depends on how much it is.
11      Q      Well, do you have an amount that you believe
12    you can post?
13      A      Well, I think so.
14      Q      Do you believe that if the Judge were to
15    reduce the bond to $10,000 cash that you would be able
16    to post that on your son's behalf?
17      A      Well, I could get them.
18      Q      You believe you could get that money?
19      A      I think so.
20      Q      Okay.  Do you understand that if you posted
21    that amount of cash and your son did not appear in
22    court, that there is a possibility you could lose that
23    bond money?
24      A      Um-hum.

1        Q     And you are still willing to post it?

2        A     Yeah, if I can get it, of course.

3        MS. COLTON:  I have no further questions of the

4    defendant's father.

5        THE COURT:  Mr. Guagliardo, you may inquire.

6

7                        CROSS-EXAMINATION

8    BY MR. GUAGLIARDO:

9        Q     Sir, you lived in California, prior to living

10   in Illinois?

11       A     Yes.

12       Q     Do you still have relatives and contacts in

13   California?

14       A     Yes.

15       Q     Who is that?

16       A     My brothers.

17       Q     Brothers, how many brothers?

18       A     Well, now there is only one there, and the

19   other one, Enavos (phonetic), went to El Paso.

20       Q     Where were you born, sir?

21       A     In El Tomita (phonetic), in Durango, Mexico.

22       Q     Do you still have relatives there?

23       A     Yeah.

24       Q     How, how are you going to raise $10,000?

1              How are you going to get that money?

2        A    Well, I would ask people and I am about to,

3    to get some money for an accident I had on my foot.

4        Q    Can you raise more than $10,000; can you

5    raise $50,000?

6        A    I don't think so.

7        Q    Do you live in a home or an apartment?

8        A    A house, I am renting.

9        Q    Do you own any vehicles?

10       A    Yes.

11       Q    Do you have bank accounts, checking accounts?

12       A    No, no checking accounts.

13       MR. GUAGLIARDO:  Judge, no further questions.

14       THE COURT:  Any redirect?

15       MS. COLTON:  No, thank you, Judge.

16                         (Witness excused.)

17       THE COURT:  You may call your next witness.

18

19                    SONIA DELATORRE,

20   called as a witness herein, having been first duly

21   sworn, was examined and testified as follows:

22                    DIRECT EXAMINATION

23   BY MS. COLTON:

24       Q    Ma'am, could you please state your name and

```
1    spell your last name for the Court?

2         A    Sonia DeLaTorre, D-E-L-A-T-O-R-R-E.

3         Q    Your first name is Sonia; is that correct?

4         A    Yes.

5         Q    Ms. DeLaTorre do you know Armando Amaya?  How

6    is it you know him?

7         A    I, he's a friend.

8         Q    How long have you known him?

9         A    Probably for a couple months.

10        Q    Did you know him on October 29, 1997?

11        A    Yes.

12        Q    And do you, were you with him on that date?

13        A    Um-hum.

14        Q    You have to answer out loud?

15        A    Yes.

16        Q    Do you know where you were with him on that

17   date?

18        A    My house.

19        Q    Where is your house located?

20        A    531 North Avenue.

21        Q    Is that in the City of Aurora?

22        A    Yes.

23        Q    Now, on October 29th of 1997, what time were

24   you with Armando Amaya on that date?
```

1       A      From 6:30 to like ten-thirty.

2       Q      And that's p.m.?

3       A      Yes.

4       Q      6:30 p.m. until ten-thirty p.m.?

5       A      Yeah.

6       Q      And who else was present at your house from

7    6:30 p.m. until ten-thirty p.m. besides you and

8    Armando?

9       A      My two sisters, Natalie and two of our other

10   friends.

11      Q      Can you name those other people?

12      A      Pamela DeLaTorre, Elizabeth DeLaTorre --

13      Q      You need to say the names again.  Say them

14   slowly so the court --

15      A      Pamela DeLaTorre, Elizabeth, George Gamboa

16   (phonetic) and Ramiro Sandoval (phonetic).

17      Q      Sandoval is the last name of the person; is

18   that correct?

19             Now, are you sure of the time that Armando

20   left your house on that day?

21      A      Yes.

22      Q      And how is it you are sure of the time?

23      A      Because his program had just finished; I'm

24   not sure which one it was; it was around ten-thirty

1   when he left.

2       Q    Was that a television program or radio

3   program?

4       A    Television.

5       Q    Now you, in fact, called the Aurora Police

6   Department, the day after October 29th; correct?

7       A    Yes.

8       Q    And that's on October 30th?

9       A    Um-hum.

10      Q    What was the reason you called the Aurora

11  Police Department on October 30, 1997?

12      A    One of my friends called me and asked me if I

13  had seen him and I said no, and they told me that they

14  thought they had gotten pulled over; to call the

15  police station to see if it was true and I called and

16  they had him.

17      Q    And you called the Aurora police station;

18  correct?

19      A    Yes, uh-huh.

20      Q    And, in fact, were officers then sent to your

21  house to talk to you?

22      A    Yes.

23      Q    And also your sister?

24      A    Yes.

1        Q    And, in fact, did you at this time give a

2    statement to Aurora police officers?

3        A    Yes.

4        Q    Where did that statement occur?

5        A    At the police station.

6        Q    And when did it occur, if you know?  What

7    date?

8        A    The next day on the 30th.

9        Q    October 30th?

10       A    Um-hum.

11       Q    And did you give a tape-recorded statement to

12   the police?

13       A    Yes.

14       Q    And during that tape-recorded statement, they

15   asked you certain questions about where Armando was on

16   the 29th?

17       A    Yes.

18       Q    And did you, in fact, tell them the same

19   thing you have testified to today; that he was present

20   at your house with you and your sisters and the two

21   young men and that you believe that he left

22   approximately ten-thirty or eleven at night?

23       A    Yes.

24       MS. COLTON:  I have no further questions of this

1    witness, Judge.

2        THE COURT:  Mr. Guagliardo, you may inquire.

3

4                        CROSS-EXAMINATION

5    BY MR. GUAGLIARDO:

6        Q    Back on October 29, 1997, how long had you

7    known the defendant?

8        A    I had known him since probably before August.

9        Q    And he's still a friend of yours?

10       A    Yes, um-hum.

11       Q    That's yes?

12       A    Yes.

13       Q    How did he get to your house that night?

14       A    They had him, they took him to my house.

15       Q    I'm sorry, I can't hear.

16       A    They drove to my house.

17       Q    And was that in a 1987 white Chevy Celebrity?

18       A    Yes.

19       Q    And was George Gamboa (phonetic) and Ramira

20   Sandoval at your house all the time from 6:30 to

21   ten-thirty p.m.?

22       A    I believe they were but I'm not sure if they

23   left or not because like during the time, we were

24   like, some of them, they went to my other sister's

1    room and we stayed in my room so I'm not sure if they

2    left or not.

3        Q    When you say you stayed in your room; you and

4    who?

5        A    Me, 'Mando and my sister.

6        Q    So Armando was in your sight at all times

7    from 6:30 to ten-thirty p.m.?

8        A    Yes.

9        Q    But George Gamboro and Ramiro Sandoval were

10   not?

11       A    No, they were in the other room with my

12   sister.

13       Q    How did Mr. Amaya leave your house; how did

14   he get out of your house?

15       A    They all left together.

16       Q    And that was in a white Chevy Celebrity?

17       A    Yes.

18       Q    And exactly what time did they leave?

19       A    About ten-thirty.

20       Q    Do you know it was ten-thirty?

21       A    I'm pretty sure it was ten-thirty.

22       Q    How are you pretty sure it was ten-thirty?

23       A    Because that program finishes at ten-thirty

24   but I don't remember which one it was.

1          Q     You don't remember which one it was?

2          A     No, it was ten-thirty.

3          Q     Is it, what was the subject of the program?

4          A     I don't remember.

5          Q     You don't remember?

6                Is it a news program?

7          A     No, it was like a show if --

8          Q     A drama?

9          A     It comes on, I'm pretty sure, comes on every

10    day at ten-thirty; but I don't know what the show is.

11         Q     You still don't know?

12         A     No, I don't remember.

13         Q     Is it possible that they left at 10:10?

14         A     No, it was ten-thirty, 'cause when they were

15    leaving, I looked at the clock; it was ten-thirty.   It

16    was ten-thirty.

17         Q     You remember looking at the clock?

18         A     Um-hum.

19         MR. GUAGLIARDO:   Judge, I have no further

20    questions.

21         THE COURT:   Any redirect?

22         MS. COLTON:   No, thank you, not of this witness.

23              I have one more, Judge.

24

1

2

3                     ELIZABETH DELATORRE,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                     DIRECT EXAMINATION

7    BY MS. COLTON:

8        Q    Ma'am, could you, will you please state your

9    name?

10       A    Elizabeth DeLaTorre.

11       Q    D-E-L-A-T-O-R-R-E?

12       A    Yes.

13       Q    Elizabeth, you are the sister of the young

14   lady who just testified; is that correct?

15       A    Yes.

16       Q    You also live at 531 North Avenue?

17       A    Yes.

18       Q    And directing your attention to October 29th

19   of 1997, were you -- Do you, first of all, do you know

20   Armando Amaya?

21       A    Yes.

22       Q    How long had you known him before October 29,

23   1997?

24           THE REPORTER:  I can't hear.

1          A     Before August.

2     BY MS. COLTON:

3          Q     Was he a friend of yours or friend of your

4     sister or both?

5          A     He was a friend of all of us.

6          Q     When you say all of us, are you referring to

7     yourself and your sisters?

8          A     Um-hum, yes.

9          Q     Did you see Armando Amaya on the evening of

10    October 29, 1997?

11         A     Yes.

12         Q     Do you recall what time he, you saw him?

13         A     Yeah, he got there like at 6:30 or something

14    and he left at ten-thirty.

15         Q     When you say there, are you referring to your

16    house at 531 North Avenue?

17         A     Yes.

18         Q     Who else was present besides yourself and Mr.

19    Amaya?

20         A     George --

21         THE REPORTER:  Excuse me, I can't hear.

22         THE WITNESS:  George Gamboa, Ramirez (phonetic)

23    Sandoval, Sonia DeLaTorre.

24         MS. COLTON:  Judge, if I could just add for the

1    court reporter, I believe Sandoval, I believe the

2    first name is Ramiro.

3              Is that correct?

4        MR. GUAGLIARDO:   That is correct.

5    BY MS. COLTON:

6        Q    And you believe they got there about 6:30?

7        A    Yes.

8        Q    Did you see them arrive?

9        A    Yes.

10       Q    And did they drive to your house?

11       A    Yes.

12       Q    Did they drive in a white Chevy?

13       A    Yes.

14       Q    Okay.  Now, during the time that they were

15   all present, were you with Armando Amaya during that

16   period of time?

17       A    Yes, I was, me and my sister.

18       Q    And you have another sister; correct?

19       A    Yes.

20       Q    And did you see George Gamboa and Mr.

21   Sandoval during that whole period of time as well?

22       A    No, because when they left together, I stayed

23   in the room with my sister Sonia.

24       Q    Do you know what time Armando left your house

1    that night?

2         A    Like, it was past ten-thirty or ten-thirty.

3         Q    Okay.  How do you know that?

4         A    Because, we were watching TV and we were

5    watching, finished at ten-thirty.

6         Q    Do you know the name of the show you were

7    watching?

8         THE REPORTER:  I didn't hear.

9    BY MS. COLTON:

10        Q    Would --

11        A    Roseanne, I think it was.

12        Q    You think it was Roseanne; but you're not

13   sure?

14        A    Yeah.

15        Q    Now, did you also give a statement to the

16   Aurora police in this case?

17        A    Yes.

18        Q    And was that because they came to your house

19   and asked you to come to the police station?

20        A    Yes.

21        Q    And did you give the statement on tape, on an

22   audio tape?

23        A    Yes.

24        Q    With a tape recorder running?

1      A    Uh-huh.

2      Q    Did you tell the police officer substantially

3    same thing you have told the Judge here this morning

4    in court?

5      A    Yeah.

6      MS. COLTON:   I have no further questions of this

7    witness.

8      THE COURT:   Mr. Guagliardo, you may inquire.

9

10                        CROSS-EXAMINATION

11    BY MR. GUAGLIARDO:

12      Q    Ms. DeLaTorre, you are still friends with Mr.

13    Armando Amaya?

14      A    Yes.

15      Q    Are you a girlfriend or friend?

16      A    Just a friend.

17      Q    Back on that evening, if I understand your

18    testimony correctly, you did not see Mr. Gamboa and

19    Mr. Sandoval all the time from 6:30 to ten-thirty p.m;

20    correct?

21      A    No, not the whole time.

22      Q    But you, in that entire four hours, were also

23    with Mr. Amaya; is that your testimony?

24      A    Yes.

1     Q   And what were you doing for that four hours?

2     A   Well, we were watching TV and then we were in

3 our room, when my dad got home we were in our room

4 just talking, listening to the radio.

5     Q   So you watched TV for awhile and then you'd

6 stop watching TV?

7     A   Yeah.

8     Q   And the last thing you did was watch TV?

9     A   Yeah.

10    Q   You didn't talk at all after you watched TV?

11    A   No, watching TV when they left.

12    Q   So that the show ended and they just got up

13 and left?

14    A   Yeah, they had to go; yeah.

15    Q   You're not sure exactly what the show was?

16    A   I think it was Roseanne.

17    Q   And are you sure of the time slot of that

18 show?

19    A   Yeah, 'cause it finishes at ten-thirty.

20    Q   You are positive it doesn't go from 9:30 to

21 ten?

22    A   No.

23    Q   And that's how you know they left at what

24 time, do you think?

1      A    Ten-thirty, little bit past ten-thirty.

2      Q    It was a little past ten-thirty?

3      A    Or ten-thirty.

4      Q    And did you see how they left the car or how

5    they left the house?

6      A    In a car.

7      Q    What form of transportation?

8      A    In a white car.

9      Q    A white car?

10     A    White car.

11     Q    Do you recall who was driving?

12     A    George, I think.

13     Q    Do you recall where Armando was sitting?

14     A    I don't know; probably in the front seat.

15     Q    You don't know?

16     A    Probably in the front seat.

17     Q    You don't know?

18     A    I don't know.

19     Q    And did you watch them get into the car?

20     A    No.

21     Q    Did you look at the clock when they left?

22     A    No, I didn't.

23     Q    You are just going off your memory of what

24   show you might have watched; is that correct?

1        A    Yeah.

2        MR. GUAGLIARDO:  Judge, I have no further

3    questions.

4        THE COURT:  Any redirect?

5        MS. COLTON:  Just briefly.

6

7                    REDIRECT EXAMINATION

8    BY MS. COLTON:

9        Q    Ms. DeLaTorre, is Jackson Street near your

10    house or Jackson Avenue?

11        A    Yeah, it's just right around the corner.

12        Q    Right around the corner from your house?

13        A    (Indicating).

14        Q    And your father was home at least for a

15    portion of the time that Armando was at your house

16    that night; is that correct?

17        A    My --

18        THE REPORTER:  I can't hear.

19        THE COURT:  All right.  Please --

20        THE WITNESS:

21        A    My dad, I think my dad seen 'em when they

22    were leaving already.

23        Q    But you're not sure of that, about that;

24    correct?

1      A    I'm not sure, but he must have, yeah.

2      MS. COLTON:  I have no further questions of the

3   witness.

4      THE COURT:  You may inquire further, Mr.

5   Guagliardo.

6      MR. GUAGLIARDO:  No further questions.

7      MS. COLTON:  Judge, I would rest at this point as

8   far as testimony goes.

9      THE COURT:  The witnesses may be seated.

10          Does the State wish to present evidence?

11      MR. GUAGLIARDO:  Judge, I would make a proffer at

12   this time of a sworn synopsis of Officer Kevin Convey

13   (phonetic) of the Aurora Police Department, and a

14   transcript of the taped statement from a witness in

15   this case.

16      MS. COLTON:  Judge, the only objection I would

17   have to the proffer -- Oh, it does show time of

18   offense, I'm sorry.

19          I don't have an objection to that, then,

20   Judge.

21      THE COURT:  Very well.  I will receive the proffer

22   and I will read it here in open court.

23                  (Brief pause.)

24      THE COURT:  I have now read the two documents that

1    constitute the proffer.

2           Any other evidence from either side?

3       MR. GUAGLIARDO:  No, Your Honor.

4       MS. COLTON:  May I be allowed to supplement the

5    proffer based on a portion of the police report that

6    I'm in receipt of, as to the stopping of the

7    defendant's vehicle or the vehicle the defendant was

8    in?

9       THE COURT:  Yes.

10      MS. COLTON:  That would be from Aurora Police

11   Department, from 97-24443 and Judge, briefly, it's

12   Investigator Scott Wolters' report of the stopping of

13   the white four-door Chevrolet Celebrity stopped in the

14   area of Jackson Street, at 10:31 p.m. on October 29,

15   1997, and at that time, the time of the stop, it was a

16   felony traffic stop on the vehicle at that time, and

17   Mr. Gamboa was the driver, Mr. Amaya was the front

18   seat passenger and Suspect Sandoval was in the rear

19   passenger seat, according to the report that I am

20   referring to; and Judge, I would just ask that the

21   Court consider the time of the stop as our portion of

22   the proffer as being 10:31.

23      THE COURT:  It is so noted.

24      MS. COLTON:  Thank you, Judge.

1          THE COURT:  We will move on, then, to the argument

2     portion.

3               Ms. Colton?

4          MS. COLTON:  Thank you, Judge.

5               You heard what I've heard would be rather

6     unique testimony this morning.

7               Normally, in bond reduction motion I'm not in

8     a position to present witnesses that can come before

9     the Court and give their sworn testimony as to where a

10    defendant was at the time of an alleged offense.

11              The State has offered a proffer this morning

12    which states that the offense was allegedly committed

13    at 10:17 p.m. on October 29, 1997.

14              You have heard testimony from the DeLaTorre

15    sisters this morning that Mr. Amaya was present at

16    their home up until ten-thirty; and you have also

17    heard my proffer that the stopping of the automobile

18    which Ms. DeLaTorre testified Jackson Street being

19    right around the corner from her house occurred at

20    10:31 p.m., approximately 16 or 17 minutes after the

21    alleged incident.

22              Judge, Mr. Amaya's father has come before the

23    Court this morning and told the Court that he will

24    attempt to raise $10,000 in cash by asking friends and

 1    family members for that money.

 2              I understand that the defendant does have a

 3    juvenile record.  He has a case pending of resisting;

 4    but that case is set for trial.

 5              He has never failed to appear for court,

 6    except for the one missed appearance while he's been

 7    in custody on this case.

 8              He has no adult record, Judge, and I would be

 9    asking, respectfully, that the Court consider reducing

10    the bail to $100,000, with ten percent to apply.

11              We are going to be asserting an alibi defense

12    in this case.  The defendant, previous to my entering

13    my appearance, had demanded trial.  I am also going to

14    be filing, I have tendered a copy to counsel this

15    morning, a motion to quash his arrest and to suppress

16    evidence in the case; so based on all of the evidence

17    that you have heard this morning, including the

18    proffers, Judge, I would ask for reduction in the bail

19    to $100,000, with ten percent to apply.

20              Thank you, Judge.

21        THE COURT:  Mr. Guagliardo?

22        MR. GUAGLIARDO:  Thank you, Your Honor.

23              Your Honor, we oppose any sort of bond

24    reduction in this matter.  $50,000 full cash seems to

1    be a very appropriate bond for this type of situation.

2    Three things that stand out:  Number one,

3    there is also a concern that the defendant may flee.

4    This defendant does have relatives, as he said and his

5    father said, in another state, that being California.

6    His father also was born in Mexico and still has

7    relatives there.

8    Your Honor, the second concern, obviously, is

9    the safety of the public.  This, this defendant is on

10   juvenile parole for aggravated discharge of a firearm.

11   He is now charged with aggravated discharge of a

12   firearm while being on parole.  Both of those threaten

13   public safety, obviously.

14   Your Honor, we've had some evidence of an

15   alibi today; moving on to my third point, I don't

16   think, I don't think it goes without saying that the

17   weakest form of alibi is alibi from friends, rather

18   than somebody at a business establishment or something

19   who doesn't even know the defendant; and not only are

20   these friends, these are young friends; the alibi is

21   incredibly convenient.

22   He was stopped at 10:31 p.m., the shooting

23   was at  10:17, and both these friends come in here

24   today and say that they are positive he left right at

1   10:30, right after the show ended.

2          No, no conversation after the show, no five,

3   ten minutes of conversation; show ended, ran in the

4   car, immediately got stopped.

5          There, there is a positive ID of this

6   defendant and the car involved, so I think that, at

7   10:17, so the alibi, really, given the source of the

8   alibi and the convenience of the alibi really doesn't

9   go very far and we, we argue that the bond should

10  stay.

11     MS. COLTON:   If I may respond to the State's

12  argument regarding alibi?

13          If I had brought in witnesses who didn't know

14  Mr. Amaya, I think the State's argument would probably

15  be that they, how could witnesses who didn't know him

16  be sure this was the person they had seen at a certain

17  date, on a certain date at a certain time.

18          We are not creating a convenient alibi,

19  Judge.  I became aware of the alibi based on police

20  reports.  And the police officers thought enough of

21  these young women to bring them down to the police

22  station and take statements.

23          You have not heard any impeachment of their

24  statements by the State this morning and they went to

1    the police station, the one sister Sonia DeLaTorre,

2    after having called the police when she heard what was

3    going on with Mr. Amaya which is what people are

4    supposed to do and what people are often criticized

5    for not doing, by the state's attorney; why didn't you

6    go to the police.

7          Here we have a situation where they did go to

8    the police station and said he was with us, came to

9    Court, sat in court almost two hours waiting to

10   testify; and I would ask that you lend whatever

11   credibility you believe is appropriate to their

12   testimony, Judge; but I would just make that comment

13   on the State's comment on the alibi.

14       THE COURT:  One of the primary purposes of bond is

15   the protection of the public.  The evidence shows that

16   this defendant was on juvenile parole for aggravated

17   discharge of a firearm, a most serious offense.

18         The defendant was identified as the shooter

19   in the drive-by shooting in which a man was shot in

20   the back, according to the proffer.  Now, the

21   defendant has an alibi defense to present; this is a

22   case that needs to be tried, and the sooner that it is

23   tried, the better.

24         The eyewitness identified this defendant as

1     being the shooter, and this identification took place

2     very shortly after the offense, and in relatively

3     close proximity and in terms of distance, as I gather.

4          In any event, I find that the evidence is

5     such and the nature of the offense is such, and the

6     defendant's background is such, that this bond is not

7     excessive and I will therefore deny the motion.

8          MS. COLTON:   Thank you.

9          Judge, I have filed a motion to quash arrest

10    and suppress evidence.  Since this case is assigned to

11    Judge Hudson, I know Your Honor is probably not in a

12    position to give us a date for hearing.

13        THE COURT:   I don't have his book; I could give

14    you a short status date in front of him so you could

15    then have a date set.

16        MR. GUAGLIARDO:   Tomorrow morning is fine, Judge.

17        MS. COLTON:   Could the case be set over for our

18    appearance tomorrow morning, December 12th at 9:00

19    just for the purpose of setting a hearing date?

20        MR. GUAGLIARDO:   Is that an agreed date?

21        MS. COLTON:   That I think would be an agreed date,

22    as I filed the motion.

23        THE COURT:   Very well.

24              (Which were all the proceedings had

41

1              in said matter on said date.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1   STATE OF ILLINOIS   )
                        ) SS.
2   COUNTY OF KANE      )

3        I hereby certify that I reported in shorthand

4   the proceedings had at the hearing in the above-

5   entitled cause, and that the foregoing Report of

6   Proceedings is a true, correct and complete transcript

7   of my shorthand notes so taken at the time and place

8   herein set forth.

9

10

11                          JACQUELINE S. WELTMER, CSR
                            Official Court Reporter,
12                          16th Judicial Circuit of
                            Illinois
13

14

15

16

17

18

19

20

21

22

23

24
```